UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **VERONICA-MAY (neé NICHOLAS) CLARK,**<br><br>                                        Plaintiff,<br><br>v.<br><br>**ANGEL QUIROS, DR. GERALD VALETTA, RICHARD BUSH, and BARBARA KIMBLE-GOODMAN,**<br><br>                                        Defendants.[1] | **FIRST AMENDED COMPLAINT**<br><br>Case No.: 3:19-cv-575 (VLB)<br><br><br>July 30, 2021 |

## NATURE OF THIS ACTION

1.  Plaintiff  Veronica-May (neé Nicholas) Clark ("Ms. Clark") brings this action under 42 U.S.C. § 1983 based upon Defendants' failure to provide Ms. Clark with medically necessary treatment, in violation of the Eighth Amendment to the United States Constitution.  Ms. Clark further brings this action against Defendants Dr. Gerald Valletta, Richard Bush, and Barbara Kimble-Goodman for intentional infliction of emotional distress.

2.  Ms. Clark brings this action to seek injunctive relief, declaratory relief, and damages to remediate Defendants' violations of her rights.

3.  Ms. Clark is a transgender woman. Although Connecticut Department of Correction ("DOC") providers diagnosed Ms. Clark with gender dysphoria no later than May 2016—and possibly earlier—DOC refused to provide her with *any* form of medically necessary treatment related to that diagnosis until

---

[1] **Plaintiff respectfully requests that the Court order the Clerk of Court to amend the caption of this action as set forth above.**

nearly two years later and after her attempted self-castration. Before September 2017, Defendants simply refused to treat Ms. Clark's gender dysphoria, thereby exacerbating her emotional and physical distress.

4. Even after DOC finally allowed Ms. Clark to receive feminizing hormones in September 2017, DOC has continued to deny Ms. Clark consistent and appropriate medical care for her gender dysphoria that meets the relevant standards of care. Because Defendants failed to ensure that Ms. Clark received blood tests and endocrinology consults on a medically necessary basis, her hormone levels oscillated and took years to reach an appropriate range. And despite repeated requests to Defendants, DOC has denied Ms. Clark *any* further gender transition-related treatment for her gender dysphoria, including evaluations for surgical intervention.

5. As a result of DOC's consistent denials of adequate medical treatment for her diagnosed gender dysphoria, Ms. Clark has suffered both physical harm and persistent, severe emotional distress.

## JURISDICTION

6. This Court has jurisdiction over Ms. Clark's Section 1983 claim, pursuant to 42 U.S.C. §§ 1331 and 1343(a)(3), and supplemental jurisdiction over Ms. Clark's state law intentional infliction of emotional distress claim because it arises out of the same actions and omissions.

7. Venue is appropriate in this judicial district, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to Ms. Clark's claims occurred in the District of Connecticut.

## PARTIES

8. Plaintiff Veronica-May Clark is a resident of Connecticut currently incarcerated at Cheshire Correctional Institution ("Cheshire"). She was previously incarcerated at MacDougall-Walker Correctional Institution, Corrigan-Radgowski Correctional Center, and Garner Correctional Institution ("Garner").

9. Ms. Clark is a transgender woman.

10. As a transgender woman, Ms. Clark has a gender identity that is different from the male sex assigned to her at birth. Ms. Clark uses she/her pronouns.

11. Defendant Angel Quiros is the current DOC Commissioner. As Commissioner, Mr. Quiros is responsible for oversight of correctional facilities in Connecticut and the proper administration of DOC policies. Mr. Quiros is sued in his official capacity.

12. Defendant Dr. Gerald Valetta is a physician at Garner. At all relevant times while Ms. Clark resided at Garner, Dr. Valetta was responsible for her medical treatment and directly participated in the decisions to deny Ms. Clark necessary medical treatment for gender dysphoria. Dr. Valetta is sued in his individual capacity.

13. Defendant Richard Bush was at all relevant times a Licensed Clinical Social Worker ("LCSW") who provided mental health care at Garner. Mr. Bush directly participated in the decisions to deny Ms. Clark adequate and necessary medical treatment for gender dysphoria. Mr. Bush is sued in his individual capacity.

14. Defendant Barbara Kimble-Goodman was at all relevant times an Advanced Practice Registered Nurse ("APRN") who provided mental health care at Garner.  Ms. Kimble-Goodman directly participated in the decisions to deny Ms. Clark adequate and necessary medical treatment for gender dysphoria.  Ms. Kimble-Goodman is sued in her individual capacity.

15. At all times relevant herein, each Defendant was acting in the course and scope of their employment and under color of state law.

## FACTUAL ALLEGATIONS

16. Ms. Clark has been in DOC custody since November 2007. During her incarceration, she has been housed in a number of DOC facilities. As relevant to this action, from approximately March 2012 through September 2016, she was housed at Cheshire. From September 2016 until Spring 2020, she was housed at Garner.  Ms. Clark remained at Garner until approximately the spring of 2020, when she was transferred back to Cheshire. She is currently at Cheshire.

17. Ms. Clark was diagnosed by DOC medical providers—possibly as early as June 2015, but no later than May 2016—with gender dysphoria, a serious medical condition characterized by cross-gender identification and persistent discomfort about one's assigned sex. As a result, Ms. Clark has experienced, and continues to experience, physical pain and profound emotional distress as a result of the disparity between her physical features and her gender identity.

18. On multiple occasions throughout her incarceration, Ms. Clark has requested medically necessary care to treat her gender dysphoria. Since at least 2016, she has repeatedly requested access to feminizing hormones; evaluation

for sex-affirming surgery and other surgeries; electrolysis; and other measures necessary to align her physical appearance with her gender identity.

19. At first, DOC officials, including Defendants, refused to provide Ms. Clark with *any* transition-related treatment so that Ms. Clark could live in accordance with her gender identity.

20. From the time of Ms. Clark's diagnosis through September 2017, Ms. Clark was refused *all* medically necessary treatment for her gender dysphoria, including appropriate transition-related care.

21. During that time, DOC officials, including some of the Defendants, told Ms. Clark that she could not receive treatment because it was DOC's policy not to begin transition-related treatment for persons who were diagnosed with gender dysphoria after they began their incarceration.

22. Because Ms. Clark is serving a 75-year sentence, that DOC policy effectively would have served as a bar to Ms. Clark *ever* receiving medically necessary transition-related treatment.

23. As a result of Defendants' denial of adequate medical treatment for her gender dysphoria, Ms. Clark has suffered, and continues to suffer, enormous physical pain and severe emotional distress.

24. Faced with the prospect that she would never receive treatment for her gender dysphoria because of DOC's policy and the Defendants' actions, on July 15, 2016, Ms. Clark attempted to castrate herself with a pair nail of clippers. Ms. Clark's attempt was unsuccessful, but caused her extreme physical pain and

psychological trauma. Ms. Clark was taken to the emergency room of a local hospital and required intensive medical treatment for over a week.

25. After Ms. Clark's attempted self-castration, she submitted multiple additional requests to DOC for appropriate treatment for her gender dysphoria, including for medically appropriate gender-transition care and feminine supplies. These requests were again met with blanket refusals by DOC.

26. For example, on or about August 24, 2016, Ms. Clark filed an Inmate Administrative Remedy Form stating that she had been denied treatment for her gender dysphoria. Ms. Clark wrote that she "ha[d] been continually denied access, going on five months now, to transition-related health care." Defendants failed adequately to address her request for medical treatment.

27. Similarly, on or about September 8, 2016, Ms. Clark requested access to transition-related health care, noting this was her second attempt to reach a resolution. Again, Defendants failed to provide necessary medical treatment. Dr. Valetta specifically denied Ms. Clark's request and cited DOC policy, stating that "transitional treatment will not be initiated while incarcerated." Due to her lengthy sentence, Ms. Clark understood that policy would effectively preclude her from ever receiving appropriate medical care to aid her transition.

28. Although Dr. Valetta referenced a DOC policy in his response to Ms. Clark's September 8, 2016 request for medical treatment, Dr. Valetta refused to provide Ms. Clark with a copy of any written policies for the care of transgender people in DOC custody. Upon knowledge and belief, Dr. Valetta is not a specialist in medically necessary transition-related health care. When Ms. Clark attempted

6

to discuss transition-related care with Dr. Valetta, he consistently told her it would not be possible. Dr. Valetta's conduct caused Ms. Clark to suffer severe emotional distress.

29. Ms. Clark also tried to discuss access to medical treatment with Mr. Bush. Ms. Clark met with Mr. Bush at least twice to request treatment for her gender dysphoria. Mr. Bush ignored these requests and further told Ms. Clark that she "deserved what she was getting." Mr. Bush further harassed Ms. Clark by stating, "what did you expect" given the nature of the crime for which Ms. Clark is incarcerated, thus implying that Ms. Clark did not deserve adequate medical or mental health care because of her incarceration. Mr. Bush's conduct caused Ms. Clark to suffer severe emotional distress.

30. Ms. Clark also tried to discuss access to medical treatment with Ms. Kimble-Goodman. Ms. Clark met with Ms. Kimble-Goodman multiple times for medication management after Ms. Kimble-Goodman prescribed Ms. Clark an antidepressant. During many of these meetings, Ms. Clark relayed her frustration and distress at her inability to obtain treatment for gender dysphoria. While Ms. Kimble-Goodman acknowledged "the length of time [Ms. Clark] has not gotten treatment," Ms. Kimble-Goodman brushed aside Ms. Clark's concerns and implied she would have to seek recourse through the courts. Ms. Kimble-Goodman's conduct caused Ms. Clark to suffer severe emotional distress.

31. After unsuccessful attempts to access medically necessary transition-related treatment for her gender dysphoria for nearly two years—and, ultimately, intervention by Columbia Law School students from a legal clinic

7

focused on prisoners' rights—DOC finally arranged for Ms. Clark to begin a hormone therapy regimen in or about September 2017.

32. On or about February 13, 2018, pursuant to a forthcoming Connecticut state law mandate,[2] DOC adopted a new policy concerning treatment of incarcerated persons for gender dysphoria: Administrative Directive 8.17. Administrative Directive 8.17 provides, in pertinent part, that all people "who meet the DSM V criteria for Gender Dysphoria will be referred to the contracted health care provider's licensed physician or APRN and facility psychologist for an evaluation to discuss possible medical and psychological interventions." Administrative Directive 8.17 further states, "All medical and mental health services, relating to gender non-conforming care, provided by the contracted healthcare employee shall be in accordance with Administrative Directives 8.1 Scope of Health Services and 8.5 Mental Health Services." Administrative Directive 8.1 in turn provides that the "contracted health services provider and DOC shall provide all inmates access to healthcare services that meet community standards."

33. Notwithstanding DOC's promulgation of Administrative Directive 8.17, Defendants have continued to fail to provide adequate medical treatment for Ms. Clark's gender dysphoria, including appropriate gender-transition care, that meets the relevant community standards.

34. For over three years, Defendants have systematically delayed or obstructed Ms. Clark's visits to endocrinologists and/or necessary blood tests to

---

[2] *See* Conn. Pub. Act No. 18-4.

determine her hormone levels. As a result, her testosterone levels remained extremely high. As of February 2020, two and a half years after beginning hormone therapy, Ms. Clark's testosterone levels were still approximately 568 nanograms per deciliter ("ng/dl"), which is within the range for standard *male* testosterone levels. A hormonal therapy regimen for transgender women is typically deemed successful once testosterone levels are between 30 to 100 ng/dl. Only recently have Ms. Clark's levels reached that range.

35. Even while Ms. Clark was receiving hormone treatment therapy, her treating physicians repeatedly confirmed that Ms. Clark was continuing to suffer from "significant dysphoria." Endocrinologists recommended that Ms. Clark speak to DOC or her primary care physician about referral to a transgender surgeon for further treatment.

36. Beginning at least as early as July 2018, Ms. Clark made numerous requests to Defendants for such further treatment, including for consultations regarding her hormone dosage; electrolysis to remove significant hair growth on her face and body; and evaluation for various surgical interventions, including gender reassignment surgery. These requests have been in writing, as well as orally during conversations with Dr. Valetta and Mr. Bush. In her requests, Ms. Clark has described significant dysphoria, including extreme revulsion at the sight of her body. She has also detailed her continuing despair and severe emotional distress at her failure to progress in her gender transition. The Defendants have ignored these requests.

9

37.     For example, on or about January 29, 2019, Ms. Clark submitted a request to DOC officials, noting that she has "been filing requests and grievances regarding this issue for almost three years now. . . .  I am called down to see Dr. Valetta, he lets me tell him what the issue is and then tells me he can't help me, and then writes 'seen in/on date.'  None of my questions have ever been answered."

38.     As recently as December 2020, Ms. Clark submitted an Inmate Request Form seeking a schedule for when she "could advance [her] transitional health care treatment."  In particular, Ms. Clark requested "standard transitional health care consistent with community standards."

39.     To date, aside from having endocrinologists periodically monitor Ms. Clark's hormone levels, Defendants have not arranged for Ms. Clark to be seen or evaluated by any medical provider specialized in care for transgender people.  Specifically, Ms. Clark has never been evaluated for gender reassignment surgery, other surgical intervention(s), or any additional transition-related medical treatment.

40.     Defendants had, and continue to have, the duty and responsibility to protect Ms. Clark and to provide her with adequate medical treatment.  Each Defendant, through their own inaction or refusal to act, failed to provide Ms. Clark with the medical care that she required.  Indeed, Ms. Clark's medical records indicate that DOC medical personnel—including Dr. Valetta and Mr. Bush—knew that Ms. Clark had a risk of self-injury, and yet failed to provide adequate and necessary medical treatment for her gender dysphoria.

41. Defendants' denial of adequate and necessary medical treatment for Ms. Clark's gender dysphoria is a clear deviation from community standards. Ms. Clark's repeated requests for medical treatment for her gender dysphoria demonstrate the severity of her physical suffering and the emotional distress resulting from the Defendants' failure to provide necessary medical care.

42. Defendants' refusal to provide Ms. Clark with access to a qualified medical provider with expertise in gender dysphoria to assess her need for additional treatment, including surgical intervention, reflects Defendants' policy, procedure, custom, and/or practice of failing to provide adequate and necessary medical treatment to persons with gender dysphoria.

43. Ms. Clark has repeatedly submitted grievances regarding her denial of medically necessary transition-related treatment for her gender dysphoria. Certain of these grievances have been marked exhausted.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**VIOLATION OF 42 U.S.C. § 1983 BASED UPON DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO MEDICALLY NECESSARY TREATMENT**
*Against All Defendants*

44. Ms. Clark repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

45. Ms. Clark has been diagnosed with the serious medical condition of gender dysphoria, which has caused and continues to cause her serious mental and emotional distress and, without necessary treatment, has resulted in serious physical harm and emotional distress to Ms. Clark.

46. Defendants are responsible for providing adequate and necessary medical treatment to Ms. Clark, including treatment for gender dysphoria.

47. Defendants have failed to provide adequate and necessary medical treatment to Ms. Clark that is consistent with prevailing medical standards of care for gender dysphoria.

48. Defendants have been and remain deliberately indifferent to Ms. Clark's medical need for treatment for gender dysphoria.

49. Defendants' continued denial of necessary medical treatment for gender dysphoria is causing irreparable harm and unnecessary suffering to Ms. Clark, including severe emotional distress resulting in psychological and physical harm.

50. Defendants' failure to provide necessary medical treatment to Ms. Clark violates the Eighth Amendment to the U.S. Constitution.

51. Dr. Valetta, by engaging in the aforementioned refusal to provide adequate and necessary medical care, acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Clark, thereby justifying an award of punitive and exemplary damages in an amount to be determined at trial.

52. Mr. Bush, by engaging in the aforementioned refusal to provide or recommend adequate and necessary medical care to Ms. Clark for her gender dysphoria, and by his abusive statements towards her, acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Clark, thereby justifying an award of punitive and exemplary damages in an amount to be determined at trial.

53. Ms. Kimble-Goodman, by engaging in the aforementioned refusal to provide adequate and necessary medical care, acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Clark, thereby justifying an award of punitive and exemplary damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*Against Defendants Dr. Valetta, Mr. Bush, and Ms. Kimble-Goodman*

54. Ms. Clark repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

55. Dr. Valetta's, Mr. Bush's, and Ms. Kimble-Goodman's failure to provide adequate and necessary medical treatment and counseling to Ms. Clark has caused her extreme anxiety, severe emotional distress, shock, humiliation, embarrassment, and mental anguish.

56. Dr. Valetta intended, or should have known, that his refusal to provide adequate and necessary medical treatment to Ms. Clark for her gender dysphoria would cause Ms. Clark emotional distress.

57. Mr. Bush intended, or should have known, that his refusal to provide or recommend treatment to Ms. Clark for her gender dysphoria, and his abusive statements towards her, would cause Ms. Clark emotional distress.

58. Ms. Kimble-Goodman intended, or should have known, that her refusal to provide or recommend treatment to Ms. Clark for her gender dysphoria would cause Ms. Clark emotional distress.

59. Dr. Valetta's failure to provide adequate and necessary medical treatment was extreme and outrageous conduct.

60. Mr. Bush's refusal to provide or recommend treatment to Ms. Clark and his abusive statements towards Ms. Clark were extreme and outrageous conduct.

61. Ms. Kimble-Goodman's failure to provide or recommend treatment to Ms. Clark was extreme and outrageous conduct.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Clark prays for judgment against the Defendants as follows:

a. For injunctive relief enjoining Defendants to provide Ms. Clark with adequate and necessary medical care for treatment of her gender dysphoria, including appropriate transition-related surgeries, other procedures, and feminine supplies;

b. For declaratory relief declaring unconstitutional and violative of federal law Defendants' practices in denying Ms. Clark adequate and necessary medical treatment;

c. For compensatory, general, and special damages, in an amount to be determined at trial;

d. For punitive and exemplary damages against Dr. Valetta, Mr. Bush, and Ms. Kimble-Goodman in an amount to be determined at trial;

e. For reasonable attorneys' fees and costs; and

f. Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY

Pursuant to Fed. R. Civ. P. 38(b), Ms. Clark demands trial by jury.

|  |  |
|---|---|
| **Dated: July 30, 2021** | **Respectfully submitted,** |
| | By: **/s/ Daniel S. Noble**<br>    **Daniel S. Noble (ct31089)**<br>    **Matthew B. Danzer (ct30740)**<br>    **Kelsey A. Powderly (ct30855)**<br>    **FINN DIXON & HERLING LLP**<br>    **Six Landmark Square**<br>    **Stamford, CT 06901-2704**<br>    **Tel: (203) 325-5000**<br>    **Fax: (203) 325-5001**<br>    **E-mail: dnoble@fdh.com** |
| | By: **/s/ Dan Barrett**<br>    **Dan Barrett (ct29816)**<br>    **Elana Bildner (ct30379)**<br>    **ACLU Foundation of Connecticut**<br>    **765 Asylum Avenue, 1st Floor**<br>    **Hartford, CT 06105**<br>    **Tel: (860) 471-8471**<br>    **E-mail: e-filings@acluct.org** |
| | *Attorneys for Plaintiff Veronica-May (neé Nicholas) Clark* |