# EXHIBIT B

**Stephen B. Levine, MD**
**6415 Gates Mills Boulevard**
**Mayfield Heights, Ohio 44124**
sbl2@case.edu
**216-831-2900 x 13 (daytime)**
**216-224-6551 (cell)**
**Fax 216 831-4306**

**Thomas J. Davis, Jr.**, Assistant Attorney General
Office of the Attorney General
110 Sherman Street
Hartford, CT 06105

JUNE 18, 2020

Mr. Davis,

Thank you for the opportunity to provide a psychiatric evaluation of and recommendations for inmate Nicholas Clark, (00355139).  Ms. Clark filed a hand written complaint on March 19, 2019 to the U.S. District Court in Hartford against eight prison officials at the Department of Corrections alleging deliberate indifference to, and psychological harm from, her alleged incompletely treated transgender state.  The inmate sought various surgeries,  $500,000 in damages, and $5,000 for feminine products. The inmate now prefers to be referred to as Veronica-May Clark. Although she has attempted to legally change her name, this has not been accomplished. I will refer to Ms. Clark in reference to her transition period and refer to Mr. Clark when discussing the inmate's prior life.

Identifying Information

Ms. Clark currently again resides at Cheshire Correction Instittution, having been transferred there in April, 2020 from Garner. She was originally removed from Cheshire ████████████████████████████████████████ eventually to Garner. The inmate is a citizen of Scotland and a resident alien of the United States. Ms. Clark is a 44-year-old, short, slender, Caucasion, biologically normal male.  She is now on 4mg oral estradiol and 300 mg spironolactone.  Her endocrine therapy began in April 2017.

The inmate has been in custody since the November 17, 2007 crime.  Upon entry into prison to serve a 75-year sentence without the possibility of parole, he did not indicate a transgendered identity. ████████████████████████████.  In 2009 he wore a full beard, one of several times in the early years of confinement. The first diagnosis of gender dysphoria was recorded in June 2015.

Records reviewed

1

1.  The Complaint;
2.  The Waterbury Police Report with photos;
3.  Mr. Clark's DOC Medical Records;
4.  DOC's Electronic Health Records 6/17/19 to 8/26/19;
5.  DOC's Master File;
6.  Non-conforming Gender Management Plan;
7.  Gender Dysphoria Assessment;
8.  7/15/16 Incident Report for self-mutilation;
9.  UConn 8/13/19 office note;
10. UConn 12/14/17 Dr. Nelakanti's office note; and
11. CMHC Inmate Summary Screen
12. Up to date medical records from August 19 to June 12, 2020
13. Movement screen

My report is divided into three parts. Part One is based only on above records review.
Part Two recounts the interview conversations/findings. Part Three contains my
conclusions and recommendations.

### Part One: Chart Review Information

<u>The November 17, 2007 crime and previous arrests</u>

The convictions were for murder, assault, burglary with deadly weapon, and violation of
a protective order.



On 2/5/2007 Mr. Clark was arrested for disorderly conduct because of domestic violence
of his wife.  Mrs. Clark obtained a domestic stay away ruling against her husband.

On 2/22/2002 Mr. Clark was arrested for grabbing and hitting a different woman
companion. 

<u>June 15, 2016</u>

2

On April 12, 2016 the inmate announced that she was ready to transition. Ms. Clark was disturbed by the prison policy to support transition only for those who came to prison partially transitioned. In addition, she was frustrated by the lack of response to her submitted requests and grievances, the negative responses to these requests, and accusations that she forged some documents to obtain support.  On June 15, 2016, the day that she was scheduled to discuss her gender dysphoria with a physician



The psychological aftermath



Mr. Clark's history from police and probation department reports



3



Patterns while incarcerated

Mr. Clark has claimed five different religious affiliations (two of which were none):
Catholic, Jewish, American Indian.

From 2013-2015 Mr. Clark was writing poems, polemics, and grievances and suggesting to others that the DOC should be abolished, more rehabilitation should occur, the legal system should be changed, and that his sentence was unfair.  He claimed that the DOC was the cause of his PTSD. These communications seemed grandiose, unrealistic, and entitled to staff. At one point he acknowledged that his unusual behaviors were to achieve a desired effect, "manipulative."

<u>Incident reports</u>

1. 6/11/10-made a barbell which was considered a dangerous instrument—6 days of punitive segregation
2. 7/10/10—altered extension cord –stinger—found hidden in bed
3. 4/5/17-claimed that the Advocate Medina did write down her request for female canteen items.  Placed in 15 days of administrative detention until 4/28/17.
4. 4/13/17-forged a signature on a document—first denied then admitted it
5. 9/28/17 removed from the People Empowering People program for nonattendance.
6. 4/3/18 tampering with security document-trying to communicate with a transferred inmate through the inmate's wife. Forfeiture of 15 credits and restrictive housing

<u>Other assessments</u>



His parents have been generally supportive of him in prison, but not of trans status. Played saxophone in school band; he loved soccer.

5

April 25, 2018 Gender Non Conforming Management Plan: Inmate granted general housing at Garner with a cellmate, separate showering, being addressed as a female, allowed to be strip searched by woman corrections officer, and access to female canteen items.

<u>Medical history while incarcerated</u>

1. 



Impressions from chart review





Psychological Testing done 4/21/2020 and 4/24/2020; computer interpretation *MMPI-2.*

**Part 2: Interviews**

8



May 21,2020 1:35-2:50PM by Telephone





Interview by Telephone on May 27, 2020 9:00-10:50 AM





Video Conference Interview June 3, 2020 9:00AM-11:00AM

VM was wearing a form of lip-gloss, eye makeup, and had long hair.  She demonstrated how she created a hair cover for her frontal balding.  She is 5'4" and of slight build with

no tattoos. 





**Part Three: Conclusions**

<u>Conclusions</u>

1. Lifetime psychiatric diagnoses:
   a. *Gender Dysphoria* of four years duration, bisexuality, no distinct paraphilia
   b. 



   **d.**   *Possible traumatic stress disorder*

**2.**  Psychodynamics:

**3.**

**4.**  Ms. Clark is neither a candidate for immediate transfer to a women's facility nor for scheduling genital reconstructive surgery.  She is a good candidate for a different array of related of services, however.

**Part 4. The Inadequate Scientific Foundation of Gender Confirming Surgery (February 11, 2021)**

Among community dwelling individuals, sex reassignment surgery (SRS), which is now spoken of as gender conforming or confirming Surgery (GCS), has been performed at increasing rates for 60+ years.  The reconstruction of genital anatomy is desired by an unknown percentage of males with gender dysphoria, although almost all consider the option at some time in their lives.  Their desire increases in intensity in times of stress.  Among some trans males the wish to possess female genitalia to be a complete woman is experienced daily, although this can easily be exaggerated and described as suffering.  The ambition for genital transformation carries with it the hope that contentment will ensue.

As trans individuals in the community are known to bear chronic suicidal ideation, minor or major suicide attempts, depression, anxiety, and substance abuse, the justification for surgery has been to improve their mental health. However, even professionals who believe that GCS improves or cures gender dysphoria now acknowledge uncertainty about its long-term mental health outcomes.  The well-known 2011 study by Dhejne et. al. demonstrated a 19 times higher completed suicide rate after SRS compared to the Swedish general population along with higher mortality from cardiovascular disease and cancer. A more recent review of suicide among the contemporary Swedish population found the completed suicide rate to be 3.5x higher than controls.  A 2019 study in American Journal of Psychiatry by Bränström and Pachankis claimed that GCS improved mental health.  The work of these Yale researchers provoked so many compelling criticisms that the editor of the journal elicited a retraction by the two authors.  That 3.5 page retraction—"our conclusions were too strong"- was published along with nine critical letters to the editor in August 2020 issue of the journal. In 2016 Medicare undertook the most sophisticated review of the existing research literature on results of SRS and concluded that the data were inconsistent.  They decided not to cover SRS for the nation but rather to consider coverage on a case-by-case basis. In the most recent study among US veterans, transgender patients ages 18-39 had a risk of suicide death more than three times that of their cisgender peers, while transgender patients 65 years and older had a risk of suicide death more than nine times that of their cisgender peers. [1]

The mental health of long-term male prisoners should be assumed to be more disturbed than community dwelling gender dysphoric biological males. Veronica-May Clark is an example of the inherent instability and changeability of various aspects of her identity: religious, vocational, marital, orientation, and gender identity.

In the quest for diminishing the incongruity of anatomy and gender identity, individuals assume that the surgeon will construct complication-free and a functional problem-free genitalia. Inmates do not undergo an informed consent process that would introduce them to the 30% serious complication rate, the need for additional corrective genital surgeries, the chronic urinary infection rate, and the insensate vagina.  Nor do they anticipate continuing or new depression, anxiety experiences, social loneliness, and their attraction to others as an exotic experience rather than a source of loving stable relationship.  Many trans individuals before and after surgery are on disability because their psychiatric symptoms prevent them from gainful employment. They also have a shortened life expectancy by several decades.

---

[1] Boyer, T. L. (2021) Suicide, Homicide, and All-Cause Mortality Among Transgender and Cisgender Patients in the Veterans Health Administration. LGBT Health Published Online: 5 Feb 2021 https://doi.org/10.1089/lgbt.2020.0235

Thus, when inmate Clark's insistent request for genital reconstruction is considered, clinicians and prison administrators have to first characterize Clark's vision of what her life will be after surgery.  This might be viewed as, "I will live happily ever after in contentment."  We are called upon here to view inmate Clark as an individual rather than a member of a class of individuals.  We are mindful that judging the wisdom of GCS on a case-by-case basis was the recommendation of the 2016 Medicare review. Clinicians and prison officials should be mindful of the fact that every cross-sectional study of community dwelling trans individuals has noted their problems.  Trans communities are described as vulnerable and marginalized. When decision makers consider the fact that the growth of GCS has not been based on scientific demonstrations of its ability to cure gender dysphoria (it ameliorates *genital* dysphoria) and to improve mental health or social functioning, caution should prevail.

While I share the opinion of the extensive review by Medicare that there is insufficient scientific evidence of benefit to recommend GCS for transgender individuals on a class wide basis, it is important to recognize that that review did not include long term inmates.  Inmates pose different more complex challenges than non-incarcerated individuals.  I offer the opinion with a reasonable degree of medical certainty that GCS may not provide Ms. Clark with a significant lasting improvement in her mental health.

**Part 5. Caveat**

Much of my report rests upon my clinical experience with the importance of recognizing denied, unrecognized, or unstated ambivalence about many aspects of transition.  Other experienced clinicians and I recommend that mental health issues be thoroughly addressed before and after genital surgery. Preoperative mental health work provides the inmate with a greater sense of control, a specific plan to move gradually move forward, and a chance to realize that her limited life in prison has been far better than she ever previously had. ███████████████████ █████, is thinking more clearly, is becoming educated, and is using her artistic and writing skills. The legal process tends to push inmates into the position that asserts the complete absence of ambivalence, danger, and genuine institutional attempt to assist. When all concerned consider that she has been provided with recognition as a trans woman, access to women inmates' canteen items, shower and strip search accommodations, and hormones, if the next steps become tied up in court processes, surgery, if desired, may be further delayed for years because of appeal processes.

Finally, it is important to note that my brief telephone and video encounters rest heavily on self-report. Ms. Clark may have distorted some aspects of her experience and omitted other relevant information.  Nonetheless, such evaluations can serve as the beginning of further psychiatric evaluation in prison.  Should new significant information arise from Ms. Clark's past or current life, I would be pleased reconsider

my recommendations.  In the meantime, I will be happy to answer any questions your office or the DOC may have.

Sincerely yours,



Stephen B. Levine, MD