# EXHIBIT E

**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **VERONICA CLARK** | **:** | **CIVIL NO. 3:19CV00575 (VLB)** |
| **v.** | **:** | |
| **COOK, ET AL.** | **:** | **APRIL 13, 2022** |

**DECLARATION OF STEPHEN LEVINE, MD**

**I, Stephen Levine, do hereby solemnly and sincerely affirm and declare under the pains and penalties of perjury or false statement that:**

1. **I am over the age of 18 and believe in the obligations of an oath.**
2. **I am a Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine. I teach about sexual dysfunction and sexual identity issues. My students are primarily mental health professionals and physicians. I have given multiple grand round lectures in various topics including on gender dysphoria.**
3. **I am a psychiatrist and am Board Certified by the American Board of Neurology and Psychiatry. I have been a practicing psychiatrist since 1973 and currently see and treat patients full time. In my career I have treated hundreds of patients, including many with gender dysphoria.**
4. **I currently serve as the psychiatric consultant for the Massachusetts Department of Correction and have been in that position since 2007. I have also previously served as a consultant for the departments of corrections for several other states throughout the country. I have also given seminars to the staffs of various departments of corrections on the topic of addressing the needs of transgender inmates.**

5. **I was previously a member of the Harry Benjamin International Gender Dysphoria Association , now renamed the World Professional Association for Transgender Health (WPATH) . I was the chairman of the writing group that created the fifth edition of the WPATH standards of care for people with gender dysphoria, which was published in 1999. I am no longer associated with WPATH and left the organization approximately twenty years ago.**
6. **WPATH has come under considerable criticism for being biased and no longer being simply a scientific organization. It has transformed into an advocacy organization. Another criticism of WPATH is that the standards of care that they widely promulgate are not based on scientific outcome studies, but rather on what a consensus of subcommittee members consider the "best" method of treatment. These recommendations often minimize or do not seriously consider the considerable gaps in knowledge about outcomes of their recommendations. These gaps persist due to the failure to perform appropriate scientific study methods. International standards of medical guidelines require revision every five years and that the guideline committees have no more than 30% of its members who earn an income based on the recommendations. Neither of these standards apply to WPATH. WPATH guidelines are not the only standards used today.**
7. **Gender dysphoria generally is the presence of a sense that one's gender identity is not congruous with one's biological sex that causes distress in that person and that distress interferes with that person's daily life and function.**

**8. There is very little constancy in our concepts of gender dysphoria and the study and knowledge surrounding this condition is dynamic. The forms of gender dysphoria and the vocabulary around it have been changing dramatically, particularly within the last 10 to 15 years. There is also considerable growing disagreement within the medical and scientific communities on how to best treat people with gender dysphoria.**

**9. Treatment for gender dysphoria can come in various forms. One form of treatment is "affirmative care" which means immediately supporting that person's desire to live life in the aspired-to gender based upon what their subjective sense of their gender is and declaring any form of their current gender identity to be entirely normal. Affirmative care has declared any attempts to explore the reasons for the new gender identity or consider alternative approaches to be unethical and damaging. Advocates of affirmative care call this "conversion therapy."**

**10. Another form of treatment for gender dysphoria is talk therapy and psychotherapy.**

**11. Another advanced form of affirmative treatment for gender dysphoria is the administration of cross-sex hormones, also known as "hormone therapy," to help the person develop the secondary sex characteristics of the aspired-to gender such as the development of breasts, redistribution of fat, and the decrease of muscle mass in transgender women who have biologically male bodies.**

**12. A further advanced form of affirmative care is surgical intervention, such as breast implants, facial feminization surgery, and the reconstruction of male genitalia to resemble female genitalia.**

**13. The suicide rate of people with gender dysphoria who have had genital surgery remains much higher than the suicide rates of the general population. There remains a very high risk that people with gender dysphoria who have had genital surgery will still have severe psychiatric problems, including but not limited to, continuing gender dysphoria, depression, substance abuse, anxiety, suicide attempts, and completed suicides.**

**14. As trans individuals in the community are known to bear chronic suicidal ideation, minor or major suicide attempts, depression, anxiety, and substance abuse, the justification for surgery has been to improve their mental health and social-vocational function. However, even professionals who believe that genital surgery improves or "cures" gender dysphoria now acknowledge uncertainty about its long-term mental health outcomes.**

**15. The well-known 2011 study by Dhejne et. al. demonstrated a 19 times higher completed suicide rate after SRS compared to the Swedish general population along with higher mortality from cardiovascular disease and cancer.**

**16. A more recent review of suicide among the contemporary Swedish population found the completed suicide rate to be 3.5 times higher than controls.**

**17. A 2019 study in American Journal of Psychiatry by Bränström and Pachankis, undertaken to investigate the long-term mental health effects of surgery, claimed that genital surgery improved mental health. The work of these Yale researchers provoked so many compelling criticisms that the editor of the journal asked two independent statisticians to review the work. As a result of the consistent findings of nine sets of reviewers, the editor asked the authors to respond to the criticisms. In their 3.5-page retraction, they stated, "our conclusions were too strong" and "further research was needed to answer the question." All of these articles were- published in the August 2020 issue of the journal.**

**18. In 2016 Medicare undertook the most sophisticated review of the existing research literature on results of SRS and concluded that the data were inconsistent. They decided not to cover SRS for the nation but rather to consider coverage on a case-by-case basis.**

**19. In the most recent study among US veterans, transgender patients ages 18-39 had a risk of suicide death more than 3 times that of their cisgender peers, while transgender patients 65 years and older had a risk of suicide death more than nine times that of their cisgender peers.**

**20. Genital surgery has a 30% complication rate (summary figure of numerous studies), often requires the additional corrective genital surgeries (approximately 9%), can bring about chronic urinary infections, urinary stream spraying, an insensate shortened vagina, and other less common negative outcomes.**

21. **Many trans individuals before and after surgery are on disability because their psychiatric symptoms prevent them from gainful employment. They also have a shortened life expectancy by up to two decades.**

22. **In my opinion, there is insufficient scientific evidence of significant long term mental health benefits to recommend genital surgery for transgender individuals on a class wide basis. At best, surgery should be performed on a case-by-case evaluative basis.**

23. **A very small number of long-term inmates with gender dysphoria have had surgery. Inmate backgrounds are typically far more psychologically problematic than those members of the community. Inmates who desire surgery tend to deny all ambivalence, particularly when involved in litigation, unlike others in the community who can spend many sessions working through their worries about such a fateful decision. WPATH's recommendations for surgery for inmates have been consistent since 1999, even before anyone in prison had undergone surgery. It clearly was not based on anything remotely scientific, represents a clinical experiment, and is based on compassion and the belief that the only considerations are the diagnosis of gender dysphoria and patient desire.**

24. **The most recent of genital surgeries for inmates occurred only a few years ago. This is too small of a sample size and too short a period to come to any scientifically reliable conclusion about the efficacy of genital surgery in inmates in reducing their distress and increasing their mental stability.**

**25. I conducted a psychiatric evaluation of Veronica May Clark, an inmate currently in the custody of the Connecticut Department of Correction (DOC), with inmate number 355139. Ms. Clark was previously known as "Nicholas Clark."**

**26. To avoid confusion, I will refer to Veronica Clark as "Ms. Clark" utilizing female pronouns in reference to her transition period and currently and I will refer to Veronica Clark as "Mr. Clark" with male pronouns when discussing Clark's life prior to transitioning.**

**27. Mr. Clark entered DOC custody on November 17, 2007 after he was arrested for his crimes and has remained in DOC custody to the present day while serving a 75-year sentence. He did not present a transgender identity upon entry into DOC.**

**28. Mr. Clark was convicted of murder, assault, burglary with deadly weapon, and violation of a protective order. Mr. Clark had been separated from his wife and two young sons for eight months prior to the murder. He was living with his parents and a court protective order had been in place preventing contact with his wife for a 43-year-period.**

**29. On the night of the murder, Clark's children were sleeping at Clark's parents' home when at 4AM, he broke into his home where his wife and a male friend were sleeping together. Armed with a pipe with screws and a hammer, he attacked the couple. He fractured the man's skull and he quickly died in bed.**

30. Mr. Clark choked and repeatedly hit his wife's face and arm, fracturing her orbital bones in four places, her arm in three places, and he bit off part of her nose. Clark's wife was able to regain consciousness and call the police.

31. Mr. Clark presuming that he had murdered both, called his father who called the police. His wife subsequently has had seven plastic surgeries, suffered from PTSD, and stated that she hated her now scarred ugly face. Their two sons went to psychotherapy. They were divorced in February 2008.

32. Prior to his incarceration, Mr. Clark had previous incidents of violence towards women, including a 2007 arrest for disorderly conduct due to a domestic violence incident against his wife and a 2002 arrest for grabbing and hitting a different woman. Mr. Clark had also assaulted two other women earlier on the night of the 2007 murder, when he punched two different women in the parking lot of a bar.

33. I conducted three interviews with Ms. Clark on May 21, May 27, and June 3, 2020. The first two interviews were conducted via phone and the third was done via video conference.

34. Prior to the interviews, I reviewed several documents, including Ms. Clark's medical records, the 2007 police report detailing Ms. Clark's murder and other crimes, and Ms. Clark's DOC master file.

35. Shortly before my interviews of Ms. Clark, she underwent psychological testing in the form of Minnesota Multiphasic Personality Inventory 2, which is a standardized psychometric test of adult personality and psychopathology. It consists of 567 true false questions. Ms. Clark also

**completed the Millon Clinical Multiaxial Inventory III. The MCMI is a psychological assessment tool intended to provide information on personality traits and psychopathology, including specific psychiatric disorders outlined in the DSM-5. It consists of 175 true-false questions.**

**36. The results of the MMPI-2 Test suggests several diagnoses including Paranoid Personality Disorder, Passive-Aggressive Personality Disorder, but Delusional Disorder must be considered. There is evidence of alcohol or substance abuse disorder as well. This testing revealed maladjustment and psychological dysfunction of moderate to mild severity**

**37. The results of the MCMI III reveal Ms. Clark exhibits psychological dysfunction of moderate to mild severity. Her personality traits include avoidance, depression, schizotypal, and self-defeating. Her diagnosis includes Psychoactive Substance Abuse, NOS.**

**38. When I spoke with Ms. Clark she was a 44-year-old, short, slender, Caucasian, biologically normal male who identified as a transgender woman.**

**39. Three traits of Ms. Clark that were apparent from both my review of Ms. Clark's medical records and from my interviews with her were poor judgment, unrealistic expectations, and exaggerated psychological pain. Ms. Clark's most significant flaw seems to be her inability to control her anger.**

**40. In my opinion, based upon a reasonable degree of medical certainty, Ms. Clark has the following lifetime psychiatric diagnoses:**

**a. Gender Dysphoria of four years consistent duration, bisexuality, no distinct paraphilia**

**b. Alcohol and Substance Abuse Disorder, institutional remission**

**c. Mixed Character Disorder with paranoid, grandiose, histrionic manipulation, narcissistic entitlement, and dependent features.**

**d. Possible traumatic stress disorder due to being forced into sexual availability in prison (most likely to be correct).**

**Ms. Clark is far more confident, grandiose, and unrealistic than any of the many trans women prisoners I have ever interviewed or heard about. Her new consolidated gender identity has given her purpose, but it has increased her distress, now focused on Body Dysmorphia Disorder-like painful preoccupation with her body, which she describes as "built like a Scottish Viking." Though it should be noted, in actuality Ms. Clark is short and has a very slender frame. Body Dysmorphic Disorder is a mental health condition where a person suffers distress due to a preoccupation due to one or more perceived defects or flaws in physical appearance that are not observable or appear slight to others. It is a widespread convention when the diagnosis of gender dysphoria is made, not to emphasize features of body dysmorphic disorder, although symptomatically they are quite similar.**

**41. Ms. Clark's incarceration has increased her self-reflective cognitive capacities but has had other consequences.**

**42. Ms. Clark has had significant emotional deterioration as she gradually realized the egregious damage she has done to many others, the personal loss of her children, the loss of her electrician trade, loss of dreams of a**

**wealthy economic future in real estate, the loss of closeness to her family, and her loss of freedom.**

**43. These recurrent emotional realizations may have played a major in role in her psychic rebirth as a woman—a solution that reached back into her former adaptations as a homosexual and as a cross-dressing gay man. Preoccupation with her trans identity helps Ms. Clark not focus on the issues discussed in the previous paragraph. The sense of herself as a woman had long been a periodically evident fantasy as she struggled unsuccessfully to find a comfortable sense of self. She approached her rebirth with energy, entitlement, optimism, angry paranoid manipulation, and frustration.**

**44. While she is happier presenting as a trans woman, Ms. Clark has had a dramatic increased discomfort with her perceived masculine features.**

**45. Ms. Clark has a serious form of character pathology characterized by impulsiveness, unrealistic thinking, grandiosity, narcissism, and aggressiveness.**

**46. Transitioning to a female identity, which is Ms. Clark's latest attempt to find personal comfort, is failing in certain important ways.**

**47. Typically, inmates feel better when they come out as trans and they are happy with hormonal treatment and the special privileges afforded to them. Ms. Clark claims a daily trauma, not from the microaggressions of others, but from her body parts.**

**48. It is safe to assume that the histrionic nature of her suffering is manipulative and she admits it, but it also reflects her continuing inability to be realistic.**

**Trans women, in and outside of prison ultimately have to accept their less than perfect bodies-just as cis women and men do, but reality has often been too much for her to bear, both before and after incarceration.**

**49. Ms. Clark is highly unrealistic. For example, Ms. Clark hopes to be extradited to Scotland and believes she would have only been sentenced to 6 years for her crimes had she been there, stating "in the UK, they figure that release generates a worker who pays taxes rather than keeping an inmate which only increases the costs to the government." Given her age, her current sentence, and lack of parole eligibility she will almost certainly remain incarcerated for the remainder of her life.**

**50. Ms. Clark is also unrealistic about the time frame in which she expects major surgical interventions to take place.**

**51. When we discussed the consequences of genital surgery, she was shocked to discover that orgasmic pleasure was far from guaranteed after the male genitalia are repurposed. She was also surprised to learn that she would likely not have a functional clitoris, the denervated vagina is likely to be insensate except for pressure, and her long existent fantasies of having a man's erection in the new vagina might be ultimately disappointing. I explained that if she had genital surgery she would be living in a female facility where the male gaze and men's interest in her sexually would be gone. I also explained the results of surgery were far from guaranteed--about 30% of surgeries had complications some of which required additional surgeries. These ideas shocked her and she was stunned emotionally by**

**these ideas. Ms. Clark had assumed she would have fully-functioning female organs with the exception of being able to "have a baby." I pointed out to her that she would also be unable to menstruate. She responded by saying that she thought that doctors would soon be able to build a uterus so even having a baby was not out of the question. There is nothing to suggest that any surgical procedure could allow for a biological male to give birth to a baby nor is this something that could ever be physically possible, so far as I am aware.**

**52. Ms. Clark seemed to be most shocked by the potential loss of sexual pleasure due to the genital surgery. Ms. Clark was disappointed by this revelation, and I told her that I have seen a number of trans people approved for surgery who do not follow through to obtain it. It is only when it is possible to have the surgery that they allow themselves to have second thoughts. Ms. Clark then told me that she would have to think about it, that she wants the option, wants to be in control, and has to rethink this because she had not considered that she would not have a penis in her new vagina and that her ability to have sexual pleasure might disappear.**

**53. Ms. Clark had a significant preoccupation with her sexuality, which in my experience is somewhat unusual among inmates with gender dysphoria.**

**54. Ms. Clark's unrealistic outlook and misconceptions about genital surgery are concerning because in order for a person with gender dysphoria to be a good candidate for genital surgery, they must understand the actual implications of the surgery. This is a prerequisite to even receiving such surgery, which**

**is irreversible, since the person must be capable of informed consent before such a surgery can take place. Based on her misconceptions about genital surgery, her unrealistic outlook, and her sense of desperation, I do not believe she could provide informed consent for genital surgery.**

55. **It is my opinion that Ms. Clark, based on my evaluation process with her in 2020, was neither a candidate for immediate transfer to a women's facility nor for scheduling genital reconstructive surgery.**
56. **It is my opinion with a reasonable degree of medical certainty that genital surgery, even if it might relieve the genital dysphoria contribution to her gender dysphoria may not provide Ms. Clark with a significant lasting improvement in her mental health. There is much more to gender dysphoria than the presence of male genitalia.**

**I declare, pursuant to 28 U.S.C. §1746, under penalty of perjury, that the foregoing declaration is true and accurate.**

**April 13, 2022**

**Date**

Stephen B Levine MD

**Stephen Levine, MD**