## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VERONICA-MAY CLARK,

      Plaintiff,

v.

ANGEL QUIROS, DR. GERALD
VALETTA, RICHARD BUSH, and
BARBARA KIMBLE-GOODMAN,

      Defendants.

Case No. 3:19-cv-575-VLB

April 14, 2022

## Plaintiff's Motion for Partial Summary Judgment as to Count I

Veronica-May Clark is a transgender woman. Due to her incarceration, she depends entirely on the Department of Correction ("DOC") for her healthcare. Ms. Clark has spent the past six years doing everything within her power to get the defendants to treat her gender dysphoria—a serious medical condition that causes her clinically significant mental and physical distress.

The defendants repeatedly and deliberately ignored Ms. Clark's pleas for medical attention. Since the day she was diagnosed, they have furnished Ms. Clark with *zero* counseling and *zero* surgery. Indeed, the defendants refused to provide her with *any* medical treatment for her gender dysphoria for an entire year, and then left her on a starter dose of hormones for years.

Defendants' conduct has caused Ms. Clark to suffer so much that she has, among other things, tried to cut out her own testicles using nail clippers. Ms. Clark considered suicide. The defendants' continued indifference to Ms. Clark's

medical needs—especially following her attempted self-castration—shocks the conscience. At this point, there are no genuine disputes of material fact that need to be resolved by a trial on Ms. Clark's deliberate indifference claim. Defendants' track record of resistance, delay, incompetence, and apathy in the face of Ms. Clark's obvious need for medical care requires judgment, and relief, in her favor.

1.     <u>FACTS</u>

Veronica-May Clark is 46 years old; grew up in Newtown, Connecticut; and has been imprisoned by the State of Connecticut since 2007 on a 75-year sentence. In April 2016, Ms. Clark first put into words and actions something that she had lived with her entire life: she is a transgender woman. From that day on, Ms. Clark has lived openly as a woman in prison.

<u>Gender Dysphoria and Its Treatment</u>

A person's gender identity is their internal sense of whether they are male, female, or non-binary. Transgender people are individuals who were designated male or female at birth, but whose gender identity is different from the designation placed upon them when they entered the world. A person's sexual orientation is distinct from their gender identity.[1]

Dysphoria, generally, means distress or discomfort. Gender dysphoria is "a whole continuum" of clinically significant distress generated by the mismatch between what a person knows their gender to be, and the gender label assigned to them at birth.[2] Not every transgender person develops gender dysphoria.[3]

---

[1] Ex. 1, Report of Dr. George Brown ¶ 47.
[2] Ex. 2, Deposition Transcript of DOC's Fed. R. Civ. 30(b)(6) Witness, 35:12-36:9.
[3] Ex. 3, Deposition Transcript of Dr. George Brown, 14:8-25.

The goal of treatment for gender dysphoria is to minimize or permanently resolve the patient's clinically significant distress symptoms[4] so that they no longer experience discomfort or limitations on their daily functioning. The World Professional Association for Transgender Health ("WPATH") Standards of Care are the accepted standards by which gender dysphoria is treated.[5] They are endorsed by the major United States medical and mental health associations, as well as correctional organizations.[6] "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (internal quotation omitted).

The WPATH Standards of Care set out a multipronged psychological and medical approach to reduce the incongruity between what a person knows their gender to be, and who the world insists they are. This includes (i) gender-informed psychotherapy, (ii) hormone therapy, and (iii) surgery to bring a person's sex organs and physical appearance into conformance with their true identity.[7] As with many other psychiatric conditions, counseling alone is insufficient to treat gender dysphoria in many patients.[8]

---

[4] Ex. 3, 138:15-21.
[5] Ex. 1 ¶ 49.
[6] Ex. 1 ¶ 67; Ex. 4, Deposition of Dr. Stephen Levine, 62:14-63:16.
[7] Ex. 1 ¶ 43 ("There are many procedures listed under the rubric 'gender confirming' and these may include genital gender confirmation surgeries (such as orchiectomy, penectomy, creation of a neovagina and neoclitoris) as well as nongenital gender confirming surgeries . . . .").
[8] Ex. 1 ¶ 84.

Untreated or insufficiently treated gender dysphoria is likely to result in serious negative medical and mental health outcomes, including depression and anxiety, auto-castration, and suicide.[9] *See Edmo*, 935 F.3d at 769 ("Left untreated," gender dysphoria "can lead to debilitating distress, depression, impairment of function, substance use, self-surgery to alter one's genitals or secondary sex characteristics, self-injurious behaviors, and even suicide.").

<u>Ms. Clark's Gender Dysphoria</u>

As someone born in 1976 to a religious, Scottish Catholic family, Ms. Clark came of age at a time when virtually no transgender people were visible in society.[10] She did not personally know anyone who was transgender and saw no positive media depictions of people whom the most charitable language of the time would have called "transsexual."[11] As a result, Ms. Clark understood from an early age that to openly represent a gender that differed from that assigned at birth would be a very difficult—and potentially perilous—existence.[12]

Unsurprisingly, Ms. Clark chose at various times in her life to keep her true identity to herself. When she began her career in the male-dominated electrical trade, for example, she presented as a man while on the job.[13] Similarly, when she

---

[9] Ex. 1 ¶¶ 62, 73; Ex. 3, 178:15-20 ("ongoing suffering, depression, potential suicidality, potential additional episodes of autocastration").
[10] Ex. 5, Deposition Transcript of Veronica-May Clark, at 36:13 ("I was completely alone when it came to being trans.")
[11] Ex. 4, 23:19-25 ("[T]here are over a hundred names . . . for various forms of gender dysphoria . . . when gender dysphoria first came onto the medical scene, we had transsexuals and normal people; right. And today we don't even use the term transsexual very much.").
[12] Ex. 5, 27:18-28:17.
[13] Ex. 5, 38:21-39:19.

was imprisoned in 2007, she reasonably concluded that a 5'4", 140-pound transgender woman in a men's prison would be in constant danger.[14] In fact, Ms. Clark was sexually assaulted by a DOC employee multiple times in 2011; the employee was fired, criminally prosecuted, and served prison time.[15]

In April 2016, however, Ms. Clark felt she could no longer bear the mental and physical anguish of hiding her gender identity.[16] With great difficulty and courage, she informed DOC clinicians that she was a transgender woman and that she believed she had gender dysphoria.[17] Ms. Clark also began writing to transgender advocacy groups for information about how to transition, as incarcerated people in Connecticut have no access to a library or the internet. To the best of her ability, she attempted to educate herself about treatment for gender dysphoria. She ordered anatomy books and autobiographies from a prison catalog, and consulted every resource to which she had access.[18]

As discussed further below, by no later than May 2016, DOC had diagnosed Ms. Clark with gender dysphoria. Following her diagnosis, Ms. Clark was forced to try to navigate the byzantine DOC medical system to obtain treatment.

<u>DOC's Medical and Mental Health Care System</u>

Each of DOC's prisons effectively has two separate urgent care clinics within its walls: one medical and one mental health. Incarcerated people do not choose the social worker, nurse, physician, or psychologist who provides their

---

[14] Ex. 5, 41:3-20.
[15] Ex. 6, April 2020 Emails re Transfer.
[16] Ex. 5, 60:11-13 ("I couldn't hide anymore. I just -- it was a collapse, you know.").
[17] Ex. 7, Ms. Clark's Medical Records, at p. 1.
[18] Ex. 5, 71:13-72:5.

care; whoever is working at the time is who they see.[19] If a provider is hostile or indifferent, the patient is stuck, because the only circumstance in which DOC considers changing a patient's provider is when the patient presents a risk to a provider.[20] And patients must think twice about complaining over neglect or maltreatment, because DOC routes complaints directly to the provider.[21]

Each prison in the DOC system has one or more principal physicians responsible for physical health.[22] Each prison also has one or two psychologists, and a psychiatrist. Those are complemented by nurses, advance practice registered nurses ("APRNs"), and social workers. But each job function is siloed; for example, nurses do not report to doctors, but to a nursing supervisor at headquarters.[23] Requests for help by people needing treatment are filtered by nurses first,[24] and the nurses decide whom a physician sees on any given day.[25]

DOC addresses medical or mental health problems by waiting for patients to ask to see a provider. It does not track people with chronic conditions like gender dysphoria, diabetes, or cancer.[26] It does not track complex conditions.[27] Nor does DOC require providers to conduct "grand rounds,"[28] which would involve regularly convening to review a particular patient's condition.

---

[19] Ex. 2, 12:14-17.
[20] Ex. 2, 13:1-18.
[21] Ex. 8, DOC Admin. Directive 8.9(6)(c)(2).
[22] Ex. 9, Deposition of Dr. Gerald Valetta, 35:2-15.
[23] Ex. 2, 17:22-18:11. *See also* Ex. 9, 69:21-70:17.
[24] Ex. 2, 94:4-11.
[25] Ex. 9, 75:17-76:22.
[26] Exhibit 10, Deposition of Dr. Craig Burns, 55:15-56:16.
[27] Ex. 10, 60:12-22.
[28] Ex. 10, 57:15-20.

This walk-in clinic format that Defendant Angel Quiros, the DOC Commissioner, employs virtually guarantees that patients with chronic conditions get *worse*, not better, because they are only seen when a symptom prompts the patient to seek help. And even then, patients tend to be treated only for the immediate problem that presents. For example, a diabetic patient who develops neuropathy in an extremity sees a physician at a sick call and receives Advil for the pain, but receives zero proactive, long-term care.

Quiros also employs a rudimentary classification system to determine whether and when a person in his custody gets care. Each person in his custody is given both a medical and mental health rating number from 1 to 5. The classification number yields "the frequency about which someone would need to be seen and the intensity of care" a person might receive.[29] A rating of 5 represents someone with severe "vulnerabilities . . . and/or risk issues," while a rating of 1 represents someone much less serious issues.[30]

Quiros knows that DOC's medical model is inadequate for patients needing more than basic, acute care, because he recently commissioned a study to "develop and provide a M[edical] M[anagement] M[odel]" to improve "inmate health outcomes."[31] The resulting study acknowledged the inadequacy of the current model and recommended significant changes—the need for which is readily apparent from Ms. Clark's own experience: that "the CT DOC sick call

---

[29] Ex. 2, 48:11-17.
[30] Ex. 2, 48:7-9. *See generally* Ex. 11, DOC Classification Manual, at pp. 27-28 (defining medical ratings); *id.* pp. 29-30 (defining mental health ratings).
[31] Ex. 12, DOC Contract with Health Management Associates, at 3.

process" undergo "an overhaul across the entire system"[32]; that each chronic illness receive "an associated clinical protocol and process for patient management"[33]; and that DOC adopt a single policy "address[ing] the structure of the chronic care program at the facility level, inclusive of treatment protocols and guidelines."[34] The study also recommended that DOC put in place "a plan for centrally tracking complex cases,"[35] like Ms. Clark's; adopt a requirement that a patient's primary care physician "tracks patients referred for specialty care but not yet seen" to avoid the "very high risk for clinical deterioration"[36]; and require staff to "conduct 'grand rounds' . . . in order to share complex cases."[37]

Not only does DOC not currently track chronic illness such as gender dysphoria, but it also lacks a treatment protocol for such diseases.[38] Moreover, DOC admits that—to this day—it has never employed a single person having "the required skills, knowledge, and expertise to undertake" the tasks of "identifying, treating, and guiding [transgender] individuals in safe gender transition."[39]

Although DOC did not track the care of people suffering from gender dysphoria and had no one on staff who knew how to treat it, DOC medical and mental health personnel could arrange for outside specialized care. Before July 2018, DOC contracted with the University of Connecticut ("UConn") to provide

---

[32] Ex. 13, Health Mgmt. Assocs., Inmate Medical Servs. Assessment, at p. 16.
[33] Ex. 13 at p. 18.
[34] Ex. 13 at p. 19.
[35] Ex. 13 at p. 21.
[36] Ex. 13 at p. 26.
[37] Ex. 13 at p. 41.
[38] Ex. 2, 36:10-37:7.
[39] Ex. 14, GNC Consultant Competitive Bidding Waiver Request, at 1.

healthcare in prison through the university's Correctional Managed Health Care program ("CMHC"), and care or consultation could be obtained from a UConn specialist. Since July 2018, DOC is able to consult with—or send patients to—other specialists beyond UConn.

**Ms. Clark's Six-Year Ordeal to Obtain Treatment for Gender Dysphoria**

On April 11, 2016, during a sick call visit, Ms. Clark told a nurse at Cheshire Correctional Institution ("Cheshire") that she believed she had gender dysphoria.[40] Ms. Clark was placed on a sick call list to see a doctor, but several months passed by without that happening.[41] On May 27, 2016, Ms. Clark had a mental health assessment, during which she explained that she was a woman and had begun revealing her gender identity to other people.[42] The assessment diagnosed Ms. Clark with gender dysphoria, noted her need for "supportive counseling," and assigned Ms. Clark a mental health classification of MH3,[43] meaning that DOC deemed her to have a "[m]ild or moderate mental health disorder (or severe mental disorder under good control)."[44] No care followed.

As months passed without any treatment, Ms. Clark formulated a plan to self-treat her gender dysphoria and suppress the testosterone in her body.[45] On

---

[40] Ex. 7 at 2.
[41] Ex. 7, 1 (clinical record showing "note[s] to inmate that he is scheduled to see the MD and will be called when it is his turn [sic]" in April, May, and June).
[42] Ex. 7, 3-6.
[43] Ex. 7, 3-6.
[44] Ex. 11 at 29.
[45] Ex. 5, 75:13-16 ("I was supposed to see the doctor and they just never -- kept never seeing me, and they just never saw me so that was -- I didn't receive any treatment."); Ex. 5, 76:1-4 ("The stress was getting kind of unbearable and so I ultimately decided to self-treat through surgical castration in an attempt to eliminate my testicles from the equation.")

July 15, 2016, Ms. Clark attempted to remove her testicles by slicing open her scrotum with a pair of nail clippers.[46] She succeeded in cutting through her scrotum and extruding (but not excising) a testis before she succumbed to the intense pain and blood loss and was forced to stop.[47]

Ms. Clark was taken to the emergency department at John Dempsey Hospital in Farmington for treatment of the wound by urological specialists.[48] On her return, she spent a week recovering in an inpatient infirmary at MacDougall-Walker Correctional Institution. She was rated an MH5 patient, the highest level.[49] Ms. Clark's attempt to castrate herself was so severe that it was labeled a "critical incident" by DOC, prompted an emergency code, and was escalated to DOC's Statewide Tactical Operations Unit.[50] Four years later, it was still considered so "horrific" by prison staff that the Cheshire warden tried to prevent Ms. Clark from ever being transferred back to the facility.[51]

Cheshire's supervising psychologist had no doubt what caused Ms. Clark to attempt self-castration: Ms. Clark's "high level of psychological distress relative to his [sic] gender dysphoria clearly motivated behavior in question."[52] Yet even though an attempted self-castration is "a psychiatric emergency,"[53] Ms.

---

[46] Ex. 7 at 7-19 (incident reports detailing incident).
[47] Ex. 7 at 20-22 (patient note and clinical record); *see also* Ex. 1, ¶¶ 24-25.
[48] Ex. 7 at 23-31 (records from emergency room).
[49] Ex. 7 at 32 ("MH5"), 34 (Dr. Santarsiero writes "requested MH level change to a 5"); 35-43 (MacDougall infirmary records).
[50] Ex. 15 (July 2016 Emails re Code Purple) at 1-2.
[51] Ex. 6 at 1 (Butricks writes: "It was a pretty horrific incident."). In fact, a deputy warden notes he spoke with Ms. Clark to make sure she was "aware of the trauma [her attempt] may have caused some" other people. *Id.*
[52] Ex. 16, Suicide Attempt and Self-Injury Summary Data Sheet, at 2.
[53] Ex. 3, 243:22.

Clark's serious self-harm did *not* result in any treatment for gender dysphoria. Instead, three days after the attempt, a prison psychologist correctly noted that Ms. Clark had "spent most of the last 39 yrs. avoiding + running from issues related to his/her gender identity," but (incredibly) chastised Ms. Clark for "lack[ing] sufficient knowledge of the resources + supports available to address these issues."[54] In what was to become a familiar refrain of refusal from DOC, the psychologist provided no treatment, but noted that "contact information for these resources has been provided."[55] And even though Ms. Clark had just tried to castrate herself with nail clippers to alleviate her gender dysphoria, DOC soon downgraded her rating to an MH3, meaning that DOC still considered her illness to be "[m]ild or moderate" or "under good control."[56]

While in the infirmary recovering from her attempted self-castration, Ms. Clark asked every provider she saw to help her access treatment for gender dysphoria, including hormone therapy.[57] She also expressed substantial regret that she was not able to fight through the pain to "complete" her castration and obtain lasting relief from her dysphoria: "I sobbed when I couldn't do it; I was so devastated."[58] The day after, she told the nurse treating her: "My only regret is that it didn't work."[59] Nonetheless, Ms. Clark expressed some hope that DOC

---

[54] Ex. 7 at 44.
[55] *Id.*
[56] *Id.* ("MH=3"); Exhibit 11 at 29.
[57] *E.g.*, Ex. 7 at 46 (7/18/2016 note stating "wanted to remove testicles from his [sic] body . . . wants to start hormone therapy") and at 45 (7/19/2016 note stating "I know this condition is treatable . . . I humbly request hormone therapy").
[58] Ex. 5, 77:1-78:5 (describing how painful self-castration was).
[59] Ex. 7 at 42 (7/16/2016 11:52 a.m. note).

would finally allow her to access medical care for her condition. She told the first psychologist to see her that "I feel like an idiot . . . I know this condition is treatable . . . I humbly request hormone therapy."[60]

On July 25, 2016, DOC transferred Ms. Clark was transferred to Garner Correctional Institution ("Garner").[61] She would remain there for four years.[62] The day she arrived, Ms. Clark submitted a request to see a doctor for treatment of her gender dysphoria.[63] She tried again five days later, asking the sick call nurse to be seen for gender dysphoria, and inquiring about hormone therapy.[64]

On August 1, 2016, two weeks after her self-castration attempt, Ms. Clark was seen by Defendant Dr. Gerald Valetta for the first time.[65] Dr. Valetta was the prison physician at Garner.[66] At the time, Dr. Valetta knew what gender dysphoria is, and knew that it is a chronic condition.[67] Dr. Valetta has never been trained in how to treat gender dysphoria.[68]

Dr. Valetta has acknowledged that he was aware that Ms. Clark has gender dysphoria,[69] but when he saw her in August 2016, he focused only on the surgical wound from her self-castration attempt. Dr. Valetta directed Ms. Clark to "M[ental]

---

[60] Ex. 7 at 44-45 (7/18/16 Psy.D. note)
[61] Ex. 7 at 49-50 (medical transfer summary filled out on 7/25/2016)
[62] Ex. 7 at 51-57 (medical transfer summary on 3/9/2020).
[63] Ex. 17 at (Grievances) at 54.
[64] Ex. 7 at 53-54.
[65] Ex. 7 at 55.
[66] Ex. 9, 34:19-35:15.
[67] Ex. 9, 115:5-8, 117:3-5.
[68] Ex. 9, 117:10-13.
[69] Valetta wrote "transgender" in the medical chart, but clarified at deposition that he used that term to signify gender dysphoria. Ex. 9, 136:16-18.

H[ealth] + case manager."[70] He directed Ms. Clark to those two places to signify that he would provide no treatment for gender dysphoria: the direction meant "[t]hat other than me attending to the patient's wound, that any other issues should be handled by mental health and [Ms. Clark's] case manager."[71]

By "case manager," Dr. Valetta meant the correctional employees[72] referred to as "counselors." Dr. Valetta knew case managers do not provide medical or mental healthcare.[73] He expected Ms. Clark to contact a counselor and explain her medical problems herself without his further involvement.[74] Dr. Valetta saw the purported utility of sending a patient to non-medical staff as lying in a case manager's ability to "advocate certain things" for incarcerated people.[75] Dr. Valetta scheduled no follow-up visit with Ms. Clark, noting future appointments would be "prn," or *pro re nata*, medical shorthand for "as needed."[76]

That same month, an APRN mental health provider who saw Ms. Clark noted her self-castration attempt "evidences clinically significant distress and

---

[70] Ex. 7 at 55.
[71] Ex. 9, 138:8-20.
[72] Ex. 9, 139:10-17, *id.* 141:12-13. "Custody" is a DOC collective term for the jailers who physically handle, restrain, and move incarcerated people, as distinct from medical or administrative employees. *See* Ex. 10, 28:20-29:9.
[73] Ex. 9, 141:22-24.
[74] Ex. 9, 142:5-14.
[75] Ex. 9, 141:14-21.
[76] Ex. 7 at 55.

strong desire to be rid of primary and secondary male sex characteristics."[77] Still, Defendants continued to leave Ms. Clark's serious medical need untreated.

In September 2016, Ms. Clark filed a health services request in which she wrote that she had been "continually denied access going on five months now to transition related health care," which was causing "internal psychological trauma."[78] The DOC denied her request, claiming that she had not made "an attempt to informally resolve this through the sick call process."[79]

A week later, Ms. Clark filed a request with Dr. Valetta and again asked for treatment.[80] Dr. Valetta responded that in accordance with DOC "policy," treatment for gender dysphoria "would be CONTINUED if inmate has already been on medication in the community, but transitional treatment will not be initiated while [the person] is incarcerated."[81] A few weeks later, Ms. Clark begged Dr. Valetta to reconsider: "It would be impossible to overstate the internal psychological trauma I experience every moment of every day I go without treatment [. . .] [P]lease, with my entire being, allow me access to transition-related healthcare."[82] Dr. Valetta again refused, recording "current practices @ CMHC/DOC are that hormonal/transitional therapy will be continued but not initiated upon incarceration. Disposition: No further treatment."[83]

---

[77] Ex. 7 at 56. She described Ms. Clark's "distressed and sad" affect "in the context of not being able to progress in gender transition currently due to correctional setting/policy." *Id.*
[78] Ex. 17 at 1 (September 1, 2016 request).
[79] *Id.*
[80] Ex. 17 at 2 (September 8, 2016 request).
[81] *Id.*
[82] Ex. 7 at 58-59 (September 21, 2016 health services request).
[83] *Id.*

The "policy" and "practices" that Valetta cited was not a written policy, but rather his "understanding of our practice" at DOC.[84] The policy was "widely known by" DOC medical staff.[85]

While facing categorical refusals for medical treatment from Dr. Valetta, Ms. Clark also had no luck in obtaining mental health counseling. In November 2016, Ms. Clark met with Defendant Barbara Kimble-Goodman, a mental health APRN. Kimble-Goodman knew what gender dysphoria was, and knew that she had never been trained in how to treat it.[86] At their first appointment, Kimble-Goodman spoke with Ms. Clark and noted that Ms. Clark "has been involved with seeking treatment while incarcerated," and "continues to express belief that male genitalia is 'poisoning me.'"[87] Kimble-Goodman provided no gender dysphoria treatment and made no referral to someone who would treat Ms. Clark; instead, she simply ordered that Ms. Clark "follow up in 3 months."[88]

In early January 2017, Ms. Clark asked yet again for help. She filed an inmate request form with mental health, expressly stating that she needed "access to transitional health care," and noting the stress that she felt due to its absence.[89] Kimble-Goodman wrote "discussed," without elaboration. The next month, Kimble-Goodman saw Ms. Clark and heard about Ms. Clark's continued distress that her genitalia were "poisoning" her.[90] Kimble-Goodman offered zero

---

[84] Ex. 9, 122:1-13, 147:3-23.
[85] Ex. 9, 122:13.
[86] Ex. 18, Deposition of Barbara Kimble-Goodman, at 75:21-76:8.
[87] Ex. 7 at 60.
[88] *Id.*
[89] Ex. 17 at 9
[90] Ex. 7 at 61.

assistance because she believed Ms. Clark "[was] pursuing legal means to address gender." Kimble-Goodman did not explain how Ms. Clark's pursuit of legal redress absolved Kimble-Goodman of the duty to provide care. Kimble-Goodman once again simply ordered that Ms. Clark return in three months.[91]

In early June 2017, Ms. Clark was seen by Kimble-Goodman again. Kimble-Goodman noted her (incorrect) impression that Ms. Clark had a "legal case to get treatment for her gender dysphoria," and was "optimistic" about "legal means" to obtain care.[92] Kimble-Goodman again provided no care.

Kimble-Goodman saw Ms. Clark again in July 2017. She started Ms. Clark on Prozac for depression, but did not provide treatment for gender dysphoria or referral to someone who would provide it.[93]  Another visit to Kimble-Goodman in November 2017 yielded maintenance of Prozac but no appropriate counseling or referral for gender dysphoria.[94] Kimble-Goodman did the exact same thing after seeing Ms. Clark again in April 2018.[95]

At a June 2018 appointment with Ms. Clark, Kimble-Goodman again offered no gender-informed counseling or referral, but recorded a Kafkaesque demerit in her file. According to Kimble-Goodman, Ms. Clark was "[a]ble to see that she is trying to get gender situation moved ahead due to length of time she has not

---

[91] *Id.*
[92] Ex. 7 at 62.
[93] Ex. 7 at 63.
[94] Ex. 7 at 64.
[95] Ex. 7 at 65.

gotten treatment"—at that point, two years—but in Kimble-Goodman's view was "not able to hold onto insight or change behavior."[96]

Like other treatment providers within DOC who saw Ms. Clark and did nothing for her, Kimble-Goodman tried to defend her indifference to Ms. Clark's medical needs by suggesting that a different person, Andrea Reischerl, might have been responsible for treating Ms. Clark.[97] However, Kimble-Goodman admitted that she knew that Reischerl did not directly treat patients.[98] Even though Reischerl was Kimble-Goodman's supervisor, Kimble-Goodman never brought Ms. Clark to Reischerl's attention.[99] In fact, during the entire time that Ms. Clark was her patient, Kimble-Goodman did not contact a single other DOC provider to discuss Ms. Clark or check on whether she was receiving care.[100] Nor did Kimble-Goodman attempt to have an outside specialist treat Ms. Clark for gender dysphoria.[101]

Ms. Clark continued trying to obtain mental health counseling to treat her gender dysphoria. In 2019, Ms. Clark was sent to Defendant Richard Bush, then a

---

[96] Ex. 7 at 66-67.
[97] "[Ms. Clark] was pursuing [treatment] already, so I did not reach out to other folks . . . [s]he had indicated that she was working on getting treatment," and was being evaluated by Reischerl, "following the system that was in place at that time."  Ex. 18, 101:17-102:3.
[98] Ex. 18, 97:24-98:2. A March 23, 2020 email from Reischerl about Ms. Clark confirms that she was not a "treatment provider": "My job is to assess whether she meets criteria for GD. My contact is usually limited after that. A treatment plan would be developed with MH- I usually am not involved in those as that is for her treatment providers to develop." Ex. 19, March 2020 Emails from Andrea Reischerl.
[99] Ex. 18, 69:13-17.
[100] Ex. 18, 101:8-14.
[101] Ex. 18, 101:8-13.

social worker at Garner. Bush saw Ms. Clark solely because he was working at the times that she put in a request for mental health care, but he did not view her as his patient.[102] Bush knew what gender dysphoria was,[103] but never received training in how to treat the condition.[104] However, Bush knew that a social worker could treat gender dysphoria with cognitive behavioral therapy in order "to improve" a patient's emotional state and make it so that they "have less dysphoria."[105] Bush, however, provided no such treatment to Ms. Clark.

In March 2019, Bush met with Ms. Clark in response to a sick call she filed, in which she stated that her requests for gender dysphoria treatment were being ignored.[106] Bush offered no treatment or referral to a provider who would treat Ms. Clark, and did not even order any follow-up.[107] Bush rated Ms. Clark an MH2,[108] signifying that she either had a "[h]istory of mental health disorder that is not currently active or needing treatment," or that she had a "current mild mental health disorder, not requiring treatment by a mental health professional."[109] Meanwhile, Ms. Clark continued to put in requests saying she was "stressed out and depressed over the transition." They were routed to Bush.[110] When Ms. Clark and Bush met again in September 2019, it was to the same end: Bush "[a]llowed

---

[102] Ex. 20, Deposition of Richard Bush, at 29:6-20, 42:6-14, 49:1-7.
[103] Ex. 20, 16:13-18.
[104] Ex. 20, 17:2-9.
[105] Ex. 20, 23:9-21.
[106] Ex. 7 at 68-70.
[107] *Id.*
[108] *Id.*
[109] Ex. 11 at 30.
[110] Ex. 21, September 2019 Emails Requesting Therapy, at 1.

[Ms. Clark] to vent her feelings," but provided no treatment for gender dysphoria or referral to someone who would treat her.[111]

Just like Kimble-Goodman, Bush provided no treatment of any kind to Ms. Clark over the six months that he was in contact with her.[112] Bush did not refer her to any other provider or to an outside specialist.[113] Indeed, Bush went so far as to inform Ms. Clark that, as far as DOC was concerned, "she was not a mental health patient."[114]

In addition to their lack of training on gender dysphoria, none of the defendants has experience treating patients with gender dysphoria.[115]

### Ms. Clark's *Pro Bono* Counsel Threatens Litigation, and Ms. Clark Gets Stuck on a Years-Long Starter Dose of Hormone Therapy Medications

Tired of being ignored, Ms. Clark retained a legal clinic at Columbia Law School to assist her in obtaining gender dysphoria treatment from DOC. In May 2017, the clinic wrote to Dr. Robert Berger, then head of mental health at CMHC,

---

[111] Ex. 7 at 71-73.

[112] Ex. 20, 29:19-20 ("Ms. Clark was not on my caseload. I did not treat Ms. Clark."). *But see* Ex. 22, September 2018 Emails re MH Score, confirming that Ms. Clark was on his caseload).

[113] *Compare* Ex. 7 at 68-70 and 71-73 (no referrals) *with* Ex. 20, 51:8-23 (confirming that it was his practice to record referrals or additional treatment needs in the patient's medical record).

[114] Ex. 20, 42:13-14.

[115] Ex. 18, 76:13 (no previous experience prior to DOC), 102:24-103:2 (couldn't remember if she ever treated any patients with gender dysphoria in DOC); Ex. 20, 22:18-23:8 (couldn't identify whether he had seen any patients with gender dysphoria, whether in DOC or elsewhere); Ex. 9, 117:6-118:15 (never treated patients with gender dysphoria before DOC and never treated patients for gender dysphoria within DOC).

to inform him of Ms. Clark's inability to access treatment and request a meeting in order to avoid litigation.[116] The clinic spoke with Dr. Berger on May 12, 2017.[117]

Thereafter, on July 6, 2017—after a year of failing to provide <u>any</u> medical treatment for Ms. Clark's gender dysphoria—Dr. Valetta filed paperwork necessary to refer Ms. Clark to an endocrinologist for evaluation.[118] In the request, Dr. Valetta noted that "I was asked to submit [the] request" by "Monica and Bob," whom he later identified as Dr. Monica Farinella, the medical director of CMHC, and Dr. Bob Trestman, the executive director of CMHC.[119]

A UConn endocrinologist saw Ms. Clark on September 14, 2017.[120] The endocrinologist did not have any data on the baseline hormone levels in Ms. Clark's blood because DOC had not provided any.[121] Nonetheless, the endocrinologist directed Dr. Valetta to start Ms. Clark on hormone therapy: spironolactone and estradiol.[122] The former reduces the level of testosterone in the body, and the latter is the chemical name for estrogen. The endocrinologist also requested to "repeat labs" in "four weeks and in twelve weeks," and to "follow up in three months."[123]

Ms. Clark began with daily doses of 2 mg of estradiol and 50 mg of spironolactone.[124] When he prescribed those medications, Dr. Valetta filed a

---

[116] Ex. 23, Letter from Ted Olds *et al.* to Dr. Robert Berger 1 (May 4, 2017).
[117] Ex. 24, Letter from Ted Olds *et al.* to Dr. Robert Berger 1 (May 12, 2017).
[118] Ex. 7 at 74.
[119] *Id.*; Ex. 9, 182:14-183:5.
[120] Ex. 7 at 76-79.
[121] Ex. 7 at 79 ("No baseline labs available.").
[122] *Id.*
[123] *Id.*
[124] Ex. 17 at 268 (Valetta prescribing).

request necessary for the three-month follow-up appointment that the UConn endocrinologist requested, which should have occurred in late December 2017.[125] But Dr. Valetta failed to undertake any further action to ensure that the follow-up appointment took place. Ultimately, it would take *one year and seven months* before Ms. Clark's *first* follow-up appointment with the endocrinologists.[126]

During the intervening 19 months, Ms. Clark filed this suit *pro se. See* Complaint, ECF 1 (filed Apr. 17, 2019). She also routinely presented to Dr. Valetta (and other providers) with questions about her hormone therapy, saying her medications did not seem effective.[127] Among other things, Ms. Clark was "[n]ot seeing breast growth, [or] decrease in facial hair" and was "still having erections," which traumatized her.[128]

In advance of the much-delayed August 2019 follow-up appointment, Dr. Valetta requested testing of Ms. Clark's blood for circulating testosterone and estrogen levels.[129] But DOC failed to perform the tests and the endocrinologist thus could not assess the efficacy of Ms. Clark's hormone therapy. The endocrinologist asked that the tests be done, and Ms. Clark return in two months.[130]

---

[125] Ex. 7 at 80.
[126] Ex. 7 at 81 (August 13, 2019 appointment with endocrinology).
[127] 82, 83-84, 85-87, 88-89, 90-101, 102-103, 104-105, 106-108, 109-110. *See also* Ex. 5, 175:5-176:18.
[128] Ex. 7 at 111-113; *see also* Ex. 5, 173:18-177:3 (explaining why Ms. Clark thought her hormone therapy was ineffective, and how she told Dr. Valetta).
[129] Ex. 7 at 114.
[130] Ex. 7 at 81.

At Ms. Clark's next visit—in October 2019 and this time with test results—the endocrinologist doubled her spironolactone dose to 200 mg daily, with orders to increase the dosage to 300 mg daily within eight weeks.[131] Increasing the testosterone blocker was necessary to combat Ms. Clark's circulating testosterone levels of 754 nanograms per deciliter ("ng/dL") of blood,[132] which falls in the upper end of the range even for a cisgender man.[133] At her next appointment—in early February 2020—Ms. Clark's circulating testosterone was still high, at 568 ng/dL.[134] The endocrinologist doubled Ms. Clark's daily estradiol dose to 4 mg, and asked that she return in four months.[135] Eight months would elapse, however, before DOC arranged for Ms. Clark's next appointment.[136]

Up until the February 2020 adjustment, Ms. Clark's medication had been at a "low dose" for 28 months, when she should have had it increased within "three to six months . . . on some patients, maybe up to nine months."[137] For the entirety of Ms. Clark's hormone therapy, in addition to bloodwork taken sporadically (and often too late for her endocrinology appointments), her medications have constantly run out,[138] and she has never received the monitoring that is essential for transgender women receiving hormone therapy—both to determine whether

---

[131] Ex. 7 at 115.
[132] Ex. 7 at 116.
[133] Ex. 1 ¶ 30.
[134] Ex. 7 at 117.
[135] Ex. 7 at 118.
[136] Ex. 7 at 119-120. At that October 2020 appointment, Ms. Clark's testosterone was down to 65 ng/dL; the endocrinologists have since kept her dosages the same. *Id.*
[137] Ex. 3, 177:18-20.
[138] Ex. 7 at 121.

the treatment is successful and to ensure there are no dangerous side effects.[139] Meanwhile, the endocrinologists have repeatedly recommended that Ms. Clark "talk to DOC or her primary care physician about referral to [a] transgender surgeon."[140] Despite Ms. Clark's repeated requests, however, DOC has never provided her with any surgical procedures.

In sum, from the day she was diagnosed with gender dysphoria, the defendants provided Ms. Clark with zero counseling, no surgery, and left her on a starter dose of hormone therapy for nearly three years. Surveying the defendants' track record, even the defendants' own expert, Dr. Stephen Levine, testified that whatever care was provided to Ms. Clark had been "insufficient."[141] Among other things, Dr. Levine said, some of Ms. Clark's lab results gave immediate cause for attention, and she should have "two kinds of therapists" regularly seeing her.[142]

### As Summary Judgment Approaches, Defendants Attempt to Moot Ms. Clark's Claims and Avoid Court Oversight

Undersigned counsel for Ms. Clark appeared in this case in April 2021. As discovery in the fall of 2021 wore on, Defendants undertook a course of conduct in an attempt to make it appear as if Ms. Clark's claims could be moot.

---

[139] *See* Ex. 3, 175:5-176:25 (explaining necessary psychological and lab monitoring for hormone therapy).
[140] *See, e.g.*, Ex. 7 at 120 and 123 (October 2020), 124 and 125 (February 2021).
[141] Ex. 4, 110:21-23.
[142] Ex. 4, 114:7-17. "[O]ne, someone would see her every two or three weeks to talk about her life and how she got to prison and how she's coping with prison, to talk about every aspect of her life. And that she should have a . . . gender therapist to talk not about the first subject the other therapist deals with, but just about her gender dysphoria and what she needs to make her comfortable." *Id.*

Although Dr. Craig Burns, DOC's chief of mental health, knew of Ms. Clark and her self-castration attempt by 2018,[143] he never treated her[144] and took no steps to become involved because he claimed he never received a formal request to do so.[145] Dr. Burns expected the staff located in Ms. Clark's prison to provide treatment to her.[146] But in fall 2021, Dr. Burns suddenly began calling outside specialists who might serve as consultants to DOC on gender dysphoria,[147] as well as surgeons who perform gender confirmation procedures.[148]

In December 2021, DOC filed an application to be exempted from statutory open bidding requirements for the purpose of purchasing "Gender Non-Conforming Consultant services."[149] In its application, DOC made an extraordinary set of admissions relating to gender dysphoria, including acknowledging the existence of "constitutional law[] obligating the Department to provide care for" transgender incarcerated people "commensurate with existing standards in the community."[150] The DOC noted that it was "facing current

---

[143] Ex. 10, 189:9-189:21.
[144] Ex. 10, 135:25-136:11.
[145] Ex. 10, 198:19-199:22.
[146] Ex. 10, 191:24-192:9.
[147] Ex. 10, 161:21-162:7.
[148] Ex. 10, 126:15-127:9.
[149] The state government generally may only award contracts to the qualified, lowest bidder following a public solicitation. Conn. Gen. Stat. § 4a-59(a). However, state agencies may apply for permission from the Department of Administrative Services to deviate and award a contract to a sole source when "a requirement is available from only a single supplier." Conn. Agencies Regs. § 4a-52-15(a). To apply, the agency must file "an explanation as to why no other [contractor] will be suitable or acceptable to meet the need." *Id.*
[150] Ex. 14. Quiros is sued in his official capacity, wherein "the real party in interest . . . is the governmental entity and not the named official." *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (internal quotation omitted). The sole-source application statements were made by DOC's "agent or employee on a matter

litigation" on the subject, and that its lack of personnel qualified to treat gender dysphoria "may be costly not only in potential damages, but also by having outside entities dictate to the Department how future similar situations will be handled."[151] DOC sought to retain a contractor without bidding so as to "provide immediate assistance with active Departmental litigation in a way that may limit or extinguish that specific litigation through provision of care."[152] DOC also emphasized the "extreme risk" faced by Ms. Clark:

> It is critical that the Department secure the services of a consultant . . . . Gender Non-Conforming (GNC) individuals, in the community, have an attempted suicide rate that approaches nearly 50% for that population. *This extreme risk is only exacerbated by incarceration, where additional stressors build for those individuals.* Combining incarceration and gender transition, neither of which can be placed on pause until the other is resolved, requires the Department to have expert guidance in the care of those in transition. *To mitigate this constant, very present risk that exceeds other populations within the Department,* we must tailor the treatment for this population, including the possibility of surgery and managing expectations surrounding possible surgical outcomes.[153]

DOC's application was granted, and on November 1, 2021, it awarded a one-year contract to Twin Peaks Counseling to provide gender-affirming care through a licensed social worker named Dayne Bachmann.[154] Bachmann

---

within the scope of that relationship and while it existed," Fed. R. Evid. 801(d)(2)(D), and are hence the non-hearsay statements of a party. *See, e.g., Geleta v. Gray*, 645 F.3d 408, 415 (D.C. Cir. 2011) (statements of municipal employees non-hearsay where District of Columbia mayor was defendant in official capacity, and therefore "the District is a party to the suit"); *Wilburn v. Robinson*, 480 F.3d 1140, 1148 (D.C. Cir. 2007) (same).

[151] Ex. 14 at 1.
[152] Ex. 14 at 1.
[153] Ex. 14 at 1 (emphases added).
[154] Ex. 25, Twin Peaks Counseling Contract, at 1.

evaluated Ms. Clark on December 21, 2021.[155] In strong terms, he concluded that genital gender confirmation surgery for Ms. Clark is "essential," "a fundamental need and vital to alleviating her gender dysphoria."[156] Bachmann's interaction with Ms. Clark was for evaluation only; she has not received counseling for her dysphoria from him or anyone else,[157] although Bachmann thought that "it would benefit Ms. Clark to have a gender therapist to talk with."[158] As has been the case since April 2016, Ms. Clark has not yet received that treatment. Nor has she received genital gender confirmation surgery.

Plaintiff's expert, Dr. George Brown, summarized Ms. Clark's experience for the last six years this way: "DOC has provided inadequate, substandard medical, psychiatric, and surgical care for [Ms. Clark's] serious medical condition (GD) in spite of full knowledge of the severity of her diagnosis."[159] Dr. Brown concluded:

- "There is no evidence in the record that [Ms. Clark] has ever received any psychiatric or other mental health care by clinicians with knowledge, training, and experience in GD"[160];

- "[Ms. Clark] has received overly conservative, inadequate hormonal care for her Gender Dysphoria diagnosis;"[161] and

---

[155] Ex. 27, Dayne Bachmann Standard Progress Note, at 1.
[156] Ex. 27 at 1.
[157] Ex. 5, 177:1-3 (explaining that mental health providers she has seen "don't respond very much to anything I have to say about gender dysphoria at all. It's kind of like a blank, blank slate, blank screen.").
[158] Ex. 27 at 2.
[159] Ex. 1 ¶ 51.
[160] *Id.* at 47.
[161] *Id.* at ¶ 50.

- Genital confirmation surgery is medically necessary for Ms. Clark.[162]

In Dr. Brown's expert opinion, after reviewing Ms. Clark's records, "[t]his lack of access to basic, medically necessary services for the treatment of GD violates any reasonable standard of care for transgender inmates."[163]

Ms. Clark's denial of care has taken a significant toll on her. She has at various points considered resorting again to self-castration—something she reported to Dr. Valetta,[164] who responded by saying he would "look into" surgery and then never followed up.[165] She has had suicidal thoughts,[166] including suicide attempts.[167] Throughout, she has been very vocal about her distress, submitting at least 24 grievances requesting treatment in her time at Garner alone.[168]

For Ms. Clark, not being treated for gender dysphoria is like "a slow-moving train crash, where every moment it just gets worse and worse and worse and worse and worse."[169] Being stuck in her body without treatment has reduced her to serving her sentence "in a prison within a prison."[170]

---

[162] *Id.* at ¶ 77; Ex. 3, 245:17-21.
[163] *Id.* at ¶ 51-52.
[164] Ex. 7 at 126, 85-87.
[165] *Id.* at 85-87. *See* Ex. 9, 239:20-240-3 ("Q: What steps, if any, did you take to get bottom surgery approved for Ms. Clark? A: I don't recall. Q: Do you recall taking any steps? A: I don't recall."); see also Ex. 5, 170:1-171:18 (same).
[166] Ex. 5, 110:5-6.
[167] Ex. 5, 111:13-25
[168] *See* Ex. 17 (grievances from Ms. Clark's time at Garner related to treatment).
[169] Ex. 5, 112-113.
[170] Ex. 5, 155:13.

2.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if," as here, "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). While the court must "assess the record in the light

most favorable to the non-movant," *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41

(2d Cir. 2000) (citation omitted), inferences drawn in favor of the nonmovant must

be supported by the evidence. Speculation, conjecture, or the "mere existence of

a scintilla of evidence in support of the [nonmovant's] position" will be

insufficient; to defeat a motion for summary judgment, there must be evidence on

which a jury could "reasonably find" for the nonmovant. *Cochran v. Ne. Mortg.,*

*LLC*, 2007 WL 2412299, at *2 (D. Conn. Aug. 21, 2007).

3.    ARGUMENT

    A.  Applicable Law

Ms. Clark moves for partial summary judgment on her Eighth Amendment

claim (Count I). It is a long-established principle of Constitutional law that the

state has an obligation "to provide medical care for those whom it is punishing

by incarceration. An inmate must rely on prison authorities to treat his medical

needs; if the authorities fail to do so, those needs will not be met." *Estelle v.*

*Gamble*, 429 U.S. 97, 103 (1976) (establishing deliberate indifference to medical

needs as cruel and unusual punishment in violation of the Eighth Amendment). In

*Langley v. Coughlin*, the Second Circuit held that "the basic legal principle is

clear and well established . . . that when incarceration deprives a person of

reasonably necessary medical care (including psychiatric or mental health care)

which would be available to him or her if not incarcerated, the prison authorities must provide such surrogate care." 888 F.2d 252, 254 (2d Cir. 1989).

"Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). It has a two-pronged analysis, involving both objective and subjective components. "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Id.* "Second, the [government official] must act with a sufficiently culpable state of mind." *Id.* An official acts with a culpable state of mind when that "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Dixon v. Lupis*, No. 3:20cv1754 (VLB), 2021 WL 4391246, at *5 (D. Conn. Sept. 24, 2021) (deliberate indifference means "prison official or medical provider was actually aware that his actions or inactions would create a substantial risk of serious harm to the inmate").

B. <u>There is no dispute that Ms. Clark has gender dysphoria</u>

Ms. Clark was diagnosed with gender dysphoria by DOC in May 2016. All parties agree that Ms. Clark has gender dysphoria. *See* Responses to Requests for Admission (defendants "Admitted" "that Plaintiff has gender dysphoria").

**C. There is no dispute that gender dysphoria is an objectively serious medical need**

There is no question that Ms. Clark's gender dysphoria satisfies the objective prong of the Eighth Amendment deliberate indifference analysis. The Second Circuit has recognized that gender dysphoria is a serious medical need. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). District courts within the Second Circuit have regularly held the same. *See Johnson v. Cook*, No. 3:19-cv-1464, 2021 WL 2741723, at *13-14 (D. Conn. July 1, 2021) ("[Plaintiff's] allegations plausibly show that . . . she suffered from a serious medical or mental health condition—i.e., gender dysphoria/identity disorder[171]—and that the condition and the symptoms stemming from the condition require treatment."); *Manning v. Goord*, No. 05-cv-850F, 2010 WL 883696, at *7 (W.D.N.Y. Mar. 8, 2010) ("Plaintiffs' [gender dysphoria] constitutes a serious medical condition."); *Brown v. Coombe*, No. 96-cv-476,1996 WL 507118, at *3 (N.D.N.Y. Sept. 5, 1996) ("In a particular prisoner, gender dysphoria may be a serious medical need.").

Other circuits have concluded that gender dysphoria is a serious medical need. As the Ninth Circuit explained in *Edmo*,

> the State [did] not dispute that [Plaintiff's] gender dysphoria is a sufficiently serious medical need to trigger the State's obligations under the Eighth Amendment. Nor could it. Gender dysphoria is a serious medical condition that causes clinically significant distress—distress that impairs or severely limits an individual's ability to function in a meaningful way.

935 F.3d at 785 (cleaned up; citation omitted). *See also Pinson v. United States*, 826 F. App'x 237 (3d Cir. 2020) (taking gender dysphoria as a serious medical

---

[171] "Gender identity disorder," or GID, is a previous term for "gender dysphoria." Ex. 1 ¶ 5.

need without discussion); *Kosilek v. Spencer*, 774 F.3d 63, 86 (1st Cir. 2014) (similar); *Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011) (similar).

Even where defendants have contested this designation, courts have affirmed it—not just in recent years, but for decades. Using different language for the same condition, the Sixth Circuit held in 1997 that, "[s]ince transsexualism is a recognized medical disorder, and transsexuals often have a serious medical need for some sort of treatment, a complete refusal by prison officials to provide a transsexual with any treatment at all would state an Eighth Amendment claim for deliberate indifference to medical needs." *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401 (6th Cir. 1997); *see also Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) ("There is no reason to treat transsexualism differently than any other psychiatric disorder. Thus . . ., plaintiff's complaint does state a 'serious medical need.'"); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988) (concluding "that transsexualism is a serious medical need"); *see also Guthrie v. Wetzel*, No. 1:20-cv-2351, 2022 WL 122372, at *3 (M.D. Pa. Jan. 12, 2022) ("[P]laintiff's gender dysphoria constitutes a serious medical need for purposes of an 8th Amendment claim."). Accordingly, there can be no dispute that Ms. Clark has satisfied the objective prong of her deliberate indifference claim.

D. <u>There is no dispute that Ms. Clark satisfies at least four formulations of the subjective prong for deliberate indifference</u>

As for the subjective prong, a person can establish a defendant's culpable state of mind in various ways, including by showing: (1) that DOC officials refused to treat her, knowing that without the sought-after treatment, she would be placed at substantial risk of suffering serious harm, *Hathaway v. Coughlin,* 99

F.3d 550, 553 (2d Cir. 1996); (2) that her "treatment" was inadequate; (3) that the

denial of care was not based on a medical judgment about her needs but rather a

blanket policy against the provision of particular treatment, *Johnson v. Wright*,

412 F.3d 398, 406 (2d Cir. 2005); or (4) that the treatment is otherwise not provided

in accordance with community standards, including because the providers lacked

competence to provide the treatment, *see id.* Here, the evidence conclusively

demonstrates all four.

> i.  <u>Defendants refused to treat Ms. Clark's gender dysphoria,
> knowing that without the sought-after treatment, Ms. Clark would
> be placed at substantial risk of suffering serious harm</u>

No matter how many times Ms. Clark pled for help, instead of treating—or

even attempting to treat—her gender dysphoria, the defendants looked the other

way. "Consciously disregarding an inmate's legitimate medical needs is not

'mere medical malpractice.'" <u>Harrison v. Barkley</u>, 219 F.3d 132, 139 (2d Cir. 2000)

(internal citation omitted). Rather, "outright refusal of any treatment for a

degenerative condition that tends to cause acute infection and pain if left

untreated . . . constitute[s] deliberate indifference on the part of prison officials."

*Id.* at 138. Put another way, "deliberate indifference may also be inferred 'where

treatment was 'cursory' or evidenced 'apathy.'" *Bardo v. Wright*, No. 3:17-CV-

1430, 2019 WL 5864820, at *6 (D. Conn. Nov. 8, 2019) (quoting *Ruffin v. Deperio,*

97 Supp. 2d 346, 353 (W.D.N.Y. 2000)).

Ms. Clark did not have the option to seek treatment for herself and, indeed,

may never have that option. Her only recourse was to her medical provider (Dr.

Valetta) and to her mental health providers (Kimble-Goodman and Bush). Ex. 10,

12:22-13:9 (explaining people in custody cannot choose providers). Yet none of

them would treat her or refer her to someone who would. Instead, they either refused outright or continually looked the other way.

Dr. Valetta was the principal physician at Garner for Ms. Clark's entire time there, and thus was her medical provider for nearly four years. As such, he was the gatekeeper to *any* treatment for Ms. Clark's gender dysphoria; all roads to treatment went through him. Yet at every juncture, Dr. Valetta was entirely disinterested in treating Ms. Clark's gender dysphoria. Ms. Clark arrived at Garner immediately after a serious self-castration attempt that landed her in the emergency room. Her wounds were still fresh when she met Dr. Valetta. But *for an entire year*, Dr. Valetta simply refused to treat her gender dysphoria at all. *See, e.g.,* ID395 (grievance refusal), Ex. 7, 58-59 (health services review refusal), Ex. 7, 128 (same). Each time Ms. Clark requested treatment, Dr. Valetta's answer was simply, "No." *Id.* It was only when a Columbia Law School clinic threatened a lawsuit in May 2017 that Dr. Valetta was finally directed by superiors to submit a request for a referral to an endocrinologist—something he still did not do for nearly two months, until July 2017. Ex. 7 at 74 (URC review form).

As far as treatment went, inadequate and unmonitored hormone therapy was all DOC arranged. Even Dr. Valetta agrees: He never did anything further to treat Ms. Clark's gender dysphoria. Ex. 9, 237:15. Dr. Valetta did nothing to facilitate the hormone therapy Ms. Clark eventually received. Dr. Valetta did not make sure her labs were timely taken, *see, e.g.*, Ex. 7, 75-79 (no labs taken prior to first endocrinology visit); 81 (no labs at visit); that she had any of the necessary monitoring*, see* Ex. 3, 175:5-176:25, or even that her prescriptions were current,

Ex. 7, 121-122, 127 (medications waiting for Dr. Valetta to renew them). In four years, Dr. Valetta never even purported to assess Ms. Clark for any medical interventions, including gender confirmation surgery, *see* Ex. 9, 206:17, 239:25, notwithstanding his concession that doing so would fall to him. Ex. 9, 227:11-18. A doctor's failure to facilitate further treatment evinces deliberate indifference to serious medical needs. *See, e.g.*, *Giraud v. Feder*, No. 20-CV-1124, 2021 WL1535751, at *4 (D. Conn. Apr. 19, 2021); *Williamson v. Naqvi*, No. 19-CV-4, 2019 WL 2718476, at *6 (D. Conn. June 27, 2019) (similar); *Martinez v. United States*, No. 20-CV-7275, 2021 WL 4224955, at *8 (S.D.N.Y. Sept. 16, 2021) (similar).

Kimble-Goodman and Bush, similarly, declined to do *anything at all* to provide mental health treatment for Ms. Clark's gender dysphoria. For her part, Kimble-Goodman simply recorded Ms. Clark's anguish. *See* Ex. 7, 61, 60 (belief that genitalia were "poisoning me"); 66-67 (depression); Ex. 17, 32 ("you have no idea the amount of stress I've had to endure"). She did not do anything to facilitate treatment. Ex. 18, 101:17-19. Instead, she appeared to regard herself as a passive observer to Ms. Clark's inability to access treatment, taking notes about the fact that Ms. Clark was forced to resort to the legal system to pursue medical care. *See, e.g.*, Ex. 7, 61 ("Is pursuing legal means to address gender"); Ex. 7, 60 ("has been involved with seeking treatment while incarcerated as currently not receiving hormone treatment due to not having been receiving when incarcerated").

Bush, meanwhile, was for a time the mental health clinician assigned to the general population at Garner. Ex. 20, 50:5-6. Thus, when Ms. Clark put in certain

requests to be seen by mental health, she was assigned to see him. *Id.* Nonetheless, Bush was adamant that he never treated Ms. Clark for gender dysphoria, or at all. Ex. 20, 23:24-24:1. Both Kimble-Goodman and Bush's refusals to treat Ms. Clark are notable in the context of DOC Administrative Directive 8.5, which purports to "ensure that all inmates have access to mental health services consistent with community standards of care regardless of gender, physical disability or cultural factors." Exhibit 26. Overall, "the focus of the little mental health counseling Ms. Clark has received from DOC appears to be assisting her to 'adjust' to prison, rather than any specialized psychological treatment for GD." Ex. 1 ¶ 84. *See Soneeya v. Spencer*, 851 F.Supp.2d 228, 248 (D. Mass. 2012) ("While the DOC has offered to treat any depression or anxiety that might occur as a result of the denial of [surgery], treating the symptoms is not a substitute for treating [the] underlying condition.").

"In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *see also Barfield v. Semple*, No. 3:18-cv-1198, 2019 WL 3680331, at *10 (D. Conn. Aug. 6, 2019) (holding that deliberate indifference "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm"). Ms. Clark's medical records are replete with evidence of Defendants' extraordinary apathy. In a series of September 2016 grievances, for example, Ms. Clark begged Dr. Valetta to reconsider and provide her with

hormone therapy, writing: "It would be impossible to overstate the internal psychological trauma I experience every moment of every day I go without treatment." Ex. 7, 59. Dr. Valetta simply checked the box stating, "No further treatment." Id. In September 2019, Bush dismissively described seeing Ms. Clark because she was "stressed out, depressed and experiencing dysphoria secondary to her transition and the frustrations of not getting what she wants when she wants it." Ex. 7, 71-73. This was two years into Ms. Clark's hormone therapy, when her testosterone levels were extremely high even for a cisgender man. Ex. 1, ¶ 30; *see also* Ex. 4. 139:22-25. She was not seeing any signs that the treatment was effective. Ex. 7, 111-113. Against this backdrop, Dr. Valetta likewise dismissed Ms. Clark's concerns and told her he would see her later. By the time she was transferred from Garner four months later, he still had not met with Ms. Clark. Ex. 7, 51-52. Meanwhile, 10 months earlier, he had told Ms. Clark not to self-castrate again and "we will look into bottom surgery." 85-87. He never did so. *See* Ex. 9, 239:20-240-3 ("Q: What steps, if any, did you take to get bottom surgery approved for Ms. Clark? A: I don't recall. Q: Do you recall taking any steps? A: I don't recall."); *see also* Ex. 5, 170:1-171:18 (Ms. Clark's recollection of same).

All in all, Ms. Clark submitted numerous requests related to her gender dysphoria during her years at Garner. At least 24 grievances involve her requests for transitional care, including hormones, surgery, and psychiatric care. Many were directed to Defendants. And each time, Defendants replied by marking things like "no further treatment," and "discussed," without elaboration.

In short, Defendants consistently treated Ms. Clark "not as a patient, but as a nuisance." *Hughes v. Joliet Correctional Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991). They "knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation." *Hathaway v. Coughlin,* 37 F.3d at 68; *see also Brown v. Coughlin*, 758 F. Supp. 876, 883 (S.D.N.Y. 1991), *on reargument,* 869 F. Supp. 196 (S.D.N.Y. 1994) ("The existence of a pattern of suffering might be taken to show that the described incidents were not 'accidents', 'inadvertent failures' or random occurrences of medical malpractice."). Defendants stood by while Ms. Clark languished notwithstanding the DOC-acknowledged "extreme risk" of self-harm attendant to gender dysphoria, Ex. 14 at 1; the fact that Ms. Clark asked everyone for treatment, constantly, *see* Ex. 5 161:19-164:5; Ms. Clark's direct and voluminous grievances about the extent of her pain and suffering, [Ex. 17]; and her continued threats of self-harm, *see, e.g.,* Ex. 7, 126.

Unsurprisingly, "[f]ailure to follow an appropriate treatment plan can expose transgender individuals to a serious risk of psychological and physical harm." *Edmo*, 935 F.3d at 771. In fact, as multiple courts have acknowledged, the kind of pain, suffering, anxiety, and depression Ms. Clark experienced as a result of Defendants' failure to provide adequate treatment for gender dysphoria is so harmful that it constitutes irreparable harm warranting a preliminary injunction. *See, e.g., Monroe v. Meeks*, No. 3:18-cv-00156, 2022 WL 355100, at *1 (S.D. Ill. Feb. 7, 2022) (granting second preliminary injunction to class of transgender prisoners in state custody for, *inter alia*, "widespread delays or denials in . . . providing

hormone therapy and hormone monitoring; failure to consider or provide gender-affirming surgery . . . and failing to provide access to medical and mental health providers competent to treat gender dysphoria"); *Iglesias v. Fed. Bureau of Prisons*, No. 19-cv-415, 2021 WL 6112790, at *22 (S.D. Ill. Dec. 27, 2021) (granting preliminary injunction to transgender woman whom, despite minimal hormone therapy, prison never made any effort to evaluate for medically appropriate care such as surgery, notwithstanding castration attempts and other threats of self-harm); *Hicklin v. Precynthe*, 2018 WL 806764, at *14 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction to transgender woman for all care "her doctors deem to be medically necessary treatment for gender dysphoria"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal. 2015), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015) (ordering Defendants "to provide Plaintiff with access to adequate medical care, including sex reassignment surgery . . . as promptly as possible").

      ii.   <u>Both experts agree Ms. Clark's medical care has been inadequate</u>

Defendants can point to no evidence to salvage their failure to treat Ms. Clark's gender dysphoria. It is true that "a prisoner does not have the right to choose his medical treatment as long as he receives *adequate* treatment." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (emphasis added). But here—strikingly—both experts agree: Ms. Clark's treatment for gender dysphoria over the past six years was not adequate. *See* Ex. 1, 241:9-246:17 (Brown); Ex. 4, 110:18-111:9 (Levine describing treatment as "insufficient," "less than ideal").

In this case, notably, the defendants:

- denied Ms. Clark *all* treatment for gender dysphoria from April 11, 2016 until September 23, 2017, when she finally began hormone therapy;

- have never, to date, provided Ms. Clark with any psychiatric care for gender dysphoria, even after her self-castration attempt;

- have consistently undermined Ms. Clark's hormonal treatment, including by failing to facilitate necessary bloodwork and schedule endocrinology appointments for her, to conduct medically necessary monitoring, or to provide adequate dosages of hormone medication;

- did not evaluate Ms. Clark for any surgical treatment, including genital gender confirmation surgery, until a few months ago—more than five years after she was diagnosed, and years after she filed this case; and

- have still not provided Ms. Clark with the surgery *that DOC's own consultant* deems medically necessary.

There is no question this care is inadequate. Defendants' expert, Dr. Levine, did not even try to argue that it was. Rather, Dr. Levine conceded: "I actually think that the treatment was *insufficient*." Ex. 4, 110:21-23 (emphasis added). He admitted that when it came to hormone therapy, Ms. Clark "should have had much more careful medical attention than she was getting," (*id.* 143:16-19); her lab results were something to be "concerned about" (*id.* 139:22-25); and her requests for proper hormone care were "reasonable requests made repeatedly" (*id.* 144:25). He agreed that Ms. Clark had not received any psychotherapy for her gender dysphoria and said she should be meeting weekly with at least two therapists, including a "gender therapist." *Id.* 115:22-116:1.

Finally, he conceded that a "pathway to genital surgery is appropriate for Ms. Clark for the treatment of her gender dysphoria." *Id.* 115:17-21.

DOC's own medical consultant was even more explicit, writing in December 2021 that the "significant medical intervention" of genital gender confirmation surgery "is a fundamental need and vital to alleviating [Ms. Clark's] gender dysphoria," as well "essential to her transition." Ex. 27 at 1.

Meanwhile, in his expert report and in his testimony, Dr. Brown explained at length "that the DOC has provided inadequate, substandard medical, psychiatric, and surgical care for [Ms. Clark's] serious medical condition (GD) in spite of full knowledge of the severity of her diagnosis." Ex. 1, ¶ 84.

In a similar case in the Southern District of Illinois, a transgender woman in Bureau of Prisons ("BOP") custody was denied hormone therapy for years, inadequately treated and monitored once she finally got it, and then refused even the opportunity to be evaluated for genital confirmation surgery by competent medical professionals, let alone have the surgery performed. *See generally Iglesias*, 2021 WL 6112790, at *22. The court found that plaintiff "made a strong showing that BOP has been deliberately indifferent to her gender dysphoria." *Id.* at *18. It granted a preliminary injunction, citing details that are familiar here, including the initial denial of all care, inadequate hormone treatment, and the complete failure to consult an expert for years to evaluate the plaintiff for surgery. *See also Soneeya,* 851 F.Supp.2d at 248 ("The DOC cannot, therefore, claim that Ms. Soneeya is receiving adequate treatment for her serious medical needs because it has not performed an individual medical evaluation aimed solely at

determining the appropriate treatment for her [gender dysphoria] under community standards of care.").

Defendants may rejoin that—after significant delay, and the imminent threat of litigation—they at least referred Ms. Clark for hormone therapy, and thus she had some treatment for gender dysphoria. "But just because Appellees have provided [Plaintiff] with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis in the original); *see also Edmo*, 935 F.3d at 793 (affirming grant of preliminary injunction in gender dysphoria case and holding that "[t]he provision of some medical treatment, even extensive treatment over a period of years, does not immunize officials from the Eighth Amendment's requirements").

To state the obvious: Where both expert witnesses—along with the consultant that the defendants hired expressly for this case—agree that Ms. Clark did not receive adequate treatment, there is no genuine dispute of material fact. Defendants have been deliberately indifferent to Ms. Clark's gender dysphoria from April 11, 2016, to today, and Ms. Clark's motion for summary judgment on her Eighth Amendment claim should be granted.

iii. Defendants applied a blanket policy in order to avoid treating Ms. Clark's gender dysphoria

The Eighth Amendment forbids prison officials from administering medical treatment to an incarcerated person that was "intentionally wrong and did not derive from sound medical judgment." *Chance*, 143 F.3d at 704. That includes application of a blanket policy that fails to account for an individual's specific

medical needs. *See Johnson*, 412 F.3d at 406 (denial of hepatitis C treatment based on policy that particular drug could not be administered to incarcerated people with recent history of substance abuse could constitute deliberate indifference if relied upon without consideration of individual medical need); *Brock v. Wright*, 315 F.3d 158, 167 (2d Cir. 2003) ("[A] jury could well conclude that steroid injections were not given, not because of a medical judgment—at most negligent—that such prevention was not worthwhile, but because the DOCS policy established by Wright forbade preventative measures in cases such as Brock's."). The "blanket, categorical denial of medically indicated [treatment] solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference." *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014).

While policies prohibiting treatment of incarcerated people with gender dysphoria have been regrettably common, various courts have held that those policies constitute deliberate indifference as a matter of law. In *Fields v. Smith*, the Seventh Circuit found that a state law barring "the consideration of hormones or surgery" for incarcerated people with gender dysphoria violated the Eighth Amendment. 653 F.3d 550, 559 (7th Cir. 2011). In *De'lonta v. Angelone*, the Fourth Circuit allowed deliberate indifference claims to proceed against prison doctors and administrators where they had discontinued the plaintiff's hormone treatment pursuant to a blanket policy. 330 F.3d 630, 634-36 (4th Cir. 2003). The Ninth Circuit issued a similar ruling in *Allard v. Gomez*, where "correctional officials based their denials on a general policy of approving hormonal treatment only on the basis of medical need, ruling that Allard's gender disorder could not qualify as a

medical need." 9 F. App'x 793, 794 (9th Cir. 2001). Numerous district courts have arrived at the same conclusion. *See, e.g., Soneeya*, 851 F. Supp. 2d at 247 & n.167 ("This blanket ban on certain types of treatment, without consideration of the medical requirements of individual inmates, is exactly the type of policy that was found to violate Eighth Amendment standards in other cases both in this district and in other circuits."); *Brooks v. Berg*, 270 F. Supp. 2d 302, 312 (N.D.N.Y. 2003) (application of freeze-frame policy was not "based on sound medical judgment" and so constituted deliberate indifference), *vacated in part on other grounds*, 289 F. Supp. 2d 286 (2003); *Hicklin*, 2018 WL 806764, at *11 ("The denial of hormone therapy based on a blanket rule, rather than an individualized medical determination, constitutes deliberate indifference in violation of the Eighth Amendment."); *Michelle v. California Dep't of Corr. & Rehab.*, No. 1:18CV01743, 2021 WL 1516401, at *8 (E.D. Cal. Apr. 16, 2021), *report and recommendation adopted sub nom. Concepcion v. Cal. Dep't of Corr. & Rehab.*, No. 1:18CV01743, 2021 WL 3488120 (E.D. Cal. Aug. 9, 2021) ("Plaintiff's allegations show that 'the only adequate medical treatment for [his] gender dysphoria is SRS . . . and that CDCR denied [him] the necessary treatment for reasons unrelated to [his] medical need.'") (alterations in original).

There is no question that from April 11, 2016, when Ms. Clark first requested treatment for gender dysphoria, until September 14, 2017, when she was finally allowed to see an endocrinologist, Defendants applied a blanket policy to deny any and all treatment to Ms. Clark. When Ms. Clark submitted a grievance form in September 2016 seeking "transition-related health care," Dr. Valetta

responded that, "[as] per CMHC/DOC policy, transitional treatment would be CONTINUED if inmate has already been on medication in the community, but transitional treatment will not be initiated while [inmate] is incarcerated." Ex. 17 at 27 (emphasis in original); *see also* Ex. 9, 121:19-122:13. He wrote much the same in October 2016, in response to yet another request by Ms. Clark for treatment of her gender dysphoria. Ex. 7 at 58-59; *see also* 128. That practice is colloquially known as a "freeze frame" policy and is exactly the sort of unthinking denial of care that courts have held constitutes deliberate indifference. *See Brooks*, 270 F. Supp. 2d at 312. Far from exercising the "sound medical judgment" that the Eighth Amendment demands, the defendants chose not to make any medical judgments at all, instead relying on a blanket policy that did not take Ms. Clark's particular needs into account. On this basis alone, the defendants were deliberately indifferent to Ms. Clark's gender dysphoria from April 11, 2016, to September 14, 2017.

iv. <u>Defendants deprived Ms. Clark of access to medical personnel qualified to treat her gender dysphoria, and otherwise failed to treat her according to community standards</u>

Courts also infer deliberate indifference where the care provided to an incarcerated person is "devoid of sound medical basis or far afield of accepted professional standards." *Orr v. Ferrucci*, No. 17-cv-788, 2019 WL 5864503, at *11 (D. Conn. Nov. 8, 2019); *Green v. Shaw*, No. 3:17-cv-913, 2019 WL 1427448, at *8 (D. Conn. Mar. 29, 2019); *see also Verley v. Goord*, 2004 WL 526740, at *11 (S.D.N.Y. 2004) (medical decisions "contrary to accepted medical standards" may exhibit deliberate indifference, because the doctor has "based his decision on something other than sound medical judgment"); *Moore v. Duffy*, 255 F.3d 543,

44

545 (8th Cir. 2001) (medical treatment may not "so deviate from the applicable standard of care as to evidence a physician's deliberate indifference"); *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987) (Eighth Amendment guarantees care "at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards").

The WPATH Standards of Care are widely accepted as the appropriate course of treatment for gender dysphoria. *See Edmo*, 935 F.3d at 771 (calling the Standards "the appropriate benchmark regarding treatment for gender dysphoria"); *see also Monroe*, 2022 WL 355100, at *3 ("WPATH dictates medically accepted Standards of Care for treating gender dysphoria"). The WPATH Standards "require providers to individually diagnose, assess, and treat individuals' gender dysphoria, including for those individuals in institutionalized environments." *Edmo,* 935 F.3d at 771. "Treatment can and should include GCS when medically necessary." *Id.* Ms. Clark's care came nowhere near meeting them. Ex. 1 ¶ 80 (counseling); ¶ 30 (hormones); ¶¶ 76-77 (surgery).

Furthermore, "medical treatment decisions regarding gender dysphoria must be made only by medical professionals who are qualified to treat gender dysphoria." *Monroe*, 2022 WL 355100, at *28. That was far from the case for Ms. Clark. Not one of Defendants has experience treating patients with gender dysphoria. Ex. 18, 76:4-13; Ex. 9, 117:6-17; Ex. 20, 22:18-23:8. Neither had they received any training for treating gender dysphoria; apparently, none even attended the training Dr. Burns offered after the commencement of this litigation, *see* Ex. 10, 183:1-3. As Defendants admitted in hiring Dayne Bachmann as a

Gender Non-Conforming Consultant in October 2021, "[n]either CTDOC nor any other state agency has in-house staff with the required skills, knowledge, and expertise to undertake this work." Ex. 14 at 1. Nonetheless, the defendants made no effort to refer Ms. Clark to someone competent to treat her.

This uncontroverted evidence, too, mandates an inference of deliberate indifference. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (surgery denial on recommendation of provider with no experience in transgender medicine could constitute indifference); *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (explaining that "if the need for specialized expertise . . . would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists permits an inference" of indifference); (*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (cannot deny incarcerated person "access to medical personnel capable of evaluating the need for treatment"); *Hoptowit v. Ray*, 682 F.2d 1237, 1252–53 (9th Cir. 1982) ("Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems."), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

3.   Conclusion

The overwhelming and uncontroverted evidence in this case is clear: Despite *more than six years* in which to treat Ms. Clark's serious medical condition, the defendants have failed adequately to do so—with full awareness of the risk to Ms. Clark's health and safety. Because there can be no genuine dispute of material facts, Ms. Clark is entitled to entry of judgment in her favor on her Eighth Amendment claim.

By: **/s/ Daniel S. Noble**

    **Daniel S. Noble (ct31089)**
    **Evan I. Cohen (ct29799)**
    **Matthew B. Danzer (ct30740)**
    **Kelsey A. Powderly (ct30855)**
    **FINN DIXON & HERLING LLP**
    **Six Landmark Square**
    **Stamford, CT 06901-2704**
    **Tel: (203) 325-5000**
    **Fax: (203) 325-5001**
    **E-mail: dnoble@fdh.com**

By: **/s/ Elana Bildner**

    **Elana Bildner (ct30379)**
    **Dan Barrett (ct29816)**
    **ACLU Foundation of Connecticut**
    **765 Asylum Avenue**
    **Hartford, CT 06105**
    **Tel: (860) 471-8475**
    **E-mail: ebildner@acluct.org**

*Attorneys for Plaintiff Veronica-May Clark*