**Plaintiff's D. Conn. Local R. 56(a)(1) Statement of Undisputed Material Facts**

| | | |
|---|---|---|
| 1 | A person's gender identity is their internal sense of whether they are male, female, or non-binary. | Ex. 1, Report of Dr. George Brown ¶ 47 |
| 2 | Transgender people are those who were designated male or female at birth, but whose gender identity is different from the that designation. | Ex. 1 ¶ 47 |
| 3 | A person's sexual orientation is distinct from their gender identity. | Ex. 1 ¶ 47 |
| 4 | Gender dysphoria is "a whole continuum" of clinically significant distress generated by the mismatch between what a person knows their gender to be, and the gender label assigned to them at birth. | Ex. 2, Deposition Transcript of DOC's 30(b)(6) Witness, 35:12-36:9 |
| 5 | The goal of treatment for gender dysphoria is to minimize or permanently resolve the patient's clinically significant distress symptoms. | Ex. 3, Deposition Transcript of Dr. George Brown, 138:15-21 |
| 6 | The World Professional Association for Transgender Health Standards of Care are the accepted standards by which gender dysphoria is treated. | Ex. 1 ¶ 49 |

| | | |
|---|---|---|
| 7 | The WPATH standards set out a multipronged medical and psychological approach to treatment, including (i) gender-informed psychotherapy, (ii) hormone therapy, and (iii) surgery to bring a person's sex organs and physical appearance into conformance with their true identity. | Ex. 1 ¶ 43 |
| 8 | Untreated or insufficiently treated gender dysphoria is likely to result in serious negative medical and mental health outcomes, including depression and anxiety, auto-castration, and suicide. | Ex. 14, GNC Consultant Competitive Bidding Waiver Request at 1; Ex. 1 ¶ 47; Ex. 3, 178:15-20 |
| 9 | Incarcerated people in Connecticut cannot choose the medical or mental health personnel who provides their care. | Ex. 2, 12:14-17 |
| 10 | DOC routes complaints about care directly to the provider. | Ex. 8, DOC Administrative Directive 8.9, at (6)(c)(2). |
| 11 | DOC does not track people with chronic conditions. | Ex. 10, Deposition Transcript of Dr. Craig Burns, 60:12-22 |
| 12 | DOC does not track people with complex conditions. | Ex. 10, 60:12-22 |

| 13 | DOC does not require providers to conduct grand rounds. | Ex. 10, 57:15-20 |
|---|---|---|
| 14 | DOC uses a classification system to determine "the frequency about which someone would need to be seen and the intensity of" medical or mental health care they might receive. | Ex. 2, 48:11-17 |
| 15 | DOC does not have a treatment protocol for any chronic illness, including gender dysphoria. | Ex. 2, 36:10-37:7 |
| 16 | As of October 2021, DOC had never employed anyone having the required skills, knowledge, and expertise to identify, treat, and guide transgender people in safe gender transition. | Ex. 14 at 1 |
| 17 | None of the individual defendants has had training in the treatment of gender dysphoria. | Ex. 9, Deposition Transcript of Dr. Gerald Valetta 117:10-13; Ex. 18, Deposition Transcript of Barbara Kimble-Goodman 75:21-76:8; Ex. 20, Deposition Transcript of Richard Bush 17:2-9 |
| 18 | None of the individual defendants has had experience treating people for gender dysphoria. | Ex. 18, 76:4-13; Ex. 9, 117:6-17; Ex. 20, 22:18-23:8 |

| 19 | On April 11, 2016, Ms. Clark told DOC clinicians she was a transgender woman and that she believed she had gender dysphoria. | Ex. 7, Ms. Clark's Medical Records at 1 |
|---|---|---|
| 20 | DOC first diagnosed Ms. Clark with gender dysphoria no later than May 27, 2016. | Ex. 7 at 3-6 |
| 21 | On July 15, 2016, Ms. Clark unsuccessfully tried to castrate herself with a pair of nail clippers. | Ex. 7 at 7-19 (incident records); 34, 20-22 (clinical records) |
| 22 | Ms. Clark was taken to the emergency room at John Dempsey Hospital and treated for her wounds. | Ex. 7, 23-31 (UCONN records) |
| 23 | A DOC psychologist acknowledged that her self-castration attempt was caused by her high level of psychological distress relative to gender dysphoria. | Ex. 16, Suicide Attempt and Self-Injury Summary Data Sheet |
| 24 | Ms. Clark was labeled a Mental Health 5 ("MH5") and taken to an infirmary at MacDougall-Walker to recover. | Ex. 7 at 32-33 (MH5), 34 (MH5), 35-36 (medical records from infirmary) |
| 25 | Ms. Clark was housed at Garner from July 2016 until March 2020. | Ex. 7 at 49-50 (transfer to Garner); 51-52 (transfer from Garner) |

| 26 | Upon her arrival at Garner in July 2016, Ms. Clark immediately submitted a written request to see a doctor for treatment of her gender dysphoria. | Ex. 17, Grievances, at 26 |
|---|---|---|
| 27 | Ms. Clark saw Defendant Gerald Valetta for the first time on August 1, 2016. | Ex. 7 at 55 |
| 28 | Dr. Valetta knew what gender dysphoria is, and knew that it is a chronic condition. | Ex. 9, 115:5-8, 117:3-5 |
| 29 | Dr. Valetta directed Ms. Clark to "M[ental] H[ealth] + case manager," to signify that he would provide no treatment for gender dysphoria. | Ex. 7 at 55; Ex. 9, 138:8-20 |
| 30 | In August 2016, a mental health APRN noted in Ms. Clark's chart that she had clinically significant distress and a strong desire to be rid of primary and secondary male sex characteristics. | Ex. 7 at 56 |
| 31 | In September-October 2016, Dr. Valetta twice refused Ms. Clark's requests for gender dysphoria treatment. | Ex. 17 at 25, 58-59 |

| 32 | On both occasions, Dr. Valetta cited an unwritten DOC policy barring gender dysphoria treatment for people who did not begin gender transition prior to incarceration. | Ex. 17 at 25, 58-59 |
|---|---|---|
| 33 | The policy was "widely known" by DOC medical staff. | Ex. 9, 122:13 |
| 34 | In September 2016, Ms. Clark filed a health services review request in which she wrote that she had been "continually denied access going on five months now to transition related health care," which was causing "internal psychological trauma." | Ex. 7 at 57 |
| 35 | Ms. Clark met with Defendant Kimble-Goodman at least eight times. | Ex. 7 at 60 (Nov. 2016)<br>Ex. 17 at 9 (Jan. 2017)<br>Ex. 7 at 61 (Feb. 2017)<br>Ex. 7 at 62 (June 2017)<br>Ex. 7 at 63 (July 2017)<br>Ex. 7 at 64 (Nov. 2017)<br>Ex. 7 at 65 (April 2018)<br>Ex. 7 at 66-7 (June 2018) |
| 36 | Kimble-Goodman knew what gender dysphoria was. | Ex. 18, 75:21-76:8. |

| 37 | Ms. Clark told Kimble-Goodman about her stress and her distress that her male genitalia were "poisoning" her. | Ex. 7 at 60, 61; Ex. 17 at 9 |
|---|---|---|
| 38 | **Kimble-Goodman provided no gender dysphoria treatment to Ms. Clark.** | Ex. 7 at 60 (Nov. 2016) <br> Ex. 17 at 9 (Jan. 2017) <br> Ex. 7 at 61 (Feb. 2017) <br> Ex. 7 at 62 (June 2017) <br> Ex. 7 at 63 (July 2017) <br> Ex. 7 at 64 (Nov. 2017) <br> Ex. 7 at 65 (April 2018) <br> Ex. 7 at 66-7 (June 2018) |
| 39 | **Kimble-Goodman offered no treatment because she believed that Ms. Clark "[was] pursuing legal means to address gender."** | Ex. 7 at 61, 62 |
| 40 | **Kimble-Goodman did not contact any other DOC treatment provider to discuss Ms. Clark or check on whether she was receiving care.** | Ex. 18, 101:8-14 |
| 41 | **Kimble-Goodman did not attempt to have an outside specialist treat Ms. Clark for gender dysphoria.** | Ex. 18, 101:8-13 |
| 42 | **Kimble-Goodman was aware of Ms. Clark's depression and medicated her.** | Ex. 7 at 63 |

| 43 | Ms. Clark met with Defendant Richard Bush in March and September 2019. | Ex. 7 at 68-70, 71-73 |
|---|---|---|
| 44 | Bush knew what gender dysphoria was. | Ex. 20, 16:13-18, 17:2-9 |
| 45 | Ms. Clark's requests for more therapy because she was "stressed out and depressed over the transition" were routed to Mr. Bush | Ex. 21 at 1 |
| 46 | Bush provided no gender dysphoria treatment to Ms. Clark. | Ex. 20, 29:19-20 |
| 47 | Bush did not attempt to have an outside specialist treat Ms. Clark for gender dysphoria. | *Compare* Ex. 7 at 68-70 and 71-73 (no referrals) *with* Ex. 20, 51:8-23 (confirming that it was his practice to record referrals in the chart) |
| 48 | Ms. Clark's counsel from Morningside Heights Legal Services spoke with Dr. Robert Berger of UCONN on May 12, 2017 in an attempt to forestall litigation over her lack of treatment. | Ex. 23, Letter from Ted Olds et al. to Dr. Robert Berger 1 (May 4, 2017) (warning of litigation); Ex. 24, Letter from Ted Olds et al. to Dr. Robert Berger 1 (May 12, 2017) (memorializing meeting) |

| 49 | In July 2017, Dr. Valetta filed the paperwork necessary to refer Ms. Clark to an endocrinologist, noting that he was asked by CMHC management to do so. | Ex. 7 at 74; Ex. 9, 182:14-183:5. |
|---|---|---|
| 50 | In September 2017, Ms. Clark began hormone therapy: daily doses of 2 mg estradiol and 50 mg spironolactone. | Ex. 17 at 13 |
| 51 | The endocrinologist Ms. Clark saw in September 2017 requested that Ms. Clark have bloodwork done after 4 and 12 weeks, and to return in 3 months. | Ex. 7 at 76-79 |
| 52 | Ms. Clark did not have a follow-up appointment with endocrinology for 1 year and 7 months. | Ex. 7 at 81 (August 2019 appointment) |
| 53 | At that appointment, in August 2019, DOC had not done any bloodwork. | Ex. 7 at 81 |
| 54 | In October 2019, the endocrinologist doubled her spironolactone dose to 200 mg daily, with orders to increase to 300 mg daily within eight weeks, so as to combat Ms. Clark's circulating testosterone levels of 754 nanograms per deciliter ("ng/dL") of blood. | Ex. 7 at 115, 116 |

| 55 | In February 2020, Ms. Clark's circulating testosterone was 568 ng/dL, and the endocrinologist doubled her daily estradiol dose to 4 mg. | Ex. 7 at 117, 118 |
|---|---|---|
| 56 | In October 2020, the endocrinologist recommended Ms. Clark seek referral to a surgeon for gender confirmation surgery, a recommendation repeated at other visits. | Ex. 7 at 120, 124 |
| 57 | Aside from the referral to endocrinology, Dr. Valetta never did anything to treat Ms. Clark's gender dysphoria. | Ex. 9, 237:15 (no further treatment); 239:20-240:2 (no recollection of any steps re: surgery) |
| 58 | Dr. Craig Burns, DOC's chief of mental health, knew of Ms. Clark and her self-castration attempt in 2018. | Ex. 10, 189:9-189:21 |
| 59 | Dr. Burns never treated Ms. Clark, and took no steps to become involved in her care. | Ex. 10, 198:19-199:22 |
| 60 | Dr. Burns expected the staff located in Ms. Clark's prison to provide treatment to her. | Ex. 10, 191:24-192:9 |
| 61 | But in fall 2021, Dr. Burns suddenly began calling people who might serve as consultants to DOC on gender dysphoria, as well as genital gender confirmation surgeons. | Ex. 10, 161:21-162:7; 126:15-127:9 |

| 62 | In October 2021, DOC sought a gender transition consultant to "provide immediate assistance with active Departmental litigation in a way that may limit or extinguish that specific litigation through provision of care." | Ex. 14 at 1 |
|---|---|---|
| 63 | DOC stated that it was "critical" to secure a gender transition consultant because of the "extreme" "constant" and "very present" "risk" of self-harm faced by gender non-conforming individuals that is "exacerbated by incarceration" and "exceeds other populations within the Department" | Ex. 14 at 1 |
| 64 | The contractor DOC hired, Dayne Bachmann, evaluated Ms. Clark on December 21, 2021. | Ex. 27, Dayne Bachmann Standard Progress Note, at 1 |
| 65 | Bachmann's evaluation concluded that gender confirmation surgery for Ms. Clark is "essential," "a fundamental need and vital to alleviating her gender dysphoria." | Ex. 27 at 1 |
| 66 | Bachmann also concluded that "it would benefit [her] to have a gender therapist." | Ex. 27 at 1 |

| 67 | Plaintiff's expert, Dr. George Brown, concluded that "DOC has provided inadequate, substandard medical, psychiatric, and surgical care for VC's serious medical condition (GD) in spite of full knowledge of the severity of her diagnosis" | Ex. 1 ¶ 51-52 |
|---|---|---|
| 68 | Dr. Brown concluded that Ms. Clark's "lack of access to basic, medically necessary services for the treatment of GD violates any reasonable standard of care for transgender inmates." | Ex. 1 ¶ 51-52 |
| 69 | Dr. Brown concluded that genital gender confirmation surgery is medically necessary for Ms. Clark. | Ex. 1 ¶ 77; Ex. 3, 245:17-21. |
| 70 | Ms. Clark has had thoughts of self-castration and reported them to Dr. Valetta. | Ex. 7 at 126, 85-87 |
| 71 | Ms. Clark has had thoughts of suicide. | Ex. 5 at 110:5-6; 111:13-25 |
| 72 | While at Garner, Ms. Clark submitted at least 24 grievances, including to Defendants, relating to her requests for treatment for gender dysphoria. | Ex. 17 at 5, 9, 11-12, 14-26, 28-29, 1, 30-31, 33-39, 45-49, 50-53 |