## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VERONICA-MAY (neé NICHOLAS) CLARK, | |
| Plaintiff, | Case No. 3:19-cv-575-VLB |
| v. | |
| ANGEL QUIROS, DR. GERALD VALETTA, RICHARD BUSH, and BARBARA KIMBLE-GOODMAN, | MAY 5, 2022 |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Defendants oppose Plaintiff's Motion for Summary Judgment.  Doc. # 133.  Defendants entitled to judgment as a matter of law on Plaintiff's claims, and her motion should be denied. First, Plaintiff fails to properly comply with the procedural rules of this Court in her statement of material facts, and her motion may be denied on that ground alone. Second, Plaintiff fundamentally misunderstands the analysis under the objective prong of her deliberate indifference claim, and a correct application of this analysis demonstrates that her claim fails. Third, Plaintiff cannot establish the subjective prong of her claim against any Defendant. Moreover, all individual Defendants are entitled to qualified immunity. Lastly, to the extent Plaintiff has moved for judgment on her injunctive claim, this claim utterly fails.

As set forth more fully below and in the Defendants' motion for summary judgment and supporting papers, the Defendants are entitled to judgment as a

matter of law. This Court should deny Plaintiff's motion for summary judgment and grant the Defendants' motion. See Doc. 128.

I.     <u>ADDITIONAL RELEVANT FACTS</u>

Defendants rely on their statement of the facts as included in their Motion for Summary Judgment and fully incorporate them into this Opposition.  See Doc. #128-1, 128-2.  Defendants set forth and highlight several additional facts which are relevant to the Court's analysis and the review of Plaintiff's claims.

As an initial matter, Defendants Valletta, Kimble-Goodman, and Bush did not even meet Plaintiff until August 2016, November 2016, and March 2019, respectively.  Ex. G, ¶ 2; Ex. H, ¶ 6; Ex. B, Pg. 00899-901, 00966-9670, 1294; Ex. I. From 2016 until July 2018, Correctional Managed Healthcare ("CMHC") an outside agency, was responsible for inmate medical care. See Ex. 2, Pgs. 73-74 (CMHC was provided health care and mental healthcare until July 2018). The Department of Correction ("DOC"), Defendant Quiros, and his predecessor were not responsible for the provision of medical or mental health care to inmates from 2016 to 2018 while CMHC provided such care.

Though Plaintiff asserts in her 56(a)(1) statement that "[t]he goal of treatment for gender dysphoria is to minimize or permanently resolve the patient's clinically significant distress symptoms," in actuality, both experts in this case, Dr. Stephen Levine and Dr. George Brown, testified that there is no cure for gender dysphoria. Ex. N 47; Ex. L at 199:4-7. Dr. George Brown further testified that "the goal of treatment is to—is to reach a level of satisfaction with a gendered self that is not discussed in terms of cure…" Ex. 3, 200:4-7; see also Ex. 3, 245:2-5 ("The goals of

treatment, as stated in—in the WPATH standard of care, which is to find—find comfort with the felt gender.")

In line with these goals, Dr. Levine testified that mental health counseling, including talk therapy or psychotherapy, is beneficial treatment for patients with gender dysphoria. See Ex. N, Pgs. 32-35, 111, 114-117. Plaintiff has been prescribed the exact dosage of spironolactone, a testosterone blocker, that Plaintiff's own expert recommends, and recent lab results showed that Plaintiff was within her own expert's recommended range of estrogen. See Ex. 1, ¶ 43 (typical high end for dose of spironolactone is 300mg per day), Ex. D, Pg. 36 (explaining raising dosage of spironolactone in Oct. 2019); Ex. 1, ¶ 78, (estradiol levels should be at 100pg/ml), See Ex. B, Pg. 00047 (estradiol levels on April 6, 2022, at 108 pg/ml).

Lastly, only approximately five prisoners (who face unique mental health and security concerns not presented in patients in the community) within the entire nation have undergone surgical intervention for gender dysphoria—the earliest of which occurred in 2018. See Ex. 3, Pgs. 84-85; 231. Further, Plaintiff's expert, Dr. Brown, could not point to a single medical involving prisoners to evaluate the efficacy and safety of surgical intervention suffering from gender dysphoria. See Ex. 3, Pgs. 231-233.

II. **ARGUMENT**

    A. **Plaintiff has failed to comply with Local Rule 56(a)1 by being egregiously disingenuous with the record and repeatedly providing inaccurate or misleading citations to support her statements of fact. For this reason alone, Plaintiff's motion should be denied.**

Local Rule of Civil Procedure 56(a)(1) requires that a motion for summary judgment be accompanied by "a document entitled 'Local Rule 56(a)1 Statement,'

which sets forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." Rule 56(a)(3) requires that each statement in the Rule 56(a)(1) Statement "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." "It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

If parties do not comply with this Rule, this Court may deny the motion for summary judgment or "[i]n the absence of meaningful citations to the record, the Court may deem certain facts that are supported by the evidence admitted." *Hubert v. Connecticut Dep't of Correction,* No. 3:14-CV-476 (VAB), 2018 WL 1582508, at *15 (D. Conn. Mar. 30, 2018) (internal citations omitted). Failure to submit an appropriate 56(a)(1) statement can "constitute grounds for denial of the motion" for summary judgment. *Turgeon v. Operating Eng'rs, Local No. 98*, 2 F. App'x 176, 179 (2d Cir. 2001).[1]

---

[1] See also, *Tross v. Ritz Carlton Hotel Co.,* 928 F. Supp. 2d 498, 503-04 (D. Conn. 2013) (denying a motion for summary judgment for failing to provide a Local Rule 56(a)1 Statement); *Carter v. Reiner, Reiner & Bendett, P.C.,* Civil No. 3:06CV00988 (AWT), 2007 U.S. Dist. LEXIS 54694, 2007 WL 2221432, at *1-2 (D. Conn. July 30, 2007) (denying summary judgment without prejudice because both parties failed to comply with the District of Connecticut's Local Rule 56(a)3); *MSF Hldg. Ltd. v. Fiduciary Trust Co. Int'l,* 435 F. Supp. 2d 285, 303-04 (S.D.N.Y. 2006) (denying motion for summary judgment because moving party failed to submit the required 56.1 statement, the equivalent of a Local Rule 56(a)1 Statement under the applicable local rules).

Here, Plaintiff disregarded the requirements of Local Rule 56. Her Local Rule 56(a)(1) statement of material facts contains numerous statements of fact that are not actually supported by her citation to evidence in the record. Many contain clearly miscited or mistaken citations to incorrect exhibits, pages, or paragraphs. Worse, to the extent Plaintiff does specifically cite to an exhibit to support her statements, a careful review of the cited evidence often indicates that the exhibit cited does not support the purported fact.[2] Consequently, Plaintiff forces Defendants, and worse, this Court, to comb through thousands of pages of exhibits to uncover Plaintiff's distortions, miscites, and mischaracterizations. This is the exact situation the Rules are designed to avoid. Indeed, this Court has imposed sanctions for less, such as where a party made general references to affidavits and cited pages rather than citing to specific paragraphs. See *Devecchis v. Scalora*, 179 F. Supp. 3d 208, 213 at n. 2 and n. 4 (D. Conn. 2016).

Rather than address every instance of Plaintiff's noncompliance, in the interests of judicial economy, Defendants will summarize some of the worst examples. First, as to citations to incorrect exhibit numbers, paragraphs, or page numbers, on at least eleven occasions, Plaintiff fails to accurately cite the evidence. See Def. 56(a)(2), ¶¶ 1, 2, 5, 11, 13, 26, 61,67, 68, 69, 70. Indeed, Plaintiff cites to pages that do not exist. See Id., ¶ 61. Plaintiff also cites to paragraphs in her own expert's report which are completely unrelated to the statement of fact she

---

[2] This disingenuousness is regrettable and contrary to the ethical duty of candor to the Court, including the well-established principle that as an attorney and officer of the court is at the core of counsel's functions to make truthful representations to the tribunal. See Rules of Professional Conduct 3.3; *Daniels v. Alander*, 268 Conn. 320, 332 (2004).

has proffered, and repeatedly miscites deposition testimony. See Id., ¶¶ 67, 68, 1, 2, 5, 11, 13. These inaccurate citations "frustrate [Local] Rule 56(a)'s purpose of clarifying whether a genuine dispute of material facts exists." *Silano v. Hammel*, No. 3:17-CV-01498 (KAD), 2019 WL 1385092, at *1 (D. Conn. Mar. 27, 2019) (quoting *Zamichiei v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-cv-00739 (VAB), 2018 WL 950116, at *1 (D. Conn. Feb. 20, 2018))

Plaintiff's looseness with the facts is also problematic. In many instances where apparently "accurate" citations are provided, a closer review demonstrates Plaintiff mischaracterizes the evidence. For example, in paragraph 53, Plaintiff asserts that "At that [endocrinology] appointment, DOC had not done any bloodwork" and cites to Plaintiff's medical records at Page 81. But Page 81 does not mention anything about bloodwork whatsoever. Similarly, in paragraph 40, Plaintiff asserts "Kimble-Goodman did not contact any other DOC treatment provider to discuss Ms. Clark or check on whether she was receiving care" and cites to Ex. 18, 101:8-14. But these lines do not support Plaintiff's assertion, and even a cursory review of the testimony just prior to that cited demonstrates that Kimble-Goodman spoke with Dr. Valletta (Ex. 18, 99:12-14), with a psychiatrist, Dr. Lee (Id., 100:9-19), and with a social worker (Id., 100:20-23) regarding Plaintiff and her treatment. Plaintiff directly misrepresents APRN Kimble-Goodman's testimony.

Plaintiff even mischaracterizes her own expert's testimony. In paragraph 5, Plaintiff states "[t]he goal of treatment for gender dysphoria is to minimize or **permanently resolve** the patient's clinically significant distress symptoms" and cites to Dr. George Brown's deposition. (Emphasis added). But the portion of the

deposition cited has nothing to do with "the goal of treatment for gender dysphoria." See Ex. 3, 138:15-21 (discussing whether patients have realistic expectations). After combing the record, testimony regarding the "goal" of treatment can be found, but in actuality Dr. Brown contradicts Plaintiff's statement of fact: "first of all, the goal of treatment for gender dysphoria is not necessarily to cure gender dysphoria…" (Ex. 3, 139:15-17) instead, "the goal of treatment is to—is to reach a level of satisfaction with a gendered self that is not discussed in terms of cure…" Ex. 3, 200:4-7; see also Ex. 3, 245:2-5 ("The goals of treatment, as stated in—in the WPATH standard of care, which is to find—find comfort with the felt gender.").

In adjudicating summary judgment motions, courts "must be satisfied that the citation to the evidence in the record supports the assertion." *Vermont Teddy Bear Co.*, 373 F.3d at 244. Plaintiff's repeated mischaracterizations of the record prevents the Court from relying upon her citations, while her inaccurate citations create additional work for the Defendants and this Court. This Court is not obligated to dig through the Plaintiff's evidence to ensure that the exhibits actually support her assertions. "The end result [of Plaintiff's actions] is that the Court is unable to discern… precisely what evidence supports [her] local rule statement" and the Court "does not have a reliable factual basis to decide the motion for summary judgment." *Callahan v. City of New Haven Bd. of Educ.,* No. 3:17CV-00617 (JAM), 2019 WL 1649940, at *1 (D. Conn. Apr. 16, 2019); *see also Tross v. Ritz Carlton Hotel Co., LLC,* 928 F. Supp. 2d 498, 503 (D. Conn. 2013)("This Court refuses to burden [the defendants] because of [plaintiff's] failure to comply with the Local

Rules"). Plaintiff has failed to substantially comply with the Local Rules. Thus, to the extent Plaintiff misrepresents facts or fails to appropriately cite to evidence to support her facts, those statements should not be considered by this Court, or her motion should be denied on this basis alone.

> **B.      Plaintiff cannot satisfy the objective prong largely because Plaintiff fails to address the well-established distinction between medical deliberate indifference cases based on denials of treatment versus delays, interruptions, or inadequacies in treatment.**

Plaintiff's motion for summary judgment rests on a number of faulty premises, the first of which is "there can be no dispute that Ms. Clark has satisfied the objective prong of her deliberate indifference claim." (Doc. #133 at 31.)  Plaintiff asserts this based on the specious contention that "gender dysphoria is a serious medical need" and leaving it at that. Defendants do not contest that the Second Circuit has "assumed" gender dysphoria is a serious medical condition in *Cuoco*. But this does not end the objective inquiry, because even Plaintiff acknowledges that she has received medical treatment for her gender dysphoria for years of her incarceration.  *See Ray v. Zamilus*, No. 13 Civ. 2201 (PGG), 2017 U.S. Dist. LEXIS 158957, at *25 (S.D.N.Y. Sep. 27, 2017) ("the case law clearly establishes that the delay in treatment does not become a constitutional violation merely because the underlying medical condition . . . is indisputably a serious one.") (quotation omitted).

The objective prong of a deliberate indifference claim itself asks two questions: "(1) 'whether the prisoner was actually deprived of adequate medical care'… and (2) 'whether the inadequacy in medical care is sufficiently serious.'" *Green v. Shaw*, 827 F. App'x 95, 96 (2d Cir. 2020) (quoting *Salahuddin v. Goord,* 467

F.3d 263, 279-80 (2d Cir. 2006)). Prison officials are only tasked with providing "reasonable" medical care, not care that is "perfect," or "great, or even very good." *Rhodes v. Chapman,* 452 U.S. 337, 347-349 (1981); *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014); *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1277 (11th Cir. 2020). The Constitution "does not mandate comfortable prisons" and a "correctional facility is not a health spa, but a prison in which convicted felons are incarcerated." *Rhodes*, 452 U.S. at 349; *Saunders v. Ricks,* No. 9:03-CV-598, 2006 WL 3051792, at *6 (N.D.N.Y. Oct. 18, 2006) (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)).

In cases where the inmate was *completely* deprived of any medical care for his or her condition, courts conduct a broad inquiry and "examine whether the inmate's medical condition is sufficiently serious" to satisfy the objective prong. *Salahuddin*, 467 F.3d at 280 (citing to *Smith*, 316 F.3d 178). If a court does determine that a plaintiff was "actually deprived of adequate medical care" in some way, the second inquiry under the objective prong requires the court "to examine how the offending conduct is inadequate and what harm, if any, *the inadequacy has caused* or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280 (citing  *Helling v. McKinney*, 509 U.S. 25, 32–33(1993) (emphasis added)).

In cases where some medical treatment was provided and the complaint is that the treatment was delayed, interrupted, or somehow inadequate, "the seriousness inquiry is narrower" and must be "tailored to the specific circumstances of each case." *Salahuddin,* 467 F.3d at 280; *Valdiviezo,* 752 F. App'x at 32. Specifically, the court must determine "whether the inadequacy in the

medical care is sufficiently serious." *Thompson v. Racette*, 519 F. App'x 32, 34 (2d Cir. 2013). That determination focuses "on the alleged inadequate treatment, not the underlying condition alone." *Butler v. Furco*, 614 F. App'x 21, 22 (2d Cir. 2015) (citing *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)). "Stated differently, it's the particular risk of harm faced by the prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Goris v. Breslin,* 402 F. App'x 582, 585 (2d Cir. 2010).

Where, as here, some treatment was provided but plaintiff alleges the care is inadequate in some way, the Second Circuit breaks down the analysis even further: (1) care may be inadequate because there was "a temporary delay" in receiving "otherwise adequate medical treatment," *see Valdiviezo,* 752 F. App'x at 32, or (2) the care provided itself may be constitutionally inadequate*. Id.* (considering two separate claims; one in which care was delayed and one in which plaintiff alleged care was "inadequate" because, in providing treatment, medical staff ordered inmates to carry plaintiff and they dropped him multiple times causing him to lose consciousness); *Thompson*, 519 F. App'x at 34 (finding the objective prong was not met where alleged "inadequacy" in care was choice to have inmate undergo physical therapy rather than surgery for torn tendon, despite multiple recommendations for surgery by specialists).[3]

---

[3] *See also Butler,* 614 F. App'x at 23 (finding objective prong  not met where plaintiff alleged care provided—medication which caused an allergic reaction—was inadequate); *Goris,* 402 F. App'x at 585 (holding analysis of the subjective prong was not even necessary where alleged inadequacies—refusal to prescribe surgery instead of physical therapy, failure to more expeditiously arrange a follow-up and

Notably, when the Second Circuit considers alleged "inadequacies" in care rather than delays, the Court rarely finds deliberate indifference, generally because the plaintiffs are unable to establish that the alleged inadequacy in care in and of itself caused a substantial risk of serious harm to the plaintiff. *See, e.g., Thompson,* 519 F. App'x at 34*, Butler,* 614 F. App'x at 23*, Goris*, 402 F. App'x at 585, *cf. Valdiviezo,* 752 F. App'x at 32 (found inadequacy to be sufficiently serious to meet objective prong because the inadequacy itself—dropping the inmate multiple times after ordering untrained inmates to carry him—not the underlying medical condition caused loss of consciousness, injury, and pain).

Courts have looked at different factors when evaluating whether a delay, interruption, or alleged inadequacy can satisfy the objective prong for purposes of a medical deliberate indifference claim. These are exacerbation of the underlying condition, adverse medical effects, demonstrable physical injury, or worsening prognosis for treatment. *See Washington v. Artus*, 708 F. App'x 705, 709 (2d Cir. 2017) ("Washington proffered no evidence, nor did he even allege, that any delay exacerbated his injury."); *Valdiviezo*, 752 F. App'x at 32 ("a court may consider the absence of adverse medical effects or demonstrable physical injury.") (quotation omitted); *Ray*, 2017 U.S. Dist. LEXIS 158957, at \*28 ("where a plaintiff has not

---

delay in either physical therapy or surgery for several months—were not "sufficiently serious as an objective matter, to be actionable");
*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998) (alleged "inadequacy" in care was "consciously choosing . . . an easier and less efficacious treatment plan" and that lack of efficacy was known to the defendant); *Camera v. Freston*, No. 3:18CV01595(SALM), 2022 U.S. Dist. LEXIS 55068, at \*44 (D. Conn. Mar. 28, 2022) (holding objective prong not satisfied where the alleged "inadequacy" in care was a limited examination and/or failure to provide eye pressure check).

offered medical evidence demonstrating disease progression or a worse prognosis, defendants have been granted summary judgment.") (collecting cases); *see also Ocampo v. Fischer*, No. 11-CV-4583 (CBA) (RER), 2018 U.S. Dist. LEXIS 50830, at *22 (E.D.N.Y. Mar. 27, 2018) ("The Court finds that Ocampo has not offered evidence sufficient to demonstrate that the alleged delay in his Hepatitis C treatment (1) caused his Hepatitis C condition to worsen; (2) presented a risk that the eventual treatment would not be successful or otherwise caused him to have a worse prognosis; or (3) caused any adverse medical effect.").

Plaintiff misleads the Court with her failure to accurately brief and discuss these significant nuances in the analysis. The record demonstrates that Plaintiff is unable to satisfy the objective prong, as argued in more detail at Doc. #128-1 at 25-31.  This is ultimately fatal to her claim because she fails to identify or offer any evidence as to what exacerbation of her condition she has suffered from any alleged inadequacies or delays in her care. Neither can she demonstrate that her prognosis has worsened, nor that she suffered any actual adverse physical injuries because of any of the alleged "inadequacies" in her care.

Quite the opposite, Plaintiff cannot dispute that her condition, which was by her own description a "ten out of ten" in terms of severity prior to treatment, has improved since receiving treatment.  Ex. L, Pgs. 193-194; Ex. B, Pg. 186, 772, 1088, 1268; Ex. K, Pgs. 117-18, 121, 122, 132-33. Further, Plaintiff cannot point to any actual physical or medical consequences of the supposed delay or inadequacy of her hormone therapy in particular. Indeed, she and her expert could only point to normal physiological processes like male pattern baldness, facial hair growth, and

having erections as physical "injuries" she suffered as a result of her supposedly deficient treatment.  Ex. K at 116; Ex. L at 181-83.  None of these are sufficient to constitute a physical injury for purposes of this analysis, nor are they "physical injuries" in a medical sense, as evidenced by the testimony of Dr. Aftab, one of Plaintiff's endocrinologists. Ex. D at 64-65; *see also Latouche v. Rockland Cty.*, No. 22-CV-1437 (LTS), 2022 U.S. Dist. LEXIS 61010, at \*20 (S.D.N.Y. Mar. 29, 2022) ("Hair loss is generally not deemed a serious medical condition."); *Lara v. Bloomberg*, No. 04 CV 8690 (KMW)(HBP), 2007 U.S. Dist. LEXIS 95635, at \*8 n.6 (S.D.N.Y. Dec. 20, 2007) (agreeing that even "erectile dysfunction and other side effects . . . "cannot support a claim of deliberate indifference to a serious medical condition.").

Further, Dr. Aftab testified that any delay achieving desired levels of testosterone and estrogen in a patient with gender dysphoria would not impact the efficacy of the hormone therapy in the future. Ex. D. at Pgs. 93-94. Indeed, Dr. Levine believes gender dysphoria cannot be cured and Dr. Brown, though allowing for this possibility, concedes that "curing" gender dysphoria is not the goal of the treatment. Ex. N 47; Ex. L at 199:4-7. It is therefore impossible to argue that an alleged delay or inadequacy in treating gender dysphoria could "worsen the prognosis" in the manner that failing to diagnose or treat cancer or a broken bone could. Any such argument would defy common sense and be based on, at best, a dispute amongst doctors. *Watson v. Wright*, No. 9:08-CV-62 (NAM/ATB), 2011 U.S. Dist. LEXIS 116709, at \*30 (N.D.N.Y. Aug. 4, 2011) ("the law is clear that a difference of opinion . . . even among medical professionals themselves, as to the appropriate

course of medical treatment does not in and of itself amount to deliberate indifference.").

Ultimately, Plaintiff cannot demonstrate on this record that, because of any alleged delay or inadequacy, she has suffered adverse medical consequences, demonstrable physical injuries, exacerbation of her gender dysphoria, or a worsening of a prognosis for a "cure" which is, at best, debatable. Plaintiff's condition improved with treatment and continues to do so.  She therefore fails the objective prong and all of her claims fail along with her. Not only is Plaintiff not entitled to summary judgment, Defendants are.

**C.     Plaintiff also fails to satisfy the subjective prong for any of her deliberate indifference claims.**

Plaintiff contends there is "no dispute" that she satisfies "four formulations of the subjective prong of deliberate indifference." (Doc. #133 at 31.) Not so. Instead, Plaintiff advances four theories that are either inapposite, contradicted by the record, divorced from the caselaw, or untethered from the subjective prong analysis altogether. Defendants will address these "formulations" in turn.

**1.     Plaintiff's argument that Defendants "refused" to treat Plaintiff's gender dysphoria despite "knowing" that she would be placed at substantial risk of serious harm is factually inaccurate, legally inapposite, and ultimately untenable.**

Plaintiff starts by arguing that Defendants "looked the other way" instead of "treating" or "even attempting to treat" Plaintiff.  Doc. #133 at 32. Again, Plaintiff mischaracterizes this case as one of denial of treatment[4] as opposed to

---

[4] Plaintiff's citation to *Harrison v. Barkley* for the premise that "outright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated" in a case so obviously about alleged delays and inadequacies

inadequacies, delay or interruption of treatment. Right off the bat, Plaintiff misunderstands or misrepresents the nature of this case by oddly suggesting that Plaintiff received no treatment. Doc. #133 at 32. However, less than a page later, Plaintiff acknowledges that she received treatment, though quickly dismisses it as "inadequate and unmonitored." Doc. #133 at 33. Plaintiff further misunderstands deliberate indifference analysis by arguing about the alleged "inadequacy" of her treatment in her first "formulation" of the *subjective* prong. This is just fundamentally wrong as argued extensively *supra*.

The best she can do is claim that Dr. Valletta "did not facilitate" her hormone therapy or "make sure" her labs were "timely taken" or that she had "necessary monitoring."  Doc. #133 at 33.  Plaintiff also claims that "[i]n four years, Dr. Valetta [sic] never even purported to assess Ms. Clark for any medical interventions, including gender confirmation surgery. . ." and cites to his deposition transcript to support this. Doc. #133 at 34. This is how the cited portions actually read:

> 14 Q. Okay. Do you recall having a conversation
> 15 with anyone about Ms. Clark's desire to receive this
> 16 surgery?
> 17 A. I don't recall specifically, no.
> Page 206
>
> 23 Q. What steps, if any, did you take to get
> 24 bottom surgery approved for Ms. Clark?
> 25 A. I don't recall what steps I took.
> Page 239.

This is just another of the host of examples of Plaintiff's misleading citations to the record. A lack of memory is not synonymous with the answer "no." Further,

---

as opposed to denials of treatment is further evidence of Plaintiff's fundamental misunderstanding of how medical deliberate indifference claims are analyzed.

Plaintiff does not and cannot contend that Dr. Valletta was qualified to refer Plaintiff for surgery pursuant to her own preferred WPATH standards. Indeed, the best Dr. Valletta could have done according to WPATH, even assuming he believed surgery to be an effective treatment, would have been to refer Plaintiff to mental health for a gender dysphoria evaluation—which he did, twice. Ex. G, ¶ 31; Ex. B, Pgs. 01195, 01046-01049.

Plaintiff's mischaracterization of the record aside, these allegations, separate or together, are insufficient to state a deliberate indifference claim. *See Gibbs v. Utilization Review Comm. Members John Doe 1-7*, No. 3:20-cv-1119 (JAM), 2020 U.S. Dist. LEXIS 227868, at *18-20 (D. Conn. Dec. 4, 2020) (dismissing in IRO claim that medical provider delayed an inmate's follow up appointment); *Eason v. Quinn*, No. 3:19-cv-219 (VAB), 2020 U.S. Dist. LEXIS 103508, at *18-20 (D. Conn. June 12, 2020) (dismissing claim that prison doctor "never ordered . . . any bloodwork or diagnostic test" holding that "failure to provide [inmate] with diagnostic tests represents, at most, negligent conduct that is not actionable under the Eighth Amendment."); *McFadden v. Fischer*, No. 16-CV-6105-FPG, 2016 U.S. Dist. LEXIS 136651, at *47-48 (W.D.N.Y. Sep. 30, 2016) (holding "the failure to schedule a follow-up visit does not state a claim of deliberate indifference in violation of the Eighth Amendment"); *Miles v. Cty. of Broome*, No. 3:04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *24 (N.D.N.Y. Mar. 6, 2006) (same); *Graham v. Wright*, No. 01 Civ. 9613 (NRB), 2004 U.S. Dist. LEXIS 15738, at *19 (S.D.N.Y. Aug. 9, 2004) (holding failure to order blood test after reviewing medical file was not deliberate indifference); *Hernandez v. New York State Dep't of Corr.*, No. 97-CV-1267 (SC),

16

2000 U.S. Dist. LEXIS 21948, at *7 (S.D.N.Y. Nov. 17, 2000) (holding that a "failure to follow-up" on therapy recommendations "at best" shows that the defendant did not "provide [the inmate] with his preferred treatment or that he somehow provided negligent treatment.").

Despite this caselaw, Plaintiff claims "[a] doctor's failure to facilitate further treatment evinces deliberate indifference to serious medical needs" and to justify this cites to three cases, each insufficient to carry the weight of that argument. *Giraud v. Feder* is an initial review order where the Court allowed a deliberate indifference claim to proceed based on an inmate's allegation that a prison doctor diagnosed him with a torn tendon and knew he required an MRI, but did nothing "to ensure that he received an MRI or further treatment." No. 3:20-cv-1124 (SRU), 2021 U.S. Dist. LEXIS 74554, at *11-12 (D. Conn. Apr. 19, 2021). The court found that to be "sufficient, for purposes of initial review, to evince deliberate indifference." *Id*. Setting aside the profound difference between Giraud's medical condition and Plaintiff's mental disorder, and the fact that *Giraud* is a denial case, not a delay one, and the drastic difference in procedural postures, *Giraud* is still completely inapposite.

Giraud *alleged* that the prison doctor suspected that he had a specific condition that required a specific diagnostic procedure to determine if a surgery was necessary. Not so here. Plaintiff cannot point to any evidence that Dr. Valletta knew a blood test was necessary to diagnose her condition. Indeed, her condition was already diagnosed by the time Dr. Valletta came into contact with her. Nor can Plaintiff point to any evidence to suggest that Dr. Valletta knew of the potential

efficacy of an increased dosage of hormone therapy or surgery. Indeed, Dr. Valletta properly deferred to the treatment decisions of the endocrinology specialists, as he was entitled to do. See Doc. #128-1 at 37, n. 7. And even if Dr. Valletta had been the person to determine what medications to provide Plaintiff and in what dosage, disagreement over what medications to prescribe and at what dosage are insufficient to state a deliberate indifference claim. *See Cephas v. Nassau Cnty. Corr. Ctr.*, No. 12-CV-1445, 2014 U.S. Dist. LEXIS 16466, at *5-6 (E.D.N.Y. Feb. 10, 2014) (dismissing the plaintiff's deliberate indifference claim because, even though the plaintiff may not have received the medication he wanted, he did receive medication).[5] Likewise, none of the Defendants knew or know if surgery is an efficacious treatment for gender dysphoria. Ex. G, ¶ 16; Ex. H, ¶ 22; Ex. I, ¶ 21. *Giraud* provides no support for Plaintiff's claims here.

*Williamson v. Naqvi*, No. 3:19cv4(MPS), 2019 U.S. Dist. LEXIS 107394, at *16 (D. Conn. June 27, 2019), another initial review order based on an alleged total denial of treatment for a knee condition, is similarly unpersuasive. *Williamson* is a Fourteenth Amendment deliberate indifference claim and therefore the *mens rea* required to satisfy the subjective prong is different from that of an Eighth

---

[5] *See also Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004), *aff'd*, 178 F. App'x 39 (2d Cir. Apr. 24, 2006) ("While prisoners have a right to medical care, they do not have a right to choose a specific type of treatment . . . . Differences in opinion . . . . over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment."); *Price v. Reilly*, 697 F. Supp. 2d 344, 360-61 (E.D.N.Y. 2010) (citing cases for the proposition that "mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference"); *Muhammad v. Cohen*, No. 13-cv-1422 (KBF), 2015 U.S. Dist. LEXIS 58001, at * 11 (S.D.N.Y. May 1, 2015) ("[P]laintiff's disagreement with [the physician assistant's] medical decision as to the appropriate medication or dosage does not create a § 1983 claim.").

Amendment claim. *See id*. at, *9 ("The court applies the Fourteenth Amendment standard set forth in *Darnell* to the plaintiff's claim. . ."). Plaintiff's citation to this case to support an argument about the subjective prong of an Eighth Amendment deliberate indifference claim is therefore puzzling. Finally, *Williamson* found an allegation that a prison doctor who actually "thought an MRI was medically necessary" but did nothing to arrange for one, was sufficient to survive initial review. *Williamson* is similar to *Giraud*, but bears no factual, procedural, or legal resemblance to this case.[6]

Plaintiff makes similar claims about Defendants Bush and Kimble-Goodman arguing they "declined to do *anything at all* to provide mental health treatment for Ms. Clark's gender dysphoria." (Doc. #133 at 34) (emphasis in original). Not so. APRN Kimble-Goodman provided Plaintiff with talk therapy and eventually prescribed Prozac to treat her depression and dysphoric mood. See Ex. H; Ex. B, Pgs. 01294, 01287, 01278, 01276, 01268, 01254, 01059-101060.[7] This treatment was

---

[6] *Martinez v. United States* is inaccessible via Lexis but based on a citation to it in another matter, it appears this case is similar to *Williamson,* a Fourteenth Amendment claim and irrelevant for purposes of a subjective prong argument about an Eighth Amendment deliberate indifference claim. *See Cruz v. Hastings*, No. 20-CV-4392 (VEC) (BCM), 2022 U.S. Dist. LEXIS 53598, at *12 n.7 (S.D.N.Y. Jan. 31, 2022) (citing Martinez for the proposition "applying *Darnell* to deliberate indifference claim brought by federal detainee under the Fifth Amendment.").

[7] Plaintiff's implication that the mental health treatment provided by APRN Kimble-Goodman and Bush was not "treatment" because neither had specialized training in gender dysphoria is contradicted by the record. As Dr. Levine testified, mental health counseling, including talk therapy or psychotherapy, is beneficial treatment for patients with gender dysphoria. See Ex. N, Pgs. 32-35, 111, 114-117. Further, there can be no dispute that mental health medications for dysphoric mood constitute "treatment." See *Smith v. Woods*, Civil Action No. 9:05-CV-1439 (LEK/DEP), 2008 U.S. Dist. LEXIS 127100, at *19 (N.D.N.Y. Feb. 26, 2008) (prescription of Prozac constitutes treatment).

effective. During one meeting with Plaintiff, she reported to Kimble-Goodman that that the Prozac had improved her sleep, improved her appetite, and provided overall benefits to her. Ex. B, Pg. 01276. After Plaintiff began receiving hormone therapy, she again reported she was experiencing benefits from her mental health medication and that she was pleased with hormone therapy. She indicated her mood was "really good, [the] best ever." Ex. B, Pg. 01268.

As for Mr. Bush, he had only two meetings with Plaintiff, did not have the power to give Plaintiff what she wanted—an increased dose of hormones and gender confirmation surgery—was not aware of what the supposedly proper dose of hormones would be, and was not aware of any potential benefits of surgery for people with gender dysphoria.  Plaintiff no doubt feels Mr. Bush should have known about these things or should have agreed with her view that she needed an increase in hormones or therapy.  Perhaps Dr. Brown feels the same way based on his understanding of the WPATH standards.  But saying "you ought to know," is very different than demonstrating that someone "did know."

This is an Eighth Amendment claim and subjective knowledge is a prerequisite to stating such a claim.  *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) ("An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official *must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference*.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (emphasis added); *see also Hall v. Dep't of Corr. Med. Dep't*, No. 18-cv-6892 (NSR), 2021 U.S. Dist. LEXIS

20

128405, at *21 (S.D.N.Y. July 8, 2021) ("Thus, while the Fourteenth Amendment's deliberate indifference standard includes an objective component, the Eighth Amendment's deliberate indifference standard is purely subjective. *Darnell*, 849 F.3d at 37. Accordingly, it is irrelevant whether [defendants] 'should [have] known' that Plaintiff's condition was serious or that surgery was urgent; it is only relevant whether [defendants] actually knew and disregarded such information.").

What's more, the actual knowledge required here is of the risk caused from the alleged inadequacy or delay, not the underlying medical condition itself.  *See Mercer v. APS Healthcare, Inc.*, 669 F. App'x 9, 11 (2d Cir. 2016) (affirming summary judgment for defendants where inmate "failed to submit evidence creating a genuine issue of material fact as to whether the defendants were 'actually aware of a substantial risk' of harm to [inmate]" caused by their alleged delay to a surgical evaluation in favor of physical therapy); *see also Marino v. Koenigsmann*, No. 9:12-CV-1170 (GTS/RFT), 2014 U.S. Dist. LEXIS 38729, at *27 (N.D.N.Y. Feb. 25, 2014) ("absent any indication that [the defendant] was conscious of the risks posed by denying *or delaying* his treatment, it is simply implausible to suggest that any of [the defendant's] actions . . . were taken in deliberate indifference towards his condition.").  Plaintiff cannot and does not point to any evidence suggesting that any Defendant was actually aware that Plaintiff faced a substantial risk of serious harm based on the alleged *delay* or *inadequacy* of her hormone treatment.  This is particularly true because none of the Defendants were subjectively aware that the hormone therapy was supposedly deficient apart from Plaintiff's complaints.  And again, this treatment was actually *effective* making a claim that Defendants were

subjectively aware that Plaintiff faced a substantial risk as a result of its ineffectiveness logically impossible.

None of the Defendants were or are actually aware of any supposed risks posed to Plaintiff based on failure to get surgery. This is because no Defendant is actually aware of any benefits that can be derived from gender reassignment surgery or whether it would be appropriate for Plaintiff. See Ex. G, ¶ 16; Ex. H, ¶ 22; Ex. I, ¶ 21. Again, Plaintiff may think that Defendants should agree with her or Dr. Brown about the supposed efficacy of surgery, but this is not sufficient to satisfy the actual knowledge requirement of the subjective prong.

After stripping away the artifice and histrionics, Plaintiff's claim is not that she received no treatment "at all," but rather that she did not receive the treatment that she wanted or that her expert thinks would have measured up to his preferred standard of care.  This is simply insufficient to state a deliberate indifference claim, particularly where Plaintiff reported positive benefits[8] to her overall mental health as a result of the medications and treatment provided and an improvement in her overall mood. Plaintiff's contention that Defendants "refused" to treat her while "knowing" that doing so would expose her to a substantial risk of serious harm is

---

[8]Plaintiff also makes the unsupported claim that "[the Defendants] 'knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] situation.'" (Doc. #133 at 37 (quoting *Hathaway v. Coughlin*, 37 F.3d at 68). Wrong. It is simply impossible for someone to "know that the course of treatment was largely ineffective" when the treatment *was* effective and had positive benefits for Plaintiff by her own account. Further, each individual's involvement in Plaintiff's care was relatively limited, with Dr. Valletta uninvolved in mental health care, APRN Kimble-Goodman uninvolved in medical care, and Bush only seeing Plaintiff twice, ever.

simply unsupported by the record evidence and this contention is therefore insufficient to satisfy the subjective prong.

        2.    **Plaintiff's argument based on the supposed "inadequacy" of her treatment is misplaced, since such an analysis comes under the objective, rather than the subjective prong.**

Plaintiff's second "formulation" regarding the subjective prong is based on a claim that her treatment was "inadequate" over the "last six years." (Doc. #133 at 38.) First, and as argued extensively *supra* at pages 6-11, arguments about "inadequacies" in treatment are analyzed under the objective, not the subjective prong. Again, Plaintiff's argument evinces a fundamental lack of understanding of how deliberate indifference claims work. This distinction is crucial because if a claim of "inadequate care" in and of itself were enough to satisfy the subjective prong, this would transform deliberate indifference claims into medical malpractice claims, which they manifestly are not. *See Tindal v. Goord*, 340 F. App'x 12, 13 (2d Cir. 2009); *Hernandez v. Keane*, 341 F.3d 137, 149 (2d Cir. 2003).

This is precisely what Plaintiff attempts here, by arguing that she suffers from a serious medical need—to satisfy the objective prong—and arguing that Plaintiff's treatment was objectively "inadequate"—to satisfy the subjective. But deliberate indifference requires more, particularly when looking at the subjective prong. It requires that Defendants know their actions are inadequate and that they persist in them. *See Salahuddin*, 467 F.3d at 281 ("The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable."); *see also Harrison v. Barkley*,

219 F.3d 132, 139 (2d Cir. 2000) (deliberate indifference is not merely "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady."); *cf. Chance*, 143 F.3d at 703 ("In certain instances, a physician may be deliberately indifferent if he or she *consciously chooses* an easier and less efficacious treatment plan) (emphasis added) (quotation omitted). Plaintiff cannot point to any such evidence here and instead relies on the opinion of her expert and out of context statements from Dr. Levine that Plaintiff's treatment was "insufficient" meaning "less than ideal." Ex. N, at 110; *Harris v. Wu*, No. 3:17-cv-440(VAB), 2017 U.S. Dist. LEXIS 88804, at *8 (D. Conn. June 9, 2017) (holding inmate unlikely to succeed on merits of deliberate indifference claim "even if [defendants] have failed to give him the treatment that he desires or that would be ideal."); *see also Ross v. Kelly*, 784 F. Supp. 35, 36-37 (W.D.N.Y. 1992) ("While [inmate's] care and treatment may not have been the most ideal, it was certainly not of such a character as to rise to the level of a constitutional violation.").

Further, and in line with Plaintiff's pervasive disingenuousness with the facts, Plaintiff fails to note that Dr. Levine's assessment of Plaintiff's care occurred more than two years ago—well before Plaintiff was placed upon the exact dosage of spironolactone that Plaintiff's own expert recommends,[9] before lab results

---

[9] See Ex. 1, ¶ 43 (typical high end for dose of spironolactone is 300mg per day), Ex. D, Pg. 36 (explaining raising dosage of spironolactone in Oct. 2019).

showed that Plaintiff was within her own expert's recommended range of estrogen,[10] before Plaintiff was evaluated by a gender transition specialist, before she had been recommended for surgical intervention, before she had been referred to Middlesex Health, and before she was evaluated several times per month, on a regular basis, by mental health providers. See Ex. F, ¶¶ 7-91. Thus, as discussed more fully below, this evidence is immaterial to Plaintiff's injunctive claim. Further, to the extent Plaintiff relies upon this statement to show that the care provided by each individual Defendant was "constitutionally inadequate," her argument fails. Dr. Levine was not evaluating the actions of each individual Defendant, considering their training, education, abilities, and subjective knowledge at the time they were exercising their medical judgment, as this Court must do.

Plaintiff attempts to sidestep the fact that she brings individual capacity claims against specific Defendants who had relatively limited involvement in Plaintiff's care. Indeed, she frequently refers to events and treatment which occurred well before any individual Defendant was aware of Plaintiff and which undisputedly no individual Defendant was personally involved in whatsoever. See, e.g., Pl. Brief Pg. 1 ("Defendants' conduct has caused Ms. Clark to suffer so much that she has, among other things, tried to cut out her own testicles using nail clippers. Ms. Clark considered suicide.); Pg. 9 ("April 11, 2016…several months passed by without [a visit] happening") and ("no care followed"); ("while in the infirmary recovering from her attempted self-castration, Ms. Clark asked every

---

[10] See Ex. 1, ¶ 78, (estradiol levels should be at 100pg/ml), See Ex. B, Pg. 00047 (estradiol levels on April 6, 2022, at 108 pg/ml).

provider she saw to help her access treatment for gender dysphoria, including hormone therapy"). The Court should ignore Plaintiff's attempt to expand her claims against the individual Defendants and focus on the actual involvement and decision making of each Defendant in Plaintiff's care.

Plaintiff also muddles the distinction between her individual capacity claims and her claim for injunctive relief by conflating the actions of the individual Defendants and Plaintiff's overall claim that she has not received "adequate" treatment. For example, Plaintiff claims "the defendants denied Ms. Clark all treatment for gender dysphoria from April 11, 2016 until September 23, 2017, when she finally began hormone therapy." (Doc. #133 at 39.) But once again, her argument is misleading and inaccurate. Defendants Valletta, Kimble-Goodman, and Bush did not even meet Plaintiff until August 2016, November 2016, and March 2019, respectively. Ex. G, ¶ 2; Ex. H, ¶ 6; Ex. B, Pg. 00899-901, 00966-96701294; Ex. I. And to the extent Plaintiff is including Commissioner Quiros in the vague term "the defendants," his predecessor as of April 2016 was not in charge of inmate medical care in the manner Commissioner Quiros is today.  At the time, CMHC, an outside agency, was responsible for inmate medical care. See Ex. 2, Pgs. 73-74 (CMHC was provided health care and mental healthcare until July 2018).

Likewise, Plaintiff asserts that "the defendants . . . have never, to date, provided Ms. Clark with any psychiatric care for gender dysphoria, even after her self-castration attempt." (Doc. #133 at 39.)   Not so. Plaintiff was transferred to DOC's mental health facility after the incident, has received numerous visits from DOC mental health care providers including individual psychotherapy—at least

twenty in the last ten months—and talk therapy from APRN Kimble-Goodman.[11] (Doc. #128-1 at 13; Ex. B Pg. 01294; Ex. H, ¶ 7.)  Perhaps Plaintiff is arguing that she has not received "psychiatric care" from a "competent" provider.  But even this argument collapses, as Plaintiff has been seen multiple times by Dayne Bachmann, who was specifically hired to provide such care to inmates with gender dysphoria. To the extent Plaintiff feels Mr. Bachmann is incompetent, such a complaint amounts to nothing more than a disagreement over treatment.

Plaintiff's complaints about Defendants supposedly "consistently undermin[ing] Ms. Clark's hormonal treatment," by failing "to facilitate necessary bloodwork and schedule endocrinology appointments for her, to conduct medically necessary monitoring, or to provide adequate dosages of hormone medication," such allegations are insufficient to constitute deliberate indifference. *See supra* at 14-15. Nonetheless, neither Kimble-Goodman nor Bush had any involvement in any of these things, and Valletta was not involved in scheduling endocrinology appointments, providing dosages of medications, and did, in fact, order bloodwork for Plaintiff on numerous occasions. See Ex. G ¶ 28; Ex. B, Pgs. 01154-01166, 00803, 00833, 00891, 00912-13, 00921, 01083. More importantly, none of the endocrinologists who have seen Plaintiff have indicated that any of these alleged deficiencies have had any negative effect on her care. See Ex. B; Ex. D.

---

[11] As noted above, Dr. Levine testified that such treatment is a form of appropriate treatment for individuals with gender dysphoria, regardless of whether the provider has specialized knowledge regarding gender dysphoria. See Ex. N, Pgs. 32-35, 111, 114-117. Thus, this argument also amounts to nothing more than a disagreement about treatment or a desire for a different treating provider, neither of which states a claim for deliberate indifference.

As for the allegations related to surgery, Plaintiff acknowledges that she has been evaluated for surgery but complains that the surgery has not yet occurred. But as Defendants explained in their own Motion for Summary Judgment, there is no surgeon in state who actually performs such surgeries, let alone one who would be willing to perform the surgery on an inmate. See Doc. #128-1, at 17. Plaintiff would still have to undergo extensive and lengthy electrolysis before such surgery could even take place, and it is not even certain that Plaintiff would be medically cleared for such a surgery assuming a surgeon could even be located. See Ex. F. This is setting aside Dr. Levine's evaluation of Plaintiff, which found Plaintiff to not be a good candidate for surgical intervention. See Ex. E, ¶¶ 55-56. Plaintiff cannot demonstrate that surgery is even possible, practical, or that it would even have any positive effect on her condition. But more importantly, she cannot demonstrate that anyone, including and especially the individual capacity Defendants, knew she needed surgery and that it would be effective. As to DOC itself, as discussed below, Plaintiff ignores the many steps it has taken to procure medical care for the Plaintiff, belying any claim of deliberate indifference.

       3.  Plaintiff's "blanket policy" argument based on *Johnson* cannot satisfy the subjective prong both because it assumes a complete denial of treatment that did not occur here and good faith adherence to a policy is not deliberate indifference.

Plaintiff's next "formulation" of the subjective prong rests almost entirely on *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) and her contention that the application of a "blanket policy" against providing hormone therapy to transgender inmates who had first attempted to transition after being incarcerated constitutes deliberate indifference.  As a preliminary matter, this argument can only apply to

28

Dr. Valletta, for August 2016 until July of 2017 (the time period during which Dr. Valletta was providing care to the Plaintiff before he referred her for hormone therapy), since Mr. Bush did not encounter Plaintiff until long after the CMHC policy to which she refers had been changed, APRN Kimble-Goodman had no role in providing the medical treatment of hormone therapy, and the office of the Commissioner did not supplant CMHC's management of inmate medical care until after the policy was changed.

Plaintiff relies entirely on *Johnson v. Wright* for this "formulation" of the subjective prong. 412 F.3d 398 (2d Cir. 2005). In *Johnson*, the plaintiff was an inmate who was denied medication for Hepatitis C due to a New York DOC policy that forbade provision of such medication to inmates, like Johnson, who had abused drugs within the past two years. *Id.* at 401. The Court held "[t]he operative question in this case is not whether the Guideline's substance abuse policy is generally justifiable, but whether *a jury could* find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." *Id.* at 404 (emphasis added). Plaintiff also cites to *Brock v. Wright*, 315 F.3d 158, 167 (2d Cir. 2003) for the proposition that "a jury could well conclude" that reflexive adherence to a policy forbidding medical treatment could constitute deliberate indifference. Doc. #133 at 42.

But Plaintiff is moving for summary judgment, which makes her reliance on *Johnson* and *Brock* puzzling. In *Johnson*, the Court specifically held that that "[a] jury could well find that the defendants rejected the requests to treat plaintiff with Rebetron therapy, not because the defendants were in any way indifferent to

plaintiff's needs, but because the defendants sincerely and honestly believed that they were required to comply with the substance abuse policy articulated in the Guideline. . ." and that "[t]he defendants may well have genuinely believed, then, that they had no choice but to comply with the policy articulated in the Guideline." *Id*. at 404.  This in no way supports Plaintiff's argument that she is entitled to summary judgment based on the alleged "reflexive application" of a "blanket policy."  At best, it would allow for a jury trial on this question.

But *Johnson* presents a further problem for Plaintiff: because the record evidence reveals that the adherence to the policy was based on an "honest belief" that the defendant had to adhere to the policy, it is not deliberate indifference. In other words, good faith reliance on a policy, even if objectively unreasonable, is insufficient to show the criminal recklessness required to satisfy the subjective prong of deliberate indifference. *See Manning v. Goord*, No. 05-CV-850F (consent), 2010 U.S. Dist. LEXIS 20597, 2010 WL 883696, at *11 ("Defendants' reliance on the [Department of Correction's Gender Identity Disorder] Policy cannot be said to be other than sincere, even if objectively unreasonable").  Plaintiff cannot point to any evidence that Dr. Valletta's adherence to the CMHC policy was not based on an honest belief on his part and they cannot dispute his testimony to that affect.

Even setting aside the significant differences between the treatment of a degenerative condition like Hepatitis C that may progress to actual medical consequences in the form of demonstrable physical injuries and the treatment of a mental condition like gender dysphoria that actually improved with therapies other than radical surgery and resulted in no exacerbation, worsening prognosis, or

physical injuries, *Johnson* is ultimately unavailing to Plaintiff. She simply cannot dispute Dr. Valletta's honest adherence to the policy even if she contends without competent evidence that his adherence to said policy was "objectively unreasonable."

Plaintiff also wastes considerable space and time citing to out of Circuit cases to contend that CMHC's so-called "freeze frame" policy regarding treatment of inmates with gender dysphoria constituted deliberate indifference. This is ultimately unavailing because even if these cases had any jurisdictional relevance or binding effect, the lack of any similar case from the Second Circuit merely reveals that at worst, Dr. Valletta would be entitled to qualified immunity on this issue. See Doc. #128-1 at 40-49. Of course, citation to these other cases also cannot change the fact Plaintiff cannot show exacerbation, adverse medical consequences, demonstrable physical injury, or a worsening prognosis as a result of the approximately eleven-month delay in referral for hormone therapy. Nor can these cases change Dr. Valletta's good-faith reliance on the CMHC policy in place at the time. No matter how one approaches Plaintiff's argument, it fails.

       4.    **Plaintiff's "community standards" argument is insufficient to establish deliberate indifference and relies upon the incorrect assumption that WPATH provides the medically accepted standards of care, which is at least a fact in dispute.**

Plaintiff's final attempt at establishing the subjective prong is her argument that "[c]ourts also infer deliberate indifference where the care provided to an incarcerated person is 'devoid of sound medical basis or far afield of accepted professional standards.'" Doc. #133 at 44 (quoting *Orr v. Ferrucci*, No. 17-cv-788, 2019 WL 5864503, at *11 (D. Conn. Nov. 8, 2019)). But *Orr* was a lawsuit brought

against police officers arising from an excessive force claim where the court concluded that the plaintiff had not even alleged the injuries he sustained constituted a sufficiently serious medical condition, let alone demonstrated that "his diagnosis and treatment were so devoid of sound medical basis or far afield of accepted professional standards as to raise an inference of deliberate indifference." *Id.* at, *29.

Likewise, Plaintiff's citation to *Green* for the same premise is odd because what the court actually said was: "[w]hile disagreements regarding choice of treatment are generally not actionable under the Eighth Amendment, judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment (in this case, no treatment) may provide the basis of a claim." *Green v. Shaw*, No. 3:17-cv-00913 (CSH), 2019 U.S. Dist. LEXIS 53981, at *21 (D. Conn. Mar. 29, 2019). This is not the same as an allegation that something ran counter to "accepted professional standards." Further, *Green* went on to hold that "the mere fact that Defendants misdiagnosed Plaintiff or failed to recognize the severity of his medical condition—even if their mistake was *obvious or highly consequential*—cannot, standing alone, support an Eighth Amendment claim." *Id.* (emphasis added).

To further support her "community standards" argument, Plaintiff cites to *Verley v. Goord* for the quote: "[m]edical decisions may also constitute indifference where they are contrary to accepted medical standards, *in that the doctor based his decision on something other than sound medical judgment.*" No. 02 Civ. 1182 (PKC) (DF), 2004 U.S. Dist. LEXIS 857, at *38-39 (S.D.N.Y. Jan. 22, 2004) (emphasis

added).  But only one sentence earlier, the court stated "[c]onduct may only rise to the level of deliberate indifference when it involves the requisite recklessness, i.e. an act or failure to act … that evinces a *conscious disregard* of a substantial risk of serious harm." *Id*. at *38 (emphasis added). Again, Plaintiff's citations are misleading at best. These vague references to district court cases that do not even stand for the premise for which they are cited are not enough to transform a medical malpractice case into an Eighth Amendment deliberate indifference case.

Plaintiff argues that "[t]he WPATH Standards of Care are widely accepted as the appropriate course of treatment for gender dysphoria" and cites to one case from outside of this circuit, *Edmo v. Corizon, Inc*., 935 F.3d 757 (9th Cir. 2019), as support.  But the appropriate standard of care is ultimately irrelevant in a deliberate indifference claim because failure to adhere to a standard of care is simply not enough to establish deliberate indifference. *See Parks v. Blanchette*, 144 F. Supp. 3d 282, 317-18 (D. Conn. 2015) ("the strongest inference that a reasonable juror could draw from [expert's] opinion in [the plaintiff's] favor is that [the defendant] was negligent, not that he was deliberately indifferent. Accordingly, [the expert's] testimony fails to create a genuine issue of material fact on [the plaintiff's] deliberate indifference claim."); *see also Chance*, 143 F.3d at 703 (holding that accusations of negligence, "even if it constitutes medical malpractice," cannot alone sustain a deliberate indifference claim) (citation omitted); *Bowman v. Campbell*, 850 F. Supp. 144, 147-48 (N.D.N.Y. 1994) (granting summary judgment because expert testimony that defendants "deviated significantly from the

appropriate standard of care" constituted "at most, a medical malpractice claim" that failed to rise to the level of deliberate indifference.).

Furthermore, the Fifth Circuit came to the exact opposite conclusion as the Ninth with regards to whether the WPATH standards are the "appropriate" standard of care. *Gibson v. Collier*, 920 F.3d 212, 223 (5th Cir. 2019). There the court agreed with the First Circuit and held "the WPATH Standards of Care do not reflect medical consensus, and that in fact there is no medical consensus at this time. WPATH itself acknowledges that 'this field of medicine is evolving.'" *Id*. Plaintiff cannot simply point to another Circuit's opinion that the WPATH standards are *the* standards of care and claim deviation from that standard constitutes deliberate indifference.  At least the Fifth and First Circuits recognize the existence of debate. The Ninth Circuit dogmatically and incorrectly announces a standard while not even allowing for debate. This is both legally and factually wrong.

What standard of care to apply is irrelevant in a deliberate indifference claim, but even if it were relevant, this is ultimately a factual matter. And Defendants dispute that the WPATH standards are the only appropriate standard of care.  As Dr. Levine observed:

> [T]he [WPATH] standards of care that they widely promulgate are not based on scientific outcome studies, but rather on what a consensus of subcommittee members consider the 'best' method of treatment. These recommendations often minimize or do not seriously consider the considerable gaps in knowledge about outcomes of their recommendations. These gaps persist due to the failure to perform appropriate scientific study methods. International standards of medical guidelines require revision every five years and that the guideline committees have no more than 30% of its members who earn an income based on the recommendations. Neither of these standards apply to WPATH. WPATH guidelines are not the only standards used today.

Ex. E, ¶ 6.  Plaintiff no doubt disagrees with this testimony, just as the Ninth Circuit disagrees with the First and Fifth Circuits. But this disagreement alone, even if a standard of care was relevant to this inquiry, is enough to defeat Plaintiff's motion for summary judgment. The WPATH's lack of relevance to this issue is what militates in favor of summary judgment for Defendants. Either way, Plaintiff has failed to satisfy the subjective prong based on her unsupported and illogical "community standards" argument. Liability cannot be established by showing medical malpractice, no matter how hard Plaintiff tries to argue otherwise.

D.     **Plaintiff's Motion should be denied because Defendants are entitled to qualified immunity.**

As noted in Defendants' memorandum in support of their motion for summary judgment, the Second Circuit has never held that an inmate with gender dysphoria is entitled to any particular treatment, let alone genital confirmation surgery or any of the less radical interventions proposed by Plaintiff. Moreover, there is a clear split in authority among the few circuits that have addressed this question. As a result, Defendants Valletta, Kimble-Goodman and Bush are entitled to qualified immunity as to the Eighth Amendment money damages claims against them. Defendants hereby incorporate their qualified argument set forth in their summary judgment memorandum. See Doc. # 128 at pp. 43-50.

**E.    To the extent Plaintiff can be said to have moved for judgment as to her injunctive claim, Plaintiff mistakenly relies upon immaterial past actions to attempt to establish her entitlement to injunctive relief and ignores the overwhelming evidence of DOC's efforts to treat Plaintiff, which completely belie a state of mind of deliberate indifference.**

It is entirely unclear from Plaintiff's briefing whether she moves for summary judgment as to her claim for injunctive relief.[12] At most, Plaintiff references several cases involving issuance of injunctive relief and argues her case is comparable. See Doc. #133 at 37-38; 40-41. To the extent Plaintiff may be moving for judgment as to her injunctive claim, her arguments utterly fail. First, as argued in Doc. # 128-1 at 50, n. 11, Plaintiff's request for injunctive relief may not be granted in absence of an evidentiary hearing on the issue. *See Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 (2nd Cir. 1977). For this reason alone, Plaintiff cannot obtain summary judgment on her injunctive claim. Beyond this, Defendant Quiros is entitled to summary judgment on this claim.

Plaintiff completely ignores her requirement to establish the subjective prong of her deliberate indifference claim seeking permanent injunctive relief. To the extent she attempts to address the subjective requirement as applied to the DOC, she focuses upon past actions of CMHC and DOC actors. But this focus completely misunderstands the analysis of a deliberate indifference claim seeking a prospective permanent injunction and attempts to distract the Court from the pertinent evidence. "[D]eliberate indifference is determined based on prison

---

[12] Plaintiff begins her brief by stating she is moving for "partial summary judgment as to count one" but there is no count one in the Amended Complaint. See ECF # 84. Plaintiff does allege a "first claim for relief" and "second claim for relief" which are her claims of deliberate indifference and intentional infliction of emotional distress. Id, Pgs. 11-13.

officials' <u>current</u> attitudes and conduct." *Valentine v. Collier*, 993 F.3d 270, 277 (5th Cir. 2021) (vacating District Court permanent injunction regarding deliberate indifference to COVID-19 in geriatric correctional facility, in part because "Defendants' response, including actions taken on the eve of and during trial" did not demonstrate deliberate indifference) (emphasis added).

"[T]o establish eligibility for an injunction, the inmate must demonstrate the continuance of [deliberate indifference] during the remainder of the litigation and into the future." *Id.* at 282. "This is a high bar because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quotation marks omitted). Plaintiff simply has not and cannot clear this bar in the face of the reasonable efforts the Defendant has taken to Plaintiff's gender dysphoria.

Plaintiff's motion suffers from the same problems as the District Court's injunction in *Rasho v. Jeffreys,* Nos. 19-1145, 19-1375, 19-1978, 2022 U.S. App. LEXIS 967 (7th Cir. Jan. 12, 2022). In *Rasho*, the Seventh Circuit vacated a district Court injunction in a claim of medical deliberate indifference, involving allegedly deficient mental health care provided to inmates in the Illinois Department of Corrections (IDOC). *Id.* After granting a preliminary injunction in the matter in May of 2018, the District Court held an evidentiary hearing in August and September of 2018, and ultimately granted the plaintiffs' request for permanent injunction. *Id.* at *8-9.

The Seventh Circuit in *Rasho* held that the District Court committed clear error in finding deliberate indifference, because it had failed to consider the actions

taken by the IDOC between May and September of 2018 which constituted "[e]vidence that the defendant responded reasonably" to the deficient mental health care. *Id.* at *12-13. The Court noted that the IDOC had presented evidence of recent actions which showed "a commitment to addressing the problem" and "reasonable efforts to cure deficiencies," and that such evidence was sufficient to defeat a claim of deliberate indifference even where IDOC's actions seemed to "lack a sense of urgency… fell short" and "were ultimately unsuccessful." *Id.* at *12-15. "The judge was wrong to fault" the defendant for its unsuccessful or less than desirable efforts because "[i]t is always possible to do more or move faster, but the existence of polices [or treatment] that may have been more effective does not mean an official recklessly disregarded the risk of harm." *Id*. at *15.

Plaintiff here is similarly wrong to fault Defendant for policies in place under a different agency more than six years ago and for treatment which has not occurred as quickly as she would like. Plaintiff is critically wrong to ignore the many reasonable efforts Defendant has taken and its' "commitment to addressing the problem" of providing Plaintiff with care.[13] The Defendant is responding to a condition which has required surgical intervention in, at most, five prisoners within the entire nation.[14] As demonstrated by Dr. Burns' declaration and Plaintiff's

---

[13] Indeed, oddly, Plaintiff seems to chide the Defendant and Dr. Burns for their efforts over the past year to retain the services of Dayne Bachmann and explore surgical options for treatment—the very care Plaintiff demands. See Pl. Brief at Pg. 24-26.

[14] Plaintiff and her expert dispute the idea that surgical intervention for individuals suffering from gender dysphoria is novel. It is undisputed, however, that only approximately five *prisoners* (who face unique mental health and security concerns not presented in patients in the community) within the entire nation have undergone surgical intervention for gender dysphoria—the earliest of which

voluminous medical records, Plaintiff has received an abundance of mental health care and medical care—despite her many refusals for care. See Ex. F, Ex. B, Ex. C. Further, DOC has taken multiple steps to retain providers who specialize in treatment of gender dysphoria who have in fact treated the Plaintiff, a complex process which has continued as described by Dr. Burns. See Ex. F. Though Plaintiff has repeatedly demanded surgical treatment immediately and implies throughout her briefing that such a process is simple and should have occurred years ago, she ignores the undisputed complexity of the process. This Court should not.

In actuality, much of this process relies upon the decision making of private medical providers, and, critically, DOC has been unable to identify a surgeon in state will to take on Plaintiff as a patient. "Put simply…[DOC] took multiple reasonable steps to fix the complex problem… so they cannot have been deliberately indifferent" even if those steps have not been as successful or occurred as quickly as Plaintiff would like. *Rasho*, 2022 U.S. App. LEXIS 967, at *16. Thus, this Court must deny Plaintiff's motion and grant Defendant's motion as to Plaintiff's claim for injunctive relief.

III.   **CONCLUSION**

The Court should deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.

---

occurred in 2018. See Ex. 3, Pgs. 84-85; 231. Even if it were accurate that surgical treatment were the *only* accepted treatment for gender dysphoria for patients in the community, Plaintiff cannot point to even *a single* medical involving prisoners to evaluate the efficacy and safety of surgical intervention suffering from gender dysphoria. See Ex. 3, Pgs. 231-233.

DEFENDANTS:
Angel Quiros, Et Al.,

WILLIAM TONG
ATTORNEY GENERAL

BY:      /s/ Terrence M. O'Neill
Terrence M. O'Neill
Assistant Attorney General
Federal Bar No. ct10835
110 Sherman Street
Hartford, CT  06105
Tel.: (860) 808-5450
Fax: (860) 808-5591
terrence.oneill@ct.gov

BY:  /s/ James M. Belforti
James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30449
E-Mail:  james.belforti@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591

BY:  /s/ Janelle R. Medeiros
Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail:  janelle.medeiros@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591

## CERTIFICATION

I hereby certify that on May 5, 2022, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent by e-mail to all parties by operation

of the Court's electronic filing system.  Parties may access this filing through the

Court's system.

/s/ Janelle R. Medeiros
Janelle R. Medeiros
Assistant Attorney General

**40**