# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| VERONICA-MAY (neé NICHOLAS) CLARK, | Case No. 3:19-cv-575-VLB |
| Plaintiff, | |
| v. | |
| ANGEL QUIROS, DR. GERALD VALETTA, RICHARD BUSH, and BARBARA KIMBLE-GOODMAN, | MAY 5, 2022 |
| Defendants. | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56(a)(2)

Pursuant to Local Rule of Civil Procedure 56(a)(2), the Defendants submit this response to Plaintiff's statement of undisputed material facts in support of their motion for summary judgment (ECF # 133-1).

1. A person's gender identity is their internal sense of whether they are male, female, or non-binary. Ex. 1, Report of Dr. George Brown ¶ 47.

Response: Plaintiff miscites the evidence. Ex. 1, ¶ 47 does not contain the above information but instead relates to sexual orientation. Assuming Plaintiff intended to refer to ¶ 38, admitted.

2. Transgender people are those who were designated male or female at birth, but whose gender identity is different from the that designation. Ex. 1 ¶ 47

Response: Plaintiff miscites the evidence. Ex. 1, ¶ 47 does not contain the above information but instead relates to sexual orientation. Assuming Plaintiff intended to refer to ¶¶ 37-38, admitted.

   3. A person's sexual orientation is distinct from their gender identity. Ex. 1 ¶ 47

Response: Admitted.

   4. Gender dysphoria is "a whole continuum" of clinically significant distress generated by the mismatch between what a person knows their gender to be, and the gender label assigned to them at birth. Ex. 2, Deposition Transcript of DOC's 30(b)(6) Witness, 35:12- 36:9

Response: Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement. Plaintiff misstates the testimony. Dr. Burns testified that "when someone has gender dysphoria, they are—the sex that they were assigned at birth is not consistent with their perceptions of their gender. So that, I guess, is probably the largest blanket term. Now, there are—there is a continuum of what that could mean. It's not just one thing or two things. It's a whole continuum." Ex. 2, 35:12-18. Dr. Burns never used the phrase "clinically significant distress" nor did he testify that "gender dysphoria is a whole continuum of clinically significant distress."

5.  **The goal of treatment for gender dysphoria is to minimize or permanently resolve the patient's clinically significant distress symptoms. Ex. 3, Deposition Transcript of Dr. George Brown, 138:15-21.**

**Response: Denied.  Plaintiff miscites the evidence. Pg. 138:15-21 relates to whether patients should have realistic expectations about treatment. Dr. Brown testified that "the goal of treatment is to—is to reach a level of satisfaction with a gendered self that is not discussed in terms of cure…" Ex. 3, 200:4-7; see also Ex. 3, 245:2-5 ("The goals of treatment, as stated in—in the WPATH standard of care, which is to find—find comfort with the felt gender.")**

6.  **The World Professional Association for Transgender Health Standards of Care are the accepted standards by which gender dysphoria is treated. Ex. 1 ¶ 49.**

**Response: Denied. See Ex. N, Pgs. 58-69 (explaining lack of scientific foundation for WPATH standards, explaining difference between standards and guidelines); See also, Ex. E, ¶¶ 5-6 (explaining considerable of WPATH and that WPATH standards are not "accepted" standards of care).  Just as important, courts have rejected this contention.  See *Kosilek v. Spencer*, 774 F.3d 63 (1ST Cir 2014); *Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019).  But see *Edmo v. Corizon, Inc*., 935 F.3d 757 (9th Cir. 2019). The split in authority further shows that the so-called WPATH standards are not "the accepted standards by which gender dysphoria is treated."**

7. **The WPATH standards set out a multipronged medical and psychological approach to treatment, including (i) gender-informed psychotherapy, (ii) hormone therapy, and (iii) surgery to bring a person's sex organs and physical appearance into conformance with their true identity. Ex. 1 ¶ 43**

Response: Admitted that WPATH sets out a multipronged approach to treatment but denied that they are "standards" as they are deficient in many ways and are best considered to be guidelines, not standards for the reasons stated in Dr. Levine's Declaration. They are not the only "standards" in use today. See Ex. E at ¶ 6.

8. **Untreated or insufficiently treated gender dysphoria is likely to result in serious negative medical and mental health outcomes, including depression and anxiety, auto-castration, and suicide. Ex. 14, GNC Consultant Competitive Bidding Waiver Request at 1; Ex. 1 ¶ 47; Ex. 3, 178:15-20**

Response: Objection: Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement. Plaintiff directly misrepresents the evidence cited. Ex. 14 does not support this statement. Ex. 1, ¶ 47 has nothing to do with medical and mental health outcomes of gender dysphoria but instead relates to gender identity. Ex. 3, 178: 15-20 addresses endocrinological treatment, not the risks of untreated gender dysphoria.

4

9.  **Incarcerated people in Connecticut cannot choose the medical or mental health personnel who provides their care. Ex. 2, 12:14-17**

**Response: Admitted.**

10. **DOC routes complaints about care directly to the provider. Ex. 8, DOC Administrative Directive 8.9, at (6)(c)(2).**

**Response: Admitted.**

11. **DOC does not track people with chronic conditions. Ex. 10, Deposition Transcript of Dr. Craig Burns, 60:12-22**

**Response Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement. Plaintiff cites Pg. 60, of Ex. 10, which is a word index for Dr. Burns' deposition. Assuming Plaintiff meant to cite to Ex. 2, 60:12-22, Plaintiff misrepresents the content of the deposition, which discusses "complex" conditions. Ex. 2, 54-56 provides an overview of Dr. Burns' knowledge regarding policies on patients with chronic mental health conditions and contradicts this statement.**

12. **DOC does not track people with complex conditions. Ex. 10, 60:12-22**

**Response: Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement. Plaintiff cites exhibit 10, Pg. 60, which is a word index for Dr. Burns' deposition. Assuming Plaintiff meant to cite to Ex. 2, 60:12-22, Plaintiff misrepresents the content of the**

deposition. In response to being asked "has DOC ever adopted a requirement that complex cases be tracked <u>system-wide</u>?" Dr. Burns replied "Not that I am aware. I think that because it usually involves folks from Central Office to help, we are often aware of who those individuals are in the department." Ex. 2, 60:12-22.

13. DOC does not require providers to conduct grand rounds. Ex. 10, 57:15-20

**Response:** Plaintiff miscites the evidence. Nevertheless, admitted, assuming Plaintiff intended to cite to Ex. 2, 57:15-20.

14. DOC uses a classification system to determine "the frequency about which someone would need to be seen and the intensity of" medical or mental health care they might receive. Ex. 2, 48:11-17

**Response:** Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement. Plaintiff again distorts the evidence. Ex. 2, 48:11-17 reads, with regard to classification scores: "In the case of mental health, it may also inform housing, but <u>it also informs us</u> about the frequency about which someone would need to be seen and the intensity of care that surrounds them."

15. DOC does not have a treatment protocol for any chronic illness, including gender dysphoria. Ex. 2, 36:10-37:7

**Response:** Denied. Plaintiff once again misrepresents the evidence. Both citations to the record here refer solely to treatment protocols for gender dysphoria. Dr.

Burns did not testify and was not asked about "treatment protocol for any chronic illness." Further, in actuality, Dr. Burns testified that while there was no "treatment protocol reduced to writing" <u>there is</u> a treatment protocol for gender dysphoria "in practice." Ex. 2, 37:19-25; 38-40.

16. As of October 2021, DOC had never employed anyone having the required skills, knowledge, and expertise to identify, treat, and guide transgender people in safe gender transition. Ex. 14 at 1

Response: Admitted.

17. None of the individual defendants has had training in the treatment of gender dysphoria. Ex. 9, Deposition Transcript of Dr. Gerald Valetta 117:10-13; Ex. 18, Deposition Transcript of Barbara Kimble- Goodman 75:21-76:8; Ex. 20, Deposition Transcript of Richard Bush 17:2-9

Response: Admitted.

18. None of the individual defendants has had experience treating people for gender dysphoria. Ex. 18, 76:4-13; Ex. 9, 117:6-17; Ex. 20, 22:18-23:8

Response: Denied. Plaintiff again distorts the evidence. Mr. Bush testified "I have seen transgendered individuals. I don't recall who was for initial assessment verse who I saw on a long-term… or treatment basis." Ex. 20, 21:24. As to APRN Kimble-Goodman, she was only asked whether in her "previous roles" she had ever treated any patients for gender dysphoria, to which she answered, "<u>Prior to DOC</u>, no, I

don't believe so." Ex. 18, 76:4-13. Further, all three Defendants provided treatment for Plaintiff, who has gender dysphoria. Ex. G, ¶¶ 5-33; Ex. H, ¶¶ 6-16; Ex. B, Pgs. 01294, 01287, 01278, 01276, 01268, 01254, 01059-01060; Ex. I, ¶¶ 6-28; Ex. B, Pgs. 00899-901, 00966-967.

19. On April 11, 2016, Ms. Clark told DOC clinicians she was a transgender woman and that she believed she had gender dysphoria. Ex. 7, Ms. Clark's Medical Records at 1

Response: Admitted.

20. DOC first diagnosed Ms. Clark with gender dysphoria no later than May 27, 2016. Ex. 7 at 3-6

Response: Admitted.

21. On July 15, 2016, Ms. Clark unsuccessfully tried to castrate herself with a pair of nail clippers. Ex. 7 at 7-19 (incident records); 34, 20-22 (clinical records)

Response: Admitted.

22. Ms. Clark was taken to the emergency room at John Dempsey Hospital and treated for her wounds. Ex. 7, 23-31 (UCONN Records)

Response: Admitted.

23. **A DOC psychologist acknowledged that her self-castration attempt was caused by her high level of psychological distress relative to gender dysphoria.   Ex. 16, Suicide Attempt and Self-Injury Summary Data Sheet**

Response: Admitted.


24. **Ms. Clark was labeled a Mental Health 5 ("MH5") and taken to an infirmary at MacDougall-Walker to recover. Ex. 7 at 32-33 (MH5), 34(MH5), 35-36 (medical records from infirmary)**

Response: Admitted.


25. **Ms. Clark was housed at Garner from July 2016 until March 2020. Ex. 7 at 49-50 (transfer to Garner); 51-52 (transfer from Garner)**

Response: Admitted.


26. **Upon her arrival at Garner in July 2016, Ms. Clark immediately submitted a written request to see a doctor for treatment of her gender dysphoria. Ex. 17, Grievances, at 26**

Response: Plaintiff miscites the evidence once again. Ex. 17, Pg. 26, is a written request from April 8, 2020, not July 2016. Assuming Plaintiff intended to cite Ex. 17, Pg. 54, admitted.


27. **Ms. Clark saw Defendant Gerald Valetta for the first time on August 1, 2016. Ex. 7 at 55**

**Response: Admitted.**

28. **Dr. Valetta knew what gender dysphoria is, and knew that it is a chronic condition. Ex. 9, 115:5-8, 117:3-5**

**Response: Admitted that Bush had an understanding of what gender dysphoria was on the day of his deposition, Ex. 20, 16:13-18, 17:2-9. To the extent Plaintiff attempts to twist this testimony to mean he had this understanding at the time he treated plaintiff, Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement.**

29. **Dr. Valetta directed Ms. Clark to "M[ental] H[ealth] + case manager," to signify that he would provide no treatment for gender dysphoria. Ex. 7 at 55; Ex. 9, 138:8-20**

**Response: Admitted that Dr. Valletta placed a referral for plaintiff to a mental health case manager. Ex. 7, Pg. 55. As to the remainder, denied. Once again, Plaintiff misrepresents evidence. Dr. Valletta did not testify that he wrote a referral "to signify that he would provide no treatment." Rather, he stated that referral meant "That other than me attending to the patient's wound, that any other issues should be handled by mental health and their case manager." Ex. 9, 138:8-13.**

30. **In August 2016, a mental health APRN noted in Ms. Clark's chart that she had clinically significant distress and a strong desire to be rid of primary and secondary male sex characteristics. Ex. 7 at 56**

**Response: Admitted.**

31. In September-October 2016, Dr. Valetta twice refused Ms. Clark's requests for gender dysphoria treatment. Ex. 17 at 25, 58-59

**Response: Plaintiff miscites the evidence. Ex. 17, Pg. 25 is an April 2020 request. There is no page 58-59 of Exhibit 17. Assuming Plaintiff intended to cite Ex. 17, Pgs. 27, 28-29, Admitted.**

32. On both occasions, Dr. Valetta cited an unwritten DOC policy barring gender dysphoria treatment for people who did not begin gender transition prior to incarceration. Ex. 17 at 25, 58-59

**Response: Denied. Plaintiff miscites the evidence. Ex. 17, Pg. 25 is an April, 2020 request. There is no page 58-59 of Exhibit 17. Assuming Plaintiff intended to cite Ex. 17, Pgs. 27, 28-29, admitted, except that Dr. Valletta referred to a "CMHC/DOC" policy.**

33. The policy was "widely known" by DOC medical staff. Ex. 9, 122:13

**Response: Admitted.**

34. In September 2016, Ms. Clark filed a health services review request in which she wrote that she had been "continually denied access going on five months now to transition related health care," which was causing "internal psychological trauma." Ex. 7 at 57

Response: Admitted.

35. Ms. Clark met with Defendant Kimble- Goodman at least eight times.  Ex.  7 at 60 (Nov. 2016) Ex. 17 at 9 (Jan. 2017) Ex. 7 at 61 (Feb. 2017) Ex. 7 at 62 (June 2017) Ex. 7 at 63 (July 2017) Ex. 7 at 64 (Nov. 2017) Ex. 7 at 65 (April 2018) Ex. 7 at 66-7 (June 2018)

Response: Admitted.

36. Kimble-Goodman knew what gender dysphoria was. Ex. 18, 75:21-76:8.

Response: Admitted that Kimble-Goodman had an understanding of what gender dysphoria was on the day of her deposition, Ex. 18, 75:21-76:8. To the extent Plaintiff attempts to twist this testimony to mean she had this understanding at the time she treated plaintiff, Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement.

37. Ms. Clark told Kimble-Goodman about her stress and her distress that her male genitalia were "poisoning" her. Ex. 7 at 60, 61; Ex. 17 at 9

Response: Admitted that Plaintiff wrote a request stating "I'm in prison because I wasn't treated all those years ago for my gender issues. You have no idea the amount of stress I've had to endure…" Ex. 17, Pg. 9, and that Kimble-Goodman wrote Plaintiff was "stressed" and "continues to express belief that male genitalia is 'poisoning me.'" Ex. 7 Pg. 60, 61. The remainder is objected to pursuant to D.

Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement.

38. Kimble-Goodman provided no gender dysphoria treatment to Ms. Clark. Ex. 7 at 60 (Nov. 2016) Ex. 17 at 9 (Jan. 2017) Ex. 7 at 61 (Feb. 2017) Ex. 7 at 62 (June 2017) Ex. 7 at 63 (July 2017) Ex. 7 at 64 (Nov. 2017) Ex. 7 at 65 (April 2018) Ex. 7 at 66-7 (June 2018)

Response: Denied. Kimble-Goodman provided treatment in the form of supportive talk therapy, and also recommended and provided medication to treat Plaintiff's mood when Plaintiff did not refuse. See Def. Ex. H, ¶¶ 6-16; Ex. B, Pgs. 01294, 01287, 01278, 01276, 01268, 01254, 01059-01060. Supportive talk therapy and/or psychotherapy are forms of treatment for patients with gender dysphoria. Ex. N, Pg. 32-35 (psychotherapeutic relationship, psychotherapy, "process of sharing" are treatments for gender dysphoria), Pg. 36-37 (psychotherapy can have a role in lessening gender dysphoria) Pg. 111, Pg. 114-117 (people with gender dysphoria "need a relationship with somebody who is interested in their lives and their internal processes and their sense of reality" and such patients require treatment in the form of "talk" therapy or psychotherapy.)

39. Kimble-Goodman offered no treatment because she believed that Ms. Clark "[was] pursuing legal means to address gender."  Ex. 7 at 61, 62

Response: Denied. Kimble-Goodman provided treatment. See supra, ¶ 38.

40. **Kimble-Goodman did not contact any other DOC treatment provider to discuss Ms. Clark or check on whether she was receiving care. Ex. 18, 101:8-14**

**Response: Denied. The testimony cited does not support this statement, and testimony just prior directly contradicts this statement. Kimble-Goodman spoke with Dr. Valletta regarding Plaintiff and her treatment (Ex. 18, 99:12-14), with a psychiatrist, Dr. Lee (Id., 100:9-19), and with a social worker (Id., 100:20-23).**

41. **Kimble-Goodman did not attempt to have an outside specialist treat Ms. Clark for gender dysphoria. Ex. 18, 101:8-13**

**Response: Admitted.**

42. **Kimble-Goodman was aware of Ms. Clark's depression and medicated her. Ex. 7 at 63**

**Response: Admitted.**

43. **Ms. Clark met with Defendant Richard Bush in March and September 2019. Ex. 7 at 68-70, 71-73**

**Response: Admitted.**

44. **Bush knew what gender dysphoria was. Ex. 20, 16:13-18, 17:2-9**

**Response: Admitted that Bush had an understanding of what gender dysphoria was on the day of his deposition, Ex. 20, 16:13-18, 17:2-9. To the extent Plaintiff**

attempts to twist this testimony to mean he had this understanding at the time he treated plaintiff, Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement.

45. **Ms. Clark's requests for more therapy because she was "stressed out and depressed over the transition" were routed to Mr. Bush   Ex. 21 at 1**

**Response:** Admitted that a single request "due to feeling stressed out and depressed over the transition" was routed to Bush in September of 2019. Ex. 21 at 1. As to the remainder, Defendants object pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) because the evidence cited does not support this statement.

46. **Bush provided no gender dysphoria treatment to Ms. Clark. Ex. 20, 29:19-20**

**Response:** Denied. Bush provided talk therapy to Plaintiff, which is a form of treatment. Ex. I, ¶¶ 20, 8; Ex. B, Pgs. 00899-901, 00966-967; Ex. N, Pgs. 32-37, Pg. 111, Pg. 114-117 (talk therapy/psychotherapy is treatment for patients with gender dysphoria).

47. **Bush did not attempt to have an outside specialist treat Ms. Clark for gender dysphoria. Compare Ex. 7 at 68-70 and 71-73 (no referrals) with Ex. 20, 51:8-23 (confirming that it was his practice to record referrals in the chart)**

**Response:** Admitted.

48. **Ms. Clark's counsel from Morningside Heights Legal Services spoke with Dr. Robert Berger of UCONN on May 12, 2017 in an attempt to forestall litigation over her lack of treatment. Ex. 23, Letter from Ted Olds et al. to Dr. Robert Berger 1 (May 4, 2017) (warning of litigation); Ex. 24, Letter from Ted Olds et al. to Dr. Robert Berger 1 (May 12, 2017) (memorializing meeting)**

**Response: Objection: Plaintiff has failed to "a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." See D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2). Both Ex. 23 and Ex. 24 are hearsay, inadmissible on summary judgment or at trial; indeed, Ex. 24 contains hearsay within hearsay relied upon to establish the stated fact. See *Bey v. Bakota,* No. 3:19-cv-1090 (JAM), 2020 U.S. Dist. LEXIS 213199, at \*8 (D. Conn. Nov. 16, 2020) (mentioning "general rule against the consideration of hearsay evidence for the purposes of ruling on a summary judgment motion.") (citing *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).**

49. **In July 2017, Dr. Valetta filed the paperwork necessary to refer Ms. Clark to an endocrinologist, noting that he was asked by CMHC management to do so. Ex. 7 at 74; Ex. 9, 182:14-183:5.**

**Response: Admitted that Dr. Valletta "filed the paperwork necessary to refer Ms. Clark to an endocrinologist" but denied that he "not[ed] that he was asked by CMHC management to do so." Dr. Valletta noted "I was asked to submit request" and wrote "Thank you, Monica and Bob" at the end of the request, mentioning CMHC management, but there is no evidence whatsoever which states that he "was**

asked by CMHC management" to submit the request nor does Dr. Valletta ever specify who asked him to submit this request. Ex. 7 at 74; Ex. 9, 182:14-183:5.

50. In September 2017, Ms. Clark began hormone therapy: daily doses of 2 mg estradiol and 50 mg spironolactone. Ex. 17 at 13

Response: Admitted.

51. The endocrinologist Ms. Clark saw in September 2017 requested that Ms. Clark have bloodwork done after 4 and 12 weeks, and to return in 3 months. Ex. 7 at 76-79

Response: Admitted.

52. Ms. Clark did not have a follow-up appointment with endocrinology for 1 year and 7 months. Ex. 7 at 81 (August 2019 appointment)

Response: Admitted.

53. At that appointment, in August 2019, DOC had not done any bloodwork. Ex. 7 at 81

Response: Denied. Plaintiff again misrepresents the evidence, which does not support this statement; the document cited does not mention whether bloodwork occurred between September 2017 and August 2019. In reality, it did. See Ex. B, Pgs. 01083 (May 2018), 01155-01157 (January 2018), 01158-01160 (October 2017).

54. In October 2019, the endocrinologist doubled her spironolactone dose to 200 mg daily, with orders to increase to 300 mg daily within eight weeks, so as to combat Ms. Clark's circulating testosterone levels of 754 nanograms per deciliter ("ng/dL") of blood. Ex. 7 at 115, 116

Response: Admitted that the endocrinologist doubled spironolactone dose and ordered the increase within eight weeks. The remainder of the statement is objected to pursuant to D. Conn. L. Civ. R. 56 (a)(3); Fed. R. Civ. Pro. 56(c)(2) as, once again, the Plaintiff mischaracterizes her own evidence. The evidence cited does not support this statement. There is no reference in the cited document of an intent or need "to combat" the plaintiff's circulating testosterone levels. See Ex. 7 at 115, 116.

55. In February 2020, Ms. Clark's circulating testosterone was 568 ng/dL, and the endocrinologist doubled her daily estradiol dose to 4 mg. Ex. 7 at 117, 118

Response: Admitted.

56. In October 2020, the endocrinologist recommended Ms. Clark seek referral to a surgeon for gender confirmation surgery, a recommendation repeated at other visits. Ex. 7 at 120, 124

Response: Admitted.

57. **Aside from the referral to endocrinology, Dr. Valetta never did anything to treat Ms. Clark's gender dysphoria. Ex. 9, 237:15 (no further treatment); 239:20-240:2 (no recollection of any steps re: surgery)**

**Response: Denied. Dr. Valletta also ordered blood work/lab work and followed endocrinologists' recommendations, Ex. G, ¶ 26; Ex. B, Pgs. 01154-01166, 00803, 00833, 00891, 00912-13, 00921, 01083; Dr. Valletta also referred Plaintiff to mental health for evaluation for mental health care for gender dysphoria. Ex. G, ¶ 31; Ex. B, Pgs. 01195, 01046-01049.**

58. **Dr. Craig Burns, DOC's chief of mental health, knew of Ms. Clark and her self-castration attempt in 2018. Ex. 10, 189:9-189:21**

**Response: Admitted.**

59. **Dr. Burns never treated Ms. Clark, and took no steps to become involved in her care. Ex. 10, 198:19-199:22**

**Response: Admitted that Dr. Burns did not treat Plaintiff; Denied that he "took no steps to become involved in" her care. The evidence cited is again misrepresented and does not support this statement. Dr. Burns has been involved extensively in Plaintiff's care to the extent described in his lengthy declaration. See Ex. F, ¶¶ 7-91.**

60. **Dr. Burns expected the staff located in Ms. Clark's prison to provide treatment to her.   Ex. 10, 191:24-192:9**

Response: Admitted.


61. But in fall 2021, Dr. Burns suddenly began calling people who might serve as consultants to DOC on gender dysphoria, as well as genital gender confirmation surgeons.   Ex. 10, 161:21-162:7; 126:15-127:9

Response: Plaintiff miscites the evidence. There is no Pg. 161, 162, 126, or 127 of Exhibit 10. Assuming Plaintiff intended to cite Exhibit 2, admitted.


62. In October 2021, DOC sought a gender transition consultant to "provide immediate assistance with active Departmental litigation in a way that may limit or extinguish that specific litigation through provision of care." Ex. 14 at 1

Response:  Admitted.


63. DOC stated that it was "critical" to secure a gender transition consultant because of the "extreme" "constant" and "very present" "risk" of self-harm faced by gender non- conforming individuals that is "exacerbated by incarceration" and "exceeds other populations within the Department" Ex. 14 at 1

Response: Admitted.


64. The contractor DOC hired, Dayne Bachmann, evaluated Ms. Clark on December 21, 2021. Ex. 27, Dayne Bachmann Standard Progress Note, at 1

**Response: Admitted.**

65. **Bachmann's evaluation concluded that gender confirmation surgery for Ms. Clark is "essential," "a fundamental need and vital to alleviating her gender dysphoria." Ex. 27 at 1**

**Response: Admitted that Mr. Bachmann concluded specifically that "gender affirmation surgery (Vaginoplasty)" was recommended and stated the surgery is "essential," "a fundamental need and vital to alleviating her gender dysphoria." Ex. 27 at 1. Denied that Mr. Bachmann mentioned "gender confirmation surgery" or any surgery other than vaginoplasty at all. See Ex. 27.**

66. **Bachmann also concluded that "it would benefit [her] to have a gender therapist." Ex. 27 at 1**

**Response: Admitted.**

67. **Plaintiff's expert, Dr. George Brown, concluded that "DOC has provided inadequate, substandard medical, psychiatric, and surgical care for VC's serious medical condition (GD) in spite of full knowledge of the severity of her diagnosis" Ex. 1 ¶ 51-52**

**Response: Plaintiff again miscites the evidence. Ex. 1, ¶¶ 51-52 refer to standards of care, and do not contain the above quote. Assuming Plaintiff intended to cite ¶ 84, admitted that Brown concluded this. Denied that "DOC has provided inadequate, substandard medical, psychiatric, and surgical care for VC's serious**

21

medical condition (GD) in spite of full knowledge of the severity of her diagnosis."
See Ex. B, Pgs. 00001-01190, Ex. F. ¶¶ 12-75, 91.

68. Dr. Brown concluded that Ms. Clark's "lack of access to basic, medically
necessary services for the treatment of GD violates any reasonable standard
of care for transgender inmates." Ex. 1 ¶ 51-52

Response: Plaintiff again miscites the evidence. Ex. 1, ¶¶ 51-52 refer to standards
of care, and do not contain the above quote. Assuming Plaintiff intended to cite ¶
84, admitted that Brown concluded this. Denied that Plaintiff's treatment "violates
any reasonable standard of care for transgender inmates." See Ex. N, Pgs. 58-69
(explaining lack of scientific foundation for WPATH standards, explaining
difference between standards and guidelines); See also, Ex. E, ¶¶ 5-6 (explaining
considerable of WPATH and that WPATH standards are not "accepted" standards
of care); See *Kosilek v. Spencer*, 774 F.3d 63 (1ST Cir 2014); *Gibson v. Collier*, 920
F.3d 212 (5th Cir. 2019).  But see *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019).

69. Dr. Brown concluded that genital gender confirmation surgery is medically
necessary for Ms. Clark. Ex. 1 ¶ 77; Ex. 3, 245:17-21

Response: Admitted as to Ex. 3. Plaintiff miscites Ex. 1, ¶ 77, which does not
include the opinion that genital gender confirmation surgery is medically
necessary.

70. Ms. Clark has had thoughts of self-castration and reported them to Dr. Valetta. Ex. 7 at 126, 85-87

Response: Admitted, as to Ex. 7, Pg. 85-87, that Plaintiff told Dr. Valletta "if [she] had a razor [she] would remove testicles." Plaintiff miscites Ex. 7, Pg. 126, which is an inmate request responded to by a provider other than Dr. Valletta.

71. Ms. Clark has had thoughts of suicide. Ex. 5 at 110:5-6; 111:13, 25

Response:  Admitted.

72. While at Garner, Ms. Clark submitted at least 24 grievances, including to Defendants, relating to her requests for treatment for gender dysphoria. Ex. 17 at 5, 9, 11-12, 14-26, 28-29, 1, 30-31, 33-39, 45-49, 50-53

Response: Denied. Of the cited documents, only twelve of these documents are grievances. Ex. 17, Pgs. 1, 5, 16-17, 20, 28-29, 30-31, 33-34, 35-36, 37-38, 39-40, 48-49. The remainder are inmate request forms, not grievances. Additionally, while Pgs. 50-51 are a grievance, it is unrelated to Plaintiff's treatment for gender dysphoria and instead refers to perceived misconduct by a Captain.

## DEFENDANTS' ADDITIONAL MATERIAL FACTS

Defendants' additional material facts are set forth in their Local Rule 56(a)1 statement accompanying their motion for summary judgment and memorandum of law, filed April 14, 2022, Doc. 128-2. Notably, many of the above stated facts

articulated by the Plaintiff are not included in the Defendants' 56(a)1 statement of

material facts, because even though many are undisputed, they are not material.


DEFENDANTS:
Angel Quiros, Et Al.,

WILLIAM TONG
ATTORNEY GENERAL

BY:     /s/ Terrence M. O'Neill
Terrence M. O'Neill
Assistant Attorney General
Federal Bar No. ct10835
110 Sherman Street
Hartford, CT  06105
Tel.: (860) 808-5450
Fax: (860) 808-5591
terrence.oneill@ct.gov

BY:  /s/ James M. Belforti
James M. Belforti
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30449
E-Mail:  james.belforti@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591


BY:  /s/ Janelle R. Medeiros
Janelle R. Medeiros
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct30514
E-Mail:  janelle.medeiros@ct.gov
Tel.:  (860) 808-5450
Fax:  (860) 808-5591


## CERTIFICATION

I hereby certify that on May 5, 2022, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Janelle R. Medeiros*
Janelle R. Medeiros
Assistant Attorney General