# EXHIBIT N

```
 1              UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF CONNECTICUT
 2        _____
                                      :
 3     VERONICA-MAY CLARKE            :
                                      :
 4              Plaintiff,            :
                                      :   CASE NO.
 5     VS.                            :
                                      :   3:19-cv-575-VLB
 6     ANGEL QUIROS, DR. GERALD       :
       VALETTA, RICHARD BUSH, and     :
 7     BARBARA KIMBLE-GOODMAN         :
                                      :
 8              Defendants
          _____
 9

10

            REMOTE DEPOSITION OF: STEPHEN B. LEVINE, M.D.
11

12                      March 9, 2022

13

14                  DEPONENT LOCATED AT:

15             6415 Gates Mills Boulevard
               Mayfield Heights, Ohio 44124
16

17

18

19

20      Reporter:  Victoria L. Germani, CSR, RPR

21

22

23              Cassian Reporting, LLC
                    21 Oak Street
24         Hartford, Connecticut   06106
                    860-595-7462
25
```

```
 1      ALL PARTIES APPEARED REMOTELY:

 2

        REPRESENTING THE PLAINTIFF VERONICA-MAY CLARKE:
 3

        ACLU OF CONNECTICUT
 4      765 Asylum Avenue
        Hartford, Connecticut 06105
 5      PHONE: 860-523-9146
        E-MAIL: ebildner@acluct.org
 6      BY:  ELANA BILDNER, ESQ.
             DAN BARRETT, ESQ.
 7

 8      FINN, DIXON & HERLING
        Six Landmark Square
 9      Stamford, Connecticut 06901
        PHONE: 203-325-5090
10      E-MAIL: dnoble@fdh.com
        BY:   DANIEL S. NOBLE, ESQ.
11            KELSEY POWDERLY, ESQ.
              MATTHEW B DANZER, ESQ.
12

13      REPRESENTING THE DEFENDANTS ANGEL QUIROS, DR. GERALD
        VALETTA, RICHARD BUSH, and BARBARA KIMBLE-GOODMAN:
14
        OFFICE OF THE ATTORNEY GENERAL
15      110 Sherman Street
        Hartford, Connecticut 06105
16      PHONE: 860-808-5450
        E-MAIL: james.belforti@ct.gov
17      BY:  JAMES BELFORTI, ESQ.
             JANELLE MEDEIROS, ESQ.
18

19
        ALSO PRESENT:
20
             Ms. Grace Sinnott, Paralegal
21           Ms. Linda Hawes, Paralegal

22

23

24

25
```

```
 1                      STIPULATIONS

 2           It is stipulated by counsel for the parties that

 3      all objections are reserved until the time of trial,

 4      except those objections as are directed to the form of

 5      the question.

 6           It is stipulated and agreed between counsel for

 7      the parties that the proof of the authority of the

 8      Notary Public before whom this deposition is taken is

 9      waived.

10           It is further stipulated that any defects in the

11      Notice are waived.

12           It is further stipulated that the reading and

13      signing of the deposition transcript before a Notary

14      Public is not waived.

15                             ---

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2

 3    WITNESS:  STEPHEN B. LEVINE, M.D.                   PAGE

 4   EXAMINATION BY MS. BILDNER                            7

 5
                              ---
 6
      PLAINTIFF'S EXHIBITS MARKED FOR I.D.               PAGE
 7

 8   Exhibit 1, CV of Dr. Levine                          70

 9   Exhibit 2, Dr. Levin List of Cases, Exhibits, and   92
         Fee,
10
     Exhibit 3, Expert Report of Dr. Levine, June 18,   102
11       2020

12   Exhibit 4, 2011 Dhejne study                        218

13   Exhibit 5, Correction to Bränström and Pachankis   224

14   Exhibit 6, Suicide, Homicide, and All-Cause         232
         Mortality Among Transgender and Cisgender Patients
15   in the Veterans Health Administration article

16   Exhibit 7, Standard Progress Note of Dayne          245
         Bachmann
17

18

19

20

21    (The exhibits were attached to the transcript.)

22

23

24

25
```

```
 1              (The deposition commenced at 9:34 a.m.)

 2                           ---

 3              THE REPORTER:  Usual stipulations?

 4              MS. BILDNER:  Yes, the usual stipulations

 5         are fine with us, assuming we have the same

 6         understanding, Jamie?

 7              MR. BELFORTI:  Yes, same understanding from

 8         us.

 9              MS. BILDNER:  Okay, same understanding as in

10         the Burns' deposition, meaning that's fine with

11         us.

12              MR. BELFORTI:  Yes.

13              THE REPORTER:  All right.  I will do a short

14         reading and then administer the oath.

15              All counsel participating in this deposition

16         proceeding acknowledge that I am not present in

17         the deposition room with the witness and that I

18         will be reporting this deposition remotely.

19         They further acknowledge that in lieu of an

20         in-person administration of the oath, it will be

21         administered remotely.

22              The parties also agree to have the

23         stenographer administer the oath understanding

24         that she is a Notary in the State of Connecticut

25         and not the State of Ohio.
```

```
 1          The parties and all counsel consent to this
 2     arrangement and waive any objections to this
 3     method of reporting.
 4          Counsel, please state your name, whom you
 5     represent, as well as your agreement to this
 6     method of reporting for the record.
 7          MS. BILDNER:  Good morning, I'm Elana
 8     Bildner, counsel for the Plaintiff.  I'm from
 9     the ACLU of Connecticut.
10          I'm accompanied on this Zoom deposition by
11     my colleague Dan Barrett from the ACLU of
12     Connecticut, my colleague Grace Sinnott from the
13     ACLU of Connecticut, and our colleague from Finn
14     Dixon and Herling, Dan Noble.
15          THE REPORTER:  And do you agree?
16          MS. BILDNER:  Yes, we agree with this method
17     of taking the deposition.  Thank you.
18          MR. BELFORTI:  Good morning, James Belforti
19     for the Attorney General's office for the
20     Defendants accompanied by Terrence O'Neill, also
21     Assistant Attorney General for the Defendants.
22          I believe we will be joined later by
23     Assistant Attorney General Janelle Medeiros.
24          And I agree.
25                         ---
```

```
 1            STEPHEN B. LEVINE, M.D., having been first

 2         duly sworn remotely by Victoria L. Germani, CSR,

 3         RPR, and Notary Public within the State of

 4         Connecticut, testified upon his oath as follows:

 5    EXAMINATION BY MS. BILDNER:

 6         Q.  Good morning again, Dr. Levine.  How are you

 7    doing?

 8         A.  I'm fine, thank you.  Good morning.

 9         Q.  Good morning.  I introduced myself a moment ago,

10    but I'll do it again for the sake of the record.  My

11    name is Elana Bildner.  I represent the Plaintiff in

12    this case, Veronica-May Clarke.  I work at the ACLU of

13    Connecticut.

14            And I have some colleagues on the phone as

15    well -- or on the Zoom as well.

16            So, Doctor, I know you've been deposed before; is

17    that correct?

18         A.  Yes.

19         Q.  About how many times have you been deposed

20    before?

21         A.  I'll just guess six.

22         Q.  Given that you've been deposed six times, I'm

23    sure you've heard a recital of ground rules for

24    depositions previously; right?

25         A.  Yes.
```

```
 1        Q.  Okay.  So maybe I'll turn the tables on you in
 2    that case and we can discuss some ground rules together.
 3        First of all, you mentioned that you have some
 4    trouble hearing; right?
 5        A.  I have hearing aids in.  And, yes.
 6        Q.  Okay.  So what will you do if you don't hear my
 7    question?
 8        A.  Oh, I will hear your question.  I may not be able
 9    to discern each word that you said.  And I will
10    certainly ask you to repeat.
11        Q.  Excellent.  So if there's any issue with your
12    hearing or discerning the words in my question, you'll
13    ask me to repeat it and I will.  That's fine.
14        What about if you don't understand a question
15    that I'm asking you, what would you do?
16        A.  I will feel free to tell you I don't grasp the
17    meaning of your question and would you please make it
18    clearer.
19        Q.  Perfect.  So if you don't understand the
20    question, please ask me and I would be more than happy
21    to clarify.
22        As in previous depositions, if you need a break,
23    please let me know; we can go off the record.  The only
24    exception to that is if a question is pending.  In that
25    case I'll ask that you answer the question before you
```

```
 1      take a break.
 2           How does that sound?
 3       A.  Sounds fine to me.
 4       Q.  Okay.  Is the volume currently loud enough for
 5      you to hear my questions?
 6       A.  Yes.
 7       Q.  Okay.  As you know from previous depositions,
 8      there's a court reporter here to transcribe what we're
 9      saying.
10           I found it is much better for everyone involved
11      if we give each other the space to talk and don't try to
12      talk over each other.  In that case, if I interrupt
13      you -- I'll try my best not to -- but if I do, let me
14      know.  And please don't interrupt me.  And I think we'll
15      proceed smoothly.
16           How does that sound?
17       A.  I'll give it my best.
18       Q.  Okay.  Can you think of any issue why you would
19      not be able to give complete and truthful testimony
20      today?
21       A.  No.
22       Q.  Okay.  Do you understand everything that we've
23      gone over so far?
24       A.  Yes.
25       Q.  Great.  How long would you like to go before we
```

```
 1    take our first break?
 2        A.  Well, I would say no more than 90 minutes,
 3    preferably closer to 60.
 4        Q.  Okay.  Assuming that we're at a good point to
 5    stop, that sounds fine to me.
 6            And again, if you need a break, please do let me
 7    know.  I know Zoom is difficult -- especially hours of
 8    Zooms are difficult for everyone.
 9            Okay.  Any questions for me before we begin?
10        A.  No.
11            THE REPORTER:  Excuse me.
12            Did you want to explain to him about read
13        and sign?
14            MS. BILDNER:  Oh, yes.  Sorry.  We didn't go
15        over it earlier.
16    BY MS. BILDNER:
17        Q.  Okay.  When the deposition is over, as I
18    mentioned, it's going to be typed up by our court
19    reporter.
20            Would you like to see it and review it before it
21    is finalized?
22        A.  Can I answer that question at the end?
23            MR. BELFORTI:  We'll -- we're going to read
24        and sign, Elana.  We'll talk about it.  But I
25        imagine he'll read and sign.
```

```
 1              MS. BILDNER:  Okay.  That sounds good to me.
 2     BY MS. BILDNER:
 3        Q.  So, Dr. Levine, how did you prepare for this
 4     deposition today?
 5        A.  I re-read my report on Sunday evening, and last
 6     night I skimmed through Dr. Brown's report and I read a
 7     few articles -- the Almazan article.  And I think that
 8     was it.  Maybe another article -- oh, yeah, I skimmed
 9     the -- I refreshed my memory about the Bränström and
10     Pachankis article and Dr. Kalin's criticisms of it.
11        Q.  The first article you mentioned, I believe you
12     said it was the Almazan article.  Did I hear that
13     correctly?
14        A.  Yes.
15        Q.  Would you mind spelling that author's name?
16        A.  A-L-M-A-Z-A-N.
17             And I think the second author was Kor -- it will
18     be hard to pronounce this -- Keuroghlian.  It was the
19     article in JAMA Surgery.
20        Q.  Was the title of that article?
21        A.  Well, I can look it up if you want.  But it's --
22     it was about surgery.
23             I'll get it for you.
24             (Off the record.)
25             THE WITNESS:  The name of the article is,
```

```
 1          The Association Between Gender-Affirming

 2          Surgeries and Mental Health Outcomes.

 3     BY MS. BILDNER:

 4       Q.  Thank you, Dr. Levine.

 5          And for the sake of the court reporter -- and

 6     this might be a common theme today -- would you mind

 7     spelling the name of that first author and, I believe,

 8     the second author of the article?

 9       A.  Sure.

10          THE WITNESS:  So, Vicky, it's Anthony

11     A-L-M-A-Z-A-N.

12          And the second name is Alex

13     K-E-U-R-O-G-H-L-I-A-N.

14     BY MS. BILDNER:

15       Q.  Thank you, Dr. Levine.

16          You also mentioned that you reviewed the

17     Bränström and Pachankis article; is that correct?

18       A.  Yes, yes.

19       Q.  Okay.  You might have to spell Bränström and

20     Pachankis for the record as well, if you don't mind.

21       A.  Well, it's B-R-A-N-S-T-R-O-M, but there are these

22     vowel sounds over the -- the A and the O.

23          And Panchankis is P-A-N-C-H-A-N-K-I-S [as

24     stated].

25          And Kalin is Ned Kalin, K-A -- K-A-L-I-N.
```

1      Q.   Okay.  And you're referring to an article in the

2   American Journal of Psychiatry from August of 2020; is

3   that correct?

4      A.   Yes.  It was originally published in 2019, but

5   online.  But it was -- yes, you have corrected the --

6   your citation is correct.

7      Q.   Thank you.  Why did you choose those two articles

8   to review?

9      A.   Well, they're seminal articles in the argument

10   for -- that sex reassignment surgery -- genital surgery

11   improves people's mental health.

12        And I presume that you are aware of those and you

13   will bring them up.  And if you aren't aware of them,

14   I'll be happy to bring them up and discuss them with

15   you.

16      Q.   Thanks, Dr. Levine.

17        In preparation for today's deposition did you

18   meet with attorneys for the Department of Correction?

19      A.   Well, if by telephone you mean did I meet with

20   them, I had a half-hour conversation with them last

21   week.

22      Q.   Okay.  Did you talk to anyone else about your

23   deposition today?

24      A.   My wife.

25      Q.   Did you talk to your wife about the substance of

```
 1      the deposition today?

 2          A.  No.  I just told her I'd be home today.

 3              She's not that interested.

 4          Q.  Fair enough.

 5              Okay, Dr. Levine, I'd like to talk to you

 6      about -- a little bit about your CV and who you are.  So

 7      unless I've got the wrong person here, you are a board

 8      certified psychiatrist; is that right?

 9          A.  Yes.

10          Q.  When did you complete your residency?

11          A.  1973.

12          Q.  Have you been practicing psychiatry since 1973?

13          A.  Nonstop.

14          Q.  Are you currently practicing psychiatry?

15          A.  Yes, I am.

16          Q.  Okay.  And you have a psychiatry -- or you had a

17      psychiatry practice of your own in Ohio; is that right?

18          A.  That's an ambiguous question, so I will try to

19      take the ambiguity out of it for you.

20              I've -- I am now an employee of the practice that

21      I owned with a co-worker for over 20 years.  So even

22      within my employee status I have a practice of my own.

23      I just -- I'm just officially an employee.  I no longer

24      have to make executive decisions about the practice.

25          Q.  What is the name of the practice group?
```

1          A.   It's called DeBalzo -- capital D-E capital

2     B-A-L-Z-O, Elgudin, E-L-G-U-D-I-N, Levine, Risen; and

3     sometimes they put an LLC on it.

4          Q.   Do you work full-time at the practice that you

5     just mentioned?

6          A.   Yes.

7          Q.   Okay.  Do you treat patients at the practice you

8     just mentioned?

9          A.   Yes.

10         Q.   How many patients are you currently treating?

11         A.   I think I can easier answer that question by

12    saying that I work five days a week, and mostly from 9

13    to 6 with a ten-minute break for lunch.

14              And the number of patients in my practice is very

15    unclear to me.  I never count them up.  But I'm pretty

16    much seeing 30 to 35 hours of patients a week.

17         Q.   So you have no sense of how many patients --

18         A.   Oh --

19         Q.   -- currently --

20         A.   -- I have hundreds of patients.  You know, I stop

21    seeing someone, and then they come back to me a year

22    later.  And so it's hard to know how many active

23    patients I have.

24              I have more patients who consider me their

25    psychiatrist than I consider to be active patients.

```
 1        Q.  What do you mean by "active patients"?

 2        A.  That is I see them on some regular basis.

 3        Q.  So would you agree with me -- I guess is your

 4   testimony that you have hundreds of patients that you

 5   currently see on a regular basis?

 6        A.  No.  I would say I -- I don't see hundreds of

 7   patients on a regular basis.  But I certainly have

 8   hundreds of people who consider me their psychiatrist

 9   even though I haven't seen them for two years or so.

10        Q.  As a clinician do you treat people with gender

11   dysphoria?

12        A.  Yes.

13        Q.  What proportion of the patients that you treat

14   are people with gender dysphoria?

15        A.  Oh, I would say 10 to 15 percent.

16        Q.  Do you have any sense of how many people with

17   gender dysphoria you are currently treating?

18        A.  I spent six hours yesterday with a patient with

19   gender dysphoria and his mother.

20             And patients -- as you can tell, I'm -- I'm

21   towards the senior end of one's career; and as such, I

22   supervise a lot of people.  So whether you consider

23   supervising therapists as treating patients, I consider

24   that an indirect form of treatment of patients.

25             So I would say there probably are four to six
```

```
 1        people who come to see me periodically who have the

 2        diagnosis of gender dysphoria active in my practice in

 3        the last year, for example.

 4              And I certainly supervise more patients than

 5        that.

 6          Q.   Thank you.

 7              Dr. Levine, do you also teach?

 8          A.   I do.

 9          Q.   What do you teach?

10          A.   I teach -- Well, my -- my career has been focused

11        on human sexual life and its problems.  And so I teach

12        about sexual dysfunction and I teach about sexual

13        identity issues.

14              I gave grand rounds frequently on the topic of

15        gender dysphoria in the last few years -- the last five

16        years.

17              I write articles and I write books.  And so I

18        would say that my subject is human sexuality.

19              But after about -- about 30 years ago I began to

20        realize that I was really specializing in -- in the

21        problem -- the aspirations and the problems of human

22        love and human connection.  And so many of my articles

23        have been directly about love.

24              And -- and so I try to teach primarily mental

25        health professionals and physicians.  But every once in
```

```
 1      awhile my teaching extends to the lay public.

 2           So the simple answer to your question is human

 3      sexuality.  But if we expand that, we get to talk about

 4      marriage, love, disappointment, loss, psychological

 5      intimacy and erectile dysfunction, you know, anorgasmia.

 6           You know, it's -- I could go on.  But I think

 7      that's enough.

 8      Q.  I'll ask you what -- I'll ask you both to spell

 9      anorgasmia and to tell me what it is.

10      A.  Anorgasmia is the state in which a person may --

11      can get sexually aroused but cannot achieve orgasm.  And

12      so -- and the preface "an" means without.  So anorgasmia

13      means without orgasm.

14           And that can happen in males and that can happen

15      in females as well.

16      Q.  Are you currently teaching anything this

17      semester?

18      A.  Well, I am presenting at the American Psychiatric

19      Association a one-and-a-half hour symposium on the

20      treatment of gender dysphoria:  Is It Time to Reexamine

21      Best Practices?  And so that's going to be a

22      presentation with three of my colleagues.

23           In June I am scheduled to give three grand round

24      lectures at the Henry Ford Hospital in Detroit on gender

25      dysphoria.
```

```
 1              I just completed a month -- January 26th a

 2      four-hour seminar at the Harvard Student Health Service

 3      Faculty on gender dysphoria.

 4              And there are a few other things coming up or

 5      recently done.  So --

 6          Q.  Are you teaching any courses --

 7          A.  -- I'm --

 8          Q.  I'm sorry.  Go ahead.

 9          A.  I said so I'm pretty busy with teaching and

10      writing, by the way.

11          Q.  Are you teaching any courses currently at Case

12      Western?

13          A.  I don't teach courses.  I teach occasional

14      seminars to residents.

15              And what happens -- the primary mode that I

16      teach -- and my primary mode of teaching when I'm not

17      giving a lecture or seminar is that I have residents in

18      psychiatry who rotate and see patients with me.

19              So they spend a half-day a week with me usually

20      for four to six months.  And occasionally they elect to

21      spend a year with me.

22          Q.  Great.  On your resumé, Dr. Levine, you also list

23      a number of consulting activities for prison; is that

24      correct?

25          A.  The word "number" is confusing me.  Since 2007
```

```
 1      I've been the psychiatric consultant to the

 2      Massachusetts Department of Correction.

 3           And while I periodically give continuing

 4      education seminars there, once a month I join the team

 5      that I established in 2007 and I am their consultant.

 6      So that's been a continuous process for 15 years.

 7           Occasionally, other states have asked me -- or

 8      organizations have asked me to evaluate one of their

 9      prisoners.

10           And I think -- this may not be accurate -- but I

11      think I've given six separate all-day seminars to

12      Departments of Correction staffs across the country just

13      giving them some orientations of the problem in

14      addressing the needs of transgender inmates.

15      Q.  And that's six seminars over the course of your

16      professional life that you've given to prisons?

17      A.  To -- well, I've given to the mental health staff

18      of various states' prisons, yes.

19      Q.  Okay.  Do you currently have a consulting

20      contract for any prison or prison system aside from

21      Massachusetts?

22      A.  Well, I have a contract to do this work with the

23      inmate in question today.

24           So every time I do a consultation, I think I

25      have a -- I have a contract for --
```

 1          Q.  All right.

 2          A.  -- but it's a very specific, you know, one case

 3     kind of contract.

 4          Q.  To clarify, Dr. Levine, I'm not talking about

 5     specific litigation, so a case such as this one; I'm

 6     talking about a general consulting or general

 7     consultancy with a prison system similar to the one you

 8     have in Massachusetts.

 9               So my question is:  Do you have any general

10     consultancy with a prison or prison system aside from

11     Massachusetts?

12          A.  No.

13          Q.  Okay, great.

14               Well, Dr. Levine, I'd love to discuss the topic

15     of the day, gender dysphoria.  I have some questions

16     about that.  First of all, a very basic one:  What is

17     gender dysphoria?

18          A.  A gender dysphoria generally is the presence of a

19     sense that one's gender identity is not in consonant, is

20     not incongruous with one's sex body.  And that usually,

21     but not always, is a source of distress.

22               And in psychiatric language, according to

23     American standards, the distress has to be present to

24     give the diagnosis of gender dysphoria; but the gender

25     dysphoria has to interfere with some aspect of a

```
 1     person's life besides the distress.

 2          In Europe the diagnosis has a different name.

 3     It's called gender incongruence, and it doesn't require

 4     distress.  It just requires the inherent incongruence

 5     between my sense of who I am in masculine-feminine terms

 6     and what my body tells me in terms of my sex.

 7          So there is a little separate confusion.  It's

 8     not a big deal, but there's a lot of -- there's some

 9     confusion about how the Europeans currently use their

10     diagnostic criteria and how the United States uses --

11     American people use the diagnosis.

12          It's very important to note that there can be

13     varying degrees of incongruence.  That is I, for

14     example, could feel that I'm a feminine man, but I am

15     not upset that I have a male sexual body -- a male

16     sexual body.

17          I can have incongruence without having -- with

18     acceptance without having to attack my body with the

19     wish to change.

20          So when there is discomfort with -- with the

21     incongruence, we recognize that that's a source of

22     subjective distress and so we give it a diagnosis.

23          So if a person is not distressed or does not want

24     to change their body in a certain way, we generally call

25     those people transgender people.
```

```
 1              And nowadays, you -- Let me back up for a minute.
 2              There's very little constancy in our concepts of
 3      gender dysphoria.  It has been something that we are
 4      aware of for about 60 years.  But the vocabulary and the
 5      forms of gender dysphoria have been changing
 6      dramatically, particularly in the last 10 or 15 years.
 7              So now we separate gender dysphoria into those
 8      people who have dysphoria and have an aspiration to
 9      actually change their sex.
10              And if they are male, for example, they want to
11      live as a female and they want to convert their body to
12      as feminine -- as female body as medicine can provide.
13              And then there are now people at increasing
14      numbers -- in fact, the majority of young people who are
15      gender dysphoric today say they're gender nonbinary.
16      They're neither male nor female, they want to be both,
17      they want to be neither, or their -- recognize that
18      they're evolving in a gender-fluid way.
19              So we have -- don't ask me to specify this -- but
20      there are over a hundred names of -- for various forms
21      of gender dysphoria.
22              So when gender dysphoria first came onto the
23      medical scene, we had transsexuals and normal people;
24      right.  And today we don't even use the term transsexual
25      very much.  The vocabulary is changing, concepts are
```

```
 1    changing.  And there is considerable controversy -- or I
 2    would say simply disagreement about how best to handle
 3    any particular situation.
 4        Q.  Dr. Levine, you had quite a lot in that answer.
 5    So I'd like to tease a few things out.
 6            First of all, let's stick to the United States
 7    for today given that this is a case about gender
 8    dysphoria in the US.
 9            So when I'm asking about "gender dysphoria," the
10    clinical definition and anything -- treatment, etc. --
11    I'm asking, to be clear, about the United States.  Do
12    you understand that?
13        A.  I do.  But I don't think we will be able to -- if
14    we're going to ever talk about the -- what science knows
15    about this, I don't think we'll be able to constrict our
16    -- the knowledge as only coming from the United States.
17            But I certainly understand what you said.
18        Q.  Okay.  You also explained that some people are
19    transgender but don't have the diagnosis of gender
20    dysphoria.
21            Did I understand that correctly?
22        A.  You did.
23        Q.  You mentioned some, I guess, historical terms
24    that have been used such as transsexual; is that right?
25        A.  Yes.
```

```
 1        Q.  And we currently don't use the term transsexual?
 2        A.  No, it's -- it's used sometimes.  But it's used
 3    primarily for those who want to jump from one sex gender
 4    kind of coincident with sex to the opposite.
 5            So -- or sometimes it's used for those who have
 6    undergone sex reassignment surgery.
 7            But there's so much variations in terms here that
 8    I don't think you could probably find ten -- quote --
 9    experts in this field who use the terms in the same way.
10        Q.  Okay.  For the purposes of today I think I'll use
11    the term "transgender."  And will you understand what I
12    mean by that?
13        A.  I will understand that that does not imply that
14    the person is distressed --
15        Q.  Okay.
16        A.  -- but just identifies as something other than
17    the cultural convention that there should be, you know,
18    a male body in a masculine -- some degree of masculinity
19    -- acceptable masculinity.
20        Q.  Okay.  I want to come back to the concept of
21    distress.  When you use the word "distress," what do you
22    mean by that?
23        A.  Well, distress is the diagnostic term.  And so
24    the distress means:  When I think about this, I'm
25    uncomfortable, or I don't like a body part and it makes
```

1    me nervous.

2         Distress means -- sometimes in a courtroom

3    distress is -- a different word for distress is used;

4    it's called suffering.

5         But what it is, is that I feel uneasy that my

6    gender identity doesn't match my body.

7         And that has various manifestations.  A common

8    manifestation in a male -- and given the nature of

9    today's case, I think I'll just be talking about males.

10    So in the case of males a very common source of distress

11    is:  I hate the hair on my body.

12         So I, for example, don't think I have gender

13    dysphoria and I accept the hair on my body.

14         But someone with gender dysphoria often tells me

15    -- or any other doctor:  I hate the presence of my

16    beard.  I hate hair on my arms and my legs and my chest.

17    I hate it.

18         So the intensity with which they say they hate

19    this, I presume it means it's distress.

20         So a patient may not say I'm distressed, but we

21    infer distressed from the language and the tone with

22    which they express that -- those words:  So I hate my

23    beard.

24       Q.  I just want to be clear, Dr. Levine, you said

25    you'll talk today about males.

```
 1              Did I hear that correctly?

 2         A.  Yes, biologically sex males who aspire to live as

 3    women.

 4         Q.  If I used the term people who were assigned male

 5    at birth, will you understand what I mean by that?

 6         A.  Yes.

 7         Q.  Okay.  Are we saying the same thing albeit using

 8    different terminology?

 9         A.  Yes.  But you won't find me using your terms.

10         Q.  Okay.  I just want to make sure that there's

11    clarity that when I ask a question using a term, you

12    understand what I'm talking about?

13         A.  I will understand.

14         Q.  Okay.  You also mentioned that the distress felt

15    by people with gender dysphoria may come in different

16    manifestations.  What do you mean by that?

17         A.  Well, some people will say that they hate their

18    body or they hate the particular body part.  For

19    example:  I hate my penis.  I wish I didn't have a

20    penis.

21              Some people don't mention it.  But when they take

22    a shower, they avoid looking at their penis; and they

23    may sit to urinate because they think standing to

24    urinate is a male feature.

25              They may wish to be called a female name because
```

```
 1        if someone calls them Max -- and Max is their name that
 2        they were assigned at birth -- that they feel that
 3        they're insulted.
 4              So these are all manifestations of the presence
 5        of a strong feminine gender identity.
 6           Q.  You also stated that, I guess, as part of the
 7        clinical diagnosis the distress that you're discussing
 8        must interfere with an aspect of the person's life.  Is
 9        that right?
10           A.  That's -- that's the criteria -- one of the
11        criterion for a psychiatric diagnosis.  It's not a
12        specific criteria for gender dysphoria.  It's a general
13        criteria -- criterion for almost every psychiatric
14        diagnosis.
15              It's not just the presence of the subjective
16        state.  It's the sense that the subjective state
17        interferes with their ability to work, enter into
18        relationships, go to school, conduct ordinary processes
19        of life.
20           Q.  In your experience working with people with
21        gender dysphoria these many years, what does that
22        interference with an aspect of the person's life look
23        like in the context of gender dysphoria?
24           A.  Well, it varies from person-to-person.  And it
25        varies with the age of the person.  It varies with the
```

```
 1      education of the person.  It varies with the

 2      relationship status of the person.

 3           For example, my first patient with gender

 4      dysphoria -- who has written an article with me about

 5      themselves -- could not use his penis for marital sexual

 6      relationships.  And as a result of his impairment and

 7      functioning as a male, he and his wife adopted children.

 8           So if you consider, as I would, the ability to

 9      conduct sexual relationships in a marital -- in a

10      marriage as one important area of function, his erectile

11      problems or his sexual disinterest or his inability to

12      use his penis in -- you know, for procreative purposes

13      would be an impairment and important other aspect of

14      function.

15        Q.  So the kinds of interference you're talking about

16      are interference in important aspects of life

17      functioning.  Did I get that right?

18        A.  Yes.  Yes, though it could be work relationship

19      formation, relationship maintenance, relationships to

20      children.

21           You know, they're multiple facets of any person's

22      life.

23        Q.  I think you touched on this earlier.  But based

24      on your experience can gender dysphoria be more or less

25      severe?
```

1          A.   I hesitate to answer that question for the

2     following reason:   If there are people who sense

3     themselves as more feminine than masculine, who accept

4     their body, and who have acknowledged that they have a

5     degree of discomfort about their body, but they do

6     nothing about it, they continue to be married and father

7     children and function as a lawyer or something; they

8     have gender dysphoria.

9          If I talk to them, they suffer with it.   That's

10    why they come to see me because they are suffering with

11    it.   They call that severe; right.

12         If I see somebody who cannot -- who says that

13    he's preoccupied day and night with this and he can't go

14    to work, and he can't possibly do X or Y or Z, he says

15    this is severe.

16         But what glibly happens is that if somebody wants

17    surgery, the doctors assume they have severe gender

18    dysphoria.

19         All this is subjective, you understand.   I have

20    no way of measuring objectively.

21         It is true in psychiatry in general and it's

22    particularly true in the area of gender dysphoria with

23    prisoners and gender dysphoria period and gender

24    dysphoria with inmates, it's self-report, you see.

25         And when people -- when people want something,

```
 1     they're smart enough to know what -- what would make

 2     them sound like they have -- quote -- severe.

 3          I know many people feel that if someone considers

 4     sex reassignment surgery or applies for sex reassignment

 5     surgery or requests it, they must have severe gender

 6     dysphoria.

 7          So I -- I personally am a little skeptical

 8     because I know -- I recognize that gender dysphoria is a

 9     serious problem and -- but I've never been quite

10     comfortable because of the lack of objectivity of this

11     in saying:  This is mild, this is moderate, and this is

12     severe gender dysphoria.

13          I don't expect that everyone agrees with me.

14          But I remember reviewing a paper about this, and

15     I objected to the term "severe."  I said:  It's enough

16     that these inmates have gender dysphoria.  You have no

17     capacity to separate mild, moderate, and severe.

18          And in response to my criticism they took out the

19     word "severe" from their paper.

20          So it's a debatable matter.

21     Q.  Okay.  Again, there's a lot in that answer so

22     I'll just tease a few things out.

23          First of all, you said you recognize that gender

24     dysphoria is a serious condition.

25          Did I hear that correctly?
```

```
 1        A.  Yes.

 2        Q.  Okay.  You also mentioned that people present to

 3    you with varying reports of the severity of their gender

 4    dysphoria.

 5            Did I get that right?

 6        A.  Well, no one says:  I have mild gender dysphoria.

 7    So you didn't get it right.

 8        Q.  Okay.  But in terms of reporting the symptoms of

 9    their gender dysphoria to you, people report different

10    levels of impairment of their daily lives?

11        A.  People report the similar degree of distress

12    about their incongruence.  They have varying degrees of

13    impairment in their social function and their vocational

14    function and their intimate function.

15            So I want to separate those two criteria;

16    distress, which is subjective, from impairment and

17    function.

18            You see, many people with gender dysphoria work,

19    you see; and some of them are very capable at their

20    work.

21        Q.  Okay.  Dr. Levine, can you tell me about the

22    treatments for gender dysphoria.  What are they?

23        A.  Well, there is a prolonged process of helping

24    people to share the history of their gender dysphoria in

25    a psychotherapeutic relationship where over time we come
```

1    to recognize the precipitance of -- we come to recognize

2    the forces that shaped their gender dysphoria, the

3    things that precipitated or crystalized their gender

4    dysphoria, the things that maintain their gender

5    dysphoria.

6         And we help them to discern what they're going to

7    do about their gender dysphoria in a psycho -- in a

8    process -- in a human professional relationship that's

9    respectful, that exists over time.  And we help them to

10   discern what they want to do given the fact that they

11   are -- here are the pluses, the benefits, and the risks

12   and the minuses of this decision.

13        But, that is not what the general public means by

14   the treatment for gender dysphoria.

15        And the treatment for gender dysphoria, of

16   course, varies greatly based on the age of the patient.

17        So I guess what we're talking about here is

18   adults.  And I guess we don't really have to talk about

19   the treatment of children or the treatment with

20   adolescents.

21        So in the adults what is generally known as the

22   treatment of gender dysphoria is something referred to

23   as affirmative care; which means that if you feel you

24   have this and if you want to, you can certainly -- we

25   would -- I will support you if you want to live your

```
 1      life in the aspired-to gender based upon what your

 2      subjective sense of your gender identity is.

 3            So that is -- one treatment is the support -- the

 4      living as -- I'll just use living as a woman --

 5      presenting yourself as a woman even though you have a

 6      male body.

 7            So then -- then another branch of treatment is

 8      the administration of cross-gender hormones to help with

 9      the growing of breast tissue and the redistribution of

10      fat and the decrease in muscle mass.

11            And so then if that isn't enough to satisfy the

12      person, if they still feel terribly incongruent and

13      distressed, then they may want larger breasts.  And so

14      they would go ahead and find a surgeon to build larger

15      breasts for them.

16            Or if they're unhappy with their face, they can

17      go have surgery to remodel their face.

18            The usual -- the usual thing that they want is to

19      get rid of their -- excuse me -- their male genitalia

20      and have their genitals restructured to resemble female

21      genitalia.

22            For some people they just want to remove their

23      testes so that they don't need to take as much estrogen

24      -- or they -- they say that's what they want.

25            So the various things that patients want are
```

1       thought to be the treatments for gender dysphoria.

2          Q.   Thank you, Dr. Levine.  You mentioned at the

3       outset you consider treatment for gender dysphoria to

4       involve a prolonged process of sharing and

5       psychotherapy; is that right?

6          A.   That's right.

7          Q.   Why is that important?

8          A.   Well, I'm hesitating because there are about --

9       there are a number of ways I might answer your question.

10          Well, it's important No. 1, to make sure the

11      person is informed about the consequences of what he or

12      she aspires to have done.  It is important to understand

13      that so that when some of those consequences occur, they

14      don't regret what they have done.

15          As you, I hope, know, that after

16      genital-confirming surgery the suicide rates of

17      post-operative people are much higher than the general

18      population suicide rates.  And so we recognize that in

19      the long-term there is a very high risk that there will

20      be psychiatric problems, depression, substance abuse,

21      anxiety states, suicide attempts, and completed

22      suicides.

23          So we're really trying to prevent short-term

24      happiness and long-term disaster.  And we want people to

25      make a connection with us so that they can understand

1    the adversities in their lives that may have produced

2    the repudiation of their maleness and we want them to be

3    realistic about what they can and cannot achieve in the

4    future by these -- quote -- treatments.

5         And I think the major reason to have

6    psychotherapy is this is a life-changing event.  It

7    needs to be carefully considered.

8         And it's ethical -- the doctor has an ethical

9    responsibility to make sure the person is thinking

10   clearly about this and understands the -- what we know

11   to be the consequences.

12        Now, there have been a number of studies that

13   have documented that the life cycle of transgender

14   people is significantly shorter than -- than if a person

15   is not transgender to the point that it may be up to

16   20 years shorter.  People who have been operated on and

17   who have lived their lives as trans people seem to die

18   of heart disease and of cancer and suicide at a much

19   higher rate, you see.

20        And so it seems very reasonable to me that people

21   who are -- especially adults who are undergoing these --

22   who request these things ought to have some thoughtful

23   process of consideration of the difference between the

24   fantasy that they have about having -- that this is

25   going to make my life happy and -- and the reality based

1    upon the thousands of people who have undergone these

2    surgeries in the past.

3         I think I'll stop there.

4    Q.  Does psychotherapy have a role in lessening

5    gender dysphoria?

6    A.  In some people, yes, it can have a role in

7    helping them to accept the fact that they're a feminine

8    man in many respects and that it's possible to live

9    their lives and express their femininity without

10    changing their bodies, per se.

11    Q.  Does psychotherapy have a role in easing the

12    day-to-day impact of gender dysphoria?

13    A.  I can't say that it does in a scientific

14    objective fashion.

15    Q.  Sure.  What about in your experience?

16    A.  But I need to tell you that there is a phenomenon

17    called detransitioning.  And so when a person decides

18    that this was a mistake and they return to their gender

19    that -- and I'm trying to use your words now -- when

20    they return to a gender consistent with the sex they

21    were assigned at birth, you see, all of a sudden, their

22    distress about gender dysphoria disappears.

23         So the distress about gender dysphoria is based

24    very heavily on the concept that I am a woman.  But when

25    one no longer says I am a woman, then the distress

1    diminishes, you see.

2         Then there's distress at the doctors who promoted

3    this and distress at the foolishness of the self for

4    having thought that I was a woman.

5         So the idea of psychotherapy helping somebody to

6    clarify their gender identity and help them not think

7    that they have to change their body just because they're

8    feminine in many respects diminishes the distress.

9         So in that sense the answer to your question is,

10   it is quite possible that psychotherapy for certain

11   individuals helps them, you see, and diminishes their

12   distress because their distress is based on the fact

13   that they have this notion that they're really born into

14   the wrong body and they're always been a female --

15   they've always been a female.

16        But if they give up that idea and they say:  Oh,

17   I see now, I was -- I conceived of this as -- I took my

18   feminine traits and I said -- I made that -- I'm a

19   woman.  And now they view their feminine traits as

20   something that happens in many men -- we're not all sort

21   of stereotypic hyper-macho aggressive gorillas, you

22   see -- then -- then psychotherapy can ease the distress.

23        If you're talking about a thousand people --

24   there's been no study to document that.  But, of course,

25   the same problems we have in the lack of science in the

```
 1   psychotherapy exists with -- with the treatments that I
 2   think Veronica-May is asking for.  So we're limited here
 3   in science.
 4        You're asking me my beliefs and you're asking me
 5   my experience, you see.  And so I'm telling you based
 6   upon my beliefs and my experience and my reading of the
 7   literature.
 8        Q.  I'm specifically asking you, Dr. Levine, based on
 9   your experience as a clinician treating with people with
10   gender dysphoria for decades if you think psychotherapy
11   can have a role in lessening that dysphoria?
12        A.  Yes.
13        Q.  Okay.  You referenced earlier detransition.  How
14   many patients have you had who detransitioned over the
15   course of your professional career?
16        A.  You need to understand that in the United States
17   as in elsewhere psychiatric care is a short-term or a
18   long-term phenomenon.  And most of the doctors who see
19   most of their patients -- most of the patients that most
20   doctors see they lose follow-up on, you see.
21        So I can only answer that question in the number
22   of people that I am aware of who have detransitioned
23   while they were seeing me.
24        Now, you may know that I wrote a paper -- I
25   published a paper about someone who detransitioned
```

 1    30 years after I originally saw this person.

 2         And you may be aware that in the last four or

 3    five months two papers have been published out of the

 4    United Kingdom that have demonstrated that within six --

 5    in one paper within 16 months of being prescribed

 6    hormones that 10 percent stopped them and another

 7    20 percent were lost to follow-up.

 8         And another paper found that 30 percent of people

 9    given hormones within five years had stopped their

10    hormones.

11         So my own personal experience with detransition

12    has been varied over the years.  It includes prisoners.

13    It includes teenagers.  And so I -- and it includes a

14    particular person who got our permission to have sex

15    reassignment surgery and never had it and then

16    detransitioned.

17         So I would say probably I am personally aware of

18    six people who have detransitioned.  But the vast

19    majority of the hundreds of people I've seen over the

20    years I've not had any follow-up on.

21         And this is, America, and we don't have a way of

22    keeping track of people.  So I don't know the answer to

23    the question in any strong scientific sense except for,

24    I should tell you, that on March the 12th there is going

25    to be an international day devoted to -- this month

1    there's an international day devoted to detransitioning

2    and -- because detransition apparently is an

3    increasingly recognized phenomenon.

4        So if you want, I can get you the link to this --

5    to this program.

6    Q.  So your answer to my question, Dr. Levine, is

7    that you are personally aware of six people who have

8    detransitioned; is that correct?

9    A.  Yes.

10   Q.  You also referred to, I guess, gender identity as

11   a notion.  And I'm wondering what you mean by that.

12   Specifically, I'm wondering, Dr. Levine, do you believe

13   that people can be talked out of their gender identity?

14   A.  No.  I just believe people can decide -- they can

15   decide that they no longer want to do this.  I don't

16   know how to talk someone out.

17       In fact, trying to talk somebody out is a

18   terrible mistake.  It is -- and probably -- especially

19   if you're dealing with young people or desperate people,

20   it probably makes them dig in further and interferes

21   with the natural process whereby they may have

22   ambivalence, and they recognize their ambivalence, and

23   they may -- they recognize their fear, and then they

24   decide to not do what they said they want to do.

25       So the answer your question, do I believe I can

1    talk someone out or professionals can talk somebody out

2    of this?  That's a misunderstanding of psychotherapy.

3    And I do not believe we can talk people out of it.

4        Q.  Okay.  Dr. Levine, we were talking kind of

5    broadly about treatments for gender dysphoria.  In

6    addition to psychotherapy you mentioned hormone therapy;

7    is that right?

8        A.  That's right.

9        Q.  Okay.  And I think you used the term cross-gender

10   hormones at one point?

11       A.  Yes.

12       Q.  Is that the same thing as --

13       A.  No, cross-sex.

14       Q.  -- hormone therapy -- I'm sorry, cross-sex

15   hormones.  My mistake.  So you used the term cross-sex

16   hormones at one point?

17       A.  Would you repeat that question?  I talked over

18   you.

19       Q.  Sorry.  We'll try not to do that in the future.

20           I believe you used term cross-sex hormones; is

21   that correct?

22       A.  Yes.

23       Q.  Yes?  I'm sorry, was that a yes, Dr. Levine?

24       A.  Yes, it was a yes.

25       Q.  Okay, great.

```
1              Does the term cross-sex hormones mean the same

2       thing as hormone therapy?

3          A.  When we're talking about the treatment of gender

4       dysphoria, yes.

5              If we're talking about medicine in general, the

6       answer is clearly no.

7          Q.  Right.  When we're talking about gender

8       dysphoria, the term hormone therapy means the same thing

9       as cross-sex hormones; correct?

10         A.  Yes.

11         Q.  Okay.  So can you please tell me about hormone

12      therapy as a treatment for gender dysphoria?

13         A.  Can I ask you what you want to know about it?  I

14      mean --

15         Q.  Sure.

16         A.  -- it's a rather general question.

17         Q.  Well, what does it entail?

18             Again, thinking of someone who was assigned male

19      at birth and is a transgender woman.

20         A.  So a transgender woman is an adult.  And so the

21      hormone therapy is to provide a form of estrogen

22      treatment.  And often it is also accompanied by a

23      diuretic that has antiandrogen qualities to it.

24             And so the -- quote -- hormone therapy is often

25      the use of the female hormone in one form or another
```

1     plus a diuretic that is not a hormone but is -- has some

2     antiandrogen quality to it -- property to it.  So that

3     is usually spironolactone in various doses.

4          And again, you can get injections of the

5     estrogen, you can get patches, you can get various forms

6     of pills; there's no one uniform scientific

7     established -- one way of delivering hormones.  It's

8     pretty much dependent upon the latest article that has

9     been read or -- or the doctor's preference and so forth.

10    Q.  Have you had patients who have been receiving

11    hormone therapy while in psychotherapy with you?

12    A.  Yes.

13    Q.  You also mentioned as a treatment for gender

14    dysphoria various kinds of surgery.  Was that right?

15    A.  I did.

16    Q.  Okay.  And I think we've used different terms,

17    sex reassignment surgery and gender-confirmation

18    surgery.

19          Do you recall those terms?

20    A.  Gender-conforming surgery.

21          You know, the language in this field is rapidly

22    changing.  What is politically correct changes from year

23    to year.

24    Q.  Okay.  Under the heading of gender-conforming

25    surgeries -- well, what's under that heading?  What

```
 1        kinds of surgeries are under that heading, again for

 2        someone who is assigned male at birth?

 3           A.  Ms. Bildner, anything -- any surgery -- any

 4        surgery may be under the term gender-conforming surgery.

 5              So if I feel my nose is too masculine, I will

 6        consider that and someone will consider this

 7        gender-conforming surgery to do a rhinoplasty.

 8              If my breasts on hormones are an A cup and I

 9        desire a B or C cup, then my -- the adding of a silicone

10        implant to my breasts is called gender-conforming

11        surgery.

12              Historically, sex reassignment surgery referred

13        only to the genital reconstruction.  But nowadays

14        everything is called -- by some people everything is

15        called gender-conforming surgery.  If I want it, it's

16        gender-conforming surgery.

17              The reason I want my forehead shaved is that I

18        feel my forehead is too masculine, and so it will

19        conform to my internal sense of femininity or femaleness

20        or being a woman if I don't have such a prominent

21        forehead.  And so the surgeon and I will consider this

22        to be gender-conforming surgery.

23              But historically it referred to the genital

24        structures.

25           Q.  Okay.  And what kinds of surgery for gender
```

```
1    dysphoria can be done that refer to the genital

2    structures?

3        A.  Well, one, the removal of the testis -- the

4    testes, the two glands that produce testosterone in the

5    scrotum; usually with preserving the scrotum because in

6    the future that scrotum can be transformed into labia.

7            It also includes the creation of a pouch called a

8    neovagina or a vaginoplasty, and the construction of

9    something that would resemble a clitoris anatomically.

10           So to various degrees these surgeries are done.

11   Generally, they're done all at once.

12           But there are some people who feel very strongly

13   that they want their testes removed and they're not sure

14   they want anything else yet.  So they have a -- they

15   remove their -- they have an orchiectomy in medical

16   language.

17       Q.  What is a good term to use, Dr. Levine, to refer

18   to surgeries -- I guess, gender-confirmation or

19   gender-conforming surgeries related to genitalia?

20       A.  I'm sorry, what was the first part of your

21   sentence?

22       Q.  If I want to refer to the surgeries you were just

23   talking about -- so -- I'm going to mess this up -- but

24   the removal of testes, the creation of a neovagina, the

25   construction of something that would resemble a
```

 1    clitoris, I assume the removal of the penis is somewhere

 2    in there -- if I wanted to refer to all of those

 3    surgeries together, what's a good term for me to use?

 4        A.  Genital surgery.

 5        Q.  Okay.  So when I use the term genital surgery,

 6    that's what I'll be referring to, surgeries for gender

 7    dysphoria that relate to the genitalia.

 8            Would you understand that?

 9        A.  Yeah, I would understand that.

10        Q.  Okay.  I just want to make sure we're on the same

11    page.

12            Okay, Dr. Levine, can gender dysphoria be cured?

13        A.  I think no.

14        Q.  Why not?

15        A.  Well, No. 1, probably before -- up to about

16    15 years ago many advocates for genital surgery felt

17    that this was a cure of gender dysphoria.

18            I think what is -- what I think people understand

19    now is that if one has considerable genital dysphoria

20    and one does genital surgery and constructs female

21    genitalia -- female-appearing genitalia; that what

22    you're curing is the distress of having testes, a

23    scrotum, and a penis.  So that in a sense cures genital

24    dysphoria.

25            But gender dysphoria -- gender is a mental thing,

1    you see.  And if I have broad shoulders or thick

2    knuckles or a prominent forehead or Adams apple, or my

3    voice is low and I continue to be fearing other people

4    will read me as a biologic male, then I -- although I

5    have female genitalia that are sufficient for my

6    purposes, I continue to have gender dysphoria.

7          And if I feel inauthentic, if I am not exactly a

8    man any longer and I'm not a woman, I still have an

9    incongruity that I -- I have distress about the sense of

10   self that I occupy a third sex, a third category; that

11   may be gender dysphoria.

12         So I think that people who are advocates of

13   surgery no longer testify that it's a cure for gender

14   dysphoria.

15         And if they do testify that it cures gender

16   dysphoria, then I think we ought to look at scans --

17   that we should be critical of that kind of statement.

18         So it's very helpful to people who have intense

19   genital dysphoria to have their genitals removed and --

20   or I should say removed and rearranged, reconformed,

21   re -- into a different female-resembling form.

22         But the idea of curing gender dysphoria -- the

23   incongruence between the feminine traits that I perceive

24   I have and the identifications that I have in my

25   anatomy -- I think the -- the fact that every -- every

 1    nucleated cell in the body and one's chromosomes

 2    indicate maleness, those -- those maleness features that

 3    are genetic remain.

 4         For example, balding -- frontal balding that

 5    happens in transgender females are as often a distress

 6    to these people because their pattern -- their male

 7    pattern baldness indicates to themselves and to other

 8    people they're still a male.  And so they have gender

 9    dysphoria about their -- it's not focused now on their

10    penis, which doesn't exist; it focuses on their scalp.

11         And so I don't think that most -- most people who

12    have been close to this phenomenon no longer talk about

13    curing gender dysphoria.

14    Q.  Would you agree, Dr. Levine, that genital

15    surgeries can cure genital dysphoria?

16    A.  Yes, in the right person it certainly can.

17    Q.  Okay.  Can gender dysphoria be lessened by

18    treatment?

19    A.  Well, if you've wanted to have your genitals

20    removed for years, and your genitals are removed and you

21    have female-acceptable -- female-looking genitalia, and

22    you can urinate without problems sitting down, and you

23    don't have chronic urinary distress or terrible

24    discharges from your new -- new vagina; then I think

25    that for a while you are very happy and will say:  I

```
 1    have no regrets.

 2         But as time goes on and you're used to your new

 3    genitals and then you begin to experience life in terms

 4    of the other indicia of your -- of previous maleness,

 5    then the gender dysphoria is still there even though

 6    you're so glad that you have female genitalia now.

 7         So, you know, it depends on when you look at the

 8    person, how you measure this, how willing the person is

 9    to tell you about their feelings.

10         So I think all of us ought to be a little

11    skeptical if we use the word "cured."

12         You know, in psychiatry we don't use the word

13    "cure" like we do in internal medicine and in general

14    surgery.  You can cure me of my acute appendicitis, you

15    see.  But -- I can help people get over their

16    depression.

17         But in psychiatry we -- we rarely talk about

18    "cure" of anything.  It's a high -- it's a high bar, you

19    see.

20         And I think the early advocates of gender

21    dysphoria surgery used the word "cure."  I think they

22    really mean amelioration, improvement, not cure.

23    Q.  So genital surgery can ameliorate the gender

24    dysphoria?

25    A.  It can ameliorate the gender dysphoria that is
```

```
 1        focused on the genitalia.

 2            Q.  And it can improve gender dysphoria?

 3            A.  To the extent I just specified.

 4            Q.  So that's a yes?

 5            A.  No.  It's a qualified yes.

 6            Q.  A qualified yes, okay.

 7                What's the best possible outcome then,

 8        Dr. Levine, for a patient who comes to you with gender

 9        dysphoria?

10            A.  Who comes to me with gender dysphoria?

11                Do you want to specify the age of the patient?

12            Q.  Adults.  And to be clear -- thank you for noting

13        that -- to be clear, Dr. Levine, at all times today I'm

14        talking about adults.

15            A.  Well, the best possible outcome is that I can

16        form a lasting relationship with them and we can

17        together over time consider their lives and we can weigh

18        the possibilities of benefit and the possibility of

19        disappointments.

20                We can understand the harms, the risks that may

21        infer.  We can understand the typical changes in family

22        relationships that occur as a result of gender -- living

23        in a new gender.

24                And that I can help the persons think through and

25        discern what they -- what they want to do informed about
```

 1    what is -- about what is a high risk and what is a low

 2    risk to occur.  That would be to me the best outcome.

 3       Q.  If the person decides to continue with other

 4    treatments, what then?

 5       A.  As long as they're informed about the risks and

 6    the benefits and that they know that -- they know what I

 7    understand about -- that he and I can or she and I can

 8    grasp -- as long as they understand my concepts and I

 9    understand what they're saying, we have a meeting of the

10    minds and we appreciate how serious a matter this is and

11    that they get to choose.  This is their life.  They get

12    to choose.

13          I often -- I often try to caution people about

14    who should give them hormones because some of them feel

15    -- some of them are really naive and -- and they go to

16    people who I consider to be charlatans who are grandiose

17    people who think they've invented the ideal treatment

18    for this.  So I try to warn them.  I try to get them to

19    conservative, you know, substantial doctors.

20       Q.  And who do you think those conservative,

21    substantial doctors who should be administering hormones

22    are?

23       A.  Well, I would think that they are

24    endocrinologists who -- who understand the limits of,

25    you know, what hormones can do and what the dangers are.

```
 1        Q.  Dr. Levine, you described this as a -- this kind

 2    of best outcome as a lasting psychological relationship

 3    with you.

 4        Do you recall using those words?

 5        A.  Yes.

 6        Q.  I'm curious what you mean by "lasting."  How long

 7    do people typically see you for treatment for gender

 8    dysphoria?

 9        A.  Well, it varies from person-to-person.  I have

10    people who have seen me for years.

11        I should remind you that in 2011 the Swedes

12    published a 30-year follow-up of everyone who had sex

13    reassignment surgery in Sweden, everyone -- which was

14    the best, most complete study that we had about this.

15    This was published in 2011.  And the six authors of that

16    study said that patients after sex reassignment surgery

17    should have lifelong psychiatric care -- lifelong

18    psychiatric care.

19        So that -- that is a pie-in-the-sky kind of

20    recommendation.  I actually think that it's needed for

21    many of them, but not all of them.  But it rarely

22    occurs.  What happens is that when they have crises,

23    they periodically come back.

24        But doctors are so busy, you know, that we can't

25    -- we actually don't have the time to see everyone for
```

```
1     the rest of their lives.  And patients don't want that

2     either.

3          But based on the data of what happened to those

4     hundreds of people that this group studied in terms of

5     the frequency of suicide attempts; the frequency of

6     completed suicide; the presence of psychiatric care; and

7     their mortality from heart disease, cancer, probably

8     from HIV infection; there was a very reasonable

9     conclusion that even after sex -- what they called in

10    those days sex reassignment surgery people continued to

11    have psychiatric difficulties.

12         You see, there are two major reasons why people

13    would undergo sex reassignment surgery or who would

14    deliver sex reassignment surgery.  One is to decrease

15    the gender dysphoria, and two is to improve the mental

16    and social functioning of the patient.

17         So the evidence of improved social and

18    psychological functioning is what is the great

19    contention here because there's not great evidence that

20    is -- improves that.

21         I think we should assume that genital dysphoria

22    for the majority of people is improved, but not the

23    psychosocial functioning.

24      Q.  Dr. Levine, so I take it from your answer that

25    you believe people with gender dysphoria would benefit
```

```
 1      from lifelong psychiatric care?

 2          A.  I think a lifelong relationship with a mental

 3      health professional -- a trusted, knowledgeable mental

 4      health professional who has the capacity to understand

 5      their lives and -- and their struggles.

 6              This is -- I already told you the limitations of

 7      lifelong psychiatric care.  There are some patients who

 8      recognize that.

 9              But the other aspect of this is:  I've made the

10      decision.  I'm now living as a woman.  I have certain

11      new problems I have as a woman.  I don't need a

12      psychiatrist to tell me what these problems are.  I only

13      need a psychiatrist when these problems overwhelm me and

14      I get depressed and I need to have a little, you know,

15      tune-up, so to speak.

16              So I have people come to me periodically for

17      tune-ups.  What their tune-up is, you know -- like, I'm

18      just thinking of one particular patient.  Their daughter

19      has become psychotic.  And their daughter hasn't talked

20      to him in 10 years since he's changed his sex.

21              So they come to me during crises, you see --

22      which is fine with me.  I mean, I think that's what my

23      job is, to understand people's lives and to be -- to

24      accompany them when they need me.

25              But I don't need to see everyone once a week for
```

1      the rest of their lives.  Please don't misunderstand me.

2          Q.  Right.  As I understand your opinion, Dr. Levine,

3      it's that long-term therapy by -- and I'll use your

4      words -- a trusted, knowledgeable professional who has

5      the capacity to understand their lives and their

6      struggles is something you would recommend for people

7      with gender dysphoria.

8              Did I get that right?

9          A.  Yes, because gender dysphoric people are human

10     beings.

11             And I often recommend that for other people, too.

12         Q.  Certainly.  But particularly given their

13     struggles, for people with gender dysphoria; correct?

14         A.  Well, that's what we're talking about today.

15         Q.  Right.  Okay.

16             I'm cognizant of your request for a break after a

17     certain amount of time. So I will get there quite soon,

18     I promise. Just a few last questions on this topic.

19             Have you ever, Dr. Levine, in your professional

20     work approved a patient for hormone therapy?

21         A.  Yes.

22         Q.  Okay.  How many times have you done that?

23         A.  Ms. Bildner, I've been working in this field

24     since 1974 -- 1973-1974.  I have written letters for

25     hormone therapy in the 70s and the 80s and 90s and in

```
 1    the 10's.

 2          Can I just answer it numerous times?

 3       Q.  Yes.  And I understand from your answer,

 4    Dr. Levine, that you approved many, many patients for

 5    hormones over the course of your career; right?

 6       A.  Yes.

 7       Q.  Okay.  Similarly, have you ever in your

 8    professional career approved a patient for genital

 9    surgery?

10       A.  Yes.

11       Q.  Okay.  And how many times have you approved

12    patients with gender dysphoria for genital surgery?

13       A.  If I told you 37, could you hear the

14    tongue-in-cheek sarcasm?

15          The answer to the question is the same:  Not as

16    many times as hormones, but I work in a -- for many

17    years I worked on a committee.  And it wasn't just I who

18    approved it.  I was the head of the committee or the

19    co-head of the committee.  And we anguished over this,

20    and we approved people for surgery -- some of whom

21    actually had the surgery, some of whom actually deferred

22    and never had the surgery.

23       Q.  Okay.  Thanks so much, Dr. Levine.  I think we'll

24    take a break now.

25          Let's see, it's 11 o'clock.  Maybe -- is a
```

```
 1    ten-minute break okay with you?

 2        A.   Even a five-minute break would be fine.

 3        Q.   Okay.  I'm happy -- yeah, ten minutes if that's

 4    okay.

 5            MR. BELFORTI:  Ten --

 6            MS. BILDNER:  Yeah, that's fine, we can do a

 7        10-minute break.  So back at 11:10.

 8            (Recess taken at 11:01 a.m.)

 9                            ---

10            (Back on the record at 11:14 a.m.)

11                            ---

12    BY MS. BILDNER:

13        Q.   Dr. Levine, I'd like to talk now about WPATH and

14    the standards of care.

15            So what is WPATH?

16        A.   It's a large international organization that has

17    evolved since the late 1970s when it was known as the

18    Harry Benjamin Gender Dysphoria Association.  It was an

19    attempt to study this new phenomenon of what was then

20    called transsexualism, trying to understand what is it,

21    who are these people who are claiming to be transsexual,

22    and what in the world can we do about them.

23            It was primarily a study that a group of

24    international people were -- some surgeons and an

25    endocrinologist and mostly psychologists and
```

```
 1    psychiatrists who were just trying to figure out what

 2    this new phenomenon was.  It evolved over the years.  It

 3    created brief standards of care and those standards of

 4    care have evolved.  And the current standards of care --

 5    which are quite out of date are the seventh.

 6         The -- it changed its name to the Harry -- to

 7    World -- to WPATH in early -- right after the turn of

 8    the century.

 9         And we're currently waiting for the eighth

10    edition of the standards of care to be published.  These

11    standards of care are probably three years overdue.

12         WPATH has come into considerable criticism for

13    being biased.  And it has ceased to be simply a

14    scientific organization.  It is now a -- quote -- both a

15    scientific and an advocacy organization.

16    Q.  And WPATH stands for the World Professional

17    Association for Transgender Health; is that correct?

18    A.  Correct.

19    Q.  And the previous name was the Harry Benjamin

20    International Gender Dysphoria Association; is that

21    right?

22    A.  That's right.

23    Q.  And were you involved with WPATH under its

24    previous time from the 1970's?

25    A.  Yes.  And I -- as you probably know, I was the
```

1       chairman of the writing group that created the fifth

2       edition of the standards of care.

3           Q.  You were the chairperson of the committee that

4       offered the fifth edition of the standards of care?

5           A.  Yes.

6           Q.  And that was published in 1998?

7           A.  I think it was 1999.

8           Q.  Okay.  And the current edition is the seventh

9       edition you said?

10          A.  Yes.

11          Q.  Okay.  And that was published, I believe, in 2011

12      or so?

13          A.  I think -- I think in 2013.  But you might be

14      right.

15          Q.  Okay.  You mentioned -- well, we've been

16      discussing the standards of care.  What -- first of all,

17      what are the standards of care?  Are they protocols?

18      Are they guidelines?  What are they?

19          A.  Well, they're guidelines.  And they're the

20      product of consensus.  And they are -- the current

21      standing edition I think is 121 pages.  In 1999 the

22      fifth edition was 21 pages.  So obviously they have much

23      to say.

24              The standards of care have again undergone two

25      very serious reviews, each of which have found them to

```
 1      be lacking in scientific merit.

 2             WPATH standards of care are touted by Americans

 3      as -- as science and as what we should all follow.  But

 4      they're not followed, they're viewed with skepticism.

 5             And in part because when -- when medicine creates

 6      standards of care, it's understood that the people on

 7      the committee that create the standards of care have to

 8      be schooled in methodology; they have to be able to be

 9      expert in evaluating studies.

10             And 30 percent maximum of the people who are

11      writing standards of care are supposed to be -- or

12      that's the limit of the number of people who

13      actually earn their living by providing the care.  But

14      close to a hundred percent of people who wrote the

15      standards of care for WPATH earn their living.

16             And so this is one -- this is only one of the

17      criticisms of the standards of care.

18             But so what -- what I'm saying is in lawsuits,

19      the courts are often told that people are following the

20      standards of care as though the standards of care are

21      something chiseled in gold and are scientifically valid.

22             And one of the criticisms of WPATH is that it's

23      not scientific.  It's the precedent of how you should

24      take care of people.  And it's not based on scientific

25      outcome studies, it's based on what people think is the
```

```
1      best thing to do even though they don't have evidence

2      that it's the best thing to do.

3            So that's what I can tell you generally about

4      WPATH.

5        Q.  Okay.  Thank you, Doctor.  Actually, that wasn't

6      my question at the time.  My question at the time was

7      simply:  What are the standards of care?

8            And I believe you answered that they are

9      guidelines for the treatment of the care -- the

10     treatment and care of transgender and gender

11     nonconforming people?

12           Is that an accurate description?

13       A.  That's -- that's how they describe it.

14       Q.  Okay.  You also mentioned that the standards of

15     care are followed by -- I think you used the word

16     Americans.

17           Is it fair to say that Version 7 of the standards

18     of care is endorsed by the major US medical and mental

19     health associations?

20       A.  Yes, it's fair to say that these --

21       Q.  Okay.

22       A.  -- larger institutions have trusted WPATH even

23     though -- the answer to your question is yes.

24       Q.  Yes, okay.  And is it fair to say that versions

25     of the WPATH standards of care is endorsed by the
```

```
 1    largest health systems in the United States?
 2        A.  Who are "the largest health systems"?  What do
 3    you mean?
 4        Q.  Sure.  Is it fair to say that Version 7 of the
 5    WPATH standards of care is endorsed by the Department of
 6    Veterans Affairs, for example?
 7        A.  I think -- I think that may be true only
 8    recently.  I'm not certain that's true, though.
 9        Q.  Is it fair to say that Version 7 of the WPATH
10    standards of care is endorsed by the Federal Bureau of
11    Prisons?
12        A.  Again, I'm not absolutely certain about the
13    answer, but I think the answer might be true.
14            Lots of institutions, like, hide behind the fact
15    that they follow the standards of care even though
16    they're not exactly sure what the standards of care are.
17        Q.  And is it fair to say, Dr. Levine, that Version 7
18    of the WPATH standards of care is endorsed by the
19    National Commission on Correctional Healthcare?
20        A.  I'm not aware either way about that.
21        Q.  Okay.  I gather that you have many criticisms of
22    the standards of care; right?
23        A.  Yes.
24        Q.  And you mentioned, among other things, that you
25    don't think they're based in -- Version 7 you don't
```

```
 1      think is based in science; is that correct?

 2          A.   Insufficiently based on science.

 3          Q.   In your opinion was Version 5, the version that

 4      you chaired, based sufficiently on science?

 5          A.   Oh, no.  That's exactly the point.  You see, I

 6      was in the room where it happened.  I was writing the

 7      standards of care.  I know what the processes were by

 8      which things got written.

 9          They did not -- they did not -- we did not review

10      critically current science.  We just thought what was

11      the best thing that -- what could we say about this

12      based on our clinical experience.

13          We had a few studies that we never looked at in

14      great detail that we sort of -- the committee of eight

15      people thought that this study showed that.  And we --

16      we never looked into the limitations of those -- of that

17      work in any close way.

18          And so I tell you based on the work that we did

19      over those two years to produce that -- to produce that

20      document, that this was not what I consider to be the

21      result of careful examination of existing literature and

22      recognition of what is missing from our literature.

23          So I do not claim that my work on the standards

24      of care -- and I want you to know I -- I approved and

25      actually authored almost all the symptoms in the fifth
```

1    edition just because it's hard for eight people to write

2    things.

3           Anyway, it is not -- it was not -- it was a

4    well-intentioned international group of different

5    disciplines trying to put together guidelines that would

6    be useful to families and useful to patients and useful

7    for doctors, but it certainly was not based on outcome

8    studies.  It certainly was not based on longitudinal

9    follow-up of anybody.

10          And so I need to tell you that when -- when it is

11   represented as scientific, I always smile because not

12   only have I read the standards of care at various times,

13   but I was involved, as I said, in the room where it

14   happened and I know it was not a -- is what I would call

15   a scientific process.

16          Now, please understand, this was almost 25 years

17   ago.  And my understanding of what science is and

18   what -- how science works is very different today.  I'm

19   far more knowledgeable today about the methods of

20   science than I was in 1997, 1998, 1999, as I'm sure

21   everyone else is, too, hopefully.

22      Q.  Again, Dr. Levine, let's tease out a few of the

23   things that you said.

24          So when it comes to the fifth edition of the

25   standards of care, you said you authored nearly every

```
 1    word of those standards?
 2        A.  Yes.  I was the editorial, yes.
 3        Q.  And you, therefore, approved every word of the
 4    fifth edition of the standards of care?
 5        A.  Yes.  It had to pass through my -- yes, it had to
 6    pass through me.
 7        Q.  And I assume you also facilitated the
 8    distribution of the fifth edition of the standards of
 9    care?
10        A.  Well, I presented it to the Board of trustees of
11    the executive committee, and they did that.
12        Q.  Okay.  You never resigned your position as
13    chairperson of the committee?
14        A.  No, no.  I resigned several years later.
15        Q.  And that was in approximately 2001?
16        A.  Approximately.  I don't remember exactly.
17        Q.  You resigned your membership in WPATH?
18        A.  It probably was HBIGDA then, yeah.
19        Q.  You resigned your membership in WPATH or --
20        A.  Whatever it was.
21        Q.  -- whatever it was.  Yes?
22        A.  Yeah.
23        Q.  Okay.  You stopped going to WPATH conferences?
24        A.  I stopped -- Let's see, the last one I attended
25    was in Galveston.  And that probably was 2002 or
```

```
 1    something like that.
 2         Q.  So about 20 years ago you stopped going to WPATH
 3    conferences?
 4         A.  Yes.
 5         Q.  And you're not currently a member of WPATH?
 6         A.  No.
 7         Q.  And you haven't been for 20 years at least?
 8         A.  That's right.
 9         Q.  Okay.  You mentioned that the current -- you
10    mentioned that the current version of the standards of
11    care is Version 7?
12         A.  Yes.
13         Q.  Have you read Version 7?
14         A.  Oh, probably -- not recently.
15         Q.  When did you read Version 7?
16         A.  Numerous times, but parts; you know, I didn't
17    read 121 pages at once.
18         Q.  So you've never read completely Version 7?
19         A.  Oh, yes, I'm sure I have completely read
20    Version 7.
21         Q.  At various points --
22         A.  At various points.
23              THE REPORTER:  I'm sorry.  You can't speak
24    over each other.
25              THE WITNESS:  The answer is at various
```

```
 1            points I've read -- I read Version 7.

 2     BY MS. BILDNER:

 3        Q.  Okay.  Do you use the standards of care in your

 4     own clinical practice?

 5        A.  Aspects of the standards of care.

 6            You see, the standards of care no longer require

 7     a mental health professional to evaluate a person.  This

 8     is deeply offensive to me.  This is against my

 9     understanding of what good care consists of.

10            So in a sense there are a few ideas in the

11     standards of care which I don't believe in.  And so the

12     answer to your question is yes and no.

13        Q.  You said you used aspects of the standards of

14     care in your own clinical practice?

15        A.  Yes.

16        Q.  Aside from the WPATH standards of care are there

17     competing or other standards of care for the treatment

18     of transgender people?

19        A.  Well, Sweden has just initiated a new standard of

20     care.  Denmark within the last year has issued a

21     different standard of care.

22            There are organizations in Europe and the United

23     States -- for example, there's something called US Path

24     United States, you know, WPATH just for the United

25     States.  And these various organizations and these
```

```
 1        various countries have their own variations of the

 2        standards of care.  I'm not familiar -- I'm not familiar

 3        with each of those.

 4             But WPATH is not the only organization that

 5        proposes to create guidelines for the handling of these

 6        things.

 7             "Guidelines" really means that in general you

 8        should think about these things, Doctor, but you have to

 9        understand that people's individual lives are different

10        from one another.  And so these guidelines are to be

11        modified based on your clinical judgment, which is based

12        upon the unique situations of this patient's life

13        circumstances.

14             So it's really important to understand the

15        difference between a protocol and a guideline.  You see,

16        there's a protocol for how to do heart surgery, step

17        one, step two, step three.  A guideline is a looser

18        concept about the doctor having an opinion based upon

19        ideally science and an appreciation of the unique needs

20        of the patient.

21        Q.   Okay.  Dr. Levine, I'd like to move on now and

22        just talk about your work -- your previous work as an

23        expert witness.

24             MS. BILDNER:  I think I'll share my screen.

25             And I'd like to mark this document as
```

1          Exhibit 1.  So give me one minute to do that.

2              (Plaintiff's Exhibit 1, CV of Dr. Levine,

3          was marked for identification.)

4              MS. BILDNER:  Is everyone seeing the CV on

5          Stephen B. Levine, M.D. on their screens?

6      BY MS. BILDNER:

7          Q.  Dr. Levine, can you see that?

8          A.  I do.

9          Q.  And is that, in fact, your most recent CV?

10         A.  Yes.

11         Q.  Okay.  So let's mark this, please, as Exhibit 1.

12             Dr. Levine, I'm on Page 4 of your CV.  Do you see

13     that?

14         A.  Yes.

15         Q.  Okay.  And you have two sections here.  You have

16     a section titled, Expert Witness, Appearances, and then

17     a little bit later a section titled, Expert Witness

18     Activities.

19             Do you see that?

20         A.  Yes.

21         Q.  What's the difference between -- what's the

22     difference, if any, between Expert Witness Activities

23     and Expert Witness Appearances?

24         A.  This is probably a reflection of my lack of legal

25     sophistication.  Probably there is little difference.

```
 1        It seems to me that when I testified at the Legislature,

 2        that was not the same thing as in testifying about a

 3        particular case, and so I separated that.

 4            Q.  Okay.

 5            A.  And in the interest of younger children, I was

 6        not talking about or advising The Court on how to take

 7        care of a particular child; I was advising The Court on

 8        the state of knowledge in this area.

 9            Q.  Okay.  Well, under Expert Witness Appearances,

10        you list, I guess, five different cases in which you've

11        appeared as an expert witness; is that right?

12            A.  Yes.

13            Q.  You list Kosilek, Battista...

14            A.  Yeah, I know.  I see what you're talking about.

15            Q.  Okay.  So those are cases in which you have

16        appeared as an expert witness?

17            A.  Yes.

18            Q.  Okay.  But this isn't a complete list of your

19        work as an expert witness, is it?

20            A.  Well, it's incomplete in that there are some

21        pending cases that I have not yet appeared in

22        deposition.

23            Q.  Okay.  And there are also some past cases that

24        don't seem to be on this list; is that right?

25            A.  I don't know if -- you know, you might be able t
```

```
 1     correct me.
 2        Q.  Sure.  For example, there was a case called
 3     Norsworthy out of California that doesn't appear on this
 4     list, does it?
 5        A.  Oh, I don't know.  Does it?
 6            I may have corrected it.  I was -- I never -- I
 7     was not an expert witness in the Norsworthy case.  I
 8     submitted an expert opinion; but I was never a witness
 9     in a deposition, I don't believe.
10        Q.  Okay.  You also were involved in a case called
11     Fuller out of Massachusetts; right?
12        A.  Oh, yes.  Was I deposed on that?
13        Q.  Well, that case doesn't appear either in Expert
14     Witness Appearances or activities, does it?
15        A.  Well, if it doesn't, it doesn't.
16        Q.  I think recently you were also involved in a case
17     called Claire versus Florida Department of Management
18     Services.
19            Do you remember that?
20        A.  I've been involved in several things in Florida.
21     One did not involve an expert witness or even a
22     written...
23            So I think I've been involved in at least two
24     things in Florida.  And I did have an expert -- I did
25     have a deposition.  And I didn't -- I don't have that in
```

```
 1     there?

 2         Q.  No.  So you recall being deposed in December 2020

 3     in a case called Claire v. Florida Department of

 4     Management -- or the Florida Department of Management

 5     Services?

 6         A.  I don't -- I don't recognize the name.  But I do

 7     recognize that I was deposed --

 8         Q.  Okay.

 9         A.  -- yes.

10         Q.  Okay.

11             MS. BILDNER:  Counsel, I'll just ask for a

12         complete list of cases in which Dr. Levine

13         testified or was deposed as a witness as

14         required by -- in the previous four years as

15         required by the rule.  I don't believe this list

16         is complete.

17     BY MS. BILDNER:

18         Q.  Dr. Levine, I'm going to go to the -- a little

19     bit later in your -- I'm sorry -- resumé.

20             I apologize.  No, a little bit earlier in your

21     resumé under the heading Consultancy.

22             Do you see that?

23         A.  Yes.

24         Q.  And you list several evaluations of inmates.

25             Do you see those?
```

```
 1        A.  Yes.

 2        Q.  And so the Virginia Department of Correction

 3   evaluation of an inmate, that was Ophelia De'Lonta's

 4   case; right?

 5        A.  Yes.

 6        Q.  And that New Jersey evaluation of an inmate, that

 7   was Michelle Angelina's case?

 8        A.  Yes.

 9        Q.  Okay.  You then note that you were a -- well, you

10   just say:  Expert witness reports to lawsuits in Idaho,

11   Wisconsin, and the UK in 2020.

12            Do you see that?

13        A.  Can you scroll down to it?

14        Q.  Sure.  It's under an X --

15        A.  Oh --

16        Q.  -- Consultancy --

17        A.  -- yeah, Idaho.  So yes, I gave a workshop to the

18   mental health professionals in Idaho.  And I support --

19   I submitted an -- expert opinion reports in those

20   states, yes.

21        Q.  Do you recall what those lawsuits were?

22        A.  Well, the UK was the Keira Bell case.  You are

23   probably familiar with that case.

24            The Wisconsin case involved a school where -- it

25   had to do with the school board's policy of changing the
```

```
 1      name of a child and not telling the parents.  That is,

 2      it was -- the parents brought suit about the fact that

 3      the school was making medical decisions and socializing

 4      their child in the opposite gender and they refused to

 5      -- without informing the parents.

 6           And the Idaho case had to do, I believe, with

 7      athletics.

 8      Q.  Okay.  I'm going to stop sharing my screen for a

 9      moment.

10           Dr. Levine, a number of the lawsuits that you

11      were involved in involved people in prison; is that

12      right?

13      A.  Yes.

14      Q.  Okay.  More specifically, they involved people in

15      prisons' access to treatment for gender dysphoria; is

16      that correct?

17      A.  Yes.

18      Q.  Okay.  And, I mean, actually, I'll refer to the

19      cases that you've done involving incarcerated people's

20      access to treatment for gender dysphoria as prison

21      cases; okay?

22      A.  Okay.

23      Q.  And in every prison case you've worked on behalf

24      of a prison system; right?

25      A.  Yes.  The Department of Correction hired me to do
```

```
 1    an evaluation.

 2        Q.  Right.  You've always been hired by the

 3    Department of Correction in those cases?

 4        A.  That wasn't the question.  But I think I -- if

 5    that was the question, yes.

 6        Q.  Yes, okay.

 7            And in every prison case you have opined that

 8    social transition was not medically necessary; is that

 9    right?

10        A.  No, that is not right.

11        Q.  There are cases -- prison cases in which you've

12    opined that social transition was medically necessary?

13        A.  Notice your question is talking about "social

14    transition."

15            No, that really wasn't the question here in those

16    cases.

17        Q.  Okay.

18        A.  So I mean --

19        Q.  Have you ever had a case in which the issue of

20    social transition was contested?

21        A.  In the Virginia case the question is:  Could I

22    provide a pathway for a sex reassignment surgery for

23    this prisoner?

24            The person had already socially transitioned.  It

25    wasn't a question of social transition.
```

```
 1              In the New Jersey -- Was it the New Jersey
 2     case? -- there was a very, extremely deteriorated human
 3     being who was violent and emotionally distraught and
 4     unable to function.  And the question is:  Could we ever
 5     get this man into a better mental state in order to
 6     consider his request to get special accommodations for
 7     what he says is his transgender state?
 8              But the man's behavior was so out of control that
 9     it made -- the real question is:  What could we do to
10     help this man settle down a little bit and not have to
11     be caged and being interviewed naked and being protected
12     from violent -- having the staff being protected from
13     violence?
14              So just those two examples is just -- that's why
15     I say it's not about social transition.  It's about --
16        Q.  And so --
17        A.  -- it's far more complicated than that, yeah.
18        Q.  Okay.  In the Keohane case out of Florida did you
19     testify that social transition was medically necessary?
20        A.  That case was about hairstyle and --
21              THE REPORTER:  Excuse me?  You said
22     "hairstyle"?
23              THE WITNESS:  Hair.  Yes, the length of hair
24     that this young man was -- who was a
25     trans person was allowed to have because of his
```

```
 1         trans identity.
 2             And so, you know, medical -- medical
 3         necessity is not usually applied to the idea of
 4         the length of hair.  So I discussed and
 5         recommended that the person could.  You know, we
 6         had to examine the rules in -- in prison to
 7         accommodate these matters.
 8             I object to the term "medical necessity" for
 9         lots of different things.  I find it a
10         rationalization that is not based upon the usual
11         tradition of medical necessity.
12             So I guess the answer to your question is:
13         I don't know if I can answer your question.
14     BY MS. BILDNER:
15         Q.  So in other words, Dr. Levine, you said you would
16     object to the definition of medical necessity, right?
17         A.  Yes.
18         Q.  It's just a yes-or-no question.  Do you -- you
19     object to the definition of medical necessity in these
20     cases?
21         A.  We're only talking about this case, the Keohane
22     case.  We're not talking about in general and in all
23     circumstances.
24         Q.  And in the Keohane case you did not say that
25     social transition -- in this case hair -- was medically
```

```
 1    necessary; right?
 2        A.  May I ask you to rephrase the question without
 3    using --
 4        Q.  Sure.
 5        A.  -- without using "social transition"?
 6        Q.  Okay.
 7        A.  This is not a case about social transition.  That
 8    person already was socially transitioned.  You see, it
 9    wasn't about social transition.
10            I think you and I have different concepts of the
11    meaning of that term.
12        Q.  Okay.
13        A.  And so I --
14        Q.  Well --
15        A.  -- it's really hard for me to answer your
16    question because of that.
17        Q.  What do you mean by "social transition"?
18        A.  I would like to ask you what you mean by "social
19    transition"?
20            If a person is in prison and he's treated as
21    though he's a trans person and is a trans female
22    prisoner, that's social transition.
23        Q.  Okay.  Dr. Levine, in all of your work on prison
24    cases you have never said that hormones are medically
25    necessary, have you?
```

```
 1        A.   I have gone along with the staff who -- who uses

 2     that term.

 3            I have given my blessing to giving hormones to

 4     people.  I think it is -- it is useful for the person

 5     given what they want and given their consistency of

 6     their identity.

 7            And so when my staff -- or that I'm the

 8     consultant for uses the term "medical necessity," I

 9     explain to them my understanding that this may be

10     helpful to the person; and, therefore, I agree that it's

11     okay for them to use the words "medical necessity."

12            I personally like to have a much more refined use

13     of that.  I like to have -- to clarify what I mean by

14     "medical necessity."

15            And I don't accept the fact that anybody who

16     wants anything for their trans state is -- is medically

17     necessary, you see.  So I --

18        Q.  Do you --

19        A.  -- object to the glib use of the term "medical

20     necessity."  And I substitute the judgment that in this

21     particular case would -- for example, hormones -- be

22     useful psychologically to this person.  And I often

23     think it might be useful psychologically to this person.

24            You must be aware that I am aware that in the

25     long run there's no strong evidence that hormones
```

```
 1      increases social and mental health.  But it is useful

 2      psychologically because the person wants it, because the

 3      person feels deprived of it, because the person feels

 4      better upon swallowing the first pill.  There is an

 5      improvement in their psychological state.

 6            So I just try to translate the concept of medical

 7      necessity into a more honest expression that I believe

 8      clinically as a doctor that this will be beneficial in

 9      the short run to the person.

10            And I'm interested in benefitting people, you

11      see.  I'm not a hard-hearted person who -- I'm trying to

12      help people, you see.  And so I think this is

13      psychologically beneficial.  And so I say yes.

14            I just don't like the term "medical necessity."

15      Because I --

16         Q.  You prefer the terms useful psychologically or

17      psychologically beneficial; is that right?

18         A.  That's right.

19         Q.  Is there any difference between the term useful

20      psychologically and psychologically beneficial?

21         A.  Not to me.

22         Q.  So given your dislike of the term medically

23      necessary you have never in a prison case said hormones

24      were medically necessary, have you?

25         A.  I think I just explained the answer to that
```

```
 1    question.
 2         Q.  The answer is no?
 3         A.  No, the answer is yes and no.  It is not no.
 4             If I as the consultant say that yes, I agree that
 5    this is medically necessary, my people understand what I
 6    mean by that, you see.
 7             So I have assented to giving hormones as a
 8    medical necessity because in Massachusetts -- which is
 9    the most liberal place in the world for transgender
10    treatments -- the people that I work -- who work in the
11    gender team, they actually believe these concepts.
12             I'm an educator there.  And I slowly help them
13    establish a little more sophistication about -- about
14    these matters.
15         Q.  Dr. Levine, have you ever said that genital
16    surgery was medically necessary for a person in prison?
17         A.  The answer to that question is exactly the answer
18    to the previous question.
19         Q.  So you have never used the term "medically
20    necessary" for a person in prison --
21         A.  That is not true.
22         Q.  I'm sorry, I didn't finish the question,
23    Dr. Levine.
24             My question was:  You have never described
25    genital surgery for someone in prison as medically
```

```
 1    necessary?
 2        A.  The answer to that question is yes and no.  It is
 3    the same answer to the question that -- about hormones.
 4            I believe genital surgery can be beneficial
 5    psychologically to select people.  It's because of that
 6    that I allow the letters to be written and I sometimes
 7    co-sign and that uses the term "medical necessity."
 8            I'm not fighting everyone in the universe about
 9    this.  I'm just trying to educate people about the
10    psychological aspects of this very complicated subject.
11        Q.  Let me use your term then.  Have you said ever in
12    a prison case that genital surgery would be
13    psychologically beneficial --
14        A.  Yes.
15        Q.  -- to a person?
16            What case?
17        A.  Kosilek.
18        Q.  And Ms. Kosilek did, in fact, receive genital
19    surgery; correct?
20        A.  Correct.
21        Q.  But you didn't say that Ms. Kosilek would benefit
22    from genital surgery at the outset of that case, did
23    you?
24        A.  In 2006?
25        Q.  In 2006?
```

```
 1        A.   Yes.  I didn't exactly say that what you've
 2   quoted.  I opined that the treatment that she was
 3   receiving in prison was sufficient.
 4        Q.   Exactly, okay.  When was the last time that you
 5   worked on a case involving an incarcerated person's
 6   access to treatment for gender dysphoria other than this
 7   one?
 8        A.   Probably in November or December of 2021.
 9        Q.   Okay.  What case was that?
10        A.   That was in Suffolk County, which is in the
11   Boston area.  And I think the -- Am I allowed to tell
12   you the name?
13        Q.   Well, I can't answer that question for you,
14   Dr. Levine.
15        A.   Is that allowed?
16        Q.   If you've been disclosed as an expert in that
17   case, then -- then sure.
18        A.   I mean, it's not -- it's not been a legal thing.
19   There's no legal thing.  And, you know, I did this -- I
20   was asked to evaluate an inmate, and I did.
21        Q.   Is that in your role with the Massachusetts
22   Department of Correction?
23        A.   Well, that's a very complicated thing because the
24   Massachusetts Department of Correction has farmed out
25   its mental health care to a company called Wellpath.
```

```
 1        And Wellpath is a national organization and works in
 2        many prisons.  And one branch of what they do is hire me
 3        to be the consultant that we -- you and I -- we've
 4        already discussed.
 5             And another branch of Wellpath hired me to
 6        evaluate this prisoner in Suffolk County jail.
 7             And there's another branch of Wellpath in
 8        California that is trying to figure out whether they
 9        want to have me come and evaluate one of their
10        prisoners.  It's not the same branch of Wellpath.
11        Although it's part of the national organization of
12        Wellpath.
13        Q.  Dr. Levine, aside from your prison cases, would
14        you agree that some of the expert witness work you've
15        done involves disputes about access to gender dysphoria
16        treatment for adolescents and children?
17        A.  Yes.
18        Q.  And what side are you working on in those cases?
19        A.  I'm working on presenting the basis of science.
20        I don't really consider myself -- I mean, I -- you would
21        consider myself on a side because I'm working for, you
22        know, like, an Attorney General.  But what I consider
23        myself to be doing is representing the state of science
24        on -- in this field.
25             I don't -- I don't actually feel like I'm against
```

```
 1        this or for that.  I'm trying to represent what science

 2        knows and make a distinction between what practice is

 3        and what science knows.  In that sense, that's what my

 4        role is.

 5             And I think the Attorneys General know that's

 6        what my role is.

 7          Q.  Let me rephrase the question then, Dr. Levine.

 8             In your work in disputes about access to gender

 9        dysphoria treatment for adolescents who hires you?

10          A.  I think -- I think a governmental agency hire me.

11          Q.  And would you agree that others of your current

12        cases or cases in which you've worked as an expert

13        involved disputes about insurance coverage for gender

14        dysphoria treatment?

15          A.  Yes.

16          Q.  And who hires you in those cases?

17          A.  Well, again, sometimes an individual law firm

18        hires me; but they are paid by an insurance company.

19          Q.  Okay.

20          A.  So I guess the answer is both the attorney and

21        the insurance company, because I presume that the

22        insurance company has to approve my being hired.

23          Q.  So you're hired by insurers indirectly or

24        directly, yes?

25          A.  Yes.
```

1          Q.   Okay.  Now, let's talk about your work as an

2     expert witness in this case.

3          So you have been retained as an expert witness by

4     the Connecticut Department of Correction here; is that

5     right?

6          A.   By the Attorney General's office.

7          Q.  Okay. And the Attorney General's office -- is it

8     your understanding that the Attorney General's office is

9     representing the Defendants in this case?

10         A.   Yes.

11         Q.   Okay.  Did you enter into a written agreement to

12    provide services in this case?

13         A.   Yes.

14         Q.   And when?

15         A.   I don't exactly -- I don't exactly remember.  But

16    since my -- it probably was 2019.  Let me just go with

17    2019.

18         Q.   What were you hired to do in this case?

19         A.   To evaluate the -- this prisoner because this

20    prisoner was causing a great deal of distress in the

21    system, and they wanted to know what I thought should be

22    done about this particular problematic inmate.

23         Q.   And when you say "this prisoner," what is the

24    name of the prisoner in this case?

25         A.   Well, now, the name of the prisoner is

```
 1    Veronica-May Clarke.
 2        Q.  Okay.  Were there any particular questions you
 3    were asked to address in your work in this case?
 4        A.  Well, it was to create an approach to managing
 5    this person.  The person, I think, requested ten
 6    different forms of intervention in a very demanding way;
 7    and was submitting grievances left and right.
 8            And so I guess the simpler question, the most
 9    important question was:  Is this person a candidate now
10    or in the future for a genital surgery or any of the
11    surgeries that he requested -- or she requested?
12        Q.  Dr. Levine, I noticed that sometimes when
13    referring to transgender women, you used the pronoun
14    "he."  Have I heard that correctly?
15        A.  Yes.  This is a -- if you notice in my report, I
16    -- unlike Dr. Brown, who wants to always refer to the
17    currently trans-identified person in their current
18    pronoun or preferred pronoun -- I believe that that's a
19    distortion of reality.
20            And I -- once a person has declared their trans
21    identity, I try very much to refer to them respectfully
22    -- as in this case a she or her.
23            But I can't control entirely my -- my unconscious
24    mind, and that I remember this person who's lived most
25    of that person's life as a male; and sometimes my mind
```

```
 1      -- my mouth -- the wrong pronoun comes out -- about

 2      which I apologize.

 3           But you need to understand that Dr. Brown and I

 4      disagree about the political correctness and the wisdom

 5      of referring to somebody as a three-year-old she when at

 6      age three the person acted like, was perceived of, and

 7      conceived of himself as a male.

 8           So that's just the difference between Dr. Brown

 9      and myself.  I know he always imputes me, imputes my

10      knowledge and my competence because I sometimes slip.

11           And if, in fact, if I write a 20-page report and

12      I use the wrong pronoun sometimes; well, that's not

13      evidence that I'm a barbarian in my view.  It is

14      evidence that I -- I'm not a very good copy editor.

15           So you are right, in answer to your question,

16      that I sometimes slip up and use the wrong pronoun.

17        Q.  But you noted that once someone announces a

18      transgender or gender identity, you try to use the

19      pronouns that that person requests; is that right?

20        A.  Yes.  And I believe that you do too.

21        Q.  Sure.  And why do you do that, Dr. Levine?

22        A.  Well, because I know it hurts their feelings when

23      they are -- quote -- misgendered.  So I try to -- I'm

24      trying to be helpful to people.  I'm not trying to

25      insult them.
```

```
 1              So, you know, I think I -- I think my errors are
 2        primarily in deposition and they're primarily on the
 3        printed page.  As I said, copy editing is not my
 4        strength.
 5              And I try as best I can when I am talking to a
 6        person, to respect their current gender identity.
 7          Q.  Are you finished with your answer, Dr. Levine?
 8          A.  I'm finished.
 9          Q.  And when working with -- you said you often train
10        younger mental health professionals; is that correct?
11          A.  Yes.
12          Q.  And when working with them, you try to train them
13        to use the correct pronouns for people who are
14        transgender today?
15          A.  They know that.  I don't have to give a lecture
16        on this.  I don't really -- they don't -- they don't
17        often make a mistake.
18          Q.  They already know to do that --
19          A.  Yes.
20          Q.  -- as knowledgeable mental health professionals;
21        correct?
22          A.  Correct.
23          Q.  Okay.  We were talking -- my original question,
24        Dr. Levine, was about what you were hired to do in this
25        case.
```

```
 1              Did you agree to treat Ms. Clarke?
 2        A.   No.  I think I agreed to outline a pathway of
 3     treatment for other people to do, to conduct.
 4        Q.   How so?
 5        A.   Well, you know, Ms. Clarke was a problematic
 6     inmate.  And they -- and they needed to know how to
 7     approach this problem of gender dysphoria and the
 8     request for surgery.
 9              And so at the end of my report I provided some
10     guidelines.
11        Q.   So you see yourself -- you see your function here
12     in addition to providing an expert opinion to the
13     attorneys as providing recommendations for a course of
14     treatment for Ms. Clarke?
15        A.   I gave some general recommendations for how they
16     can approach this over time and eventually make a
17     decision about what to do about the request for surgery.
18        Q.   And you did that in the context of your expert
19     report in this case?
20        A.   I did.
21        Q.   Did you do that outside the context of your
22     expert report in this case?
23        A.   I don't understand that question.
24        Q.   Well, do you have an ongoing role --
25        A.   No --
```

```
 1        Q.  -- in recommending -- Sorry, let me just finish

 2    my question for the record.

 3        Do you have an ongoing role in providing

 4    recommendations for the course of treatment for

 5    Ms. Clarke?

 6        A.  No.  I did a one-time report.  And I haven't been

 7    involved since.  No one has asked me to be involved

 8    since.

 9        Q.  Okay.  And aside from your expert witness role in

10    this case have you ever been hired by the Connecticut

11    Department of Correction to do any consulting work?

12        A.  I don't think so.

13        Q.  Okay.  So I'd like to discuss the records that

14    you reviewed for your work in this case.  I'm going to

15    go ahead and share my screen once again.

16        Are you able to see that, Dr. Levine?

17        A.  Yes, I can see it.

18        Q.  Okay.  This is a document that we received

19    titled:  Dr. Levine List of Cases, Exhibits, and Fee.

20        MS. BILDNER:  I'd like to mark this document

21    as Exhibit 2.  It's a two-page document.

22        (Plaintiff's Exhibit 2, Dr. Levin List of

23    Cases, Exhibits, and Fee, was marked for

24    identification.)

25    ///
```

```
 1    BY MS. BILDNER:

 2        Q.  Now, Dr. Levine, what -- well, first of all, did

 3    you author this document?

 4        A.  I don't recognize the document.  Obviously, it's

 5    mine.

 6            Can you scroll down?  What is this?

 7        Q.  Sure.

 8        A.  Is this the beginning of my report?

 9        Q.  No.  This is a separate document that we received

10    from opposing counsel.  Again, it's titled:  Dr. Levine

11    List of Cases, Exhibits, and Fee.

12        A.  Oh, okay.  All right.  I forgot that I wrote

13    that.  But I wrote it.

14        Q.  You wrote this; okay.  So where it says,

15    Respectfully submitted, Stephen B. Levine, M.D., you did

16    write this document; right?

17        A.  Yes.

18        Q.  Okay.  And so what is this document?

19        A.  Well, as of the date that I wrote that, it was my

20    summary of all my legal involvements and of the things

21    that I reviewed for the -- for the Veronica-May case.

22        Q.  Okay.  I'm going to scroll back up to page -- I'm

23    sorry, the beginning of Page 2 of this document.

24            No. 10 says:  Jonas.lettocourt.pdf.

25            Do you see that?
```

```
1        A.  Yes.

2        Q.  What is that document?

3        A.  I have no idea.  You need to understand that I

4    have --

5        Q.  And I --

6        A.  -- I have not -- I have not reviewed what I

7    reviewed to write that report in -- for many -- for a

8    very long time.

9            I could pull it up and I could answer questions

10   about it, but right now I don't know, what it is.

11       Q.  Okay.  I'm just going to go back up to the top of

12   this document.  The date of this document is

13   18 April 2021.

14           Do you see that, Dr. Levine?

15       A.  Yes.

16       Q.  So I take it to mean that you wrote this document

17   on April 18th of 2021?

18       A.  I presume so.

19       Q.  Going back to the heading, All Documents Read Or

20   Referred to in My Report, do you see that on the bottom

21   of Page 1, Dr. Levine?

22       A.  Yes.

23       Q.  Okay.  So there appear to be -- I'm going to

24   scroll down -- 19 items in that list; is that right?

25       A.  Yes.
```

```
 1          Q.  Okay.  And of the 19 items under this heading

 2     many are records related to Veronica-May Clarke;

 3     correct?

 4          A.  Yes.

 5          Q.  For example, Clarke EHR, which is No. 2; Clarke

 6     Gender Management Plan, No. 4.

 7          Do you see those?

 8          A.  I see them.

 9          Q.  Okay.  And some of the items on this list are, I

10     would say, external references to scholarly articles and

11     the like.

12          Do you see some of those?

13          A.  Yes.

14          Q.  Okay.  So I take it that these are the sources

15     that you used in writing the expert report in this case?

16          A.  I think these are the sources that I may have

17     quoted in the report.

18          Q.  Okay.  Did you rely on or consider any other

19     sources in writing your expert report in this case other

20     than the 19 items in this list?

21          A.  That's a very difficult question to answer

22     because, as you know, I've been involved in this subject

23     material for many years and I can't -- I don't -- I

24     can't recall at any given time many of the probably

25     thousands of articles that I've read to influence my
```

```
 1     opinions.

 2          So in -- particular in writing the report I'm

 3     making a specific point.  And if there is a modern paper

 4     that supports that point or refutes that point, you

 5     know, I may quote it.

 6          So I hope my answer has just explained why it's

 7     so difficult for me to answer your question yes or no.

 8     Q.  Okay.  So I take it from your answer this is not

 9     the definitive list of sources that you relied on or

10     considered in writing your expert report in this case?

11     A.  Again, the answer to your question is yes and no.

12          I'm sorry, I can't -- I can't simply agree with

13     some of these terse statements that you're making just

14     because I find that my knowledge base is not confined to

15     four articles.  And -- and I don't always know exactly

16     what article and when that article shaped my opinion.

17          That's the best I can answer your question.

18     Q.  Okay.  So of the articles that you, I guess,

19     chose to include on this list -- I see by my count six

20     external references; is that right?

21          And I can list them if that's helpful.

22     A.  Yes.  But No. 16 is, in fact -- say, 7, 8, 9 --

23     is -- No. 16 has nine different references embedded in

24     it.

25     Q.  Sure.  So you considered in writing your expert
```

```
 1    report your own article from the Journal of the American

 2    Academy of Psychiatry and Law from 2016.  You considered

 3    this Boyer article from 2021, the Kalin letter, and

 4    other letters involved in the correction to the

 5    Bränström and Pachankis article, the Dhejne article, the

 6    Swedish dataset, and then the CMS final decision memo

 7    from 2016.

 8         Am I correctly noting all of the external

 9    references you considered?

10      A.  Yes.

11      Q.  And I guess the CMS decision memo is listed

12    twice, it looks like, in No. 9 and No. 19; is that

13    right?

14      A.  Oh, right, right.

15      Q.  That's the same document; correct?

16      A.  It's the same document.

17          It's an example of my copy editing skills.

18      Q.  So again, that looks like a total of six external

19    references that you consulted in writing your expert

20    report; right?

21      A.  If you consider No. 16 to be one.

22      Q.  Sure.  And then there are records specific to

23    Ms. Clarke; correct?

24      A.  Yes.

25      Q.  Did you review any materials in preparation for
```

```
 1     writing your expert report other than those listed here
 2     with regards to Ms. Clarke?
 3         A.  I don't think so.
 4         Q.  Okay.  And have you reviewed any additional
 5     documents related to this case since your report was
 6     written in June 2020?
 7         A.  June 2020 is a long -- was a long time ago.  And
 8     since that time I've been deeply involved in the
 9     literature of this whole field -- primarily with younger
10     people -- in trans matters.
11             And so the answer to your question is yes, I have
12     reviewed many articles since that time.  To what extent
13     they actually apply to this case is unclear.  But there
14     are some in terms of understanding the limitations of
15     what we know about the psychological benefits or the
16     lack of knowledge of psychological benefits of gender
17     reassignment surgery, it bears some kind of relationship
18     to this case.
19             So in terms of the rapidity of knowledge --
20     acquisition of knowledge in this field, my report on --
21     on Veronica-May Clarke is very old.  The field has
22     advanced considerably since that time.
23             And so perhaps some of the questions you will ask
24     me I will have references to new information that was
25     not available to me.
```

1           I already told you one piece of new information

2      earlier today that was not available in June of 2020.

3           So that's where we are.

4      Q.  Okay, thank you.

5           Dr. Levine, I think you're answering a different

6      question than the one I asked.  The question that I

7      asked was:  Did you review any additional materials

8      specific to Veronica-May Clarke since writing your

9      report in this case?

10          I'm not talking about academic studies, external

11     reference; I'm talking about material specific to

12     Veronica-May Clarke.

13     A.  Yes.  I reviewed a paper written by two -- by a

14     number of authors, whose first authors' name is Boutros.

15     Q.  Sorry, what was that paper?

16     A.  B-O-U-T-R-O-S.

17     Q.  What's the title of that paper?

18     A.  Well, I could tell you the subject of the paper.

19     I'm not sure I have the title.

20          It's about -- it was a meta-analysis of 27

21     studies looking at the regret rates for sex -- for

22     gender-confirming surgeries of any kind.

23     Q.  Okay.  Again, Dr. Levine, I'm not asking you

24     about whether you reviewed new articles.  I'm asking you

25     whether you've reviewed new materials specific to

```
 1      Veronica-May Clarke?

 2           So let me give you some examples.  Have you

 3      reviewed updated medical records for Veronica-May Clarke

 4      since you wrote this report?

 5          A.  No.

 6          Q.  Okay.  Have you reviewed journal entries written

 7      by Veronica-May Clarke --

 8          A.  No.

 9          Q.  -- since you wrote this report?

10           Have you reviewed updated legal filings in this

11      case since you wrote this report?

12          A.  No.

13          Q.  For example, there's an Amended Complaint in this

14      case since you wrote your report.  Have you reviewed

15      that?

16          A.  I'm unaware of that.

17          Q.  Did you review any deposition transcripts in this

18      case?

19          A.  No, I have not.

20          Q.  Okay.  So you haven't reviewed any materials

21      specific to Veronica-May Clarke since you wrote this

22      expert report; is that right?

23          A.  With one exception.

24          Q.  And that is?

25          A.  There is a new hire at -- who recommended sex
```

```
 1     reassignment surgery.  I think the social worker's name

 2     was Bachmann, B-A-C-H-M-A-N [as stated].  So I read

 3     that.

 4          And when I say I reviewed the Boutros article, I

 5     did in anticipation of this deposition today I read that

 6     article.

 7       Q.  Okay, thank you.

 8       A.  I also read the article -- again, I had

 9     previously read it, but not in relationship to this case

10     because it wasn't published yet -- the Almazan

11     Keuroghlian article that I referenced earlier this

12     morning.

13       Q.  Okay.  Dr. Levine, let's take a look at your

14     report in this case.

15          Once again I will share my screen.

16          Okay.  Do you see a document on your screen dated

17     June 18th, 2020?

18       A.  I do.

19       Q.  And that's with your letterhead?

20       A.  It is.

21          MS. BILDNER:  And I believe -- are we up to

22     Exhibit 3 for marking purposes?

23          THE REPORTER:  Yes.

24          MS. BILDNER:  Okay, excellent.  So let's

25     mark this as Exhibit 3.
```

```
 1              (Plaintiff's Exhibit 3, Expert Report of

 2         Dr. Levine, June 18, 2020, was marked for

 3         identification.)

 4    BY MS. BILDNER:

 5         Q.  Is this your expert report in this case,

 6    Dr. Levine?

 7         A.  It looks like it.

 8         Q.  And did you, in fact, write this on June 18th,

 9    2020?

10         A.  That was the date I submitted it probably.

11         Q.  Did anyone help you write this report?

12         A.  I discussed this report with a Mr. Davis, Thomas

13    Davis, but I -- The question is:  What has helped me

14    write the report?

15              He helped me see what the issues he wanted me to

16    address were.  And so in a sense I wrote this report;

17    I'm the sole author of this report.  I wrote this report

18    for him.

19              And I think it depends on how you define "help."

20         Q.  And to be clear, Jamie, and Dr. Levine, I do not

21    want to know anything about your conversations with

22    AAG Davis, or Mr. Belforti, or anyone else in that

23    office.  And I don't think you did anything of that sort

24    in that answer.  But please don't tell me anything about

25    those conversations regardless.
```

```
 1              I'm going down now to Page 17 of your report,
 2      toward the bottom of the page where it says:  Part 4,
 3      The Inadequate Scientific Foundation of Gender
 4      Confirming Surgery.
 5              Do you recognize that, Dr. Levine?
 6         A.  Yes, I do.
 7         Q.  And there's a date under that, February 11th,
 8      2021.  Do you see that?
 9         A.  Yes.
10         Q.  So it's a different date than the rest of the
11      report; correct?
12         A.  Yes.
13         Q.  And this section is also it looks like in a
14      different font than the rest of the report; is that
15      correct?
16         A.  My eyes don't tell me that; but if yours do, I
17      will accept your view.
18         Q.  Okay.  Should I take that to mean -- the
19      different date, the different font -- Dr. Levine, that
20      this section was added after you initially wrote this
21      report?
22         A.  Well, of course you should take it that way.
23         Q.  Okay.  Approximately seven months later?
24         A.  Yes.
25         Q.  Why did you add this section to your report seven
```

```
 1      months later?
 2          A.  I'm not sure I can tell you that factually.  I
 3      don't recall.
 4              I had periodic discussions with Mr. Davis and --
 5              MR. BELFORTI:  Dr. Levine, I'm going to
 6          instruct you not to discuss anything you talked
 7          about with AAG Tom Davis, or with me, or AAG
 8          O'Neill, or AAG Medeiros for that matter.
 9              THE WITNESS:  Okay.
10              Well, I guess the answer to the question is
11          that it became apparent to me that what I
12          previously wrote might be further substantiated
13          by additional pieces of information.  And so
14          that's why I added the additional report.
15              I actually know the limitations of any kind
16          of forensic evaluation.  And I know that new
17          information can change one's opinion, and that
18          new information can come from the -- about the
19          inmate herself or it could come from published
20          literature.
21              And I've become aware of published
22          literature that I previously was unaware of.
23          And so it becomes relevant to me to strengthen
24          my opinions so that people like you can
25          understand my viewpoint.  So that's why I added
```

```
 1        an addition to this.

 2   BY MS. BILDNER:

 3        Q.  Okay.  And I'm just going to go down to Page 18

 4   of your report.  So the additional published literature

 5   you became aware of, Dr. Levine, is that described in

 6   this first paragraph on Page 18?

 7        A.  Well, I was long aware of the 2011 study, of

 8   course.  And the -- I became aware of the more recent

 9   suicide rates published by Sweden.  And the Bränström

10   Pachankis study certainly became a cause celeb since I

11   originally wrote the report.  And this study is an

12   example of what -- of the problem in the field.

13        And I thought it was really important that if --

14   when I'm deposed or if I ever go to court on this case,

15   that I be able to explain to The Court and to you that

16   what -- what the problems with this study are and what

17   the bias inherent in this study actually is.

18        And so that's why it was important to me to write

19   the addendum.

20        Q.  Okay.  So you were -- at the time of writing this

21   initial report in 2020 you were long aware of the 2011

22   study by Dhejne; correct?

23        A.  I was certainly aware of the 2011 study.

24        Q.  And you were also aware, I assume, of the 2016

25   Medicare final decision letter; right?
```

1      A.  No, I don't think -- I'm not sure that I can

2    answer your question definitively.  I'm not sure when I

3    became aware of that.

4      Q.  Had you read the 2019 Bränström and Pachankis

5    article by June of 2020?

6      A.  Yes.  I had not -- I had read it.

7         I was actually considering writing a letter to

8    the editor about its limitations, but I never got around

9    to it.

10     Q.  And none of those three is included in your

11    initial report; correct?

12     A.  I don't think so.  They couldn't have been, yeah.

13     Q.  In putting together this report, Dr. Levine, you

14    met with Ms. Clarke; correct?

15     A.  I did.

16     Q.  How many times?

17     A.  Three times.

18     Q.  When were those meetings?

19     A.  Could you just scroll to the dates in the report

20    and I can tell you definitively as opposed to guessing?

21     Q.  Sure.  So I assume you are talking about the

22    section titled, Interviews, which begins on the bottom

23    of Page 8 --

24     A.  Yes --

25     Q.  -- is that right?

```
 1        A.  -- right.  Those are the accurate answers to your

 2    question.

 3        Q.  Okay.  So you met with Ms. Clarke on May 21st of

 4    2020 by telephone?

 5        A.  Yes.

 6        Q.  And you met with Ms. Clarke again -- let's see --

 7    on May 27th, 2020, by telephone?

 8        A.  Yes.

 9        Q.  And then you met with Ms. Clarke a final time on

10    June 3rd, 2020, by video conference; is that right?

11        A.  Yes.

12        Q.  Okay.  And each of those meetings was between one

13    and two hours; is that right?

14        A.  They're -- the exact times are recorded.

15        Q.  Okay.  Have you met with Ms. Clarke since

16    June 3rd of 2020?

17        A.  No.

18        Q.  Have you spoken with Ms. Clarke since June 3rd of

19    2020?

20        A.  No.

21        Q.  In writing this report you also had psychological

22    testing done on Ms. Clarke; is that right?

23        A.  Yes.

24        Q.  And what kind of testing was that?

25        A.  That was -- Could you scroll to that and I can
```

```
 1     talk about that?

 2         Q.  Do you have any recollection of what kind of

 3     psychological testing you had done?

 4         A.  It was the MMPI and MCMI.

 5         Q.  Okay.  And what are those?

 6         A.  Well, the MCMI is a question and answer,

 7     true-false short questionnaire about 70 questions that

 8     seems to get at the pattern of life, the characterologic

 9     patterns of a person's life.

10         And the MMPI is a much more extensive true-false

11     question self-administered test that gets at the current

12     emotional state.

13         And so between the two of them we get a

14     semi-objective interpretation of the person's lifelong

15     patterns and their current emotional state in terms of

16     how they think and feel.

17         And it's just -- it's something I like to have to

18     see if my clinical impressions match or don't match the

19     psychological impressions based upon these standard

20     interpretations.

21         Q.  Do you --

22         THE REPORTER:  I'm sorry.  I didn't get the

23     beginning.

24     BY MS. BILDNER:

25         Q.  -- do you administer those two psychological
```

```
 1      tests to your own patients, Dr. Levine?

 2          A.  Often, yes.

 3          Q.  Okay.  And how did you do that testing for this

 4      report?

 5          A.  Well, I had the psychologist at the institution

 6      provide it.

 7          Q.  Have you spoken with psychologists from the

 8      Connecticut Department of Correction since that time?

 9          A.  No.

10          Q.  Have you spoken with anyone at the Connecticut

11      Department of Correction -- again other than attorneys

12      or attorneys representing them -- since that time?

13          A.  No.

14          Q.  Okay, we'll go back there shortly.

15              But in the meantime I'd like to talk about

16      Ms. Clarke and gender dysphoria.  First of all,

17      Dr. Levine, you agree that Veronica-May Clarke has a

18      diagnosis of gender dysphoria; correct?

19          A.  Yes.

20          Q.  You diagnosed her with gender dysphoria yourself?

21          A.  Yes.

22          Q.  Do you believe that Ms. Clarke suffers from --

23      Strike that, please.

24              Do you believe Ms. Clarke has genital dysphoria?

25          A.  She claims she does.
```

1      Q.  In your report you reference Ms. Clarke's -- I

2   believe you used the term allegedly incomplete

3   transgender state.

4        I can show that to you if that would be helpful.

5      A.  It would be helpful.

6      Q.  Sure.  I'll go back to share.

7        Okay, so we're back on Page 1 of your report,

8   Dr. Levine.  I'm looking at the first paragraph,

9   approximately four lines down -- I'm sorry, five lines

10   down.  And you say that Ms. Clarke filed a handwritten

11   complaint.

12        And you say that it alleges several things,

13   including deliberate indifference to and psychological

14   harm from her alleged incompletely treated transgender

15   state.

16        Did I read that correctly?

17      A.  Yes.

18      Q.  Okay.  Do you believe, Dr. Levine, that

19   Ms. Clarke has received adequate treatment for her

20   gender dysphoria since April 2016?

21      A.  I believe that in -- it's far less than ideal.

22   So I actually think that the treatment was insufficient

23   and...

24        But I am aware of prison life and prison culture

25   and prison sensibilities and prison policies.  And

1    oftentimes many, many prisoners with gender dysphoria

2    feel that they are inadequately treated.

3         And the question is:  What is adequate treatment?

4    When is the treatment to be done?  And -- and who should

5    dictate it other than the patient?

6         So if you asked me in a very simple

7    straightforward way:  Was her treatment perfectly

8    adequate?  I would say no.  There was room for

9    improvement.

10     Q.  You just described Ms. Clarke's treatment for

11   gender dysphoria as far less than ideal and

12   insufficient.  Can you tell me why?

13     A.  Well, I've already testified what I think people

14   need when they have gender dysphoria.  They need a

15   relationship with somebody who is interested in their

16   lives and their internal processes and their sense of

17   reality.

18        And prison systems -- mental health work in

19   prison systems I think it's fair to say is

20   crisis-oriented; it's not long-term, in-depth

21   psychotherapeutically oriented.

22        Prisons are prisons.  They have adequate -- they

23   have excellent general care for crises, and they -- they

24   are very good at preventing suicide; but they're not

25   ideal care that Dr. Levine would have done in his

```
 1    private practice given the same set of circumstances.

 2         But community-based care and private

 3    psychiatry-based care and prison care are two different

 4    cultural conditions.  And so if you're talking about how

 5    Dr. Levine might have treated Veronica-May once the --

 6    you know, the declaration was made, I would say that I

 7    would have been able to be -- I would have me be much

 8    more involved in the person's life in a regular way to

 9    investigate this with Veronica-May in the way I talked

10    to you earlier this morning about investigation over

11    time about understanding where this comes from, and what

12    possibly can be done about it, and what can I do to take

13    the desperation away.

14         You know a trustworthy new relationship with a

15    mental health professional gives people hope and takes

16    away desperation.  But it's very hard to do that in

17    prison systems -- not just in Connecticut, but in all

18    the prison systems that I've ever heard about.  Mental

19    health care in prison systems has to do more with crisis

20    than in long-term self-understanding.

21    Q.  Do you believe, Dr. Levine, that Ms. Clarke's --

22    that Ms. Clarke has received adequate psychotherapy for

23    her gender dysphoria?

24    A.  Well, I recommended a plan of therapy for

25    Ms. Clarke.  And as you've already established, I have
```

```
 1        no idea whether that was conducted or not.
 2            Q.  You recommended a plan of therapy for Ms. Clarke
 3        where?
 4            A.  In prison.
 5            Q.  I'm sorry, where did you make that
 6        recommendation --
 7            A.  At the end --
 8            Q.  -- at the --
 9                THE REPORTER:  I'm sorry.  I didn't get the
10            end of the question.  Did you say something
11            after "make that recommendation"?
12                MS. BILDNER:  No.
13                THE REPORTER:  Okay, thank you.
14                I'm sorry, Doctor.
15                THE WITNESS:  It's my understanding that in
16            the addendum to the report I provided an outline
17            and approach to the therapy that might be
18            useful.
19        BY MS. BILDNER:
20            Q.  I'm confused by what you mean by "addendum to the
21        report," Dr. Levine.  Can you explain that?
22            A.  Well, the February 11th thing that you --
23        portion.
24            Q.  Okay.  So your testimony is that in the
25        February 11th, 2021, portion of this report you've
```

1    outlined a course of therapy for Ms. Clarke that you

2    thought would treat her gender dysphoria?

3        A.  I outlined a pathway to -- to further

4    consideration of the possibility of some genital surgery

5    in the future.

6        Q.  Okay.  And what was that pathway?

7        A.  Well, I said that she should have -- she should

8    have two kinds of therapists; one, someone would see her

9    every two or three weeks to talk about her life and how

10   she got to prison and how she's coping with prison, to

11   talk about every aspect of her life.

12           And that she should have a gender -- someone

13   assigned to be her gender therapist to talk not about

14   the first subject the other therapist deals with, but

15   just about her gender dysphoria and what she needs to

16   make her comfortable.  And that that process should go

17   on for at least a year.

18           So that she should have two different kinds of

19   regular therapy sessions.  And that was to determine

20   whether or not she still wanted to be transferred to a

21   women's prison.

22           And then I said that it would be ideal that

23   before she had any sex reassignment surgery that she

24   could demonstrate that she lived comfortably without

25   problems among female prisoners.

 1              And if she ever changed her mind, if she didn't

 2       like not being around men, just being around women, or

 3       if she got into behavioral disturbances, or that her

 4       aggressive -- which characterized her pre-prison life --

 5       returned, then she could be returned to a male prison.

 6              And if, in fact, she got along well after a long

 7       period of time in a female prison and -- I'm blocking on

 8       the name of the female prison in Connecticut -- but then

 9       the chief psychiatrist of the female facility ought to

10       take a look at this.

11              And if the patient still wants sex reassignment

12       surgery, then I think she should have an appointment

13       with a local surgeon, someone who's very experienced,

14       whose complication rates are -- might be likely to be

15       lesser than a less-experienced surgeon, and we could go

16       from there.

17          Q.  Okay.  So am I to understand your testimony today

18       as you believe that a pathway to genital surgery is

19       appropriate for Ms. Clarke for the treatment of her

20       gender dysphoria?

21          A.  A pathway.  A pathway.

22          Q.  Okay.  And you suggested among other things

23       particular kinds of psychotherapy because Ms. Clarke had

24       not yet received them; is that right?

25          A.  I don't think -- I don't -- yes, I think that's

```
 1     right.
 2         Q.  Okay.  And what else did you say that you
 3     suggested for Ms. Clarke?
 4         A.  I suggested two forms of therapy over the next
 5     year; and one was specifically to focus on her distress
 6     about her gender dysphoria and the other was to talk
 7     about her as a person.
 8         Q.  Prior to making that suggestion, Dr. Levine,
 9     Ms. Clarke had not received two forms of psychotherapy
10     as you detailed; right?
11         A.  No.  I don't think it's unique to Ms. Clarke.  I
12     don't think that's the kind of work that is being done
13     in most prisons.
14             And so I was just -- see, I was just trying to
15     also help the readers of this report understand perhaps
16     a better program for people other than this particular
17     inmate.
18             Although this is about this inmate, I am mindful
19     of the fact that in prison populations the prevalence of
20     gender dysphoria is higher than the general population.
21     And so I also have a mind, you know, in writing things
22     that who's reading these reports and what influence they
23     may have in a larger sense than Ms. Clarke.
24             But that's my fantasy life, you know.
25         Q.  So your testimony today, Dr. Levine, is that
```

```
1        Ms. Clarke is an appropriate candidate for various kinds

2     of psychotherapy to treat her gender dysphoria; is that

3     right?

4        A.  To help her understand her gender dysphoria --

5        Q.  Okay.

6        A.  -- to help her make a decision without histrionic

7     desperation.

8        Q.  And in your professional opinion, that

9     psychotherapy is warranted for Ms. Clarke?

10       A.  I believe that kind of therapy is warranted for

11    any human being who is suffering or represents themself

12    as suffering from gender dysphoria.

13       Q.  And it's your testimony, Dr. Levine, that based

14    on that psychotherapy, Ms. Clarke may be an appropriate

15    candidate for genital surgery; is that right?

16       A.  And may not be.

17       Q.  Sure.  May or may not be an appropriate candidate

18    for --

19       A.  Yes, I -- I can agree to may or may not be.

20       Q.  Okay.  Let's take a look at that section of your

21    report, Dr. Levine.  So I'm going to the section of

22    your -- scrolling to the section of your report titled:

23    Part 4, The Inadequate Scientific Foundation of Gender

24    Confirming Surgery.

25            Do you see that?
```

```
 1        A.  Yes.

 2        Q.  Okay.  I'm going to give you a chance to just

 3    skim -- and please tell me when to scroll -- this

 4    section of your report.

 5        A.  Go ahead and scroll.  Scroll more.  Keep going.

 6    Keep going.

 7            Where is the section that I'm making reference

 8    to?

 9        Q.  That's my question for you, Dr. Levine.  I don't

10    see any of the course of treatment recommendations that

11    you just described in this section of your report.

12    Would you agree?

13        A.  Could you scroll up again?  Maybe I -- See, when

14    I submitted this, it was in an outline form.  So I don't

15    -- I'm a little confused at the moment.  Maybe if you go

16    back to the beginning and let me read -- just reread it

17    rather than skim it.

18            Could you go up above that?

19        Q.  Sure.

20        A.  Okay.  All right, Scroll, please.

21        Q.  Sure.

22        A.  Next scroll.  Next scroll, please.  Next line --

23    next scroll, please.  Keep going.

24            Well, I'm a little confused because in the

25    material that I reviewed last night -- or the other day
```

```
 1    in anticipation of this there is a section that I just
 2    summarized for you that you can't find.  And I can't
 3    explain why it's not there.  I just -- I don't have any
 4    explanation.
 5         It was my understanding that this was in my
 6    report.  Maybe I'm missing something, I'm not
 7    remembering something.
 8         This is perhaps part of the problem with having,
 9    you know, 21 months later after I wrote this report or
10    -- or less.
11         Anyway, what I told you is what I -- what I think
12    that when prisoners need to be recognized as having a
13    unique form of distress, they have rather characteristic
14    complaints, and they can get very desperate; and
15    addressing their complaints decreases their desperation.
16         And the discernment whether or not they have sex
17    reassignment surgery has to be a very careful,
18    thoughtful process over time that makes sure that they
19    have informed consent.
20         So I don't -- I'm sorry, I can't explain why it's
21    not in my report.
22    Q.  Okay.  So the recommendations for Ms. Clarke's
23    treatment that we just discussed, you would agree do not
24    appear in this version of your report?
25    A.  I'm sorry -- sorry to say, but I don't -- I can't
```

```
1    explain it, yes.

2        Q.  Okay.  I might come back to that.

3            Let's see, we're at 12:45.

4            Well, I had asked you earlier, Dr. Levine, about

5    Ms. Clarke's treatment.  We discussed psychotherapy, as

6    you'll recall; and that's how we got onto this search

7    for your recommendations.  Let me ask you a different

8    question.

9            Do you believe that Ms. Clarke has received

10   adequate hormone treatment for her gender dysphoria

11   since April of 2016?

12       A.  She is a bit of a medical mystery in that her

13   testosterone levels have been very high.  And so I -- I

14   think initially -- initially she needed probably much

15   more -- I mean, in the early years she probably needed

16   much more testosterone suppression than she got from her

17   estrogens.  I.

18           Don't know where she stands today.  Of course, I

19   don't know anything about her today.

20           It's very hard to -- You need to understand the

21   difficulties of inmates in getting hormonal treatment.

22   Most of the physicians in the prison system are not

23   experienced with this and this is not -- and they tend

24   to farm out to outside endocrinologists -- at least

25   initially.
```

```
 1            And getting external consultations is a

 2     logistical problem for many prisoners -- for many prison

 3     systems.

 4            But I think the usual patient might have gotten

 5     much more testosterone suppression than Ms. Clarke got

 6     from her initial treatment.

 7            And this -- the presence of her erections I think

 8     was a source of stated distress for the patient,

 9     although the patient also values the person's capacity

10     to have orgasm.

11            And so there may be a little more ambivalence

12     than meets the eye here because the patient's sexual

13     pleasures are an important part of Ms. Clarke's life,

14     and yet she's complaining about being inadequately

15     estrogenized.

16       Q.  So it's your testimony, Dr. Levine, in that case

17     that Ms. Clarke should have received much higher doses

18     initially of her hormonal medications than she did?

19            MR. BELFORTI:  Objection as to form.

20            Answer if you can, Dr. Levine.

21            THE WITNESS:  I'm sorry, would you say that

22       again?

23     BY MS. BILDNER:

24       Q.  You can answer --

25            THE WITNESS:  Mr. Belforti, I didn't hear
```

```
1        what you said.
2             MR. BELFORTI:  What I said was objection as
3        to form.  But you can answer if you can,
4        Dr. Levine.
5             THE WITNESS:  Answer if I can.
6   BY MS. BILDNER:
7        Q.  You can answer, Dr. Levine.
8        A.  Yes.  Well, if you repeat the question, I think I
9   could point out to you that the issue is when should she
10  have had more estrogen and how long should -- you know,
11  how long should any dose be given before the results are
12  thought to be inadequate?
13            And this is really a question for
14  endocrinologists.  I don't really represent myself as
15  expert in the endocrine treatment of these individuals.
16       Q.  And you've been involved with patients who have
17  been on hormone therapy in your 48 years of practice;
18  right?
19       A.  Yes.  But I don't provide the hormones.  You
20  know, I -- so I don't take responsibility for measuring,
21  you know, various blood parameters and making decisions
22  based on laboratory and patient complaints.  That's not
23  my field.
24       Q.  Right.  You don't take responsibility for making
25  those decisions, Dr. Levine; is that right?
```

```
 1        A.  That's right.

 2        Q.  But you have some awareness of the target ranges

 3     of hormone therapy; correct?

 4        A.  I have -- I have some, yes.

 5        Q.  Okay.  And as you were saying before,

 6     Ms. Clarke's initial doses in your opinion should have

 7     been much higher than they were?

 8            MR. BELFORTI:  Objection as the form.

 9            Answer if you can.

10            THE WITNESS:  No, I think the problem with

11     your question is the word "initial."

12            Once -- a prudent physician starts with a

13     low dose.  It's -- it's not -- we don't start

14     with 6 milligrams, you know, of a particular

15     thing when the basic dose is 1 milligram or 2

16     milligrams.

17            In other words we don't know the biologic

18     system that we're dealing with.  We have to --

19     we have to take time.

20            MS. BILDNER:  Let's -- Well, it's 1:00

21     o'clock, so I might take a quick break here; but

22     I do want it to not be a very long break.

23            How does 15 minutes sound to you,

24     Dr. Levine.

25            (Off the record.)
```

```
 1              THE WITNESS:  Shall we consider this a lunch

 2        break?

 3              MS. BILDNER:  Yeah, I think we should

 4        consider this a lunch break.  But since you

 5        normally take ten-minute lunch breaks,

 6        Dr. Levine, I hope it won't be too much of an

 7        inconvenience if we do a quick one here.

 8              THE WITNESS:  If you want 15 minutes, I'll

 9        grab a bite to eat, yeah.  I'll be back.

10              MR. BELFORTI:  Elana, is there any way we

11        can make it 30?

12              MS. BILDNER:  We need to keep plugging

13        through, Jamie.  So can we compromise?

14              MR. BELFORTI:  I mean, it's -- I imagine you

15        have a lot more to get into and it's going to be

16        a long day one way or the other.  So I think

17        taking a little bit of time now probably isn't

18        the worst idea.

19              MS. BILDNER:  Sure.  In that case, let's

20        take a 30-minute break now.

21              Let's go off the record, please.

22              (Off the record.)

23              (Luncheon recess was taken at 12:57 p.m.)

24                              ---

25
```

```
 1                    AFTERNOON SESSION (1:33 p.m.)

 2    BY MS. BILDNER:

 3        Q.  Thank you, Dr. Levine.  Welcome back.  You're

 4    still under oath.

 5        A.  I am.

 6        Q.  Okay.  So before we took a break we were talking

 7    about Ms. Clarke's hormone treatment.

 8            Do you remember that?

 9        A.  Yes.

10        Q.  So stepping back a moment, what are the typical

11    physical effects of hormone therapy for transgender

12    women?

13        A.  Breast -- sort of breast budding and then breast

14    development, softening of the skin, a diminished sexual

15    drive, sometimes a re-contouring of the body with a

16    decreased muscle mass, and depending on their weight

17    their fat distribution changes a bit.

18            That are physical changes in the laboratory.  But

19    the patient is not aware of those until they -- you

20    know, they're told; changes in their lipid profile.

21            And those are in general.

22        Q.  What about reduction of body hair?

23        A.  That's a controversial thing.  At best there is

24    a -- perhaps a little less body hair growth.  But if

25    you're -- if you have hairy legs, you're going to still
```

```
 1    have hairy legs.

 2          And so the idea that if I take estrogen my beard

 3    and my body hair will disappear is a longed-for wish,

 4    but it doesn't -- it's not a reality.

 5       Q.  And what --

 6       A.  As we are quite aware, women have body hair.

 7       Q.  -- what about a decrease in spontaneous

 8    erections?

 9       A.  Well, there probably is a decrease in spontaneous

10    erections.  And that probably corresponds to the level

11    of testosterone.

12          So actually you have to have a pretty low

13    testosterone -- total testosterone and free testosterone

14    to totally get rid of that.

15          The body has been designed to put blood into the

16    penis at night three times a night in order to keep the

17    tissues alive.  So when you talk about spontaneous

18    erections, sometimes it's a morning erection and it's

19    not really spontaneous; it's what's going on to preserve

20    the tissues of the penis.  The body conserves itself in

21    that way.

22       Q.  Okay.  So is your testimony that there is a

23    decrease in erections --

24       A.  Yes --

25       Q.  -- particularly in the morning?
```

```
 1         A.  -- there's -- yes, there's a decreased frequency

 2     and perhaps turgidity of the erection with lower

 3     testosterone.

 4         Q.  And what about testicular shrinkage?

 5         A.  The testes itself over probably several years

 6     would shrink in size --

 7         Q.  What --

 8         A.  -- they won't disappear.

 9         Q.  -- about reduction in muscle mass or strength?

10         A.  Both.

11         Q.  And you mentioned breast growth.  What about

12     softening of the skin?

13         A.  I mentioned that too.

14         Q.  You mentioned that as well, yes; okay.

15             So breast growth, softening of the skin,

16     reduction in muscle mass, decreased erection, possible

17     reduction in body hair, and testicular shrinkage.

18             Did I miss anything on that list?

19         A.  Well, the increase in serum lipids you missed,

20     sometimes high triglycerides.

21             Anyway, that's generally true, what you said.

22         Q.  Okay.  And there are -- am I correct that there

23     are different combinations of medications given to

24     transgender women for hormone therapy?

25         A.  Is that a question?
```

```
 1        Q.  Yes.  I can repeat it if you'd like.

 2        A.  Yes, there are -- there are different

 3    combinations.

 4        Q.  Do you know what medications Ms. Clarke is on for

 5    hormone therapy?

 6        A.  Today I don't know, no.

 7        Q.  At the time of your report do you know what --

 8        A.  I think she was --

 9        Q.  Strike that.  Let me -- Sorry.  Let me ask a

10    clearer question.

11            Do you know at the time of your report what

12    medications Ms. Clarke was on for hormone therapy?

13        A.  I think she was on Estrace and spironolactone.

14        Q.  What is Estrace?

15        A.  It's an estrogen compound.

16            I don't know what -- what exactly you're asking.

17        Q.  Is it the same thing as estradiol?

18        A.  It's a brand name and I think it is for

19    estradiol, yes.

20        Q.  Okay.  And what does estradiol do in the context

21    of hormone therapy?

22        A.  For male -- biologic males what it does?  It does

23    the exact things that you previously outlined.

24        Q.  Okay.  What are the typical dosing ranges for

25    estradiol for hormone therapy for transgender women?
```

```
 1        A.  Well, that depends on the endocrinologist.  But

 2   generally speaking, up to 6 milligrams a day.  Many

 3   people don't need 6 milligrams a day.

 4        Many transgender people, if they were treated the

 5   way they wanted to, would probably take far more than

 6   that.

 7        But I think 6 milligrams is the usual upper dose.

 8        Q.  Six milligrams is the upper dose.  What's the

 9   lower dose?

10        A.  Well, it depends on the patient's response.  I

11   mean, I think it varies considerably.

12        It depends also on the patient's risk of

13   thromboembolic phenomena and their history of heart

14   disease and so forth and so on.

15        Q.  What's a typical starting dose for Estrace?

16        A.  I think 1 or 2 milligrams.  It --

17        Q.  Okay.  You --

18        A.  -- depends on the conservatism of the doctor.

19        Q.  Okay.  You mentioned that Ms. Clarke was also

20   taking spironolactone; is --

21        A.  Yes.

22        Q.  -- that correct?

23        What is spironolactone?

24        A.  It's a diuretic, and it's thought to have some

25   androgen and receptor blocking capacities so that it
```

```
 1       doesn't change testosterone levels, but it changes the

 2       uptake of testosterone.  And --

 3          Q.  Do you --

 4              THE REPORTER:  I'm sorry.  I didn't --

 5              THE WITNESS:  It changes the uptake of

 6          testosterone into individual cells.  It's a

 7          receptor blocker.  It's a side effect of the

 8          medicine.

 9              THE REPORTER:  Thank you.

10       BY MS. BILDNER:

11          Q.  So same question as with Estrace.  What are the

12       typical dosing ranges for spironolactone for hormone

13       therapy for transgender women?

14          A.  100 to 300 milligrams.

15          Q.  Okay.  Should transgender women who are on

16       hormones be monitored?

17          A.  Yes, they should be monitored.  Of course they

18       should be monitored.

19          Q.  What for?

20          A.  For their -- for lipids -- lipid abnormalities,

21       for liver abnormalities, for blood clots, for anemia,

22       and their general physical health.

23              Really -- really, we need to worry about

24       cardiovascular disease.  And so whatever the doctor's

25       standards for measuring -- monitoring cardiovascular
```

```
1    disease -- whether it's by history, physical
2    examination, by CT scan for calcium deposits in the
3    heart.
4         You know, I don't dictate these things as a
5    psychiatrist.  But generally speaking, I want my
6    patients to be in a -- at least twice a year -- minimum
7    once a year if they're well-established -- visit to a
8    primary care doctor or endocrinologist or internist who
9    would measure their blood studies and take a look at
10   their body.
11     Q.  Okay.  And so am I understanding then that this
12   monitoring is done through blood work?
13     A.  Well, it's done by a combination of seeing an
14   M.D. -- and not a psychiatrist, but an M.D. -- and blood
15   studies.
16     Q.  Okay.  How do you determine whether hormone
17   therapy levels are effective?
18     A.  Well, we have to ask what the outcome is that the
19   patient and the doctor are looking for.  And then we
20   just evaluate breast growth, for example, lipid levels,
21   whether or not the patient's had any decrease in their
22   libido.
23         It's really hard to -- I mean, we could measure,
24   but I doubt very much if people measure the calf -- the
25   circumference of the calf or the circumference of the
```

```
1    biceps.  Or I don't think we measure strength, we don't
2    test people's strength.
3         People report to us they feel like their muscles
4    are shrinking or their decrease in their arm strength or
5    whatever.
6    Q.  So in order to tell whether hormone therapy is
7    effective you would look to those typical physical
8    effects of hormone therapy that we discussed earlier; is
9    that right?
10   A.  Yes, but within the -- within the reasonable
11   understanding about biology that -- you know, many
12   people think that they're going to have very large
13   breasts with estrogens and they think it's going to take
14   six months.  And in fact, it doesn't take six months and
15   many people do not get large breasts.
16        And we have to point out to them that seems to be
17   determined genetically by forces that we don't
18   understand, and that cisgender women have all sorts of
19   breast sizes.  And even though they may desire to have
20   large breasts, they may never biologically be able to
21   have large breasts depending on, you know, these
22   mysterious genetic factors.
23        But it's sometimes hard to explain that to
24   somebody who has great -- has a desire to be
25   hyper-feminine in terms of breast size.  So...
```

```
 1          Q.  My question, Dr. Levine, was how you could tell,

 2     how you could determine whether hormone therapy was

 3     effective?

 4          A.  Well, I was -- what I'm trying to say, it depends

 5     on -- I'm going to just try to answer your question

 6     specifically here.  It depends on the outcome in

 7     question.

 8              So I -- I want to know what we're talking about.

 9     Is it effective for this or is it effective for that?

10     Is it effective for psychological reasons or is it

11     effective for physical reasons -- not that they're

12     unrelated, you see, but I can separate those things.

13          Q.  Sure.  So you would look to the physical effects

14     that we discussed earlier and see if any of them are

15     apparent, for example?

16              If someone is developing breasts, would that be

17     an indicator of the effectiveness of hormone therapy?

18          A.  Well, one, if -- No. 1, I'm a psychiatrist.  I

19     generally don't do physical examinations; and in

20     particular, I don't examine patients' breasts.  So I'm

21     asking questions about this.

22              I really think the adequacy of breast growth is

23     something they can talk to me about.  But they need to

24     have had their breasts examined by a physical doctor

25     who's equipped, you know, to gown people, and you -- I
```

1    don't think I have to explain further.

2       Q.  Sure.

3       A.  So my work in adjudging the adequacy from the

4    patient's point of view of hormone therapy is to ask

5    questions about the various parameters that you outlined

6    before.

7       Q.  Okay.  What are the target estrogen levels in a

8    transgender woman who is undergoing hormone therapy?

9       A.  Probably between 150 and 200 units of whatever

10   the lab measures, micrograms per deciliter or something.

11      Q.  Okay.  What are the target testosterone levels

12   for a transgender woman undergoing hormone therapy?

13      A.  I would say less than -- certainly less than a

14   hundred and many people less than 50.

15      Q.  When we talk about these target levels, would

16   seeing estrogen or testosterone at these target levels

17   be an indicator of the effectiveness of hormone therapy?

18      A.  It's an indicator.  It's --

19      Q.  So the answer is yes?

20      A.  No.  The answer is, it's an indicator.

21      Q.  Okay.  To make sure I understand, Doctor, your

22   answer is that seeing estrogen and testosterone levels

23   in these target ranges is "an indicator" of

24   effectiveness of hormone therapy; is that correct?

25      A.  That's my -- yes, that's correct.

```
 1          Q.  Okay.  When did Ms. Clarke begin hormone

 2     treatment?

 3          A.  I don't have a specific date in mind.  I think it

 4     was several years before I saw the patient.

 5          Q.  Okay.  Let me --

 6          A.  The answer to that question is in my report.

 7          Q.  Okay.  Let me share my screen in that case.

 8     Sorry, I took down your report.  So hold on one second.

 9          Okay, do you see the report on your screen again?

10          A.  I do.

11          Q.  And we've marked this, this is Exhibit 3, I

12     believe.

13          So on Page 1 of your report in the second-to-last

14     paragraph on the bottom of the page you have a note that

15     says Ms. Clarke's endocrine therapy began in April of

16     2017.

17          Do you see that?

18          A.  I do.

19          Q.  Okay.  And then a little bit later on Page 6 of

20     your report you have a section called, Medical History

21     While Incarcerated.

22          Do you see that on your screen?

23          A.  Uh-hum.

24          Q.  Okay.  And here, if you'll look down at No. 11,

25     you have a note that says 2017 -- dash -- hormones
```

```
 1     approved in August -- comma -- started in September.

 2          Do you see that?

 3       A.  I do.

 4       Q.  Do you know which date is the correct date,

 5     Dr. Levine?

 6       A.  At this moment I don't, no.

 7       Q.  Okay.

 8       A.  I think the correct day we could summarize is

 9     2017.

10       Q.  Okay.  If I told you that Ms. Clarke began

11     hormones on September 23rd of 2017, do you have any

12     reason to dispute that?

13       A.  I would trust you.

14       Q.  Okay.  Do you know what Ms. Clarke's initial dose

15     of hormones was?

16       A.  I don't know with certainty, but I would imagine

17     it was no more than 2 milligrams.  Perhaps it was

18     1 milligram.

19       Q.  That's 2 milligrams of what?

20       A.  Estrace or estradiol.

21       Q.  Okay.  And any sense of how much her initial dose

22     of spironolactone was?

23       A.  I don't recall.  It probably was not 300.

24       Q.  Do you know when Ms. Clarke's hormone levels were

25     first checked?
```

```
 1        A.  I once did.  I don't recall.

 2        Q.  Okay.  Do you know if Ms. Clarke's dose was

 3   raised, if ever?

 4        A.  I don't recall.  I see item 12 says there's a --

 5   there's a lab result in front of me.  So I guess part of

 6   the answer is if in September she was started on the

 7   drug, then she had -- in three months she had a lab

 8   result, which seems to be a reasonable amount of time.

 9        Q.  Let's look at this again.  We're on page -- let's

10   double-check that.  This says Page 6 of your report in a

11   section called Medical History; right?

12            You have a -- so as we discussed earlier, you

13   have an item in here that says -- item No. 11 that says:

14   2017 hormones approved in August, started in September.

15            Do you see that?

16        A.  What number is that?

17        Q.  That's item No. 11 on this list.

18        A.  Yeah, okay.

19        Q.  Okay.  So would you agree that this means

20   Ms. Clarke started her hormone therapy in September of

21   2017?

22        A.  Yes.  And I trust you.

23        Q.  Okay.  And then item 12, which you just referred

24   to, says 2018 -- dash -- January lab results 59 pg --

25   slash -- ml estradiol -- comma -- testosterone equals
```

```
 1      465 ng -- slash -- dL.

 2           And that last phrase, testosterone equals 465

 3      ng -- slash -- dL is bolded.

 4           Do you see that?

 5      A.  Yes.

 6      Q.  Okay.  Why is that bolded?

 7      A.  Because it's high -- surprisingly high.

 8      Q.  Is a testosterone level of 465 within the range

 9      that you would expect for a transgender woman on hormone

10      therapy?

11      A.  No.  It's a normal level for a cismale.

12      Q.  Later on, Dr. Levine -- I'm going to scroll down

13      a bit -- item 19 -- sorry, item 16 -- still on the

14      bottom of Page 6 on this list -- there's a note that

15      says:  2019 September -- or 2019 Sept -- dot -- I

16      believe that stands for September; correct?

17      A.  Yes.

18      Q.  Okay.  Testosterone level 754 -- exclamation

19      mark.

20           Do you see that?

21      A.  Yes.

22      Q.  Okay.  Why did you put an exclamation mark after

23      754?

24      A.  No. 1, it's higher.  No. 2, it's very noteworthy.

25      And No. 3 it represents the possibility of a lab error.
```

```
 1     Because people on estradiol shouldn't have an increase
 2     in testosterone.
 3          And if they do have an increase in
 4     testosterone -- I mean, if you repeat the -- if you
 5     repeat the lab and it is still increased; and then you
 6     ask yourself -- or you ask the question and you ask
 7     yourself:  Is the patient actually taking the
 8     medication, the estradiol, that she says she's taking?
 9     Is she -- you know, is she actually taking it?
10          It implies that -- it implies two things -- it
11     implies three possibilities:  One, she's not taking the
12     medicine; two, there is a lab error; and three, that
13     there is something else going on medically that
14     surreptitiously or abnormally is producing testosterone.
15          For example, does she have a tumor in her adrenal
16     gland producing testosterone?  Does she have a lung
17     tumor that's producing testosterone?
18        Q.  But as of September 2019, Ms. Clarke had been on
19     hormone therapy for two years, right, since September of
20     2017?
21        A.  Yes.
22        Q.  Okay.  So if you saw someone who had been on
23     hormone therapy for two years with a testosterone level
24     of 754, you said you would be concerned about that?
25        A.  That's why there's an exclamation point.
```

1      Q.  Okay.  And what would you do?

2      A.  I would repeat the testosterone.  You need --

3      Q.  So -- Sorry.  Go ahead.

4      A.  -- you need to understand that in medicine when

5   we get an abnormal result, and if we repeat the result,

6   it often is no longer abnormal.  There is a -- there is

7   a five percent chance in any -- that any particular

8   thing is a lab error.

9      Q.  Okay.  So we saw that Ms. Clarke's testosterone

10  in January 2018 was 465; was that right?

11     A.  Yes.

12     Q.  And now in September of 2019 it's 754; is that

13  right?

14     A.  That's what I reported.

15     Q.  Okay.  Do you know if Ms. Clarke's dose -- doses

16  of spironolactone and estradiol has been changed between

17  September of 2017 through September of 2019?

18     A.  At this moment I don't recall what happened.

19  This was -- you know, I haven't reviewed these medical

20  records for almost two years.

21     Q.  Okay.  If you look at item No. 17 in that list,

22  it says:  2020 Feb.

23         Do you see it?

24     A.  Yes.

25     Q.  And then it says:  Estradiol doubled to decrease

```
 1      testosterone.
 2           Did I read that correctly?
 3       A.  Yes.
 4       Q.  Okay.  Would that suggest to you that
 5      Ms. Clarke's hormone therapy had not been changed until
 6      February of 2020?
 7       A.  That's what it would suggest to me looking at it
 8      today, yes.
 9       Q.  So from September of 2017 through February of
10      2020 Ms. Clarke's hormone medication was at least to
11      your knowledge not changed?
12       A.  To my knowledge.
13       Q.  In your opinion, Dr. Levine, are these
14      testosterone levels consistent with someone who is
15      receiving adequate hormonal care?
16       A.  If we only think narrowly about the range -- the
17      expected range of estradiol levels and testosterone
18      levels when treating these people, it seems like we're
19      not being very successful.
20           But as I said, the differential diagnosis for a
21      doctor is:  Is the patient taking the medicine?  Is this
22      a lab error?  And if I can't get the person's
23      testosterone level down, is there some other source of
24      testosterone in the body that's not responsive to
25      estrogen?
```

```
 1              These are the things that would occur to a

 2      physician.

 3         Q.  Dr. Levine, let me go back to page -- All right,

 4      let me see what page this is -- on Page 3 of your

 5      report, and I'm in -- So this is Page 3 of your report.

 6      I'm in the paragraph -- the large paragraph in the

 7      middle under the heading The Psychological Aftermath.

 8              Do you see that?

 9         A.  Yes.

10         Q.  Okay.  It says -- I'm going to read:  14 months

11      after receiving hormones she wanted an increased dose

12      and more appointments with an endocrinologist -- period.

13      The reason was that her daily erections traumatized her

14      as did her truncal and extremity hair, the shape of her

15      face (I need facial feminization surgery) and male

16      pattern baldness.

17              Do you see that?

18         A.  Yes.

19         Q.  She asserted that she has been pleading for

20      trans care for three years before filing suit.  Nowhere

21      in her many requests was the recognition that her

22      surgical and endocrine requests were grossly

23      unrealistic.

24              Did I read that correctly?

25         A.  Yes.
```

1      Q.  Is it your opinion, Dr. Levine, that Ms. Clarke's

2   endocrine requests were grossly unrealistic?

3      A.  I want sex reassignment surgery now.  I want what

4   I want now.

5          I don't know how the prison system actually

6   works.  I don't know what the policies have been.

7          I'm just saying that we are establishing that she

8   did not have an ideal endocrine treatment and her

9   request -- her request for immediate attention and her

10   not going through the -- the avenues that she was

11   instructed that she has to go through, these things are

12   what is unrealistic.

13          Her expectations that because she needs it,

14   because she wants it, it should immediately happen, is

15   what is unrealistic.

16          I agree with you that she did not have an

17   adequate early response to her endocrine treatment and

18   she should have had much more careful medical attention

19   than she was getting.

20          But you see, she did not just talk about

21   hormones.  She was talking about ten different things

22   that she wanted and in a way that alarmed and put off

23   the prison officials who were used to transgender

24   patients.

25          So, that's all I mean.  I'm not implying that --

```
 1      that she was well treated in terms of the parameters

 2      that you and I have been discussing.  But she was

 3      linking this to other things, you know.

 4           Now, you see the word "trauma" that you read.  I

 5      hope you'll ask me about this.

 6       Q.  Okay.  Dr. Levine, I want to be -- I'm going to

 7      go back to my previous question.

 8           MS. BILDNER:  Actually, Vicky, would you

 9         mind just reading -- sorry, would you mind just

10         reading back to me the question that I had asked

11         Dr. Levine?

12           (The reporter read back the requested

13         testimony.)

14           MS. BILDNER:  Thank you.

15      BY MS. BILDNER:

16       Q.  So I'd like you to answer that question.  I'm not

17      talking about surgery.  I'm not talking about other

18      aspects of her care.

19           I'm simply asking:  Is it your opinion

20      today, Dr. Levine, that Ms. Clarke's endocrine

21      requests -- given all you've seen -- are grossly

22      unrealistic?

23       A.  Because you said the word "today," I would agree

24      with you they were not grossly unrealistic, they were

25      reasonable requests made repeatedly.
```

```
 1          Q.  Dr. Levine, in your review of Ms. Clarke's chart
 2      did you take note of whether Ms. Clarke was monitored
 3      during hormone therapy?
 4          A.  I don't recall if I knew that or not.
 5              The fact that she had three months after starting
 6      hormones lab tests means that she was monitored.  And
 7      every -- every subsequent lab value represents a
 8      monitoring.
 9              Whether -- So I guess to some extent I was aware
10      she was monitored.  I would -- she was monitored.
11          Q.  So to some extent you were aware that -- Sorry.
12      Strike that.
13              So you are aware that at some points Ms. Clarke
14      received blood work; is that right?
15          A.  Yes.
16          Q.  Are you aware of anything else related to
17      monitoring during Ms. Clarke's hormone therapy?
18          A.  I just presume that if someone drew blood to
19      monitor her levels, that they were also talking with
20      her, having a physical examination -- or at least -- at
21      least a clinical encounter.
22          Q.  You presume that, is that what you said?
23          A.  Yes.  I don't think they just ordered blood tests
24      and never saw her.
25          Q.  So you don't know either way if they ever saw her
```

```
 1    when ordering blood tests?
 2        A.  I would presume that someone saw her in the
 3    prison system, some -- either nurse practitioner or
 4    primary care doctor, someone who had -- who had the
 5    authority -- the medical credentials to order a blood
 6    test.
 7        Q.  And you would presume that, Dr. Levine, because
 8    that's what should happen?
 9        A.  It should happen.  And in my experience it
10    often -- that's what -- in my experience in
11    Massachusetts that's what happens, yeah.
12        Q.  But you have no sense here in Connecticut whether
13    that happened or didn't happen, do you?
14        A.  Well, if you want me to be absolutely certain, I
15    cannot be certain.
16        Q.  I'm just going to take this down once again.
17    Okay.
18            I'm going to go back to something, Dr. Levine.
19    Earlier -- way earlier now -- we spoke about
20    Ms. Clarke's diagnosis of gender dysphoria.
21            Do you remember talking about that?
22        A.  Yes.
23        Q.  And you agree that Ms. Clarke has gender
24    dysphoria; is that right?
25        A.  Yes.
```

```
 1          Q.  You diagnosed Ms. Clarke with gender dysphoria?

 2          A.  She diagnosed herself with gender dysphoria and I

 3     agreed with her.

 4          Q.  What do you mean when you say "she diagnosed

 5     herself with gender dysphoria" --

 6          A.  Gender --

 7          Q.  -- and you agreed?

 8          A.  -- gender dysphoria is a self-diagnosis.  It's

 9     not like someone comes in with chest pain and the doctor

10     diagnoses that they have gender dysphoria.  Gender

11     dysphoria is something the patient tells you that she

12     has.

13          And oftentimes people know what the criteria for

14     the diagnosis are and so they tell you that they have

15     gender dysphoria.

16          And if they forget a criterion, then the doctor,

17     like me, asks:  What about this?  What about distress?

18     You know, what about interference with your vocation,

19     whatever?  And so then I make the diagnosis.

20          But really -- really we have to recognize that

21     this is a self-report diagnosis.  This is not a

22     laboratory diagnosis.  This is not a physical

23     examination diagnosis.  This is not a verification --

24     this is not a diagnosis that usually gets verified.

25          The patient tells us what she feels, what she
```

```
1    thinks; and we recognize that it's in a pattern that we

2    call gender dysphoria and so we make the diagnosis.  We

3    write the diagnosis down.

4         But this is not like making a diagnosis of

5    pancreatic cancer, you see.  This is a diagnosis of

6    self-report.

7    Q.  So Ms. Clarke reported to you that she had gender

8    dysphoria; correct?

9    A.  Correct.

10   Q.  And then you said you agreed with that diagnosis;

11   correct?

12   A.  Given what she said, she falls in the category of

13   gender dysphoria.

14   Q.  Okay.  You're free, of course, to disagree with

15   that self-report; right?

16   A.  If I think someone's lying, if I think someone is

17   exaggerating, if I think there's some benefit that she

18   anticipates that she'll get if she has that diagnosis;

19   then I -- you know, I'm not sure.  I might say she has

20   gender dysphoria not otherwise specified, or I give some

21   other explanation.

22   Q.  Okay.  But here you didn't do any of that, did

23   you?

24   A.  I took her story literally that she suffers from

25   the criteria of gender dysphoria.
```

```
 1          Q.  And you agreed with the diagnosis?

 2          A.  I think I've said that to you several times.

 3          Q.  When you described gender dysphoria as a

 4      self-reporting diagnosis -- was that the correct -- is

 5      that the term that you used?

 6          A.  I said it's based upon self-report.

 7          Q.  Based upon self-report.

 8              Are other psychiatric conditions similarly based

 9      upon self-report?

10          A.  Yes.

11          Q.  What psychiatric conditions are also -- what

12      psychiatric diagnoses, I'm sorry, are also based on

13      self-report?

14          A.  Panic attack, generalized anxiety disorder.

15      There are some that are not based simply on self-report.

16              But all psychiatric diagnoses generally -- almost

17      all psychiatric diagnoses begin with self-report,

18      several do not.

19          Q.  So when you go about making a diagnosis,

20      Dr. Levine, in your own practice, you begin often with

21      the patient's self-report?

22          A.  Of course.

23          Q.  And from there you determine whether that

24      self-report in your experience and your expertise is

25      consistent with the diagnosis?
```

```
 1        A.  I ask a series of questions.

 2            I consider what else it might be.  And I consider

 3    what dilemma the person is having and what symptoms are

 4    coming from that dilemma.

 5            And I make a diagnosis and I make a treatment

 6    plan based on my current understanding of the patient's

 7    life and the patient's presentation.

 8            That current tentative diagnosis is likely to

 9    change as I get to know the person over time.

10        Q.  Earlier, Dr. Levine, we discussed genital

11    dysphoria.

12            Do you recall that?

13        A.  I do recall.

14        Q.  And I asked you whether Ms. Clarke has genital

15    dysphoria; correct?

16        A.  Correct.

17        Q.  Okay.  So I'm not sure what your answer to that

18    question was.  So I'd like to ask you that again:  Does

19    Ms. Clarke have genital dysphoria?

20        A.  As best that I can recall, that was part of the

21    dysphoria -- of her gender dysphoria, that she didn't

22    like the presence of her male genitalia.

23        Q.  So that would be a yes, in other words?

24        A.  I'm trying to be humorous about this rather than

25    to be annoyed by the repetition of your questions.  I
```

```
 1    hope I succeed.
 2        Q.  I'm not sure that was an answer.  But I -- I
 3    think your previous answer was as best you could recall
 4    that genital dysphoria was a part of Ms. Clarke's gender
 5    dysphoria.
 6        And I want to make sure I got that right.  Did I
 7    get that right?
 8        A.  You got it right.
 9        Q.  Okay.  One last thing I'd just like to revisit
10    and that's the definition or concept of medically
11    necessary.
12        I'm sure you remember that we spoke about that
13    earlier; right, Dr. Levine?
14        A.  Right.
15        Q.  So I want to be very clear.  What does the term
16    "medically necessary" mean to you?
17        A.  You mean in the conduct of treatment of gender
18    dysphoria, I presume?
19        Q.  No, actually -- I actually mean that as a broader
20    question.  In the practice of medicine what does
21    "medically necessary" mean?
22        A.  It means an intervention that would either
23    prevent death, prevent disability, or remove symptoms --
24    symptomatic suffering.
25        Sometimes it -- it means medically necessary to
```

```
1      prevent disease -- future disease like in vaccinations.

2           So it's -- it's a combination of all of the

3      above --

4        Q.  Okay.

5        A.  -- or any of the above.

6        Q.  I just want to make sure I got that list right.

7      You said "medically necessary" means something what

8      would prevent death?

9        A.  Yes.

10       Q.  Something that would prevent disease, including

11     future disease?

12       A.  Yes.

13       Q.  And then I believe you said something that would

14     prevent symptomatic effects; is that correct?

15       A.  I also said it would prevent disability; right?

16     That's why we set a leg when it's broken; right.

17       Q.  All right, disability.

18       A.  And it would -- it would remove symptoms.  When

19     we couldn't cure a disease, we give some anti-nausea

20     agent for someone who's having nausea, even though we

21     can't cure the underlying disease.  So symptomatic

22     relief.

23           So death, disability, dysfunction, and

24     symptomatic relief.

25       Q.  Disability, dysfunction, and symptomatic relief;
```

```
 1      right?

 2         A.  Yes.

 3         Q.  Is that an accepted meaning of the term

 4      "medically necessary" in medical practice?

 5         A.  Oh, yes.

 6         Q.  Okay.  What about in the mental health context,

 7      what does the term "medically necessary" mean?

 8         A.  Well, that's a much more problematic matter

 9      because if we go back to the general meaning, it

10      requires a qualified mental health professional -- a

11      qualified medical professional to make the assessment

12      along those parameters; right?

13         And so when it comes to mental health

14      professionals, we see that we have a wide variety of

15      people who are mental health professionals with

16      different levels of education, and different levels of

17      clinical experience, and different levels of exposure to

18      various mental problems.

19         So "medically necessary" is not exactly a term

20      that we throw around in medical -- in psychiatric

21      language.  We think it is a therapeutic -- a reasonable

22      therapeutic option rather than -- you know, I guess I

23      could say that giving a profoundly depressed human being

24      an antidepressant is medically necessary; right?  It is

25      also psychologically necessary or -- but it's one of the
```

```
1    many treatment options that we have.

2         So I'm just saying it's a little less clear in

3    psychiatric terms as it is in medical and surgical --

4    with medical and surgical problems.

5         In part because I know some people want to say

6    gender dysphoria is a medical problem.  But I consider

7    it to be a developmental, psychological problem.  And --

8       Q.  Going back to what you -- I'm sorry, Dr. Levine.

9    Were you finished?

10      A.  I think I'm finished.

11          I'm not sure I answered your question to your

12   satisfaction.

13      Q.  Well, I guess going back to what you just touched

14   on, are there mental health contexts in which something

15   can be medically necessary?

16          You mentioned antidepressants for a

17   severely-depressed person.

18      A.  Right.  Now, we make -- if I may speak for

19   psychiatrists as a whole, we make decisions to give

20   people various treatments.  We believe in good faith

21   that there is a distinct likelihood that this will help

22   them.

23          And so for insurance purposes we probably will

24   verify that this is medically necessary that they have a

25   electroconvulsive therapy, for example; right?
```

1        So yes, there are times when I agree that a

2    psychiatrist will say that a treatment is medically

3    necessary.

4        Q.  Okay.  What about in the context of gender

5    dysphoria?  Are there treatments for gender dysphoria

6    that you believe are medically necessary?

7        A.  I've already explained the context in which I

8    believe I can use the term "medically necessary."  I

9    always want to qualify it.

10       I don't want to use it the way I believe you want

11   me to use it, you see.

12       But I believe that when I ascertain after an

13   extent of understanding of a person's life, that -- that

14   hormone therapy or surgical intervention would

15   psychologically benefit and the benefits are likely to

16   outweigh the risks; and the patient understands the

17   risks, you see; and the consequence -- the negative

18   consequences and the benefits; then I will say it's

19   psychologically beneficial and -- and it's medically

20   necessary.

21       I always want to qualify when you try to force me

22   to say I believe this is medically necessary, and I

23   always will object to a simplification of the symptoms.

24       And so if you ask me three times, I think I'm

25   going to make the same answer three times.

```
1        Q.  I understand, Dr. Levine.  I just want to make

2    sure I am clear on what you mean.

3            We just discussed that in the medical context you

4    believe certain treatments, certain things can be

5    medically necessary; correct?

6        A.  Given what I've -- the preface, the answer is

7    yes.

8        Q.  And you also said that in the psychiatric context

9    you are willing to say that some things can be medically

10   necessary; is that correct?

11           THE REPORTER:  I'm sorry.  I didn't get the

12       answer.

13           THE WITNESS:  Yes.

14   BY MS. BILDNER:

15       Q.  But in the context of gender dysphoria

16   specifically, it seems you're reluctant to say that some

17   things are medically necessary absent qualification; is

18   that right?

19       A.  I'm saying in the context of gender dysphoria the

20   evaluation needs to be extensive before I'm willing to

21   say it's medically necessary.

22       Q.  And that's unique to gender dysphoria; is that

23   right?

24       A.  No, it is not unique to gender dysphoria.  It's

25   the same with depression.
```

```
 1              I would not say meeting a stranger or hearing
 2      about a stranger they should have deep brain stimulation
 3      or that they, you know, should have bariatric surgery.
 4      I want to know who this person is, what they're
 5      suffering from; and I want a chance to form a
 6      relationship with them so that I can make a prudent
 7      decision in their best interest given what I know and
 8      what I don't know about the science behind these
 9      treatments.
10              I'm not -- I don't really think this is different
11      than in gender dysphoria.
12         Q.  Right.  I wasn't asking you a question about your
13      approach to determining medical necessity.  I was simply
14      asking whether your qualifications about the term
15      "medically necessary" are unique to the context of
16      gender dysphoria?
17         A.  And I'm saying they're not unique.
18         Q.  Okay.
19         A.  Would you like some background on my answer, or
20      should I just shut up?
21              MR. BELFORTI:  Dr. Levine, why don't we wait
22      until a question is posed and then answer --
23              THE WITNESS:  I'm afraid --
24              MR. BELFORTI:  -- the question.
25              THE WITNESS:  -- they really will never pose
```

```
 1          the question and it might make her questioning,

 2          but --

 3               MR. BELFORTI:  I think -- we'll, let's --

 4               THE WITNESS:  I can' keep quite.  I'm sorry.

 5          I am sorry.

 6               MR. BELFORTI:  -- Well, it's Counsel's

 7          deposition.  So why don't we just wait for her

 8          to pose a question.

 9     BY MS. BILDNER:

10          Q.  Well, with an invite like that, Dr. Levine, it's

11     hard to resist.

12               What did you want to tell me about medical

13     necessity and gender dysphoria that I didn't ask?

14          A.  You didn't ask about where this started in the

15     gender team -- in the gender NW and HBIGDA.

16               Everybody knew that taking off healthy tissues

17     was an ethical problem.  Everybody even today knows that

18     removing the breasts of a 20-year old woman who says

19     that she's a trans man, and removing the penis and

20     scrotum of a 45-year old person who says who says he's

21     transgender -- a healthy penis and a healthy un-diseased

22     scrotum -- is -- is this above all do no harm.

23               And so we needed to find out -- a group of us at

24     HBIGDA needed to figure out how we can justify the

25     treatment and not run into -- and not run into the
```

```
 1    objection from ethicists and from the whole society that
 2    we are doing something against the fundamental ethical
 3    principle of medicine.
 4         And so the answer was:  We will declare that if
 5    you listen to the suffering of the patient -- that is, I
 6    hate my penis and I'm going to -- I don't know how long
 7    I can live with this kind of pain -- we are going to say
 8    this is not cosmetic surgery; this is -- this is an
 9    exception to the rule that we never, never, never remove
10    healthy tissue or interfere with healthy physiology like
11    menstruation, for example.  We will call it medically
12    necessary.
13         So a group of us agreed to call it medically
14    necessary.  And from that point on -- and from 1977 on
15    all these treatments were justified as not cosmetic, as
16    not simply for the patient's benefit because they want
17    it, it was because it was medically necessary.
18         In other words, we wrapped our work around death,
19    disability, improved function, compassionate symptomatic
20    relief around this term that the general public
21    understood.  If a doctor says it's medically necessary,
22    it must be deeply medically necessary to justify taking
23    away healthy tissues.
24         And that's the origin of the term "medical
25    necessity" in gender dysphoria.
```

```
 1              Thank you for asking the question.  I appreciate

 2      the opportunity to enlighten you about the history of

 3      where this concept got applied to the issues that you're

 4      raising today.

 5         Q.  Okay.  With that, Dr. Levine, I'm going to turn

 6      back to your report and ask you some more specific

 7      questions about it -- which means I need to share my

 8      screen.  Hold on one moment.

 9              Sorry, for some reason it's not taking -- Okay,

10      let me just try that again.

11              Do you see your report, Exhibit 3, back on the

12      screen?

13         A.  It's on my screen.

14         Q.  Okay.  I'm on page -- let's see, okay, Page 3 of

15      your report.  This is up at the top where it says:  On

16      April 12th, 2016.

17              Do you see that?

18         A.  Yes.

19         Q.  Okay.  Your report says:  On April 12th, 2016,

20      the inmate announced that she was ready to transition --

21      period.

22              Did I read that correctly?

23         A.  Yes.

24         Q.  Who did Ms. Clarke announce that she was ready to

25      transition to?
```

1        A.  I'm sorry, what was your question?

2        Q.  Who did Ms. Clarke announce that she was ready to

3    transition to?

4        A.  Oh, at this moment I don't know.  I presume to

5    one of her either therapists or medical provider or to a

6    -- or -- I don't know --

7        Q.  Okay.

8        A.  -- at this point.  I may have known, but I don't

9    remember.

10       Q.  And the next sentence says:  Ms. Clarke was

11   disturbed by the prison policy to support transition

12   only for those who came to prison partially

13   transitioned.

14          Did I read that correctly?

15       A.  Yes.

16       Q.  Okay.  Is it your understanding that the

17   Connecticut Department of Correction had a policy that

18   precluded new gender dysphoric people from

19   trans healthcare?

20       A.  I think about seven, eight years ago it was very

21   common in many, many prisons -- in state prisons to have

22   such a policy.

23          I think that policy has pretty much disappeared

24   over -- in the last eight years.

25       Q.  That kind of policy was known as a freeze-frame

```
 1     policy?  You've read that term?

 2         A.  Yes.

 3         Q.  So it's your understanding that Connecticut, in

 4     fact, had a policy precluding transition for those who

 5     had not yet --

 6         A.  Based --

 7         Q.  -- treatment --

 8         A.  -- based upon Ms. Clarke's frustration that she

 9     was told several times about that.

10         Q.  Okay.  On Page -- Oh, sorry.  Actually, I should

11     stay up there.

12             On Page 3 where we were there's a sentence that

13     begins on June 15th, 2016.  Do you see that?

14         A.  Yes.

15         Q.  Okay.  I'll read that sentence:  On June 15th,

16     2016, the day that she was scheduled to discuss her

17     gender dysphoria with the physician, the inmate incised

18     her scrotum with a fingernail clipper, extruded her

19     right testis, then alerted the guard to her bloody legs.

20             Did I read that correctly?

21         A.  You did.

22         Q.  So this is a description of Ms. Clarke's

23     autocastration attempt; is that right?

24         A.  Yes.

25         Q.  And you state here that this happened on June
```

```
 1      15th of 2016; is that right?

 2          A.  There's what I wrote, yes.

 3          Q.  Do you know if that date is correct, Dr. Levine?

 4          A.  No.

 5          Q.  Okay.  Incidentally, on Page 2 you note that you

 6      reviewed -- this is Item 8 -- a 7/15/16 Incident Report

 7      for self-mutilation.

 8              Do you see that?

 9          A.  Yes.

10          Q.  Okay.  So that's a July 15th, 2016, Incident

11      Report that you looked at?

12          A.  So this is a -- again, I don't think I could

13      write any 30-page report that wouldn't have copy editing

14      or inconsistencies.

15              I think the important thing is that on the day

16      that she was scheduled to talk to her physician she

17      attempted to remove her testis.

18          Q.  And she succeeded in excising a testis; is that

19      correct?

20          A.  No, she didn't really cut out her testis.  She

21      removed her testis from the scrotum sac.

22          Q.  Ms. Clarke removed her testis from the scrotum

23      sac; is that right?

24          A.  Yes.

25          Q.  And that took place on July 15th of 2016; is that
```

```
 1    correct?

 2        A.  Well, if you would like to tell me that's the

 3    date it happened, I would believe you.

 4        Q.  Okay.  Back to Page 3.  Okay, we looked at this a

 5    little bit earlier.  In the second paragraph here there

 6    is a sentence that starts with the words "14 months."

 7            Do you see that?

 8        A.  I'm sorry, what sentence is that?

 9        Q.  Well, actually I'll go --

10        A.  I see it.  I see it.  14 --

11        Q.  Yeah, 14 months.  So we read that before.

12            If you go down a little bit later, there's a

13    sentence that says:  Nowhere in her many requests was

14    the recognition that her surgical and endocrine requests

15    were grossly unrealistic -- period.

16            Did I read that correctly?

17        A.  I can't -- I remember you reading it correctly

18    from the past, yeah.

19        Q.  It's about midway down that paragraph.

20        A.  Yes, I see it now.

21        Q.  Okay.  Is it your opinion, Dr. Levine, that a

22    gender dysphoric person who wants surgery is -- quote --

23    grossly unrealistic?

24        A.  Just that sentence alone, the answer would be

25    yes.
```

```
 1              But we're not talking about a gender dysphoric
 2      person -- some abstract concept of a person.  We're
 3      talking about a particular person who resides in prison,
 4      who has had a history that was very much problematic;
 5      and a person who is asking not only for sex reassignment
 6      surgery, but a whole other list of things that prisons
 7      nowhere in the United States or in the world have ever
 8      provided.
 9              So if you repeat the specific question you asked
10      me, the answer is:  Of course, it's not totally
11      unrealistic.
12              If you ask me about this particular person
13      because I know her style, you see, I know her
14      manipulative nature; I would say it can be unrealistic.
15              But, you see, I'm a doctor for individual
16      patients.  And sometimes I'm more of an expert on the --
17      on scientific literature.  And so when you ask me a
18      question that somehow is in between those two poles, I'm
19      a little confused about how to answer the question.
20              So I would ask for a clarification of your
21      question.
22         Q.  You mentioned a few things in that response.  One
23      of them was that of course it's not totally unrealistic
24      for someone with gender dysphoria to want surgery.
25              Did I get that right?
```

1      A.  You got that right.

2      Q.  Okay.  And then you continued to say that for

3   someone who resides in prison, you thought these

4   requests were unrealistic.

5          Is that what you said?

6      A.  I'm recognizing that this particular inmate wants

7   it now.  "Now" is an unrealistic matter.

8          Sex reassignment surgery even in the

9   community doesn't happen now.

10     Q.  So the immediacy of Ms. Clarke's request -- of

11  Ms. Clarke's desire for surgery is what you find to be

12  unrealistic?

13     A.  It's -- it's the immediacy of that, it's the --

14  it's wanting that along with all other kinds of services

15  now.

16          It's with the idea that she is going to have her

17  sentence reduced and she's going to be discharged in the

18  -- and sent to Scotland or the UK for prison.

19          There are lots of things about her that are

20  unrealistic.  This is unrealistic.

21          I was asked to see her because she was

22  particularly demanding, unlike other trans inmates in

23  the Connecticut prison.  She was a particular management

24  problem.  She was -- she was in the view of the prison

25  officials so unrealistic that -- that they didn't know

```
 1      what to do with her.
 2          Q.  What's the basis for your statement that
 3      Ms. Clarke was more unrealistic than other transgender
 4      people in the Connecticut prison system?
 5          A.  Because I was -- I was told that.
 6              And I also have interviewed countless prisoners,
 7      inmates, and I've never seen anyone who made requests
 8      the way she did.
 9              And she explained to me that she knows -- at some
10      time she explained to me that she knows she may not get
11      what she wants, but she wants to continue demanding it
12      because that's how she's going to get what she wants.
13              This was -- this was designed by her to make
14      herself heard in part to get what she wanted and in part
15      to pave the way for her other transgender sisters so
16      that they might have an easier time in the future.
17              And that's one of the reasons why you are
18      involved in this and -- according to her.
19              So -- so she is a particular personality who
20      understands about manipulation.  And -- and she was
21      making her voice heard.  And she did not care that she
22      was exaggerating.
23              And she -- she maintained that she wanted all
24      that list that's in the paragraph, you see, including
25      she have wanted her scalp hairline restructured.
```

```
 1              You see, for a prisoner to say I want the DOC to

 2       give me something to help me with my facial hair -- my

 3       scalp hair to me is unrealistic.

 4          Q.  Dr. Levine, as a general matter, is it your

 5       belief that people in prison should have different

 6       expectations for their medical and mental health

 7       healthcare than people on the outside?

 8          A.  I think if they're realistic, they would, yes;

 9       because a prison cannot provide the same level of

10       quality care.

11              They can provide adequate care and they can

12       provide crisis care.  But they do not have the resources

13       to provide the same kind of care that is available in

14       the community.

15          Q.  Is it your belief, Dr. Levine, that someone in

16       prison should receive different medical or mental health

17       care --

18          A.  No, no.

19          Q.  -- than someone in the -- Please let me finish

20       the question.

21              Is it your belief, Dr. Levine, that someone in

22       prison should receive different medical or mental health

23       healthcare than someone on the outside?

24          A.  It is not my belief that they should receive

25       different.
```

```
 1              So the answer --

 2         Q.  But they --

 3         A.  -- to your question is no.

 4         Q.  -- but they do?

 5         A.  I think they often do, of course, because as I

 6    said, prison mental health interventions are primarily

 7    geared to crises.

 8         Q.  Dr. Levine, who told you that Ms. Clarke was

 9    particularly demanding -- was your word?

10              MR. BELFORTI:  Dr. Levine, I'm going to

11         instruct you -- you can answer that question to

12         the extent it doesn't reveal any conversations

13         you had with me, or Mr. O'Neill, or Ms.

14         Medeiros, or Mr. Davis or any other lawyers

15         involved in this case.

16              If you can answer it outside of that

17         context, please do.  If not, I'm going to

18         instruct you not to.

19              MS. BILDNER:  Thank you, Jamie.

20    BY MS. BILDNER:

21         Q.  And yes, as before, Dr. Levine, I don't know want

22    to know about your conversations with attorneys.  So my

23    question is aside from attorneys?

24         A.  I think I prefer not to answer that question --

25    or I can't answer that question.
```

1        Q.   Okay.  So I'll take it to mean that your answer

2    to my question of who told you Ms. Clarke was

3    particularly demanding would involve attorney-client

4    privilege and thus you can't answer; is that right?

5        A.   I read the notes.

6        Q.   How did you -- Hold on a second.

7             How did your conclusion that Ms. Clarke's desire

8    for surgery was unrealistic factor into your assessment

9    of her, if at all?

10       A.   There are other aspects of her that are

11   unrealistic.

12            I want hip enhancement surgery is unrealistic.  I

13   want breast augmentation is un -- surgical breast

14   augmentation is not realistic.  I want total body

15   electrolysis is unrealistic.  I want facial feminization

16   surgery now is unrealistic.  I want cricoid cartilage

17   surgery.

18            The real issue is, is she ever going to be a --

19   an inmate who can receive -- because it will be

20   psychologically beneficial to her -- genital

21   reconstructive surgery?  That part is a possibility.

22            And that part is in keeping with what is commonly

23   thought about by people who are transgendered, whether

24   they have gender dysphoria or not.

25            These other things are unrealistic given the

```
1     prison setting.  They are unrealistic in the community

2     setting.  In order to have all those kind of surgeries,

3     you probably need to be -- have a million dollars to --

4     to spare; and you've got to find the right set of

5     surgeons to do this.

6          And so I'm saying that it's not just who I think

7     sex reassignment surgery and inmates are unrealistic,

8     it's -- it's what is packaged.

9          It is the style of the patient and what the

10    patient is demanding and the insistence with which she

11    demands, you see; and the fact that she's quite aware

12    that this is a manipulative process, including hiring a

13    -- and getting eventually an attorney to help her get

14    what she wants.

15         There -- I -- So I think that's the answer to

16    your question.

17         MS. BILDNER:  Would you mind reading back

18       the question, Vicky?

19         (The reporter read back the requested

20       testimony.)

21    BY MS. BILDNER:

22      Q.  Okay, I don't believe you answered that question,

23    Dr. Levine, in all the things you told me.

24      A.  Well --

25      Q.  How did this conclusion factor into your
```

```
 1    assessment of Ms. Clarke?
 2        A.  I think you're missing my answer.  I answered
 3    your question.
 4           If you re-read my question -- my answer, you will
 5    see that her request for ten different things or nine
 6    different things represents the why or how I decided she
 7    was unrealistic.
 8           Because even in the community people do not ask
 9    for things like this.  They don't get things like this.
10    They can't afford things like this.  They don't
11    necessarily want all those things.
12           And -- and this person is telling me that she
13    wants all of this and she wants it now.  That's why I
14    say she's unrealistic.
15           She's not only unrealistic for the context in
16    which she lives -- that is a prison, who has no history
17    of providing any of these surgeries to any inmate --
18    she's unrealistic even if she were in the community.
19           And by the way, if she were in the community, she
20    wouldn't get any of these because of her history of
21    alcoholism and violence, etc., etc.
22           So that's the answer to your question.  I think
23    I've just answered your question twice.
24        Q.  In your initial answer, Dr. Levine, you said that
25    the genital surgery -- you exempted genital surgery from
```

```
1      your list and said that that is a -- quote --

2      possibility.

3           Do you recall saying that genital surgery is a

4      possibility?

5        A.  I do recall saying that.

6        Q.  Okay.  So is someone who has been requesting

7      genital surgery in a prison context in your view grossly

8      unrealistic?

9           Just -- I'm just asking about genital surgery.

10       A.  Oh, no.  I'm saying given the fact that someone

11     has gender dysphoria, the vast majority of people with

12     gender dysphoria sometimes think about having -- they

13     imagine having genital surgery.  That's not unrealistic.

14          It may be a little unrealistic in terms of

15     wanting it now given the context of a prison system and

16     the fact that at that point no prisoner in the history

17     of the United States has ever had genital surgery; so

18     it's an uphill battle, so to speak.  It's up against

19     tradition and policy in the history of correctional --

20     the correctional profession.

21          So -- but the fact that she has gender dysphoria

22     and the fact that she thinks about having sex

23     reassignment surgery and actually feels that she wants

24     it and feels that she would benefit from it, that's not

25     unrealistic.  That's not unexpected to hear from a
```

```
 1        trans person -- especially a trans person in prison who

 2        is often in a very desperate state -- emotional state.

 3             I hope that answers your query.

 4        Q.  It does, thank you.

 5             I'll ask you then do you believe today that

 6        Ms. Clarke is an appropriate candidate for genital

 7        surgery?

 8        A.  As I have not seen Ms. Clarke since 22 months

 9        ago, I would have to reserve that judgment based upon my

10        ability to see her, to talk with her extensively.

11        Q.  So you can't say today whether she or is not an

12        appropriate candidate for genital surgery?

13        A.  Not within my -- not within my professional

14        ethical concept of professionalism.

15        Q.  Okay.  Let's look at some more portions of your

16        report.  Let's see.

17             Okay, I'm on Page 5 looking at a section titled

18        Other Assessments.  Do you see that?

19        A.  Yes.

20        Q.  Okay.  And in the first paragraph under Other

21        Assessments, the last sentence of that paragraph is:  In

22        2018 claimed a corrections officer assaulted her in 2016

23        at McDougal claiming it was sexual in nature.

24             Did I read that correctly?

25        A.  Yes.
```

1    Q.  Okay.  Tell me about this sentence, Dr. Levine.

2    A.  I'm reporting what she told me.

3    Q.  This is in a section entitled, Other Assessments.

4        Do you see that?

5    A.  Yes.

6    Q.  Okay.

7    A.  I don't know what you're asking me to tell you

8    about that sentence.

9    Q.  Well, I'm asking you if this is a self-report of

10   Ms. Clarke to you or if this is in some kind of other

11   assessment or material that you read?

12   A.  I can't recall at the moment.  I'm sure there is

13   a definitive answer to that question.  I just can't tell

14   it to you at the moment.

15   Q.  The sentence appears to reference a sexual

16   assault of Ms. Clarke by a DOC employee; is that

17   correct?

18   A.  Yes.  I think -- I think if I recall correctly,

19   she told me that at one of her prisons a very large man

20   who was in charge of gang members told her that she was

21   going to be the sexual servant of one of the correction

22   officers, and that that eventually lead to the arrest of

23   the correction officer and the imprisonment of the

24   connection officer as a sex offender.

25   Q.  Did --

```
 1        A.  I presume that that was correct and -- and that

 2     she experienced that.

 3             I think that was even before that she came out as

 4     a trans person.

 5             This is something else, that I think she claimed

 6     that she was assaulted.  But I don't know the details --

 7     at least I don't recall any of the details from that as

 8     we sit here today.

 9        Q.  Let's take a look at the other description that

10     you just referenced.  I believe that's on Page 11.  So

11     I'm going to scroll there.

12             Okay, I'm looking at the second full paragraph

13     that begins:  Before the castration attempt.

14             Do you see that?

15        A.  Yes.

16        Q.  Okay.  Before the castration attempt -- comma --

17     VM was housed in Cheshire -- period.

18             V-M is Veronica-May Clarke?

19        A.  Yes.  I think I accurately described that in my

20     report, yeah.

21        Q.  I'll continue reading.  She was transferred to be

22     in a medical facility.  She was there for three years,

23     primarily in the general population.  There she was

24     stabbed in the face with a pencil.  A 360-pound gang

25     leader informed her that she was to be the sex partner
```

```
 1     of a corrections officer who was delivering drugs
 2     surreptitiously to inmates.  Fearing for her safety she
 3     complied three -- dash -- four times until the officer
 4     was arrested then put in prison as a sex offender --
 5     period.
 6          Did I read that correctly?
 7      A.  Yes.  You get an A for reading, by the way.
 8      Q.  I hope so.  I went to law school.
 9          Is this the description that you were just
10     talking about earlier?
11      A.  This is what I was referencing, yes.
12      Q.  Okay.  So it's your understanding that Ms. Clarke
13     was sexually assaulted by a DOC employee at some point
14     before she came out was transgender; is that right?
15      A.  I think so.
16      Q.  Okay.  And that that employee was subsequently
17     arrested and served some time in prison; is that right?
18      A.  That's right.
19      Q.  Okay.  I'm going to go to Page 17; okay.
20          This is in the conclusions section of your
21     report, Dr. Levine.  On the top of this page you have a
22     list of -- or in the middle of the list of diagnoses
23     item D says:  Possible traumatic stress disorder due to
24     being forced into prostitution in prison -- quote -- or,
25     I'm sorry -- parentheses -- there is some question from
```

```
 1     prison officials whether this actually occurred -- close

 2     quote.

 3         Do you see that?

 4     A.  Yes, but -- I am -- I see that.  But I don't

 5     know, is that talking -- is that a reference now to what

 6     happened after she transitioned or before?  I can't

 7     recall.

 8     Q.  Well, that's my question to you, Dr. Levine.

 9     This is in your report.  What is this in reference to?

10     A.  It's a reference to the fact that there is some

11     note in -- I read something in her notes that expressed

12     doubt whether, in fact, as she exactly reported it, it

13     happened.

14         I think that there was a sexual assault by this

15     corrections officer, I don't think is in doubt.

16         I think whether her account of it is exactly

17     correct, that's what I think it is about.  There might

18     be a discrepancy between the legal proceedings of what

19     actually happened to this man and what the person

20     experienced at the hands of this man and the hands of

21     the 360-pound other inmate.

22         I'm just saying there is some question about the

23     details.  I'm not saying she wasn't sexually assaulted.

24     Q.  You're not saying that Ms. Clarke was not

25     sexually assaulted by a DOC employee; is that right?
```

```
1        A.   That's right.

2        Q.   Okay.  You have no reason to dispute that?

3        A.   I don't dispute that, no.

4        Q.   Did you make any effort to look into that?

5        A.   Only through the -- only through the records.

6        Q.   So you didn't take any steps to look into

7    Ms. Clarke's sexual assault and whatever happened

8    subsequently with the DOC employee who assaulted her?

9        A.   No, I did not.

10            You know, this is just one of numerous things

11   that you might ask me; Did I -- I read the medical

12   record.  I tried to summarize as best I could accurately

13   the medical record.

14            I didn't feel it was my role to verify everything

15   that was in the medical record.

16       Q.   Okay.  Yet you expressed some skepticism about

17   whether this actually occurred in your report; is that

18   right?

19            MR. BELFORTI:  Objection as to form.

20            You can answer, Dr. Levine.

21            THE WITNESS:  I feel like I already answered

22       it.  I already clarified I didn't -- I'm not

23       doubting that she was sexually assaulted by this

24       person.  I just said to you I'm not sure that

25       her particular account is a hundred percent --
```

```
 1           corresponds to what the documentation may show.

 2      BY MS. BILDNER:

 3           Q.  You didn't review any documentation specific to

 4      that sexual assault, did you?

 5           A.  No, I didn't.

 6           Q.  Later on in Item 2-D you wrote:  A periodic

 7      reminder of her vulnerability to subjugation at the

 8      hands of an inmate who ordered her into sexual servitude

 9      and cellmates who may want to sexually use her.  This

10      alleged scheme with the corrections officer --

11               THE REPORTER:  I'm sorry.  Could you read a

12           little slower, please.

13               MS. BILDNER:  Sure.  Sorry about that.

14      BY MS. BILDNER:

15           Q.  The second sentence of 2-D says:  This alleged

16      scheme with the corrections officer represented her

17      weakness, helplessness, and the lack of personal control

18      as a trans woman in a male prison.

19               Did I read that correctly, Doctor?

20           A.  Yes.

21           Q.  Okay.  A few moments earlier, however, you told

22      me that your understanding is that this incident

23      happened -- the sexual assault happened before

24      Ms. Clarke came out as transgender in prison; is that

25      right?
```

```
 1        A.  Yes.

 2            MR. BELFORTI:  Objection as to the form.

 3            Please answer, Dr. Levine, if you can.

 4     BY MS. BILDNER:

 5        Q.  Was your answer yes, Dr. Levine?

 6        A.  Well, I may -- I may have used the wrong word

 7     here.

 8            I do think that being commanded to be the sexual

 9     partner to someone she didn't choose to be the sexual

10     partner of reminded her of the weakness and the

11     helplessness and lack of personal control of anyone.

12            And as she is thinking about herself as a woman,

13     and she may be used in terms of being anally penetrated

14     or performing fellatio on somebody, that in her mind

15     that was a kind of demeaning and womanly thing.

16            And so perhaps -- perhaps I should have said as a

17     -- as a small man, or as a feminine man, or as a man who

18     sometimes gave people an indication that she was

19     different than other -- than the average inmate.

20            I guess I used the word trans perhaps not in an

21     ideal fashion if, in fact, this happened before she came

22     out as a trans person and if, in fact, this happened

23     before she ever confessed to anyone that she was

24     thinking about being trans.

25            So I think the real issue here is the subjective
```

```
 1    sense of weakness, of helplessness, of not having agency

 2    and control over what happens to her own body.

 3        Q.  Would you agree the inability to access the

 4    genital surgery would contribute to a sense of a lack of

 5    agency over Ms. Clarke's own body?

 6        A. Yes. If she sincerely and consistently desired

 7    this, it adds to her sense of helplessness and lack of

 8    agency over her own anatomic body, yes.

 9        Q. On page -- I'm sorry, we're going back a little

10    bit. On Page 8, the second paragraph here begins:

11    Ms. Clarke has a serious form of character pathology.

12            Do you see that, Dr. Levine?

13        A.  Oh, yes.

14        Q.  What is "character pathology"?

15        A.  Character pathology is a psychiatric concept that

16    has to do with a stable organization of people's

17    behavior over time; that is, not at one developmental

18    phase in life but what they're like as a person; whether

19    someone is trustworthy, whether someone is honest,

20    whether someone is caring or un-empathic to other

21    people, whether someone's kind or considerate, whether

22    someone is a cheater, whether someone lies.

23            It has to do with a stable behavioral trait that

24    co-exists -- that exists over various developmental

25    phases; childhood, adolescence, early adolescence,
```

```
 1        middle adolescence, late adolescence, adult life, old

 2        age.

 3             People have character traits.  Each one of us has

 4        a set of character traits.

 5             But when the character traits are maladaptive and

 6        they cause problems for themselves and for other people

 7        we call that character pathology.  Now --

 8        Q.  Is character pathology a DSM term?

 9        A.  Character personality disorder is a synonym for

10        that in DSM.

11             And the most common form of diagnosis of

12        character pathology is a mixed -- is a mixed character

13        pathology.  Yes, it is -- it is.

14             But I'm saying that character pathology is a

15        concept that goes beyond a formal diagnosis DSM-5.

16        Q.  A little bit later in the paragraph you write:

17        Transitioning to a female identity, the latest attempt

18        to find personal comfort is failing -- period.

19        Typically inmates feel better when they come out as

20        trans -- period.

21        A.  Yes.

22        Q.  Did I read that correctly?

23        A.  A plus.

24        Q.  Thank you.

25             In fact, Dr. Levine, Ms. Clarke did tell you that
```

```
 1    she felt better when she came out as transgender, didn't

 2    she?

 3        A.  Yes, temporarily.

 4        Q.  She told you that her psychological state has

 5    been ever so much better since she came out when

 6    compared to previous years before and during

 7    incarceration, didn't she?

 8        A.  She came out after she collapsed -- she said she

 9    emotionally collapsed from hiding her trans state; and

10    that she was for a week so excited she couldn't sleep.

11    And so during that time she was so, so much better.

12            But then what happened, of course, is that she

13    started presenting herself as being gravely distressed

14    and needing immediate attention and making all sorts of

15    demands; and then having these ideas that the reason

16    she's in prison is rehabilitation.

17            And then she had this idea that we should get rid

18    of prisons entirely.  That is she was -- she was

19    representing her inability to be realistic about her

20    social situation.  And she presents herself as

21    suffering, suffering, suffering.

22            And so that is not exactly what the long-term

23    outcome of a transition is supposed to do.  It's

24    supposed to -- I am much more comfortable in my body now

25    and I am happy with myself.  And yes, I would like to
```

1      take hormones; and yes, I would want someday to have

2      surgery.

3             But -- but she doesn't represent herself as

4      having equanimity, she -- having peace.  She represents

5      herself as suffering and demanding because she is in so

6      much distress; and that you bastards in the Department

7      of Correction are not paying attention to me.

8             So I'm saying to you that before she came out in

9      prison as trans -- before she was actually in prison for

10     -- for attempted murder and murder, that she had already

11     evidenced a serious form of maladaptive behaviors.  And

12     those things are character traits.  They don't get

13     better.

14            You don't -- you don't really -- if you are a

15     fundamentally dishonest human being and you change your

16     gender, you don't become necessarily a fundamentally

17     honest human being.  You change your gender, and your

18     personality is pretty much the same.

19            And this is -- this is one of the things that's

20     unrealistic sometimes about prisoners.  They really want

21     to change their personality dramatically.  And we hope

22     that they're actually going to achieve it, you see.

23            Because this has been an extremely violent and

24     incredibly destructive human being, both

25     self-destructive and destructive to other people.

1          And this is what psychiatrists who are -- have

2     been experienced with a broad range of human behavior

3     would call character pathology.

4        Q.  You just brought up Ms. Clarke's criminal

5     history, Dr. Levine; is that right?

6        A.  (No response.)

7        Q.  You were just referencing her criminal history?

8        A.  Yes.

9        Q.  Okay.  Is it the gender dysphoria treatment that

10    Ms. Clarke gets today connected to the crime that

11    Ms. Clarke committed in 2007?

12        A.  The crimes -- the crimes that she committed in

13    2007 and -- and her behavior before that time bears some

14    historical relationship to her desire to live as a woman

15    today and have the various ten treatments that she

16    wants.

17          In some historical life -- if you were her

18    biographer, of course you would be talking about that

19    and wondering how that plays into her gender dysphoria

20    and her current wishes to -- to live her life as a

21    woman.  Of course it would.

22          But somehow in these legal proceedings that kind

23    of life perspective seems irrelevant to many people.

24        Q.  I wasn't asking you about her diagnosis,

25    Dr. Levine.  I was asking you about her treatment.  So

```
 1        I'll ask in a slightly rephrased way.

 2             Is the treatment that Ms. Clarke receives

 3        connected to the crime that she committed?

 4        A.  No.  Her treatment is related to her

 5        psychological state and her pain, her discomfort.  And

 6        her treatment is related to our attempt to ease her

 7        discomfort with herself.

 8             The origins of her comfort -- of the discomfort

 9        with herself is a separate question.  But the treatment

10        is about trying to help this poor person.

11        Q.  Okay.  So the treatment is about trying to treat

12        Ms. Clarke today regardless of what crime she committed;

13        is that right?

14        A.  In a limited sense, that's right.

15        Q.  Why in "a limited sense"?

16        A.  Because if we are to undergo and helping her to

17        understand why she's in such pain, we would have to

18        understand her life history.

19             And her criminal history and her noncriminal, but

20        character pathology history are part and parcel of -- of

21        her.  They're just -- we can't separate her motivations

22        to live her life as a woman from the things that have

23        happened to her and things that she has done in her

24        life.

25             So in a limited sense we are trying to treat her
```

1    gender dysphoria, to create a program that will enable

2    her to feel comfortable in herself, with herself.

3         But we know historically that she has a past.

4    And that past, because she's a human being, enters into

5    her memory bank, into her associations that creates

6    feelings about -- feelings about the past come to her

7    present, you see.

8         There are -- they're not totally unrelated.  They

9    may be legally unrelated, but they're not

10   psychologically unrelated to her past.

11        And so just to summarize my answer, the treatment

12   that we are talking about finding for this inmate is

13   about her current level of distress and suffering.  That

14   distress and suffering bears some relationship to her

15   past history -- period.

16      Q.  Is it your testimony, Dr. Levine, that if

17   Ms. Clarke had committed a different crime, that would

18   alter the treatment that she should get for gender

19   dysphoria?

20      A.  No.  I mean, if she was in for stealing cars and

21   she had gender dysphoria, you see, and if she was in for

22   life; then we would want to know -- her stealing cars

23   would have something to do with her need to create a

24   different and a better sense of self.  And the gender

25   dysphoria would be treated.

```
1         Q.  So in other words, the crime does not dictate the

2    treatment?

3         A.  Exactly.

4         Q.  Okay.  Going back to your report -- we looked at

5    this a bit earlier -- on Page 6 you have a section

6    titled, Medical History While Incarcerated.

7              Do you see that?

8         A.  Yes.

9         Q.  Okay.  What's the purpose of this section of your

10   report?

11        A.  The purpose is to review what is known based on

12   the records of this person's physical status and

13   psychological status, and what ails the person, and what

14   treatments were necessary, and what psychological states

15   of mood or anxiety states or traumatic states -- what

16   kind of victimization did she experience.

17             I'm just trying to understand who this person is

18   in terms of their medical and psychiatric history as

19   based -- as incomplete as that may be in any medical

20   record system.

21        Q.  So this section is intended to detail kind of

22   significant medical history and mental health history

23   for Ms. Clarke; is that a correct understanding?

24        A.  I'm just trying to learn everything I can based

25   on the information available to me about this person.
```

```
 1         Q.   Okay.  And nowhere in this medical history while

 2    incarcerated section of your report do you mention

 3    Ms. Clarke's autocastration attempt, do you, Dr. Levine?

 4         A.   I thought we just -- you and I just reviewed

 5    that.

 6              I think if you -- you found two places in my

 7    report that -- that talked about that.

 8         Q.   Okay.  But nowhere in this section -- which is

 9    Ms. Clarke's medical history while incarcerated -- do

10    you mention her autocastration attempt; right?

11         A.   I don't know.

12         Q.   Okay.  Well, let's take a look at the dates.  I

13    think we discussed that the autocastration was in July

14    of 2016; is that right?

15              THE REPORTER:  I'm sorry.  I didn't get the

16    answer.

17    BY MS. BILDNER:

18         Q.   What was your answer, Dr. Levine?

19         A.   In this section that information is not present.

20         Q.   Okay.  Let's talk a little bit about that

21    autocastration attempt.

22              Well, first of all, just can you please describe

23    for me what you know about Ms. Clarke's attempt to

24    castrate herself?

25         A.   What I remember from the review of the medical
```

```
 1      records is the ironic thing that after complaining about

 2      being trans, that she -- she had an appointment with a

 3      doctor to discuss her gender dysphoria, and prior to

 4      that event she -- the same day she castrated herself --

 5      or the day before she castrated herself --

 6          Q.  And what --

 7          A.  I -- she met -- she had a castration attempt.

 8      She actually didn't castrate herself in a medical sense.

 9          Q.  Okay.  And in terms of the substance of the

10      attempt, you recall that Ms. Clarke attempted to remove

11      her, I believe, right testicle?

12          A.  That was her intention, was to remove one testis.

13          Q.  Okay.  And so she took a pair of nail clippers to

14      try to do this?

15          A.  Yes.

16          Q.  Okay.  And using those clippers she succeeded in

17      removing -- I think removing the testicle from the

18      scrotum; is that the correct medical description?

19          A.  Yes.

20          Q.  Okay.  And at that point she was in substantial

21      pain; right?

22          A.  She was in pain, yes.

23          Q.  Well, I guess as a physician, what kind of pain

24      would you expect cutting into your right testicle with a

25      nail clippers to entail?
```

```
 1        A.  Well, it's not one cut.  It must have been a
 2     series of cuts.  And it was probably intense.
 3            But actually I -- I think when she was
 4     transferred to the hospital, she wasn't in particular
 5     pain; she was just bloody.
 6            And I think the incision itself caused a great
 7     deal of pain, which stopped her from going further.
 8            The worst pain -- And I don't need to give you a
 9     medical lecture about pain.  I'm sorry.
10        Q.  No, that's fine.
11            So at some point your understanding is Ms. Clarke
12     stopped because she was in too much pain; is that
13     correct?
14        A.  That's what she said, she was in too much pain.
15            She was probably afraid.  And she saw great deal
16     of blood, and that probably frightened her.
17        Q.  And she was taken to a hospital -- an emergency
18     department; is that your understanding?
19        A.  Right.
20        Q.  And after that she was taken to a prison
21     infirmary where she recovered for a period of time --
22        A.  I --
23        Q.  -- is that your understanding?
24        A.  -- think somewhere in my report I quoted what she
25     said afterward, after she got back to the prison system,
```

```
 1        how -- how stupid it was for her to do that.

 2            Q.  And why do you think she said that?

 3            A.  Perhaps because she thought -- she was

 4        embarrassed that she did it.

 5                I don't know.  I'm just quoting her -- I'm just

 6        quoting what was in the record.  She -- she expressed

 7        regret and she called it stupid.

 8            Q.  Dr. Levine, earlier we talked about gender

 9        dysphoria in terms of distress.

10                Do you recall that conversation?

11            A.  You know, you've asked me if I recall

12        conversations that we've had.

13                I want you to know I'm not demented.

14            Q.  Don't take it personally.  It's a function of the

15        deposition --

16            A.  I have to -- I have to take it personally.  I

17        don't understand why you keep asking me the same obvious

18        answer -- obvious --

19            Q.  Sure.  Well, we spoke earlier about gender

20        dysphoria in terms of distress.

21                So my question to you is:  Would you consider

22        autocastration to be a sign of distress from gender

23        dysphoria?

24            A.  Yes.  I think it's usually a sign of -- that I'm

25        not receiving the appropriate medical attention that I
```

```
 1    feel I deserve.  I'm not being recognized for the pain

 2    that I'm in.  I'm special because I have gender

 3    dysphoria and I need some attention.  I'm in great

 4    distress over this weird thing that I'm experiencing

 5    that I hate my body.

 6         So I think what happens -- how prison systems

 7    have learned to take -- we don't like people -- and we

 8    don't get autocastration as often occurring because

 9    trans -- because prisons have special programs to

10    recognize the transgender person.

11         So I have come to view personally autocastration

12    attempts as indicating that the prisoner feels that

13    they're not getting sufficient medical attention,

14    psychiatric attention, staff attention for their unique

15    form of suffering.  And when that happens, the

16    autocastration phenomenon, I think, disappears.

17    Q.  When people are given sufficient attention to the

18    suffering that's happening, autocastration disappears;

19    is that what you just said?

20    A.  Yes.  There's no reason to castrate one's self if

21    one -- if one can eventually get attention,

22    understanding, and hopefully the treatment that they

23    think they need.

24    Q.  Dr. Levine, in your professional opinion what

25    kind of intervention would be appropriate after an event
```

```
 1    such as this?

 2        A.  I think a much more intensive paying attention to

 3    the circumstances that lead up to the autocastration

 4    attempt, and letting the person know that we know that

 5    you're trans and we are going to do what we can to help

 6    you deal with this; that we recognize -- we see you.  We

 7    hear you.  We are going to offer -- we're offering our

 8    services to help you.

 9            And now often these services have -- as come to

10    be in 2022 there are special accommodations that prisons

11    make.  For example, just giving access to female canteen

12    items goes a long way to making a person feel seen and

13    appreciated for whom they are currently.

14        Q.  Would a psychotherapy intervention --

15        A.  Yes --

16        Q.  -- be appropriate after an event such as this?

17        A.  -- yes.

18        Q.  And what -- what would that look like?

19        A.  It would look exactly like I've already described

20    to you.  That is, you're going to meet somebody.  You're

21    going to talk regularly about your personhood, including

22    your gender -- your sexual identity, your life history,

23    and your current sexual identity, and the component of

24    your sexual identity we call gender identity.

25            In other words, we're going to talk to you
```

```
 1      regularly and get to know you as a person.

 2          Q.  Do you suggest -- I guess, would a psychiatric

 3      treatment plan be appropriate for someone after an

 4      attempted autocastration?

 5          A.  That's what I'm talking about.  That's just a

 6      synonym for what I'm talking about.

 7          Q.  Okay.  So you agree -- we agree that after an

 8      event such as this someone should have a psychiatric

 9      treatment plan for their gender dysphoria?

10              MR. BELFORTI:  Objection as to the form.

11              Answer if you can, Dr. Levine.

12              THE WITNESS:  So I already said to you that

13          mental health in many prisons, as far as I

14          understand it, are crisis-oriented.

15              And a castration attempt is a crisis.  We

16          all agree this is a crisis.

17              And, therefore, the prisons respond by

18          putting them in a different setting where they

19          can be observed, where people can be talked to.

20              And whether that meets Dr. Levine's criteria

21          for psychotherapy or not, it probably meets the

22          prison's concept of how they manage crises.

23      BY MS. BILDNER:

24          Q.  What other kinds of interventions would be

25      appropriate after a crisis such as this?
```

```
 1        A.  I'm sorry, the first part of your question was
 2     what type -- what type?
 3        Q.  What other types of interventions would be
 4     appropriate after a crisis such as this?
 5        A.  Medication treatment, and interviews, and plans
 6     to continue those interviews, and to see if we can't
 7     address the desperation, the sadness, the foolishness --
 8     whatever it is that's troubling the person.
 9            We want to know what caused this castration
10     attempt and we want to know how we can address that to
11     prevent it.
12            Now, what is one of the principles here from a
13     psychiatrist's point of view is that a crisis represents
14     both danger and an opportunity.  So the mental health
15     establishes and recognizes the danger -- that is the
16     crisis, the autocastration attempt.
17            And the question is, herein lies the next -- the
18     next step is:  What is the opportunity that we are going
19     to provide this person to prevent the recurrence of this
20     crisis?
21            And my answer to that is, we put them into a
22     special medical system in prison.  We talk to them.  We
23     give them medicine if that seems to be by the evaluator
24     appropriate.  And we continue keeping them on our radar
25     screen.
```

```
 1              And I -- you know, I think that's the kind of
 2      thing that happens in prisons.  It's a crisis.  So their
 3      systems -- the mental health systems are designed to
 4      respond to crisis.  There is a crisis.  They responded.
 5              Now, you see, if someone said:  What a stupid
 6      thing I did.  I'm really sorry I did at that; you know,
 7      that's -- that's sort of -- the mental health
 8      professional notes a sentence like that, you know.
 9              I mean, if the person said:  I wish -- I'm going
10      to do it again; you know, or:  Next time I'm going to
11      kill myself; they would respond differently.
12              We rely on the words that the patients utter.
13              THE REPORTER:  Excuse me.
14              Can we take a break for a couple minutes?
15              MS. BILDNER:  Oh, sure, yeah.  Sorry.  It's
16         been a while.
17              Okay, let's go off the record and take a
18         break.
19              (Recess taken at 3:23 p.m.)
20                              ---
21              (Back on the record at 3:36 p.m.)
22                              ---
23      BY MS. BILDNER:
24         Q.  Okay, we're back on the record.
25              Dr. Levine, I wanted to ask you --
```

```
 1              THE REPORTER:  Excuse me.  There's somebody

 2         else here.  Kelsey?

 3              (Off the record.)

 4    BY MS. BILDNER:

 5         Q.  Okay, we're back on the record.

 6              Dr. Levine, I wanted to talk to you about again

 7    your own experience treating people with gender

 8    dysphoria.

 9              Have you had patients with gender dysphoria who

10    found it difficult to come out as transgender?

11         A.  I think every adolescent transgender person --

12    probably 95 percent of them have difficulty coming out.

13    Almost every gay and lesbian person has difficulty

14    coming out.  And every trans person has a certain degree

15    of difficulty -- maybe even larger than gay people.  But

16    I'm not -- I can't really quantify that, yeah.

17         Q.  And why do you say that almost every single

18    transgender person would have a larger degree of

19    difficulty coming out?

20         A.  Well, coming out, as you probably know, has

21    different -- there's coming out to the self, and there's

22    coming out to another, and then there's coming out to

23    one's family, and then there's the coming out process to

24    one's work.

25              And so coming out can't be summarized as easy or
```

1    difficult.  It depends on the context.

2          So coming out to the self for a trans person is

3    often difficult, depending on the family attitudes it's

4    difficult, Depending on their friend group it's

5    difficult, and depending on their work environment and

6    the reason they live and so forth it's difficult.

7          If they're church members -- if from conservative

8    group it's difficult.

9          So the answer to your question is it's difficult.

10    Q.  You have patients in your practice or have you

11    had patients in your practice who have struggled with

12    the decision about whether to come out to themselves or

13    to others about being transgender?

14    A.  Yes.

15    Q.  Have you had patients in your professional

16    practice who have come out as transgender to themselves

17    or others later in life?

18    A.  Yes.

19    Q.  Have you had patients in your professional

20    practice who have attempted to come out as transgender

21    and for various reasons gone back into the closet, so to

22    speak?

23    A.  You're not talking about detransitioning people;

24    right?

25    Q.  No, I'm not talking about detransition.

```
 1        A.  You're talking about people like Veronica-May who

 2    claims to have lived two years as a woman and then

 3    returned to living as a man --

 4        Q.  Sure.

 5        A.  -- that was your -- that would be an example?

 6            Have I seen that before Veronica-May?  I've

 7    certainly seen that in the histories of inmates.  I

 8    don't think I see it as often in the community.  But I

 9    do see it in people more often in inmates, yes.

10        Q.  Ms. Clarke was -- I believe is 46 years old.

11            When Ms. Clarke was growing up in the 1970's, you

12    were practicing as a psychiatrist; is that right?

13        A.  That's true.

14        Q.  And you were treating people with gender

15    dysphoria at that time?

16        A.  Starting in 1973 was my first patient.

17        Q.  Okay.  Were transgender people well-known at the

18    time?

19        A.  No.

20        Q.  Were transgender people well-known even to mental

21    health professionals at the time?

22        A.  Not in 1973.

23        Q.  Would someone growing up in the 1970s who is

24    transgender perhaps find it difficult to gain

25    acceptance?
```

1        A.  Yes.  But people growing up in 1970 probably

2   wouldn't know that they were transgender.  They would

3   think that they were different.  They weren't sure how

4   they were different.  And they would go through a phase

5   where they thought they probably were gay or gay-to-be.

6            That's 50 years ago, you know, and -- almost

7   50 years ago.  The world has changed dramatically in

8   50 years.

9            And so, see, transgender is a menaced expression.

10  It is not simply something within the self, it is

11  something that comes from and has to relate to the

12  culture.

13           And so that's why your questions are really

14  important about what it's like to grow up as a

15  gender-atypical child in 1970 versus growing up as a

16  gender-atypical child today.

17       Q.  Dr. Levine, I am going to share my screen and go

18  back to your report, Exhibit 3.

19           Are you able to see that?

20       A.  I do.

21       Q.  Okay.  I'll go to Page 16.

22           So I'm on Page 16 of your report in this first, I

23  guess, continued paragraph.  I'm looking at a sentence

24  that begins:  The results of surgery were far from

25  guaranteed.

```
 1              Do you see that?
 2      A.  Yes.
 3      Q.  Okay.  The results of surgery were far from
 4   guaranteed -- dash -- about 30 percent of surgeries
 5   required additional surgeries because of problems.
 6              Did I read that correctly?
 7      A.  That's right.
 8      Q.  And here you're talking about genital surgeries;
 9   is that correct?
10      A.  Yes.
11      Q.  And you're talking to Ms. Clarke about genital
12   surgeries in the context of one of your conversations?
13      A.  Yes.
14      Q.  What is this statement about 30 percent of
15   surgeries required additional surgeries?  What does that
16   mean?
17      A.  That means that there are complications and that
18   -- that, you know, when one wants surgery, one keeps
19   one's fingers crossed that everything will go fine.  And
20   I'll have one anesthetic experience.  I'll recover and
21   go home and live happy ever after.
22              But given the results -- the published results of
23   genital surgery back in those days -- many times they're
24   -- that figure is based upon something from the
25   literature where people often had to have minor returns
```

1    to fix something or they had complications.

2          And so I just wanted -- when I was talking to

3    Ms. Clarke, I just wanted to -- her to know that -- that

4    it is not a slam-dunk.  Just because you actually get

5    surgery doesn't mean that everything goes well.

6          She was a little shocked by this, I wrote.  She

7    was stunned by that, actually.

8          So I just think, you know, it's the beginning

9    phase of trying to appreciate how a person is thinking

10   about what they want, you see.

11         And, you know, I've already said to you and

12   you've questioned me extensively about what is the basis

13   of my unrealistic -- my describing her as unrealistic.

14         She didn't seem to know at that time that there

15   was a possibility that there was a complication to be

16   contended with with surgery.

17         Now, I don't expect her to know about 30 percent.

18   But I do expect people to know that any surgical

19   experience has complications.

20      Q.  Dr. Levine, I was asking you specifically about

21   this -- this 30 percent figure.

22         You don't have a cite for the 30 percent figure

23   in here, do you?

24      A.  Yes, I realize I don't.  And it probably should

25   have been cited.  But it came from my review of the

```
 1      literature probably about another case, you know, in

 2      some other circumstance.

 3           It was my -- it's a deficiency of this report

 4      that I didn't cite that.

 5        Q.  Is there a cite for --

 6        A.  I can't tell --

 7        Q.  -- the 30 --

 8           THE REPORTER:  I can't --

 9      BY MS. BILDNER:

10        Q.  -- Sorry, let me finish my question, Dr. Levine,

11      thank you, for the record.

12           My question was:  Is there a cite for the

13      30 percent of surgeries required additional surgeries

14      figure?

15        A.  This is a basis -- There is somewhere a cite for

16      that.  I didn't make this up out of the blue.  I took it

17      from a surgical paper.

18           I think it -- I searched out the complication

19      rates of genital surgery, and there were a number of

20      papers that came up.  And I'm quoting one of them.  I

21      don't recall which one, no.

22        Q.  So you don't recall what paper --

23        A.  No, I don't --

24        Q.  -- states that the 30 percent of surgeries

25      require additional surgeries?
```

```
1         A.  -- I don't recall.

2         Q.  And in fact, Dr. Levine, isn't -- you previously

3    testified that you don't know if this number is

4    currently accurate; is that right?

5         MR. BELFORTI:  Objection as to the form.

6         Answer if you can, Dr. Levine.

7         THE WITNESS:  So these figures come from a

8    surgeon or a surgical team looking at the

9    surgical literature, you see, in reviewing

10   multiple studies and reviewing the complications

11   and the rates of any kind of additional incision

12   or -- for example -- that is made.

13        So for example, if there are post-operative

14   urinary problems, they may need to intervene in

15   the bladder in some way.

16        One of my patient's left labias turned

17   necrotic right after surgery; so they had to

18   have an additional surgery to remove the

19   necrotic left labia.

20        These are not the kind of things that

21   surgeons generally like to advertise.  But there

22   are academic surgeons who review multiple

23   papers.  And this 30 percent came from one of

24   those review articles.

25        But if I -- you know, I probably looked at
```

```
 1          that paper in 2020 or 2019.  And I haven't -- I

 2          haven't looked at the surgical literature

 3          complication rate, I think, since that time.  So

 4          I just don't remember.

 5     BY MS. BILDNER:

 6          Q.  Your --

 7          A.  If we -- if we had to, we could look at the

 8     literature together and find articles.

 9          Q.  Okay.  So just to confirm your testimony,

10     Dr. Levine, you're not sure today what surgical paper

11     this cite comes from; is that right?

12          A.  That's right.

13          Q. And you're also not sure if the recent literature

14     on surgical complications rate -- surgical complications

15     would have the same rate; is that right?

16          A.  Oh, I'm sure that every surgeon has a little

17     different rate.

18          Q.  Okay.

19          A.  But this is kind of a summary statement.

20          Q.  So you're --

21          A.  The --

22          Q.  -- not sure --

23          A.  -- I think what I am sure about is that what

24     people -- when they go into surgery, they need to expect

25     that there's a possibility that there will be a
```

```
 1      complication.  And some of those complications will

 2      require an additional surgical experience.  That's my

 3      point.

 4         Q.  Understood.  But whether that surgery

 5      complication rate is 30 percent or 20 percent or some

 6      other percent, sitting here today you can't tell me, can

 7      you?

 8         A.  I don't think you're really understanding what

 9      I'm saying to you.

10         Q.  Let me -- I think my question was --

11         A.  I was --

12         Q.  -- relatively straightforward.  I'm just asking

13      you:  Based on the conversation we just had, sitting

14      here today you can't tell me if the complication rate

15      for genital surgery is 30 percent or not, can you?

16         A.  What I think you don't understand and why I can't

17      answer your question is that surgeons have different

18      complication rates.  And surgical teams don't

19      necessarily public all of their complications.

20             And so we're relying upon published complication

21      rates from a number of studies.  And I'm trying to

22      create a summary of -- I can't tell you what the Boston

23      General Hospital complication rate is versus your

24      Connecticut General Hospital versus Cornell Hospital.

25      These are likely to be different because the surgical
```

1    techniques and the surgeons are different.

2         All I'm looking for in this figure is to say it's

3    from the literature, and a patient should not expect to

4    have any kind of surgery -- especially a complicated

5    genital reconstructive surgery -- without complications.

6    Q.  Okay.  Dr. Levine, based what you know today --

7    I'll stop the share for a second -- is Ms. Clarke

8    an appropriate candidate for transfer to a women's

9    prison?

10   A.  What was the first part of the sentence?  Based

11   on what?

12   Q.  Based on what you know today is Ms. Clarke an

13   appropriate candidate for transfer to a women's prison?

14   A.  Based on what I know today is my memory of

15   Ms. Clarke and I -- when I interviewed her in May of

16   2020.

17        I've already testified in answer to that question

18   that I am not in the position of making a recommendation

19   today about anything about her treatment without

20   personally seeing her and -- for an extended period of

21   time to help her and the prison system make up their

22   mind whether she should be transferred.

23   Q.  All right.

24   A.  I'm trying to be honest here, and humble here,

25   and not presumptuous that my knowledge based on an

```
 1      interview that I did 23 -- 21 months ago gives me the

 2      right to make treatment recommendations.

 3         Q.  Okay.  Understood.

 4            I'd like to move on to discuss part four of your

 5      report.  I'll share my screen so you can see it; okay.

 6            So this starts at the bottom of Page 17 and goes

 7      through Page 18 and a little bit into Page 19 of your

 8      report; okay.  Oh, sorry, went too far.

 9            Okay.  So at the top of Page 18 you write:

10      However, even professionals who believe that GCS

11      improves or cures gender dysphoria now acknowledge

12      uncertainty about its long-term mental health outcomes.

13            Did I read that sentence correctly?

14         A.  A plus.

15         Q.  Then you cite several studies and sources in the

16      remainder of this paragraph; right?

17         A.  Yes.

18         Q.  So these studies, I take it, are meant to

19      illustrate uncertainty about genital surgery's long-term

20      mental health outcomes; is that correct?

21         A.  Yes.

22         Q.  Okay.  Let's take a look at the studies.

23            So the first one comes in this sentence:  The

24      well-known 2011 study by Dhejne, D-H-E-J-E-N-E, et al,

25      demonstrated a 19 times higher completed suicide rate
```

```
 1        after SRS compared to the Swedish general population

 2        along with higher mortality from cardiovascular disease

 3        and cancer.

 4             Did I read that correctly?

 5        A.  Yes.

 6        Q.  Okay.  And this study -- the study that you

 7        referenced is the one titled Long-Term Follow-Up of

 8        Transsexual Persons Undergoing Sex Reassignment Surgery;

 9        Cohort Study in Sweden.

10             Is that right?

11        A.  That's right.

12        Q.  We're talking about the same study?

13             Okay.  So this study followed 324 transgender

14        people in Sweden; right?

15        A.  Yes.

16        Q.  And those 324 transgender people in Sweden were

17        born between 1973 and 2003; is that right?

18        A.  I couldn't -- I trust you.

19        Q.  Okay.  Do you have any reason to dispute that

20        representation?

21        A.  No.  I trust you're reading it accurately.

22        Q.  Okay.  And this study compared transgender people

23        who had gender-affirming surgery or gender-conforming

24        surgery with transgender people -- I'm sorry -- with the

25        general population.
```

```
 1              Let me strike that and say that cleanly.

 2              This study compared transgender people who had

 3      gender-affirming surgery or gender-conforming surgery

 4      with the Swedish general population; is that accurate?

 5         A.  Yes.  It compared it with both female and male

 6      control groups born in the same month in the same year.

 7      Yes, that -- that was the control group.

 8              It did not include the people with gender

 9      dysphoria who did not have sex reassignment surgery.

10              And just for your emphasis, those -- the number

11      that you quoted is all of the people who had sex

12      reassignment surgery in Sweden during those 30-year

13      period.  Those are not the year of the birth, those are

14      the year of the surgery.

15         Q.  Yes.

16         A.  All right.

17         Q.  So as you just said, Dr. Levine, this study does

18      compare people who had gender-affirming surgery with

19      people who did not have gender-affirming surgery;

20      correct?

21         A.  That's right.

22         Q.  Okay.  And, therefore, this article does not say

23      that surgery is ineffective, does it?

24         A.  The surgery is -- this study -- Actually, the

25      authors of the study felt that the study improved
```

```
 1      gender -- genital dysphoria.

 2           It just -- it's about the other psychiatric

 3      complications and the medical complications in the life

 4      story of these people as seen during the 30 years of

 5      observation.

 6        Q.  Right.  To be clear, Dr. Levine, this study does

 7      not say, for example, that people who receive surgery

 8      become more suicidal, does it?

 9        A.  No, no, that's not right.  It says that they are

10      more suicidal -- dramatically more suicidal, profoundly

11      more suicidal than both male and females in the general

12      Swedish population.  And --

13        Q.  Right.  Again --

14        A.  -- when they say that there's a 19 times

15      increased suicide rate -- that's a really high number,

16      you see -- that's after sex reassignment surgery.

17      That's after the final intervention that is thought to

18      cure gender dysphoria.  And what we're having here is

19      suicide and suicide attempts.

20           So let's be very clear about what that 19.1

21      means.  It does not mean -- it doesn't say that -- that

22      it doesn't prevent suicide; it says these people commit

23      suicide after the best treatment for transgenderism.

24           That is in those days they thought that was the

25      best treatment, surgery.
```

```
1        Q.  Okay.  Dr. Levine, I'll backup one step.

2            So once again, this study does not compare

3    transgender people who had surgery with transgender

4    people who didn't have surgery, does it?

5        A.  It does not do that.  That's one of the grave

6    deficiencies of this study.  It's one of the reasons for

7    skepticism about this whole -- whole transgender

8    industry, yeah.

9        Q.  Okay.  The study instead compares transgender

10   people who had surgery with the general population;

11   correct?

12       A.  Right.

13       Q.  And as such, it says nothing about whether

14   surgery is effective or not; correct?

15           MR. BELFORTI:  Objection as to the form.

16           Answer if you can, Dr. Levine.

17   BY MS. BILDNER:

18       Q.  You can answer, Dr. Levine.

19       A.  It is -- it demonstrates it's ineffective in

20   creating the rest of one's life free of medical and

21   psychiatric illness.

22           It's demonstrating that it does not improve

23   mental health to the point -- to the point that it

24   prevents suicide.  It doesn't restore the suicide rate

25   to the general population.
```

```
 1              It means that there is no reason to say that
 2      genital surgery cures gender dysphoria.  That's what
 3      this study means.
 4          Q.  Dr. Levine, have you ever talked with Cecilia
 5      Dhejne -- I'm sorry, that's not how she pronounces her
 6      name -- about your interpretation of this study?
 7          A.  She thinks -- I've read what she's written about
 8      what I've said about her study.  She --
 9          Q.  And what --
10          A.  -- she has written that I am against all sex
11      reassignment surgery, which is not correct.  It is not
12      an accurate characterization of me that I'm against all
13      sex reassignment surgery.
14              I have said that -- that this study is the best
15      study that existed to date from -- in 2011.  And this
16      study demonstrated based on her words that people after
17      sex reassignment surgery need lifelong psychiatric care.
18              So there is no way of saying that this study
19      demonstrates that sex reassignment surgery -- those were
20      the terms in those days -- that cures mental problems.
21      In fact, it may, in fact, cure -- And here's what
22      Cecilia would say, I think -- that it seems to help with
23      genital dysphoria; but it doesn't take care of gender
24      dysphoria, per se.
25              There are many other forces that intervene in a
```

 1    person's life that may cause them to continue to have

 2    psychiatric troubles, including -- including gender

 3    dysphoria.

 4         You need to understand that -- that suicide is a

 5    -- is a dreaded complication of medical intervention,

 6    because medical intervention is undertaken to help --

 7    from the patient's point of view is to help me from my

 8    depression.  I'm so depressed.  I'm so anxious.  I'm so

 9    impaired.  I hate my body.  Fix my body and I'll be

10    happy.

11         And then if you have an increased rate of

12    suicide, it must indicate -- at least the hypothesis is

13    that this is not a cure for gender dysphoria for some

14    people.  And that's a lot of people.

15    Q.  Dr. Levine, my question to you is whether you'd

16    ever talked to the author of this study about your

17    interpretation?

18         So I'll take it that your answer is no, you have

19    not talked to --

20    A.  I have --

21    Q.  -- the author of this study --

22    A.  -- I have --

23    Q.  -- about your interpretation?

24    A.  -- I have never talked to her about our

25    disagreements about the interpretation of her study.

```
 1          I know we've had some kind of dialogue through

 2     publications, but not in person.

 3       Q.  So you agree that Dr. Dhejne vigorously disputes

 4     your interpretation of this study; correct?

 5       A.  I don't exactly know what she disagrees with me

 6     about.

 7          I think what she disagrees with me about is that

 8     this might be a -- this might be a scientific basis to

 9     hesitate to perform sex reassignment surgery.  That's

10     what I think she disagrees with.

11          She believes that despite what her findings are,

12     that sex reassignment surgery is a very good thing.  In

13     fact, she runs a clinic for this in Sweden.  She's the

14     head of a clinic there.

15          And, so -- so she may disagree.  I don't know

16     exactly what she disagrees with me about other than what

17     I just said.

18          But I don't really think that because she did the

19     study that her interpretation of the study is the last

20     word, you see.

21          Many of us, when we do a study, we get so

22     invested in the study that we need an objective

23     appraisal of some other people to tell us what the study

24     means.  So...

25       Q.  I'm going to go ahead and bring up the study.  So
```

```
 1        I'll share my screen; okay.  Maybe we can shed some

 2        light on the source of your disagreement.

 3              This is the study we're talking about; right?

 4        A.  Yes.

 5        Q.  Okay.  If I go down to page --

 6              MR. BELFORTI:  Elana, are you going to have

 7        this marked?

 8              MS. BILDNER:  Oh, yes.  I'm sorry.  I should

 9        mark this.  This will be marked as Exhibit 4, I

10        believe.

11              (Plaintiff's Exhibit 4, 2011 Dhejne study,

12        was marked for identification.)

13    BY MS. BILDNER:

14        Q.  And, Dr. Levine, this is the study that we are --

15    we were just discussing, the 2011 Dhejne study.

16              If you go down to the bottom of Page 2, on the

17    left-hand column, the last sentence there -- or the last

18    two sentences there are:  This study design sheds new

19    light on transsexual persons' health after sex

20    reassignment -- period.  It does not, however, address

21    whether sex reassignment is an effective treatment or

22    not -- period.

23              Did I read this correctly?

24        A.  A plus.

25        Q.  Okay.  So I take it then your disagreement is
```

```
1      that Dr. Dhejne has said in her study that this does not

2      address whether sex reassignment is an effective

3      treatment or not and you believe otherwise; is that

4      correct?

5         A.  Notice that she didn't say it is effective for

6      gender dysphoria, or genital dysphoria, or whether it

7      was effective in improving mental health.  She just let

8      the statement be:  Address whether sex reassignment is

9      an effective treatment or not.

10             That distinction that I am drawing you must

11     consider very carefully.

12             Is this an effective treatment for gender

13     dysphoria in terms of gender dysphoria -- genital

14     dysphoria?

15             And if you follow people who've had this surgery,

16     they will say that they feel much better now that they

17     don't have -- we'll just talk about a penis, right -- if

18     we follow them over time about their gender dysphoria,

19     you see, and not focus on their genital dysphoria; we

20     might get a different answer.

21             And if you look at the data she has presented in

22     this study about general mental health and the data that

23     other people have said about the number of people on

24     disability, for example, it looks like it's a very nice

25     glib statement that you're quoting here.  But it doesn't
```

```
 1        really address the issue that is at hand.

 2             Does sex reassignment surgery improve people's

 3        mental health?  Is that the same as making them happy,

 4        you see, that they had their surgery?  Or does mental

 5        health have a broader definition in terms of how we

 6        define mental health?

 7             Now, she presented suicide attempts, you know,

 8        and treatments for depression, and actual suicide

 9        events.  Those are indications of mental health and

10        increase -- in some complicated way increase in the risk

11        of automobile accidents and substance abuse and

12        cardiovascular disease are also sometimes indications of

13        mental health.

14             So she is drawing attention to the fact that

15        these people are needy people even after sex

16        reassignment surgery.  But she insists that genital

17        surgery is effective.

18             But you'll notice she doesn't define it.

19             So we disagree about this issue.  This word

20        "effective" needs to be expanded.  What's it effective

21        for?  What's it not effective for?

22        Q.  Dr. Levine, again my question was more narrow.

23        And I think your disagreement with her is possibly more

24        narrow.

25             When it comes to this paper, Dr. Dhejne says this
```

```
 1     paper -- the study does not address whether surgery is

 2     effective.  Correct?  That's what she says?

 3          I'm sorry, Is that what she says here?

 4     A.  It does not, however, address whether it's

 5     effective.  But --

 6     Q.  And you think --

 7     A.  -- of course --

 8     Q.  -- that it does; correct?

 9     A.  I think we need to read the whole study before --

10     Q.  Okay.  Well, in the interest of time I'm going to

11     move on to the next study that you cite.

12          And I'll go back to your report so you can see

13     that; okay.

14          So the sentence begins:  A more recent review of

15     suicide among the contemporary Swedish population found

16     the completed suicide rate to be 3.5 times higher than

17     controls.

18          Do you see that sentence?

19     A.  Yes.

20     Q.  Okay.  And you're referring to an -- I guess, the

21     national Swedish database from a dataset from twenty --

22     from June 2020; is that correct?

23     A.  That sounds right.

24     Q.  Okay.  I have this paper in Swedish.  But I can't

25     find it in English.
```

```
 1              Do you have this paper in English?

 2         A.  I do.

 3         Q.  Okay.  Well, I'd love to see a copy.

 4              Once again, based on my Swedish translation

 5    skills, is it fair to say that this dataset does not

 6    compare transgender people who had surgery with

 7    transgender people who did not have surgery?

 8         A.  That's right.  It's comparing it with the Swedish

 9    population.

10         Q.  Okay.  The next study you cite is a 2019 study in

11    the American Journal of Psychiatry by Bränström and

12    Pachankis.

13              Do you see that referenced here?

14         A.  Yes.

15         Q.  Okay.  Actually, I'm not sure -- are you citing

16    the correction here or are you also citing the

17    underlying study?

18         A.  Well, they're a package.

19         Q.  Okay.  And the study is titled, Reduction in

20    Mental Health Treatment Utilization Among Transgender

21    Individuals After Gender-Affirming Surgeries:  A Total

22    Population Study.

23              Is that right?

24         A.  Yes.

25         Q.  And I think we said that study came out in 2019;
```

```
 1      correct?

 2          A.  It was published online in 2019.  It was

 3      published in print of August 2020.

 4          Q.  Okay.  And the correction -- Well, I'm sorry, you

 5      say this is a retraction; is that right?

 6          A.  It was a response to the reviewer, and it -- it

 7      -- we can argue about whether -- what the word

 8      "retraction" means.

 9          The authors were asked to respond to the seven

10      letters to the editor and the two separate statistical

11      analysis or reanalysis of their data, and they wrote a

12      -- they wrote a subsequent article modifying their

13      conclusions and recommending more research, and realized

14      that their major conclusion was not justified on the

15      basis of their data.

16          Q.  Okay.  So let's take a look at --

17          A.  I call --

18          Q.  -- that correction.

19          A.  -- I call that a retraction.

20          Q.  Sure.  And the authors called it a correction,

21      didn't they?

22          A.  Yeah.  What's in a word?

23          Q.  Let's take a look at the correction.

24          MS. BILDNER:  Okay, I'd like to mark this --

25          Are we up to 5 now?
```

```
 1              THE REPORTER:  Yes.

 2              MS. BILDNER:  Okay, so we'll mark this

 3         Exhibit 5.

 4              (Plaintiff's Exhibit 5, Correction to

 5         Bränström and Pachankis was marked for

 6         identification.)

 7    BY MS. BILDNER:

 8         Q.  This is a correction to Bränström and Pachankis.

 9              Do you see this on your screen, Dr. Levine?

10         A.  I do.

11         Q.  Okay.  So let's look at this correction.

12              At the bottom of the page it says:  Given that

13    the study used neither a perspective cohort design nor a

14    randomized controlled trial design, the conclusion that

15    the longitudinal association between gender-affirming

16    surgery and lower use the mental health treatment lends

17    support to the decision to provide gender-affirming

18    surgeries to transgender individuals who seek them is

19    too strong.

20              Is that correct?  Did I read that correctly?

21         A.  Yes.

22         Q.  Okay.  Now, once again, Dr. Levine, this study

23    did not use a randomized controlled design, did it?

24         A.  What is your -- No, it didn't.

25         Q.  It did not.  Meaning it did not compare
```

```
 1        transgender people who had surgery with transgender

 2        people who did not have surgery, did it?

 3            A.   That's what that means, yes.

 4            Q.   Okay.  Let's take a look at the next study you

 5        cite -- which I don't think is a study at all -- it's

 6        the Medicare decision letter.

 7                 Back at your report, you say:  In 2016 Medicare

 8        undertook the most sophisticated review of the existing

 9        research literature on results of SRS and concluded that

10        the data were inconsistent.

11                 Do you see that?

12            A.   Yes.

13            Q.   And you continue:  They decided not cover SRS for

14        the nation but rather to consider coverage on a

15        case-by-case basis.

16                 Is that right?

17            A.   Yes.

18            Q.   So you would agree with me that as with your

19        previous sources, Medicare did not compare transgender

20        people who had surgery to transgender people who did not

21        have surgery, did it?

22            A.   Ms. Bildner, you are going in a direction to

23        establish that there is no randomized controlled study

24        available, which is correct.

25                 This is the problem.  And the solution for the
```

```
 1     problem is to have a follow-up study of everyone who has
 2     had sex reassignment surgery in a particular surgical
 3     setting.
 4          We know the limitations of -- We know the
 5     difficulties in creating a randomized controlled
 6     surgical study for genital surgery.  It's a methodologic
 7     problem that no one has yet agreed on how to solve.
 8          We all recognize that this is the necessary type
 9     of study or series of studies that would help us answer
10     the question whether patients are benefitted from
11     genital surgery in various predefined ways.  We don't
12     have that information.
13          What you just had me establish, you know, in
14     looking at the correction, that it's nonrandomized; it's
15     not -- it's -- it means it -- it only means that the
16     field does not have this kind of information.  And
17     therefore, we don't know the answer to the question.
18          My point and the Medicare's point -- because
19     Medicare only looked at the studies that were in
20     existence until that time, you see.  None of those
21     studies are randomized controlled studies.  And every
22     one of those studies had very grave methodologic
23     limitations from a scientific point of view.
24          So the point is that we are not sure whether sex
25     reassignment surgery benefits people in the long run,
```

```
 1        and to what extent it benefits, and to what extent it

 2        may harm.

 3              This is what I've been saying to you in -- in my

 4        inadequately-stated reports.

 5              Of course you are right, there is no randomized

 6        controlled study available.

 7              The idea that -- in the 2011 Swedish study that

 8        every person who had sex reassignment surgery we had

 9        data on was an -- it was an amazing advance.

10              And if -- if people said that this does not prove

11        that it's effective or it doesn't prove it's

12        ineffective, that's okay.

13              What I'm saying, it's uncertain.  All my report

14        is saying is the body of medical and surgical literature

15        -- despite what people are busy advocating for sex

16        reassignment surgery for prisoners and other people, you

17        see -- the science does not know -- we simply do not

18        know whether we're -- to what extent we're harming --

19        what percentage of people we're ultimately harming, what

20        percentage of people we are ultimately helping, and in

21        what way we're helping, you see.

22              Now, we do know that they die younger from

23        various causes, including suicide.  That should give all

24        of us around the table today some cause, some reason to

25        pause, and to be respectful of what is not known.
```

```
 1              And what is not known is whether sex reassignment

 2       surgery, in fact, improves people.  And if it improves

 3       some people, what are their characteristics?  And if it

 4       harms some people, what are their characteristics?

 5       These are simply unknown.  And that is what I've been

 6       trying to say in this report.

 7              But I recognize listening to you I haven't said

 8       it clearly enough so that everyone understands my

 9       position.  My position is it's uncertain.

10          Q.  Dr. Levine, you've actually suggested a possible

11       solution to the lack of randomized controlled studies

12       for genital surgery, haven't you?

13          A.  Yes, I have.

14          Q.  You've suggested that we should conduct a

15       randomized controlled study of people in prison and find

16       out from that whether surgery is effective; is that

17       correct?

18          A.  No, you're not correct.  What I -- what I have

19       said are two things that you may -- I'll just tell you

20       two things that I have said.

21              One is if people are going to have surgery --

22       genital surgery, they ought to have very careful

23       preoperative evaluation and their mental health should

24       be measured.  And then they should have follow-up at

25       designated intervals for a number of years -- perhaps
```

1    ten years -- with predetermined ways of evaluating their

2    current mental health.

3         And in other words, we can't do randomized

4    controlled studies.  So what we should do is have

5    careful follow-up studies of everyone who we deem to be

6    an appropriate candidate from clinical judgment for sex

7    reassignment surgery.

8         So that's one thing I have suggested, follow-up

9    of everybody.  And if you can't follow-up everybody,

10   follow-up 90 percent of people because some people will

11   be lost to follow-up in prospective studies.

12        The second thing I've said about prisoners is

13   that many of these prisoners who request sex

14   reassignment surgery are prisoners for life.  And that

15   provides us for a chance to have -- to -- when clinical

16   judgment is made that this prisoner should have sex

17   reassignment -- could have sex reassignment surgery and

18   they're going to be in prison for the rest of their

19   life, we have an opportunity to study what happens to

20   those people.

21        But it's an experiment to give a -- a prisoner

22   sex reassignment surgery.  We're not supposed to

23   experiment with prisoners.  I think that's against the

24   federal law.

25        But there is a natural clinical experience for a

1    life -- a person for life in prison.  So if we give them

2    sex reassignment surgery, we need not to let them just

3    disappear in the general population.

4        We need to study those people, monitor their

5    adaptation, see what happens to them so that based upon

6    a series of five or six or ten people in a particular

7    prison or a particular group of people being studied in

8    various states, we then can use that information to make

9    decisions for the next group of prisoners who have not

10   had sex reassignment surgery who then want sex

11   reassignment surgery, you see.

12       I'm saying, let's use the opportunity we have and

13   let's see what happens.  Let's not let this be a typical

14   American phenomenon where we do sex reassignment surgery

15   and the person disappears and we never see them again.

16   We never know what happens to them, whether they live

17   happily ever after, whether they're productive, whether

18   they're disabled, whether they suicide, or whether they

19   murder.  I don't know, you see.

20       In Sweden -- in the Scandinavian countries they

21   have follow-up on everybody; they have data.  In America

22   we have no data.

23       Prisons for life -- prisoners give us data.

24   That's what you're quoting, I think.  That's what I

25   believe.  That's what I have said.

```
 1        Q.  Yes.  I'm referencing your article and

 2   reflections on the legal battles over prisoners with

 3   gender dysphoria.  You wrote that in 2016?

 4        A.  I'm glad you read it.  Thank you.  Yes.

 5        Q.  And in that article you suggest that it would be

 6   scientifically preferable to select prisoners for SRS by

 7   an agreed-upon methodology perhaps randomized to SRS and

 8   no SRS to ensure that each operated-upon person's life

 9   course is carefully documented.

10        Is that what you were referring to?

11        A.  Yes.  And that's a very nice summary.  Thank you.

12        Q.  Okay.  Let's go back to the last source you cite

13   -- sorry, I need to open your report again.

14        Okay, so we're just going to let -- I've gone

15   through -- we've gone through the 2011 study.  We've

16   gone through the Swedish dataset from 2020.  We've gone

17   through the 2019 study correction, the 2016 Medicare

18   letter.

19        The last source you cite here is in the last

20   sentence.  Do you see that?

21        A.  I'm sorry, would you --

22        Q.  I'll read it aloud.

23        A.  Yeah.

24        Q.  Yeah.  In the most recent -- the last sentence of

25   the paragraph on Page 18:  In the most recent study
```

```
 1        among US Veterans, transgender patients ages 18 to 39

 2        had a risk of suicide death more than three times that

 3        of their cisgender peers, while the transgender patients

 4        65 years and older had a risk of suicide death more than

 5        nine times that of their cisgender peers.

 6             Did I read that correctly?

 7        A.  You still get a good grade.

 8        Q.  So this study is the Boyer, et al, 2021 study

 9        entitled:  Suicide, Homicide, and All-Cause Mortality

10        Among Transgender and Cisgender Patients in the Veterans

11        Health Administration.

12             Is that right?

13        A.  Yeah.

14        Q.  Okay.  And this study -- Well, I can open it up.

15        How about that.

16             MS. BILDNER:  Okay.  I'd like to mark this

17        as Exhibit 6.

18             (Plaintiff's Exhibit 6, Suicide, Homicide,

19        and All-Cause Mortality Among Transgender and

20        Cisgender Patients in the Veterans Health

21        Administration article was marked for

22        identification.)

23        BY MS. BILDNER:

24        Q.  This is the study we were just discussing

25        Dr. Levine; is that right?
```

```
 1        A.  I think so.

 2        Q.  By Taylor Boyer and others?

 3        A.  Yes.

 4        Q.  Okay.  And so this study looked at VHA electronic

 5   health records from October 1st of '99 to December 31st

 6   of 2016; is that right?

 7        A.  That's what it says, yes.

 8        Q.  And it looked at the records of transgender

 9   patients and cisgender patients; is that right?

10        A.  Uh-huh.

11        Q.  32,441 of them altogether; is that correct?

12        A.  Yes.

13        Q.  And this study did not separate the transgender

14   population by treated or untreated, did it?

15        A.  I don't think so.

16        Q.  All right.  And some of the --

17        A.  You know, that depends on what you mean by

18   "treated."

19            You see, if it's in the VA system -- I think I'm

20   really asking you, do you mean surgically treated or not

21   surgically treated?  Because they've been treated in

22   some other way, yeah.

23        Q.  Sure.  This study does not separate the

24   transgender population into surgically treated and

25   nonsurgically treated; correct?
```

```
 1          A.  Right.

 2          Q.  So some of the transgender people in this study

 3     may have had surgery while others may not have; right?

 4          A.  Right.

 5          Q.  And once again, Dr. Levine, this study does not

 6     compare transgender people with surgery to transgender

 7     people without surgery; correct?

 8          A.  I'm hesitating to answer this because you're

 9     being repetitive.

10          I've already made the point that if you're

11     pointing this out as a deficiency of the study, all of

12     these -- all studies have -- there is no study that

13     meets the criteria that you want, you see.  So --

14          Q.  Okay.  So --

15          A.  -- I mean, you can quote any study you want.  You

16     could ask me the same question.  And the answer will

17     always be the same:  It doesn't have the right

18     comparison to -- to get a stronger view about the

19     conclusion.

20          Because really what you're asking about is, is

21     there harm to not -- is the harm of not treating greater

22     than the harm of treating?  And the answer is:  We don't

23     know.

24          Q.  Right.  This study says nothing about that either

25     way; correct?
```

     1        A.  This study says what I said it says.  It says

     2     that if you have a diagnosis of transgenderism in the

     3     electronic medical records of a huge system and -- and

     4     they record the death by suicide, they will record more

     5     suicide in young people and older people who have this

     6     diagnosis.  That's what --

     7        Q.  Regardless of surgery --

     8            THE REPORTER:  I'm sorry, I didn't that.

     9     BY MS. BILDNER:

    10        Q.  The question was:  Regardless of surgery;

    11     correct?

    12        A.  Yes.  It's very well-known even -- it's very

    13     well-known throughout the general population from

    14     teenagers on there's much more suicidal preoccupation in

    15     trans human -- trans identified human beings than there

    16     are in cisgender human beings.

    17            And there's some indication that there is

    18     actually more suicidal ideation in trans individuals

    19     than in homosexual individuals.  But the data about that

    20     is not clear because there's a lot of suicidal ideation

    21     in the coming-out process in gay and lesbian people as

    22     well.

    23            So I think you've established very clearly that

    24     there's the absence of the kind of study that you would

    25     like to have in medical literature.  And I actually

 1    agree with you.  I would like to see that study as well.

 2       Q.  Okay.  I'm going to go back to your report,

 3    Dr. Levine.  So back to Exhibit 3.

 4         Okay.  I'll share my screen in a moment.  I'm

 5    still on Page 18 of your report of Exhibit 3.  I'm

 6    looking at the middle paragraph of this page.  There is

 7    a sentence that states:  Veronica-May Clarke is an

 8    example of the inherent instability and changeability of

 9    various aspects of her identity, religious, vocational,

10    marital, orientation, and gender identity.

11         Do you see that?

12       A.  Yes.

13       Q.  Okay.  And I assume I read that correctly since

14    you didn't correct me.

15         What do you mean by that statement, Dr. Levine?

16       A.  I'm always taken a little aback by that question.

17    I try very much to be very clear about what I write.

18         During the course of one's life -- a life history

19    perspective, this person has had many more changes in

20    things that we call identity than the average human

21    being.  She's had religious identity changes.  She's had

22    vocational changes.  She's had marital relational

23    change -- she's had relational changes including marital

24    changes.  She's a very -- she was a very unstable

25    husband.  She's had orientation changes, you see.

Stephen B. Levine, M.D.

```
 1              And now she's had a solidification of her gender
 2     identity, which was not as clearly established until she
 3     was in prison for many years.
 4              So I'm just noticing that this personality --
 5     this human being -- has demonstrated a little more
 6     instability or a little more changeability in dimensions
 7     of her -- her identity -- and this is -- there are many
 8     aspects of identity, and I'm only focusing on five of
 9     them -- than the average human being that we recognize.
10              And she's even had more -- she has had -- she's
11     inherently changeable.  She has demonstrated a great
12     changeability in her life, more so than if you have
13     children that you would want your children to have.
14        Q.  You said that her gender identity solidified.  Is
15     that the word that you used?
16        A.  Yes.  I could have said consolidated.  She's
17     consolidated.  She has settled upon, you know, in the
18     last seven, eight years a gender identity that we call a
19     trans identity.
20        Q.  So am I correct, Dr. Levine, that by religious
21     you're referring to Ms. Clarke's interest in other
22     religions; is that right?
23        A.  Yes.  I am referring to the things she's checked
24     on her various, you know, forms she's filled out over
25     the years.
```

1          Q.  Vocational refers to the fact that she became an

2     electrician, or something else?

3          A.  It refers to the sum of things that she did

4     pursuing life.

5              She became -- she became an electrician.  That

6     was wonderful.  That was wonderful that she became an

7     electrician.  It was finally a stable trade that she

8     could have -- were it not for her tragedies, she could

9     have had a lifelong stability as an electrician if she

10    got along with people.

11             But apparently as long as she was working as an

12    electrician, she was doing pretty well.

13         Q.  And the term marital refers to the fact that

14    Ms. Clarke was married and then divorced; is that right?

15         A.  It was -- it refers to her relationships with

16    other people, her intimate relationships with other

17    people.  The marriage is just the most dramatic and

18    horrible side of her life history with relationships.

19         Q.  So the marital refers to the fact that she had

20    relationships with different people; is that correct?

21         A.  That she had -- she had heterosexual

22    relationships.  She had homosexual relationships.  She

23    was violent in every one of those relationships,

24    including her marriage -- particularly her marriage, of

25    course.

1    Q.  So the use of the word marital here encompasses

2    something related to violence?

3    A.  I should have used the word relational.  And I

4    should have then put in parenthesis, including marriage.

5        I wasn't referring here to her violence; I was

6    referring to the changeability over time of this person.

7    That's all I'm referring to.

8    Q.  Okay.  And orientation refers to the fact that

9    Ms. Clarke is bisexual; is that correct?

10    A.  No.  It refers to the fact that Ms. Clarke at

11    various times defined herself in different ways.  We may

12    objectively look at her life and say she was bisexual.

13    But at any given time she might not have said that.

14        You see, sexual identity is a series of

15    self-labels.  We from the outside label people's sexual

16    identity based on what we know about them.

17        But one can change one's identity -- one can

18    change one's sense of one's orientation -- and commonly

19    do.  People do change their sense of self in terms of

20    that orientation component of sexual identity.

21        So her concept of herself has changed.

22        Now, if you see her at any time and ask her about

23    that, you might get one answer or another.  But in

24    retrospect, she may have a -- she may have a

25    retrospective view of her life history and that she

```
 1      would say:  Well, I've always been trans, or I've always
 2      been bisexual.  But if you would have seen her at 13 or
 3      17 or 22, or 28; she might have told you a different
 4      thing.
 5            There is a whole idea of can anyone -- is anyone
 6      telling you truth when they tell you about their
 7      history, especially about these kind of very -- somewhat
 8      stigmatized behaviors.
 9        Q.  Ms. Clarke told you in your interview -- and I'm
10      going to Page 11 here -- that -- and I assume this is a
11      direct quote -- all my life I have been attracted to
12      both sexes.
13            Do you see that on the bottom of Page 11?
14        A.  Yes -- no, I don't see it; but I'm trusting you
15      -- yeah, I see it, yeah.
16        Q.  And in fact, at various other points in your
17      interview and in your records Ms. Clarke referred to
18      herself as bisexual, didn't she?
19        A.  I presume she is.
20            But what I'm saying is that at any given time --
21      like when I'm interviewing her -- she could say a thing
22      like:  All my life I've been attracted to both sexes.
23            But all of her life she didn't behave sexually
24      with both sexes.  You know, when she was living with a
25      gay man, she probably would have said she was gay.
```

```
 1              And so in retrospect, in looking back over the
 2       course of her life she could say:  All my life I've been
 3       aware I've been attracted to both sexes.
 4              So orientation has two dimensions, which I think
 5       you're aware of, Ms. Bildner.  And that is there's an
 6       erotic dimension, which is what I think about what I'm
 7       attracted to; and then there's a behavioral dimension to
 8       orientation as to who -- which class of individuals do I
 9       have sex with.
10              So one can have an incongruity between what is
11       the erotic dimension of orientation and the behavioral
12       dimension.
13              So if she is accurate in saying that all of her
14       life she's known herself to be a bisexual person, that
15       may be true in terms of what she knows herself to be.
16              But her behavior is a different story, you see.
17       And all of her life she didn't represent herself to her
18       parents or to her wife as bisexual, you see.
19              But if she's only talking about her -- her erotic
20       component, that is a private subjective component, the
21       psychological component, she may or may not be accurate
22       in what she told me.
23              Now, even Dr. Brown notices that -- said in the
24       end of his report that this is -- he's aware that people
25       don't always tell us the truth, especially about
```

```
1     intimate matters about sexuality.

2          So there are limitations to what I can tell.

3     This is based on the person's self-report.  This person

4     has behaviorally behaved with both sexes, not simply

5     because that he's bisexual.

6          It's just more complicated -- it's more nuanced

7     than you're -- I think we're trying to make it out to be

8     here.

9       Q.  I'm trying to understand your comment,

10    Dr. Levine, that -- about inherent instability.  So is

11    it your opinion that someone who is attracted to and

12    behaves with both sexes is inherently unstable?

13      A.  It is my opinion that Veronica-May Clarke in

14    general as a person has been inherently unstable in

15    multiple dimensions.

16          I am not imputing the reputation or the -- or the

17    instability of everyone who is bisexual.  I'm talking

18    about this particular person.  Please, let's confine

19    ourselves to this.

20      Q.  Okay.  And so it's not your opinion, Dr. Levine,

21    that everyone who changes vocation is inherently

22    unstable, I gather?

23      A.  You gather correctly.

24      Q.  It's not your opinion that everyone who changes

25    religions is inherently unstable, is it?
```

```
 1         A.  Religious...

 2              We're talking about a dimension of a self,

 3     religious feelings, vocational behavior -- vocational

 4     capacities and interests.  This is -- these are

 5     dimensions of the self.

 6              Everybody has some degree of evolution in their

 7     20's -- I have written about 27 dimensions of the self.

 8     So every dimension of the self has an evolutionary

 9     capacity.

10              So I, of course, would never say -- if you would

11     read what I have written about this, I would never imply

12     what you're implying in your question; that I believe if

13     someone changes their vocation or changes their

14     religion, they are somehow inherently pervasively an

15     unstable character.

16              Nicholas -- now Veronica-May Clarke -- over the

17     course of her 45 years has demonstrated sufficient

18     evidence for me to say this is a person who has a

19     certain degree for much of her life an inherent

20     instability; an instability of control of herself, an

21     instability of her interests, an instability of her

22     behaviors, an instability of her integrity.  So...

23         Q.  What about when it comes to gender identity,

24     Dr. Levine?  Is it your opinion that someone who is

25     transgender is inherently unstable?
```

```
 1        A.  No.  It's possible to have a lifelong stability
 2    of a transgender identification.
 3        Q.  I'll stop sharing.
 4        Dr. Levine, you mentioned earlier that you have
 5    reviewed a report by a consultant to the Department of
 6    Correction that was written since you wrote this report;
 7    is that right?
 8        A.  I did mention that.
 9        Q.  Okay.  And that consultant's name is Dayne
10    Bachmann; is that right?
11        A.  I remember the last name, not the first, yeah.
12        Q.  Okay.  So what do you understand about
13    Mr. Bachmann's role at DOC?
14        A.  I think he was a newly-hired social worker who --
15    the only records I had were the basis of a one-hour
16    interview with the patient.
17        And he demonstrated a certainty that -- that the
18    person's transgender -- his gender dysphoria would be
19    helped immensely by having sex reassignment surgery.
20        Q.  Okay.  I'm going to share my screen.
21        Is this the report that you were just referring
22    to, Dr. Levine?
23        A.  Yes.
24        Q.  Okay.
25        MS. BILDNER:  I'd like to mark this as --
```

```
1        I'm sorry, are we on 6 or 7?
2            THE REPORTER:  Exhibit 7.
3            MS. BILDNER:  Thank you.  I'm always bad
4        with numbers.
5            Okay, I'd like to mark this as Exhibit 7.
6            (Plaintiff's Exhibit 7, Standard Progress
7        Note of Dayne Bachmann, was marked for
8        identification.)
9   BY MS. BILDNER:
10       Q.  This document is titled, Standard Progress Note.
11  And you understand this to be a progress note authored
12  by Dayne Bachmann, Dr. Levine?
13       A.  You know, the "progress note" confused me because
14  progress notes usually are written in -- in the course
15  of a longer-term psychotherapeutic relationship, you
16  see.
17           "Progress report" implies:  Well, I saw the
18  person originally and this was their state; and now this
19  is the progress that has been made.
20           But the only information I got was one progress
21  note, which seemed like an evaluation done for the
22  purposes of deciding whether this is a candidate for sex
23  reassignment surgery.
24           So I don't know if this is a progress -- whether
25  this is just a mislabel, Standard Progress Note; because
```

```
 1      it says psychiatric diagnosis evaluation just above that

 2      note.  And so it sounded to me like this was a one-time

 3      thing; but it's labeled progress note.  So I was just a

 4      bit confused.

 5         Q.  Do you know Mr. Bachmann, Dr. Levine?

 6         A.  Oh, no.  No, I don't.

 7         Q.  Do you know anything about Mr. Bachmann?

 8         A.  Only what's on this paper.

 9         Q.  So you reviewed nothing about Mr. Bachmann other

10      than this document titled, Standard Progress Note; is

11      that correct?

12         A.  That's correct.

13         Q.  Okay.  So in the first paragraph of this note

14      starting at the end of the second line it says:  As we

15      have discussed in detail, this surgery is a fundamental

16      need and vital to alleviating her gender dysphoria.

17      This significant medical intervention is essential to

18      her transition.  It will not only increase her external

19      and internal sense of self, it will inevitably bolster

20      her confidence and self-esteem.  For many trans

21      identified individuals this is crucial to their

22      well-being and quality of life.

23            Then it says:  Ms. Clarke's expectations around

24      this procedure are completely reasonable, realistic, and

25      well-aligned with her needs.
```

```
 1              What do you think of that, Dr. Levine?
 2         A.  I would say that Dayne Bachmann has made up -- I
 3    don't know his -- is it a Mr. or Ms. Bachmann; do you
 4    know?
 5         Q.  I believe mister.
 6         A.  Mister.  I would say that while he's very
 7    impressively certain, and I hope it's based on more than
 8    an hour's interview, and I hope that Mr. Bachmann is
 9    aware of the literature about the outcome studies.  And
10    so I was a little shocked at the certainty.
11              But I do realize that mental health professionals
12    have different attitudes towards this -- these kind of
13    treatments.  And many people -- Education happens in a
14    kind of chain of trust that people above you teach you
15    how -- what the ideal treatment for a condition is.
16              And when people learn, for example, in graduate
17    school what the treatment of depression is and gender
18    dysphoria is, they're told what the ideal treatment is.
19    That's what they bring to the clinical setting.  And so
20    they perceive things based upon their knowledge and
21    their beliefs.
22              So I would say that Mr. Bachmann has a set of
23    beliefs that sex reassignment surgery is a really
24    helpful thing, that it helps almost anyone that they
25    perceive to be gender dysphoric, and that...
```

```
 1              I would just say, wow, to this.  Wow about the
 2       certainty about this.
 3              In a world that's filled with uncertainty it's
 4       very reassuring to see people who know the answers to
 5       unanswered questions.
 6              So listen, I don't mean -- I'm not disrespectful
 7       of Mr. Bachmann's opinion.  After all, I haven't seen
 8       this patient for a very long time.  I don't know what
 9       Mr. Bachmann knows about his past.
10              And I can just tell you that in the treatment of
11       transgenderism for many people, the only important thing
12       is -- is whether or not the person has gender dysphoria
13       because they believe the only treatments for it really
14       are hormones and surgery.
15              And so I believe that Mr. Bachmann has given you
16       his sincere opinion based upon his knowledge and based
17       upon his experience of this patient.  I hope it's for
18       more than one hour.  But based on this progress note, it
19       is an opinion that was made after 60 minutes with the
20       patient.
21          Q.  Later on --
22              THE REPORTER:  I'm sorry.  You blocked out
23          there.
24              MS. BILDNER:  Sorry about that.
25       ///
```

```
 1    BY MS. BILDNER:

 2       Q.  Later on in the third paragraph down Mr. Bachmann

 3    writes:  Ms. Clarke has met the WPATH standards of care

 4    criteria for surgery.  I have discussed risks, benefits,

 5    limitations, and alternatives of surgery with her and I

 6    feel she has as an excellent understanding.  I've

 7    assessed Ms. Clarke's readiness for surgery and I fully

 8    support her decision to move forward.

 9          What do you think of that, Dr. Levine?

10       A.  I'm going to answer that question -- I'm really

11    answering this question, but I have to -- I have to tell

12    you something else.

13          I am -- I haven't had a paper accepted for

14    publication; it's in the process of being posted

15    probably within the next two weeks on informed consent

16    for individuals with transgender identities.

17          And the paper -- I have several co-authors.  It's

18    going to be in the Journal of Sex and Marital Therapy.

19    And it is a discussion of informed consent and the

20    processes that enable a person -- a doctor to actually

21    satisfy the ethical responsibilities that he has/she has

22    to make sure the person is informed.

23          I contrast informed consent for gender identity

24    disorder interventions with informed consent for

25    appendectomies or surgical procedures.  Those things are
```

 1    written perfunctory documentations that protect the

 2    doctor from lawsuit in case of complication.

 3          In informed consent processes for transgender

 4    people -- especially for surgery, what we're trying to

 5    do is not protect the institution or the doctor; we're

 6    trying to protect the patient so -- to make sure that

 7    they understand.

 8          If this person -- if this person, Mr. Bachmann,

 9    in one hour made the diagnosis, you see, and estimated

10    within one hour that this person was fully informed and

11    understood the alternatives and the risks and benefits;

12    I would say that this qualified as an awfully efficient

13    informed consent process.

14          And the informed consent process may meet the

15    standards of WPATH, because they don't really -- they

16    just think the person needs to know what the dangers

17    are, you see, and -- but they don't have a chance to

18    discuss it.  They don't have a chance to sleep on it,

19    you see.

20          And so I would say that this was a rather

21    efficient evaluation, not only of the diagnosis, not

22    only of the person's readiness for surgery, but of the

23    person's understanding of the possibilities of harms and

24    the possibilities of benefits, and understands the

25    scientific limitations of what we know about the harms

```
 1      and the benefits.

 2           So I would say that -- that this was awfully

 3      efficient in making these conclusions.

 4           I wouldn't imagine that Mr. Bachmann is

 5      well-acquainted with the literature.  I think he's

 6      probably more well-acquainted with a paragraph in the --

 7      in WPATH, its Seventh edition of Standards of Care.

 8           And so I'm not disagreeing with Mr. Bachmann.

 9      I'm just not certain he has done enough homework to meet

10      this conclusion.  But I believe he believes his

11      conclusions.

12           And listen, if he's the person who makes the

13      decision in Connecticut in this prison, if he's -- if

14      that's the guy that the policy has -- I mean, the people

15      hired him for, we rest upon his decision; right?

16           Whether it's a good decision or not a good

17      decision, I'm saying we won't know until the surgery is

18      done or the surgery is not done, you see.  And then we

19      have the kind of follow-up that I outlined for you.

20        Q.  Okay.

21        A.  I hope that is a direct answer to your question.

22        Q.  Well, I have hopefully good news for you,

23      Dr. Levine.  I am almost done here.  I'd like to take a

24      quick break now and maybe we can reconvene in ten

25      minutes.
```

```
 1              Is that okay with you, Dr. Levine, and Jamie as

 2      well?

 3        A.  Yes.

 4              MR. BELFORTI:  Good for us.  Thanks.

 5              MS. BILDNER:  Great.

 6              (Recess taken at 4:59 p.m.)

 7                            ---

 8              (Back on the record at 5:03 p.m.)

 9                            ---

10              MS. BILDNER:  Okay.  We're back on the

11      record.

12              Thank you, Dr. Levine.  That concludes my

13      questions for you today.

14              And I will send the exhibits to you, Vicky,

15      and to the AG's office as well.

16              THE WITNESS:  Okay.

17              MR. BELFORTI:  I have no questions.  Thank

18      you.

19              THE REPORTER:  Okay, thank you.

20              Do you have a standing order or do you need

21      to state your order on the record?

22              MR. BELFORTI:  Yes, we'd just like an

23      electronic copy.

24              MS. BILDNER:  Same please, yes, just an

25      e-tran would be great.
```

```
 1              THE REPORTER:  Okay.  Thank you.

 2              (The deposition concluded at 5:05 p.m.)

 3                          ---

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF DEPONENT

 2

 3          I, STEPHEN B. LEVINE, M.D., do hereby certify the

 4     foregoing testimony given by me on March 9, 2022, is

 5     true and accurate to the best of my ability.

 6

 7     _____        _____

 8     DATE                          STEPHEN B. LEVINE, M.D.

 9

10

11     At_____in said county of

12     _____, this_____day of

13     _____, 2022, personally appeared STEPHEN

14     B. LEVINE, M.D., and he/she made oath to the truth of

15     the foregoing answers by him/her subscribed.

16

17

18

19     Before me,_____, Notary

20     Public.

21

22

23     My commission expires:

24

25
```

```
 1                    CORRECTION SHEET

 2

 3      Please note any error(s) and/or corrections thereof on

 4      this sheet.  The rules require a reason for any change

 5      or correction.  This must be accomplished within 30 (30)

 6      days from date on Correction Sheet.

 7      RE: Case No. 3:19-cv-575-VLB, VERONICA-MAY CLARKE vs.
        ANGEL QUIROS, DR. GERALD VALETTA, RICHARD BUSH, and
 8      BARBARA KIMBLE-GOODMAN; Deposition of STEPHEN B. LEVINE,
        M.D. taken March 9, 2022:

 9
        PAGE   LINE   NOW READS   SHOULD READ   REASON FOR CHANGE
10
       _____  ____  _____  _____  _____
11
       _____  ____  _____  _____  _____
12
       _____  ____  _____  _____  _____
13
       _____  ____  _____  _____  _____
14
       _____  ____  _____  _____  _____
15
       _____  ____  _____  _____  _____
16
       _____  ____  _____  _____  _____
17
       _____  ____  _____  _____  _____
18
       _____  ____  _____  _____  _____
19
       _____  ____  _____  _____  _____
20
       _____  ____  _____  _____  _____
21

22

23
       _____        _____
24     DATE                       STEPHEN B. LEVINE, M.D.

25
```

```
 1                    CERTIFICATE OF REPORTER

 2          I, Victoria L. Germani, RPR, LSR, and Notary

 3     Public duly commissioned and qualified within and for

 4     the State of Connecticut; do hereby certify that

 5     pursuant to Notice there appeared before me remotely on

 6     March 9, 2022, at 9:34 a.m., the following named person,

 7     to wit: STEPHEN B. LEVINE, M.D., who was by me duly

 8     sworn remotely to testify to the truth and nothing but

 9     the truth; that he/she was thereupon carefully examined

10     upon his/her oath; and his/her examination reduced to

11     writing under my supervision; and that the deposition is

12     a true record of the testimony given taken to the best

13     of my ability.

14          I further certify that I am neither attorney nor

15     counsel for, nor related to nor employed by any of the

16     parties to the action in which this deposition is taken;

17     and further that I am not a relative or employee of any

18     attorney or counsel employed by the parties hereto, or

19     financially interested in the action.

20          IN WITNESS THEREOF, I have hereunto set my hand

21     this 14th day of March, 2022.

22

23

24     Victoria L. Germani, Notary Public
            My Commission expires April 30, 2025

25
```

## WORD INDEX

**< 0 >**
**0** 4:*1, 2*
**06105** 2:*4, 15*
**06106** 1:*24*
**06901** 2:*9*

**< 1 >**
**1** 4:*1, 2* 35:*10*
47:*15* 70:*1, 2, 11*
94:*21* 110:*7*
123:*15* 129:*16*
133:*18* 135:*13*
136:*18* 138:*24*
**1:00** 123:*20*
**1:33** 125:*1*
**10** 16:*15* 23:*6*
40:*6* 55:*20* 93:*24*
**100** 130:*14*
**102** 4:*1*
**10-minute** 58:*7*
**10's** 57:*1*
**11** 57:*25* 135:*24*
137:*13, 17* 176:*10*
240:*10, 13*
**11:01** 58:*8*
**11:10** 58:*7*
**11:14** 58:*10*
**110** 2:*15*
**11th** 103:*7* 113:*22,
25*
**12** 137:*4, 23*
**12:45** 120:*3*
**12:57** 124:*23*
**121** 60:*21* 67:*17*
**12th** 40:*24* 160:*16,
19*
**13** 240:*2*
**14** 142:*10* 164:*6,
10, 11*
**14th** 256:*21*
**15** 16:*15* 20:*6*
23:*6* 47:*16*
123:*23* 124:*8*
**150** 134:*9*
**15th** 162:*13, 15*
163:*1, 10, 25*
**16** 40:*5* 96:*22, 23*
97:*21* 138:*13*
202:*21, 22*

**17** 103:*1* 140:*21*
177:*19* 210:*6*
240:*3*
**18** 4:*1* 94:*13*
102:*2* 105:*3, 6*
210:*7, 9* 231:*25*
232:*1* 236:*5*
**18th** 94:*17* 101:*17*
102:*8*
**19** 94:*24* 95:*1, 20*
97:*12* 138:*13*
210:*7, 25* 213:*14*
**19.1** 213:*20*
**1970** 202:*1, 15*
**1970s** 58:*17*
201:*23*
**1970's** 59:*24*
201:*11*
**1973** 14:*11, 12*
201:*16, 22* 211:*17*
**1973-1974** 56:*24*
**1974** 56:*24*
**1977** 159:*14*
**1997** 65:*20*
**1998** 60:*6* 65:*20*
**1999** 60:*7, 21*
65:*20*
**1st** 233:*5*

**< 2 >**
**2** 4:*1, 2* 92:*21, 22*
93:*23* 95:*5*
123:*15* 129:*16*
136:*17, 19* 138:*24*
163:*5* 218:*16*
**20** 14:*21* 36:*16*
40:*7* 67:*2, 7* 208:*5*
**200** 134:*9*
**2001** 66:*15*
**2002** 66:*25*
**2003** 211:*17*
**2006** 83:*24, 25*
**2007** 19:*25* 20:*5*
186:*11, 13*
**2011** 4:*1* 53:*11,
15* 60:*11* 105:*7,
21, 23* 210:*24*
215:*15* 218:*11, 15*
227:*7* 231:*15*
**2013** 60:*13*

**2016** 97:*2, 7*
105:*24* 110:*20*
120:*11* 160:*16, 19*
162:*13, 16* 163:*1,
10, 25* 174:*22*
190:*14* 225:*7*
231:*3, 17* 233:*6*
**2017** 135:*16, 25*
136:*9, 11* 137:*14,
21* 139:*20* 140:*17*
141:*9*
**2018** 137:*24*
140:*10* 174:*22*
**2019** 13:*4* 87:*16,
17* 106:*4* 138:*15*
139:*18* 140:*12, 17*
207:*1* 222:*10, 25*
223:*2* 231:*17*
**2020** 4:*1* 13:*2*
73:*2* 74:*11* 98:*6,
7* 99:*2* 101:*17*
102:*2, 9* 105:*21*
106:*5* 107:*4, 7, 10,
16, 19* 140:*22*
141:*6, 10* 207:*1*
209:*16* 221:*22*
223:*3* 231:*16*
**2021** 84:*8* 94:*13,
17* 97:*3* 103:*8*
113:*25* 232:*8*
**2022** 1:*12* 195:*10*
254:*4, 13* 255:*8*
256:*6, 21*
**2025** 256:*24*
**203-325-5090** 2:*9*
**20-page** 89:*11*
**20's** 243:*7*
**20-year** 158:*18*
**21** 1:*23* 60:*22*
119:*9* 210:*1*
**218** 4:*1*
**21st** 107:*3*
**22** 174:*8* 240:*3*
**224** 4:*1*
**23** 210:*1*
**232** 4:*1*
**23rd** 136:*11*
**245** 4:*1*
**25** 65:*16*
**26th** 19:*1*

**27** 99:*20* 243:*7*
**27th** 107:*7*
**28** 240:*3*
**2-D** 180:*6, 15*

**< 3 >**
**3** 4:*1, 2* 101:*22,
25* 102:*1* 135:*11*
138:*25* 142:*4, 5*
160:*11, 14* 162:*12*
164:*4* 202:*18*
236:*3, 5*
**3.5** 221:*16*
**3:19-cv-575-VLB**
1:*5* 255:*7*
**3:23** 198:*19*
**3:36** 198:*21*
**30** 15:*16* 17:*19*
40:*1, 8* 61:*10*
124:*11* 203:*4, 14*
204:*17, 21, 22*
205:*7, 13, 24*
206:*23* 208:*5, 15*
213:*4* 255:*5*
256:*24*
**300** 130:*14* 136:*23*
**30-minute** 124:*20*
**30-page** 163:*13*
**30-year** 53:*12*
212:*12*
**31st** 233:*5*
**32,441** 233:*11*
**324** 211:*13, 16*
**35** 15:*16*
**360-pound** 176:*24*
178:*21*
**37** 57:*13*
**39** 232:*1*
**3rd** 107:*10, 16, 18*

**< 4 >**
**4** 4:*1, 2* 70:*12*
95:*6* 103:*2*
117:*23* 218:*9, 11*
**4:59** 252:*6*
**44124** 1:*15*
**45** 243:*17*
**45-year** 158:*20*
**46** 201:*10*
**465** 138:*1, 2, 8*

140:*10*
48 122:*17*

< 5 >
5 4:*1, 2* 64:*3*
174:*17* 223:*25*
224:*3, 4*
5:03 252:*8*
5:05 253:*2*
50 134:*14* 202:*6,
7, 8*
59 137:*24*

< 6 >
6 4:*1* 15:*13*
123:*14* 129:*2, 3, 7*
135:*19* 137:*10*
138:*14* 189:*5*
232:*17, 18* 245:*1*
60 10:*3* 23:*4*
248:*19*
6415 1:*15*
65 232:*4*

< 7 >
7 4:*1* 62:*17* 63:*4,
9, 17, 25* 67:*11, 13,
15, 18, 20* 68:*1*
96:*22* 245:*1, 2, 5, 6*
7/15/16 163:*6*
70 4:*1* 108:*7*
70s 56:*25*
754 138:*18, 23*
139:*24* 140:*12*
765 2:*4*

< 8 >
8 4:*1* 96:*22*
106:*23* 163:*6*
182:*10*
80s 56:*25*
860-523-9146 2:*5*
860-595-7462 1:*24*
860-808-5450 2:*16*

< 9 >
9 1:*12* 4:*1* 15:*12*
96:*22* 97:*12*
254:*4* 255:*8* 256:*6*
9:34 5:*1* 256:*6*

90 10:*2* 229:*10*
90s 56:*25*
92 4:*1*
95 199:*12*
99 233:*5*

< A >
a.m 5:*1* 58:*8, 10*
256:*6*
AAG 102:*22*
104:*7, 8*
aback 236:*16*
ability 28:*17* 29:*8*
174:*10* 254:*5*
256:*13*
able 8:*8* 9:*19*
24:*13, 15* 61:*8*
71:*25* 92:*16*
105:*15* 112:*7*
132:*20* 202:*19*
abnormal 140:*5, 6*
abnormalities
130:*20, 21*
abnormally 139:*14*
absence 235:*24*
absent 156:*17*
absolutely 63:*12*
146:*14*
abstract 165:*2*
abuse 35:*20*
220:*11*
academic 99:*10*
206:*22*
Academy 97:*2*
accept 26:*13* 30:*3*
37:*7* 80:*15* 103:*17*
acceptable 25:*19*
acceptance 22:*18*
201:*25*
accepted 153:*3*
249:*13*
access 75:*15, 20*
84:*6* 85:*15* 86:*8*
182:*3* 195:*11*
accidents 220:*11*
accommodate 78:*7*
accommodations
77:*6* 195:*10*
accompanied 6:*10,
20* 43:*22*
accompany 55:*24*

accomplished
255:*5*
account 178:*16*
179:*25*
accurate 20:*10*
62:*12* 107:*1*
206:*4* 212:*4*
215:*12* 241:*13, 21*
254:*5*
accurately 176:*19*
179:*12* 211:*21*
achieve 18:*11*
36:*3* 185:*22*
acknowledge 5:*16,
19* 210:*11*
acknowledged 30:*4*
ACLU 2:*1* 6:*9, 11,
13* 7:*12*
acquisition 98:*20*
acted 89:*6*
action 256:*16, 19*
active 15:*22, 25*
16:*1* 17:*2*
activities 19:*23*
70:*18, 22* 72:*14*
actual 220:*8*
acute 50:*14*
Adams 48:*2*
adaptation 230:*5*
add 103:*25*
added 103:*20*
104:*14, 25*
addendum 105:*19*
113:*16, 20*
adding 45:*9*
addition 42:*6*
91:*12* 105:*1*
additional 98:*4*
99:*7* 104:*13, 14*
105:*4* 203:*5, 15*
205:*13, 25* 206:*11,
18* 208:*2*
address 88:*3*
102:*16* 197:*7, 10*
218:*20* 219:*2, 8*
220:*1* 221:*1, 4*
addressing 20:*14*
119:*15*
adds 182:*7*
adequacy 133:*22*
134:*3*

accomplished
255:*5*

adequate 110:*19*
111:*3, 8, 22*
112:*22* 120:*10*
141:*15* 143:*17*
168:*11*
adjudging 134:*3*
administer 5:*14,
23* 108:*25*
administered 5:*21*
administering
52:*21*
Administration
4:*1* 5:*20* 34:*8*
232:*11, 21*
adolescence 182:*25*
183:*1*
adolescent 199:*11*
adolescents 33:*20*
85:*16* 86:*9*
adopted 29:*7*
adrenal 139:*15*
adult 43:*20* 183:*1*
adults 33:*18, 21*
36:*21* 51:*12, 14*
advance 227:*9*
advanced 98:*22*
adversities 36:*1*
advertise 206:*21*
advising 71:*6, 7*
advocacy 59:*15*
advocates 47:*16*
48:*12* 50:*20*
advocating 227:*15*
Affairs 63:*6*
affirmative 33:*23*
afford 172:*10*
afraid 157:*23*
192:*15*
Aftermath 142:*7*
AFTERNOON
125:*1*
afterward 192:*25*
age 28:*25* 33:*16*
51:*11* 89:*6* 183:*2*
agency 86:*10*
182:*1, 5, 8*
agent 152:*20*
ages 232:*1*
aggressive 38:*21*
115:*4*

ago 7:9 17:19
47:16 65:17 67:2
98:7 161:20
174:9 202:6, 7
210:1
agree 5:22 6:15,
16, 24 16:3 49:14
80:10 82:4 85:14
86:11 91:1 96:12
109:17 117:19
118:12 119:23
137:19 143:16
144:23 146:23
155:1 182:3
196:7, 16 217:3
225:18 236:1
agreed 3:6 91:2
147:3, 7 148:10
149:1 159:13
226:7
agreed-upon 231:7
agreement 6:5
87:11
agrees 31:13
AG's 252:15
ahead 19:8 34:14
92:15 118:5
140:3 217:25
aids 8:5
ails 189:13
al 210:24 232:8
alarmed 143:22
albeit 27:7
alcoholism 172:21
alerted 162:19
Alex 12:12
alive 126:17
All-Cause 4:1
232:9, 19
all-day 20:11
alleged 110:14
180:10, 15
allegedly 110:2
alleges 110:12
alleviating 246:16
allow 83:6
allowed 77:25
84:11, 15
Almazan 11:7, 12
101:10

A-L-M-A-Z-A-N
11:16 12:11
aloud 231:22
alter 188:18
alternatives 249:5
250:11
altogether 233:11
amazing 227:9
ambiguity 14:19
ambiguous 14:18
ambivalence 41:22
121:11
ameliorate 50:23,
25
amelioration 50:22
Amended 100:13
America 40:21
230:21
American 13:2
18:18 21:23
22:11 97:1
222:11 230:14
Americans 61:2
62:16
amount 56:17
137:8
anally 181:13
analysis 223:11
anatomic 182:8
anatomically 46:9
anatomy 48:25
and/or 255:3
androgen 129:25
anemia 130:21
anesthetic 203:20
ANGEL 1:6 2:13
255:7
Angelina's 74:7
anguished 57:19
announce 160:24
161:2
announced 160:20
announces 89:17
annoyed 150:25
anorgasmia 18:5, 9,
10, 12
answer 8:25
10:22 15:11 18:2
24:4 30:1 31:21
35:9 38:9 39:21
40:22 41:6, 25

43:6 54:24 57:2,
3, 15 62:23 63:13
67:25 68:12
78:12, 13 79:15
81:25 82:2, 3, 17
83:2, 3 84:13
86:20 89:15 90:7
94:9 95:21 96:6,
7, 8, 11, 17 98:11
102:24 104:10
106:2 108:6
121:20, 24 122:3,
5, 7 123:9 133:5
134:19, 20, 22
135:6 137:6
144:16 150:17
151:2, 3 155:25
156:6, 12 157:19,
22 159:4 164:24
165:10, 19 169:1,
11, 16, 24, 25 170:1,
4 171:15 172:2, 4,
22, 24 175:13
179:20 181:3, 5
188:11 190:16, 18
193:18 196:11
197:21 200:9
206:6 208:17
209:17 214:16, 18
216:18 219:20
226:9, 17 234:8,
16, 22 239:23
249:10 251:21
answered 62:8
154:11 171:22
172:2, 23 179:21
answering 99:5
249:11
answers 107:1
174:3 248:4
254:15
Anthony 12:10
antiandrogen
43:23 44:2
anticipates 148:18
anticipation 101:5
119:1
antidepressant
153:24
antidepressants

154:16
anti-nausea 152:19
anxiety 35:21
149:14 189:15
anxious 216:8
anybody 65:9
80:15
Anyway 65:3
119:11 127:21
apologize 73:20
89:2
apparent 104:11
133:15
apparently 41:2
238:11
appear 72:3, 13
94:23 119:24
Appearances
70:16, 23 71:9
72:14
APPEARED 2:1
71:11, 16, 21
254:13 256:5
appears 175:15
appendectomies
249:25
appendicitis 50:14
apple 48:2
applied 78:3 160:3
applies 31:4
apply 98:13
appointment
115:12 191:2
appointments
142:12
appraisal 217:23
appreciate 52:10
160:1 204:9
appreciated 195:13
appreciation 69:19
approach 88:4
91:7, 16 113:17
157:13
appropriate
115:19 117:1, 14,
17 174:6, 12
193:25 194:25
195:16 196:3, 25
197:4, 24 209:8,
13 229:6
approve 86:22

approved 56:20
57:4, 8, 11, 18, 20
64:24 66:3 136:1
137:14
approximately
66:15, 16 103:23
110:9
April 94:13, 17
110:20 120:11
135:15 160:16, 19
256:24
area 29:10 30:22
71:8 84:11
argue 223:7
argument 13:9
arm 132:4
arms 26:16
aroused 18:11
arrangement 6:2
arrest 175:22
arrested 177:4, 17
article 4:1 11:7, 8,
10, 11, 12, 19, 20, 25
12:8, 17 13:1
29:4 44:8 96:16
97:1, 3, 5 101:4, 6,
8, 11 106:5
212:22 223:12
231:1, 5 232:21
articles 11:7 13:7,
9 17:17, 22 95:10,
25 96:15, 18
98:12 99:24
206:24 207:8
ascertain 155:12
aside 20:20 21:10
68:16 85:13 92:9
169:23
asked 20:7, 8
84:20 88:3 92:7
99:6, 7 111:6
120:4 144:10
150:14 165:9
166:21 193:11
223:9
asking 8:15 24:9,
11 39:2, 4, 8
99:23, 24 128:16
133:21 144:19
157:12, 14 160:1
165:5 173:9

175:7, 9 186:24,
25 193:17 204:20
208:12 233:20
234:20
asks 147:17
aspect 21:25 28:8,
22 29:13 55:9
114:11
aspects 29:16
68:5, 13 83:10
144:18 170:10
236:9 237:8
aspiration 23:8
aspirations 17:21
aspire 27:2
aspired-to 34:1
aspires 35:12
assault 175:16
178:14 179:7
180:4, 23
assaulted 174:22
176:6 177:13
178:23, 25 179:8,
23
assented 82:7
asserted 142:19
assessed 249:7
assessment 153:11
170:8 172:1
175:11
Assessments
174:18, 21 175:3
assigned 27:4
28:2 37:21 43:18
45:2 114:13
Assistant 6:21, 23
Association 12:1
18:19 58:18
59:17, 20 224:15
associations 62:19
188:5
assume 30:17
47:1 54:21 66:7
105:24 106:21
236:13 240:10
assuming 5:5 10:4
Asylum 2:4
athletics 75:7
attached 4:2
attack 22:18
149:14

attempt 58:19
162:23 176:13, 16
183:17 187:6
190:3, 10, 21, 23
191:7, 10 195:4
196:15 197:10, 16
attempted 163:17
185:10 191:10
196:4 200:20
attempts 35:21
54:5 194:12
213:19 220:7
attended 66:24
attention 143:9, 18
184:14 185:7
193:25 194:3, 13,
14, 17, 21 195:2
220:14
attitudes 200:3
247:12
ATTORNEY 2:13
6:19, 21, 23 85:22
86:20 87:6, 7, 8
171:13 256:14, 18
attorney-client
170:3
attorneys 13:18
86:5 91:13
109:11, 12 169:22,
23
attracted 240:11,
22 241:3, 7 242:11
augmentation
170:13, 14
August 13:2
136:1 137:14
223:3
author 11:17 12:7,
8 93:3 102:17
216:16, 21
authored 64:25
65:25 245:11
authority 3:7
146:5
authors 53:15
99:14 212:25
223:9, 20
author's 11:15
autocastration
162:23 190:3, 10,
13, 21 193:22

194:8, 11, 16, 18
195:3 196:4
197:16
automobile 220:11
available 98:25
99:2 168:13
189:25 225:24
227:6
Avenue 2:4
avenues 143:10
average 181:19
236:20 237:9
avoid 27:22
aware 13:12, 13
23:4 39:22 40:2,
17 41:7 63:20
80:24 104:21
105:5, 7, 8, 21, 23,
24 106:3 110:24
125:19 126:6
145:9, 11, 13, 16
171:11 241:3, 5,
24 247:9
awareness 123:2
awfully 250:12
251:2
awhile 18:1

< B >
B-A-C-H-M-A-N
101:2
Bachmann 4:1
101:2 244:10
245:7, 12 246:5, 7,
9 247:2, 3, 8, 22
248:9, 15 249:2
250:8 251:4, 8
Bachmann's
244:13 248:7
back 15:21 23:1
25:20 53:23 58:7,
10 93:22 94:11,
19 109:14 110:6,
7 118:16 120:2
124:9 125:3, 10
142:3 144:7, 10,
12 146:18 153:9
154:8, 13 160:6,
11 164:4 171:17,
19 182:9 189:4
192:25 198:21, 24

199:5  200:21
202:18  203:23
221:12  225:7
231:12  236:2, 3
241:1 252:8, 10
**background** 157:19
**backup** 214:1
**bad** 245:3
**balding** 49:4
**baldness** 49:7
142:16
**B-A-L-Z-O** 15:2
**bank** 188:5
**bar** 50:18
**BARBARA**  1:7
2:13 255:8
**barbarian** 89:13
**bariatric** 157:3
**BARRETT** 2:6
6:11
**base** 96:14
**based** 29:23 33:16
34:1 36:25 37:23
38:12 39:5, 8
54:3 61:24, 25
63:25 64:1, 2, 4,
12, 18 65:7, 8
69:11, 18 78:10
108:19 117:13
122:22 149:6, 7, 8,
12, 15 150:6
162:6, 8 174:9
189:11, 19, 24
203:24 208:13
209:6, 10, 12, 14, 25
215:16 222:4
230:5 239:16
242:3 247:7, 20
248:16, 18
**basic** 21:16 123:15
**basis** 16:2, 5, 7
85:19 167:2
204:12 205:15
217:8 223:15
225:15 244:15
**bastards** 185:6
**Battista** 71:13
**battle** 173:18
**battles** 231:2
**beard** 26:16, 23
126:2

**bears** 98:17
186:13 188:14
**began** 17:19
135:15 136:10
**beginning** 93:8, 23
108:23 118:16
204:8
**begins** 106:22
162:13 176:13
182:10 202:24
221:14
**behalf**  75:23
**behave**  240:23
**behaved**  242:4
**behaves** 242:12
**behavior** 77:8
182:17 186:2, 13
241:16 243:3
**behavioral** 115:3
182:23 241:7, 11
**behaviorally** 242:4
**behaviors** 185:11
240:8 243:22
**beings** 56:10
235:15, 16
**BELFORTI** 2:17
5:7, 12 6:18
10:23 58:5
102:22 104:5
121:19, 25 122:2
123:8 124:10, 14
157:21, 24 158:3,
6 169:10 179:19
181:2 196:10
206:5 214:15
218:6 252:4, 17, 22
**belief** 168:5, 15, 21,
24
**beliefs** 39:4, 6
247:21, 23
**believe** 6:22 11:11
12:7 41:12, 14, 25
42:3, 20 54:25
60:11 62:8 68:11
72:9 73:15 75:6
81:7 82:11 83:4
88:18 89:20
101:21 109:22, 24
110:2, 18, 21
112:21 115:18
117:10 120:9

135:12 138:16
152:13 154:20
155:6, 8, 10, 12, 22
156:4 164:3
171:22  174:5
176:10  191:11
201:10  210:10
218:10  219:3
230:25  243:12
247:5 248:13, 15
251:10
**believes** 217:11
251:10
**Bell** 74:22
**beneficial** 81:8, 13,
17, 20 83:4, 13
155:19 170:20
**benefit** 51:18
54:25 83:21
148:17 155:15
159:16 173:24
**benefits** 33:11
52:6 98:15, 16
155:15, 18 226:25
227:1 249:4
250:11, 24 251:1
**benefitted** 226:10
**benefitting** 81:10
**Benjamin** 58:18
59:19
**best** 9:13, 17
18:21 24:2 51:7,
15 52:2 53:2, 14
62:1, 2 64:11
90:5 96:17
125:23 150:20
151:3 157:7
179:12 213:23, 25
215:14 254:5
256:12
**better** 9:10 77:5
81:4 116:16
183:19 184:1, 5,
11 185:13 188:24
219:16
**beyond** 183:15
**bias** 105:17
**biased** 59:13
**biceps** 132:1
**big** 22:8

**BILDNER**  2:6
4:1 5:4, 9  6:7, 8,
16 7:5, 11  10:14,
16 11:1, 2  12:3,
14 45:3 56:23
58:6, 12 68:2
69:24 70:4, 6
73:11, 17 78:14
92:20 93:1
101:21, 24 102:4
105:2 108:24
113:12, 19 121:23
122:6 123:20
124:3, 12, 19
125:2 130:10
144:8, 14, 15
156:14 158:9
169:19, 20 171:17,
21 180:2, 13, 14
181:4 190:17
196:23 198:15, 23
199:4 205:9
207:5 214:17
218:8, 13 223:24
224:2, 7 225:22
232:16, 23 235:9
241:5 244:25
245:3, 9 248:24
249:1 252:5, 10, 24
**biographer** 186:18
**biologic** 48:4
123:17 128:22
**biologically** 27:2
132:20
**biology** 132:11
**birth** 27:5 28:2
37:21 43:19 45:2
212:13
**bisexual** 239:9, 12
240:2, 18 241:14,
18 242:5, 17
**bit** 14:6 70:17
73:19, 20 77:10
120:12 124:17
125:17 135:19
138:13 164:5, 12
182:10 183:16
189:5 190:20
210:7 246:4
**bite** 124:9

**bladder** 206:*15*
**blessing** 80:*3*
**blocked** 248:*22*
**blocker** 130:*7*
**blocking** 115:*7*
129:*25*
**blood** 122:*21*
126:*15* 130:*21*
131:*9, 12, 14*
145:*14, 18, 23*
146:*1, 5* 192:*16*
**bloody** 162:*19*
192:*5*
**blue** 205:*16*
**board** 14:*7* 66:*10*
**board's** 74:*25*
**bodies** 37:*10*
**body** 21:*20* 22:*6,*
*15, 16, 18, 24* 23:*11,*
*12* 25:*18, 25* 26:*6,*
*11, 13* 27:*18* 30:*4,*
*5* 34:*6* 38:*7, 14*
*49:1* 125:*15, 22,*
*24* 126:*3, 6, 15, 20*
127:*17* 131:*10*
141:*24* 170:*14*
182:*2, 5, 8* 184:*24*
194:*5* 216:*9*
227:*14*
**bolded** 138:*3, 6*
**bolster** 246:*19*
**books** 17:*17*
**born** 38:*13*
211:*17* 212:*6*
**Boston** 84:*11*
208:*22*
**bottom** 94:*20*
103:*2* 106:*22*
135:*14* 138:*14*
210:*6* 218:*16*
224:*12* 240:*13*
**Boulevard** 1:*15*
**Boutros** 99:*14*
101:*4*
**B-O-U-T-R-O-S**
99:*16*
**Boyer** 97:*3* 232:*8*
233:*2*
**brain** 157:*2*
**branch** 34:*7* 85:*2,*

*5, 7, 10*
**brand** 128:*18*
**B-R-A-N-S-T-R-O-**
**M** 12:*21*
**Bränström** 4:*1*
11:*9* 12:*17, 19*
97:*5* 105:*9* 106:*4*
222:*11* 224:*5, 8*
**break** 8:*22* 9:*1*
10:*1, 6* 15:*13*
56:*16* 57:*24* 58:*1,*
*2, 7* 123:*21, 22*
124:*2, 4, 20* 125:*6*
198:*14, 18* 251:*24*
**breaks** 124:*5*
**breast** 34:*9*
125:*13* 127:*11, 15*
131:*20* 132:*19, 25*
133:*22* 170:*13*
**breasts** 34:*13, 15*
45:*8, 10* 132:*13,*
*15, 20, 21* 133:*16,*
*20, 24* 158:*18*
**brief** 59:*3*
**bring** 13:*13, 14*
217:*25* 247:*19*
**broad** 48:*1* 186:*2*
**broader** 151:*19*
220:*5*
**broadly** 42:*5*
**broken** 152:*16*
**brought** 75:*2*
186:*4*
**Brown** 88:*16* 89:*3,*
*8* 241:*23*
**Brown's** 11:*6*
**budding** 125:*13*
**build** 34:*14*
**Bureau** 63:*10*
**Burns** 5:*10*
**BUSH** 1:*6* 2:*13*
255:*7*
**busy** 19:*9* 53:*24*
227:*15*

**< C >**
**caged** 77:*11*
**calcium** 131:*2*
**calf** 131:*24, 25*
**California** 72:*3*
85:*8*

**call** 22:*24* 30:*11*
65:*14* 148:*2*
159:*11, 13* 183:*7*
186:*3* 195:*24*
223:*17, 19* 236:*20*
237:*18*
**called** 15:*1* 22:*3*
26:*4* 27:*25* 37:*17*
45:*10, 14, 15* 46:*7*
54:*9* 58:*20* 68:*23*
72:*2, 10, 17* 73:*3*
84:*25* 135:*20*
137:*11* 193:*7*
223:*20*
**calls** 28:*1*
**cancer** 36:*18* 54:*7*
148:*5* 211:*3*
**candidate** 88:*9*
117:*1, 15, 17*
174:*6, 12* 209:*8,*
*13* 229:*6* 245:*22*
**canteen** 195:*11*
**capable** 32:*19*
**capacities** 129:*25*
243:*4*
**capacity** 31:*17*
55:*4* 56:*5* 121:*9*
243:*9*
**capital** 15:*1*
**cardiovascular**
130:*24, 25* 211:*2*
220:*12*
**care** 33:*23* 39:*17*
53:*17, 18* 54:*6*
55:*1, 7* 58:*14*
59:*3, 4, 10, 11*
60:*2, 4, 16, 17, 24*
61:*2, 6, 7, 11, 13, 15,*
*17, 20, 24* 62:*7, 9,*
*10, 15, 18, 25* 63:*5,*
*10, 15, 16, 18, 22*
64:*7, 24* 65:*12, 25*
66:*4, 9* 67:*11*
68:*3, 5, 6, 9, 11, 14,*
*16, 17, 20, 21* 69:*2*
71:*7* 84:*25*
111:*23, 25* 112:*2,*
*3, 19* 131:*8*
141:*15* 142:*20*
144:*18* 146:*4*
167:*21* 168:*10, 11,*

*12, 13, 17* 215:*17,*
*23* 249:*3* 251:*7*
**career** 16:*21*
17:*10* 39:*15* 57:*5,*
*8*
**careful** 64:*21*
119:*17* 143:*18*
228:*22* 229:*5*
**carefully** 36:*7*
219:*11* 231:*9*
256:*9*
**caring** 182:*20*
**cars** 188:*20, 22*
**cartilage** 170:*16*
**CASE** 1:*4* 7:*12*
8:*2, 25* 9:*12*
19:*11* 21:*2, 5*
24:*7* 26:*9, 10*
71:*3* 72:*2, 7, 10,*
*13, 16* 73:*3* 74:*4,*
*7, 22, 23, 24* 75:*6,*
*23* 76:*7, 19, 21*
77:*2, 18, 20* 78:*21,*
*22, 24, 25* 79:*7*
80:*21* 81:*23*
83:*12, 16, 22* 84:*5,*
*9, 17* 87:*2, 9, 12, 18,*
*24* 88:*3, 22* 90:*25*
91:*19, 22* 92:*10,*
*14* 93:*21* 95:*15,*
*19* 96:*10* 98:*5, 13,*
*18* 99:*9* 100:*11,*
*14, 18* 101:*9, 14*
102:*5* 105:*14*
121:*16* 124:*19*
135:*7* 169:*15*
205:*1* 250:*2* 255:*7*
**case-by-case**
225:*15*
**Cases** 4:*1* 71:*10,*
*15, 21, 23* 73:*12*
75:*19, 21* 76:*3, 11,*
*16* 78:*20* 79:*24*
85:*13, 18* 86:*12,*
*16* 92:*19, 23* 93:*11*
**Cassian** 1:*23*
**castrate** 190:*24*
191:*8* 194:*20*
**castrated** 191:*4, 5*

castration 176:*13,
16* 191:7 196:*15*
197:*9*
category 48:*10*
148:*12*
cause 105:*10*
183:*6* 216:*1*
227:*24*
caused 192:*6*
197:*9*
causes 227:*23*
causing 87:*20*
caution 52:*13*
ceased 59:*13*
Cecilia 215:*4, 22*
celeb 105:*10*
cell 49:*1*
cellmates 180:*9*
cells 130:*6*
century 59:*8*
certain 22:*24*
38:*10* 55:*10*
56:*17* 63:*8, 12*
146:*14, 15* 156:*4*
199:*14* 243:*19*
247:*7* 251:*9*
certainly 8:*10*
16:7 17:*4* 24:*17*
33:*24* 49:*16*
56:*12* 65:*7, 8*
105:*10, 23* 134:*13*
201:*7*
certainty 136:*16*
244:*17* 247:*10*
248:*2*
**CERTIFICATE**
254:*1* 256:*1*
certified 14:*8*
certify 254:*3*
256:*4, 14*
chain 247:*14*
chaired 64:*4*
chairman 60:*1*
chairperson 60:*3*
66:*13*
chance 118:*2*
140:7 157:*5*
229:*15* 250:*17, 18*
change 22:*19, 24*
23:9 38:7 104:*17*
130:*1* 150:*9*

185:*15, 17, 21*
236:*23* 239:*17, 18,
19* 255:*4, 8*
changeability
236:8 237:*6, 12*
239:*6*
changeable 237:*11*
changed 55:*20*
59:6 115:*1*
140:*16* 141:*5, 11*
202:7 239:*21*
changes 44:*22*
51:*21* 125:*17, 18,
20* 130:*1, 5*
236:*19, 21, 22, 23,
24, 25* 242:*21, 24*
243:*13*
changing 23:*5, 25*
24:*1* 37:*10* 44:*22*
74:*25*
character 182:*11,
14, 15* 183:*3, 4, 5, 7,
8, 9, 12, 14* 185:*12*
186:*3* 187:*20*
243:*15*
characteristic
119:*13*
characteristics
228:*3, 4*
characterization
215:*12*
characterized
115:*4*
characterologic
108:*8*
charge 175:*20*
charlatans 52:*16*
chart 145:*1*
cheater 182:*22*
checked 136:*25*
237:*23*
Cheshire 176:*17*
chest 26:*16* 147:*9*
chief 115:*9*
child 71:7 75:*1, 4*
202:*15, 16*
childhood 182:*25*
children 29:*7, 20*
30:7 33:*19* 71:*5*
85:*16* 237:*13*
chiseled 61:*21*

choose 13:7   52:*11,
12* 181:*9*
chose 96:*19*
chromosomes 49:*1*
chronic 49:*23*
church 200:*7*
circumference
131:*25*
circumstance 205:*2*
circumstances
69:*13*   78:*23*
112:*1*   195:*3*
Cisgender 4:*1*
132:*18* 232:*3,   5,
10, 20* 233:*9*
235:*16*
cismale 138:*11*
citation 13:*6*
cite 204:*22* 205:*4,
5, 12, 15* 207:*11*
210:*15* 221:*11*
222:*10* 225:*5*
231:*12, 19*
cited 204:*25*
citing 222:*15, 16*
claim 64:*23*
claimed 174:*22*
176:*5*
claiming 58:*21*
174:*23*
claims 109:*25*
201:*2*
Claire 72:*17* 73:*3*
clarification 165:*20*
clarified 179:*22*
clarify 8:*21* 21:*4*
38:6 80:*13*
clarity 27:*11*
**CLARKE** 1:*3* 2:*1*
7:*12* 88:*1* 91:*1, 5,
14* 92:5 95:*2, 5*
97:*23* 98:*2, 21*
99:*8, 12* 100:*1, 3,
7, 21* 106:*14*
107:*3, 6, 9, 15, 18,
22* 109:*16, 17, 22,
24* 110:*10, 19*
112:*22, 25* 113:*2*
114:*1* 115:*19, 23*
116:*3, 9, 11, 23*
117:*1, 9, 14* 120:*9*

121:*5, 17* 128:*4,
12* 129:*19* 135:*1*
136:*10* 137:*20*
139:*18* 145:*2, 13*
146:*23* 147:*1*
148:7 150:*14, 19*
160:*24* 161:*2, 10*
163:*22* 167:*3*
169:8 170:*2*
172:*1* 174:*6, 8*
175:*10, 16* 176:*18*
177:*12* 178:*24*
180:*24* 182:*11*
183:*25* 186:*10, 11*
187:*2, 12* 188:*17*
189:*23* 191:*10*
192:*11* 201:*10, 11*
203:*11* 204:*3*
209:*7, 12, 15*
236:7 238:*14*
239:*9, 10* 240:*9,
17* 242:*13* 243:*16*
249:*3* 255:*7*
**Clarke's** 110:*1*
111:*10* 112:*21*
119:*22* 120:*5*
121:*13* 123:*6*
125:7 135:*15*
136:*14, 24* 137:*2*
140:*9, 15* 141:*5,
10* 143:*1* 144:*20*
145:*1, 17* 146:*20*
151:*4* 162:*8, 22*
166:*10, 11* 170:*7*
179:7 182:*5*
186:4 190:*3, 9, 23*
237:*21* 246:*23*
249:*7*
class 241:*8*
cleanly 212:*1*
clear 24:*11* 26:*24*
51:*12, 13* 102:*20*
151:*15* 154:*2*
156:*2* 213:*6, 20*
235:*20* 236:*17*
clearer 8:*18*
128:*10*
clearly 36:*10* 43:*6*
228:8 235:*23*
237:*2*
clinic 217:*13, 14*

Cassian Reporting, LLC
scheduling@cassianreporting.com

**clinical** 24:*10* 28:*7* 64:*12* 68:*4, 14* 69:*11* 108:*18* 145:*21* 153:*17* 229:*6, 15, 25* 247:*19*

**clinically** 81:*8*

**clinician** 16:*10* 39:*9*

**clipper** 162:*18*

**clippers** 191:*13, 16, 25*

**clitoris** 46:*9* 47:*1*

**close** 49:*12* 61:*14* 64:*17* 178:*1*

**closer** 10:*3*

**closet** 200:*21*

**clots** 130:*21*

**CMS** 97:*6, 11*

**co-authors** 249:*17*

**co-exists** 182:*24*

**cognizant** 56:*16*

**co-head** 57:*19*

**Cohort** 211:*9* 224:*13*

**coincident** 25:*4*

**collapsed** 184:*8, 9*

**colleague** 6:*11, 12, 13*

**colleagues** 7:*14* 18:*22*

**column** 218:*17*

**combination** 131:*13* 152:*2*

**combinations** 127:*23* 128:*3*

**come** 15:*21* 17:*1* 25:*20* 27:*15* 30:*10* 32:*25* 33:*1* 53:*23* 55:*16, 21* 59:*12* 85:*9* 104:*18, 19* 120:*2* 183:*19* 188:*6* 194:*11* 195:*9* 199:*10* 200:*12, 16, 20* 206:*7*

**comes** 51:*8, 10* 65:*24* 89:*1* 112:*11* 147:*9* 153:*13* 202:*11*

**comfort** 183:*18* 187:*8*

**comfortable** 31:*10* 114:*16* 184:*24* 188:*2*

**comfortably** 114:*24*

**coming** 19:*4* 24:*16* 150:*4* 199:*12, 14, 19, 20, 21, 22, 23, 25* 200:*2*

**coming-out** 235:*21*

**comma** 136:*1* 137:*25* 176:*16*

**commanded** 181:*8*

**commenced** 5:*1*

**comment** 242:*9*

**Commission** 63:*19* 254:*23* 256:*24*

**commissioned** 256:*3*

**commit** 213:*22*

**committed** 186:*11, 12* 187:*3, 12* 188:*17*

**committee** 57:*17, 18, 19* 60:*3* 61:*7* 64:*14* 66:*11, 13*

**common** 12:*6* 26:*7, 10* 161:*21* 183:*11*

**commonly** 170:*22* 239:*18*

**community** 166:*9* 168:*14* 171:*1* 172:*8, 18, 19* 201:*8*

**community-based** 112:*2*

**company** 84:*25* 86:*18, 21, 22*

**compare** 212:*18* 214:*2* 222:*6* 224:*25* 225:*19* 234:*6*

**compared** 184:*6* 211:*1, 22* 212:*2, 5*

**compares** 214:*9*

**comparing** 222:*8*

**comparison** 234:*18*

**compassionate** 159:*19*

**competence** 89:*10*

**competing** 68:*17*

**complaining** 121:*14* 191:*1*

**Complaint** 100:*13* 110:*11*

**complaints** 119:*14, 15* 122:*22*

**complete** 9:*19* 14:*10* 53:*14* 71:*18* 73:*12, 16*

**completed** 19:*1* 35:*21* 54:*6* 210:*25* 221:*16*

**completely** 67:*18, 19* 246:*24*

**complicated** 77:*17* 83:*10* 84:*23* 209:*4* 220:*10* 242:*6*

**complication** 115:*14* 204:*15* 205:*18* 207:*3* 208:*1, 5, 14, 18, 20, 23* 216:*5* 250:*2*

**complications** 203:*17* 204:*1, 19* 206:*10* 207:*14* 208:*1, 19* 209:*5* 213:*3*

**complied** 177:*3*

**component** 195:*23* 239:*20* 241:*20, 21*

**compound** 128:*15*

**compromise** 124:*13*

**conceived** 38:*17* 89:*7*

**concept** 25:*20* 37:*24* 69:*18* 81:*6* 151:*10* 160:*3* 165:*2* 174:*14* 182:*15* 183:*15* 196:*22* 239:*21*

**concepts** 23:*2, 25* 52:*8* 79:*10* 82:*11*

**concerned** 139:*24*

**concluded** 225:*9* 253:*2*

**concludes** 252:*12*

**conclusion** 54:*9* 170:*7* 171:*25* 223:*14* 224:*14* 234:*19* 251:*10*

**conclusions** 177:*20* 223:*13* 251:*3, 11*

**condition** 31:*24* 247:*15*

**conditions** 112:*4* 149:*8, 11*

**conduct** 28:*18* 29:*9* 91:*3* 151:*17* 228:*14*

**conducted** 113:*1*

**conference** 107:*10*

**conferences** 66:*23* 67:*3*

**confessed** 181:*23*

**confidence** 246:*20*

**confine** 242:*18*

**confined** 96:*14*

**confirm** 207:*9*

**Confirming** 103:*4* 117:*24*

**conform** 45:*19*

**confused** 113:*20* 118:*15, 24* 165:*19* 245:*13* 246:*4*

**confusing** 19:*25*

**confusion** 22:*7, 9*

**connected** 186:*10* 187:*3*

**CONNECTICUT** 1:*1, 24* 2:*1, 4, 9, 15* 5:*24* 6:*9, 12, 13* 7:*4, 13* 87:*4* 92:*10* 109:*8, 10* 112:*17* 115:*8* 146:*12* 161:*17* 162:*3* 166:*23* 167:*4* 208:*24* 251:*13* 256:*4*

**connection** 17:*22* 35:*25* 175:*24*

**consensus** 60:*20*

**consent** 6:*1* 119:*19* 249:*15, 19, 23, 24* 250:*3, 13, 14*

**consequence** 155:*17*

consequences 35:*11*, *13* 36:*11* 155:*18*

conservatism 129:*18*

conservative 52:*19*, *20* 200:*7*

conserves 126:*20*

consider 15:*24*, *25* 16:*8*, *22*, *23* 29:*8* 35:*3* 45:*6*, *21* 51:*17* 52:*16* 64:*20* 77:*6* 85:*20*, *21*, *22* 95:*18* 97:*21* 124:*1*, *4* 150:*2* 154:*6* 193:*21* 219:*11* 225:*14*

considerable 24:*1* 47:*19* 59:*12*

considerably 98:*22* 129:*11*

considerate 182:*21*

consideration 36:*23* 114:*4*

considered 36:*7* 96:*10*, *25* 97:*2*, *9*

considering 106:*7*

considers 31:*3*

consistency 80:*5*

consistent 37:*20* 141:*14* 149:*25*

consistently 182:*6*

consists 68:*9*

consolidated 237:*16*, *17*

consonant 21:*19*

constancy 23:*2*

constrict 24:*15*

construction 46:*8*, *25*

constructs 47:*20*

consultancy 21:*7*, *10* 73:*21* 74:*16*

consultant 20:*1*, *5* 80:*8* 82:*4* 85:*3* 244:*5*

consultant's 244:*9*

consultation 20:*24*

consultations 121:*1*

consulted 97:*19*

consulting 19:*23* 20:*19* 21:*6* 92:*11*

contemporary 221:*15*

contended 204:*16*

contention 54:*19*

contested 76:*20*

context 28:*23* 91:*18*, *21* 128:*20* 153:*6* 155:*4*, *7* 156:*3*, *8*, *15*, *19* 157:*15* 169:*17* 172:*15* 173:*7*, *15* 200:*1* 203:*12*

contexts 154:*14*

continue 30:*6* 48:*3*, *6* 52:*3* 167:*11* 176:*21* 197:*6*, *24* 216:*1* 225:*13*

continued 54:*10* 166:*2* 202:*23*

continuing 20:*3*

continuous 20:*6*

contract 20:*20*, *22*, *25* 21:*3*

contrast 249:*23*

contribute 182:*4*

control 77:*8* 88:*23* 180:*17* 181:*11* 182:*2* 212:*6*, *7* 243:*20*

controlled 224:*14*, *23* 225:*23* 226:*5*, *21* 227:*6* 228:*11*, *15* 229:*4*

controls 221:*17*

controversial 125:*23*

controversy 24:*1*

convention 25:*17*

conversation 13:*20* 193:*10* 208:*13*

conversations 102:*21*, *25* 169:*12*, *22* 193:*12* 203:*12*

convert 23:*11*

coping 114:*10*

copy 89:*14* 90:*3* 97:*17* 163:*13*

222:*3* 252:*23*

Cornell 208:*24*

correct 7:*17* 12:*17* 13:*3*, *6* 19:*24* 41:*8* 42:*21* 43:*9* 44:*22* 56:*13* 59:*17*, *18* 64:*1* 72:*1* 75:*16* 83:*19*, *20* 90:*10*, *13*, *21*, *22* 95:*3* 97:*15*, *23* 103:*11*, *15* 105:*22* 106:*11*, *14* 109:*18* 123:*3* 127:*22* 129:*22* 134:*24*, *25* 136:*4*, *8* 138:*16* 148:*8*, *9*, *11* 149:*4* 150:*15*, *16* 152:*14* 156:*5*, *10* 163:*3*, *19* 164:*1* 175:*17* 176:*1* 178:*17* 189:*23* 191:*18* 192:*13* 203:*9* 210:*20* 212:*20* 214:*11*, *14* 215:*11* 217:*4* 219:*4* 221:*2*, *8*, *22* 223:*1* 224:*20* 225:*24* 228:*17*, *18* 233:*11*, *25* 234:*7*, *25* 235:*11* 236:*14* 237:*20* 238:*20* 239:*9* 246:*11*, *12*

corrected 13:*5* 72:*6*

Correction 4:*1* 13:*18* 20:*2*, *12* 74:*2* 75:*25* 76:*3* 84:*22*, *24* 87:*4* 92:*11* 97:*4* 109:*8*, *11* 161:*17* 175:*21*, *23* 185:*7* 222:*16* 223:*4*, *18*, *20*, *23* 224:*4*, *8*, *11* 226:*14* 231:*17* 244:*6* 255:*1*, *5*, *6*

Correctional 63:*19* 173:*19*, *20*

corrections 174:*22* 177:*1* 178:*15* 180:*10*, *16* 255:*3*

correctly 11:*13* 24:*21* 27:*1* 31:*25* 88:*14* 97:*8* 110:*16* 141:*2* 142:*24* 160:*22* 161:*14* 162:*20* 164:*16*, *17* 174:*24* 175:*18* 177:*6* 180:*19* 183:*22* 203:*6* 210:*13* 211:*4* 218:*23* 224:*20* 232:*6* 236:*13* 242:*23*

correctness 89:*4*

corresponds 126:*10* 180:*1*

co-sign 83:*7*

cosmetic 159:*8*, *15*

counsel 3:*2*, *6* 5:*15* 6:*1*, *4*, *8* 73:*11* 93:*10* 256:*15*, *18*

Counsel's 158:*6*

count 15:*15* 96:*19*

countless 167:*6*

countries 69:*1* 230:*20*

country 20:*12*

County 84:*10* 85:*6* 254:*11*

couple 198:*14*

course 20:*15* 33:*16* 38:*24* 39:*15* 57:*5* 91:*13* 92:*4* 103:*22* 105:*8* 114:*1* 118:*10* 120:*18* 130:*17* 148:*14* 149:*22* 165:*10*, *23* 169:*5* 184:*12* 186:*18*, *21* 221:*7* 227:*5* 231:*9* 236:*18* 238:*25* 241:*2* 243:*10*, *17* 245:*14*

courses 19:*6*, *11*, *13*

COURT 1:*1* 9:*8* 10:*18* 12:*5* 71:*6*, *7* 105:*14*, *15*

courtroom 26:*2*

courts 61:*19*
cover 225:*13*
coverage 86:*13*
225:*14*
co-worker 14:*21*
create 61:*7* 69:*5*
88:*4* 188:*1, 23*
208:*22*
created 59:*3* 60:*1*
creates 61:*5* 188:*5*
creating 214:*20*
226:*5*
creation 46:*7, 24*
credentials 146:*5*
cricoid 170:*16*
crime 186:*10*
187:*3, 12* 188:*17*
189:*1*
crimes 186:*12*
criminal 186:*4, 7*
187:*19*
crises 53:*22* 55:*21*
111:*23* 169:*7*
196:*22*
crisis 112:*19*
168:*12* 196:*15, 16,*
*25* 197:*4, 13, 16, 20*
198:*2, 4*
crisis-oriented
111:*20* 196:*14*
criteria 22:*10*
28:*10, 12, 13*
32:*15* 147:*13*
148:*25* 196:*20*
234:*13* 249:*4*
criterion 28:*11, 13*
147:*16*
critical 48:*17*
critically 64:*10*
criticism 31:*18*
59:*12*
criticisms 11:*10*
61:*17, 22* 63:*21*
crossed 203:*19*
cross-gender 34:*8*
42:*9*
cross-sex 42:*13, 14,*
*15, 20* 43:*1, 9*
crucial 246:*21*
crystalized 33:*3*

CSR 1:*20* 7:*2*
CT 131:*2*
cultural 25:*17*
112:*4*
culture 110:*24*
202:*12*
cup 45:*8, 9*
cure 47:*17* 48:*13*
49:*15* 50:*13, 14,*
*18, 21, 22* 152:*19,*
*21* 213:*18* 215:*21*
216:*13*
cured 47:*12* 50:*11*
cures 47:*23* 48:*15*
210:*11* 215:*2, 20*
curing 47:*22*
48:*22* 49:*13*
curious 53:*6*
current 59:*4* 60:*8,*
*20* 64:*10* 67:*9, 10*
86:*11* 88:*17* 90:*6*
108:*11, 15* 150:*6,*
*8* 186:*20* 188:*13*
195:*23* 229:*2*
currently 9:*4*
14:*14* 15:*10, 19*
16:*5, 17* 18:*16*
19:*11* 20:*19* 22:*9*
25:*1* 59:*9* 67:*5*
88:*17* 195:*13*
206:*4*
cut 163:*20* 192:*1*
cuts 192:*2*
cutting 191:*24*
CV 4:*1* 14:*6* 70:*2,*
*4, 9, 12*
cycle 36:*13*

< D >
daily 32:*10* 142:*13*
DAN 2:*6* 6:*11, 14*
danger 197:*14, 15*
dangers 52:*25*
250:*16*
DANIEL 2:*10*
DANZER 2:*11*
dash 135:*25*
137:*24* 177:*3*
203:*4*
data 54:*3* 219:*21,*
*22* 223:*11, 15*

225:*10* 227:*9*
230:*21, 22, 23*
235:*19*
database 221:*21*
dataset 97:*6*
221:*21* 222:*5*
231:*16*
date 59:*5* 93:*19*
94:*12* 102:*10*
103:*7, 10, 19*
135:*3* 136:*4*
163:*3* 164:*3*
215:*15* 254:*8*
255:*6, 24*
dated 101:*16*
dates 106:*19*
190:*12*
daughter 55:*18, 19*
Davis 102:*12, 13,*
*22* 104:*4, 7* 169:*14*
day 21:*15* 30:*13*
40:*25* 41:*1*
118:*25* 124:*16*
129:*2, 3* 136:*8*
162:*16* 163:*15*
191:*4, 5* 254:*12*
256:*21*
Dayne 4:*1* 244:*9*
245:*7, 12* 247:*2*
days 15:*12* 54:*10*
203:*23* 213:*24*
215:*20* 255:*6*
day-to-day 37:*12*
D-E 15:*1*
deal 22:*8* 87:*20*
192:*7, 15* 195:*6*
dealing 41:*19*
123:*18*
deals 114:*14*
death 151:*23*
152:*8, 23* 159:*18*
232:*2, 4* 235:*4*
DeBalzo 15:*1*
debatable 31:*20*
decades 39:*10*
December 73:*2*
84:*8* 233:*5*
decide 41:*14, 15, 24*
decided 172:*6*
225:*13*

decides 37:*17* 52:*3*
deciding 245:*22*
deciliter 134:*10*
decision 33:*12*
55:*10* 91:*17* 97:*6,*
*11* 105:*25* 117:*6*
157:*7* 200:*12*
224:*17* 225:*6*
249:*8* 251:*13, 15,*
*16, 17*
decisions 14:*24*
75:*3* 122:*21, 25*
154:*19* 230:*9*
declaration 112:*6*
declare 159:*4*
declared 88:*20*
decrease 34:*10*
54:*14* 126:*7, 9, 23*
131:*21* 132:*4*
140:*25*
decreased 125:*16*
127:*1, 16*
decreases 119:*15*
deem 229:*5*
deep 157:*2*
deeply 68:*8* 98:*8*
159:*22*
defects 3:*10*
Defendants 1:*8*
2:*13* 6:*20, 21* 87:*9*
deferred 57:*21*
deficiencies 214:*6*
deficiency 205:*3*
234:*11*
define 102:*19*
220:*6, 18*
defined 239:*11*
definition 24:*10*
78:*16, 19* 151:*10*
220:*5*
definitive 96:*9*
175:*13*
definitively 106:*2,*
*20*
degree 25:*18* 30:*5*
32:*11* 199:*14, 18*
243:*6, 19*
degrees 22:*13*
32:*12* 46:*10*
deliberate 110:*13*
deliver 54:*14*

delivering 44:7
177:1
De'Lonta's 74:3
demanding 88:6
166:22 167:11
169:9 170:3
171:10 185:5
demands 171:11
184:15
demeaning 181:15
demented 193:13
demonstrate
114:24
demonstrated 40:4
210:25 215:16
237:5, 11 243:17
244:17
demonstrates
214:19 215:19
demonstrating
214:22
Denmark 68:20
Department 13:18
20:2 63:5 72:17
73:3, 4 74:2
75:25 76:3 84:22,
24 87:4 92:11
109:8, 11 161:17
185:6 192:18
244:5
Departments 20:12
dependent 44:8
depending 125:16
132:21 200:3, 4, 5
depends 50:7
102:19 129:1, 10,
12, 18 133:4, 6
200:1 233:17
DEPONENT 1:14
254:1
deposed 7:16, 19,
22 72:12 73:2, 7,
13 105:14
DEPOSITION 1:8
3:8, 13 5:1, 10, 15,
17, 18 6:10, 17
10:17 11:4 13:17,
23 14:1 71:22
72:9, 25 90:2
100:17 101:5
158:7 193:15

253:2 255:8
256:11, 16
depositions 7:24
8:22 9:7
deposits 131:2
depressed 55:14
153:23 216:8
depression 35:20
50:16 156:25
216:8 220:8
247:17
deprived 81:3
describe 62:13
190:22
described 53:1
82:24 105:5
111:10 118:11
149:3 176:19
195:19
describing 204:13
description 62:12
162:22 176:9
177:9 191:18
deserve 194:1
design 218:18
224:13, 14, 23
designated 228:25
designed 126:15
167:13 198:3
desire 45:9
132:19, 24 166:11
170:7 186:14
desired 182:6
desperate 41:19
119:14 174:2
desperation 112:13,
16 117:7 119:15
197:7
despite 217:11
227:15
destructive 185:24,
25
detail 64:14
189:21 246:15
detailed 116:10
details 176:6, 7
178:23
deteriorated 77:2
determine 114:19
131:16 133:2

149:23
determined 132:17
determining 157:13
detransition 39:13
40:11 41:2    200:25
detransitioned
39:14, 22, 25
40:16, 18 41:8
detransitioning
37:17 41:1 200:23
Detroit 18:24
developing 133:16
development
125:14
developmental
154:7 182:17, 24
devoted 40:25
41:1
D-H-E-J-E-N-E
210:24
Dhejne 4:1 97:5
105:22 210:24
215:5 217:3
218:11, 15 219:1
220:25
diagnosed 109:20
147:1, 2, 4
diagnoses 147:10
149:12, 16, 17
177:22
diagnosis 17:2
21:24 22:2, 11, 22
24:19 28:7, 11, 14
109:18 141:20
146:20 147:14, 19,
21, 22, 23, 24 148:2,
3, 4, 5, 10, 18 149:1,
4, 19, 25 150:5, 8
183:11, 15 186:24
235:2, 6 246:1
250:9, 21
diagnostic 22:10
25:23
dialogue 217:1
dictate 111:5
131:4 189:1
die 36:17 227:22
difference 36:23
69:15 70:21, 22,
25 81:19 89:8

different 22:2
26:3 27:8, 15
32:9 44:16 48:21
65:4, 18 68:21
69:9 71:10 78:9
79:10 88:6 96:23
99:5 103:10, 14,
19 112:3 114:18
120:7 127:23
128:2 143:21
153:16, 17 157:10
168:5, 16, 22, 25
172:5, 6 181:19
188:17, 24 196:18
199:21 202:3, 4
207:17 208:17, 25
209:1 219:20
238:20 239:11
240:3 241:16
247:12
differential 141:20
differently 198:11
difficult 10:7, 8
95:21 96:7
199:10 200:1, 3, 4,
5, 6, 8, 9 201:24
difficulties 54:11
120:21 226:5
difficulty 199:12,
13, 15, 19
dig 41:20
dilemma 150:3, 4
dimension 241:6, 7,
11, 12 243:2, 8
dimensions 237:6
241:4 242:15
243:5, 7
diminished 125:14
diminishes 38:1, 8,
11
direct 240:11
251:21
directed 3:4
direction 225:22
directly 17:23
86:24
disability 151:23
152:15, 17, 23, 25
159:19 219:24
disabled 230:18

disagree 89:4
148:14 217:15
220:19
disagreeing 251:8
disagreement 24:2
218:2, 25 220:23
disagreements
216:25
disagrees 217:5, 7,
10, 16
disappear 126:3
127:8 230:3
disappeared 161:23
disappears 37:22
194:16, 18 230:15
disappointment
18:4
disappointments
51:19
disaster 35:24
discern 8:9 33:6,
10 51:25
discerning 8:12
discernment
119:16
discharged 166:17
discharges 49:24
disciplines 65:5
disclosed 84:16
discomfort 22:20
30:5 187:5, 7, 8
discrepancy 178:18
discuss 8:2 13:14
21:14 92:13
104:6 162:16
191:3 210:4
250:18
discussed 78:4
85:4 102:12
119:23 120:5
132:8 133:14
137:12 150:10
156:3 190:13
246:15 249:4
discussing 28:7
60:16 144:2
218:15 232:24
discussion 249:19
discussions 104:4
disease 36:18
54:7 129:14

130:24 131:1
152:1, 10, 11, 19, 21
211:2 220:12
dishonest 185:15
disinterest 29:11
dislike 81:22
disorder 149:14
177:23 183:9
249:24
dispute 136:12
179:2, 3 211:19
disputes 85:15
86:8, 13 217:3
disrespectful 248:6
distinct 154:21
distinction 86:2
219:10
distortion 88:19
distraught 77:3
distress 21:21, 23
22:1, 4, 22 25:21,
23, 24 26:2, 3, 10,
19 27:14 28:7
32:11, 16 37:22,
23, 25 38:2, 3, 8, 12,
22 47:22 48:9
49:5, 23 87:20
116:5 119:13
121:8 147:17
185:6 188:13, 14
193:9, 20, 22 194:4
distressed 22:23
25:14 26:20, 21
34:13 184:13
distribution 66:8
125:17
DISTRICT 1:1
disturbances 115:3
disturbed 161:11
diuretic 43:23
44:1 129:24
divorced 238:14
DIXON 2:8 6:14
dL 138:1, 3
dnoble@fdh.com
2:10
DOC 168:1
175:16 177:13
178:25 179:8
244:13

Doctor 7:16 26:15
36:8 62:5 69:8,
18 81:8 113:14
129:18 131:8, 19
133:24 134:21
141:21 146:4
147:9, 16 159:21
165:15 180:19
191:3 249:20
250:2, 5
doctors 30:17
38:2 39:18, 20
52:19, 21 53:24
65:7
doctor's 44:9
130:24
document 38:24
64:20 69:25
92:18, 20, 21 93:3,
4, 9, 16, 18, 23 94:2,
12, 16 97:15, 16
101:16 245:10
246:10
documentation
180:1, 3
documentations
250:1
documented 36:13
231:9
Documents 94:19
98:5
doing 7:7 85:23
159:2 238:12
dollars 171:3
dose 122:11
123:13, 15 129:7,
8, 9, 15 136:14, 21
137:2 140:15
142:11
doses 44:3 121:17
123:6 140:15
dosing 128:24
130:12
dot 138:15
double-check
137:10
doubled 140:25
doubt 131:24
178:12, 15
doubting 179:23

DR 1:6 2:13 4:1
7:6 11:3, 6, 10
12:4, 15 13:16
14:5 17:7 19:22
21:4, 14 24:4
26:24 32:21 35:2
39:8 41:6, 12
42:4, 23 46:17
47:12 49:14 51:8,
13 53:1 54:24
56:2, 19 57:4, 23
58:13 63:17
65:22 69:21 70:2,
7, 12 73:12, 18
75:10 78:15
79:23 82:15, 23
84:14 85:13 86:7
88:12, 16 89:3, 8,
21 90:7, 24 92:16,
19, 22 93:2, 10
94:14, 21 99:5, 23
101:13 102:2, 6,
20 103:5, 19
104:5 105:5
106:13 109:1, 17
110:8, 18 111:25
112:5, 21 113:21
116:8, 25 117:13,
21 118:9 120:4
121:16, 20 122:4,
7, 25 123:24
124:6 125:3
133:1 136:5
138:12 141:13
142:3 143:1
144:6, 11, 20
145:1 146:7, 18
149:20 150:10
151:13 154:8
156:1 157:21
158:10 160:5
163:3 164:21
168:4, 15, 21
169:8, 10, 21
171:23 172:24
175:1 177:21
178:8 179:20
181:3, 5 182:12
183:25 186:5, 25
188:16 190:3, 18
193:8 194:24

196:*11, 20* 198:*25*
199:*6* 202:*17*
204:*20* 205:*10*
206:*2, 6* 207:*10*
209:*6* 212:*17*
213:*6* 214:*1, 16,*
*18* 215:*4* 216:*15*
217:*3* 218:*14*
219:*1* 220:*22, 25*
224:*9, 22* 228:*10*
232:*25* 234:*5*
236:*3, 15* 237:*20*
241:*23* 242:*10, 20*
243:*24* 244:*4, 22*
245:*12* 246:*5*
247:*1* 249:*9*
251:*23* 252:*1, 12*
255:*7*
**dramatic** 238:*17*
**dramatically** 23:*6*
185:*21* 202:*7*
213:*10*
**drawing** 219:*10*
220:*14*
**dreaded** 216:*5*
**drew** 145:*18*
**drive** 125:*15*
**drug** 137:*7*
**drugs** 177:*1*
**DSM** 183:*8, 10*
**DSM-5** 183:*15*
**due** 177:*23*
**duly** 7:*2* 256:*3, 7*
**dysfunction** 17:*12*
18:*5* 152:*23, 25*
**dysphoria** 16:*11,*
*14, 17, 19* 17:*2, 15*
18:*20, 25* 19:*3*
21:*15, 17, 18, 24, 25*
23:*3, 5, 7, 8, 21, 22*
24:*8, 9, 20* 26:*13,*
*14* 27:*15* 28:*12,*
*21, 23* 29:*4, 24*
30:*8, 18, 22, 23, 24*
31:*6, 8, 12, 16, 24*
32:*4, 6, 9, 18, 22, 24*
33:*2, 4, 5, 7, 14, 15,*
*22* 35:*1, 3* 37:*5,*
*12, 22, 23* 39:*10, 11*
42:*5* 43:*4, 8, 12*
44:*14* 46:*1* 47:*7,*

*12, 17, 19, 24, 25*
48:*6, 11, 14, 16, 19,*
*22* 49:*9, 13, 15, 17*
50:*5, 21, 24, 25*
51:*2, 9, 10* 53:*8*
54:*15, 21, 25* 56:*7,*
*13* 57:*12* 58:*18*
59:*20* 75:*15, 20*
84:*6* 85:*15* 86:*9,*
*14* 91:*7* 109:*16,*
*18, 20, 24* 110:*20*
111:*1, 11, 14*
112:*23* 114:*2, 15*
115:*20* 116:*6, 20*
117:*2, 4, 12*
120:*10* 146:*20, 24*
147:*1, 2, 5, 8, 10, 11,*
*15* 148:*2, 8, 13, 20,*
*25* 149:*3* 150:*11,*
*15, 19, 21* 151:*4, 5,*
*18* 154:*6* 155:*5*
156:*15, 19, 22, 24*
157:*11, 16* 158:*13*
159:*25* 162:*17*
165:*24* 170:*24*
173:*11, 12, 21*
186:*9, 19* 188:*1,*
*19, 21, 25* 191:*3*
193:*9, 20, 23*
194:*3* 196:*9*
199:*8, 9* 201:*15*
210:*11* 212:*9*
213:*1, 18* 215:*2,*
*23, 24* 216:*3, 13*
219:*6, 13, 14, 18, 19*
231:*3* 244:*18*
246:*16* 247:*18*
248:*12*
**dysphoric** 23:*15*
56:*9* 161:*18*
164:*22* 165:*1*
247:*25*

**< E >**
**earlier** 10:*15*
29:*23* 39:*13*
73:*20* 99:*2*
101:*11* 112:*10*
120:*4* 132:*8*
133:*14* 137:*12*
146:*19* 150:*10*

151:*13* 164:*5*
177:*10* 180:*21*
189:*5* 193:*8, 19*
244:*4*
**early** 50:*20* 59:*7*
120:*15* 143:*17*
182:*25*
**earn** 61:*13, 15*
**ease** 38:*22* 187:*6*
**easier** 15:*11*
167:*16*
**easing** 37:*11*
**easy** 199:*25*
**eat** 124:*9*

**ebildner@acluct.org**
2:*5*
**editing** 90:*3* 97:*17*
163:*13*
**edition** 59:*10* 60:*2,*
*4, 8, 9, 21, 22* 65:*1,*
*24* 66:*4, 8* 251:*7*
**editor** 89:*14*
106:*8* 223:*10*
**editorial** 66:*2*
**educate** 83:*9*
**education** 20:*4*
29:*1* 153:*16*
247:*13*
**educator** 82:*12*
**effect** 130:*7*
**effective** 131:*17*
132:*7* 133:*3, 9, 10,*
*11* 214:*14* 218:*21*
219:*2, 5, 7, 9, 12*
220:*17, 20, 21*
221:*2, 5* 227:*11*
228:*16*
**effectiveness**
133:*17* 134:*17, 24*
**effects** 125:*11*
132:*8* 133:*13*
152:*14*
**efficient** 250:*12, 21*
251:*3*
**effort** 179:*4*
**EHR** 95:*5*
**eight** 64:*14* 65:*1*
161:*20, 24* 237:*18*
**eighth** 59:*9*

**either** 54:*2* 63:*20*
72:*13* 145:*25*
146:*3* 151:*22*
161:*5* 234:*24*
**ELANA** 2:*6* 6:*7*
7:*11* 10:*24*
124:*10* 218:*6*
**elect** 19:*20*
**electrician** 238:*2, 5,*
*7, 9, 12*
**electroconvulsive**
154:*25*
**electrolysis** 170:*15*
**electronic** 233:*4*
235:*3* 252:*23*
**Elgudin** 15:*2*
**E-L-G-U-D-I-N**
15:*2*
**E-MAIL** 2:*5, 10, 16*
**embarrassed** 193:*4*
**embedded** 96:*23*
**emergency** 192:*17*
**emotional** 108:*12,*
*15* 174:*2*
**emotionally** 77:*3*
184:*9*
**emphasis** 212:*10*
**employed** 256:*15,*
*18*
**employee** 14:*20, 22,*
*23* 175:*16* 177:*13,*
*16* 178:*25* 179:*8*
256:*17*
**enable** 188:*1*
249:*20*
**encompasses** 239:*1*
**encounter** 145:*21*
**endocrine** 122:*15*
135:*15* 142:*22*
143:*2, 8, 17*
144:*20* 164:*14*
**endocrinologist**
58:*25* 129:*1*
131:*8* 142:*12*
**endocrinologists**
52:*24* 120:*24*
122:*14*
**endorsed** 62:*18, 25*
63:*5, 10, 18*
**English** 221:*25*
222:*1*

enhancement 170:12
enlighten 160:2
ensure 231:8
entail 43:17 191:25
enter 28:17 87:11
enters 188:4
entirely 88:23 184:18
entitled 175:3 232:9
entries 100:6
environment 200:5
equals 137:25 138:2
equanimity 185:4
equipped 133:25
erectile 18:5 29:10
erection 126:18 127:2, 16
erections 121:7 126:8, 10, 18, 23 142:13
erotic 241:6, 11, 19
error 138:25 139:12 140:8 141:22
error(s 255:3
errors 90:1
especially 10:7 36:21 41:18 174:1 209:4 240:7 241:25 250:4
ESQ 2:6, 10, 11, 17
essential 246:17
establish 82:13 225:23 226:13
established 20:5 44:7 112:25 235:23 237:2
establishes 197:15
establishing 143:7
estimated 250:9
Estrace 128:13, 14 129:15 130:11 136:20
estradiol 128:17, 19, 20, 25 136:20

137:25 139:1, 8 140:16, 25 141:17
estrogen 34:23 43:21 44:5 122:10 126:2 128:15 134:7, 16, 22 141:25
estrogenized 121:15
estrogens 120:17 132:13
et 210:24 232:8
ethical 36:8 158:17 159:2 174:14 249:21
ethicists 159:1
e-tran 252:25
Europe 22:2 68:22
Europeans 22:9
evaluate 20:8 68:7 84:20 85:6, 9 87:19 131:20
evaluating 61:9 229:1
evaluation 74:3, 6 76:1 104:16 156:20 228:23 245:21 246:1 250:21
evaluations 73:24
evaluator 197:23
evening 11:5
event 36:6 191:4 194:25 195:16 196:8
events 220:9
eventually 91:16 171:13 175:22 194:21
Everybody 158:16, 17 229:9 230:21 243:6
evidence 54:17, 19 62:1 80:25 89:13, 14 243:18
evidenced 185:11
evolution 243:6
evolutionary 243:8
evolved 58:17 59:2, 4
evolving 23:18

exact 107:14 128:23
exactly 48:7 63:16 64:5 66:16 82:17 84:1, 4 87:15 96:15 128:16 153:19 178:12, 16 184:22 189:3 195:19 217:5, 16
exaggerating 148:17 167:22
EXAMINATION 4:1 7:5 64:21 131:2 145:20 147:23 256:10
examinations 133:19
examine 78:6 133:20
examined 133:24 256:9
example 17:3 22:14 23:10 26:12 27:19 29:3 49:4 63:6 68:23 72:2 80:21 95:5 97:17 100:13 105:12 131:20 133:15 139:15 154:25 159:11 195:11 201:5 206:12, 13 213:7 219:24 236:8 247:16
examples 77:14 100:2
Excellent 8:11 101:24 111:23 249:6
exception 8:24 100:23 159:9
excising 163:18
excited 184:10
exclamation 138:18, 22 139:25
Excuse 10:11 34:19 77:21 198:13 199:1
executive 14:24

66:11
exempted 172:25
Exhibit 4:1 70:1, 2, 11 92:21, 22 101:22, 25 102:1 135:11 160:11 202:18 218:9, 11 224:3, 4 232:17, 18 236:3, 5 245:2, 5, 6
EXHIBITS 4:1, 2 92:19, 23 93:11 252:14
exist 49:10
existed 215:15
existence 226:20
existing 64:21 225:8
exists 33:9 39:1 182:24
expand 18:3
expanded 220:20
expect 31:13 138:9 191:24 204:17, 18 207:24 209:3
expectations 143:13 168:6 246:23
expected 141:17
experience 28:20 29:24 37:15 39:5, 6, 9 40:11 50:3 64:12 146:9, 10 149:24 153:17 189:16 199:7 203:20 204:19 208:2 229:25 248:17
experienced 115:13 120:23 176:2 178:20 186:2
experiencing 194:4
experiment 229:21, 23
Expert 4:1 61:9 69:23 70:16, 17, 22, 23 71:9, 11, 16, 19 72:7, 8, 13, 21, 24 74:10, 19

84:*16* 85:*14*
86:*12* 87:2, *3*
91:*12, 18, 22* 92:*9*
95:*15, 19* 96:*10,*
*25* 97:*19* 98:*1*
100:*22* 102:*1, 5*
122:*15* 165:*16*
**expertise** 149:*24*
**experts** 25:*9*
**expires** 254:*23*
256:*24*
**explain** 10:*12*
80:*9* 105:*15*
113:*21* 119:*3, 20*
120:*1* 132:*23*
134:*1*
**explained** 24:*18*
81:*25* 96:*6* 155:*7*
167:*9, 10*
**explanation** 119:*4*
148:*21*
**exposure** 153:*17*
**express** 26:*22* 37:*9*
**expressed** 178:*11*
179:*16* 193:*6*
**expression** 81:*7*
202:*9*
**extended** 209:*20*
**extends** 18:*1*
**extensive** 108:*10*
156:*20*
**extensively** 174:*10*
204:*12*
**extent** 51:*3* 98:*12*
145:*9, 11* 155:*13*
169:*12* 227:*1, 18*
**external** 95:*10*
96:*20* 97:*8, 18*
99:*10* 121:*1*
246:*18*
**extremely** 77:*2*
185:*23*
**extremity** 142:*14*
**extruded** 162:*18*
**eye** 121:*12*
**eyes** 103:*16*

**< F >**
**face** 34:*16, 17*
142:*15* 176:*24*
**facets** 29:*21*

**facial** 142:*15*
168:*2* 170:*15*
**facilitated** 66:*7*
**facility** 115:*9*
176:*22*
**fact** 23:*14* 33:*10*
37:*7* 38:*12* 41:*17*
48:*25* 63:*14* 70:*9*
75:*2* 80:*15* 83:*18*
89:*11* 96:*22*
102:*8* 115:*6*
116:*19* 132:*14*
145:*5* 162:*4*
171:*11* 173:*10, 16,*
*21, 22* 178:*10, 12*
181:*21, 22* 183:*25*
206:*2* 215:*21*
217:*13* 220:*14*
228:*2* 238:*1, 13,*
*19* 239:*8, 10*
240:*16*
**factor** 170:*8*
171:*25*
**factors** 132:*22*
**factually** 104:*2*
**Faculty** 19:*3*
**failing** 183:*18*
**Fair** 14:*4* 62:*17,*
*20, 24* 63:*4, 9, 17*
111:*19* 222:*5*
**faith** 154:*20*
**falls** 148:*12*
**familiar** 69:*2*
74:*23*
**families** 65:*6*
**family** 51:*21*
199:*23* 200:*3*
**fantasy** 36:*24*
116:*24*
**far** 9:*23* 65:*19*
77:*17* 110:*21*
111:*11* 129:*5*
196:*13* 202:*24*
203:*3* 210:*8*
**farm** 120:*24*
**farmed** 84:*24*
**fashion** 37:*14*
181:*21*
**fat** 34:*10* 125:*17*
**father** 30:*6*

**fear** 41:*23*
**fearing** 48:*3* 177:*2*
**feature** 27:*24*
**features** 49:*2*
**Feb** 140:*22*
**February** 103:*7*
113:*22, 25* 141:*6, 9*
**Federal** 63:*10*
229:*24*
**Fee** 4:*1* 92:*19, 23*
93:*11*
**feel** 8:*16* 22:*14*
26:*5* 28:*2* 31:*3*
33:*23* 34:*12* 45:*5,*
*18* 46:*12* 48:*7*
52:*14* 85:*25*
108:*16* 111:*2*
132:*3* 179:*14, 21*
183:*19* 188:*2*
194:*1* 195:*12*
219:*16* 249:*6*
**feelings** 50:*9*
89:*22* 188:*6* 243:*3*
**feels** 81:*3* 147:*25*
173:*23, 24* 194:*12*
**fellatio** 181:*14*
**felt** 27:*14* 47:*16*
184:*1* 212:*25*
**female** 23:*11, 12,*
*16* 27:*25* 34:*20*
38:*14, 15* 43:*25*
47:*20* 48:*5* 50:*6*
79:*21* 114:*25*
115:*7, 8, 9* 183:*17*
195:*11* 212:*5*
**female-acceptable**
49:*21*
**female-appearing**
47:*21*
**female-looking**
49:*21*
**femaleness** 45:*19*
**female-resembling**
48:*21*
**females** 18:*15*
49:*5* 213:*11*
**feminine** 22:*14*
23:*12* 28:*5* 30:*3*
37:*7* 38:*8, 18, 19*
48:*23* 181:*17*

**femininity** 37:*9*
45:*19*
**feminization**
142:*15* 170:*15*
**field** 25:*9* 44:*21*
56:*23* 85:*24* 98:*9,*
*20, 21* 105:*12*
122:*23* 226:*16*
**fifth** 60:*1, 4, 22*
64:*25* 65:*24* 66:*4,*
*8*
**fighting** 83:*8*
**figure** 59:*1* 85:*8*
158:*24* 203:*24*
204:*21, 22* 205:*14*
209:*2*
**figures** 206:*7*
**filed** 110:*10*
**filing** 142:*20*
**filings** 100:*10*
**filled** 237:*24* 248:*3*
**final** 97:*6* 105:*25*
107:*9* 213:*17*
**finalized** 10:*21*
**finally** 238:*7*
**financially** 256:*19*
**find** 25:*8* 27:*9*
34:*14* 78:*9* 96:*14*
119:*2* 158:*23*
166:*11* 171:*4*
183:*18* 201:*24*
207:*8* 221:*25*
228:*15*
**finding** 188:*12*
**findings** 217:*11*
**fine** 5:*5, 10* 7:*8*
8:*13* 9:*3* 10:*5*
55:*22* 58:*2, 6*
192:*10* 203:*19*
**fingernail** 162:*18*
**fingers** 203:*19*
**finish** 82:*22* 92:*1*
168:*19* 205:*10*
**finished** 90:*7, 8*
154:*9, 10*
**FINN** 2:*8* 6:*13*
**firm** 86:*17*
**first** 7:*1* 8:*3* 10:*1*
11:*11* 12:*7* 21:*16*
23:*22* 24:*6* 29:*3*
31:*23* 46:*20*

60:*16* 81:*4* 93:*2*
99:*14* 105:*6*
109:*16* 110:*8*
114:*14* 136:*25*
174:*20* 190:*22*
197:*1* 201:*16*
202:*22* 209:*10*
210:*23* 244:*11*
246:*13*
**five** 15:*12* 17:*15*
40:*3, 9* 71:*10*
110:*9* 140:*7*
230:*6* 237:*8*
**five-minute** 58:*2*
**fix** 204:*1* 216:*9*
**Florida** 72:*17, 20,*
*24* 73:*3, 4* 77:*18*
**focus** 116:*5* 219:*19*
**focused** 17:*10*
49:*9* 51:*1*
**focuses** 49:*10*
**focusing** 237:*8*
**follow** 61:*3* 63:*15*
219:*15, 18*
**followed** 61:*4*
62:*15* 211:*13*
**following** 30:*2*
61:*19* 256:*6*
**follows** 7:*4*
**follow-up** 39:*20*
40:*7, 20* 53:*12*
65:*9* 211:*7* 226:*1*
228:*24* 229:*5, 8, 9,*
*10, 11* 230:*21*
251:*19*
**font** 103:*14, 19*
**foolishness** 38:*3*
197:*7*
**force** 155:*21*
**forced** 177:*24*
**forces** 33:*2*
132:*17* 215:*25*
**Ford** 18:*24*
**foregoing** 254:*4, 15*
**forehead** 45:*17, 18,*
*21* 48:*2*
**forensic** 104:*16*
**forget** 147:*16*
**forgot** 93:*12*
**form** 3:*4* 16:*24*
43:*21, 25* 48:*21*

51:*16* 118:*14*
119:*13* 121:*19*
122:*3* 123:*8*
157:*5* 179:*19*
181:*2* 182:*11*
183:*11* 185:*11*
194:*15* 196:*10*
206:*5* 214:*15*
**formal** 183:*15*
**formation** 29:*19*
**forms** 23:*5, 20*
44:*5* 88:*6* 116:*4,*
*9* 237:*24*
**forth** 44:*9* 129:*14*
200:*6*
**forward** 249:*8*
**found** 9:*10* 40:*8*
60:*25* 190:*6*
199:*10* 221:*15*
**Foundation** 103:*3*
117:*23*
**four** 16:*25* 19:*20*
40:*2* 73:*14* 96:*15*
110:*9* 177:*3* 210:*4*
**four-hour** 19:*2*
**free** 8:*16* 126:*13*
148:*14* 214:*20*
**freeze-frame**
161:*25*
**frequency** 54:*5*
127:*1*
**frequently** 17:*14*
**friend** 200:*4*
**frightened** 192:*16*
**front** 137:*5*
**frontal** 49:*4*
**frustration** 162:*8*
**full** 176:*12*
**Fuller** 72:*11*
**full-time** 15:*4*
**fully** 249:*7* 250:*10*
**function** 29:*10, 14*
30:*7* 32:*13, 14, 17*
77:*4* 91:*11*
159:*19* 193:*14*
**functioning** 29:*7,*
*17* 54:*16, 18, 23*
**fundamental** 159:*2*
246:*15*
**fundamentally**
185:*15, 16*

**further** 3:*10, 12*
5:*19* 41:*20*
104:*12* 114:*3*
134:*1* 192:*7*
256:*14, 17*
**future** 36:*4* 42:*19*
46:*6* 88:*10* 114:*5*
152:*1, 11* 167:*16*

**< G >**
**gain** 201:*24*
**Galveston** 66:*25*
**gang** 175:*20*
176:*24*
**Gates** 1:*15*
**gather** 63:*21*
242:*22, 23*
**gay** 199:*13, 15*
202:*5* 235:*21*
240:*25*
**gay-to-be** 202:*5*
**GCS** 210:*10*
**geared** 169:*7*
**gender** 16:*10, 14,*
*17, 19* 17:*2, 15*
18:*20, 24* 19:*3*
21:*15, 17, 18, 19, 24*
22:*3* 23:*3, 5, 7, 15,*
*21, 22* 24:*7, 9, 19*
25:*3* 26:*6, 12, 14*
27:*15* 28:*5, 12, 21,*
*23* 29:*3, 24* 30:*8,*
*17, 22, 23* 31:*5, 8,*
*12, 16, 23* 32:*3, 6, 9,*
*18, 22, 24* 33:*2, 3, 4,*
*7, 14, 15, 22* 34:*1, 2*
35:*1, 3* 37:*5, 12,*
*18, 20, 22, 23* 38:*6*
39:*10* 41:*10, 13*
42:*5* 43:*3, 7, 12*
44:*13* 45:*25* 47:*6,*
*12, 17, 25* 48:*6, 11,*
*13, 15, 22* 49:*8, 13,*
*17* 50:*5, 20, 23, 25*
51:*2, 8, 10, 22, 23*
53:*7* 54:*15, 25*
56:*7, 9, 13* 57:*12*
58:*18* 59:*20*
62:*10* 75:*4, 15, 20*
82:*11* 84:*6* 85:*15*
86:*8, 13* 89:*18*

90:*6* 91:*7* 95:*6*
98:*16* 103:*3*
109:*16, 18, 20*
110:*20* 111:*1, 11,*
*14* 112:*23* 114:*2,*
*12, 13, 15* 115:*20*
116:*6, 20* 117:*2, 4,*
*12, 23* 120:*10*
146:*20, 23* 147:*1,*
*2, 5, 6, 8, 10, 15*
148:*2, 7, 13, 20, 25*
149:*3* 150:*21*
151:*4, 17* 154:*6*
155:*4, 5* 156:*15,*
*19, 22, 24* 157:*11,*
*16* 158:*13, 15*
159:*25* 161:*18*
162:*17* 164:*22*
165:*1, 24* 170:*24*
173:*11, 12, 21*
185:*16, 17* 186:*9,*
*19* 188:*1, 18, 21, 24*
191:*3* 193:*8, 19,*
*22* 194:*2* 195:*22,*
*24* 196:*9* 199:*7, 9*
201:*14* 210:*11*
212:*8* 213:*1, 18*
215:*2, 23* 216:*2,*
*13* 219:*6, 12, 13, 18*
231:*3* 236:*10*
237:*1, 14, 18*
243:*23* 244:*18*
246:*16* 247:*17, 25*
248:*12* 249:*23*
**Gender-Affirming**
12:*1* 211:*23*
212:*3, 18, 19*
222:*21* 224:*15, 17*
**gender-atypical**
202:*15, 16*
**gender-
confirmation**
44:*17* 46:*18*
**gender-confirming**
99:*22*
**Gender-conforming**
44:*20, 24* 45:*4, 7,*
*10, 15, 16, 22* 46:*19*
211:*23* 212:*3*
**gender-fluid** 23:*18*

**GENERAL** 2:*13*
6:*21, 23* 21:6, *9*
28:*12* 30:*21*
33:*13* 35:*17* 43:*5,*
*16* 50:*13* 69:*7*
78:*22* 85:*22* 86:*5*
91:*15* 111:*23*
116:*20* 125:*21*
130:*22* 153:*9*
159:*20* 168:*4*
176:*23* 208:*23, 24*
211:*1, 25* 212:*4*
213:*11* 214:*10, 25*
219:*22* 230:*3*
235:*13* 242:*14*
**generalized** 149:*14*
**generally** 21:*18*
22:*24* 33:*21*
46:*11* 62:*3*
127:*21* 129:*2*
131:*5* 133:*19*
149:*16* 206:*21*
**General's** 6:*19*
87:6, *7, 8*
**genetic** 49:*3*
132:*22*
**genetically** 132:*17*
**genital** 13:*10*
45:*13, 23* 46:*1*
47:4, *5, 16, 19, 20,*
*23* 48:*19* 49:*14,*
*15* 50:*23* 54:*21*
57:*8, 12* 82:*15, 25*
83:*4, 12, 18, 22*
88:*10* 109:*24*
114:*4* 115:*18*
117:*15* 150:*10, 14,*
*19* 151:*4* 170:*20*
172:*25* 173:*3, 7, 9,*
*13, 17* 174:*6, 12*
182:*4* 203:*8, 11,*
*23* 205:*19* 208:*15*
209:*5* 210:*19*
213:*1* 215:*2, 23*
219:*6, 13, 19*
220:*16* 226:*6, 11*
228:*12, 22*
**genital-confirming**
35:*16*
**genitalia** 34:*19, 21*
46:*19* 47:*7, 21*

48:*5* 49:*21* 50:*6*
51:*1* 150:*22*
**genitals** 34:*20*
48:*19* 49:*19, 20*
50:*3*
**GERALD** 1:*6*
2:*13* 255:*7*
**Germani** 1:*20* 7:*2*
256:*2, 24*
**getting** 120:*21*
121:*1* 143:*19*
171:*13* 194:*13*
**give** 9:*11, 17, 19*
18:*23* 20:*3* 21:*24*
22:*22* 38:*16*
52:*14* 70:*1* 90:*15*
100:*2* 118:*2*
148:*20* 152:*19*
154:*19* 168:*2*
192:*8* 197:*23*
227:*23* 229:*21*
230:*1, 23*
**Given** 7:*22* 20:*11,*
*16, 17* 24:*7* 26:*8*
33:*10* 40:*9* 56:*12*
80:*3, 5* 81:*22*
95:*24* 112:*1*
122:*11* 127:*23*
144:*21* 148:*12*
156:*6* 157:*7*
170:*25* 173:*10, 15*
194:*17* 203:*22*
224:*12* 239:*13*
240:*20* 248:*15*
254:*4* 256:*12*
**gives** 112:*15* 210:*1*
**giving** 19:*17*
20:*13* 80:*3* 82:*7*
153:*23* 195:*11*
**glad** 50:*6* 231:*4*
**gland** 139:*16*
**glands** 46:*4*
**glib** 80:*19* 219:*25*
**glibly** 30:*16*
**go** 8:*23* 9:*25*
10:*14* 18:6 19:*8*
28:*18* 30:*13*
34:*14, 17* 52:*15*
73:*18* 87:*16*
92:*15* 94:*11*
105:*3, 14* 109:*14*

110:*6* 114:*16*
115:*15* 118:*5, 15,*
*18* 124:*21* 140:*3*
142:*3* 143:*11*
144:*7* 146:*18*
149:*19* 153:*9*
164:*9, 12* 177:*19*
198:*17* 202:*4, 17,*
*21* 203:*19, 21*
207:*24* 217:*25*
218:*5, 16* 221:*12*
231:*12* 236:*2*
**goes** 50:*2* 183:*15*
195:*12* 204:*5*
210:*6*
**going** 10:*18, 23*
18:*21* 24:*14* 33:*6*
36:*25* 40:*24*
46:*23* 66:*23* 67:*2*
73:*18* 75:*8* 92:*14*
93:*22* 94:*11, 19,*
*23* 103:*1* 104:*5*
105:*3* 117:*21*
118:*2, 5, 6, 23*
124:*15* 125:*25*
126:*19* 132:*12, 13*
133:*5* 138:*12*
139:*13* 142:*10*
143:*10* 144:*6*
146:*16, 18* 154:*8,*
*13* 155:*25* 159:*6,*
*7* 160:*5* 166:*16,*
*17* 167:*12* 169:*10,*
*17* 170:*18* 175:*21*
176:*11* 177:*19*
182:*9* 185:*22*
189:*4* 192:*7*
195:*5, 7, 20, 21, 25*
197:*18* 198:*9, 10*
202:*17* 217:*25*
218:*6* 221:*10*
225:*22* 228:*21*
229:*18* 231:*14*
236:*2* 240:*10*
244:*20* 249:*10, 18*
**gold** 61:*21*
**Good** 6:*7, 18* 7:*6,*
*8, 9* 10:*4* 11:*1*
46:*17* 47:*3* 68:*9*
89:*14* 111:*24*
154:*20* 217:*12*

232:*7* 251:*16, 22*
252:*4*
**gorillas** 38:*21*
**gotten** 121:*4*
**governmental**
86:*10*
**gown** 133:*25*
**grab** 124:*9*
**Grace** 2:*17* 6:*12*
**grade** 232:*7*
**graduate** 247:*16*
**grand** 17:*14* 18:*23*
**grandiose** 52:*16*
**grasp** 8:*16* 52:*8*
**grave** 214:*5*
226:*22*
**gravely** 184:*13*
**Great** 9:*25* 19:*22*
21:*13* 42:*25*
54:*18, 19* 64:*14*
87:*20* 132:*24*
192:*6, 15* 194:*3*
237:*11* 252:*5, 25*
**greater** 234:*21*
**greatly** 33:*16*
**grievances** 88:*7*
**grossly** 142:*22*
143:*2* 144:*21, 24*
164:*15, 23* 173:*7*
**ground** 7:*23* 8:*2*
**group** 14:*25* 54:*4*
58:*23* 60:*1* 65:*4*
158:*23* 159:*13*
200:*4, 8* 212:*7*
230:*7, 9*
**groups** 212:*6*
**grow** 202:*14*
**growing** 34:*9*
201:*11, 23* 202:*1,*
*15*
**growth** 125:*24*
127:*11, 15* 131:*20*
133:*22*
**guaranteed** 202:*25*
203:*4*
**guard** 162:*19*
**guess** 7:*21* 16:*3*
24:*23* 28:*6* 33:*17,*
*18* 41:*10* 46:*18*
71:*10* 78:*12*
86:*20* 88:*8* 96:*18*

97:*11* 104:*10*
137:*5* 145:*9*
153:*22* 154:*13*
181:*20* 191:*23*
196:*2* 202:*23*
221:*20*
**guessing** 106:*20*
**guideline** 69:*15, 17*
**guidelines** 60:*18,
19* 62:*9* 65:*5*
69:*5, 7, 10* 91:*10*
**guy** 251:*14*

< H >
**hair** 26:*11, 13, 16*
77:*23* 78:*4, 25*
125:*22, 24* 126:*3,
6* 127:*17* 142:*14*
168:*2, 3*
**hairline** 167:*25*
**hairstyle** 77:*20, 22*
**hairy** 125:*25*
126:*1*
**half-day** 19:*19*
**half-hour** 13:*20*
**hand** 220:*1* 256:*20*
**handle** 24:*2*
**handling** 69:*5*
**hands** 178:*20*
180:*8*
**handwritten**
110:*10*
**happen** 18:*14*
143:*14* 146:*8, 9,
13* 166:*9*
**happened** 54:*3*
64:*6* 65:*14*
140:*18* 146:*13*
162:*25* 164:*3*
178:*6, 13, 19*
179:*7* 180:*23*
181:*21, 22* 184:*12*
187:*23*
**happening** 194:*18*
**happens** 19:*15*
30:*16* 38:*20* 49:*5*
53:*22* 146:*11*
182:*2* 194:*6, 15*
198:*2* 229:*19*
230:*5, 13, 16*

247:*13*
**happily** 230:*17*
**happiness** 35:*24*
**happy** 8:*20* 13:*14*
36:*25* 49:*25* 58:*3*
184:*25* 203:*21*
216:*10* 220:*3*
**hard** 11:*18* 15:*22*
65:*1* 79:*15*
112:*16* 120:*20*
131:*23* 132:*23*
158:*11*
**hard-hearted** 81:*11*
**harm** 110:*14*
158:*22* 227:*2*
234:*21, 22*
**harming** 227:*18, 19*
**harms** 51:*20*
228:*4* 250:*23, 25*
**Harry** 58:*18* 59:*6,
19*
**Hartford** 1:*24* 2:*4,
15*
**Harvard** 19:*2*
**has/she** 249:*21*
**hate** 26:*11, 15, 16,
17, 18, 22* 27:*17, 18,
19* 159:*6* 194:*5*
216:*9*
**Hawes** 2:*21*
**HBIGDA** 66:*18*
158:*15, 24*
**he/she** 254:*14*
256:*9*
**head** 57:*18* 217:*14*
**heading** 44:*24, 25*
45:*1* 73:*21* 94:*19*
95:*1* 142:*7*
**Health** 4:*1* 12:*2*
13:*11* 17:*25* 19:*2*
20:*17* 55:*3, 4*
59:*17* 62:*19* 63:*1,
2* 68:*7* 74:*18*
81:*1* 84:*25* 90:*10,
20* 111:*18* 112:*15,
19* 130:*22* 153:*6,
10, 13, 15* 154:*14*
168:*6, 16, 22*
169:*6* 189:*22*
196:*13* 197:*14*
198:*3, 7* 201:*21*

210:*12, 20* 214:*23*
218:*19* 219:*7, 22*
220:*3, 5, 6, 9, 13*
222:*20* 224:*16*
228:*23* 229:*2*
232:*11, 20* 233:*5*
247:*11*
**Healthcare** 63:*19*
161:*19* 168:*7, 23*
**healthy** 158:*16, 21*
159:*10, 23*
**hear** 8:*6, 8* 9:*5*
11:*12* 27:*1* 31:*25*
57:*13* 121:*25*
173:*25* 195:*7*
**heard** 7:*23* 88:*14*
112:*18* 167:*14, 21*
**hearing** 8:*4, 5, 12*
157:*1*
**heart** 36:*18* 54:*7*
69:*16* 129:*13*
131:*3*
**heavily** 37:*24*
**Heights** 1:*15*
**he'll** 10:*25*
**help** 33:*6, 9* 34:*8*
38:*6* 50:*15* 51:*24*
77:*10* 81:*12*
82:*12* 102:*11, 19*
116:*15* 117:*4, 6*
154:*21* 168:*2*
171:*13* 187:*10*
195:*5, 8* 209:*21*
215:*22* 216:*6, 7*
226:*9*
**helped** 102:*13, 15*
244:*19*
**helpful** 48:*18*
80:*10* 89:*24*
96:*21* 110:*4, 5*
247:*24*
**helping** 32:*23*
37:*7* 38:*5* 187:*16*
227:*20, 21*
**helplessness**
180:*17* 181:*11*
182:*1, 7*
**helps** 38:*11* 247:*24*
**Henry** 18:*24*
**hereto** 256:*18*
**hereunto** 256:*20*

**HERLING** 2:*8*
6:*14*
**hesitate** 30:*1*
217:*9*
**hesitating** 35:*8*
234:*8*
**heterosexual**
238:*21*
**hide** 63:*14*
**hiding** 184:*9*
**high** 35:*19* 50:*18*
52:*1* 120:*13*
127:*20* 138:*7*
213:*15*
**higher** 35:*17*
36:*19* 116:*20*
121:*17* 123:*7*
138:*24* 210:*25*
211:*2* 221:*16*
**him/her** 254:*15*
**hip** 170:*12*
**hire** 85:*2* 86:*10*
100:*25*
**hired** 75:*25* 76:*2*
85:*5* 86:*22, 23*
87:*18* 90:*24*
92:*10* 251:*15*
**hires** 86:*9, 16, 18*
**hiring** 171:*12*
**his/her** 256:*16*
**historical** 24:*23*
186:*14, 17*
**Historically** 45:*12,
23* 188:*3*
**histories** 201:*7*
**history** 32:*24*
129:*13* 131:*1*
135:*20* 137:*11*
160:*2* 165:*4*
172:*16, 20* 173:*16,
19* 186:*5, 7*
187:*18, 19, 20*
188:*15* 189:*6, 18,
22* 190:*1, 9*
195:*22* 236:*18*
238:*18* 239:*25*
240:*7*
**histrionic** 117:*6*
**HIV** 54:*8*
**hold** 135:*8* 160:*8*

170:6
**home** 14:2 203:21
**homework** 251:9
**Homicide** 4:1
232:9, 18
**homosexual**
235:19 238:22
**honest** 81:7
182:19 185:17
209:24
**hope** 35:15 96:6
112:15 124:6
144:5 151:1
174:3 177:8
185:21 247:7, 8
248:17 251:21
**hopefully** 65:21
194:22 251:22
**hormonal** 120:21
121:18 141:15
**hormone** 42:6, 14
43:2, 8, 11, 21, 24,
25 44:1, 11 56:20,
25 120:10 122:17
123:3 125:7, 11
127:24 128:5, 12,
21, 25 130:12
131:16 132:6, 8
133:2, 17 134:4, 8,
12, 17, 24 135:1
136:24 137:20
138:9 139:19, 23
141:5, 10 145:3,
17 155:14
**hormones** 34:8
40:6, 9, 10 42:10,
15, 16, 20 43:1, 9
44:7 45:8 52:14,
21, 25 57:5, 16
79:24 80:3, 21, 25
81:23 82:7 83:3
122:19 130:16
135:25 136:11, 15
137:14 142:11
143:21 145:6
185:1 248:14
**horrible** 238:18
**Hospital** 18:24
192:4, 17 208:23,
24

**hour** 18:19
248:18 250:9, 10
**hours** 10:7 15:16
16:18 107:13
**hour's** 247:8
**housed** 176:17
**huge** 235:3
**human** 17:11, 18,
21, 22 18:2 33:8
56:9 77:2 117:11
153:23 185:15, 17,
24 186:2 188:4
235:15, 16 236:20
237:5, 9
**humble** 209:24
**humorous** 150:24
**hundred** 23:20
61:14 134:14
179:25
**hundreds** 15:20
16:4, 6, 8 40:19
54:4
**hurts** 89:22
**husband** 236:25
**hyper-feminine**
132:25
**hyper-macho** 38:21
**hypothesis** 216:12

**< I >**
**I.D** 4:1
**Idaho** 74:10, 17, 18
75:6
**idea** 38:5, 16
48:22 78:3 94:3
113:1 124:18
126:2 166:16
184:17 227:7
240:5
**ideal** 52:17
110:21 111:11, 25
114:22 143:8
181:21 247:15, 18
**ideally** 69:19
**ideas** 68:10 184:15
**ideation** 235:18, 20
**identification** 70:3
92:24 102:3
218:12 224:6
232:22 244:2
245:8

**identifications**
48:24
**identified** 235:15
246:21
**identifies** 25:16
**identities** 249:16
**identity** 17:13
21:19 26:6 28:5
34:2 38:6 41:10,
13 78:1 80:6
88:21 89:18 90:6
183:17 195:22, 23,
24 236:9, 10, 20, 21
237:2, 7, 8, 14, 18,
19 239:14, 16, 17,
20 243:23 249:23
**illness** 214:21
**illustrate** 210:19
**imagine** 10:25
124:14 136:16
173:13 251:4
**immediacy** 166:10,
13
**immediate** 143:9
184:14
**immediately**
143:14
**immensely** 244:19
**impact** 37:12
**impaired** 216:9
**impairment** 29:6,
13 32:10, 13, 16
**implant** 45:10
**implies** 139:10, 11
245:17
**imply** 25:13
243:11
**implying** 143:25
243:12
**important** 22:12
29:10, 13, 16 35:7,
10, 12 69:14 88:9
105:13, 18 121:13
163:15 202:14
248:11
**impressions**
108:18, 19
**impressively** 247:7
**imprisonment**
175:23

**improve** 51:2
54:15 214:22
220:2
**improved** 54:17,
22 159:19 212:25
**improvement**
50:22 81:5 111:9
**improves** 13:11
54:20 210:11
228:2
**improving** 219:7
**imputes** 89:9
**imputing** 242:16
**inability** 29:11
182:3 184:19
**Inadequate** 103:3
117:23 122:12
**inadequately** 111:2
121:14
**inadequately-stated**
227:4
**inauthentic** 48:7
**incarcerated** 75:19
84:5 135:21
189:6 190:2, 9
**incarceration** 184:7
**Incident** 163:6, 10
180:22
**Incidentally** 163:5
**incised** 162:17
**incision** 192:6
206:11
**include** 96:19
212:8
**included** 106:10
**includes** 40:12, 13
46:7
**including** 110:13
152:10 167:24
171:12 195:21
216:2 227:23
236:23 238:24
239:4
**incomplete** 71:20
110:2 189:19
**incompletely**
110:14
**incongruence** 22:3,
4, 13, 17, 21 32:12
48:23
**incongruent** 34:12

incongruity 48:9
241:10
incongruous 21:20
inconsistencies
163:14
inconsistent 225:10
inconvenience
124:7
increase 127:19
139:1, 3 220:10
246:18
increased 139:5
142:11 213:15
216:11
increases 81:1
increasing 23:13
increasingly 41:3
incredibly 185:24
in-depth 111:20
INDEX 4:1
indicate 49:2
216:12
indicates 49:7
indicating 194:12
indication 181:18
235:17
indications 220:9,
12
indicator 133:17
134:17, 18, 20, 23
indicia 50:4
indifference 110:13
indirect 16:24
indirectly 86:23
individual 69:9
86:17 130:6
165:15
individuals 38:11
122:15 222:21
224:18 235:18, 19
241:8 246:21
249:16
industry 214:8
ineffective 212:23
214:19 227:12
inevitably 246:19
infection 54:8
infer 26:21 51:21
infirmary 192:21
influence 95:25
116:22

information 98:24
99:1 104:13, 17,
18 189:25 190:19
226:12, 16 230:8
245:20
informed 35:11
51:25 52:5
119:19 176:25
249:15, 19, 22, 23,
24 250:3, 10, 13, 14
informing 75:5
inherent 22:4
105:17 236:8
242:10 243:19
inherently 237:11
242:12, 14, 21, 25
243:14, 25
initial 105:21
106:11 121:6
123:6, 11 136:14,
21 172:24
initially 103:20
120:14, 25 121:18
initiated 68:19
injections 44:4
inmate 20:23 74:3,
6 84:20 87:22
91:6 104:19
116:17, 18 160:20
162:17 166:6
170:19 172:17
178:21 180:8
181:19 188:12
inmates 20:14
30:24 31:16
73:24 120:21
166:22 167:7
171:7 177:2
183:19 201:7, 9
in-person 5:20
insistence 171:10
insists 220:16
instability 236:8
237:6 242:10, 17
243:20, 21, 22
institution 109:5
250:5
institutions 62:22
63:14
instruct 104:6

169:11, 18
instructed 143:11
insufficient 110:22
111:12
Insufficiently 64:2
insult 89:25
insulted 28:3
insurance 86:13,
18, 21, 22 154:23
insurers 86:23
integrity 243:22
intended 189:21
intense 48:18
192:2
intensity 26:18
intensive 195:2
intention 191:12
interest 71:5
157:7 221:10
237:21
interested 14:3
81:10 111:15
256:19
interests 243:4, 21
interfere 21:25
28:8 159:10
interference 28:22
29:15, 16 147:18
interferes 28:17
41:20
internal 45:19
50:13 111:16
246:19
international
40:25 41:1 58:16,
24 59:20 65:4
internist 131:8
interpretation
108:14 215:6
216:17, 23, 25
217:4, 19
interpretations
108:20
interrupt 9:12, 14
intervals 228:25
intervene 206:14
215:25
intervention 88:6
151:22 155:14
194:25 195:14

213:17 216:5, 6
246:17
interventions
169:6 196:24
197:3 249:24
interview 210:1
240:9, 17 244:16
247:8
interviewed 77:11
167:6 209:15
interviewing
240:21
Interviews 106:22
197:5, 6
intimacy 18:5
intimate 32:14
238:16 242:1
introduced 7:9
invented 52:17
invested 217:22
investigate 112:9
investigation
112:10
invite 158:10
involve 35:4
72:21 170:3
involved 9:10
59:23 65:13
72:10, 16, 20, 23
74:24 75:11, 14
86:13 92:7 95:22
97:4 98:8 112:8
122:16 167:18
169:15
involvements 93:20
involves 85:15
involving 75:19
84:5
ironic 191:1
irrelevant 186:23
issue 8:11 9:18
76:19 122:9
170:18 181:25
220:1, 19
issued 68:20
issues 17:13
102:15 160:3
item 137:4, 13, 17,
23 138:13 140:21
163:6 177:23
180:6

**items** 94:*24* 95:*1, 9, 20* 195:*12*
**its** 17:*11* 59:*6, 23* 84:*25* 106:*8* 210:*12* 251:*7*

**< J >**
**jail** 85:*6*
**JAMA** 11:*19*
**JAMES** 2:*17* 6:*18*
**james.belforti@ct.g ov** 2:*16*
**Jamie** 5:*6* 102:*20* 124:*13* 169:*19* 252:*1*
**JANELLE** 2:*17* 6:*23*
**January** 19:*1* 137:*24* 140:*10*
**Jersey** 74:*6*     77:*1*
**job** 55:*23*
**join** 20:*4*
**joined** 6:*22*

**Jonas.lettocourt.pdf** 93:*24*
**Journal** 13:*2* 97:*1* 100:*6* 222:*11* 249:*18*
**judgment** 69:*11* 80:*20* 174:*9* 229:*6, 16*
**July** 163:*10, 25* 190:*13*
**jump** 25:*3*
**June** 4:*1* 18:*23* 98:*6, 7* 99:*2* 101:*17* 102:*2, 8* 106:*5* 107:*10, 16, 18* 162:*13, 15, 25* 221:*22*
**justified** 159:*15* 223:*14*
**justify** 158:*24* 159:*22*

**< K >**
**K-A** 12:*25*
**Kalin** 12:*25* 97:*3*
**K-A-L-I-N** 12:*25*
**Kalin's** 11:*10*

**Keep** 118:*5, 6, 23* 124:*12* 126:*16* 158:*4* 193:*17*
**keeping** 40:*22* 170:*22* 197:*24*
**keeps** 203:*18*
**Keira** 74:*22*
**KELSEY** 2:*11* 199:*2*
**Keohane** 77:*18* 78:*21, 24*
**Keuroghlian** 11:*18* 101:*11*
**K-E-U-R-O-G-H-L-I-A-N** 12:*13*
**kill** 198:*11*
**KIMBLE-GOODMAN** 1:7 2:*13* 255:*8*
**kind** 21:*3* 25:*4* 42:*4* 48:*17* 53:*1, 19* 98:*17* 99:*22* 104:*15* 107:*24* 108:*2*   116:*12* 117:*10*   159:*7* 161:*25* 168:*13* 171:*2* 175:*10* 181:*15* 182:*21* 186:*22* 189:*16, 21* 191:*23* 194:*25* 198:*1* 206:*11, 20* 207:*19* 209:*4* 217:*1* 226:*16* 235:*24* 240:*7* 247:*12, 14* 251:*19*
**kinds** 29:*15* 44:*14* 45:*1, 25* 114:*8, 18* 115:*23* 117:*1* 166:*14* 196:*24*
**Kingdom** 40:*4*
**knew** 145:*4* 158:*16*
**know** 7:*16* 8:*23* 9:*7, 14* 10:*7* 15:*20, 22* 18:*5, 6* 21:*2* 25:*17* 29:*12, 21* 31:*1, 3, 8* 35:*15* 36:*10* 39:*24* 40:*22* 41:*16* 43:*13* 44:*21* 50:*7, 12*

52:*6, 19, 25* 53:*24* 55:*14, 17* 59:*25* 64:*7, 24* 65:*14* 67:*16* 68:*24* 71:*14, 25* 72:*5* 78:*2, 5, 13* 84:*19* 85:*22* 86:*5* 87:*21* 89:*9, 22* 90:*1, 15, 18* 91:*5, 6* 94:*10* 95:*22* 96:*5, 15* 98:*15* 102:*21* 104:*15, 16* 112:*6, 14* 116:*21, 24* 119:*9* 120:*18, 19* 122:*10, 20, 21* 123:*14, 17* 125:*20* 128:*4, 6, 7, 11, 16* 131:*4* 132:*11, 21* 133:*8, 25* 136:*4, 14, 16, 24* 137:*2* 139:*9* 140:*15, 19* 143:*5, 6* 144:*3* 145:*25* 147:*13, 18* 148:*19*   150:*9* 153:*22*   154:*5* 157:*3, 4, 7, 8* 159:*6* 161:*4, 6* 163:*3* 165:*13* 166:*25* 169:*21, 22* 175:*7* 176:*6* 178:*5* 179:*10* 188:*3, 22* 190:*11, 23* 193:*5, 11, 13* 195:*4* 196:*1*   197:*9, 10* 198:*1, 6, 8, 10* 199:*20* 202:*2, 6* 203:*18* 204:*3, 8, 11, 14, 17, 18* 205:*1* 206:*3, 25* 209:*6, 12, 14* 217:*1, 5, 15* 220:*7* 226:*4, 13, 17* 227:*17, 18, 22* 230:*16, 19* 233:*17* 234:*23* 237:*17, 24* 239:*16* 240:*24* 245:*13, 24* 246:*5, 7* 247:*3, 4* 248:*4, 8* 250:*16, 25* 251:*17*

**knowledge** 24:*16* 71:*8* 89:*10* 96:*14* 98:*16, 19, 20* 141:*11, 12* 209:*25* 247:*20* 248:*16*
**knowledgeable** 55:*3* 56:*4* 65:*19* 90:*20*
**known** 33:*21* 58:*17* 161:*8, 25* 189:*11* 227:*25* 228:*1* 241:*14*
**knows** 24:*14* 86:*2, 3* 158:*17* 167:*9, 10* 241:*15* 248:*9*
**knuckles** 48:*2*
**Kor** 11:*17*
**Kosilek** 71:*13* 83:*17, 18, 21*

**< L >**
**lab** 134:*10* 137:*5, 7, 24* 138:*25* 139:*5, 12*   140:*8* 141:*22*   145:*6, 7*
**label** 239:*15*
**labeled** 246:*3*
**labia** 46:*6* 206:*19*
**labias** 206:*16*
**laboratory** 122:*22* 125:*18* 147:*22*
**lack** 31:*10* 38:*25* 70:*24* 98:*16* 180:*17* 181:*11* 182:*4, 7* 228:*11*
**lacking** 61:*1*
**Landmark** 2:*8*
**language** 21:*22* 26:*21* 44:*21* 46:*16* 153:*21*
**large** 58:*16* 132:*12, 15, 20, 21* 142:*6* 175:*19*
**larger** 34:*13, 14* 62:*22* 116:*23* 199:*15, 18*
**largest** 63:*1, 2*
**lasting** 51:*16* 53:*2, 6*
**late** 58:*17* 183:*1*
**latest** 44:*8* 183:*17*

law 86:*17* 97:*2*
177:*8* 229:*24*
lawsuit 250:*2*
lawsuits 61:*18*
74:*10, 21* 75:*10*
lawyer 30:*7*
lawyers 169:*14*
lay 18:*1*
lead 175:*22* 195:*3*
leader 176:*25*
learn 189:*24*
247:*16*
learned 194:*7*
lecture 19:*17*
90:*15* 192:*9*
lectures 18:*24*
left 88:*7* 206:*16,
19*
left-hand 218:*17*
leg 152:*16*
legal 70:*24* 84:*18,
19* 93:*20* 100:*10*
178:*18* 186:*22*
231:*2*
legally 188:*9*
Legislature 71:*1*
legs 26:*16* 125:*25*
126:*1* 162:*19*
lends 224:*16*
length 77:*23* 78:*4*
lesbian 199:*13*
235:*21*
lessened 49:*17*
lessening 37:*4*
39:*11*
lesser 115:*15*
less-experienced
115:*15*
letter 97:*3* 105:*25*
106:*7* 225:*6*
231:*18*
letterhead 101:*19*
letters 56:*24* 83:*6*
97:*4* 223:*10*
letting 195:*4*
level 126:*10* 138:*8,
11, 18* 139:*23*
141:*23* 168:*9*
188:*13*
levels 32:*10*
120:*13* 130:*1*

131:*17, 20* 134:*7,
11, 15, 16, 22*
136:*24* 141:*14, 17,
18* 145:*19* 153:*16,
17*
Levin 4:*1* 92:*22*
LEVINE 1:*8* 4:*1*
7:*1, 6* 11:*3* 12:*4,
15* 13:*16* 14:*5*
15:*2* 17:*7* 19:*22*
21:*4, 14* 24:*4*
26:*24* 32:*21* 35:*2*
39:*8* 41:*6, 12*
42:*4, 23* 46:*17*
47:*12* 49:*14* 51:*8,
13* 53:*1* 54:*24*
56:*2, 19* 57:*4, 23*
58:*13* 63:*17*
65:*22* 69:*21* 70:*2,
5, 7, 12* 73:*12, 18*
75:*10* 78:*15*
79:*23* 82:*15, 23*
84:*14* 85:*13* 86:*7*
88:*12* 89:*21* 90:*7,
24* 92:*16, 19* 93:*2,
10, 15* 94:*14, 21*
99:*5, 23* 101:*13*
102:*2, 6, 20* 103:*5,
19* 104:*5* 105:*5*
106:*13* 109:*1, 17*
110:*8, 18* 111:*25*
112:*5, 21* 113:*21*
116:*8, 25* 117:*13,
21* 118:*9* 120:*4*
121:*16, 20* 122:*4,
7, 25* 123:*24*
124:*6* 125:*3*
133:*1* 136:*5*
138:*12* 141:*13*
142:*3* 143:*1*
144:*6, 11, 20*
145:*1* 146:*7, 18*
149:*20* 150:*10*
151:*13* 154:*8*
156:*1* 157:*21*
158:*10* 160:*5*
163:*3* 164:*21*
168:*4, 15, 21*
169:*8, 10, 21*
171:*23* 172:*24*
175:*1* 177:*21*

178:*8* 179:*20*
181:*3, 5* 182:*12*
183:*25* 186:*5, 25*
188:*16* 190:*3, 18*
193:*8* 194:*24*
196:*11* 198:*25*
199:*6* 202:*17*
204:*20* 205:*10*
206:*2, 6* 207:*10*
209:*6* 212:*17*
213:*6* 214:*1, 16,
18* 215:*4* 216:*15*
218:*14* 220:*22*
224:*9, 22* 228:*10*
232:*25* 234:*5*
236:*3, 15* 237:*20*
242:*10, 20* 243:*24*
244:*4, 22* 245:*12*
246:*5* 247:*1*
249:*9* 251:*23*
252:*1, 12* 254:*3, 8,
14* 255:*8, 24* 256:*7*
Levine's 196:*20*
liberal 82:*9*
libido 131:*22*
lies 182:*22* 197:*17*
lieu 5:*19*
life 17:*11* 20:*16*
22:*1* 28:*8, 19, 22*
29:*16, 22* 34:*1*
36:*13, 25* 50:*3*
52:*11* 69:*12*
88:*25* 108:*8, 9*
110:*24* 112:*8*
114:*9, 11* 115:*4*
116:*24* 121:*13*
150:*7* 155:*13*
182:*18* 183:*1*
186:*17, 20, 23*
187:*18, 22, 24*
188:*22* 195:*22*
200:*17* 213:*3*
214:*20* 216:*1*
229:*14, 19* 230:*1,
23* 231:*8* 236:*18*
237:*12* 238:*4, 18*
239:*12, 25* 240:*11,
22, 23* 241:*2, 14, 17*
243:*19* 246:*22*
life-changing 36:*6*

lifelong 53:*17*
55:*1, 2, 7* 108:*14*
215:*17* 238:*9*
244:*1*
light 218:*2, 19*
likelihood 154:*21*
limit 61:*12*
limitations 55:*6*
64:*16* 98:*14*
104:*15* 106:*8*
226:*4, 23* 242:*2*
249:*5* 250:*25*
limited 39:*2*
187:*14, 15, 25*
limits 52:*24*
Linda 2:*21*
line 118:*22*
246:*14* 255:*8*
lines 110:*9*
link 41:*4*
linking 144:*3*
lipid 125:*20*
130:*20* 131:*20*
lipids 127:*19*
130:*20*
List 4:*1* 19:*22*
71:*10, 13, 18, 24*
72:*4* 73:*12, 15, 24*
92:*19, 22* 93:*11*
94:*24* 95:*9, 20*
96:*9, 19, 21*
127:*18* 137:*17*
138:*14* 140:*21*
152:*6* 165:*6*
167:*24* 173:*1*
177:*22*
listed 97:*11* 98:*1*
listen 159:*5* 248:*6*
251:*12*
listening 228:*7*
literally 148:*24*
literature 39:*7*
64:*21, 22* 98:*9*
104:*20, 22* 105:*4*
165:*17* 203:*25*
205:*1* 206:*9*
207:*2, 8, 13* 209:*3*
225:*9* 227:*14*
235:*25* 247:*9*
251:*5*
litigation 21:*5*

**little** 14:6 22:7
23:2 31:7 50:10
55:14 70:17, 25
73:18, 20 77:10
82:13 118:15, 24
121:11 124:17
125:24 135:19
154:2 164:5, 12
165:19 173:14
180:12 182:9
183:16 190:20
204:6 207:16
210:7 236:16
237:5, 6 247:10
**live** 23:11 27:2
33:25 37:8 159:7
186:14, 20 187:22
200:6 203:21
230:16
**lived** 36:17 88:24
114:24 201:2
**liver** 130:21
**lives** 32:10 36:1,
17 37:9 51:17
54:1 55:5, 23
56:1, 5 69:9
111:16 172:16
**living** 34:4 51:22
55:10 61:13, 15
201:3 240:24
**LLC** 1:23 15:3
**local** 115:13
**LOCATED** 1:14
**logistical** 121:2
**long** 9:25 52:5, 8
53:6 80:25 94:8
98:7 105:7, 21
115:6 122:10, 11
123:22 124:16
159:6 195:12
226:25 238:11
248:8
**longed-for** 126:3
**longer** 14:23
37:25 41:15 48:8,
13 49:12 68:6
140:6
**longer-term** 245:15
**longitudinal** 65:8
224:15

**long-term** 35:19,
24 39:18 56:3
111:20 112:20
184:22 210:12, 19
211:7
**look** 11:21 28:22
48:16 50:7
101:13 115:10
117:20 131:9
132:7 133:13
135:24 137:9
140:21 174:15
176:9 179:4, 6
190:12 195:18, 19
207:7 210:22
219:21 223:16, 23
224:11 225:4
239:12
**looked** 64:13, 16
163:11 164:4
189:4 206:25
207:2 226:19
233:4, 8
**looking** 27:22
99:21 110:8
131:19 141:7
174:17 176:12
202:23 206:8
209:2 226:14
236:6 241:1
**looks** 97:12, 18
102:7 103:13
219:24
**looser** 69:17
**lose** 39:20
**loss** 18:4
**lost** 40:7 229:11
**lot** 16:22 22:8
24:4 31:21
124:15 216:14
235:20
**Lots** 63:14 78:9
166:19
**loud** 9:4
**love** 17:22, 23
18:4 21:14 222:3
**low** 48:3 52:1
123:13 126:12
**lower** 127:2 129:9
224:16
**LSR** 256:2

**lunch** 15:13 124:1,
4, 5
**Luncheon** 124:23
**lung** 139:16
**lying** 148:16

< M >
**M.D** 1:8 4:1 7:1
70:5 93:15
131:14 254:3, 8,
14 255:8, 24 256:7
**maintain** 33:4
**maintained** 167:23
**maintenance** 29:19
**major** 36:5 54:12
62:18 223:14
**majority** 23:14
40:19 54:22
173:11
**making** 75:3 96:3,
13 116:8 118:7
122:21, 24 148:4
149:19 167:21
184:14 195:12
209:18 220:3
251:3
**maladaptive** 183:5
185:11
**male** 22:15 23:10,
16 25:18 26:8
27:4, 24 29:7
34:6, 19 43:18
45:2 48:4 49:6, 8
88:25 89:7 115:5
128:22 142:15
150:22 180:18
212:5 213:11
**maleness** 36:2
49:2 50:4
**males** 18:14 26:9,
10, 25 27:2 128:22
**man** 22:14 37:8
48:8 77:5, 10, 24
158:19 175:19
178:19, 20 181:17
201:3 240:25
**manage** 196:22
**Management**
72:17 73:4 95:6
166:23

**managing** 88:4
**manifestation** 26:8
**manifestations**
26:7 27:16 28:4
**manipulation**
167:20
**manipulative**
165:14 171:12
**man's** 77:8
**March** 1:12 40:24
254:4 255:8
256:6, 21
**marital** 29:5, 9
236:10, 22, 23
238:13, 19 239:1
249:18
**mark** 69:25 70:11
92:20 101:25
138:19, 22 218:9
223:24 224:2
232:16 244:25
245:5
**MARKED** 4:1
70:3 92:23 102:2
135:11 218:7, 9,
12 224:5 232:21
245:7
**marking** 101:22
**marriage** 18:4
29:10 238:17, 24
239:4
**married** 30:6
238:14
**masculine** 25:18
30:3 45:5, 18
**masculine-feminine**
22:5
**masculinity** 25:18,
19
**mass** 34:10
125:16 127:9, 16
**Massachusetts**
20:2, 21 21:8, 11
72:11 82:8 84:21,
24 146:11
**match** 26:6 108:18
**material** 95:23
99:11 118:25
175:11
**materials** 97:25
99:7, 25 100:20

Cassian Reporting, LLC
scheduling@cassianreporting.com

matter 31:*20*
52:*10* 104:*8*
153:*8* 166:*7* 168:*4*
matters 78:*7*
82:*14* 98:*10* 242:*1*
MATTHEW 2:*11*
Max 28:*1*
maximum 61:*10*
Mayfield 1:*15*
McDougal 174:*23*
MCMI 108:*4, 6*
mean 13:*19* 16:*1*
25:*12, 22* 27:*5, 16*
41:*11* 43:*1, 14*
50:*22* 53:*6* 55:*22*
63:*3* 75:*18* 76:*18*
79:*17, 18* 80:*13*
82:*6* 84:*18* 85:*20*
94:*16* 103:*18*
113:*20* 120:*15*
124:*14* 129:*11*
131:*23* 139:*4*
143:*25* 147:*4*
151:*16, 17, 19, 21*
153:*7* 156:*2*
170:*1* 188:*20*
198:*9* 203:*16*
204:*5* 213:*21*
233:*17, 20* 234:*15*
236:*15* 248:*6*
251:*14*
meaning 5:*10*
8:*17* 79:*11* 153:*3,*
*9* 224:*25*
means 18:*12, 13*
25:*24* 26:*2, 19*
33:*13, 23* 43:*8*
69:*7* 137:*19*
145:*6* 151:*22, 25*
152:*7* 160:*7*
203:*17* 213:*21*
215:*1, 3* 217:*24*
223:*8* 225:*3*
226:*15*
meant 210:*18*
measure 50:*8*
131:*9, 23, 24* 132:*1*
measured 228:*24*
measures 134:*10*
measuring 30:*20*
122:*20* 130:*25*

MEDEIROS 2:*17*
6:*23* 104:*8* 169:*14*
medical 23:*23*
46:*15* 62:*18* 75:*3*
78:*2, 8, 11, 16, 19*
80:*8, 11, 14, 19*
81:*6, 14* 82:*8*
83:*7* 100:*3*
120:*12* 135:*20*
137:*11* 140:*19*
143:*18* 146:*5*
153:*4, 11, 20*
154:*3, 4, 6* 156:*3*
157:*13* 158:*12*
159:*24* 161:*5*
168:*6, 16, 22*
176:*22* 179:*11, 13,*
*15* 189:*6, 18, 19, 22*
190:*1, 9, 25* 191:*8,*
*18* 192:*9* 193:*25*
194:*13* 197:*22*
213:*3* 214:*20*
216:*5, 6* 227:*14*
235:*3, 25* 246:*17*
medically 76:*8, 12*
77:*19* 78:*25*
79:*24* 80:*16*
81:*22, 24* 82:*5, 16,*
*19, 25* 139:*13*
151:*10, 16, 21, 25*
152:*7* 153:*4, 7, 19,*
*24* 154:*15, 24*
155:*2, 6, 8, 19, 22*
156:*5, 9, 17, 21*
157:*15* 159:*11, 13,*
*17, 21, 22*
Medicare 105:*25*
225:*6, 7, 19*
226:*19* 231:*17*
Medicare's 226:*18*
medication 139:*8*
141:*10* 197:*5*
medications
121:*18* 127:*23*
128:*4, 12*
medicine 23:*12*
43:*5* 50:*13* 61:*5*
130:*8* 139:*12*
140:*4* 141:*21*
151:*20* 159:*3*
197:*23*

meet 13:*18, 19*
195:*20* 250:*14*
251:*9*
meeting 52:*9*
157:*1*
meetings 106:*18*
107:*12*
meets 121:*12*
196:*20, 21* 234:*13*
member 67:*5*
members 175:*20*
200:*7*
membership 66:*17,*
*19*
memo 97:*6, 11*
memory 11:*9*
188:*5* 209:*14*
men 38:*20* 115:*2*
menaced 202:*9*
menstruation
159:*11*
Mental 12:*2*
13:*11* 17:*24*
20:*17* 47:*25*
54:*15* 55:*2, 3*
62:*18* 68:*7* 74:*18*
77:*5* 81:*1* 84:*25*
90:*10, 20* 111:*18*
112:*15, 18* 153:*6,*
*10, 13, 15, 18*
154:*14* 168:*6, 16,*
*22* 169:*6* 189:*22*
196:*13* 197:*14*
198:*3, 7* 201:*20*
210:*12, 20* 214:*23*
215:*20* 219:*7, 22*
220:*3, 4, 6, 9, 13*
222:*20* 224:*16*
228:*23* 229:*2*
247:*11*
mention 27:*21*
190:*2, 10* 244:*8*
mentioned 8:*3*
10:*18* 11:*11*
12:*16* 15:*5, 8*
24:*23* 27:*14* 32:*2*
35:*2* 42:*6* 44:*13*
60:*15* 62:*14*
63:*24* 67:*9, 10*
127:*11, 13, 14*

129:*19* 154:*16*
165:*22* 244:*4*
merit 61:*1*
mess 46:*23*
met 106:*14* 107:*3,*
*6, 9, 15* 191:*7*
249:*3*
meta-analysis
99:*20*
method 6:*3, 6, 16*
methodologic
226:*6, 22*
methodology 61:*8*
231:*7*
methods 65:*19*
Michelle 74:*7*
micrograms 134:*10*
middle 142:*7*
177:*22* 183:*1*
236:*6*
midway 164:*19*
mild 31:*11, 17*
32:*6*
milligram 123:*15*
136:*18*
milligrams 123:*14,*
*16* 129:*2, 3, 7, 8, 16*
130:*14* 136:*17, 19*
million 171:*3*
Mills 1:*15*
mind 11:*15* 12:*6,*
*20* 88:*24, 25*
115:*1* 116:*21*
135:*3* 144:*9*
171:*17* 181:*14*
209:*22*
mindful 116:*18*
minds 52:*10*
mine 93:*5*
minimum 131:*6*
minor 203:*25*
minuses 33:*12*
minute 23:*1* 70:*1*
minutes 10:*2* 58:*3*
123:*23* 124:*8*
198:*14* 248:*19*
251:*25*
misgendered 89:*23*
mislabel 245:*25*
missed 127:*19*

**missing** 64:*22*
119:*6* 172:*2*
**mistake** 37:*18*
41:*18* 42:*15* 90:*17*
**mister** 247:*5, 6*
**misunderstand**
56:*1*
**misunderstanding**
42:*2*
**mixed** 183:*12*
**ml** 137:*25*
**MMPI** 108:*4, 10*
**mode** 19:*15, 16*
**moderate** 31:*11, 17*
**modern** 96:*3*
**modified** 69:*11*
**modifying** 223:*12*
**moment** 7:*9* 75:*9*
118:*15* 125:*10*
136:*6* 140:*18*
160:*8* 161:*4*
175:*12, 14* 236:*4*
**moments** 180:*21*
**monitor** 145:*19*
230:*4*
**monitored** 130:*16,
17, 18* 145:*2, 6, 10*
**monitoring** 130:*25*
131:*12* 145:*8, 17*
**month** 19:*1* 20:*4*
40:*25* 212:*6*
**months** 19:*20*
40:*3, 5* 103:*23*
104:*1* 119:*9*
132:*14* 137:*7*
142:*10* 145:*5*
164:*6, 11* 174:*8*
210:*1*
**mood** 189:*15*
**morning** 6:*7, 18*
7:*6, 8, 9* 101:*12*
112:*10* 126:*18, 25*
**Mortality** 4:*1*
54:*7* 211:*2* 232:*9,
19*
**mother** 16:*19*
**motivations** 187:*21*
**mouth** 89:*1*
**move** 69:*21* 210:*4*
221:*11* 249:*8*

**multiple** 29:*21*
206:*10, 22* 242:*15*
**murder** 185:*10*
230:*19*
**muscle** 34:*10*
125:*16* 127:*9, 16*
**muscles** 132:*3*
**mysterious** 132:*22*
**mystery** 120:*12*

**< N >**
**nail** 191:*13, 25*
**naive** 52:*15*
**naked** 77:*11*
**name** 6:*4* 7:*11*
11:*15, 25* 12:*7, 12*
14:*25* 22:*2* 27:*25*
28:*1* 59:*6, 19*
73:*6* 75:*1* 84:*12*
87:*24, 25* 99:*14*
101:*1* 115:*8*
128:*18* 215:*6*
244:*9, 11*
**named** 256:*6*
**names** 23:*20*
**narrow** 220:*22, 24*
**narrowly** 141:*16*
**nation** 225:*14*
**National** 63:*19*
85:*1, 11* 221:*21*
**natural** 41:*21*
229:*25*
**nature** 26:*8*
165:*14* 174:*23*
**nausea** 152:*20*
**nearly** 65:*25*
**necessarily** 172:*11*
185:*16* 208:*19*
**necessary** 76:*8, 12*
77:*19* 79:*1, 25*
80:*17* 81:*23, 24*
82:*5, 16, 20* 83:*1*
151:*11, 16, 21, 25*
152:*7* 153:*4, 7, 19,
24, 25* 154:*15, 24*
155:*3, 6, 8, 20, 22*
156:*5, 10, 17, 21*
157:*15* 159:*12, 14,
17, 21, 22* 189:*14*
226:*8*

**necessity** 78:*3, 8,
11, 16, 19* 80:*8, 11,
14, 20* 81:*7, 14*
82:*8* 83:*7* 157:*13*
158:*13* 159:*25*
**necrotic** 206:*17, 19*
**Ned** 12:*25*
**need** 8:*22* 10:*6*
34:*23* 37:*16*
39:*16* 55:*11, 13,
14, 24, 25* 65:*10*
89:*3* 94:*3* 111:*14*
119:*12* 120:*20*
124:*12* 129:*3*
130:*23* 133:*23*
140:*2, 4* 142:*15*
160:*7* 171:*3*
188:*23* 192:*8*
194:*3, 23* 206:*14*
207:*24* 215:*17*
216:*4* 217:*22*
221:*9* 230:*2, 4*
231:*13* 246:*16*
252:*20*
**needed** 53:*20*
91:*6* 120:*14, 15*
158:*23, 24*
**needing** 184:*14*
**needs** 20:*14* 36:*7*
69:*19* 114:*15*
143:*13* 156:*20*
220:*20* 246:*25*
250:*16*
**needy** 220:*15*
**negative** 155:*17*
**neither** 23:*16, 17*
224:*13* 256:*14*
**neovagina** 46:*8, 24*
**nervous** 26:*1*
**never** 15:*15* 31:*9*
40:*15* 57:*22*
64:*13, 16* 66:*12*
67:*18* 72:*6, 8*
79:*24* 81:*23*
82:*19, 24* 106:*8*
132:*20* 145:*24*
157:*25* 159:*9*
167:*7* 216:*24*
230:*15, 16* 243:*10,
11*

**new** 49:*24* 50:*2*
51:*23* 55:*11*
58:*19* 59:*2* 68:*19*
74:*6* 77:*1* 98:*24*
99:*1, 24, 25*
100:*25* 104:*16, 18*
112:*14* 161:*18*
218:*18*
**newly-hired** 244:*14*
**news** 251:*22*
**ng** 138:*1, 3*
**nice** 219:*24* 231:*11*
**Nicholas** 243:*16*
**night** 11:*6* 30:*13*
118:*25* 126:*16*
**nine** 96:*23* 172:*5*
232:*5*
**NOBLE** 2:*10* 6:*14*
**nonbinary** 23:*15*
**nonconforming**
62:*11*
**noncriminal** 187:*19*
**nonrandomized**
226:*14*
**Nonstop** 14:*13*
**nonsurgically**
233:*25*
**normal** 23:*23*
138:*11*
**normally** 124:*5*
**Norsworthy** 72:*3, 7*
**nose** 45:*5*
**Notary** 3:*8, 13*
5:*24* 7:*3* 254:*19*
256:*2, 24*
**Note** 4:*1* 22:*12*
74:*9* 135:*14, 25*
138:*14* 145:*2*
163:*5* 178:*11*
245:*7, 10, 11, 13, 21,
25* 246:*2, 3, 10, 13*
248:*18* 255:*3*
**noted** 89:*17*
**notes** 170:*5*
178:*11* 198:*8*
245:*14*
**noteworthy** 138:*24*
**Notice** 3:*11* 76:*13*
88:*15* 219:*5*
220:*18* 256:*5*

noticed 88:12
notices 241:23
noticing 237:4
noting 51:12 97:8
notion 38:13 41:11
November 84:8
nowadays 23:1
45:13
nuanced 242:6
nucleated 49:1
number 15:14
19:23, 25 35:9
36:12 39:21
61:12 75:10
99:14 137:16
205:19 206:3
208:21 212:10
213:15 219:23
228:25
numbers 23:14
245:4
numerous 57:2
67:16 179:10
nurse 146:3
NW 158:15

< O >
Oak 1:23
oath 5:14, 20, 23
7:4 125:4 254:14
256:10
object 78:8, 16, 19
80:19 155:23
objected 31:15
Objection 121:19
122:2 123:8
159:1 179:19
181:2 196:10
206:5 214:15
objections 3:3, 4
6:2
objective 37:14
217:22
objectively 30:20
239:12
objectivity 31:10
observation 213:5
observed 196:19
obvious 193:17, 18
obviously 60:22

93:4
occasional 19:13
occasionally 19:20
20:7
occupy 48:10
occur 35:13 51:22
52:2 142:1
occurred 178:1
179:17
occurring 194:8
occurs 53:22
o'clock 57:25
123:21
October 233:5
offender 175:24
177:4
offensive 68:8
offer 195:7
offered 60:4
offering 195:7
OFFICE 2:13
6:19 87:6, 7, 8
102:23 252:15
officer 174:22
175:23, 24 177:1,
3 178:15 180:10,
16
officers 175:22
officially 14:23
officials 143:23
166:25 178:1
oftentimes 111:1
147:13
Oh 8:8 10:14
11:8 15:18 16:15
38:16 64:5 67:14,
19 72:5, 12 74:15
93:12 97:14
153:5 161:4
162:10 173:10
182:13 198:15
207:16 210:8
218:8 246:6
Ohio 1:15 5:25
14:17
Okay 5:9 8:1, 6
9:4, 7, 18, 22 10:4,
9, 17 11:1 12:19
13:1, 22 14:5, 16
15:7 20:19 21:13
24:18 25:10, 15,

20 27:7, 10, 14
31:21 32:2, 8, 21
39:13 42:4, 9, 25
43:11 44:16, 24
45:25 47:5, 10, 12
49:17 51:6 56:15,
22 57:7, 11, 23
58:1, 3, 4 60:8, 11,
15 62:5, 14, 21, 24
63:21 66:12, 23
67:9 68:3 69:21
70:11, 15 71:4, 9,
15, 18, 23 72:10
73:8, 10 74:9
75:8, 14, 18, 21, 22
76:6, 17 77:18
79:6, 12, 23 80:11
84:4, 9 86:19
87:1, 7, 11 88:2
90:23 92:9, 13, 18
93:12, 14, 18, 22
94:11, 23 95:1, 9,
14, 18 96:8, 18
98:4 99:4, 23
100:6, 20 101:7,
13, 16, 24 103:18,
23 104:9 105:3,
20 107:3, 12, 15
108:5 109:3, 14
110:7, 18 113:13,
24 114:6 115:17,
22 116:2 117:5,
20 118:2, 20
119:22 120:2
123:5 125:6
126:22 127:14, 22
128:20, 24 129:17,
19 130:15 131:11,
16 134:7, 11, 21
135:1, 5, 7, 9, 19, 24
136:7, 10, 14, 21
137:2, 18, 19, 23
138:6, 18, 22
139:22 140:1, 9,
15, 21 141:4
142:10 144:6
146:17 148:14, 22
150:17 151:9
152:4 153:6
155:4 157:18
160:5, 9, 14, 19

161:7, 16 162:10,
15 163:5, 10
164:4, 21 166:2
170:1 171:22
173:6 174:15, 17,
20 175:1, 6
176:12, 16 177:12,
16, 19 179:2, 16
180:21 186:9
187:11 189:4, 9
190:1, 8, 12, 20
191:9, 13, 16, 20
196:7 198:17, 24
199:5 201:17
202:21 203:3
207:9, 18 209:6
210:3, 5, 8, 9, 22
211:6, 13, 19, 22
212:22 214:1, 9
218:1, 5, 25
221:10, 13, 20, 24
222:3, 10, 15, 19
223:4, 16, 24
224:2, 11, 22
225:4 227:12
231:12, 14 232:14,
16 233:4 234:14
236:2, 4, 13 239:8
242:20 244:9, 12,
20, 24 245:5
246:13 251:20
252:1, 10, 16, 19
253:1
old 98:21 158:18,
20 183:1 201:10
older 232:4 235:5
once 17:25 20:4
46:11 55:25
67:17 88:20
89:17 92:15
101:15 112:5
123:12 131:7
137:1 146:16
214:2 222:4
224:22 234:5
one-and-a-half
18:19
one-hour 244:15
O'Neill 6:20
104:8 169:13

one's 16:*21* 21:*19,*
*20* 49:*1* 104:*17*
194:*20* 199:*23, 24*
203:*19* 214:*20*
236:*18* 239:*17, 18*
one-time 92:*6*
246:*2*
ongoing 91:*24*
92:*3*
online 13:*5* 223:*2*
open 231:*13*
232:*14*
operated 36:*16*
operated-upon
231:*8*
Ophelia 74:*3*
opined 76:*7, 12*
84:*2*
opinion 56:*2* 64:*3*
69:*18* 72:*8* 74:*19*
91:*12* 96:*16*
104:*17* 117:*8*
123:*6* 141:*13*
143:*1* 144:*19*
164:*21* 194:*24*
242:*11, 13, 20, 24*
243:*24* 248:*7, 16,*
*19*
opinions 96:*1*
104:*24*
opportunity 160:*2*
197:*14, 18* 229:*19*
230:*12*
opposed 106:*20*
opposing 93:*10*
opposite 25:*4* 75:*4*
option 153:*22*
options 154:*1*
orchiectomy 46:*15*
order 77:*5* 126:*16*
132:*6* 146:*5*
171:*2* 252:*20, 21*
ordered 145:*23*
180:*8*
ordering 146:*1*
ordinary 28:*18*
organization 58:*16*
59:*14, 15* 69:*4*
85:*1, 11* 182:*16*
organizations 20:*8*
68:*22, 25*

orgasm 18:*11, 13*
121:*10*
orientation 236:*10,*
*25* 239:*8, 18, 20*
241:*4, 8, 11*
orientations 20:*13*
oriented 111:*21*
origin 159:*24*
original 90:*23*
originally 13:*4*
40:*1* 105:*11*
245:*18*
origins 187:*8*
ought 36:*22* 48:*16*
50:*10* 115:*9*
228:*22*
outcome 51:*7, 15*
52:*2* 53:*2* 61:*25*
65:*7* 131:*18*
133:*6* 184:*23*
247:*9*
Outcomes 12:*2*
210:*12, 20*
outline 91:*2*
113:*16* 118:*14*
outlined 114:*1, 3*
128:*23* 134:*5*
251:*19*
outset 35:*3* 83:*22*
outside 91:*21*
120:*24* 168:*7, 23*
169:*16* 239:*15*
outweigh 155:*16*
overdue 59:*11*
overwhelm 55:*13*
owned 14:*21*

< P >
p.m 124:*23* 125:*1*
198:*19, 21* 252:*6,*
*8* 253:*2*
Pachankis 4:*1*
11:*10* 12:*17, 20*
97:*5* 105:*10*
106:*4* 222:*12*
224:*5, 8*
package 222:*18*
packaged 171:*8*
PAGE 4:*1* 47:*11*
70:*12* 90:*3* 93:*22,*
*23* 94:*21* 103:*1, 2*

105:*3, 6* 106:*23*
110:*7* 135:*13, 14,*
*19* 137:*9, 10*
138:*14* 142:*3, 4, 5*
160:*14* 162:*10, 12*
163:*5* 164:*4*
174:*17* 176:*10*
177:*19, 21* 182:*9,*
*10* 189:*5* 202:*21,*
*22* 210:*6, 7, 9*
218:*5, 16* 224:*12*
231:*25* 236:*5, 6*
240:*10, 13* 255:*8*
pages 60:*21, 22*
67:*17*
paid 86:*18*
pain 147:*9* 159:*7*
187:*5, 17* 191:*21,*
*22, 23* 192:*5, 7, 8, 9,*
*12, 14* 194:*1*
pair 191:*13*
Panchankis 12:*23*
P-A-N-C-H-A-N-K-
I-S 12:*23*
pancreatic 148:*5*
Panic 149:*14*
paper 31:*14, 19*
39:*24, 25* 40:*5, 8*
96:*3* 99:*13, 15, 17,*
*18* 205:*17, 22*
207:*1, 10* 220:*25*
221:*1, 24* 222:*1*
246:*8* 249:*13, 17*
papers 40:*3*
205:*20* 206:*23*
paragraph 105:*6*
110:*8* 135:*14*
142:*6* 164:*5, 19*
167:*24* 174:*20, 21*
176:*12* 182:*10*
183:*16* 202:*23*
210:*16* 231:*25*
236:*6* 246:*13*
249:*2* 251:*6*
Paralegal 2:*17, 21*
parameters 122:*21*
134:*5* 144:*1*
153:*12*
parcel 187:*20*
parentheses 177:*25*
parenthesis 239:*4*

parents 75:*1, 2, 5*
241:*18*
part 25:*25* 27:*18*
28:*6* 46:*20* 61:*5*
85:*11* 103:*2*
117:*23* 119:*8*
121:*13* 137:*5*
150:*20* 151:*4*
154:*5* 167:*14*
170:*21, 22* 187:*20*
197:*1* 209:*10*
210:*4*
partially 161:*12*
participating 5:*15*
particular 24:*3*
27:*18* 40:*14*
55:*18* 71:*3, 7*
80:*21* 87:*22* 88:*2*
96:*2* 115:*23*
116:*16* 123:*14*
133:*20* 140:*7*
165:*3, 12* 166:*6,*
*23* 167:*19* 179:*25*
192:*4* 226:*2*
230:*6, 7* 242:*18*
particularly 23:*6*
30:*22* 56:*12*
126:*25* 166:*22*
169:*9* 170:*3*
238:*24*
PARTIES 2:*1* 3:*2,*
*7* 5:*22* 6:*1*
256:*16, 18*
partner 176:*25*
181:*9, 10*
parts 67:*16*
pass 66:*5, 6*
patches 44:*5*
Path 68:*23*
pathology 182:*11,*
*14, 15* 183:*7, 8, 12,*
*13, 14* 186:*3*
187:*20*
pathway 76:*22*
91:*2* 114:*3, 6*
115:*18, 21*
patient 16:*18*
26:*20* 29:*3* 33:*16*
51:*8, 11* 54:*16*
55:*18* 56:*20* 57:*8*
69:*20* 111:*5*

115:*11* 121:*4, 8, 9*
122:*22* 125:*19*
131:*19* 135:*4*
139:*7* 141:*21*
147:*11, 25* 155:*16*
159:*5* 171:*9, 10*
201:*16* 209:*3*
244:*16* 248:*8, 17,
20* 250:*6*
**Patients** 4:*1* 15:*7,
10, 14, 16, 17, 20, 23,
24, 25* 16:*1, 4, 7, 13,
20, 23, 24* 17:*4*
19:*18* 34:*25*
39:*14, 19* 44:*10*
53:*16* 54:*1* 55:*7*
57:*4, 12* 65:*6*
109:*1* 122:*16*
131:*6* 133:*20*
143:*24* 165:*16*
198:*12* 199:*9*
200:*10, 11, 15, 19*
226:*10* 232:*1, 3,
10, 20* 233:*9*
**patient's** 69:*12*
121:*12* 129:*10, 12*
131:*21* 134:*4*
149:*21* 150:*6, 7*
159:*16* 206:*16*
216:*7*
**pattern** 49:*6, 7*
108:*8* 142:*16*
148:*1*
**patterns** 108:*9, 15*
**pause** 227:*25*
**pave** 167:*15*
**paying** 185:*7*
195:*2*
**peace** 185:*4*
**peers** 232:*3, 5*
**pencil** 176:*24*
**pending** 8:*24*
71:*21*
**penetrated** 181:*13*
**penis** 27:*19, 20, 22*
29:*5, 12* 47:*1, 23*
49:*10* 126:*16, 20*
158:*19, 21* 159:*6*
219:*17*
**people** 16:*8, 10, 14,
16, 22* 17:*1* 22:*11,*

25 23:*8, 13, 14, 23*
24:*18* 27:*4, 15, 17,
21* 28:*20* 30:*2, 25*
31:*3* 32:*2, 9, 11,
18, 24* 34:*22*
35:*17, 24* 36:*14,
16, 17, 20* 37:*1, 6*
38:*23* 39:*9, 22*
40:*8, 18, 19, 22*
41:*7, 13, 14, 19*
42:*3* 45:*14* 46:*12*
47:*18* 48:*3, 12, 18*
49:*6, 8, 11* 50:*15*
52:*13, 16, 17* 53:*7,
10* 54:*4, 10, 12, 22,
25* 55:*16* 56:*6, 9,
11, 13* 57:*20*
58:*21, 24* 61:*6, 10,
12, 14, 19, 24, 25*
62:*11* 64:*15* 65:*1*
68:*18* 75:*11, 14*
80:*4* 81:*10, 12*
82:*5, 10* 83:*5, 9*
89:*24* 90:*13* 91:*3*
98:*10* 104:*24*
111:*13* 112:*15*
116:*16* 129:*3, 4*
131:*24* 132:*3, 12,
15* 133:*25* 134:*14*
139:*1* 141:*18*
147:*13* 153:*15*
154:*5, 20* 161:*18*
167:*4* 168:*5, 7*
170:*23* 172:*8*
173:*11* 181:*18*
182:*21* 183:*3, 6*
185:*25* 186:*23*
194:*7, 17* 196:*19*
199:*7, 15* 200:*23*
201:*1, 9, 14, 17, 20*
202:*1* 203:*25*
204:*18* 207:*24*
211:*14, 16, 22, 24*
212:*2, 8, 11, 18, 19*
213:*4, 7, 22* 214:*3,
4, 10* 215:*16*
216:*14* 217:*23*
219:*15, 23* 220:*15*
222:*6, 7* 225:*1, 2,
20* 226:*25* 227:*10,
15, 16, 19, 20* 228:*2,*

3, 4, 15, 21 229:*10,
20* 230:*4, 6, 7*
234:*2, 6, 7* 235:*5,
21* 238:*10, 16, 17,
20* 239:*19* 241:*24*
247:*13, 14, 16*
248:*4, 11* 250:*4*
251:*14*
**people's** 13:*11*
55:*23* 69:*9* 75:*19*
132:*2* 182:*16*
220:*2* 239:*15*
**perceive** 48:*23*
247:*20, 25*
**perceived** 89:*6*
**percent** 16:*15*
40:*6, 7, 8* 61:*10,
14* 140:*7* 179:*25*
199:*12* 203:*4, 14*
204:*17, 21, 22*
205:*13, 24* 206:*23*
208:*5, 6, 15* 229:*10*
**percentage** 227:*19,
20*
**Perfect** 8:*19*
**perfectly** 111:*7*
**perform** 217:*9*
**performing** 181:*14*
**perfunctory** 250:*1*
**period** 30:*23*
115:*7* 142:*12*
160:*21* 164:*15*
176:*17* 177:*5*
183:*18, 20* 188:*15*
192:*21* 209:*20*
212:*13* 218:*20, 22*
**periodic** 104:*4*
180:*6*
**periodically** 17:*1*
20:*3* 53:*23* 55:*16*
**permission** 40:*14*
**person** 14:*7* 18:*10*
22:*23* 25:*14*
28:*25* 29:*1, 2*
34:*12* 35:*11* 36:*9,
14* 37:*17* 40:*1, 14*
49:*16* 50:*8* 52:*3*
68:*7* 76:*24* 77:*25*
78:*5* 79:*8, 20, 21*
80:*4, 10, 22, 23*
81:*2, 3, 9, 11*

82:*16, 20* 83:*15*
88:*5, 9, 17, 20, 24*
89:*6, 19* 90:*6*
116:*7* 150:*3, 9*
154:*17* 157:*4*
158:*20* 164:*22*
165:*2, 3, 5, 12*
172:*12* 174:*1*
176:*4* 178:*19*
179:*24* 181:*22*
182:*18* 187:*10*
189:*13, 17, 25*
194:*10* 195:*4, 12*
196:*1* 197:*8, 19*
198:*9* 199:*11, 13,
14, 18* 200:*2*
204:*9* 217:*2*
227:*8* 230:*1, 15*
236:*19* 239:*6*
241:*14* 242:*3, 14,
18* 243:*18* 245:*18*
248:*12* 249:*20, 22*
250:*8, 10, 16*
251:*12* 256:*6*
**personal** 40:*11*
180:*17* 181:*11*
183:*18*
**personality** 167:*19*
183:*9* 185:*18, 21*
237:*4*
**personally** 31:*7*
40:*17* 41:*7* 80:*12*
193:*14, 16* 194:*11*
209:*20* 254:*13*
**personhood** 195:*21*
**persons** 51:*24*
211:*8* 218:*19*
**person's** 22:*1*
28:*8, 22* 29:*21*
84:*5* 88:*25* 108:*9,
14* 112:*8* 121:*9*
141:*22* 155:*13*
189:*12* 216:*1*
231:*8* 242:*3*
244:*18* 250:*22, 23*
**person-to-person**
28:*24* 53:*9*
**perspective** 186:*23*
224:*13* 236:*19*
**pervasively** 243:*14*
**pg** 137:*24*

phase 182:*18*
202:*4* 204:*9*
phases 182:*25*
phenomena 129:*13*
phenomenon 37:*16*
39:*18* 41:*3* 49:*12*
58:*19* 59:*2*
194:*16* 230:*14*
PHONE 2:*5, 9, 16*
7:*14*
phrase 138:*2*
physical 125:*11, 18*
130:*22* 131:*1*
132:*7* 133:*11, 13,
19, 24* 145:*20*
147:*22* 189:*12*
physician 123:*12*
142:*2* 162:*17*
163:*16* 191:*23*
physicians 17:*25*
120:*22*
physiology 159:*10*
piece 99:*1*
pieces 104:*13*
pie-in-the-sky
53:*19*
pill 81:*4*
pills 44:*6*
place 82:*9* 163:*25*
places 190:*6*
Plaintiff 1:*4* 2:*1*
6:*8* 7:*11*
PLAINTIFF'S 4:*1*
70:*2* 92:*22* 102:*1*
218:*11* 224:*4*
232:*18* 245:*6*
Plan 95:*6* 112:*24*
113:*2* 150:*6*
196:*3, 9*
plans 197:*5*
plays 186:*19*
pleading 142:*19*
please 6:*4* 8:*17,
20, 23* 9:*14* 10:*6*
43:*11* 56:*1* 65:*16*
70:*11* 102:*24*
109:*23* 118:*3, 20,
22, 23* 124:*21*
168:*19* 169:*17*
180:*12* 181:*3*

190:*22* 242:*18*
252:*24* 255:*3*
pleasures 121:*13*
plugging 124:*12*
plus 44:*1* 183:*23*
210:*14* 218:*24*
pluses 33:*11*
point 10:*4* 36:*15*
42:*10, 16* 64:*5*
96:*3, 4* 122:*9*
132:*16* 134:*4*
139:*25* 159:*14*
161:*8* 173:*16*
177:*13* 191:*20*
192:*11* 197:*13*
208:*3* 214:*23*
216:*7* 226:*18, 23,
24* 234:*10*
pointing 234:*11*
points 67:*21, 22*
68:*1* 145:*13*
240:*16*
poles 165:*18*
policies 110:*25*
143:*6*
policy 74:*25*
161:*11, 17, 22, 23,
25* 162:*1, 4*
173:*19* 251:*14*
political 89:*4*
politically 44:*22*
poor 187:*10*
population 35:*18*
116:*20* 176:*23*
211:*1, 25* 212:*4*
213:*12* 214:*10, 25*
221:*15* 222:*9, 22*
230:*3* 233:*14, 24*
235:*13*
populations 116:*19*
portion 113:*23, 25*
portions 174:*15*
pose 157:*25* 158:*8*
posed 157:*22*
position 66:*12*
209:*18* 228:*9*
possibilities 51:*18*
139:*11* 250:*23, 24*
possibility 51:*18*
114:*4* 138:*25*

170:*21* 173:*2, 4*
204:*15* 207:*25*
possible 37:*8*
38:*10* 51:*7, 15*
127:*16* 177:*23*
228:*10* 244:*1*
possibly 30:*14*
112:*12* 220:*23*
posted 249:*14*
post-operative
35:*17* 206:*13*
pouch 46:*7*
POWDERLY 2:*11*
practice 14:*17, 20,
22, 24, 25* 15:*4, 7,
14* 17:*2* 68:*4, 14*
86:*2* 112:*1*
122:*17* 149:*20*
151:*20* 153:*4*
200:*10, 11, 16, 20*
Practices 18:*21*
practicing 14:*12,
14* 201:*12*
practitioner 146:*3*
precedent 61:*23*
precipitance 33:*1*
precipitated 33:*3*
precluded 161:*18*
precluding 162:*4*
predefined 226:*11*
predetermined
229:*1*
preface 18:*12*
156:*6*
prefer 81:*16*
169:*24*
preferable 231:*6*
preferably 10:*3*
preference 44:*9*
preferred 88:*18*
preoccupation
235:*14*
preoccupied 30:*13*
preoperative
228:*23*
preparation 13:*17*
97:*25*
prepare 11:*3*
pre-prison 115:*4*
prescribed 40:*5*

presence 21:*18*
26:*15* 28:*4, 15*
54:*6* 121:*7* 150:*22*
PRESENT 2:*17*
5:*16* 21:*23* 32:*2*
188:*7* 190:*19*
presentation 18:*22*
150:*7*
presented 66:*10*
219:*21* 220:*7*
presenting 18:*18*
34:*5* 85:*19* 184:*13*
presents 184:*20*
preserve 126:*19*
preserving 46:*5*
presume 13:*12*
26:*19* 86:*21*
94:*18* 145:*18, 22*
146:*2, 7* 151:*18*
161:*4* 176:*1*
240:*19*
presumptuous
209:*25*
pretty 15:*15* 19:*9*
44:*8* 126:*12*
161:*23* 185:*18*
238:*12*
prevalence 116:*19*
prevent 35:*23*
151:*23* 152:*1, 8,
10, 14, 15* 197:*11,
19* 213:*22*
preventing 111:*24*
prevents 214:*24*
previous 8:*22* 9:*7*
50:*4* 59:*19, 24*
69:*22* 73:*14*
82:*18* 144:*7*
151:*3* 184:*6*
225:*19*
previously 7:*24*
101:*9* 104:*12, 22*
128:*23* 206:*2*
primarily 17:*24*
25:*3* 58:*23* 90:*2*
98:*9* 169:*6* 176:*23*
primary 19:*15, 16*
131:*8* 146:*4*
principle 159:*3*
principles 197:*12*

**print** 223:*3*
**printed** 90:*3*
**Prior** 116:*8* 191:*3*
**prison** 19:*23*
  20:*20* 21:*7, 10*
  75:*11, 20, 23, 24*
  76:*7, 11* 78:*6*
  79:*20, 23* 81:*23*
  82:*16, 20, 25*
  83:*12* 84:*3* 85:*13*
  110:*24, 25* 111:*18,*
  *19* 112:*3, 17, 18, 19*
  113:*4* 114:*10, 21*
  115:*5, 7, 8* 116:*19*
  120:*22* 121:*2*
  143:*5, 23* 146:*3*
  161:*11, 12* 165:*3*
  166:*3, 18, 23, 24*
  167:*4* 168:*5, 9, 16,*
  *22* 169:*6* 171:*1*
  172:*16* 173:*7, 15*
  174:*1* 177:*4, 17,*
  *24* 178:*1* 180:*18,*
  *24* 184:*16* 185:*9*
  192:*20, 25* 194:*6*
  197:*22* 209:*9, 13,*
  *21* 228:*15* 229:*18*
  230:*1, 7* 237:*3*
  251:*13*
**prisoner** 76:*23*
  79:*22* 85:*6* 87:*19,*
  *20, 23, 24, 25* 168:*1*
  173:*16* 194:*12*
  229:*16, 21*
**prisoners** 20:*9*
  30:*23* 40:*12*
  85:*10* 111:*1*
  114:*25* 119:*12*
  121:*2* 167:*6*
  185:*20* 227:*16*
  229:*12, 13, 14, 23*
  230:*9, 23* 231:*2, 6*
**prisons** 20:*16, 18*
  63:*11* 75:*15* 85:*2*
  111:*22* 116:*13*
  161:*21* 165:*6*
  175:*19* 184:*18*
  194:*9* 195:*10*
  196:*13, 17* 198:*2*
  230:*23*
**prison's** 196:*22*

**private** 112:*1, 2*
  241:*20*
**privilege** 170:*4*
**probably** 16:*25*
  25:*8* 40:*17* 41:*18,*
  *20* 47:*15* 54:*7*
  59:*11, 25* 66:*18,*
  *25* 67:*14* 70:*24,*
  *25* 74:*23* 84:*8*
  87:*16* 95:*24*
  102:*10* 120:*14, 15*
  124:*17* 126:*9, 10*
  127:*5* 129:*5*
  134:*9* 136:*23*
  154:*23* 171:*3*
  192:*2, 15, 16*
  196:*21* 199:*12, 20*
  202:*1, 5* 204:*24*
  205:*1* 206:*25*
  240:*25* 249:*15*
  251:*6*
**problem** 17:*21*
  20:*13* 31:*9* 91:*7*
  105:*12* 119:*8*
  121:*2* 123:*10*
  154:*6, 7* 158:*17*
  166:*24* 225:*25*
  226:*1, 7*
**problematic** 87:*22*
  91:*5* 153:*8* 165:*4*
**problems** 17:*11, 21*
  29:*11* 35:*20*
  38:*25* 49:*22*
  55:*11, 12, 13*
  105:*16* 114:*25*
  153:*18* 154:*4*
  183:*6* 203:*5*
  206:*14* 215:*20*
**procedure** 246:*24*
**procedures** 249:*25*
**proceed** 9:*15*
**proceeding** 5:*16*
**proceedings**
  178:*18* 186:*22*
**process** 20:*6*
  32:*23* 33:*8* 35:*4*
  36:*23* 41:*21*
  65:*15* 114:*16*
  119:*18* 171:*12*
  199:*23* 235:*21*
  249:*14* 250:*13, 14*

**processes** 28:*18*
  64:*7* 111:*16*
  249:*20* 250:*3*
**procreative** 29:*12*
**produce** 46:*4*
  64:*19*
**produced** 36:*1*
**producing** 139:*14,*
  *16, 17*
**product** 60:*20*
**productive** 230:*17*
**profession** 173:*20*
**professional** 20:*16*
  33:*8* 39:*15* 55:*3,*
  *4* 56:*4, 19* 57:*8*
  59:*16* 68:*7*
  112:*15* 117:*8*
  153:*10, 11* 174:*13*
  194:*24* 198:*8*
  200:*15, 19*
**professionalism**
  174:*14*
**professionals**
  17:*25* 42:*1* 74:*18*
  90:*10, 20* 153:*14,*
  *15* 201:*21* 210:*10*
  247:*11*
**profile** 125:*20*
**profoundly** 153:*23*
  213:*10*
**program** 41:*5*
  116:*16* 188:*1*
**programs** 194:*9*
**Progress** 4:*1*
  245:*6, 10, 11, 13, 14,*
  *17, 19, 20, 24, 25*
  246:*3, 10* 248:*18*
**prolonged** 32:*23*
  35:*4*
**prominent** 45:*20*
  48:*2*
**promise** 56:*18*
**promoted** 38:*2*
**pronoun** 88:*13, 18*
  89:*1, 12, 16*
**pronounce** 11:*18*
**pronounces** 215:*5*
**pronouns** 89:*19*
  90:*13*
**proof** 3:*7*

**property** 44:*2*
**proportion** 16:*13*
**proposes** 69:*5*
**prospective** 229:*11*
**prostitution** 177:*24*
**protect** 250:*1, 5, 6*
**protected** 77:*11, 12*
**protocol** 69:*15, 16*
**protocols** 60:*17*
**prove** 227:*10, 11*
**provide** 23:*12*
  43:*21* 76:*22*
  87:*12* 109:*6*
  122:*19* 168:*9, 11,*
  *12, 13* 197:*19*
  224:*17*
**provided** 91:*9*
  113:*16* 165:*8*
**provider** 161:*5*
**provides** 229:*15*
**providing** 61:*13*
  91:*12, 13* 92:*3*
  172:*17*
**prudent** 123:*12*
  157:*6*
**Psychiatric** 18:*18*
  20:*1* 21:*22* 28:*11,*
  *13* 35:*20* 39:*17*
  53:*17, 18* 54:*6, 11*
  55:*1, 7* 149:*8, 11,*
  *12, 16, 17* 153:*20*
  154:*3* 156:*8*
  182:*15* 189:*18*
  194:*14* 196:*2, 8*
  213:*2* 214:*21*
  215:*17* 216:*2*
  246:*1*
**psychiatrist** 14:*8*
  15:*25* 16:*8* 55:*12,*
  *13* 115:*9* 131:*5,*
  *14* 133:*18* 155:*2*
  201:*12*
**psychiatrists** 59:*1*
  154:*19* 186:*1*
**psychiatrist's**
  197:*13*
**Psychiatry** 13:*12*
  14:*12, 14, 16, 17*
  19:*18* 30:*21*
  50:*12, 17* 97:*2*
  222:*11*

psychiatry-based 112:3
psycho 33:7
psychological 18:4 53:2 54:18 81:5 83:10 98:15, 16 107:21 108:3, 19, 25 110:13 133:10 142:7 154:7 184:4 187:5 189:13, 14 241:21
psychologically 80:22, 23 81:2, 13, 16, 17, 20 83:5, 13 153:25 155:15, 19 170:20 188:10
psychologist 109:5
psychologists 58:25 109:7
psychosocial 54:23
psychotherapeutic 32:25 245:15
psychotherapeutically 111:21
psychotherapy 35:5 36:6 37:4, 11 38:5, 10, 22 39:1, 10 42:2, 6 44:11 112:22 115:23 116:9 117:2, 9, 14 120:5 195:14 196:21
psychotic 55:19
Public 3:8, 14 7:3 18:1 33:13 159:20 208:19 254:20 256:3, 24
publication 249:14
publications 217:2
published 13:4 39:25 40:3 53:12, 15 59:10 60:6, 11 101:10 104:19, 21 105:4, 9 203:22 208:20 223:2, 3
pull 94:9
purpose 189:9, 11
purposes 25:10 29:12 48:6 101:22 154:23

245:22
pursuant 256:5
pursuing 238:4
put 15:3 65:5 126:15 138:22 143:22 177:4 197:21 239:4
putting 106:13 196:18

< Q >
qualification 156:17
qualifications 157:14
qualified 51:5, 6 153:10, 11 250:12 256:3
qualify 155:9, 21
qualities 43:23
quality 44:2 168:10 246:22
quantify 199:16
query 174:3
question 3:5 8:7, 8, 12, 14, 17, 20, 24, 25 10:22 14:18 15:11 18:2 20:23 21:9 27:11 30:1 35:9 38:9 39:21 40:23 41:6, 25 42:17 43:16 57:15 62:6, 23 68:12 76:4, 5, 13, 15, 21, 25 77:4, 9 78:12, 13, 18 79:2, 16 82:1, 17, 18, 22, 24 83:2, 3 84:13 86:7 88:8, 9 89:15 90:23 91:23 92:2 95:21 96:7, 11, 17 98:11 99:6 102:13 104:10 106:2 107:2 108:6, 11 111:3 113:10 118:9 120:8 122:8, 13 123:11 127:25 128:10 130:11 133:1, 5, 7 135:6 139:6

144:7, 10, 16 150:18 151:20 154:11 157:12, 22, 24 158:1, 8 160:1 161:1 165:9, 18, 19, 21 168:20 169:3, 11, 23, 24, 25 170:2 171:16, 18, 22 172:3, 4, 22, 23 175:13 177:25 178:8, 22 187:9 193:21 197:1, 17 200:9 205:10, 12 208:10, 17 209:17 216:15 220:22 226:10, 17 234:16 235:10 236:16 243:12 249:10, 11 251:21
questioned 204:12
questioning 158:1
questionnaire 108:7
questions 9:5 10:9 21:15 56:18 88:2 94:9 98:23 108:7 133:21 134:5 150:1, 25 160:7 202:13 248:5 252:13, 17
quick 123:21 124:7 251:24
QUIROS 1:6 2:13 255:7
quite 24:4 31:9 38:10 56:17 59:5 126:6 158:4 171:11
quote 25:8 31:2 36:4 43:24 59:14 89:23 96:5 164:22 173:1 177:24 178:2 234:15 240:11
quoted 84:2 95:17 192:24 212:11
quoting 193:5, 6 205:20 219:25 230:24

< R >
radar 197:24
raised 137:3
raising 160:4
randomized 224:14, 23 225:23 226:5, 21 227:5 228:11, 15 229:3 231:7
range 138:8 141:16, 17 186:2
ranges 123:2 128:24 130:12 134:23
rapidity 98:19
rapidly 44:21
rarely 50:17 53:21
rate 36:19 207:3, 14, 15, 17 208:5, 14, 23 210:25 213:15 214:24 216:11 221:16
rates 35:16, 18 99:21 105:9 115:14 205:19 206:11 208:18, 21
rationalization 78:10
read 10:12, 23, 25 11:6 44:9 48:4 65:12 67:13, 15, 17, 18, 19 68:1 94:19 95:25 101:2, 5, 8, 9 106:4, 6 110:16 118:16 141:2 142:10, 24 144:4, 12 160:22 161:14 162:1, 15, 20 164:11, 16 170:5 171:19 174:24 175:11 177:6 178:11 179:11 180:11, 19 183:22 203:6 210:13 211:4 215:7 218:23 221:9 224:20 231:4, 22 232:6 236:13 243:11 255:8
readers 116:15

**readiness** 249:7
250:22
**reading** 3:12 5:14
39:6 116:22
144:9, 10 164:17
171:17 176:21
177:7 211:21
**READS** 255:8
**ready** 160:20, 24
161:2
**real** 77:9 170:18
181:25
**realistic** 36:3
168:8 170:14
184:19 246:24
**reality** 36:25
88:19 111:17
126:4
**realize** 17:20
204:24 247:11
**realized** 223:13
**really** 17:20 33:18
35:23 38:13
50:22 52:15 69:7,
14 76:15 79:15
85:20 90:16
105:13 122:13, 14
126:19 130:23
131:23 133:22
147:20 157:10, 25
163:20 185:14, 20
198:6 199:16
202:13 208:8
213:15 217:18
220:1 233:20
234:20 247:23
248:13 249:10
250:15
**reanalysis** 223:11
**rearranged** 48:20
**reason** 30:2 36:5
45:17 136:12
142:13 160:9
179:2 184:15
194:20 200:6
211:19 215:1
227:24 255:4, 8
**reasonable** 36:20
54:8 132:10
137:8 144:25
153:21 246:24

**reasons** 54:12
133:10, 11 167:17
200:21 214:6
**reassignment**
13:10 25:6 31:4
40:15 44:17
45:12 53:13, 16
54:10, 13, 14
76:22 98:17
101:1 114:23
115:11 119:17
143:3 165:5
166:8 171:7
173:23 211:8
212:9, 12 213:16
215:11, 13, 17, 19
217:9, 12 218:20,
21 219:2, 8 220:2,
16 226:2, 25
227:8, 16 228:1
229:7, 14, 17, 22
230:2, 10, 11, 14
244:19 245:23
247:23
**reassuring** 248:4
**recall** 44:19 53:4
73:2 74:21 95:24
104:3 120:6
136:23 137:1, 4
140:18 145:4
150:12, 13, 20
151:3 173:3, 5
175:12, 18 176:7
178:7 191:10
193:10, 11 205:21,
22 206:1
**receive** 83:18
168:16, 22, 24
170:19 213:7
**received** 92:18
93:9 110:19
112:22 115:24
116:9 120:9
121:17 145:14
**receives** 187:2
**receiving** 44:10
84:3 141:15
142:11 193:25
**receptor** 129:25
130:7

**Recess** 58:8
124:23 198:19
252:6
**recital** 7:23
**recognition** 64:22
142:21 164:14
**recognize** 22:21
23:17 31:8, 23
33:1 35:18 41:22,
23 55:8 73:6, 7
93:4 103:5
147:20 148:1
194:10 195:6
226:8 228:7 237:9
**recognized** 41:3
119:12 194:1
**recognizes** 197:15
**recognizing** 166:6
**recollection** 108:2
**recommend** 56:6,
11
**recommendation**
53:20 113:6, 11
209:18
**recommendations**
91:13, 15 92:4
118:10 119:22
120:7 210:2
**recommended**
78:5 100:25
112:24 113:2
**recommending**
92:1 223:13
**reconformed** 48:20
**reconstruction**
45:13
**reconstructive**
170:21 209:5
**re-contouring**
125:15
**reconvene** 251:24
**record** 6:6 7:10
8:23 11:24 12:20
58:10 92:2
123:25 124:21, 22
179:12, 13, 15
189:20 193:6
198:17, 21, 24
199:3, 5 205:11
235:4 252:8, 11,

21 256:12
**recorded** 107:14
**records** 92:13
95:2 97:22 100:3
140:20 179:5
189:12 191:1
233:5, 8 235:3
240:17 244:15
**recover** 203:20
**recovered** 192:21
**recurrence** 197:19
**redistribution** 34:9
**reduced** 166:17
256:10
**reduction** 125:22
127:9, 16, 17
222:19
**Reexamine** 18:20
**refer** 46:1, 17, 22
47:2 75:18 88:16,
21
**reference** 99:11
110:1 118:7
175:15 178:5, 9, 10
**referenced** 39:13
101:11 176:10
211:7 222:13
**references** 95:10
96:20, 23 97:9, 19
98:24
**referencing** 177:11
186:7 231:1
**referred** 33:22
41:10 45:12, 23
94:20 137:23
240:17
**referring** 13:1
47:6 88:13 89:5
221:20 231:10
237:21, 23 239:5,
6, 7 244:21
**refers** 238:1, 3, 13,
15, 19 239:8, 10
**refined** 80:12
**reflection** 70:24
**reflections** 231:2
**refreshed** 11:9
**refused** 75:4
**refutes** 96:4
**regardless** 102:25

187:*12* 235:*7, 10*
**regards** 98:*2*
**regret** 35:*14*
99:*21* 193:*7*
**regrets** 50:*1*
**regular** 16:*2, 5, 7*
112:*8* 114:*19*
**regularly** 195:*21*
196:*1*
**rehabilitation**
184:*16*
**relate** 47:*7* 202:*11*
**related** 46:*19*
95:*2* 98:*5* 145:*16*
187:*4, 6* 239:*2*
256:*15*
**relational** 236:*22,*
*23* 239:*3*
**relationship** 29:*2,*
*18, 19* 32:*25* 33:*8*
51:*16* 53:*2* 55:*2*
98:*17* 101:*9*
111:*15* 112:*14*
157:*6* 186:*14*
188:*14* 245:*15*
**relationships** 28:*18*
29:*6, 9, 19* 51:*22*
238:*15, 16, 18, 20,*
*22, 23*
**relative** 256:*17*
**relatively** 208:*12*
**relevant** 104:*23*
**relied** 96:*9*
**relief** 152:*22, 24,*
*25* 159:*20*
**religion** 243:*14*
**religions** 237:*22*
242:*25*
**religious** 236:*9, 21*
237:*20* 243:*1, 3*
**reluctant** 156:*16*
**rely** 95:*18* 198:*12*
**relying** 208:*20*
**remain** 49:*3*
**remainder** 210:*16*
**remember** 31:*14*
66:*16* 72:*19*
87:*15* 88:*24*
125:*8* 146:*21*
151:*12* 161:*9*

164:*17* 190:*25*
207:*4* 244:*11*
**remembering**
119:*7*
**remind** 53:*11*
**reminded** 181:*10*
**reminder** 180:*7*
**remodel** 34:*17*
**REMOTE** 1:*8*
**REMOTELY** 2:*1*
5:*18, 21* 7:*2*
256:*5, 8*
**removal** 46:*3, 24*
47:*1*
**remove** 34:*22*
46:*15* 151:*23*
152:*18* 159:*9*
163:*17* 191:*10, 12*
206:*18*
**removed** 46:*13*
48:*19, 20* 49:*20*
163:*21, 22*
**removing** 158:*18,*
*19* 191:*17*
**repeat** 8:*10, 13*
42:*17* 122:*8*
128:*1* 139:*4, 5*
140:*2, 5* 165:*9*
**repeatedly** 144:*25*
**repetition** 150:*25*
**repetitive** 234:*9*
**rephrase** 79:*2*
86:*7*
**rephrased** 187:*1*
**Report** 4:*1* 11:*5,*
*6* 32:*9, 11* 88:*15*
89:*11* 91:*9, 19, 22*
92:*6* 93:*8* 94:*7,*
*20* 95:*15, 17, 19*
96:*2, 10* 97:*1, 20*
98:*1, 5, 20* 99:*9*
100:*4, 9, 11, 14, 22*
101:*14* 102:*1, 5,*
*11, 12, 14, 16, 17*
103:*1, 11, 14, 21, 25*
104:*14* 105:*4, 11,*
*21* 106:*11, 13, 19*
107:*21* 109:*4*
110:*1, 7* 113:*16,*
*21, 25* 116:*15*
117:*21, 22* 118:*4,*

*11* 119:*6, 9, 21, 24*
128:*7, 11* 132:*3*
135:*6, 8, 9, 13, 20*
137:*10* 142:*5*
160:*6, 11, 15, 19*
163:*6, 11, 13*
174:*16* 176:*20*
177:*21* 178:*9*
179:*17* 189:*4, 10*
190:*2, 7* 192:*24*
202:*18, 22* 205:*3*
210:*5, 8* 221:*12*
225:*7* 227:*13*
228:*6* 231:*13*
236:*2, 5* 241:*24*
244:*5, 6, 21* 245:*17*
**reported** 140:*14*
148:*7* 178:*12*
**Reporter** 1:*20* 5:*3,*
*13* 6:*15* 9:*8*
10:*11, 19* 12:*5*
67:*23* 77:*21*
101:*23* 108:*22*
113:*9, 13* 130:*4, 9*
144:*12* 156:*11*
171:*19* 180:*11*
190:*15* 198:*13*
199:*1* 205:*8*
224:*1* 235:*8*
245:*2* 248:*22*
252:*19* 253:*1*
256:*1*
**Reporting** 1:*23*
5:*18* 6:*3, 6* 32:*8*
175:*2*
**reports** 32:*3*
74:*10, 19* 116:*22*
227:*4*
**represent** 6:*5*
7:*11* 86:*1* 122:*14*
185:*3* 241:*17*
**representation**
211:*20*
**represented** 65:*11*
180:*16*
**REPRESENTING**
2:*1, 13* 85:*23*
87:*9* 109:*12*
184:*19*
**represents** 117:*11*
138:*25* 145:*7*

172:*6* 185:*4*
197:*13*
**repudiation** 36:*2*
**reputation** 242:*16*
**request** 36:*22*
56:*16* 77:*6* 91:*8,*
*17* 143:*9* 166:*10*
172:*5* 229:*13*
**requested** 88:*5, 11*
144:*12* 171:*19*
**requesting** 173:*6*
**requests** 31:*5*
89:*19* 142:*21, 22*
143:*2* 144:*21, 25*
164:*13, 14* 166:*4*
167:*7*
**require** 22:*3* 68:*6*
205:*25* 208:*2*
255:*4*
**required** 73:*14, 15*
203:*5, 15* 205:*13*
**requires** 22:*4*
153:*10*
**reread** 118:*16*
**re-read** 11:*5* 172:*4*
**research** 223:*13*
225:*9*
**resemble** 34:*20*
46:*9, 25*
**reserve** 174:*9*
**reserved** 3:*3*
**residency** 14:*10*
**residents** 19:*14, 17*
**resides** 165:*3*
166:*3*
**resigned** 66:*12, 14,*
*17, 19*
**resist** 158:*11*
**resources** 168:*12*
**respect** 90:*6*
**respectful** 33:*9*
227:*25*
**respectfully** 88:*21*
93:*15*
**respects** 37:*8* 38:*8*
**respond** 196:*17*
198:*4, 11* 223:*7*
**responded** 198:*4*
**response** 31:*18*
129:*10* 143:*17*

165:22 186:6
223:6
**responsibilities**
249:21
**responsibility** 36:9
122:20, 24
**responsive** 141:24
**rest** 54:1 56:1
103:10, 14 214:20
229:18 251:15
**restore** 214:24
**restructured** 34:20
167:25
**result** 29:6 51:22
64:21 137:5, 8
140:5
**results** 122:11
137:24 202:24
203:3, 22 225:9
**resumé** 19:22
73:19, 21
**retained** 87:3
**retraction** 223:5, 8,
19
**retrospect** 239:24
241:1
**retrospective**
239:25
**return** 37:18, 20
**returned** 115:5
201:3
**returns** 203:25
**reveal** 169:12
**review** 10:20 13:8
64:9 97:25 99:7
100:17 145:1
180:3 189:11
190:25 204:25
206:22, 24 221:14
225:8
**reviewed** 12:16
92:14 93:21 94:6,
7 98:4, 12 99:13,
24, 25 100:3, 6, 10,
14, 20 101:4
118:25 140:19
163:6 190:4
244:5 246:9
**reviewer** 223:6
**reviewing** 31:14

206:9, 10
**reviews** 60:25
**revisit** 151:9
**rhinoplasty** 45:7
**RICHARD** 1:6
2:13 255:7
**rid** 34:19 126:14
184:17
**right** 5:13 7:24
8:4 14:8, 17 21:1
23:24 24:24 28:9
29:17 30:11 32:5,
7 35:5, 6 42:7, 8
43:7 44:14 49:16
56:2, 8, 15 57:5
59:7, 21, 22 60:14
63:22 67:8 71:11,
24 72:11 74:4
75:12, 24 76:2, 9,
10 78:16 79:1
81:17, 18 87:5
88:7 89:15, 19
93:12, 16 94:10,
24 96:20 97:13,
14, 20 100:22
105:25 106:25
107:1, 10, 13, 22
115:24 116:1, 10
117:3, 15 118:20
122:18, 24, 25
123:1 132:9
137:11 139:19
140:10, 13 142:3
145:14 146:24
148:15 151:6, 7, 8,
13, 14 152:6, 15, 16,
17 153:1, 12, 24
154:18, 25 156:18,
23 157:12 162:19,
23 163:1, 23
165:25 166:1
170:4 171:4
177:14, 17, 18
178:25 179:1, 18
180:25 186:5
187:13, 14 190:10,
14 191:11, 21, 24
192:19 200:24
201:12 203:7
206:4, 17 207:11,
12, 15 209:23

210:2, 16 211:10,
11, 14, 17 212:16,
21 213:6, 9, 13
214:12 218:3
219:17 221:23
222:8, 23 223:5
225:16 227:5
232:12, 25 233:6,
9, 16 234:1, 3, 4, 17,
24 237:22 238:14
244:7, 10 251:15
**Risen** 15:2
**risk** 35:19 52:1, 2
129:12 220:10
232:2, 4
**risks** 33:11 51:20
52:5 155:16, 17
249:4 250:11
**role** 37:4, 6, 11
39:11 84:21 86:4,
6 91:24 92:3, 9
179:14 244:13
**room** 5:17 64:6
65:13 111:8
**rotate** 19:18
**round** 18:23
**rounds** 17:14
**RPR** 1:20 7:3
256:2
**rule** 73:15 159:9
**rules** 7:23 8:2
78:6 255:4
**run** 80:25 81:9
158:25 226:25
**runs** 217:13

**< S >**
**sac** 163:21, 23
**sadness** 197:7
**safety** 177:2
**sake** 7:10 12:5
**sarcasm** 57:14
**satisfaction** 154:12
**satisfy** 34:11
249:21
**saw** 40:1 135:4
139:22 140:9
145:24, 25 146:2
192:15 245:17
**saying** 9:9 15:12
27:7 31:11 52:9

61:18 123:5
143:7 154:2
156:19 157:17
171:6 173:3, 5, 10
178:22, 23, 24
183:14 185:8
208:9 215:18
227:3, 13, 14
230:12 240:20
241:13 251:17
**says** 30:12, 14
32:6 37:25 77:7
93:14, 24 103:2
135:15, 25 137:4,
10, 13, 24 138:15
139:8 140:22, 25
142:10 158:18, 20
159:21 160:15, 19
161:10 164:13
177:23 180:15
213:9, 22 214:13
220:25 221:2, 3
224:12 233:7
234:24 235:1
246:1, 14, 23
**scalp** 49:10
167:25 168:3
**scan** 131:2
**Scandinavian**
230:20
**scans** 48:16
**scene** 23:23
**scheduled** 18:23
162:16 163:16
**scheme** 180:10, 16
**scholarly** 95:10
**school** 28:18
74:24, 25 75:3
177:8 247:17
**schooled** 61:8
**science** 24:14
38:25 39:3 61:3
64:1, 2, 4, 10
65:17, 18, 20
69:19 85:19, 23
86:1, 3 157:8
227:17
**scientific** 37:13
40:23 44:6 59:14,
15 61:1, 23, 24
65:11, 15 103:3

117:23 165:17
217:8 226:23
250:25
**scientifically** 61:21
231:6
**Scotland** 166:18
**screen** 69:24 75:8
92:15 101:15, 16
135:7, 9, 22 160:8,
12, 13 197:25
202:17 210:5
218:1 224:9
236:4 244:20
**screens** 70:5
**scroll** 74:13 93:6,
22 94:24 106:19
107:25 118:3, 5,
13, 20, 22, 23
138:12 176:11
**scrolling** 117:22
**scrotum** 46:5, 6
47:23 158:20, 22
162:18 163:21, 22
191:18
**se** 37:10 215:24
**search** 120:6
**searched** 205:18
**second** 11:17 12:8,
12 135:8 164:5
170:6 176:12
180:15 182:10
209:7 229:12
246:14
**second-to-last**
135:13
**section** 70:16, 17
103:13, 20, 25
106:22 117:20, 21,
22 118:4, 7, 11
119:1 135:20
137:11 174:17
175:3 177:20
189:5, 9, 21 190:2,
8, 19
**sections** 70:15
**see** 10:20 16:2, 5,
6 17:1 19:18
30:10, 12, 24
32:18, 19 36:19
37:21 38:1, 11, 17,
22 39:5, 18, 20

48:1 50:15, 19
53:7, 25 54:12
55:21, 25 57:25
64:5 66:24 68:6
69:15 70:7, 12, 19
71:14 73:22, 25
74:12 79:8 80:17
81:11, 12 82:6
91:11 92:16, 17
93:25 94:14, 20
95:7, 8, 12 96:19
101:16 102:15
103:8 107:6
108:18 114:8
116:14 117:25
118:10, 13 120:3
133:12, 14 135:9,
17, 22 136:2
137:4, 15 138:4,
20 140:23 142:4,
8, 17 143:20
144:4 148:5
153:14 155:11, 17
160:11, 14, 17
162:13 163:8
164:7, 10, 20
165:13, 15 166:21
167:24 168:1
171:11 172:5
174:10, 16, 18
175:4 176:14
178:3, 4 182:12
185:22 188:7, 21
189:7 195:6
197:6 198:5
201:8, 9 202:9, 19
203:1 204:10
206:9 210:5
213:16 217:20
219:19 220:4
221:12, 18 222:3,
13 224:9 225:11
226:20 227:17, 21
230:5, 11, 13, 15, 19
231:20 233:19
234:13 236:1, 11,
25 239:14, 22
240:13, 14, 15
241:16, 18 245:16
248:4 250:9, 17,
19 251:18

**seeing** 15:16, 21
39:23 70:4
131:13 134:16, 22
209:20
**seek** 224:18
**seen** 16:9 40:19
53:10 144:21
167:7 174:8
195:12 201:6, 7
213:4 240:2 248:7
**select** 83:5 231:6
**self** 38:3 48:10
188:24 194:20
199:21 200:2
202:10 239:19
243:2, 5, 7, 8
246:19
**self-administered**
108:11
**self-destructive**
185:25
**self-diagnosis** 147:8
**self-esteem** 246:20
**self-labels** 239:15
**self-mutilation**
163:7
**self-report** 30:24
147:21 148:6, 15
149:6, 7, 9, 13, 15,
17, 21, 24 175:9
242:3
**self-reporting**
149:4
**self-understanding**
112:20
**semester** 18:17
**seminal** 13:9
**seminar** 19:2, 17
**seminars** 19:14
20:4, 11, 15
**semi-objective**
108:14
**send** 252:14
**senior** 16:21
**sense** 15:17 16:16
21:19 22:5 28:16
30:2 34:2 38:9
40:23 45:19
47:23 48:9 68:10
86:3 102:16
111:16 116:23

136:21 146:12
182:1, 4, 7 187:14,
15, 25 188:24
191:8 239:18, 19
246:19
**sensibilities** 110:25
**sent** 166:18
**sentence** 46:21
161:10 162:12, 15
164:6, 8, 13, 24
166:17 174:21
175:1, 8, 15
180:15 198:8
202:23 209:10
210:13, 23 218:17
221:14, 18 231:20,
24 236:7
**sentences** 218:18
**separate** 20:11
22:7 23:7 31:17
32:15 93:9
133:12 187:9, 21
223:10 233:13, 23
**separated** 71:3
**Sept** 138:15
**September** 136:1,
11 137:6, 14, 20
138:15, 16 139:18,
19 140:12, 17
141:9
**series** 150:1 192:2
226:9 230:6
239:14
**serious** 31:9, 24
52:10 60:25
182:11 185:11
**serum** 127:19
**servant** 175:21
**served** 177:17
**Service** 19:2
**Services** 72:18
73:5 87:12
166:14 195:8, 9
**servitude** 180:8
**SESSION** 125:1
**sessions** 114:19
**set** 112:1 152:16
171:4 183:4
247:22 256:20

setting 171:*1, 2*
196:*18* 226:*3*
247:*19*
settle 77:*10*
settled 237:*17*
seven 103:*23, 25*
161:*20* 223:*9*
237:*18*
seventh 59:*5* 60:*8*
251:*7*
severe 29:*25*
30:*11, 15, 17* 31:*2,*
*5, 12, 15, 17, 19*
severely-depressed
154:*17*
severity 32:*3*
sex 13:*10* 21:*20*
22:*6* 23:*9* 25:*3, 4,*
*6* 27:*2* 31:*4*
37:*20* 40:*14*
44:*17* 45:*12*
48:*10* 53:*12, 16*
54:*9, 10, 13, 14*
55:*20* 76:*22*
99:*21* 100:*25*
114:*23* 115:*11*
119:*16* 143:*3*
165:*5* 166:*8*
171:*7* 173:*22*
175:*24* 176:*25*
177:*4* 211:*8*
212:*9, 11* 213:*16*
215:*10, 13, 17, 19*
217:*9, 12* 218:*19,*
*21* 219:*2, 8* 220:*2,*
*15* 226:*2, 24*
227:*8, 15* 228:*1*
229:*6, 13, 16, 17, 22*
230:*2, 10, 14*
241:*9* 244:*19*
245:*22* 247:*23*
249:*18*
sexes 240:*12, 22,*
*24* 241:*3* 242:*4, 12*
sexual 17:*11, 12*
22:*15, 16* 29:*5, 9,*
*11* 121:*12* 125:*14*
174:*23* 175:*15, 21*
178:*14* 179:*7*
180:*4, 8, 23* 181:*8,*

9 195:*22, 23, 24*
239:*14, 15, 20*
sexuality 17:*18*
18:*3* 242:*1*
sexually 18:*11*
177:*13* 178:*23, 25*
179:*23* 180:*9*
240:*23*
shape 142:*14*
shaped 33:*2* 96:*16*
share 32:*24* 69:*24*
92:*15* 101:*15*
110:*6* 135:*7*
160:*7* 202:*17*
209:*7* 210:*5*
218:*1* 236:*4*
244:*20*
sharing 35:*4* 75:*8*
244:*3*
shaved 45:*17*
shed 218:*1*
sheds 218:*18*
SHEET 255:*1, 4, 6*
she'll 148:*18*
Sherman 2:*15*
shocked 204:*6*
247:*10*
short 5:*13* 81:*9*
108:*7*
shorter 36:*14, 16*
shortly 109:*14*
short-term 35:*23*
39:*17*
shoulders 48:*1*
show 110:*4* 180:*1*
showed 64:*15*
shower 27:*22*
shrink 127:*6*
shrinkage 127:*4, 17*
shrinking 132:*4*
shut 157:*20*
side 85:*18, 21*
130:*7* 238:*18*
sign 10:*13, 24, 25*
193:*22, 24*
significant 189:*22*
246:*17*
significantly 36:*14*
signing 3:*13*
silicone 45:*9*
similar 21:*7* 32:*11*

Similarly 57:*7*
149:*8*
simple 18:*2* 111:*6*
simpler 88:*8*
simplification
155:*23*
simply 24:*2* 59:*13*
62:*7* 96:*12*
144:*19* 149:*15*
157:*13* 159:*16*
202:*10* 227:*17*
228:*5* 242:*4*
sincere 248:*16*
sincerely 182:*6*
single 199:*17*
Sinnott 2:*17* 6:*12*
sisters 167:*15*
sit 27:*23* 176:*8*
sitting 49:*22*
208:*6, 13*
situation 24:*3*
184:*20*
situations 69:*12*
Six 2:*8* 7:*21, 22*
16:*18, 25* 19:*20*
20:*11, 15* 40:*4, 18*
41:*7* 53:*15* 96:*19*
97:*18* 129:*8*
132:*14* 230:*6*
size 127:*6* 132:*25*
sizes 132:*19*
skeptical 31:*7*
50:*11*
skepticism 61:*4*
179:*16* 214:*7*
skills 97:*17* 222:*5*
skim 118:*3, 17*
skimmed 11:*6, 8*
skin 125:*14*
127:*12, 15*
slam-dunk 204:*4*
slash 137:*25*
138:*1, 3*
sleep 184:*10*
250:*18*
slightly 187:*1*
slip 89:*10, 16*
slower 180:*12*
slowly 82:*12*
small 181:*17*

smart 31:*1*
smile 65:*11*
smoothly 9:*15*
social 32:*13* 54:*16,*
*17* 76:*8, 12, 13, 20,*
*25* 77:*15, 19*
78:*25* 79:*5, 7, 9,*
*17, 18, 22* 81:*1*
101:*1* 184:*20*
244:*14*
socializing 75:*3*
socially 76:*24* 79:*8*
society 159:*1*
softening 125:*14*
127:*12, 15*
sole 102:*17*
solidification 237:*1*
solidified 237:*14*
solution 225:*25*
228:*11*
solve 226:*7*
somebody 30:*12,*
*16* 38:*5* 41:*17*
42:*1* 89:*5* 111:*15*
132:*24* 181:*14*
195:*20* 199:*1*
someday 185:*1*
someone's 148:*16*
182:*21*
somewhat 240:*7*
soon 56:*17*
sophisticated 225:*8*
sophistication
70:*25* 82:*13*
Sorry 10:*14* 19:*8*
42:*14, 19, 23*
46:*20* 67:*23*
73:*19* 82:*22* 92:*1*
93:*23* 96:*12*
99:*15* 108:*22*
110:*9* 113:*5, 9, 14*
119:*20, 25* 121:*21*
128:*9* 130:*4*
135:*8* 138:*13*
140:*3* 144:*9*
145:*11* 149:*12*
154:*8* 156:*11*
158:*4, 5* 160:*9*
161:*1* 162:*10*
164:*8* 177:*25*
180:*11, 13* 182:*9*

190:*15* 192:*9*
197:*1* 198:*6, 15*
205:*10*  210:*8*
211:*24*  215:*5*
218:*8* 221:*3*
223:*4* 231:*13, 21*
235:*8* 245:*1*
248:*22, 24*
**sort** 38:*20* 64:*14*
102:*23* 125:*13*
198:*7*
**sorts** 132:*18*
184:*14*
**sound** 9:*2, 16*
31:*2* 123:*23*
**sounded** 246:*2*
**Sounds** 9:*3* 10:*5*
11:*1* 12:*22* 221:*23*
**source** 21:*21*
22:*21* 26:*10*
121:*8* 141:*23*
218:*2* 231:*12, 19*
**sources** 95:*14, 16,*
*19* 96:*9* 210:*15*
225:*19*
**space** 9:*11*
**spare** 171:*4*
**speak** 55:*15* 67:*23*
154:*18* 173:*18*
200:*22*
**speaking** 129:*2*
131:*5*
**special** 77:*6* 194:*2,*
*9* 195:*10* 197:*22*
**specializing** 17:*20*
**specific** 21:*2, 5*
28:*12* 96:*3* 97:*22*
99:*8, 11, 25*
100:*21* 135:*3*
160:*6* 165:*9* 180:*3*
**specifically** 39:*8*
41:*12* 75:*14*
116:*5* 133:*6*
156:*16* 204:*20*
**specified** 51:*3*
148:*20*
**specify** 23:*19*
51:*11*
**spell** 12:*19* 18:*8*
**spelling** 11:*15*

12:*7*
**spend** 19:*19, 21*
**spent** 16:*18*
**spironolactone**
44:*3* 128:*13*
129:*20, 23* 130:*12*
136:*22* 140:*16*
**spoke** 146:*19*
151:*12* 193:*19*
**spoken** 107:*18*
109:*7, 10*
**spontaneous** 126:*7,*
*9, 17, 19*
**Square** 2:*8*
**SRS** 211:*1* 225:*9,*
*13* 231:*6, 7, 8*
**stabbed** 176:*24*
**stability** 238:*9*
244:*1*
**stable** 182:*16, 23*
238:*7*
**staff** 20:*17* 77:*12*
80:*1, 7* 194:*14*
**staffs** 20:*12*
**Stamford** 2:*9*
**Standard** 4:*1*
68:*19, 21* 108:*19*
245:*6, 10, 25*
246:*10*
**standards** 21:*23*
58:*14* 59:*3, 4, 10,*
*11* 60:*2, 4, 16, 17,*
*24* 61:*2, 6, 7, 11, 15,*
*17, 20* 62:*7, 14, 17,*
*25* 63:*5, 10, 15, 16,*
*18, 22* 64:*7, 23*
65:*12, 25* 66:*1, 4,*
*8* 67:*10* 68:*3, 5, 6,*
*11, 13, 16, 17* 69:*2*
130:*25* 249:*3*
250:*15* 251:*7*
**standing** 27:*23*
60:*21* 252:*20*
**stands** 59:*16*
120:*18* 138:*16*
**start** 123:*13*
**started** 136:*1*
137:*6, 14, 20*
158:*14* 184:*13*

**starting** 129:*15*
145:*5* 201:*16*
246:*14*
**starts** 123:*12*
164:*6* 210:*6*
**State** 5:*24, 25*    6:*4*
7:*3* 18:*10* 28:*16*
71:*8* 77:*5, 7*
80:*16* 81:*5* 85:*23*
108:*12, 15* 110:*3,*
*15* 161:*21* 162:*25*
174:*2* 184:*4, 9*
187:*5* 245:*18*
252:*21* 256:*4*
**stated** 12:*24* 28:*6*
101:*2* 121:*8*
**statement** 48:*17*
167:*2* 203:*14*
207:*19* 219:*8, 25*
236:*15*
**statements** 96:*13*
**STATES** 1:*1* 20:*7,*
*18* 22:*10* 24:*6, 11,*
*16* 35:*21* 39:*16*
63:*1* 68:*23, 24, 25*
74:*20* 165:*7*
173:*17* 189:*14, 15*
205:*24* 230:*8*
236:*7*
**statistical** 223:*10*
**status** 14:*22* 29:*2*
189:*12, 13*
**stay** 162:*11*
**stealing** 188:*20, 22*
**stenographer** 5:*23*
**step** 69:*16, 17*
197:*18* 214:*1*
**STEPHEN** 1:*8*
4:*1* 7:*1* 70:*5*
93:*15* 254:*3, 8, 13*
255:*8, 24* 256:*7*
**stepping** 125:*10*
**steps** 179:*6*
**stereotypic** 38:*21*
**stick** 24:*6*
**stigmatized** 240:*8*
**stimulation** 157:*2*
**stipulated** 3:*2, 6,*
*10, 12*
**STIPULATIONS**
3:*1* 5:*3, 4*

**stop** 10:*5* 15:*20*
37:*3* 75:*8* 209:*7*
244:*3*
**stopped** 40:*6, 9*
66:*23, 24* 67:*2*
192:*7, 12*
**story** 148:*24*
213:*4* 241:*16*
**straightforward**
111:*7* 208:*12*
**stranger** 157:*1, 2*
**Street** 1:*23* 2:*15*
**strength** 90:*4*
127:*9* 132:*1, 2, 4*
**strengthen** 104:*23*
**stress** 177:*23*
**Strike** 109:*23*
128:*9* 145:*12*
212:*1*
**strong** 28:*5* 40:*23*
80:*25* 224:*19*
**stronger** 234:*18*
**strongly** 46:*12*
**structures** 45:*24*
46:*2*
**struggled** 200:*11*
**struggles** 55:*5*
56:*6, 13*
**Student** 19:*2*
**studied** 54:*4* 230:*7*
**studies** 36:*12* 61:*9,*
*25* 64:*13* 65:*8*
99:*10, 21* 131:*9,*
*15* 206:*10* 208:*21*
210:*15, 18, 22*
226:*9, 19, 21, 22*
228:*11* 229:*4, 5,*
*11* 234:*12* 247:*9*
**study** 4:*1* 38:*24*
53:*14, 16* 58:*19,*
*23* 64:*15* 105:*7,*
*10, 11, 16, 17, 22, 23*
210:*24* 211:*6, 9,*
*12, 13, 22* 212:*2, 17,*
*24, 25* 213:*6*
214:*2, 6, 9* 215:*3,*
*6, 8, 14, 15, 16, 18*
216:*16, 21, 25*
217:*4, 19, 21, 22, 23,*
*25*  218:*3, 11, 14, 15,*
*18* 219:*1, 22*

Cassian Reporting, LLC
scheduling@cassianreporting.com

221:*1, 9, 11*
222:*10, 17, 19, 22,*
*25* 224:*13, 22*
225:*4, 5, 23* 226:*1,*
*6, 9* 227:*6, 7*
228:*15* 229:*19*
230:*4* 231:*15, 17,*
*25* 232:*8, 14, 24*
233:*4, 13, 23*
234:*2, 5, 11, 12, 15,*
*24* 235:*1, 24* 236:*1*
**stunned** 204:*7*
**stupid** 193:*1, 7*
198:*5*
**style** 165:*13* 171:*9*
**subject** 17:*18*
83:*10* 95:*22*
99:*18* 114:*14*
**subjective** 22:*22*
28:*15, 16* 30:*19*
32:*16* 34:*2*
181:*25* 241:*20*
**subjugation** 180:*7*
**submitted** 72:*8*
74:*19* 93:*15*
102:*10* 118:*14*
**submitting** 88:*7*
**subscribed** 254:*15*
**subsequent** 145:*7*
223:*12*
**subsequently**
177:*16* 179:*8*
**substance** 13:*25*
35:*20* 191:*9*
220:*11*
**substantial** 52:*19,*
*21* 191:*20*
**substantiated**
104:*12*
**substitute** 80:*20*
**succeed** 151:*1*
**succeeded** 163:*18*
191:*16*
**successful** 141:*19*
**sudden** 37:*21*
**suffer** 30:*9*
**suffering** 26:*4*
30:*10* 117:*11, 12*
151:*24* 157:*5*
159:*5* 184:*21*

185:*5* 188:*13, 14*
194:*15, 18*
**suffers** 109:*22*
148:*24*
**sufficient** 48:*5*
84:*3* 194:*13, 17*
243:*17*
**sufficiently** 64:*4*
**Suffolk** 84:*10* 85:*6*
**suggest** 141:*4, 7*
196:*2* 231:*5*
**suggested** 115:*22*
116:*3, 4* 228:*10,*
*14* 229:*8*
**suggestion** 116:*8*
**suicidal** 213:*8, 10,*
*11* 235:*14, 18, 20*
**Suicide** 4:*1* 35:*16,*
*18, 21* 36:*18* 54:*5,*
*6* 105:*9* 111:*24*
210:*25* 213:*15, 19,*
*22, 23* 214:*24*
216:*4, 12* 220:*7, 8*
221:*15, 16* 227:*23*
230:*18* 232:*2, 4, 9,*
*18* 235:*4, 5*
**suicides** 35:*22*
**suit** 75:*2* 142:*20*
**sum** 238:*3*
**summarize** 136:*8*
179:*12* 188:*11*
**summarized** 119:*2*
199:*25*
**summary** 93:*20*
207:*19* 208:*22*
231:*11*
**Sunday** 11:*5*
**supervise** 16:*22*
17:*4*
**supervising** 16:*23*
**supervision** 256:*11*
**support** 33:*25*
34:*3* 74:*18*
161:*11* 224:*17*
249:*8*
**supports** 96:*4*
**supposed** 61:*11*
184:*23, 24* 229:*22*
**suppression**
120:*16* 121:*5*

**sure** 7:*23* 12:*9*
27:*10* 35:*10* 36:*9*
37:*15* 43:*15*
46:*13* 47:*10* 63:*4,*
*16* 65:*20* 67:*19*
72:*2* 74:*14* 79:*4*
84:*17* 89:*21* 93:*7*
96:*25* 97:*22*
99:*19* 104:*2*
106:*1, 2, 21* 110:*6*
117:*17* 118:*19, 21*
119:*18* 124:*19*
133:*13* 134:*2, 21*
148:*19* 150:*17*
151:*2, 6, 12* 152:*6*
154:*11* 156:*2*
175:*12* 179:*24*
180:*13* 193:*19*
198:*15* 201:*4*
202:*3* 207:*10, 13,*
*16, 22, 23* 222:*15*
223:*20* 226:*24*
233:*23* 249:*22*
250:*6*
**surgeon** 34:*14*
45:*21* 115:*13, 15*
206:*8* 207:*16*
**surgeons** 58:*24*
171:*5* 206:*21, 22*
208:*17* 209:*1*
**Surgeries** 12:*2*
37:*2* 44:*25* 45:*1*
46:*10, 18, 19, 22*
47:*3, 6* 49:*15*
88:*11* 99:*22*
171:*2* 172:*17*
203:*4, 5, 8, 12, 15*
205:*13, 24, 25*
222:*21* 224:*18*
**Surgery** 11:*19, 22*
13:*10* 25:*6* 30:*17*
31:*4, 5* 34:*17*
35:*16* 40:*15*
44:*14, 17, 18, 20*
45:*3, 4, 7, 11, 12, 15,*
*16, 22, 25* 47:*4, 5,*
*16, 20* 48:*13*
50:*14, 21, 23*
53:*13, 16* 54:*10,*
*13, 14* 57:*9, 12, 20,*
*21, 22* 69:*16*

76:*22* 82:*16, 25*
83:*4, 12, 19, 22*
88:*10* 91:*8, 17*
98:*17* 101:*1*
103:*4* 114:*4, 23*
115:*12, 18* 117:*15,*
*24* 119:*17* 142:*15*
143:*3* 144:*17*
157:*3* 159:*8*
164:*22* 165:*6, 24*
166:*8, 11* 170:*8,*
*12, 16, 17, 21* 171:*7*
172:*25* 173:*3, 7, 9,*
*13, 17, 23* 174:*7, 12*
182:*4* 185:*2*
202:*24* 203:*3, 18,*
*23* 204:*5, 16*
205:*19* 206:*17, 18*
207:*24* 208:*4, 15*
209:*4, 5* 211:*8, 23,*
*24* 212:*3, 9, 12, 14,*
*18, 19, 23, 24* 213:*7,*
*16, 25* 214:*3, 4, 10,*
*14* 215:*2, 11, 13, 17,*
*19* 217:*9, 12*
219:*15* 220:*2, 4,*
*16, 17* 221:*1*
222:*6, 7* 224:*16*
225:*1, 2, 20, 21*
226:*2, 6, 11, 25*
227:*8, 16* 228:*2,*
*12, 16, 21, 22* 229:*7,*
*14, 17, 22* 230:*2, 10,*
*11, 14* 234:*3, 6, 7*
235:*7, 10* 244:*19*
245:*23* 246:*15*
247:*23* 248:*14*
249:*4, 5, 7* 250:*4,*
*22* 251:*17, 18*
**surgery's** 210:*19*
**surgical** 142:*22*
154:*3, 4* 155:*14*
164:*14* 170:*13*
204:*18* 205:*17*
206:*8, 9* 207:*2, 10,*
*14* 208:*2, 18, 25*
226:*2, 6* 227:*14*
249:*25*
**surgically** 233:*20,*
*21, 24*
**surprisingly** 138:*7*

surreptitiously
139:*14* 177:2
swallowing 81:*4*
Sweden 53:*13*
68:*19* 105:9
211:*9, 14, 16*
212:*12* 217:*13*
230:*20*
Swedes 53:*11*
Swedish 97:*6*
211:*1* 212:*4*
213:*12* 221:*15, 21,
24* 222:*4, 8* 227:7
231:*16*
sworn 7:*2* 256:*8*
symposium 18:*19*
symptomatic
151:*24* 152:*14, 21,
24, 25* 159:*19*
symptoms 32:*8*
64:*25* 150:*3*
151:*23* 152:*18*
155:*23*
synonym 183:*9*
196:*6*
system 20:*20* 21:*7,
10* 75:*24* 87:*21*
120:*22* 123:*18*
143:*5* 146:*3*
167:*4* 173:*15*
189:*20* 192:*25*
197:*22* 209:*21*
233:*19* 235:*3*
systems 63:*1, 2*
111:*18, 19* 112:*17,
18, 19* 121:*3*
194:*6* 198:*3*

< T >
table 227:*24*
tables 8:*1*
take 9:*1* 10:*1*
14:*19* 27:*21*
34:*23* 54:*24*
57:*24* 61:*24* 71:*6*
94:*16* 95:*14* 96:*8*
101:*13* 103:*18, 22*
112:*12* 115:*10*
117:*20* 122:*20, 24*
123:*19, 21* 124:*5,
20* 126:*2* 129:*5*

131:*9* 132:*13, 14*
145:*2* 146:*16*
170:*1* 176:*9*
179:*6* 185:*1*
190:*12* 193:*14, 16*
194:*7* 198:*14, 17*
210:*18, 22* 215:*23*
216:*18* 218:*25*
223:*16, 23* 225:*4*
251:*23*
taken 3:*8* 58:*8*
124:*23* 192:*17, 20*
198:*19* 236:*16*
252:*6* 255:*8*
256:*12, 16*
takes 112:*15*
talk 9:*11, 12*
10:*24* 13:*22, 25*
14:*5* 18:*3* 24:*14*
26:*25* 30:*9* 33:*18*
41:*16, 17* 42:*1, 3*
49:*12* 50:*17*
58:*13* 69:*22* 87:*1*
108:*1* 109:*15*
114:*9, 11, 13*
116:*6* 126:*17*
133:*23* 134:*15*
143:*20* 163:*16*
174:*10* 190:*20*
195:*21, 25* 197:*22*
199:*6* 219:*17*
talked 41:*13*
42:*17* 55:*19*
104:*6* 112:*9*
190:*7* 193:*8*
196:*19* 215:*4*
216:*16, 19, 24*
talking 21:*4, 6*
26:*9* 27:*12* 29:*15*
33:*17* 38:*23* 42:*4*
43:*3, 5, 7* 46:*23*
51:*14* 56:*14* 71:*6,
14* 76:*13* 78:*21,
22* 90:*5, 23* 99:*10,
11* 106:*21* 112:*4*
125:*6* 133:*8*
143:*21* 144:*17*
145:*19* 146:*21*
165:*1, 3* 177:*10*
178:*5* 186:*18*
188:*12* 196:*5, 6*

200:*23, 25* 201:*1*
203:*8, 11* 204:*2*
211:*12* 218:*3*
241:*19* 242:*17*
243:*2*
target 123:*2*
134:*7, 11, 15, 16, 23*
Taylor 233:*2*
teach 17:*7, 9, 10,
11, 12, 24* 19:*13, 16*
247:*14*
teaching 18:*1, 16*
19:*6, 9, 11, 16*
team 20:*4* 82:*11*
158:*15* 206:*8*
teams 208:*18*
tease 24:*5* 31:*22*
65:*22*
techniques 209:*1*
teenagers 40:*13*
235:*14*
telephone 13:*19*
107:*4, 7*
tell 8:*16* 16:*20*
18:*9* 32:*21* 37:*16*
40:*24* 43:*11* 50:*9*
55:*12* 62:*3* 64:*18*
65:*10* 84:*11*
99:*18* 102:*24*
103:*16* 104:*2*
106:*20* 111:*12*
118:*3* 132:*6*
133:*1* 147:*14*
158:*12* 164:*2*
175:*1, 7, 13*
183:*25* 205:*6*
208:*6, 14, 22*
217:*23* 228:*19*
240:*6* 241:*25*
242:*2* 248:*10*
249:*11*
telling 39:*5* 75:*1*
172:*12* 240:*6*
tells 22:*6* 26:*14*
147:*11, 25*
temporarily 184:*3*
ten 25:*8* 58:*3, 5*
88:*5* 143:*21*
172:*5* 186:*15*
229:*1* 230:*6*

251:*24*
tend 120:*23*
ten-minute 15:*13*
58:*1* 124:*5*
tentative 150:*8*
term 23:*24* 25:*1,
11, 23* 27:*4, 11*
31:*15* 42:*9, 15, 20*
43:*1, 8* 45:*4*
46:*17* 47:*3, 5*
78:*8* 79:*11* 80:*2,
8, 19* 81:*14, 19, 22*
82:*19* 83:*7, 11*
110:*2* 149:*5*
151:*15* 153:*3, 7,
19* 155:*8* 157:*14*
159:*20, 24* 162:*1*
183:*8* 238:*13*
terminology 27:*8*
terms 22:*5, 6*
24:*23* 25:*7, 9*
27:*9* 32:*8* 44:*16,
19* 50:*3* 54:*4*
81:*16* 98:*14, 19*
108:*15* 132:*25*
144:*1* 154:*3*
173:*14* 181:*13*
189:*18* 191:*9*
193:*9, 20* 215:*20*
219:*13* 220:*5*
239:*19* 241:*15*
Terrence 6:*20*
terrible 41:*18*
49:*23*
terribly 34:*12*
terse 96:*13*
test 108:*11* 132:*2*
146:*6*
testes 34:*23* 46:*4,
13, 24* 47:*22* 127:*5*
testicle 191:*11, 17,
24*
testicular 127:*4, 17*
testified 7:*4* 71:*1*
73:*13* 111:*13*
206:*3* 209:*17*
testify 48:*13, 15*
77:*19* 256:*8*
testifying 71:*2*
testimony 9:*19*
16:*4* 113:*24*

115:*17* 116:*25*
117:*13* 121:*16*
126:*22* 144:*13*
171:*20* 188:*16*
207:*9* 254:*4*
256:*12*
**testing** 107:*22, 24*
108:*3* 109:*3*
**testis** 46:*3* 162:*19*
163:*17, 18, 20, 21,
22* 191:*12*
**testosterone** 46:*4*
120:*13, 16* 121:*5*
126:*11, 13* 127:*3*
130:*1, 2, 6* 134:*11,
16, 22* 137:*25*
138:*2, 8, 18* 139:*2,
4, 14, 16, 17, 23*
140:*2, 9* 141:*1, 14,
17, 23, 24*
**tests** 109:*1* 145:*6,
23* 146:*1*
**Thank** 6:*17* 7:*8*
12:*4, 15* 13:*7*
17:*6* 35:*2* 51:*12*
62:*5* 99:*4* 101:*7*
113:*13* 125:*3*
130:*9* 144:*14*
160:*1* 169:*19*
174:*4* 183:*24*
205:*11* 231:*4, 11*
245:*3* 252:*12, 17,
19* 253:*1*
**Thanks** 13:*16*
57:*23* 252:*4*
**theme** 12:*6*
**themself** 117:*11*
**therapeutic** 153:*21,
22*
**therapist** 114:*13,
14*
**therapists** 16:*23*
114:*8* 161:*5*
**therapy** 42:*6, 14*
43:*2, 8, 12, 21, 24*
44:*11* 56:*3, 20, 25*
112:*24* 113:*2, 17*
114:*1, 19* 116:*4*
117:*10* 122:*17*
123:*3* 125:*11*
127:*24* 128:*5, 12,*

21, 25* 130:*13*
131:*17* 132:*6, 8*
133:*2, 17* 134:*4, 8,
12, 17, 24* 135:*15*
137:*20* 138:*10*
139:*19, 23* 141:*5*
145:*3, 17* 154:*25*
155:*14* 249:*18*
**thereof** 255:*3*
256:*20*
**thick** 48:*1*
**thing** 27:*7* 34:*18*
42:*12* 43:*2, 8*
47:*25* 62:*1, 2*
64:*11* 71:*2* 84:*18,
19, 23* 113:*22*
123:*15* 125:*23*
128:*17* 140:*8*
151:*9* 163:*15*
181:*15* 191:*1*
194:*4* 198:*2, 6*
217:*12* 229:*8, 12*
240:*4, 21* 246:*3*
247:*24* 248:*11*
**things** 19:*4* 24:*5*
31:*22* 33:*3, 4*
34:*25* 36:*22*
63:*24* 64:*8* 65:*2,
23* 69:*6, 8* 72:*20,
24* 78:*9* 93:*20*
110:*12* 115:*22*
116:*21* 128:*23*
131:*4* 133:*12*
139:*10* 142:*1*
143:*11, 21* 144:*3*
156:*4, 9, 17* 165:*6,
22* 166:*19* 170:*25*
171:*23* 172:*5, 6, 9,
10, 11* 179:*10*
185:*12, 19* 187:*22,
23* 206:*20* 228:*19,
20* 236:*20* 237:*23*
238:*3* 247:*20*
249:*25*
**think** 9:*14, 18*
11:*7, 17* 15:*11*
18:*6* 20:*10, 11, 24*
24:*13, 15* 25:*8, 10,
24* 26:*9, 12* 27:*23*
29:*23* 36:*5* 37:*3*
38:*6* 39:*2, 10*

42:*9* 44:*16* 47:*13,
18* 48:*12, 16, 25*
49:*11, 24* 50:*10,
20, 21* 51:*24*
52:*17, 20, 23*
53:*20* 54:*21* 55:*2,
22* 57:*23* 60:*7, 13,
21* 61:*25* 62:*15*
63:*7, 13, 25* 64:*1*
69:*8, 24* 72:*16, 23*
76:*4* 79:*10* 80:*4,
23* 81:*12, 25*
84:*11* 86:*5, 10*
88:*5* 90:*1* 91:*2*
92:*12* 95:*16* 98:*3*
99:*5* 101:*1*
102:*19, 23* 106:*1,
12* 108:*16* 110:*22*
111:*13, 19* 115:*12,
25* 116:*11, 12*
119:*11* 120:*14*
121:*4, 7* 122:*8*
123:*10* 124:*3, 16*
128:*8, 13, 18*
129:*7, 11, 16*
132:*1, 12, 13*
133:*22* 134:*1*
135:*3* 136:*8*
141:*16* 145:*23*
148:*16, 17* 149:*2*
151:*3* 153:*21*
154:*10* 155:*24*
157:*10* 158:*3*
161:*20, 23* 163:*12,
15* 168:*8* 169:*5,
24* 171:*6, 15*
172:*2, 22* 173:*12*
175:*18* 176:*3, 5,
19* 177:*15* 178:*14,
15, 16, 17* 181:*8, 25*
190:*6, 13* 191:*17*
192:*3, 6, 24* 193:*2,
24* 194:*6, 16, 23*
195:*2* 198:*1*
199:*11* 201:*8*
202:*3* 204:*8*
205:*18* 207:*3, 23*
208:*8, 10, 16*
215:*22* 217:*7, 10,
18* 220:*23* 221:*6,
9* 222:*25* 225:*5*

229:*23* 230:*24*
233:*1, 15, 19*
235:*23* 241:*4, 6*
242:*7* 244:*14*
247:*1* 249:*9*
250:*16* 251:*5*
**thinking** 36:*9*
43:*18* 55:*18*
181:*12, 24* 204:*9*
**thinks** 148:*1*
173:*22* 215:*7*
**third** 48:*10* 249:*2*
**Thomas** 102:*12*
**thought** 35:*1* 38:*4*
64:*10, 15* 87:*21*
105:*13* 114:*2*
122:*12* 129:*24*
166:*3* 170:*23*
190:*4* 193:*3*
202:*5* 213:*17, 24*
**thoughtful** 36:*22*
119:*18*
**thousand** 38:*23*
**thousands** 37:*1*
95:*25*
**three** 18:*22, 23*
59:*11* 69:*17* 89:*6*
106:*10, 17* 114:*9*
126:*16* 137:*7*
139:*11, 12* 142:*20*
145:*5* 155:*24, 25*
176:*22* 177:*3*
232:*2*
**three-year-old** 89:*5*
**thromboembolic**
129:*13*
**throw** 153:*20*
**time** 3:*3* 18:*20*
20:*24* 32:*25* 33:*9*
50:*2* 51:*17* 53:*25*
56:*17* 59:*24* 62:*6*
84:*4* 91:*16* 94:*8*
95:*24* 98:*7, 8, 12,
22* 105:*20* 107:*9*
109:*8, 12* 112:*11*
115:*7* 119:*18*
123:*19* 124:*17*
128:*7, 11* 137:*8*
150:*9* 167:*10, 16*
177:*17* 182:*17*
184:*11* 186:*13*

192:*21* 198:*10*
201:*15, 18, 21*
204:*14* 207:*3*
209:*21* 219:*18*
221:*10* 226:*20*
239:*6, 13, 22*
240:*20* 248:*8*
**times** 7:*19, 22*
51:*13* 56:*22* 57:*2,*
*11, 16* 65:*12*
67:*16* 106:*16, 17*
107:*14* 126:*16*
149:*2* 155:*1, 24,*
*25* 162:*9* 177:*3*
203:*23* 210:*25*
213:*14* 221:*16*
232:*2, 5* 239:*11*
**tissue** 34:*9* 159:*10*
**tissues** 126:*17, 20*
158:*16* 159:*23*
**title** 11:*20* 99:*17,*
*19*
**titled** 70:*16, 17*
92:*19* 93:*10*
106:*22* 117:*22*
174:*17* 189:*6*
211:*7* 222:*19*
245:*10* 246:*10*
**today** 9:*20* 11:*4*
12:*6* 13:*23* 14:*1,*
*2* 20:*23* 23:*15, 24*
24:*7* 25:*10* 26:*25*
51:*13* 56:*14*
65:*18, 19* 90:*14*
99:*2* 101:*5*
115:*17* 116:*25*
120:*18, 19* 128:*6*
141:*8* 144:*20, 23*
158:*17* 160:*4*
174:*5, 11* 176:*8*
186:*10, 15* 187:*12*
202:*16* 207:*10*
208:*6, 14* 209:*6,*
*12, 14, 19* 227:*24*
252:*13*
**today's** 13:*17* 26:*9*
**told** 14:*2* 55:*6*
57:*13* 61:*19* 99:*1*
119:*11* 125:*20*
136:*10* 162:*9*
167:*5* 169:*8*

170:*2* 171:*23*
175:*2, 19, 20*
180:*21* 184:*4*
240:*3, 9* 241:*22*
247:*18*
**Tom** 104:*7*
**tone** 26:*21*
**tongue-in-cheek**
57:*14*
**top** 94:*11* 160:*15*
177:*21* 210:*9*
**topic** 17:*14* 21:*14*
56:*18*
**total** 97:*18* 126:*13*
170:*14* 222:*21*
**totally** 126:*14*
165:*10, 23* 188:*8*
**touched** 29:*23*
154:*13*
**touted** 61:*2*
**track** 40:*22*
**trade** 238:*7*
**tradition** 78:*11*
173:*19*
**tragedies** 238:*8*
**train** 90:*9, 12*
**trait** 182:*23*
**traits** 38:*18, 19*
48:*23* 183:*3, 4, 5*
185:*12*
**trans** 36:*17* 77:*25*
78:*1* 79:*21* 80:*16*
88:*20* 98:*10*
142:*20* 158:*19*
161:*19* 166:*22*
174:*1* 176:*4*
180:*18* 181:*20, 22,*
*24* 183:*20* 184:*9*
185:*9* 191:*2*
194:*9* 195:*5*
199:*14* 200:*2*
235:*15, 18* 237:*19*
240:*1* 246:*20*
**transcribe** 9:*8*
**transcript** 3:*13*
4:*2*
**transcripts** 100:*17*
**transfer** 209:*8, 13*
**transferred** 114:*20*
176:*21* 192:*4*

209:*22*
**transformed** 46:*6*
**Transgender** 4:*1*
20:*14* 22:*25*
24:*19* 25:*11*
36:*13, 15* 43:*19,*
*20* 49:*5* 59:*17*
62:*10* 68:*18* 77:*7*
82:*9* 88:*13* 89:*18*
90:*14* 110:*3, 14*
125:*11* 127:*24*
128:*25* 129:*4*
130:*13, 15* 134:*8,*
*12* 138:*9* 143:*23*
158:*21* 167:*3, 15*
177:*14* 180:*24*
184:*1* 194:*10*
199:*10, 11, 18*
200:*13, 16, 20*
201:*17, 20, 24*
202:*2, 9* 211:*13,*
*16, 22, 24* 212:*2*
214:*3, 7, 9* 222:*6,*
*7, 20* 224:*18*
225:*1, 19, 20*
232:*1, 3, 10, 19*
233:*8, 13, 24*
234:*2, 6* 243:*25*
244:*2, 18* 249:*16*
250:*3*
**transgendered**
170:*23*
**transgenderism**
213:*23* 235:*2*
248:*11*
**trans-identified**
88:*17*
**transition** 76:*8, 12,*
*14, 20, 25* 77:*15, 19*
78:*25* 79:*5, 7, 9,*
*17, 19, 22* 160:*20,*
*25* 161:*3, 11*
162:*4* 184:*23*
246:*18*
**transitioned** 76:*24*
79:*8* 161:*13* 178:*6*
**Transitioning**
183:*17*
**translate** 81:*6*
**translation** 222:*4*

**transsexual** 23:*24*
24:*24* 25:*1* 58:*21*
211:*8* 218:*19*
**transsexualism**
58:*20*
**transsexuals** 23:*23*
**trauma** 144:*4*
**traumatic** 177:*23*
189:*15*
**traumatized** 142:*13*
**treat** 15:*7* 16:*10,*
*13* 91:*1* 114:*2*
117:*2* 187:*11, 25*
**treated** 79:*20*
110:*14* 111:*2*
112:*5* 129:*4*
144:*1* 188:*25*
233:*14, 18, 20, 21,*
*24, 25*
**treating** 15:*10*
16:*17, 23* 39:*9*
141:*18* 199:*7*
201:*14* 234:*21, 22*
**treatment** 16:*24*
18:*20* 24:*10*
33:*14, 15, 19, 22*
34:*3, 7* 35:*3* 43:*3,*
*12, 22* 44:*13*
49:*18* 52:*17* 53:*7*
62:*9, 10* 68:*17*
75:*15, 20* 84:*2, 6*
85:*16* 86:*9, 14*
91:*3, 14* 92:*4*
110:*19, 22* 111:*3,*
*4, 7, 10* 115:*19*
118:*10* 119:*23*
120:*5, 10, 21*
121:*6* 122:*15*
125:*7* 135:*2*
143:*8, 17* 150:*5*
151:*17* 154:*1*
155:*2* 158:*25*
162:*7* 186:*9, 25*
187:*2, 4, 6, 9, 11*
188:*11, 18* 189:*2*
194:*22* 196:*3, 9*
197:*5* 209:*19*
210:*2* 213:*23, 25*
218:*21* 219:*3, 9,*
*12* 222:*20* 224:*16*

247:*15, 17, 18*
248:*10*
**treatments** 32:*22*
35:*1* 36:*4* 39:*1*
42:*5* 52:*4* 82:*10*
154:*20* 155:*5*
156:*4* 157:*9*
159:*15* 186:*15*
189:*14* 220:*8*
247:*13* 248:*13*
**trial** 3:*3* 224:*14*
**tried** 179:*12*
**triglycerides**
127:*20*
**trouble** 8:*4*
**troubles** 216:*2*
**troubling** 197:*8*
**true** 30:*21, 22*
63:*7, 8, 13* 82:*21*
127:*21* 201:*13*
241:*15* 254:*5*
256:*12*
**true-false** 108:*7, 10*
**truncal** 142:*14*
**trust** 136:*13*
137:*22* 211:*18, 21*
247:*14*
**trusted** 55:*3* 56:*4*
62:*22*
**trustees** 66:*10*
**trusting** 240:*14*
**trustworthy**
112:*14* 182:*19*
**truth** 240:*6*
241:*25* 254:*14*
256:*8, 9*
**truthful** 9:*19*
**try** 9:*11, 13* 14:*18*
17:*24* 42:*19*
52:*13, 18* 81:*6*
88:*21* 89:*18, 23*
90:*5, 12* 133:*5*
155:*21* 160:*10*
191:*14* 236:*17*
**trying** 35:*23*
37:*19* 41:*17*
58:*20* 59:*1* 65:*5*
81:*11* 83:*9* 85:*8*
86:*1* 89:*24*
116:*14* 133:*4*
150:*24* 187:*10, 11,*

25 189:*17, 24*
204:*9* 208:*21*
209:*24* 228:*6*
242:*7, 9* 250:*4, 6*
**tumor** 139:*15, 17*
**tune-up** 55:*15, 17*
**tune-ups** 55:*17*
**turgidity** 127:*2*
**turn** 8:*1* 59:*7*
160:*5*
**turned** 206:*16*
**twenty** 221:*21*
**twice** 97:*12* 131:*6*
172:*23*
**two** 13:*7* 16:*9*
32:*15* 40:*3* 46:*4*
54:*12, 15* 60:*24*
64:*19* 69:*17*
70:*15* 72:*23*
77:*14* 99:*13*
107:*13* 108:*13, 25*
112:*3* 114:*8, 9, 18*
116:*4, 9* 139:*10,*
*12, 19, 23* 140:*20*
165:*18* 190:*6*
201:*2* 218:*18*
223:*10* 228:*19, 20*
241:*4* 249:*15*
**two-page** 92:*21*
**type** 197:*2* 226:*8*
**typed** 10:*18*
**types** 197:*3*
**typical** 51:*21*
125:*10* 128:*24*
129:*15* 130:*12*
132:*7* 230:*13*
**typically** 53:*7*
183:*19*

**< U >**
**Uh-huh** 233:*10*
**Uh-hum** 135:*23*
**UK** 74:*11, 22*
166:*18*
**ultimately** 227:*19,*
*20*
**un** 170:*13*
**unable** 77:*4*
**unanswered** 248:*5*
**unaware** 100:*16*
104:*22*

**uncertain** 227:*13*
228:*9*
**uncertainty** 210:*12,*
*19* 248:*3*
**unclear** 15:*15*
98:*13*
**uncomfortable**
25:*25*
**unconscious** 88:*23*
**undergo** 54:*13*
187:*16*
**undergoing** 36:*21*
134:*8, 12* 211:*8*
**undergone** 25:*6*
37:*1* 60:*24*
**underlying** 152:*21*
222:*17*
**understand** 8:*14,*
*19* 9:*22* 24:*12, 17,*
*21* 25:*11, 13* 27:*5,*
*12, 13* 30:*19*
35:*12, 25* 39:*16*
47:*8, 9, 18* 51:*20,*
*21* 52:*7, 8, 9, 24*
55:*4, 23* 56:*2, 5*
57:*3* 58:*20* 65:*16*
69:*9, 14* 82:*5*
89:*3* 91:*23* 94:*3*
104:*25* 115:*17*
116:*15* 117:*4*
120:*20* 132:*18*
134:*21* 140:*4*
156:*1* 187:*17, 18*
189:*17* 193:*17*
196:*14* 208:*16*
216:*4* 242:*9*
244:*12* 245:*11*
250:*7*
**understanding** 5:*6,*
*7, 9, 23* 65:*17*
68:*9* 80:*9* 87:*8*
98:*14* 112:*11*
113:*15* 119:*5*
131:*11* 132:*11*
150:*6* 155:*13*
161:*16* 162:*3*
177:*12* 180:*22*
189:*23* 192:*11, 18,*
*23* 194:*22* 208:*8*
249:*6* 250:*23*

**understands** 36:*10*
155:*16* 167:*20*
228:*8* 250:*24*
**understood** 61:*6*
159:*21* 208:*4*
210:*3* 250:*11*
**undertaken** 216:*6*
**undertook** 225:*8*
**un-diseased** 158:*21*
**uneasy** 26:*5*
**un-empathic**
182:*20*
**unexpected** 173:*25*
**unhappy** 34:*16*
**uniform** 44:*6*
**unique** 69:*12, 19*
116:*11* 119:*13*
156:*22, 24* 157:*15,*
*17* 194:*14*
**UNITED** 1:*1*
22:*10* 24:*6, 11, 16*
39:*16* 40:*4* 63:*1*
68:*22, 24* 165:*7*
173:*17*
**units** 134:*9*
**universe** 83:*8*
**unknown** 228:*5*
**unrealistic** 142:*23*
143:*2, 12, 15*
144:*22, 24* 164:*15,*
*23* 165:*11, 14, 23*
166:*4, 7, 12, 20, 25*
167:*3* 168:*3*
170:*8, 11, 12, 15, 16,*
*25* 171:*1, 7* 172:*7,*
*14, 15, 18* 173:*8, 13,*
*14, 25* 185:*20*
204:*13*
**unrelated** 133:*12*
188:*8, 9, 10*
**unstable** 236:*24*
242:*12, 14, 22, 25*
243:*15, 25*
**untreated** 233:*14*
**updated** 100:*3, 10*
**uphill** 173:*18*
**upper** 129:*7, 8*
**upset** 22:*15*
**uptake** 130:*2, 5*
**urinary** 49:*23*
206:*14*

Cassian Reporting, LLC
scheduling@cassianreporting.com

(860) 595-7462

**urinate** 27:*23, 24*
49:*22*
**use** 22:*9, 11* 23:*24*
25:*1, 9, 10, 21*
29:*5, 12* 34:*4*
37:*19* 43:*25*
46:*17* 47:*3, 5*
50:*11, 12* 56:*3*
68:*3* 80:*11, 12, 19*
83:*11* 89:*12, 16,*
*18* 90:*13* 155:*8,*
*10, 11* 180:*9*
224:*16, 23* 230:*8,*
*12* 239:*1*
**useful** 65:*6* 80:*4,*
*22, 23* 81:*1, 16, 19*
113:*18*
**uses** 22:*10* 80:*1, 8*
83:*7*
**Usual** 5:*3, 4* 34:*18*
78:*10* 121:*4* 129:*7*
**usually** 19:*19*
21:*20* 44:*3* 46:*5*
78:*3* 147:*24*
193:*24* 245:*14*
**Utilization** 222:*20*
**utter** 198:*12*

**< V >**
**VA** 233:*19*
**vaccinations** 152:*1*
**vagina** 49:*24*
**vaginoplasty** 46:*8*
**VALETTA** 1:*6*
2:*13* 255:*7*
**valid** 61:*21*
**value** 145:*7*
**values** 121:*9*
**variations** 25:*7*
69:*1*
**varied** 40:*12*
**varies** 28:*24, 25*
29:*1* 33:*16* 53:*9*
129:*11*
**variety** 153:*14*
**various** 20:*18*
23:*20* 26:*7* 34:*25*
44:*3, 5, 14* 46:*10*
65:*12* 67:*21, 22,*
*25* 68:*25* 69:*1*
117:*1* 122:*21*

134:*5* 153:*18*
154:*20* 182:*24*
186:*15* 200:*21*
226:*11* 227:*23*
230:*8* 236:*9*
237:*24* 239:*11*
240:*16*
**varying** 22:*13*
32:*3, 12*
**vast** 40:*18* 173:*11*
**verification** 147:*23*
**verified** 147:*24*
**verify** 154:*24*
179:*14*
**VERONICA-MAY**
1:*3* 2:*1* 7:*12*
39:*2* 88:*1* 93:*21*
95:*2* 98:*21* 99:*8,*
*12* 100:*1, 3, 7, 21*
109:*17* 112:*5, 9*
176:*18* 201:*1, 6*
236:*7* 242:*13*
243:*16* 255:*7*
**Version** 62:*17*
63:*4, 9, 17, 25*
64:*3* 67:*10, 11, 13,*
*15, 18, 20* 68:*1*
119:*24*
**versions** 62:*24*
**versus** 72:*17*
202:*15* 208:*23, 24*
**Veterans** 4:*1* 63:*6*
232:*1, 10, 20*
**VHA** 233:*4*
**Vicky** 12:*10*
144:*8* 171:*18*
252:*14*
**victimization**
189:*16*
**Victoria** 1:*20* 7:*2*
256:*2, 24*
**video** 107:*10*
**view** 38:*19* 89:*13*
103:*17* 134:*4*
166:*24* 173:*7*
194:*11* 197:*13*
216:*7* 226:*23*
234:*18* 239:*25*
**viewed** 61:*4*
**viewpoint** 104:*25*
**vigorously** 217:*3*

**violence** 77:*13*
172:*21* 239:*2, 5*
**violent** 77:*3, 12*
185:*23* 238:*23*
**Virginia** 74:*2*
76:*21*
**visit** 131:*7*
**vital** 246:*16*
**VM** 176:*17*
**V-M** 176:*18*
**vocabulary** 23:*4,*
*25*
**vocation** 147:*18*
242:*21* 243:*13*
**vocational** 32:*13*
236:*9, 22* 238:*1*
243:*3*
**voice** 48:*3* 167:*21*
**volume** 9:*4*
**vowel** 12:*22*
**VS** 1:*5* 255:*7*
**vulnerability** 180:*7*

**< W >**
**wait** 157:*21* 158:*7*
**waiting** 59:*9*
**waive** 6:*2*
**waived** 3:*9, 11, 14*
**want** 10:*12* 11:*21*
22:*23* 23:*10, 11,*
*16, 17* 25:*3, 20*
26:*24* 27:*10*
30:*25* 32:*15*
33:*10, 24, 25*
34:*13, 18, 22, 24, 25*
35:*24* 36:*2* 41:*4,*
*15, 24* 43:*13*
45:*15, 17* 46:*13,*
*14, 22* 47:*10*
51:*11, 25* 54:*1*
64:*24* 80:*5* 85:*9*
102:*21* 123:*22*
124:*8* 131:*5*
133:*8* 143:*3, 4*
144:*6* 146:*14*
151:*6, 15* 152:*6*
154:*5* 155:*9, 10,*
*21* 156:*1* 157:*4, 5*
158:*12* 159:*16*
165:*24* 168:*1*
169:*21* 170:*12, 13,*

*14, 15, 16* 172:*11*
180:*9* 185:*1, 20*
188:*22* 193:*13*
197:*9, 10* 204:*10*
230:*10* 234:*13, 15*
237:*13*
**wanted** 47:*2*
49:*19* 87:*21*
102:*15* 114:*20*
129:*5* 142:*11*
143:*22* 167:*14, 23,*
*25* 198:*25* 199:*6*
204:*2, 3*
**wanting** 166:*14*
173:*15*
**wants** 30:*16*
80:*16* 81:*2* 88:*16*
115:*11* 143:*14*
164:*22* 166:*6*
167:*11, 12* 171:*14*
172:*13* 173:*23*
186:*16* 203:*18*
**warn** 52:*18*
**warranted** 117:*9,*
*10*
**way** 19:*10* 22:*24*
23:*18* 25:*9* 30:*20*
40:*21* 44:*7* 63:*20*
64:*17* 88:*6*
103:*22* 111:*7*
112:*8, 9* 124:*10,*
*16* 126:*21* 129:*5*
143:*22* 145:*25*
146:*19* 155:*10*
167:*8, 15* 172:*19*
177:*7* 187:*1*
195:*12* 206:*15*
215:*18* 220:*10*
227:*21* 233:*22*
234:*25*
**ways** 35:*9* 226:*11*
229:*1* 239:*11*
**weakness** 180:*17*
181:*10* 182:*1*
**week** 13:*21* 15:*12,*
*16* 19:*19* 55:*25*
184:*10*
**weeks** 114:*9*
249:*15*
**weigh** 51:*17*

weight 125:*16*
weird 194:*4*
Welcome 125:*3*
well 6:*5* 7:*15*
  10:*2* 11:*21* 12:*20*,
  *21* 13:*9*, *19* 17:*10*
  18:*15*, *18* 20:*17*,
  *22* 21:*14* 25:*23*
  27:*17* 28:*24* 32:*6*,
  *23* 35:*8*, *10* 43:*17*
  44:*25* 46:*3* 47:*15*
  49:*19* 51:*15*
  52:*23* 53:*9* 56:*14*
  60:*15*, *19* 66:*10*
  68:*19* 71:*9*, *20*
  72:*13*, *15* 74:*9*, *22*
  79:*14* 84:*13*, *23*
  86:*17* 87:*25* 88:*4*
  89:*12*, *22* 91:*5*, *24*
  93:*2*, *19* 99:*18*
  103:*22* 104:*10*
  105:*7* 108:*6*
  109:*5* 111:*13*
  112:*24* 113:*22*
  114:*7* 115:*6*
  118:*24* 120:*4*
  122:*8* 123:*20*
  126:*9* 127:*14*, *19*
  129:*1*, *10* 131:*13*,
  *18* 133:*4*, *18*
  144:*1* 146:*14*
  153:*8* 154:*13*
  158:*6*, *10* 164:*2*, *9*
  171:*24* 175:*9*
  178:*8* 181:*6*
  190:*12*, *22* 191:*23*
  192:*1* 193:*19*
  199:*20* 204:*5*
  221:*10* 222:*3*, *18*
  223:*4* 232:*14*
  235:*22* 236:*1*
  238:*12* 240:*1*
  245:*17* 251:*22*
  252:*2*, *15*
well-acquainted
  251:*5*, *6*
well-aligned 246:*25*
well-being 246:*22*
well-established
  131:*7*

well-intentioned
  65:*4*
well-known 201:*17*,
  *20* 210:*24* 235:*12*,
  *13*
Wellpath 84:*25*
  85:*1*, *5*, *7*, *10*, *12*
went 177:*8* 210:*8*
we're 9:*8* 10:*4*, *23*
  24:*14* 33:*17*
  35:*23* 38:*20* 39:*2*
  43:*3*, *5*, *7* 47:*10*
  56:*14* 59:*9* 78:*21*,
  *22* 110:*7* 120:*3*
  123:*18* 133:*8*
  137:*9* 141:*18*
  165:*1*, *2* 182:*9*
  195:*7*, *25* 198:*24*
  199:*5* 208:*20*
  211:*12* 213:*18*
  218:*3* 227:*18*, *19*,
  *21* 229:*22* 231:*14*
  242:*7* 243:*2*
  250:*4*, *5* 252:*10*
Western 19:*12*
we've 9:*22* 44:*16*
  60:*15* 85:*3*
  135:*11* 193:*12*
  217:*1* 231:*15*, *16*
who've 219:*15*
wide 153:*14*
wife 13:*24*, *25*
  29:*7* 241:*18*
willing 50:*8* 156:*9*,
  *20*
Wisconsin 74:*11*,
  *24*
wisdom 89:*4*
wish 22:*19* 27:*19*,
  *25* 126:*3* 198:*9*
wishes 186:*20*
wit 256:*7*
WITNESS 4:*1*
  5:*17* 11:*25* 12:*10*
  67:*25* 69:*23*
  70:*16*, *17*, *22*, *23*
  71:*9*, *11*, *16*, *19*
  72:*7*, *8*, *14*, *21*
  73:*13* 74:*10*
  77:*23* 85:*14* 87:*2*,
  *3* 92:*9* 104:*9*

113:*15* 121:*21*, *25*
  122:*5* 123:*10*
  124:*1*, *8* 130:*5*
  156:*13* 157:*23*, *25*
  158:*4* 179:*21*
  196:*12* 206:*7*
  252:*16* 256:*20*
woman 34:*4*, *5*
  37:*24*, *25* 38:*4*, *19*
  43:*19*, *20* 45:*20*
  48:*8* 55:*10*, *11*
  134:*8*, *12* 138:*9*
  158:*18* 180:*18*
  181:*12* 186:*14*, *21*
  187:*22* 201:*2*
womanly 181:*15*
women 27:*3*
  88:*13* 115:*2*
  125:*12* 126:*6*
  127:*24* 128:*25*
  130:*13*, *15* 132:*18*
women's 114:*21*
  209:*8*, *13*
wonderful 238:*6*
wondering 41:*11*,
  *12* 186:*19*
word 8:*9* 19:*25*
  25:*21* 26:*3* 31:*19*
  50:*11*, *12*, *21*
  62:*15* 66:*1*, *3*
  123:*11* 144:*4*, *23*
  169:*9* 181:*6*, *20*
  217:*20* 220:*19*
  223:*7*, *22* 237:*15*
  239:*1*, *3*
words 8:*12* 26:*22*
  37:*19* 53:*4* 56:*4*
  78:*15* 80:*11*
  123:*17* 150:*23*
  159:*18* 164:*6*
  189:*1* 195:*25*
  198:*12* 215:*16*
  229:*3*
work 7:*12* 15:*4*,
  *12* 20:*22* 28:*17*
  29:*18* 30:*14*
  32:*18*, *20* 56:*20*
  57:*16* 64:*17*, *18*,
  *23* 69:*22* 71:*19*
  79:*23* 82:*10*
  85:*14* 86:*8* 87:*1*

88:*3* 92:*11*, *14*
  111:*18* 116:*12*
  131:*12* 134:*3*
  145:*14* 159:*18*
  199:*24* 200:*5*
worked 57:*17*
  75:*23* 84:*5* 86:*12*
worker 244:*14*
worker's 101:*1*
working 28:*20*
  56:*23* 85:*18*, *19*,
  *21* 90:*9*, *12* 238:*11*
works 65:*18* 85:*1*
  143:*6*
workshop 74:*17*
world 58:*22* 59:*7*,
  *16* 82:*9* 165:*7*
  202:*7* 248:*3*
worry 130:*23*
worst 124:*18*
  192:*8*
wow 248:*1*
WPATH 58:*13*, *15*
  59:*7*, *12*, *16*, *23*
  61:*2*, *15*, *22* 62:*4*,
  *22*, *25* 63:*5*, *9*, *18*
  66:*17*, *19*, *23* 67:*2*,
  *5* 68:*16*, *24* 69:*4*
  249:*3* 250:*15*
  251:*7*
wrapped 159:*18*
write 17:*17* 65:*1*
  89:*11* 93:*16* 94:*7*
  102:*8*, *11*, *14*
  105:*18* 148:*3*
  163:*13* 183:*16*
  210:*9* 236:*17*
writes 249:*3*
writing 19:*10*
  60:*1* 61:*11* 64:*6*
  95:*15*, *19* 96:*2*, *10*,
  *25* 97:*19* 98:*1*
  99:*8* 105:*20*
  106:*7* 107:*21*
  116:*21* 256:*11*
written 29:*4*
  56:*24* 64:*8* 72:*22*
  83:*6* 87:*11* 98:*6*
  99:*13* 100:*6*
  215:*7*, *10* 243:*7*,

*ll* 244:*6* 245:*14*
250:*1*
**wrong** 14:*7* 38:*14*
89:*1, 12, 16* 181:*6*
**wrote** 39:*24* 61:*14*
93:*12, 13, 14, 19*
94:*16* 100:*4, 9, 11,
14, 21* 102:*16, 17*
103:*20* 104:*12*
105:*11* 119:*9*
163:*2* 180:*6*
204:*6* 223:*11, 12*
231:*3* 244:*6*

**< Y >**
**yeah** 11:*8* 47:*9*
58:*3, 6* 66:*18, 22*
71:*14* 74:*17*
77:*17* 106:*12*
124:*3, 9* 137:*18*
146:*11*   164:*11, 18*
176:*20*   198:*15*
199:*16*   214:*8*
223:*22*   231:*23, 24*
232:*13*   233:*22*
240:*15*   244:*11*
**year** 15:*21* 17:*3*
19:*21* 44:*22, 23*
68:*20* 114:*17*
116:*5* 131:*6, 7*
212:*6, 13, 14*
**years** 14:*21* 16:*9*
17:*15, 16, 19* 20:*6*
23:*4, 6* 28:*21*
36:*16* 40:*1, 9, 12,
20* 47:*16* 49:*20*
53:*10* 55:*20*
57:*17* 59:*2, 11*
64:*19* 65:*16*
66:*14* 67:*2, 7*
73:*14* 95:*23*
120:*15* 122:*17*
127:*5* 135:*4*
139:*19, 23*   140:*20*
142:*20*   161:*20, 24*
176:*22* 184:*6*
201:*2, 10* 202:*6, 7,
8* 213:*4* 228:*25*
229:*1*   232:*4*
237:*3, 18, 25*

243:*17*
**yes-or-no**   78:*18*
**yesterday**   16:*18*
**young** 23:*14*
41:*19* 77:*24* 235:*5*
**younger** 71:*5*
90:*10* 98:*9* 227:*22*

**< Z >**
**Zoom** 6:*10* 7:*15*
10:*7*
**Zooms** 10:*8*