**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

VERONICA-MAY CLARK,

  Plaintiff,

v.

ANGEL QUIROS, DR. GERALD
VALLETTA, RICHARD BUSH, and
BARBARA KIMBLE-GOODMAN,

  Defendants.

Case No. 3:19-cv-575-VLB

May 19, 2022

<u>**Plaintiff's Reply to Defendants' Opposition to Motion for Summary Judgment**</u>

## <u>TABLE OF CONTENTS</u>

**Page**

I.    **This Case Is Not About One Particular Procedure or Medication**.................. 1

II.   **Ms. Clark's Gender Dysphoria Meets the Objective Prong of the Deliberate Indifference Test**.......................................................................................... 1

III.  **Defendants' Efforts to Reframe Their Conduct and Narrow Their Obligations Do Not Excuse Their Failure to Treat Ms. Clark** ......................... 3

IV.  **Dr. Valletta's Blind Application of DOC's Blanket Policy to Deny Ms. Clark Treatment is Deliberate Indifference**.................................................. 6

V.   **Defendants' Belated Attempts to Initiate Treatment for Ms. Clark Do Not Moot Ms. Clark's Request for Injunctive Relief, Particularly When Defendants Continue to Contest Whether Ms. Clark Should Receive Any Treatment At All**................................................................................................. 7

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ................................................... 8

*Brock v. Wright*,
  315 F.3d 158 (2d Cir. 2003) ................................................ 6, 7

*Currytto v. Furey*,
  No. 3:18-cv-01696, 2019 WL 1921856 (D. Conn. Apr. 30, 2019) ........... 3

*Eason v. Quinn*,
  No. 3:19-cv-219, 2020 WL 3129457 (D. Conn. June 12, 2020) ............. 5

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ................................................ 11

*Gibbs v. Doe 1-7*,
  No. 3:20-cv-1119, 2020 WL 7129584 (D. Conn. Dec. 4, 2020) ............. 5

*Hathaway v. Coughlin*,
  37 F.3d 63 (2d Cir. 1994) ................................................ 4

*Hicklin v. Precynthe*,
  No. 4:16-cv-01357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ............ 11

*Holness v. Gagne*,
  No. 3:18-cv-1752, 2019 WL 1789907 (D. Conn. Apr. 24, 2019) ........... 3

*Iglesias v. Fed. Bureau of Prisons*,
  No. 19-cv-415, 2022 WL 1136629 (S.D. Ill. Apr. 18, 2022) ............. 12

*Johnson v. Cook*,
  No. 3:19-cv-1464, 2021 WL 2741723 (D. Conn. July 1, 2021) ........... 1, 7

*Johnson v. Wright*,
  412 F.3d 398 (2d Cir. 2005) ................................................ 6, 7

*Klein v. Qlik Techs., Inc.*,
  906 F.3d 215 (2d Cir. 2018) ................................................ 8

*Kosilek v. Mici*,
  No. 18-cv-11838 (D. Mass. May 27, 2021) ............................. 12

ii

*Manning v. Goord*,
 No. 05-cv-850F, 2010 WL 883696 (W.D.N.Y. Mar. 8, 2010) ...................................... 7

*McTerrell v. Koenigsmann*,
 No. 18-cv-1028, 2021 WL 5772484 (W.D.N.Y. Aug. 18, 2021) ................................ 2

*Monroe v. Meeks*,
 No. 3:18-cv-00156, 2022 WL 355100 (S.D. Ill. Feb. 7, 2022) ................................. 11

*Norsworthy v. Beard*,
 87 F. Supp. 3d 1164 (N.D. Cal. 2015) ...................................................................... 11

*SEC v. Rsch. Automation Corp.*,
 585 F.2d 31 (2d Cir. 1978) ........................................................................................ 8

*Young v. Choinski*,
 15 F. Supp. 3d 194 (D. Conn. 2014) ......................................................................... 3

**Other Authorities**

Fed. R. Civ. P. § 56(e) ...................................................................................................... 8

**I.      This Case Is Not About One Particular Procedure or Medication**

As an initial matter, Defendants improperly focus their arguments on *particular* procedures and medications. But there is no single magic pill for gender dysphoria; effective treatment requires a multi-pronged, multi-disciplinary, individualized approach. Hormone therapy, gender-affirming therapy, and surgical interventions may *all* be necessary. *See* Ex. 1 (ECF 133-3) ¶¶ 43, 50; Ex. 28 (ECF 154-2) at 33:21-35:6. It is thus inappropriate to examine any single therapy session, pill, or procedure in isolation, as Defendants urge. Ms. Clark seeks comprehensive treatment for her gender dysphoria, which Defendants have failed to provide.

**II.     Ms. Clark's Gender Dysphoria Meets the Objective Prong of the Deliberate Indifference Test**

As set forth in Ms. Clark's Opposition to Defendants' Motion for Summary Judgment (ECF 154 at 21), in every case Plaintiff has located on this question, either the court found a plaintiff's gender dysphoria met the objective prong or defendants conceded as much. As recently as last year, another court in this District held that gender dysphoria met the objective prong on a motion to dismiss. *See Johnson v. Cook*, No. 3:19-cv-1464, 2021 WL 2741723, at *14 (D. Conn. July 1, 2021); *see also* Pl.'s Opp. (ECF 154) at 19-26. Defendants ignore this relevant precedent and rely instead on a series of summary orders about short delays in treatment involving only a few weeks or months (*Goris*), and cases that do not examine the objective prong in any meaningful way (*Butler*).

No matter how Defendants try to spin it, this is a case about denial of treatment—*i.e.*, a case where Ms. Clark alleges that prison staff "wholly refused to

treat her medical condition." *McTerrell v. Koenigsmann*, No. 18-cv-1028, 2021 WL 5772484, at *4 (W.D.N.Y. Aug. 18, 2021). From her diagnosis in May 2016 until her first endocrinology appointment in September 2017, Ms. Clark's gender dysphoria went completely untreated. From May 2016 until April 8, 2022,[1] she has been denied gender affirming psychotherapy. And from her diagnosis until today, she has been denied any gender-affirming surgeries. Thus, contrary to the Defendants' contention, this is a case about denial of treatment. As every court has held, gender dysphoria is "sufficiently serious" to satisfy the objective prong.

Defendants argue that so long as Ms. Clark received *some* treatment at any point in time, then her treatment has simply been "delayed." Further, Defendants contend that, because gender dysphoria is not curable, no delay in treatment could *ever* be actionable. *See* Defs.' Opp. (ECF 153-1) at 13. According to Defendants' logic, it would always be constitutional under the Eighth Amendment for DOC to delay treatment for any "chronic" or "incurable" mental health condition, such as schizophrenia, because it does not matter if a person receives treatment tomorrow or in five years.[2] But that is not the law.

---

[1] Contrary to their ongoing discovery obligations, Defendants never produced updated medical records, though they filed some with their Motion. *See* Ex. B (ECF 128-4). Those do not reflect any appointments with Dayne Bachmann, but Ms. Clark confirmed that she met with him for therapy on April 8, 2022, after he evaluated her on December 22, 2021. It is not true that he saw Ms. Clark "multiple times for treatment."

[2] It is difficult to understand the import of Defendants' callous suggestion that because Ms. Clark was in a terrible state after her attempted self-castration, nothing they did, or did not do, could have made her *worse*. *See* Defs.' Opp. at 10. The fact that Ms. Clark's condition was dire in no way excuses Defendants' failure to treat her gender dysphoria.

Courts in this District have repeatedly recognized that mental health diagnoses meet the objective prong of the deliberate indifference test. *See, e.g.*, *Holness v. Gagne*, No. 3:18-cv-1752, 2019 WL 1789907, at *6 (D. Conn. Apr. 24, 2019) (finding that person being taken off medication for "schizophrenia, PTSD, and emotional distress . . . is sufficiently serious to meet the objective prong"); *Currytto v. Furey*, No. 3:18-cv-01696, 2019 WL 1921856, at *5 (D. Conn. Apr. 30, 2019) (provider's "lapse in treatment for several months" of providing therapy to someone with bipolar disorder and other mental health diagnoses "alleges sufficient facts to show he has a serious medical need"); *Young v. Choinski*, 15 F. Supp. 3d 194, 199 (D. Conn. 2014) ("[P]ropensities to attempt suicide, harm oneself, and/or exhibit severe depression or anxiety attacks have been viewed as 'sufficiently serious.'").

Because Ms. Clark's gender dysphoria constitutes a serious medical need, she has satisfied the objective prong of the deliberate indifference test.

### III. Defendants' Efforts to Reframe Their Conduct and Narrow Their Obligations Do Not Excuse Their Failure to Treat Ms. Clark

Defendants' attempts to excuse their failure to treat Ms. Clark for gender dysphoria are based on a misunderstanding of the law and a misrepresentation of the facts in this case.

Dr. Valletta offers various excuses, mostly predicated on his own incompetence or purported ignorance. Thus, he claims that he was not "qualified to refer Plaintiff for surgery," Defs.' Opp. at 16; referred Ms. Clark to mental health, *id.* at 17; did not "kn[o]w a blood test was necessary to diagnose her

condition,"[3] *id.*; did not know "of the potential efficacy of an increased dosage of hormone therapy or surgery," *id.* at 17-18; and "deferred to the treatment decisions of the endocrinology specialists," *id.* at 18. Each excuse misses the mark.

Dr. Valletta admits it was his job to assess Ms. Clark "for the suitability of surgery." Ex. 9 (ECF 133-11) at 227:11-18. He never did so. *Id.* at 239:20-240:2. Dr. Valletta was also responsible for ensuring Ms. Clark had follow-up appointments with endocrinologists. *Id.* at 108:14-110:1, 111:21-113:16. Yet he let Ms. Clark go 20 months without that follow-up, ECF 154-7 ¶ 25, keeping her on a hormone dose that left her with the testosterone levels of a cisgender man, Ex. 1 ¶ 30. Dr. Valletta also knew Ms. Clark needed bloodwork performed to facilitate the endocrinologists' provision of proper care to Ms. Clark, ECF 154-7 ¶ 26, but failed to ensure she received that bloodwork in time for her appointments, *id.* ¶ 27.

Dr. Valletta also cannot escape liability by referring Ms. Clark to mental health officials or endocrinologists and washing his hands of the matter. *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994). Dr. Valletta was Ms. Clark's primary care physician and saw her on a regular basis. ECF 154-7 ¶ 12. Ms. Clark repeatedly alerted Dr. Valletta to her continued suffering, the symptoms of her ineffective hormone therapy, her need for another endocrinology visit, and her need for further treatment beyond hormone therapy. ECF 154-7 ¶ 122. Dr. Valletta ignored Ms. Clark and left her to languish instead.

---

[3] This is a *non sequitur*. DOC diagnosed Ms. Clark with gender dysphoria well before her first appointment with any endocrinologist. ECF 153-2 ¶ 20. Ms. Clark needed bloodwork to aid the endocrinologists in prescribing proper hormone dosages, which Dr. Valletta well knew. ECF 154-7 ¶ 26.

Defendants cite cases that support *Ms. Clark's* position. In *Gibbs v. Doe 1-7*, No. 3:20-cv-1119, 2020 WL 7129584 (D. Conn. Dec. 4, 2020), allegations that a prison doctor "did not provide a follow-up appointment he had agreed to schedule on the basis of the severity of Gibbs's pain and his visible injury" were sufficient to support a deliberate indifference claim. *Id.* at *7. By contrast, the court dismissed claims against another prison official who merely delayed the plaintiff's follow-up appointment for *two months*. *Id.* at *8. Dr. Valletta did not provide Ms. Clark with a follow-up endocrinology appointment for *20 months*, and even then failed to arrange for the necessary bloodwork. ECF 154-7 ¶¶ 25, 27.

In *Eason v. Quinn*, No. 3:19-cv-219, 2020 WL 3129457 (D. Conn. June 12, 2020), the court found claims against a prison doctor for "failure to order bloodwork or other tests to determine the cause of [the plaintiff's] skin condition" insufficient to support a deliberate indifference claim when the plaintiff did "not allege that Dr. Pillai failed to provide him any treatment." *Id.* at *8 (citation omitted). But Ms. Clark does allege that Dr. Valletta failed to treat her, in addition to his failure to ensure she received necessary follow-up appointments and bloodwork.

Defendants also claim that Kimble-Goodman treated Ms. Clark's gender dysphoria through "talk therapy" and Prozac for her "dysphoric mood." Defs.' Opp. at 19. That is misleading. Contrary to Defendants' efforts to twist that language, Kimble-Goodman made crystal clear that a "dysphoric mood" has nothing to do with gender dysphoria, and simply means "a down mood that does not meet the criteria for major depression." Ex. 18 (ECF 133-20) at 89:19-90:10.

The weakness of Defendants' arguments is further underscored by their effort to portray the "talk therapy" that Kimble-Goodman provided a handful of times over two years, *see* ECF 154-7 ¶ 45, as treatment consistent with Dr. Levine's recommendation of general therapy "every two or three weeks," alongside a "gender therapist," for at least a year, Ex. 28 (ECF 154-2) at 114:3-17. Instead, on a rinse-and-repeat cycle every few months, Kimble-Goodman simply listened to Ms. Clark's requests for treatment and then sent her on her way with no help.

Finally, Bush's attempt to invoke his own ignorance and incompetence about gender dysphoria is unavailing. Defs.' Opp. at 20. Even if Bush could not provide Ms. Clark with "an increased dose of hormones and gender confirmation surgery," Defs.' Opp. at 20, he could have referred her to someone who *could* treat her. Instead, Bush "assessed" Ms. Clark, heard her pain, but did not help Ms. Clark access treatment. Defs.' Mot (ECF 128-1) at 33; *compare* Ex. 7 (ECF 133-9) at 71-73 (recording no referrals by Bush), *with* Ex. 20 (ECF 133-22) at 51:8-23 (confirming it was Bush's practice to record referrals in the medical chart).

IV.   **Dr. Valletta's Blind Application of DOC's Blanket Policy to Deny Ms. Clark Treatment is Deliberate Indifference**

Defendants claim that Dr. Valletta could not be deliberately indifferent to Ms. Clark's serious medical need so long as he relied on DOC's blanket policy in good faith. Defs.' Opp. at 28-30. They are wrong.

Both *Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005), and *Brock v. Wright*, 315 F.3d 158 (2d Cir. 2003), make clear that even where a prison official "sincerely and honestly believed that they were required to comply with" a prison policy to deny certain treatment to a patient, that official is nevertheless deliberately

indifferent where they knew the policy was not "medically justifiable." *Johnson*, 412 F.3d at 404; *see also Brock*, 315 F.3d at 167 ("[A] jury could well conclude that steroid injections were not given, not because of a *medical judgment*—at most negligent—that such prevention was not worthwhile, but because the DOCS policy established by Wright forbade preventative measures in cases such as Brock's." (emphasis added)); *cf. Manning v. Goord*, No. 05-cv-850F, 2010 WL 883696, at *11 (W.D.N.Y. Mar. 8, 2010) ("[A] jury could infer the absence of a sufficiently culpable state of mind if the jury believed that the defendant denied the plaintiff medical treatment because the defendant sincerely and honestly believed that applying a prison policy mandating the denial of treatment was, *in plaintiff's case, medically justifiable*." (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006) (emphasis added; cleaned up)).

Defendants argue this is a question for the jury because both *Johnson* and *Brock* mention that "a jury" could find deliberate indifference from application of a blanket policy. Defs.' Opp. at 29-30. But in both of those cases, the defendants argued that application of the policy to the plaintiff was "medically justifiable," which created a fact question for a jury to resolve. *Johnson*, 412, F.3d at 404; *see also Brock*, 315 F.3d at 166. Here, it is undisputed that Dr. Valletta did not use his medical judgment to deny treatment to Ms. Clark; he just blindly relied on DOC's policy. *See* ECF 154-7 ¶ 123.

V.   **Defendants' Belated Attempts to Initiate Treatment for Ms. Clark Do Not Moot Ms. Clark's Request for Injunctive Relief, Particularly When Defendants Continue to Contest Whether Ms. Clark Should Receive Any Treatment At All**

Defendants argue that the Court cannot grant injunctive relief absent a hearing. Defs.' Opp. at 36 (citing *Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 (2nd Cir. 1977)). Not so. "[E]ven in suits for injunctive relief, the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e)." *SEC v. Rsch. Automation Corp.,* 585 F.2d 31, 33-34 (2d Cir. 1978) (affirming summary judgment on the record before the district court).

Defendants also suggest a "voluntary cessation" argument, hinting that their nascent efforts to arrange treatment renders Ms. Clark's request for injunctive relief moot. The Second Circuit urges "suspicion" when a defendant voluntarily ceases or "strategically paus[es] [its] wrongdoing" and claims that doing so vitiates the need for an injunction. *Klein v. Qlik Techs., Inc.,* 906 F.3d 215, 224 (2d Cir. 2018). In such instances, the defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.,* 568 U.S. 85, 91 (2013) (internal quotation marks omitted).

Here, the Defendants fall far short of meeting their burden. Defendants' belated efforts to have Ms. Clark "evaluated" for surgery, Defs.' Opp. at 28, do not bind them to a course of treatment. Indeed, Defendants do not even represent that the surgical procedures they trumpet in their filings will ever occur. *Id.* at 28 (complaining about "extensive and lengthy electrolysis"); *id.* at 39 (bemoaning the "complexity of treatment"). Nor have they formally disavowed their "practice"

limiting hormone treatment, or conversely, adopted a policy to provide such treatment.

More troubling, Defendants repeatedly proclaim that no future treatment they choose to provide to Ms. Clark is constitutionally necessary or actionable if it does not occur. *See id.* at 13 (continued refusal could not worsen Ms. Clark's prognosis); *id.* at 27 (any complaint about Bachmann's very recent care would be "nothing more than a disagreement over treatment"); *id.* at 30 (gender dysphoria could not "progress to actual medical consequences in the form of demonstrable physical injuries"); *id.* at 34 (disputing applicability of WPATH standards of care); *id.* at 38 (arguing gender dysphoria "has required surgical intervention in, at most, five prisoners within the entire nation"). Simply put, Defendants cannot be trusted to provide Ms. Clark the care she needs in the absence of Court supervision.

The record makes clear that, without injunctive relief, Ms. Clark will not receive adequate treatment. Ms. Clark first asked for treatment, including surgery, in April 2016; to date, she has not had any surgical procedures.[4] UCONN endocrinologists have repeatedly noted in Ms. Clark's medical records over the years that she should "talk to DOC or her primary care physician about referral to transgender surgeon." Ex. C at 9 (February 2020 visit—adding, "She needs follow-up with psychiatry, and needs referral by her primary care physician"); Ex.

---

[4] Defendants fault Ms. Clark, without any sense of irony, for being so audacious as to request treatment "immediately." But it is now six years later and Ms. Clark has not received any surgical intervention. Meanwhile, she met with a gender affirming therapist for the *first time* on April 8, 2022—just days before Defendants filed for summary judgment.

7 at 120 (October 2020 visit); Ex. B at 417 (February 2021 visit); Ex. B at 187 (December 2021 visit). But when Ms. Clark followed that recommendation and asked DOC to refer her for surgery, DOC sent her right back—to endocrinology. Ex. B at 234 (request for surgery referral met with "Your endocrinology visit had already been scheduled"). Ms. Clark even tried to locate an outside provider herself. *See* Ex. 7 at 105 (requesting that DOC confer with Planned Parenthood provider). DOC refused to play ball. DOC also stymied Ms. Clark's attempts to get Dr. Burns involved. *Compare* Ex. B at 619 (requesting referral because "the endocrinologist told me . . . that I needed to see a psychiatrist specializing in gender dysphoria," marked as sent to Dr. Burns in April 2020), *with* Ex. 10 at 199:20-22 (Dr. Burns had no "direct care involvement" with Ms. Clark). Notably, DOC even ignored Dr. Levine's recommendations for Ms. Clark in his June 2020 expert report.

Contrary to Defendants' contention, Ms. Clark does not "chide" Dr. Burns for his efforts in the past few months. *Cf.* Defs.' Opp. at 38. Much the opposite— she welcomes any steps toward treatment, no matter how preliminary. But Ms. Clark has sought treatment for over six years, and DOC's habit of providing treatment only when faced with judicial intervention gives her no confidence that DOC will follow through on their preliminary steps absent a court order. That is particularly so when, by DOC's own admission, its recent efforts at providing treatment is the direct result of this litigation. Ex. 14 at 1 (retaining Bachmann "to limit or extinguish that specific litigation through provision of care").

Defendants' representations of future treatment are all the more incredible given the paradoxical positions Defendants stake out in this litigation. On the one hand, Defendants argue that "DOC has taken multiple steps to retain providers who specialize in treatment of gender dysphoria who have in fact treated the Plaintiff,"[5] including hiring a consultant who says surgery is "essential" for Ms. Clark. On the other hand, they argue that Ms. Clark is not suitable for surgery and that nobody knows how effective surgery is anyway.[6] *See* Defs.' Mot. at 49, 54; Defs.' Opp. at 28. In other words, Defendants seek to have it both ways: DOC is arranging treatment for Ms. Clark, but treatment is unnecessary and ineffective.

Although Defendants try to portray Ms. Clark's requested relief as unprecedented, multiple courts have ordered prison systems to provide necessary gender-affirming treatment. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (affirming order to Idaho to provide surgery); *Monroe v. Meeks*, No. 3:18-cv-00156, 2022 WL 355100, at *1 (S.D. Ill. Feb. 7, 2022) (appointing monitor for Illinois prisons to oversee provision of hormone therapy and gender confirmation surgery to class members); *Hicklin v. Precynthe*, No. 4:16-cv-01357, 2018 WL 806764, at *15 (E.D. Mo. Feb. 9, 2018) (ordering Missouri "to provide Ms. Hicklin with care that her doctors deem to be medically necessary treatment for her gender dysphoria"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal.

---

[5] Only one person—Dayne Bachmann—has treated Ms. Clark, once, through a therapy visit. It is unclear to whom else Defendants refer.

[6] Multiple courts have discounted Dr. Levine's singular opinions in this regard as entirely out of step with the field. *E.g.*, *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) ("The Court gives very little weight to the opinions of Levine, whose report misrepresents the Standards of Care . . . .").

2015) (ordering California to provide surgery). Most recently, the Southern District of Illinois ordered the Federal Bureau of Prisons—which offered a similar catalogue of excuses as Defendants here—to ensure a person in custody gets surgery by the end of this year. *Iglesias v. Fed. Bureau of Prisons*, No. 19-cv-415, 2022 WL 1136629, at \*10 (S.D. Ill. Apr. 18, 2022).[7]

What Ms. Clark is asking DOC to do—provide adequate treatment for her gender dysphoria—is not novel. It is not unprecedented. It is not impossible. The Eighth Amendment obligates DOC to treat Ms. Clark's serious medical need, and it is far past time that DOC meet its constitutional duties.

By: /s/ Elana Bildner
    Elana Bildner (ct30379)
    Dan Barrett (ct29816)
    ACLU Foundation of Connecticut
    765 Asylum Avenue
    Hartford, CT 06105
    Tel: (860) 471-8475
    E-mail: ebildner@acluct.org

By: /s/ Daniel S. Noble
    Daniel S. Noble (ct31089)
    Evan I. Cohen (ct29799)
    Matthew B. Danzer (ct30740)
    Kelsey A. Powderly (ct30855)
    FINN DIXON & HERLING LLP
    Six Landmark Square
    Stamford, CT 06901-2704
    Tel: (203) 325-5000
    Fax: (203) 325-5001
    E-mail: dnoble@fdh.com

*Attorneys for Plaintiff Veronica-May Clark*

---

[7] As for surgery, while Defendants stress that "only five prisoners . . . within the entire nation have undergone surgical intervention for gender dysphoria," they fail to appreciate the significance of this statistic: despite the complexities and logistical hurdles, multiple prison systems have managed to facilitate gender-affirming surgery. One of these is Connecticut's neighbor, Massachusetts. *See* Status Report at 1, *Kosilek v. Mici*, No. 18-cv-11838 (D. Mass. May 27, 2021), ECF 89 (noting upcoming surgery).