**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| **VERONICA-MAY (Neé Nicholas) Clark** | : | |
| | : | |
| | : | **No. 3:19-cv-00575-VLB** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **September 15, 2023** |
| | : | |
| **ANGEL QUIROS, DR. GERALD VALLETTA, RICHARD BUSH, AND BARBARA KIMBLE-GOODMAN,** | : | |
| | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS FOR LEAVE TO SUPPLEMENT**
[DKTS. 128, 133, 190, 192]

Veronica-May Clark is a transgender woman serving what is essentially a life sentence in prison.  Ms. Clark informed prison officials that she was a transgender woman while serving her sentence.  Thereafter, she was diagnosed with gender dysphoria ("GD")—psychological distress resulting from an incongruence between one's sex assigned at birth and one's gender identity.  Less than two months after her diagnosis, Ms. Clark attempted self-castration by using a pair of nail clippers to remove her testicles.  Ms. Clark removed one of her testicles from her scrotum before stopping due to the excruciating pain.  She was hospitalized and then transferred to another prison.  After her self-castration attempt, Ms. Clark sought treatment for gender dysphoria.  In response, the prison physician with the duty to treat Ms. Clark told her that he would not facilitate any hormone therapy because of a purported policy against providing inmates with hormone therapy

unless they were receiving it prior to incarceration.  Ten months later and after threats of litigation were lodged, the prison physician referred Ms. Clark to an outside endocrinologist for evaluation and potential hormone therapy treatment. The endocrinologist recommended the prison physician prescribe Ms. Clark a starter dose of hormone medication and return Ms. Clark for a follow-up appointment in three months.  The medication was prescribed, but Ms. Clark was not returned to the endocrinologist for her first three-month follow-up appointment for 22 months.  Eventually, Ms. Clark's hormone therapy was successful in matching the hormone level for her gender identity.  For years after her diagnosis, the only other treatment Ms. Clark received was talk therapy from mental health providers who had no experience or expertise in treating someone with GD, and anti-depressants.

Ms. Clark sues Dr. Gerald Valetta, a prison primary care physician; LCSW Richard Bush and APRN Barbara Kimble-Goodman, prison mental healthcare providers (collectively, the "Provider-Defendants"); and Connecticut Department of Correction ("DOC") Commissioner Angel Quiros (collectively with the Provider-Defendants, the "Defendants").  Ms. Clark raises a deliberate indifference claim, alleging that the Defendants' failure to adequately treat her gender dysphoria constitutes a violation of her right against cruel and unusual punishment.  (Am. Compl., Count I, ECF No. 84.)  Ms. Clark also raises a claim of intentional infliction of emotional distress against the Provider-Defendants.  (Am. Compl., Count II.)

Before the Court are cross-motions for summary judgment.  (Def.s' Mot. for Summ. J., ECF No. 128; Pl.'s Mot. for Summ. J., ECF No. 133.)  Ms. Clark seeks

summary judgment on her claim of deliberate indifference.  (Pl.'s Mot. for Summ. J.)  The Defendants seek summary judgment on all claims.  (Def.s' Mot. for Summ. J.)  For the reasons set forth below, the Defendants' motion is DENIED, and Ms. Clark's motion is GRANTED.

I.      BACKGROUND[1]

The Plaintiff, Veronica May (Neé Nicholas) Clark, has been in the custody of the Connecticut Department of Correction ("DOC") since 2007.  (Pl.'s 56(a)2 at ¶ 1; Ex. M, ECF No. 128-15, at 1–2.)  She was convicted of murder, assault, burglary with a deadly weapon, and violation of protective order and is serving a sentence of 75 years without the possibility of parole.  (Pl.'s 56(a)2 at ¶ 2.)

### *DOC Health Care, Generally*

This case involves Ms. Clark's health care while in DOC custody. Incarcerated people in DOC custody cannot choose the medical or mental health personnel who provide their care.  (*Id.* ¶ 9.)  However, there are onsite health care providers who can refer patients to outside health care specialists when necessary. (Ex 2 at 63:15–66:8.)  The providers can make direct referrals or use other physicians within the DOC chain of command to facilitate referrals to specialists. (*Id.*)

The DOC uses a classification system to categorize inmates based on the individuals' risk and vulnerabilities.  (Ex. 2, ECF No. 133-4 at 48:7–17.)  An inmate category can be between 5 (being the most severe) and 1 (being the least severe.)

---

[1] The facts come from the parties' Local Rule 56(a) statements of fact, exhibits attached to the parties' motions, and information the Court can judicially notice of.

(*Id.*)  The inmate score impacts a person's housing, the frequency about which someone would need to be seen for medical care, and the intensity of care that surrounds them.  (*Id.*)  Even though the DOC has a classification system, it does not have a process or system for tracking complex patient cases.  (Ex. 2 at 59:12–60:22.)  Notwithstanding the lack of formalized tracking, the DOC Central Office is usually involved in facilitating referrals and treatments, gaining awareness of complex cases. (*Id.*)

The DOC has written policies and procedures called "Administrative Directives" ("AD").  AD 8.9 covers Health Service Administrative Remedies, which has the stated purpose of "enabl[ing] an inmate to seek formal review of any health care provision, practice, diagnosis or treatment."  (Ex. 8, ECF No. 133-10.)  AD 8.9 identifies two types of health services administrative remedies: one for diagnosis and treatment issues and another for administrative issues (such as a practice, procedure, administrative provision or policy, or an allegation of improper conduct by a health services provider).  (*Id.* § 6.a.)  When an inmate seeks review, they are to first make a verbal request for informal resolution.  (*Id.* § 6.b.ii.)  If verbal informal resolution fails, the inmate is to submit a written "informal" request using an Inmate Request Form.  (*Id.*)  If the inmate is not satisfied with the response, they can submit a Level 1 Grievance, which is generally reviewed by the health care provider responsible for the inmate's care.  (*Id.* § 6.c.i.–ii.)  There are two additional levels of grievances thereafter.  (*Id.* § 6.c.iii–iv.)

4

### *Gender Dysphoria Diagnosis*

A person's gender identity is their internal sense of whether they are male, female, or non-binary.  (Defs.' 56(a)2 ¶ 1.)  A transgender individual is a person whose gender identity is different from their designation at birth.  (Defs.' 56(a)2 ¶ 2.)  In a related manner, gender dysphoria is clinically significant distress—i.e., distress that interferes with a person's livelihood—associated with an incongruence between a person's gender identity and assigned sex at birth.  (Ex. 1, ECF No. 133-3 at ¶ 44 (Pl.'s Expert); Ex. E at ¶ 17 (Defs.' Expert)).  In April 2016, Ms. Clark informed a DOC clinician that she is a transgender woman and expressed her belief that she was suffering from gender dysphoria.  (Defs.' 56(a)2 ¶ 19.)  Thereafter, around May 2016, a DOC health care provider formally diagnosed Ms. Clark with gender dysphoria.  (Defs.' 56(a)2 at ¶ 20.)

The parties have each hired an expert to provide their opinion on, *inter alia*, what is gender dysphoria and how it is treated.  Ms. Clark's expert, Dr. George R. Brown, is a medical doctor who is Board Certified in Psychiatry.  (Ex. 1 at ¶ 4.)  Dr. Brown is a faculty member and professor of psychiatry at East Tennessee State University Quillen College of Medicine.  (*Id.*)  For over thirty years, Dr. Brown's research has focused principally on the study of transgender health, particularly with adults with gender dysphoria.  (*Id.* at ¶ 5.)  He has served on the World Professional Association for Transgender Health (WPATH) Committee to Revise the Standards of Care since 1990.  (*Id.* at ¶ 6.)  According to Dr. Brown, WPATH Standards of Care are authoritative for the evaluation and treatment of gender dysphoria.  (Ex. 1 at ¶ 49.)  WPATH Standards of Care are guidelines that can be

modified based on individual patient circumstances and their health care professional's clinical judgment.  (*Id.*)  Treatment of gender dysphoria under the WPATH Standards of Care are individualized for patients and may include one or more of the following modalities: gender-informed psychotherapy, gender confirming hormonal treatment, voice therapy, and gender confirming surgeries.[2] (Ex. 1 at 29 ¶ 43; Defs.' 56(a)2 at ¶ 7.)  According to Dr. Brown, the consequences of denying gender conforming surgery may include auto-castration, depression, and possible suicide.  (Ex. 1 at 37–38 ¶ 62.)

The Defendants' expert, Dr. Stephen Levine, is also a medical doctor who is Board Certified in Psychiatry.  (Ex. E at ¶ 3.)  Dr. Levine is a clinical professor of psychiatry at Case Western Reserve University School of Medicine.  (Ex. E at ¶ 2.) Since 1973, Dr. Levine has been a practicing psychiatrist who has treated hundreds of patients, including many with gender dysphoria.  (Ex. E at ¶ 3.)  He has served as a psychiatry consultant for departments of corrections for several states throughout the country and has spoken at seminars for correctional staff members on topics involving transgender inmates.  (Ex. E at ¶ 4.)  Dr. Levine was a member of WPATH, once serving as the chairman of the writing group that created the fifth edition of the WPATH Standard of Care for People with Gender Dysphoria that was published in 1999.  (Ex. E. at ¶ 5.)  Dr. Levine criticizes the WPATH Standards of Care as not based on scientific outcomes, but he recognizes that many institutions use them for treating patients with gender dysphoria.  (Ex. N, ECF No. 153-4 at 58–

---

[2] In general, the Court will use the term "gender affirming" in this decision to describe the treatment.  Where the Court references an expert's opinion or a provider, the Court will use that individual's terms.

69.)  Dr. Levine did not provide an expert opinion on what are the standards of care for treating patients with gender dysphoria.  Rather, Dr. Levine noted that treatment comes in various forms including talk therapy, psychotherapy, hormone therapy, and surgical intervention.  (Ex. E at ¶¶ 9–12.)

As of October 2021, the DOC has never employed anyone having the required skills, knowledge, and expertise to identify, treat, and guide transgender people in safe gender transition.  (Defs.' 56(a)2 at ¶ 16.)  As of February 2022, the DOC did not have a formal treatment protocol for gender dysphoria but was in the process of developing one.  (Ex. 2 at 36:10–43:20.)

### *Self-Castration Attempt, Denial of Medical Treatment for Gender Dysphoria*

Prior to July 15, 2016, Ms. Clark reviewed an anatomy textbook to devise a plan for castrating herself.  (Ex. 5, ECF No. 133-7, at 78:2–12.)  On July 15, 2016, while at Cheshire Correctional Institution, Ms. Clark unsuccessfully tried to castrate herself with a pair of nail clippers.  (Defs.' 56(a)2 ¶ 21.)  She spent about twenty minutes cutting open her scrotum with a nail clipper until she was able to move one testicle out of the scrotum.  (Ex. 5 at 78:2–5.)  She stopped before removing the testicle because of the excruciating pain.  (Ex. 5 at 78:13–17.)  Correctional staff discovered Ms. Clark in her cell bleeding from her genitals.  (Ex. 7 at 10.)  She was hand cuffed while a prison doctor attended to her.  (*Id.*)  That doctor determined she needed to be transported to an outside hospital via an ambulance.  (*Id.*)  Ms. Clark was then transported to John Dempsey Hospital and treated for her wounds.  (Defs.' 56(a)2 ¶ 22; Ex. 7 at 9–19.)  In a post-injury summary report, a DOC supervising psychologists noted that Ms. Clark's "high level of

psychological distress relative to [her] gender dysphoria clearly motivated" her self-castration attempt. (Ex. 16, ECF No. 133-18.) Years after Ms. Clark's attempted self-castration, DOC officials stated the incident as "horrific" and likely traumatizing for the DOC staff members who were present. (Ex. 6, ECF No. 133-8.)

After Ms. Clark was discharged from the hospital, DOC mental health providers categorized her vulnerabilities and risk level as a level 5, which is the most severe level of risk. (Ex. 7, ECF No. 133-9 at 32–33.) DOC officials placed Ms. Clark in an infirmary at the MacDougall-Walker Correctional Institution to recover. (Defs.' 56(a)2 ¶ 24.)

Ms. Clark was transferred to Garner Correctional Institution on July 27, 2016. (Ex. 7 at 49.) On July 30, 2016, Ms. Clark submitted a request to see a doctor about treatment for gender dysphoria. (Ex. 7 at 53–54.) On August 1, 2016, Ms. Clark met with Dr. Gerald Valetta for the first time. (Defs.' 56(a)2 ¶ 27; Pl.'s 56(a)2 ¶ 11.)

Dr. Valetta was a principal medical physician at Garner while Ms. Clark was incarcerated there. (Pl.'s 56(a)2 ¶ 5.) Dr. Valletta provided a variety of medical services for Ms. Clark including treatment of injuries and vaccinations. (Pl.'s 56(a)2 ¶ 6.) Dr. Valetta, as the principal medical physician, was also responsible for assessing a patient's suitability for surgery. (Ex. 9, ECF No. 133-11, at 227:11–18.) Dr. Valetta does not have any training on treating patients with gender dysphoria. (Defs.' 56(a)2 at ¶ 17.) When an inmate requires medical or mental health evaluation and treatment that the prison health care providers—like Dr. Valetta—cannot provide, there are processes and procedures for that provider to refer the inmate to an outside health care provider. (Ex. 9 at 108:14–110:23.) The process requires

the provider to submit a request for specialist-referral to a committee known as the Utilization Review Committee, which typically consists of the DOC medical director and other physicians.  (Ex. 9 at 108:17–24, 109:9–110:1.)  When a patient was approved to see a specialist and that specialist recommended the patient return for a follow-up appointment, Dr. Valetta was responsible for submitting requests for each follow-up appointment.  (Ex. 9 at 111:21–113:8.)

When Dr. Valetta first met Ms. Clark on August 1, 2016, he attended to her attempted self-castration wounds.  (Ex. 7 at 55.)  Dr. Valetta made the following note: "[inmate] referred to M[ental] H[ealth] [and] case manager."  (*Id.*)  He could not recall whether he took any affirmative action after making this note to refer Ms. Clark to a mental health provider.  (Ex. 9 at 139:4–9.)  Ten days later, Ms. Clark did meet with a mental health provider, who is not a defendant in this case.  (Defs.' 56(a)2 at ¶ 30.)  That provider noted that Ms. Clark had clinically significant distress and a strong desire to rid her primary and secondary male characteristics.  (*Id.*)

On September 8, 2016, Ms. Clark submitted a written inmate request form asking for transition-related healthcare.  (Ex. 17, ECF No. 133-19, at 27.)  In response, Dr. Valetta wrote: "As per CMHC[3]/DOC policy, transitional treatment

---

[3] CMHC stands for Correctional Managed Healthcare.  (Pl.'s 56(a)2 ¶ 14.)  Though it is not of significant importance to this action, the Court notes that CMHC was a subdivision of UConn Health that provided health care to DOC inmates until in or around 2018.  *See CT Prison Population Drops to Lowest in 25 years*, AP News (May 15, 2019), available at: https://apnews.com/article/149663aa33d24251a9e5d3ad22e7080a; *DOC emails show officials were aware of prison health care problems before taking over from UConn*, CT Mirror (Nov. 13, 2020), available at https://ctmirror.org/2020/11/13/doc-emails-show-officials-were-aware-of-prison-health-care-problems-years-before-taking-over-from-uconn/.  In or around 2018, the DOC took direct control over inmate health care.  *Id.*  The Court cites these sources for the simple position that in or around 2018, the DOC changed from a health care system run by CMHC to one run by the DOC directly.  This fact does not

would be **CONTINUED** if [the] inmate has already been on medication in the community, but transitional treatment will not be initiated while [the inmate] is incarcerated." (*Id.*) On September 21, 2016, Ms. Clark appealed that response. (Ex. 17 at 28.) In her appeal, she reported suffering with psychological trauma from the DOC's refusal to treat her gender dysphoria. (*Id.* at 29.) She stated "I cannot overstate just how much emotional and psychological pain I'm in." (*Id.*) Dr. Valetta responded to the appeal, again writing that he informed Ms. Clark of the "CMHC/DOC" policy not to provide transitional treatment to inmates who did not receive the treatment before incarceration. (*Id.*) Dr. Valetta testified during his deposition that the "CMHC/DOC" policy mentioned in his responses to Ms. Clark's requests was "widely known." (Ex. 9 at 122:10–12.) However, he could not remember if this was a written policy, where he learned it, or ever discussing it with anyone. (Ex. 9 at 121:19–122:16.)

On November 7, 2016, approximately five months after her attempted self-castration, Ms. Clark met with APRN Kimble-Goodman for the first time. (Ex. 7 at 60.) APRN Kimble-Goodman is a mental health provider. (Pl.'s 56(a)2 at ¶ 7.) Specifically, APRN Kimble-Goodman is a psychiatric APRN who worked at Garner from 2016 to 2018. (*Id.* at ¶ 44.) In this role, she was responsible for providing mental health evaluation and treatment, including prescribing psychiatric medication. (*Id.* at ¶ 44.) APRN Kimble-Goodman does not have any training in treating patients with gender dysphoria. (*Id.* at ¶ 17.)

---

affect the legal conclusions in this case, but rather provides context for the references to CMHC throughout the early portion of the background.

During their first appointment, Ms. Clark informed APRN Kimble-Goodman that she was denied hormone therapy because she was not receiving the treatment before incarceration.  (Ex 7 at 60.)  Ms. Clark told APRN Kimble-Goodman that she believed her male genitalia were poisoning her.  (*Id.*)  Even though Ms. Clark was reported as feeling poisoned, APRN Kimble-Goodman noted that Ms. Clark had a "great" mood and denied having plans to self-injure.  (*Id.*)  APRN Kimble-Goodman recommended a follow-up appointment in three months.  (*Id.*)

On January 7, 2017, Ms. Clark submitted an inmate request seeking transition treatment, including hormone therapy and gender affirming surgery.  (Ex. 17 at 9.)  In the request, she described her circumstances as "simply intolerable" and the DOC's treatment of her as "cruel and unusual."  (*Id.*)  She also wrote that the DOC was prioritizing its own "policy" over her health and exclaimed "PLEASE HELP ME!"  (*Id.*)  APRN Kimble-Goodman responded three days later by writing only: "[d]iscussed."  (*Id.*)

On February 2, 2017, Ms. Clark met with APRN Kimble-Goodman, who reported Ms. Clark as saying she "need[ed] treatment," "feel[s] poisoned everyday," and "feel[s] like [she's] dying."  (Ex. 7 at 61.)  During this meeting, they discussed medication for depression, but Ms. Clark was apprehensive about taking antidepressants.  (*Id.*)  APRN Kimble-Goodman recommended a follow-up meeting in three months.  (*Id.*)

On May 4, 2017, students at Columbia University School of Law, working under the supervision of Morningside Heights Legal Services, Inc., wrote to Dr.

Robert Berger of CMHC.[4]  (Ex. 23, ECF No. 133-25.)  The letter accused the DOC and CMHC of refusing to treat Ms. Clark due to the purported "policy" against providing transition treatment to an inmate who was not already receiving that treatment before incarceration.  (*Id.*)  The letter threatened litigation if the issues relating to Ms. Clark's care are not resolved.  (*Id.*)  The students sent a second letter on May 12, 2017, indicating that they would follow up again in a few weeks.  (Ex. 24, ECF No. 133-26.)

On June 6, 2017, Ms. Clark met with APRN Kimble-Goodman and reported being "OK considering [her] lack of treatment." (Ex. 7 at 62.)  Ms. Clark is reported as saying that she had moments of sobbing but was in a better place than she was a year prior.  (*Id.*)  This meeting took place approximately a year after her attempt to self-castrate.  (*Supra* at 7–8.)  APRN Kimble-Goodman reported that Ms. Clark mentioned working on bringing a legal case to obtain treatment.  (Ex. 7 at 62.)  The two again discussed medication for depression, and Ms. Clark again declined to take antidepressants.  (*Id.*)  APRN Kimble-Goodman recommended a follow-up meeting in three months.  (*Id.*)

---

[4] The Defendants object to the Court's consideration of this exhibit, arguing that it is inadmissible hearsay evidence.  A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial." *Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015).  The Court considers this evidence, not for the truth of the matter asserted, but rather the effect on the listener.  Thus, the Court is not relying on this evidence in a way that violates the rules against hearsay.  Furthermore, there are other potential grounds for admitting these letters even if offered for the truth, including Federal Rule of Evidence 801(d)(2)(D), and 803(6).  The Defendants' objection is overruled.

On July 6, 2017, Dr. Valetta submitted a Utilization Review Request ("URR") for Ms. Clark to be referred to an outside endocrinologist for evaluation.[5]  (Ex. 7 at 74.)  In the request, Dr. Valetta stated that he was submitting the URR upon request and thanked two individuals within CMHC management.  (*Id.*; Ex. 9 182:17–21.) What preceded and caused Dr. Valetta to submit the URR is unclear.  He claims in a post-deposition declaration that he submitted the URR when "the practice within [the] DOC regarding hormone therapy changed."  (Ex. G at ¶ 17.)  He could not recall when the change occurred.  (*Id.*)  Dr. Valetta also could not recall whether he was asked to submit the URR by the CMHC managers that he thanked in the URR itself.  (Ex. 9 at 183:9–22.)  Based on the temporal proximity to the Columbia student's communications and the references to the CMHC managers in the URR, CMHC management responded to the student's actions by either changing their treatment policy or clarifying with Dr. Valetta the correct policy for treating people with gender dysphoria.

On July 11, 2017, Ms. Clark met with APRN Kimble-Goodman and reported having a "bad day," being "in a bad place," and being "scared to go on meds." (Ex. 7 at 63.)  APRN Kimble-Goodman noted that Ms. Clark was suffering from a decreased appetite, not exercising, not showering, or changing her clothes, and

---

[5] Dr. Valetta declared in a post-deposition declaration that he referred Ms. Clark to "mental health for her gender dysphoria" on July 6, 2017.  (Ex. G at ¶ 31.)  To support this claim, the Defendants cite to the July 6, 2017 URR.  (Ex. B at 1195.)  In the URR, Dr. Valetta is seeking a consult with an endocrinologist, not a mental health care provider.  (*Id.*)  Though he mentions that the URR is for endocrine evaluation and continued mental health follow-up, the URR is expressly seeking services from a specialist in endocrinology, not mental health care.  Thus, the Court finds that the Defendants have failed to present evidence supporting the contention that Dr. Valetta referred Ms. Clark "to mental health" on July 6, 2017.

feeling hopeless.  (*Id.*)  Despite her apprehension, Ms. Clark requested medication to treat her depression.  (*Id.*)  APRN Kimble-Goodman prescribed Ms. Clark Prozac at 10mg to be taken daily and recommended a follow-up meeting for one to two months.  (*Id.*)

### *Begins Receiving Hormone Therapy*

On September 14, 2017, Ms. Clark met with an endocrinologist with UConn Health Endocrinology Associates.  (Ex. 7 at 76–78.)  The endocrinologist documented Ms. Clark's gender dysphoria and desire to transition to female.  (*Id.*) The endocrinologist noted that Ms. Clark was evaluated by a CMHC psychiatrist, who reported that Ms. Clark had a history of consistent and persistent gender dysphoria and had the capacity to provide informed consent to hormone therapy. (*Id.*)  The endocrinologist recommended Ms. Clark: (1) start hormone therapy at 1 mg of Estrace (which is the brand name for estradiol) per day, then increase to 2 mg per day as tolerated and 50mg of spironolactone twice a day; (2) undergo lab work in 4 weeks and again at 12 weeks to monitor hormone levels; and (3) follow up with the endocrinologist in three months on or about December 14, 2017.  (*Id.*)

On September 20, 2017, Ms. Clark began hormone therapy with Dr. Valetta prescribing: 1 mg of estradiol daily for one month, increase to 2 mg thereafter for 6 months, and 50 mg of spironolactone twice a day for one year.  (Ex. 17 at 13.) Also on September 20, 2017, Dr. Valetta submitted a URR for Ms. Clark to have a three-month follow-up appointment with the endocrinologist as recommended. (Ex. 7 at 80.)  Dr. Valetta received approval for the follow-up appointment on October 6, 2017.  (*Id.*)

On October 30, 2017, approximately one month after being prescribed hormone treatment, Ms. Clark's bloodwork reflected that her overall testosterone level was within the range of normal for an adult male at 442 ng/dL. (Ex. B, ECF No. 128-4 at 1158–60.)

On November 28, 2017, Ms. Clark met with APRN Kimble-Goodman and reported feeling "softer" now that she started hormone therapy. (Ex. 7 at 64.) APRN Kimble-Goodman reported that Ms. Clark was feeling benefits from her medication including improved sleep, appetite, and motivation. (*Id.*) Ms. Clark stated her mood was "really good, best ever." (*Id.*) APRN Kimble-Goodman recommended a follow-up meeting for three months. (*Id.*)

On January 2, 2018, a lab test revealed Ms. Clark's testosterone had increased to 465 ng/dL, which is within the normal range for an adult male, (ex. B at 1155–57), indicating that Ms. Clark's hormone therapy was ineffective as her testosterone levels continued to increase rather than decrease. (*Supra* at 15.) Ms. Clark had not seen the endocrinologist as recommended.

On April 9, 2018, Ms. Clark met with APRN Kimble-Goodman and stated that she felt "better than ever, best in my life." (Ex. 7 at 65.) APRN Kimble-Goodman reported that Ms. Clark was refusing to take her anti-depressants because they were upsetting her stomach when she was on a hunger strike. (*Id.*) APRN Kimble-Goodman recommended a follow-up meeting for three months. (*Id.*)

On April 23, 2018, Ms. Clark submitted a grievance requesting a health services review of her treatment. (Ex. 17 at 16–17.) In her grievance, she reported not receiving her prescribed estradiol for the last four days because—according to

the nurse dispensing the medicine—the prescription expired. (*Id.*) Ms. Clark reported that this was the fourth or fifth time her prescription was not refilled since beginning hormone therapy and requested review of her hormone medication. (*Id.*) At this point, Ms. Clark had still not seen the endocrinologist.

On May 23, 2018, Ms. Clark met with Dr. Valetta after submitting a grievance, wherein she said she was dissatisfied with her transition so far. (Ex. 7 at 85–87.) As reported by Dr. Valetta, Ms. Clark requested bottom surgery and informed him that if she had a razor, she would attempt self-castration again. (*Id.*) Dr. Valetta reported telling her that he would run additional lab work in a month and would "look into bottom surgery as an option." (*Id.*) Dr. Valletta neither mentioned nor made note of Ms. Clark's overdue endocrinology appointment.

On May 25, 2018, a lab test revealed Ms. Clark's testosterone had increased to 614 ng/dL, which is within the normal range for an adult male, (ex. B at 1081–82), indicating that Ms. Clark's hormone therapy was ineffective as her testosterone levels continued to increase rather than decrease. (*Supra* at 15.)

On June 28, 2018, Ms. Clark met with APRN Kimble-Goodman and reported feeling "[s]tressed out about the hormones and meds," was "shaving 2-3 [times] a day," felt "depressed [when] in the cell, [and] happy out of the cell." (Ex. 7 at 66.) As reported by APRN Kimble-Goodman, Ms. Clark stated she was writing to Planned Parenthood for help due to her concern that she was not receiving the correct medications for hormone therapy. (*Id.*) APRN Kimble-Goodman did not recommend a scheduled follow-up. (*Id.*)

The June 28, 2018, meeting was the last interaction between Ms. Clark and APRN Kimble-Goodman.  (Ex. H, ECF No. 128-10, at ¶ 17.)  At no time during her treatment of Ms. Clark did APRN Kimble-Goodman provide Ms. Clark with anything other than "talk-therapy" and a prescription for anti-depressants.  (*See supra*.)  APRN Kimble-Goodman did not refer Ms. Clark to an outside specialist to treat her gender dysphoria.  (Defs.' 56(a)2 ¶ 41.)  APRN Kimble-Goodman testified that she did not make referrals or reach out to anyone about setting up a treatment plan for Ms. Clark because Ms. Clark was legally pursuing treatment on her own.  (Ex. 18, ECF No. 133-20, at 101:14–102:3.)  When asked whether she made any referrals or spoke with anyone about Ms. Clark's care, APRN Kimble-Goodman stated she believed she might have spoken with Dr. Valetta about Ms. Clark, who initially told her that Ms. Clark was not receiving treatment.  (*Id.* at 99:12–100:8.)  APRN Kimble-Goodman also spoke with a "Dr. Lee," who simply informed her that he evaluated Ms. Clark before her endocrinology consultation but did not discuss his evaluation or anything else relating to Ms. Clark's treatment.  (*Id.* at 100:9–19.)

On July 18, 2018, Ms. Clark submitted an inmate request form in which she stated she was trying to file a health service review but has been told she needed to try to resolve her issues through a sick call first.  (Ex. 17 at 14.)  In this submission, she reported feeling traumatized by still having erections and advancing male pattern baldness.  (*Id.*)  She asked questions about side effects of her hormone treatment.  (*Id.*)  Ms. Clark requested a referral to see a specific provider with Planned Parenthood in New Haven, Connecticut, who told Ms. Clark she would be willing to help her.  (*Id.*)  Ms. Clark sought gender affirming surgeries

and procedures, including facial reconstruction, excision of her Adam's apple, and restoration of her hairline.  (*Id.*)  She wrote: "I do not know how to communicate how much pain I'm in."  (*Id.*)   On July 24, 2018, Dr. Valetta met with Ms. Clark in response to her request.  (Ex. B at 1046–48.)  Dr. Valetta submitted a new order for an onsite referral to mental health.  (*Id.*)  In the order form, he provided only the following instructions: "gender dysphoria/ depression/ possible SSIR- wants ED." (*Id.* at 1049.)  There is no record of treatment subsequent to the referral nor any record of Dr. Valetta following up.

On Thursday September 27, 2018, Ms. Clark submitted an inmate request, reporting that her estradiol prescription was not filled and inquiring why this kept happening.  (Ex. 17 at 18.)  On Tuesday October 2, 2018, a nurse responded by stating Ms. Clark received the estradiol that evening—reflecting at least an additional four-day delay in receiving her medication.  (*See id.*)

On February 7, 2019, Ms. Clark submitted an inmate request asking whether the hormone replacement medicine she was receiving was properly dosed.  (Ex. 17 at 19.)  The undated response from an unknown source simply says "seen."  (*Id.*)

On March 8, 2019, LCSW Bush met with Ms. Clark for the first time.  (Ex. 7 at 68–70.)  LCSW Bush is a mental health provider who had no education or other training on treating gender dysphoria.  (Pl.'s 56(a)2 at ¶ 7; Defs.' 56(a)2 at ¶ 17.) During their meeting, Ms. Clark was upset because her inmate grievances were not being addressed.  (Ex. 7 at 68–70.)  LCSW Bush told Ms. Clark that he contacted the medical team and was informed that Ms. Clark had no pending grievances.  (*Id.*)

As reported by LCSW Bush, Ms. Clark mentioned she would submit a new inmate request.  (*Id.*)

On April 17, 2019, Ms. Clark, proceeding as a self-represented litigant, brought this case seeking monetary damages against various DOC officials in their individual capacity and provision of "proper and standard medical and mental health treatment associated with gender dysphoria."  (Compl., ECF No. 1.)

On June 17, 2019, Ms. Clark submitted a request asking why she had not received the three-month follow-up endocrinology appointment ordered by the endocrinologist.  (Ex. 17 at 20.)  By the time of this request, Ms. Clark had not met with the endocrinologist for over 21 months.  (*Supra* at 14.)  Approximately two weeks later, someone from the DOC responded stating that "endocrinology [at] UConn is very backed up and appointment slots are difficult to obtain.  Although, you have an appointment with endocrinology coming up within the next month."  (*Id.*)  There is no record showing that all endocrinology appointments were reserved during that interim period.  Nor is there a record showing efforts taken by the DOC to schedule Ms. Clark for the follow-up appointment prior to Ms. Clark's request.

On August 13, 2019, Ms. Clark had her first follow-up appointment with the endocrinologist via telemedicine.  (Ex. 7 at 81.)  The follow-up appointment was approximately 20 months later than recommended by the endocrinologist in September 2017.  (*Supra* at 14.) The endocrinologist recommended Ms. Clark undergo lab testing and follow up with them in two months.  (Ex. 7 at 81.) The endocrinologist noted that new lab work was necessary because the previous

results were 15 months old, more than a year longer than the temporal proximity between the test result and the follow-up visit ordered by the endocrinologist.  (Ex. C, ECF No. 128-5, at 27.)

On September 9, 2019, Ms. Clark submitted an inmate request in which she reported feeling stressed out and depressed over her transition treatment and requested more therapy.  (Ex. 21, ECF No. 133-23.)  This request was given to LCSW Bush.  (*Id.*)  On September 12, 2019, LCSW Bush met with Ms. Clark for the second time.  (Ex. 7 at 71–73.)  LCSW Bush reported that Ms. Clark asked for a referral to a mental health provider because she was upset that "nothing seems to be happening for [her] transition."  (*Id.*)  In the report of this interaction, LCSW Bush characterized Ms. Clark's concerns as "frustrations of not getting what she wants when she wants it."  (*Id.*)  LCSW Bush "allowed" Ms. Clark to "vent her feelings and provided perspective, support, and reframing when appropriate/needed."  (*Id.*)  The report of this interaction also stated that Ms. Clark said she was looking forward to an upcoming appointment with her endocrinologist.  (*Id.*)

The September 9, 2019, meeting was the last time Ms. Clark met with LCSW Bush.  (Pl.'s 56(a)2 at ¶ 59.)  Aside from their conversations, LCSW Bush neither provided nor arranged for any further treatment of Ms. Clark.  (Defs.' 56(a)2 ¶¶ 46–47.)

On September 24, 2019, a lab test revealed Ms. Clark's testosterone had increased to 754 ng/dL, which is within the normal range for an adult male, (ex. 7 at 116), indicating that Ms. Clark's hormone therapy was ineffective as her testosterone levels continued to increase rather than decrease.  (*Supra* at 16.)

On October 8, 2019, Ms. Clark had a follow-up appointment with her endocrinologist, who recommended an increase in her medication from 50 mg of spironolactone to 100 mg per day for six to eight weeks and then increase to 300 mg per day.  (Ex. 7 at 115.)  The endocrinologist recommended repeat lab work in three and a half months and a follow-up appointment in four months, in or around February 2020.  (*Id.*)

On October 23 and 24, 2019, Ms. Clark submitted inmate requests asking about when she could receive gender affirming surgeries and changes in her hormone therapy.  (Ex. 17 at 22–23.)  In response, a DOC official wrote "per our discussion you were notified you are on MDSC list for further eval."  (*Id.*)

On February 11, 2020, Ms. Clark had a follow-up appointment with her endocrinologist, following which the endocrinologist increased her dosage of estradiol from 2 mg to 4 mg daily and ordered a follow-up appointment in four months.  (Ex. 7 at 118.)

On February 12, 2020, Ms. Clark submitted an inmate request for a referral to a psychiatrist who can properly treat her gender dysphoria.  (Ex. 17 at 24.)  The unsigned, undated response simply stated that Ms. Clark was transferred to another facility on March 9, 2020.  (*Id.*)

### *Transfer from Garner to MacDougall-Walker*

In or around March 2020, the DOC transferred Ms. Clark from Garner CI to MacDougall-Walker CI.  (Ex. 7 at 51–52.)  Shortly after her transfer, the DOC planned to move Ms. Clark back to Cheshire, where she attempted self-castration in July 2016.  (Ex. 6.)  However, Cheshire staff resisted the transfer out of concern for the

trauma experienced by the staff who responded to Ms. Clark's self-castration attempt, the relatively benign observation of which they described as a "pretty horrific incident." (*Id.*) On April 5 and 8, 2020, Ms. Clark submitted inmate requests asking questions about her hormone therapy. (Ex. 17 at 25–26.) The stamped response stated: "Please sign up for PromptCare in your housing unit." (*Id.*)

Ms. Clark's medical records are sparse following her transfer to MacDougall-Walker. The records do show, however, that she had telehealth visits with an endocrinologist on October 13, 2020, February 9, 2021, and December 14, 2021, during which the endocrinologist recommended that Ms. Clark continue her prescriptions for estradiol and spironolactone at the previously prescribed doses, be referred to a transgender surgeon, and follow up in six months. (Ex. C at 2–7; Ex. B at 186–87.)

In the summer or early fall of 2021, more than four years after Ms. Clark was diagnosed with gender dysphoria, Dr. Burns, who is the DOC's Chief Mental Health Officer and chair of the DOC's Gender Non-Conforming Review Committee, first sought a gender non-conforming specialist to treat Ms. Clark by cold-calling providers. (Ex. 2 at 161:16–162:12; Ex. F, ECF No. 128-8, at ¶ 5.) Dr. Burns knew about Ms. Clark's gender dysphoria and her prior attempt at self-castration, but he never directly treated her. (Defs.' 56(a)2 at ¶¶ 58–59.) Prior to his involvement in summer or early fall 2021, Dr. Burns did nothing to treat Ms. Clark's gender dysphoria. (Defs.' 56(a)2 at ¶ 59.) Dr. Burns expected the staff at the prison housing Ms. Clark to provide her treatment. (Defs.' 56(a)2 at ¶ 60.)

22

On October 5, 2021, the DOC requested a waiver from a competitive solicitation requirement to allow the acquisition of Twin Peaks Counseling to provide Gender Non-Conforming Consultant services for the DOC.  (Ex. 14, ECF No. 133-16.)  The services were needed to ensure that the DOC is meeting its legal obligations to gender non-conforming inmates and because surgeons require supportive letters before performing transition surgery.  (*Id.*)

Around this time, in November 2021, Ms. Clark testified during her deposition that she was still suffering from gender dysphoria, which included having suicidal thoughts.  (Defs.' 56(a)2 at ¶ 71.)

Over the fall of 2021, the DOC hired LCSW Dayne Bachmann, a gender non-conforming consultant.  (Defs.' 56(a)2 at ¶ 64; Pl.'s 56(a)2 at ¶ 80.)  LCSW Bachmann met with Ms. Clark on December 22, 2021.  (Ex. 27, ECF No. 133-29.)  In his notes from this appointment, he states that gender conforming surgery "is a fundamental need and vital to alleviating [Ms. Clark's] gender dysphoria."  (*Id.*)  He wrote: "After thorough discussion with Ms. Clark, it is believed that this procedure will help lead to a healthier, more balanced life post-surgery."  (*Id.*)  LCSW Bachmann reported that "Ms. Clark has met the WPATH standards of care criteria for surgery."  (*Id.*)  As for a post-appointment plan, LCSW Bachmann first recommended Ms. Clark be referred to Middlesex Transgender Health or UConn Transgender Health.  (*Id.*)  He also wrote that he believes Ms. Clark would benefit to have a gender therapist to talk with and process upcoming procedures.  (*Id.*)  The DOC initiated recurring telehealth visits with Mr. Bachmann for Ms. Clark with her next scheduled visit to be four months after her first visit.  (Pl.'s 56(a)2 at ¶ 82.)

Ms. Clark is reported as refusing to meet with mental health clinicians other than LCSW Bachmann on February 24, 2022, and March 23, 2022.  (Ex. B at 91, 118.)

On LCSW Bachmann's recommendation, the DOC referred Ms. Clark to a transgender clinic called Middlesex Center for Gender Medicine and Wellness.  (Pl.'s 56(a)2 at ¶ 83.)  Her first telehealth visit was scheduled for April 2022, which was after the briefing period for the underlying motions.  (*Id.*)  Middlesex is expected to provide several specialty services, including services with a transition coordinator.  (Pl.'s 56(a)2 at ¶ 84.)

### *DOC Efforts to Obtain Treatment Providers*

According to Dr. Burns, who is the Chief Mental Health Officer for the DOC, it can be difficult to secure outside healthcare providers who are willing to provide services to inmates because there are some logistical challenges to treating the inmate population.  (Pl.'s 56(a)2 at ¶ 90.)  Dr. Burns states that some providers are afraid that having an inmate as a patient would impact their other patients.  (*Id.*)  Further, according to Dr. Burns, the DOC is required to evaluate the provider's office prior to transporting an inmate for the purpose of addressing security issues.  (Pl.'s 56(a)2 at ¶ 91.)  DOC personnel have conducted site security assessments in the past upon request from Dr. Burns.  (*Id.* at ¶ 47.)  If an outside provider is willing to accept the inmate as a patient, then the DOC contracts with the provider for the inmate's care.  (Pl.'s 56(a)2 at ¶ 92.)  According to Dr. Burns, the entire process of securing an outside specialist for an inmate can take a long time.

Dr. Burns reports that he has begun the process of trying to find a surgeon to evaluate and potentially perform a vaginoplasty on Ms. Clark.  On February 4,

2022, Dr. Burns provided information to a surgeon in Connecticut that is qualified to perform a vaginoplasty.  (Ex. 2 at 126:24–127:13.)  Dr. Burns has not heard back from the surgeon even though he reached out to him six times since January 2022.  (Ex. F at ¶ 32.)  According to Dr. Burns, during one of the calls, he was told by the surgeon's assistant that the surgeon was not providing vaginoplasties at the time.  (Ex. F. at ¶ 33.)  Dr. Burns states that he was told that the surgeon was temporarily without the assistance of a urologist, which the Court presumes is necessary for this type of procedure.  (Ex. F. at ¶ 33.)  Dr. Burns did not locate or attempt to locate another practice in Connecticut.

According to Dr. Burns, the next closest surgeon he could locate to evaluate and potentially perform a vaginoplasty on Ms. Clark was in Manhattan, New York.  (*Id.* at ¶ 37.)  He states that if the surgery was performed out of state, the DOC would need to transfer custody of Ms. Clark to the state department of correction system where the surgery would take place.  (*Id.*)  Further, the other state's department of correction would need to agree to take temporary custody of Ms. Clark before the transfer.  (*Id.* at ¶ 38.)  There is an interstate compact for custodial management in New York that could provide for the temporary transfer of custody.  (*Id.*)

Dr. Burns also claims he has been attempting to arrange for Ms. Clark to have electrolysis with an outside provider.  (*Id.* at ¶¶ 41–42.)  He has reached out to two providers in Connecticut.  (*Id.* at ¶ 42.)  No additional information is provided on these efforts.

### *Expert Opinions on Ms. Clark's Treatment*

As explained above, the parties have retained experts.  Dr. Brown, Ms. Clark's expert, opined that "the DOC has provided inadequate, substandard medical, psychiatric, and surgical care" for her gender dysphoria because she has not received an evaluation for surgical interventions, and the mental health counseling has been limited and conducted by staff members without experience in providing gender conforming care.  (Ex. 2 at ¶ 84.)  Dr. Brown further opines that "[t]his lack of access to basic, medically necessary services for the treatment of [gender dysphoria] violates any reasonable standard of care for transgender inmates."  (*Id.*)   In Dr. Brown's opinion, genital affirming surgery is medically necessary for Ms. Clark.  (Ex. 3, ECF No. 133-5, at 245:17–21.)  Dr. Brown states that the consequences of not providing gender affirming surgery to an individual who needs it are much greater than the possible consequences of such surgery. (Ex. 1 37–38.)  He lists the possible consequences of not receiving surgery as auto-castration, depression, and possible suicide.   (*Id.*)   As to the possible consequences of the surgery, Dr. Brown listed surgical complications, loss of orgasmic capacity, and suicidality.  (*Id.*)  Dr. Brown reports that he has never had a patient who received gender affirming surgery regret the decision or try to harm themselves after having surgery.  (*Id.*)

Dr. Levine, the Defendants' expert, agrees that Ms. Clark has not received adequate treatment for her gender dysphoria since April 2016.  (Ex. 4, ECF No. 133-6, at 110:18–23.)  Dr. Levine focuses his post-deposition declaration on pointing out that there is disagreement on how to treat gender dysphoria and on whether

Ms. Clark is a suitable candidate for gender affirming surgery.  (Ex. E.)  Dr. Levine opines, "[t]here is very little constancy in our concepts of gender dysphoria and the study and knowledge surrounding this condition is dynamic."  (Ex. E at ¶ 8.)  Further, "[t]he form of gender dysphoria and the vocabulary around it have been changing dramatically, particularly within the last 10 to 15 years." (*Id.*)  He opines "[t]here is also considerable growing disagreement within the medical and scientific communities on how to best treat people with gender dysphoria."  (*Id.*)  Dr. Levine further states "there is insufficient scientific evidence of significant long term mental health benefits to recommend genital surgery for transgender individuals on a class wide basis.  At best, surgery should be performed on a case-by-case evaluative basis."  (*Id.* at ¶ 22.)   Dr. Levine's opinion applies to all transgender individuals, not just those with gender dysphoria, like Ms. Clark.

As to Ms. Clark specifically, Dr. Levine states that he believes Ms. Clark has "poor judgment, unrealistic expectations, and exaggerated psychological pain," and that her "most significant flaws seem to be her inability to control her anger." (Ex. E at ¶ 39.) Dr. Levine opines that, based on his evaluation of Ms. Clark as of 2020, she is not a candidate for genital reconstructive surgery.  (Ex. E at ¶ 55.)  He reaches this opinion after finding that Ms. Clark has "misconception[s] about genital surgery," and "unrealistic outlook," and "a sense of desperation . . . ."  (*Id.* at ¶ 54.)   He states that he does "not believe she could provide informed consent for genital surgery."   (*Id.*)   He states that if Ms. Clark did receive genital reconstructive surgery, it "may not provide Ms. Clark with a significant lasting improvement in her mental health."  (*Id.* at ¶ 56.)

27

## II.    PROCEDURAL HISTORY

On April 17, 2019, Ms. Clark filed the original complaint in this case as a self-represented litigant (also known as pro se).  (Compl., ECF No. 1.)  The Court reviewed the complaint pursuant to 28 U.S.C. § 1915A and issued an initial review order ("IRO").  (IRO, ECF No. 10.)  At the IRO phase, the only claims permitted to proceed to discovery was a claim of deliberate indifference to medical needs and intentional infliction of emotional distress against Dr. Valetta.  (*Id.*)

Ms. Clark sought the appointment of counsel, (ECF Nos. 18, 23), which the Court ultimately granted.  (ECF No. 33.)  In April 2021, lawyers from the ACLU Foundation of Connecticut and Finn Dixon & Herling, LLP entered appearances on Ms. Clark's behalf, substituting the court-appointed counsel.  (ECF Nos. 65, 66, 67, 69, 72.)

Ms. Clark, through her legal team, filed an Amended Complaint.  (Am. Compl., ECF No. 84.)  In the Amended Complaint, Ms. Clark named four defendants: Angel Quiros, DOC Commissioner; Dr. Gerald Valetta; LCSW Richard Bush; and APRN Barbara Kimble-Goodman.  (*Id.*)  She raises two claims in her Amended Complaint: (1) a claim of deliberate indifference to medical needs in violation of the Eighth Amendment, actionable under 42 U.S.C. § 1983, against all Defendants, and (2) a claim of intentional infliction of emotional distress against Dr. Valetta, LCSW Bush, and APRN Kimble-Goodman.  (*Id.*)  In her Amended Complaint she seeks the following forms of relief: (1) "injunctive relief enjoining Defendants to provide Ms. Clark with adequate and necessary medical care for treatment of her gender dysphoria, including appropriate transition-related surgeries, other procedures,

and feminine supplies;" (2) "declaratory relief declaring unconstitutional and violative of federal law Defendants' practices of denying Ms. Clark adequate and necessary medical treatment;" (3) monetary damages, including compensatory, general, special, punitive, and exemplary damages; (4) attorneys' fees and costs; and (5) "[s]uch other relief as the Court may deem just and proper."  (*Id.* at 14.)

Before the Court are the parties' cross motions for summary judgment. (Defs.' Mot. Summ. J.; Pl.'s Mot. Summ. J.)  The Defendants have also filed two Motions for Leave to Supplement their Motion for Summary Judgment, wherein they seek to include a declaration from a DOC counselor about her efforts to secure Ms. Clark's transfer out of state for bottom surgery.  (Defs.' First Suppl. Mot., ECF No. 190; Defs.' Second Suppl. Mot., ECF No. 192.)  The Court will address these two motions here.  The declarant claims that in February or March 2023, she queried all thirty states that are members of the Interstate Corrections Compact to determine if they can perform gender affirming surgery for their inmate populations.  (Osden Decl. at ¶ 9, ECF No. 192-2.)  She claims that three reported they have arranged for an inmate to receive bottom surgery, but none of those three states were willing to review Ms. Clark for transfer.  (*Id.* at ¶¶ 9–10.)

In support of this claim, she attaches emails that appear to show a mixed response from the three states.  The Massachusetts representative wrote that there was an issue with the "rationale" listed for transfer.  (*Id.* at 5–6.)  In response to this email, the DOC proposed changing the "reason for transfer."  (*Id.* at 5.)  There is nothing in the record indicating that DOC ever followed up.  The Massachusetts' response does not support a conclusion that they have refused to facilitate bottom

surgery for Ms. Clark.  Representatives from the other two states, Oregon and Colorado, stated they were unwilling to review the case at the time but did leave the door open for further inquiry.  (*Id.* at 9 (Oregon indicating: "If you would like to check back in at a later time I would be happy to see where were are in the process and if anything changes let you know."); (Colorado indicating: "We are no longer providing this surgery and our new Director has Interstate transfers on hold *for now* . . . we are so short staffed.")  The Defendants have not provided any proof supporting the declarant's claim that she queried the other 27 states in the Interstate Corrections Compact, or if any action was taken to contact the states that are not part of the Compact.

Ms. Clark opposes the Defendants' motion to present this supplemental evidence.  (Pl.'s Obj. to Suppl. Mot., ECF No. 193.)  There is no need to engage in an exhaustive analysis of whether the Defendants' may introduce this evidence after the dispositive motions deadline, because this evidence does not support the Defendants' positions.  If anything, this evidence tends to support Ms. Clark's claim that injunctive relief is necessary.  The declaration shows that the DOC queried only a little over a half of the states' departments of corrections well-over a year after its own gender non-conforming specialist deemed Ms. Clark needed bottom surgery and a year after their Chief Mental Health Officer began searching for surgeons.  (Osden Decl. ¶¶ 8–11; Ex. 27; Ex. 2 at 126:24–127:13.)  The Defendants have not even tried to present an excuse for why it took them so long to reach out to the states within the Interstate Correction Compact, why they limited their direct

inquiry to states that have performed the surgery, and why they have not inquired with states not party to the Compact.

Other courts have considered whether to allow new evidence post-summary judgment briefing under Federal Rule of Civil Procedure 6(b)(2). *See Davidson v. Scully*, 148 F. Supp. 2d 249, 251–52 (S.D.N.Y. 2001).

> Under Fed. R. Civ. P. 6(b)(2), the Court has discretion to allow plaintiff to submit new evidence if the Court determines that plaintiff's failure to submit such evidence in a timely fashion was the result of excusable neglect. . . . [E]xcusable neglect under Rule 6(b) is a somewhat elastic concept and is not limited strictly to omissions caused by circumstances beyond the control of the movant. . . . The determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. . . . Relevant circumstances include the danger of prejudice to the non-moving party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* (internal citations and quotation marks omitted). Here, the relevant circumstances tend to support granting the Defendants' motion. There is no danger of prejudice to Ms. Clark, because, as detailed above, this evidence tends to support her position. Granting the motion will not delay adjudication of the pending motions because there is no need for further discovery on this issue at this time. The Defendants' reason for the delay, the amount of control they had over the delay, and their motivations are a bit of a mixed bag. Technically this evidence did not exist at the time of the summary judgment briefing. Should it have? Absolutely. The DOC has known for at least a year and a half that Ms. Clark needed gender affirming surgery as recommended by their own expert and are just now investigating out-of-state options. Notwithstanding, the equities support

granting the Defendants' motion to supplement its briefing and thus, the motion is GRANTED.

### III.     LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure requires courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original). An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Whether a fact is "material" is identified by the substantive law. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "[A]t the summary judgment stage the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Evidence that is "merely colorable" and "not significantly probative" is not enough to reject summary judgment. *Id.* at 249–50. "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed

in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, . . . questions of admissibility are properly resolved by the court." *Id.* (internal citation omitted).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he nonmoving party must come forward with 'specific facts that there is a *genuine issue for trial*,'" *id.* (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation" *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," and the rule "should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "Summary judgment procedure is properly

33

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* at 327.

## IV.   DISCUSSION

### A.   Local Rule 56(a)1

The Defendants argue the Court should deny Ms. Clark's motion for summary judgment for failing to comply with Local Rule 56(a).  Local Rule of Civil Procedure 56(a)1 requires a party moving for summary judgment to file a 'Local Rule 56(a)1 Statement of Undisputed Facts,' which sets forth, in separately numbered paragraphs . . . a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  "Each statement of material fact . . . must be followed by a specific citation" to evidence in the record.  D. Conn. L. R. Civ. P. 56(a)3.  If the moving party fails to provide specific citations, the Court "may" impose sanctions, including "an order denying the motion for summary judgment."  *Id.*

The Defendants make two arguments as to why the Court should exercise authority under Local Rule 56(a)3 and deny Ms. Clark's motion for summary judgment.  First, the Defendants argue that Ms. Clark's 56(a)1 Statement contains inaccurate and misleading citations to support her statements of fact.  After the Defendants raised this argument, Ms. Clark requested leave to file a corrected 56(a)1, correcting the clerical citation errors.  The Court granted this request.  Thus, the Defendants' first argument is moot now that the record has been corrected.

Second, the Defendants argue that Ms. Clark is egregiously disingenuous with the record.  They provide as an example a statement of fact where Ms. Clark said, "At that [endocrinology] appointment, DOC had not done any bloodwork" and cites to page 81 of the medical records.  Page 81 of Ms. Clark's medical records exhibit is a record from Dr. Valetta following a telemedicine consult with endocrinology where the endocrinologist recommended rechecking labs.  (Ex. 7 at 81.)  Nothing in the record specifically says that the DOC had not done any bloodwork for Ms. Clark prior to this appointment.  However, Ms. Clark was in a difficult position in trying to prove a negative; absent any record of bloodwork completed before this appointment, her only alternative would have been to point to the entire record.  The Local Rule 56(a)2 statement procedure allows opponents to check this kind of statement by affording them an opportunity to deny a fact and citing to the record to support the denial.  The Defendants could have denied the fact and cited to the record showing lab work was completed.  However, they could not do that with respect to this specific statement of fact because the record shows Ms. Clark did not receive bloodwork for over a year before the first follow-up appointment with the endocrinologist.  Indeed, the record shows that the DOC failed to perform hormone tests and produce Ms. Clark for a follow-up appointment as directed by the endocrinologist; as a result, the test results produced at the time of her long-delayed endocrinology appointment were so outdated as to be useless.  In other words, the Defendants rely on semantics rather than substance.

Accordingly, the Court does not agree with the Defendants' characterization that this statement of fact is egregiously disingenuous.  Nor will the Court afford

the significant sanction of denying the Plaintiff's motion.  *See Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 174 (2d Cir. 2001) ("A clear preference exists for cases to be adjudicated on the merits.").  In fact, while there was bloodwork, there was no recent bloodwork consistent with the endocrinologist's treatment protocol.  Therefore, the Defendants' request that the Court deny Ms. Clark's motion for summary judgment for failing to comply with Local Rule 56(a) is denied.

### B.   Defense-Witnesses' Post-Deposition Declarations

The Plaintiff argues that the Court should disregard statements contained in Dr. Levine, Dr. Valetta, and LCSW Bush's post-deposition declarations.  While the moving party may rely on declarations and affidavits to support their position under Fed. R. Civ. P. 56(c)(1)(A), in this Circuit, neither a party nor its witness may "create an issue of fact by submitting an affidavit in [support or] opposition[] to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Raskin*, 125 F.3d at 63; *In re Fosamax*, 707 F.3d 189, 193 (2d Cir. 2013).  This is known as the "sham affidavit doctrine." *Federal Deposit Ins. Co. v. Murex, LLC*, 500 F. Supp. 3d 76, 94–95 (S.D.N.Y. 2020).  "[C]ourts in the Second Circuit are particularly reluctant to credit affidavit testimony that alleges critical, obviously material facts that [rehabilitate a witness's deposition testimony], noting that such circumstances strongly suggest a sham affidavit." *Id.* (quoting *Golden v. Merrill Lynch & Co.*, No. 06 Civ 2970 (RWS), 2007 WL 4299443, at *9 (S.D.N.Y. Dec. 6, 2007)).  "If a declarant's prior testimony and summary judgment declaration are not in direct contradiction, mere tensions or

inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment." *Id.*

Dr. Levine.  In Dr. Levine's post-deposition declaration, he states: "It is my opinion that Ms. Clark, based on my evaluation process with her in 2020, was neither a candidate for immediate transfer to a women's facility nor for scheduling genital reconstructive surgery." (Ex. E at ¶ 55.)  However, during his deposition, which occurred after his "evaluation process with [Ms. Clark] in 2020," he testified that Ms. Clark "may or may not be" an appropriate candidate for genital reconstructive surgery.  (Ex. 28 at 117:13–19.)  He testified he was unable at the time of his deposition to make a professional opinion as to whether Ms. Clark was a candidate for genital reconstructive surgery "as [he had] not seen Ms. Clark[] since 22 months" prior.  (*Id.* at 174:5–14.)  He explicitly stated that he was "not in the position of making a recommendation [at that time] about *anything* about her treatment without personally seeing her . . . ."  (*Id.* at 209:18–20 (emphasis added).)  The Defendants have not reported that Dr. Levine saw Ms. Clark between the time he was deposed and his declaration.  The distinctly opposite positions between Dr. Levine's deposition and post-deposition declaration strongly supports of finding of a "sham" affidavit.  The differences are more than mere tensions or inconsistencies.  Dr. Levine has completely reversed his position on whether he could render an opinion on Ms. Clark's candidacy for surgery without any justification or explanation for this shift.  The circumstances suggest litigation gamesmanship rather than a fair and reasoned assessment of Ms. Clark's medical needs.  No reasonable jury faced with this evidence would credit Dr. Levine's

opinion about Ms. Clark's candidacy in light of these facts.  Accordingly, Dr. Levine's post-deposition opinion about Ms. Clark's candidacy is deemed inadmissible and not considered for summary judgment.  *Raskin*, 125 F.3d at 66.

> Dr. Valetta.  In Dr. Valetta's post-deposition declaration, he states, "I did not have authority to refer Ms. Clark to a gender confirming surgeon," "I cannot . . . assess whether surgical treatment would be medically indicated for . . . a patient" with gender dysphoria because I am not a mental health provider and have no special training in gender dysphoria," and "I was not and am not involved in scheduling specialist visits."  (Ex. G., ECF No. 128-9, at ¶¶ 14–15, 20.)  The Court rejects the Plaintiff's argument that Dr. Valetta's declaration that he "cannot . . . assess whether surgical treatment would be medically necessary for a patient with gender dysphoria" contradicts his prior deposition testimony.  In the deposition, Dr. Valetta said, "the task of – assessing someone for the *suitability* of surgery would probably come to me being the primary physician . . . ."  (Ex. 9 at 227:15–18 (emphasis added).)  "Suitability for surgery" and whether gender affirming surgery is medically indicated are two separate questions.  The former asks if the patient is medically healthy enough for surgery.  The latter asks whether the procedure is medically necessary.  Thus, the declaration and testimony are not inconsistent.

> Next, Dr. Valetta's declaration that he did not have authority to refer Ms. Clark to a gender affirming surgeon is not truly in conflict with the deposition testimony, though the declaration is deceiving.  He testified that he does not make referrals to specialists, rather he makes a request for a referral to a committee of prison medical officials, who make the referral.  (*Id.* at 108:14–110:1.)  While somewhat

misleading, this is not technically inconsistent.  Similarly, his declaration that he was not involved in scheduling specialist visits is not truly in conflict with his testimony.  He testified that a nurse in the DOC central office schedules the appointments.  (*Id.* at 110:2–8.)  So, while it is true, he does not schedule the appointments, he is involved in the process in that he initiates the referral by submitting a request to the committee.  (*Id.* at 111:21–113:18.)  And he is expected to submit the request for each follow-up visit.  (*Id.*)  Thus, these declarations will not be set aside as inadmissible.

**LCSW Bush.**  In LCSW Bush's post-deposition declaration, he declares: "My note indicates that Ms. Clark verbalized her concerns regarding her gender transition and dysphoria to Ms. Reischerl, a psychiatric APRN, in her visits with her."  (Ex. I, ECF No. 128-11, at ¶ 23.)  The "note" to which LCSW is referring is from the September 12, 2019, encounter he had with Ms. Clark, where he wrote that Ms. Clark "complained about the lack of programs at [Garner] and potential interest in transferring to another facility.  Inmate reported verbalizing this to Ms. Reischerl in [their] last meeting."  (Ex. B at 899.)  At his deposition, he could not remember what he discussed with Ms. Clark at this meeting.  (Ex. 20, ECF No. 133-22, at 55:14–23.)  He also could not recall what he meant in his notes when he said Ms. Clark was frustrated with not getting what she wants when she wants it.  (Ex. 20 at 56:14–57:9.)  LCSW Bush's declaration is disregarded under the sham affidavit doctrine because the declaration and the testimony are contradictory in a way that suggests gamesmanship.  During his deposition, he had no memory of his conversations and no ability to interpret his notes; then, once he was no longer subject to

39

examination, he conspicuously became able to add critical context.  There is no explanation as to why he can suddenly remember the conversation or interpret his notes.  No reasonable jury presented with this evidence would find that LCSW Bush's declaration that he was told Ms. Clark verbalized her concerns with Ms. Reischerl credible.  Accordingly, the Court disregards the statement for summary judgment.

### C.    Striking Dr. Levine's Informed Consent Theory

The Plaintiff argues the Court should disregard Dr. Levine's declaration that Ms. Clark is unable to offer informed consent for genital reconstructive surgery because, in part, he did not make such a claim in his expert report or during his deposition.  Rule 26(a)(2)(B) requires experts who are "retained or specially employed to provide expert testimony in the case," like Dr. Levine, to disclose a written report containing "a complete statement of all opinions that the witness will express and the basis and reasons for them."  Dr. Levine's declaration would circumvent that requirement, and the Defendants provide no good cause to set aside his obligations under the Rules.  The declaration denies the Plaintiff an opportunity to rebut this evidence through the discovery process.  There are good reasons that Federal Rules require experts to disclose their opinions in their reports and why those reports are typically provided before depositions, which include affording the parties an opportunity to collect evidence to discover the truth.  This type of gamesmanship should never be rewarded.  Thus, the Court will not consider any theory that the Plaintiff is not a suitable candidate for gender affirming surgery because of an alleged inability to give informed consent.

### D. <u>Deliberate Indifference</u>

The Eighth Amendment prohibits infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII. "The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .' against which we must evaluate penal measures." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  The scope of the Eighth Amendment "is not static." *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958).  The "Amendments proscripts are not limited to those practices condemned by the common law in 1789." *Ford v. Wainwright*, 477 U.S. 399, 406 (1986).  "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 101.  Courts are to consider "objective evidence of contemporary values before determining whether a particular punishment comports with the fundamental human dignity that the Amendment protects." *Ford*, 477 U.S. at 406.  On occasion, the Supreme Court has applied this standard in finding intolerable and thus unconstitutional once constitutionally permissible punishments; including death for raping an adult woman, *Coker v. Georgia*, 433 U.S. 584, 593–96 (1977), death for any non-homicide crimes, *Enmund v. Florida*, 458 U.S. 782, 789–93 (1982), death of minors, *Roper v. Simmons*, 543 U.S. 551 (2005), and mandatory sentences of life without the possibility of parole of minors, *Miller v. Alabama*, 567 U.S. 460 (2012).

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103.  "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment." *Id.* at 104.  "The

standard of deliberate indifference includes both subjective and objective components." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.'" *Id.* "Second, the defendant 'must act with a sufficiently culpable state of mind.'" *Id.*

### 1. Objective Prong

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "The 'deliberate indifference' standard of *Estelle* is equally applicable to the constitutional adequacy of psychological or psychiatric care provided at a prison." *Young v. Choinski*, 15 F. Supp. 3d 172, 184 (D. Conn. 2014) (citing *Guglielmoni v. Alexander*, 583 F. Supp. 821, 826 (D. Conn. 1984)).

"Determining whether a deprivation is an objectively serious deprivation entails two inquiries." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court is to determine "whether the prisoner was actually deprived of adequate medical care." *Id.* "[P]rison official's duty is only to provide reasonable care." *Id.* "[F]ailing 'to take reasonable measures' in response to a medical condition can lead to liability." *Id.* at 280. Second, the court is to determine "whether the inadequacy in medical care is sufficiently serious." *Id.* The court is to consider "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.*

"Negligen[ce] in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429

U.S. at 106.   A plaintiff cannot establish a claim of deliberate indifference on a theory that the defendant failed to take some available alternative or additional diagnostic techniques or forms of treatment when the defendant's decision is based on sound medical judgment.  *See id.* at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice . . . ."); *see also Chance*, 143 F.3d at 703–04.  "[M]ere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance*, 143 F.3d at 703.   However, prison healthcare providers must still provide reasonable care.  *Salahuddin*, 467 F.3d at 279.  Care is not reasonable when it is easier but not efficacious.  *Chance*, 143 F.3d at 703.

"[G]iven the fact-specific nature of Eighth Amendment denial of medical care claims, it is difficult to formulate a precise standard of 'seriousness' . . . that is adequately sensitive (in the sense of capturing those medical conditions properly within the realm of Eighth Amendment concern) yet appropriately specific (*i.e.,* excluding those conditions that are not)."  *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997)).  "Because '[t]he objective component of an Eighth Amendment claim is . . . [necessarily] contextual' and fact-specific . . . the serious medical need inquiry must be tailored to the specific circumstances of each case."  *Id.* at 185.  Some "highly relevant" factors "to the inquiry into whether a given medical condition is a serious one" include "[t]he existence of an injury that a reasonable doctor or

patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702–03.  Further, in assessing whether a medical need is serious, courts can consider "[t]he absence of adverse medical effects or demonstrable physical injury."  *Smith*, 316 F.3d at 187; *see also Salahuddin*, 467 F.3d at 280 ("This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.")  "Indeed, in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  *Id.*  However, "actual physical injury is not necessary."  *Id.* at 188.  "[P]rison officials may not ignore medical conditions that are 'very likely to cause serious illness and needless suffering' in the future even if the prisoner has 'no serious current symptoms.'"  *Id.*  The lack of present physical injury may be probative in assessing risk of future harm.  *Id.*

> When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.

*Smith*, 316 F.3d at 185.  In cases where there is a delay in treatment, courts are to consider "the particular risk of harm faced by a prisoner" due to the delay, "rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  *Id.* at 186.  However,

"[t]here is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition."  *Id.* at 185–86.

As outlined above, the jurisprudence on how to determine whether an inmate has suffered from an objectively serious medical need is abundant.  The case law directs courts to engage in contextual and fact-specific inquiries into whether a medical need is objectively serious.  Drawing from all of the considerations detailed above that are applicable to this case, the Court finds for the following reasons that Ms. Clark has established an objectively serious medical need, satisfying the objective prong of her Eighth Amendment claim.

Here, the experts agree that Ms. Clark was denied adequate care.  It took years, and this litigation, for DOC officials to refer Ms. Clark to see someone with experience and expertise in treating gender dysphoria.  It took over ten months after her self-castration attempt to receive any care aside from a referral to a mental health provider that had no experience or expertise in treating patients with gender dysphoria.  Then, when she received some treatment in the form of hormone therapy, the DOC failed to follow the medical protocol prescribed by that specialist and ignored multiple test results which reflected the increasing need to follow the prescribed protocol.  The record is devoid of any evidence of the DOC's attempt to follow the protocol or of any documentary scheduling or other impediments to following the protocol.  During this time, she received some treatment for her dysphoria in the form of talk therapy but said "therapy" was conducted by

someone without any experience or expertise in treating someone with gender dysphoria.  When eventually Ms. Clark was referred to someone with experience and expertise in treating someone with gender dysphoria, the DOC continued to fail to provide Ms. Clark with the treatment recommended by that expert.  This is not adequate care.

It is worth noting that the Defendants are not arguing that gender dysphoria is not a serious medical condition.  The Second Circuit in *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) assumed "transsexualism constitutes a serious medical need."  In assuming the objective prong was satisfied, the Second Circuit cited to the Seventh Circuit's decision in *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987), that found treatment of a psychiatric disorder, which includes transsexualism, may present a serious medical need.  *Cuoco*, 222 F.3d at 106.  While *Cuoco* is instructive in determining whether gender dysphoria is a serious medical condition, *Cuoco* is somewhat distinguishable in that it is a case where absolutely no care was provided.  Thus, the decision in *Cuoco* is not directly binding here, but is instructive.

One of the "highly relevant" factors identified by courts in assessing whether a medical need is sufficiently serious is "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment."  *Chance*, 143 F.3d at 702–03.  The injury here is years of documented mental anguish.  The Defendants attempt to diminish the anguish Ms. Clark suffered by cherry picking instances over the years of care where she reported feeling better after receiving some treatment.  While doing so, Defendants omit crucial context.

***First***, the referenced instances occurred shortly after students at Columbia Law School began helping Ms. Clark, and she was prescribed hormone treatment, which she believed would reduce her testosterone levels.  These instances occurred during moments of hope that the DOC was finally going to treat her gender dysphoria.  That hope understandably improved her mood and had a placebo-like effect on her mental health.

***Second***, these occasional reports of feeling better are engulfed by the many reports showing Ms. Clark was suffering and demanding adequate treatment for her mental health condition.  Between September 2016 and February 2020, she filed at least ten grievances, wherein she reports feeling aguish ("I cannot overstate just how much emotional and psychological pain I'm in," the distress was "intolerable," "I do not know how to communicate how much pain I'm in."), not receiving her hormone replacement medication, and seeking treatment for her gender dysphoria. DOC mental health providers reported several instances of clinically significant distress, depressed mood, sobbing, and generally feeling she was in a "bad place." Essentially, as weeks turned to months, and months turned to years without Ms. Clark receiving adequate care, her hope faded, and the anguish resurfaced as documented in the DOC medical records and Ms. Clark's grievances.  The Court finds the Defendants' argument disingenuous given the fact that Ms. Clark was not transferred back to the DOC facility where she attempted to castrate herself because staff members were traumatized by seeing what she did.  It defies credulity that DOC could appreciate the trauma its staff experienced, and yet not appreciate the trauma Ms. Clark was experiencing which compelled her to try to castrate

herself with a nail clipper.  The pain she must have been experiencing is inescapably palpable.  Thus, the Court rejects the Defendants' argument that Ms. Clark did not suffer an injury from inadequate care.

In any case, as explained above, actual injury caused by the deprivation of adequate care is not necessary to find a serious medical need.  *Smith*, 316 F.3d at 188.  Seriousness can be shown where the deprivation will likely cause injury.  *See Salahuddin*, 467 F.3d at 279.  Here, the fact that Ms. Clark suffered from an injury (years of mental anguish) proves the likelihood of injury.  Any reasonable medical professional knows that someone suffering with untreated or marginally treated gender dysphoria, particularly someone like Ms. Clark that has a history of attempting to self-castrate, will likely continue to suffer from the anguish that marks the condition.

Other factors, including "the presence of a medical condition that significantly affects an individual's daily activities" and "the existence of chronic and substantial pain," *Chance*, 143 F.3d at 702–03, also support a finding of seriousness.  As detailed above, Ms. Clark repeatedly reported anguish brought on by the lack of adequate care for her mental health condition for years.  Her persistent pleas for help went entirely ignored until she brought suit, and even then, she is still not receiving the treatment recommended by the DOC's own consultant.

The Court rejects the Defendants' argument that the Court must apply the delayed treatment standard in this case, and such standard requires a showing of injury caused by the delay.  The Defendants' argument fails for several reasons.

48

First, the Defendants' argument requires the Court to interpret the law as requiring injury for a medical need to be deemed serious.  However, the case law expressly rejects this requirement.  *See Smith*, 316 F.3d at 188; *Salahuddin*, 467 F.3d at 279. Second, the Defendants' argument requires to Court to agree that Ms. Clark did not suffer injury or pain caused by the delay.  As detailed more fully above, Ms. Clark has proven an injury caused by the Defendants' failure to adequately treat her. Finally, the Defendants' argument requires the Court to fit the facts and circumstances of this case into the narrow cases involving pure delays in treatment.  This case does not involve a simple delay.  While there were some egregious delays (ten-month delay for a referral to an endocrinologist, 19-month delay for a follow-up appointment with an endocrinologist, multi-year delay in a referral to a mental health provider with experience and expertise in treating someone with gender dysphoria), Ms. Clark still has not received treatment in the form of gender affirming surgery (which is treatment the DOC's gender conforming care specialist, the endocrinologist, and Ms. Clark's expert all agree is necessary for Ms. Clark).  Thus, this case does not fit under the delay-in-treatment standard for assessing the seriousness of the medical need.

Therefore, for the reasons stated, the Court finds that the Plaintiff has satisfied the objective prong of her deliberate indifference to medical needs claim.

### 2.      *Subjective Prong*

The Court now turns to the subjective prong.  "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Chance*, 143 F.3d at 702 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The state of mind standard is "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith*, 316 F.3d at 184 (internal citations and quotation marks omitted).

> Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable.  The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result.  Rather, proof of awareness of a substantial risk of the harm suffices. . . . But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin*, 467 F.3d at 263.  "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  *Id.*  "The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere.  Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable."  *Id.* at 281.

A plaintiff can establish the defendants had the requisite subjective intent for a deliberate indifference claim by pointing to evidence such as an "outright refusal of any treatment for a degenerative condition that tends to cause acute infection and pain if left untreated . . ."  *Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000).  "[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it."  *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003); *see also*

*Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (The Court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.").

"The fact that the defendants responded to plaintiff's complaints and treated plaintiff's symptoms does not preclude a finding that the defendants were deliberately indifferent to a serious medical need." *Hannah v. Chouhan*, No. 3:04CV314 (JBA), 2005 WL 2042074, at *4 (D. Conn. Aug. 24, 2005) (citing *Hemmings v. Gorczyk*, 134 F.3d 104, 108–09 (2d Cir.1998) (prison medical staff's failure to diagnose classic symptoms of a ruptured Achilles tendon may be sufficient to satisfy deliberate indifference standard, even though prison medical staff did not deny him treatment and eventually referred prisoner to an outside specialist); *Hathaway, v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) (defendant doctor's frequent examinations of plaintiff did not preclude finding of deliberate indifference because "course of treatment was largely ineffective, and [he] declined to do anything more to improve [plaintiff's] situation."); *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974) (physician may be deliberately indifferent if s/he consciously chooses "an easier and less efficacious" treatment); *Ruffin v. Deperio*, 97 F.Supp.2d 346, 353 (W.D.N.Y. 2000) (stating that deliberate indifference could be pleaded despite frequent treatment by prisoner's doctors where treatment was "cursory" or evidenced "apathy").

### i.     Dr. Valetta

Dr. Valetta was Ms. Clark's primary medical physician while she was at Garner.  When he first met with her, shortly after she attempted self-castration and while she was still recovering from the attempt, he failed to provide her with

informed care.  It is obvious to the Court and must have been obvious to Dr. Valetta, that Ms. Clark was in extreme mental anguish at that time.  When he first met with her, Ms. Clark was already diagnosed with gender dysphoria.  The diagnosing provider reported that Ms. Clark's "high level of psychological distress relating to [her] gender dysphoria clearly motivated" her self-castration attempt.  The extent of her injuries from the self-castration attempt were severe.  She was able to remove one of her testicles from her scrotum with a nail clipper, which required emergency hospitalization.  These circumstances known by Dr. Valetta clearly demonstrate a patient with extreme distress in need of care.

Dr. Valetta was aware of both the extent of her injuries and what caused her injuries, yet he provided her with no informed care.  For the first ten months of her care, he refused to provide her with any form of treatment based on an undocumented "CMHC/DOC policy."  The Defendants argue that Dr. Valetta could not be deliberately indifferent during this time period because he relied in good faith on this "policy."  However, a prison healthcare provider can be deliberately indifferent even when relying on prison policy if the provider fails to take any steps to assure that application of the policy to the inmate is "a medically justifiable course of action."  *Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005).  In *Johnson*, the Second Circuit reversed summary judgment for the defendant-prison physician, who reflexively applied prison policy on the treatment of individuals with hepatitis C in the face of the unanimous, express, and repeated recommendations of the inmates' treating physicians.  *Id.* at 400.  While the procedural posture of *Johnson* is different than here, the lesson remains the same:  namely, prison

52

officials cannot rely on reflexive application of a prison policy to rebut evidence that the official was deliberately indifferent.

The Defendants cite to a single district court decision, *Manning v. Goord*, No. 05-cv-850F, 2010 WL 883696 (W.D.N.Y. Mar. 8, 2010), to support their proposition that Dr. Valetta's reliance on the alleged "policy" absolves him of the subjective intent necessary for establishing the deliberate indifference claim. *Manning* does not stand for that proposition. In *Manning*, there was a similar policy as the policy Dr. Valetta claims to have relied upon, which limited hormone therapy to inmates who were receiving it before incarceration. *Id.* at *3. However, the physician in *Manning* did not blindly follow this policy when deciding to reject the inmate's request for hormone therapy. *Id.* Rather, the physician in *Manning* rejected the request after exercising medical judgment. *Id.* The physician explained that one of the reasons he refused the inmate's request for hormone therapy was because it was against the inmate's best interest as someone who was HIV-positive already undergoing significant medication treatments. *Id.* Thus, *Manning* does not support the Defendants' position. Rather, *Manning* supports a finding that a prison healthcare provider cannot rely on reflexive application of a prison policy to rebut evidence that the provider was deliberately indifferent.

For the time following Dr. Valetta's eventual referral to an endocrinologist, the Defendants argue that Dr. Valetta could not have the requisite subjective intent to deprive the Plaintiff of hormone therapy because, once he referred her to an endocrinologist, he simply followed the dosing the specialist recommended. The Defendants' argument overlooks the fact that Dr. Valetta failed to follow the

endocrinologist's instructions to arrange for Ms. Clark to follow up with the endocrinologist in three months, while at the same time 1) ignoring lab results showing Ms. Clark's testosterone levels were increasing rather than decreasing as intended and 2) failing to perform lab tests and provide medication prescribed by the endocrinologist.

The obviousness of the risk associated with failing to follow these instructions are best illustrated by the following hypothetical. Suppose Dr. Valetta referred Ms. Clark to an oncologist to treat a malignant tumor, and the oncologist instructed that Ms. Clark be prescribed medication to reduce the size of the tumor and that Ms. Clark return for a follow up to check the status of the treatment. If Dr. Valetta prescribed the medication but Ms. Clark's tumor not only did not shrink but it grew larger, and Dr. Valetta—knowing this—failed to follow up, then it would be undeniable that Dr. Valetta was deliberately indifferent to Ms. Clark's medical needs. He could not hide behind the "just following orders" argument, because he did not follow orders.

The argument the Defendants are making with respect to Dr. Valetta's subjective intent as it relates to hormone therapy is akin to the argument made and rejected in *Hathaway*, where the prison general practitioner argued that his conduct did not amount to deliberate indifference because he merely referred the inmate to a specialist. *Hathaway*, 37 F.3d at 68. The Second Circuit rejected that argument because prison general practitioners, like Dr. Valetta here, are not like general practitioners in the public that have limited contact with their patients. *Id.* Rather, prison general practitioners, like Dr. Valetta, oversee treatment recommendations

by specialists, such as writing prescriptions, regularly meeting with the patient, and receiving complaints of ailments. *Id.* Thus, the jurisprudence that supports finding physicians that make simple referrals less culpable does not apply in this context.

Finally, the Defendants argue that Dr. Valetta could not have the requisite subjective intent to deprive the Plaintiff of gender affirming surgery because he did not have authority to refer her to a surgeon, does not know of a surgeon to whom he could refer her, and does not know of the benefits of said surgery. This is an incorrect framing of the issues. The issue is not whether Dr. Valetta should have performed the surgery or personally searched the nation for a surgeon willing to perform the surgery. Rather, Dr. Valetta had a duty to provide Ms. Clark with informed care within his capabilities. This includes referring her to someone capable of assessing her medical needs and facilitating appropriate treatment. Dr. Valetta repeatedly concedes that he does not have the experience or expertise to treat someone suffering from gender dysphoria, like Ms. Clark. Instead of referring her to someone who could help her, he entirely refused to provide any treatment for almost a year, and then provided severely inadequate partial treatment for three years. This lack of informed care obviously contributed to Ms. Clark's suffering, to which Dr. Valetta was deliberately indifferent.

Returning to the hypothetical: If Ms. Clark had cancer, Dr. Valetta, who is not an oncologist, would logically refer her to an oncologist for evaluation and treatment. If he failed to refer her to an oncologist, knowing she had cancer and was suffering, he would undeniably be deliberately indifferent to her serious

medical needs.  The fact that he may refer her to another specialist, say a gastroenterologist, to address one of her symptoms, does not negate the fact that he was required to refer her to someone capable of treating her condition.  Put another way, giving a patient an ice pack for a broken bone is not adequate care. Dr. Valetta is not permitted to hide behind his incompetence in treating people suffering from gender dysphoria to avoid liability.  The fact that he did not know how to treat her is proof positive that he had a duty to refer her to someone who could.

Again, *Hathaway* is instructive.  In *Hathaway*, the inmate had an arthritic hip that included surgery to insert metal pins to stabilize the joint. 37 F.3d at 64.  When the inmate began to experience significant pain in the hip, the prison general practitioner referred the inmate to an orthopedic specialist, who determined that the pins broke.  *Id.* at 65.  Neither the specialist nor the general practitioner told the inmate of the broken pins, but the general practitioner did give him pain killers.  *Id.* After dozens of complaints over two years, the inmate learned of the broken pins from a nurse.  *Id.*  Not until the inmate sued the general practitioner, did he refer the inmate for reevaluation with a specialist.  *Id.*  In reversing summary judgment, the Second Circuit rejected the defendants' argument that, because the general practitioner frequently examined the inmate, he could not have been deliberately indifferent.  *Id.* at 66, 68.  The court explained that "the course of treatment [the inmate] received clearly did not alleviate his suffering" in light of the nearly-50 complaints over approximately two and a half years.  *Id.*  The court found that "[a] jury could infer deliberate indifference from the fact that [the general practitioner]

knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the inmate's] situation." *Id.* As in *Hathaway* and here, the fact that the healthcare provider provided some care does not foreclose a finding of deliberate indifference where the care is severely inadequate.

To the extent Dr. Valetta is trying to argue he could not refer Ms. Clark to a specialist qualified to treat gender dysphoria, the Court rejects such argument. Dr. Valetta knew how to use the URC process to request referral to an outside specialist. He used the process to refer Ms. Clark to an endocrinologist. The DOC medical system was capable of referring Ms. Clark to a specialist—as evidenced by the fact that the DOC eventually did issue the referral.

Accordingly, the Court finds that Dr. Valetta was deliberately indifferent to Ms. Clark's serious medical needs.

### ii.    LCSW Bush and APRN Kimble-Goodman

Moving next to LCSW Bush and APRN Kimble-Goodman, these defendants argue that they could not have the subjective intent necessary to establish deliberate indifference because they did not have the ability to affect Ms. Clark's treatment. Specifically, these defendants argue that they are not medical doctors and do not have the medical training, expertise, or authority to adjust Ms. Clark's hormone treatment or to provide her with gender affirming surgery. LCSW Bush and APRN Kimble-Goodman also argue they provided the care that they believed was medically necessary, which included only talk therapy with LCSW Bush and talk therapy and antidepression medication from APRN Kimble-Goodman.

The Court rejects these arguments for substantially similar reasons that the Court found Dr. Valetta was deliberately indifferent.  The Defendants are framing this case incorrectly.  The issue is not whether the mental health providers had the ability to perform surgery or prescribe hormone therapy.  The issue is whether they were deliberately indifferent to Ms. Clark's medical needs by failing to provide Ms. Clark with informed care.  Both of these Defendants concede they are not qualified to treat someone with gender dysphoria.  Notwithstanding, they failed to refer her to someone capable of providing her care.  It was obvious to these Defendants that the failure to refer Ms. Clark to someone competent to provide her care would perpetuate Ms. Clark's acute anguish.  Ms. Clark's gender dysphoria was the cause of her severe mental anguish which led to her partial self-castration.  Instead of treating her medical condition, these Defendants offered, at best, treatment of a mere symptom of her underlying medical condition.  That is analogous to providing pain medication, rather than treatment for the medical condition known to cause the pain.  Further, defendants were the authors of multiple reports documenting this anguish.  Ms. Clark begged them for help, but they did nothing more than listen and document her suffering.  This is not adequate care.  Like with Dr. Valetta, they knew of the extent of Ms. Clark's care, they knew the treatment she was receiving was ineffective, and they declined to do anything more to attempt to improve her situation.  *See Hathaway*, 37 F.3d at 68.

The Defendants argue that LCSW Bush specifically could not be deliberately indifferent because he was hardly involved, having only met with Ms. Clark twice. The Defendants have not cited to any authority suggesting that deliberate

indifference is at all tied to the number of times an official knows of and substantially disregards an inmate's serious medical needs.  The limited interactions may impact allocation of damages but does not justify a finding of no liability.

Accordingly, the Court finds that LCSW Bush and APRN Kimble-Goodman were deliberately indifferent to Ms. Clark's serious medical needs.

E.    Qualified Immunity

The Defendants argue that, even if the Court finds a constitutional violation has occurred, they are entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*  The Supreme Court "has accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "The general rule of qualified immunity is intended to provide government officials

with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'"  *Id.* at 646.

Qualified immunity is an affirmative defense that government-official defendants have the burden of pleading and proving.  *See Blisset v. Coughlin*, 66 F.3d 531, 539 (2d Cir. 1995) (citing *Harlow*, 457 U.S. at 815).  In assessing whether a defendant has met their burden of proof, the court must ask: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful."  *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).  As detailed above, the Court finds that the Plaintiff has shown facts making out a violation of her constitutional rights.

"Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  *Pearson*, 555 U.S. at 232.  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  *Anderson*, 483 U.S. at 639.  The legal rule cannot be overly general so as to make "a rule of virtually unqualified liability simply by alleging violation of extreme abstract rights."  *Id.*  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 640.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Id.*

The Defendants argue that the Second Circuit has never held that an inmate with gender dysphoria is entitled to any particular treatment, and on this fact, the Court is required to grant them qualified immunity.   The Defendants' view is impermissibly narrow.  *See LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) ("An overly narrow definition of the right can effectively insulate the government's actions by making it easy to assert that the narrowly defined right was not clearly established.").  A narrow framing of the "legal rule" similar to the one advanced by the Defendants was rejected by the Second Circuit in *LaBounty*, which held that the district court erred in describing the rule at issue as the right to be free from the particular threat to the inmate's health.  *Id.* at 74 (specifically "the right to be free from crumbling asbestos.")  In *LaBounty*, the Second Circuit held:

> Such a restricted view of the right conflates the specific conduct at issue with the defined right running afoul of this Court's recognition that "[a] court need not have passed on the identical course of conduct in order for its illegality to be 'clearly established.'" *Williams v. Greifinger,* 97 F.3d 699, 703 (2d Cir.1996).  Instead, we find that the right to be free from deliberate indifference to serious medical needs, established in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), best encompasses the alleged conduct.  In *Estelle,* the Court held that such indifference constituted "cruel and unusual punishment" under the Eighth Amendment.  *Id.*

*Id; see also Rodriguez v. Manenti*, 606 Fed. Appx. 25, 26 (2d Cir. 2015) ("[T]his Court does not analyze Eighth Amendment claims for the deprivation of medical care according to body parts.").  As found in *LaBounty*, the correct inquiry is whether Ms. Clark had the right to be free from deliberate indifference to serious medical needs.  This right is clearly established as held in *Estelle* and *LaBounty*, both of which were decided well before the events in this case.  *See e.g., Randle v. Alexander*, 170 F. Supp. 3d 580, 596 (S.D.N.Y. 2016) ("a prisoner's right to be free

from deliberate indifference to his serious medical needs has been clearly established for decades."); *Benjamin v. Schwartz*, 299 F. Supp. 2d 196, 201 (S.D.N.Y. 2004).

Now that Ms. Clark has shown facts making out a violation of a clearly established constitutional right, "to establish their qualified immunity defense, the defendants must show that it was 'objectively reasonable,' . . . for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). In satisfying this standard, the Defendants must show that no "every reasonable official would have understood what he was doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotations and citation omitted). Where judges "disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy." *Pearson*, 555 U.S. at 245.

The Defendants state they are unable to find any district court case within this Circuit where a denial of hormone therapy or gender assignment surgery has been held to constitute deliberate indifference. The Defendants claim that three district court decisions held the opposite and/or granted qualified immunity. These cases are *Pack v. Bukowski*, No. 07-cv-6344L, 2010 WL 1403995 (W.D.N.Y. Mar. 31, 2010), *Manning*, 2010 WL 883696, and *Lopez v. City of N.Y.*, 2009 U.S. Dist. LEXIS 7645, at *35–36 (S.D.N.Y. Jan. 29, 2009). Each of these cases are fundamentally distinguishable as to make them entirely inapplicable to the question of whether it was objectively reasonable for the Provider-Defendants to believe they were acting within the confines of the law.

*Pack* involved an inmate who failed to present evidence that she suffered from gender dysphoria. 2010 WL 1403995, at *1. That is not the case here, as it is undisputed that Ms. Clark suffers from gender dysphoria and the Provider-Defendants knew she suffered from gender dysphoria. Because there was no evidence the inmate suffered from gender dysphoria, the court in *Pack* found that the inmate failed to show an objectively serious medical need. *Id.* at *3.

The Court addressed *Manning* above, which involves a prison-physician denying an inmate hormone therapy. 2010 WL 883696. While the physician in *Manning* relied in part on a prison policy limiting hormone therapy to inmates who were receiving the treatment prior to incarceration, the physician denied the treatment in *Manning* because in his medical opinion the treatment was contraindicated. *Id.* at *3. Dr. Valetta did not exercise similar medical judgment. Again*, Manning* does not support the Provider-Defendants' argument here.

In *Lopez*, an inmate brought a deliberate indifference to medical needs claim in the administration of her hormone therapy only. 2009 WL 229956, at *10. The plaintiff was denied hormone treatment for at most a period of no more than two weeks, *id.*, which is not the case here. The court in *Lopez* explained that "[w]hile a total denial of hormone therapy to a prisoner for an extended period of time might rise to the level of deliberate indifference, nothing in the record of this case supports an allegation." *Id.* at *11. Unlike in *Lopez*, there is evidence here showing that Dr. Valetta failed to provide Ms. Clark with even a referral to an endocrinologist for hormone therapy for almost year. And even after he submitted the referral, he

failed to follow the medical protocol prescribed by the endocrinologist as detailed above.

Notwithstanding these clearly distinguishing facts, these cases are distinguishable because Ms. Clark is not arguing that the Defendant-Providers were deliberately indifferent in failing to facilitate hormone therapy or surgery. Ms. Clark is arguing the Defendant-Providers failed to facilitate any informed care from a provider qualified to treat someone with her condition. Thus, cases like *Pack*, *Manning*, and *Lopez* do not apply. No reasonable official could read these cases to justify providing Ms. Clark with uninformed and inadequate care for years during which there is documented pain and suffering. The Defendants also try to point to a "Circuit split" and cite to similarly distinguishable out-of-circuit cases. For the same reasons the three district court cases are deemed inapplicable, the out-of-circuit cases are as well. Thus, no objectively reasonable official with the information these Defendant-Providers had would believe that their conduct was lawful.

In contrast to the cases cited by the Provider-Defendants, the Court returns again to *Hathaway*. While qualified immunity was not an issue in *Hathaway*, the Second Circuit's long-standing reasoning forms the basis of Ms. Clark's "clearly established constitutional right." That is, a practitioner who merely provides the same course of treatment when it clearly does not alleviate an inmate's suffering—as evidenced by the inmate's numerous complaints—acts with deliberate indifference. Given the longevity and import of *Hathaway*'s reasoning, the Court concludes that no reasonable official would have believed it was lawful to fail to

provide informed care to Ms. Clark given her numerous and consistent complaints describing severe anguish would have violated her constitutional rights.

Therefore, the Provider-Defendants have failed to meet their burden to show they are entitled to qualified immunity.

F.   **Injunctive Relief**

In the Amended Complaint, Ms. Clark seeks "injunctive relief enjoining Defendants to provide Ms. Clark with adequate and necessary medical care for treatment of her gender dysphoria, including appropriate transition-related surgeries, other procedures, and feminine supplies."  (Am. Compl. at 14.)  The Defendants move for summary judgment on Ms. Clark's injunctive relief claim.

"In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons."  *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997).

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.

*Turner v. Safley*, 482 U.S. 78, 84–85 (1987).

"This cautious approach to judicial intervention in the prison context is based on concerns of federal judicial competency and comity."  *Id.* at 168 (citing *Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994).  "Injunctive relief should

therefore be issued in the prison context only in extraordinary circumstances." *Fisher*, 981 F. Supp. at 168 (citing *Taylor*, 34 F.3d at 268).

The Supreme Court has encouraged courts to "scrupulously respect[] the limits of [its] role, by not . . . thrust[ing] itself into prison administration" and instead permitting "[p]rison administrators [to] exercise[e] wide discretion within the bounds of constitutional requirements." *Lewis v. Casey*, 518 U.S. 343, 363 (1996).

> An inmate seeking an injunction on the ground that there is 'a contemporary violation of a nature likely to continue . . . to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*Farmer*, 511 U.S. at 845–46. "If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief." *Id.* at 846. "Of course, a district court should approach issuance of injunctive orders with the usual caution, . . . and may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction." *Id.* at 846–47. "[F]ederal judicial intervention in the details of prison management is justifiable only where state officials have been afforded the opportunity to correct constitutional infirmities and have abdicated their responsibility to do so." *Fisher*, 981 F. Supp. at 177 (citing *Taylor*, 34 F.3d at 269).

The Defendants' injunctive relief portion of their brief focuses largely on their argument that Ms. Clark has failed to establish a constitutional violation in the first

instance.[6]  As detailed above, Ms. Clark has established a deliberate indifference to medical needs claims.  Thus, the Defendants' substantially similar arguments on the injunctive relief claim fail.

The Defendants then raise several, somewhat conflicting, theories as to why they are entitled to summary judgment on the injunctive relief claim.  First, they argue that the Court should afford them summary judgment on the injunctive relief claim because Ms. Clark is not a candidate for gender affirming surgery and the efficaciousness of the surgery is questionable.  Their argument on this theory relies heavily on Dr. Levine's opinion made in his post-deposition declaration.  As addressed fully above, this post-deposition declaration is inadmissible because he recognized during his deposition that he is not qualified to make such an opinion.  The Defendants' hired consultant, LCSW Bachmann, found that gender affirming surgery "is a fundamental need and vital to" treating Ms. Clark.  (Ex. 27.)  Ms. Clark's expert opined that genital confirmation surgery is medically necessary for Ms. Clark.  (Ex. 1 at 37–38.)  All of the admissible expert opinions based on Ms. Clark's medical needs find that gender affirming surgery is not just efficacious, but it is necessary for treating Ms. Clark.

Second, the Defendants argue that injunctive relief is not necessary because Ms. Clark has been provided and is currently being provided a litany of medical services, medical personnel, and specialized treatment for gender dysphoria.  The

---

[6] The Defendants cite to *Lamb v. Norwood*, 262 F. Supp. 3d 1151 (D. Kan. 2017) in their injunctive relief section of their brief, but *Lamb* involved questions of whether the inmate established a deliberate indifference claim.  Thus, *Lamb* does not provide any authority, which at most could be persuasive authority, addressing whether the Defendants have established an entitlement to summary judgment on the injunctive relief claim.

Defendants point to the evidence that they engaged the services of a transgender consultant and the services of a transgender clinic. The Defendants claim that they have attempted to engage the services of a gender affirming surgeon and an electrolysis specialist. The Defendants' argument requires a finding that there is no genuine dispute that the DOC has taken all reasonable and appropriate steps towards facilitating the treatment procedures the medical experts have found Ms. Clark needs. This is very much in dispute. As addressed fully above, the Defendants introduced evidence through a declaration from a DOC counselor that they have been trying to work with other DOC systems to arrange for Ms. Clark to receive gender affirming surgery. However, their own declaration and its exhibits show disingenuous efforts made to contact only some DOC systems, and of those few contacted, none of which expressly foreclosed the possibility of facilitating the procedure. In addition, Dr. Burns, the Chief Mental Health Officer of the DOC who appears to be leading efforts to secure a specialist to treat Ms. Clark, submitted a declaration where he outlines the efforts made, that only began in January 2022 (over five years after Ms. Clark attempted to cut off her testicles with a nail clipper). (Ex. F at ¶ 30.) His efforts show he reached out to a single surgeon in Connecticut, speaking only with that surgeon's staff. (*Id.* at ¶¶ 30–36.) There is nothing in his declaration as to whether he considered other surgeons in Connecticut. Dr. Burns states that the next closest surgeon would be in Manhattan, New York, but his declaration is silent on any efforts to secure that surgeon. (*Id.* at ¶¶ 37–38.) Thus, it is very much disputed whether the DOC has taken reasonable and appropriate steps toward securing Ms. Clark adequate care. It is not lost on the Court that

securing a specialist to provide Ms. Clark with adequate care can be difficult and time consuming.  However, government officials do not have the power to infringe upon a constitutional right because it is difficult or inconvenient.

Therefore, the Court denies the Defendants' motion for summary judgment on the injunctive relief claim.

### G.   Intentional Infliction of Emotional Distress

In the Amended Complaint, Ms. Clark raised a claim of intentional infliction of emotional distress against the Provider-Defendants.  (Am. Compl. at ¶¶ 54–61.) Under Connecticut law, a claim of intentional infliction of emotional distress ("IIED") has four elements:

> It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."

*Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000).

As applied to the circumstances of this case, the *mens rea* for an IIED claim under Connecticut law and the subjective intent requirement for the deliberate indifference to medical needs claim are substantially similar, if not the same.  For an IIED claim, "the actor [must have] intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of his conduct."  *Id*.  For an Eighth Amendment deliberate indifference claim the actor must at least "know[] of and disregard[] an excessive risk to inmate health or safety."  *Chance*, 143 F.3d at 702.  As detailed above on the deliberate indifference claim, the Provider-Defendants knew and disregarded the excessive risk that their

conduct was causing Ms. Clark's emotional distress.  That finding satisfies the *mens rea* element of the IIED claim raised here.

The Defendants argue that the Provider-Defendants could not, as a matter of law, be found "extreme and outrageous."  "Liability for intentional infliction of emotional distress requires conduct that exceeds 'all bounds usually tolerated by decent society . . . .'"  *Appleton*, 254 Conn. at 210.

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Id.*  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Hartmann v. Gulf View Ests. Homeowners Ass'n, Inc.*, 88 Conn. App. 290, 295 (2005).  "Only where reasonable minds disagree does it become an issue for the jury."  *Id.*

The Defendants argue that they were unable to find any precedent that the failure to give an inmate desired medical treatment constitutes "extreme and outrageous" conduct.  The Defendants do not cite to any authority suggesting that prior legal precedent is required for a finding of extreme and outrageous conduct. In contrast, Ms. Clark cites to a Connecticut Superior Court case that challenges this proposition.  *Johnson v. Martin*, No. CV960557415, 1996 WL 383351 (Conn. Super. Ct. June 11, 1996).  In *Johnson*, the plaintiff, who was detained, alleged that members of the Glastonbury Police Department sent him a Christmas card that

appeared to be signed by numerous police officers and mocked the plaintiff, in order to ridicule, humiliate, and enrage him. *Id.* at *1. In denying the defendants' motion to strike, the Superior Court found that the plaintiff sufficiently alleged "extreme and outrageous" conduct for several reasons. *Id.* at *2–3. As an initial matter, the card was unsettling because it came from officers with the sworn duty to protect and respect citizens. *Id.* at *2. Moreover, the plaintiff was particularly vulnerable given that he was detained pending charges brought by officers from that police department. *Id.* at *3. The totality of the circumstances was sufficient to raise a claim of extreme and outrageous conduct. *Id. Johnson* is analogous to this case as both cases involve defendants in a position of power and authority over a vulnerable victim who abuse their position in a shocking way. While *Johnson* is somewhat distinguishable in procedural posture and in degree of intent, it provides enough to suggest that a reasonable jury could conclude that the Provider-Defendants' conduct was extreme and outrageous.

As detailed above and incorporated here by reference, the Provider-Defendants' denial of any medical care for a period of ten-months followed by failing to follow the endocrinologist's instructions, as well as failing to provide qualified health treatment, despite her repeated complaints and history of self-castration, could lead a reasonable jury to find the Provider-Defendants' conduct was extreme and outrageous.

The Defendants argue they are entitled to summary judgment on the IIED claim because such claim is not applicable where the conduct complained of falls well within the ambit of other traditional tort liability. However, the Defendants do

not cite to any Connecticut authority to support this proposition.  While one of the cases the Defendants cite to is a Connecticut case, that case applied New York law.

The Defendants argue that the PLRA requires an inmate claiming IIED to show actual physical injury and the Plaintiff has not shown physical injury.  *See* 42 U.S.C. § 1997e(e).  Section 1997e(e) provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

The Second Circuit has held that section 1997e(e) bars "only awards of compensatory damages, not as barring nominal damages, punitive damages, or injunctive relief."  *Walker v. Schult*, 45 F.4th 598, 612 (2d Cir. 2022).  Meaning, even if Ms. Clark is unable to show "physical injuries," such failing does not warrant judgment for the Provider-Defendants on the IIED claim.  Rather, such failing would bar compensatory damages.  Because the Defendants have not sought judgment on this defense to damages, the Court will not assess independently whether judgment is appropriate for that reason.

Accordingly, the Defendants' motion for summary judgment on the IIED claim is denied.

## V.    CONCLUSION

For the above reasons, Ms. Clark's motion for summary judgment is granted. The Court grants summary judgment to Ms. Clark on Count I of the Amended Complaint.  The Defendants' motion for summary judgment is denied.

The parties are ordered to meet and confer then report to the Court within 35 days of this decision how they would like to proceed.

**IT IS SO ORDERED.**

_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated this day in Hartford, Connecticut: September 15, 2023**