UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VERONICA-MAY CLARK,

*Plaintiff*,

v.

ANGEL QUIROS, DR. GERALD VALETTA,
RICHARD BUSH, and BARBARA KIMBLE-
GOODMAN,

*Defendants*.

Case No. 3:19-cv-575-VAB

April 29, 2024

## PLAINTIFF'S MEMORANDUM STATING POSITIONS
## ON ISSUES BEFORE THE COURT

In response to the Court's briefing order, *see* ECF 218, 220, Plaintiff Veronica-May Clark

respectfully submits this memorandum setting forth her position on the matters currently before

the Court. *First*, this memorandum provides a brief overview of Judge Bryant's ruling on the

parties' cross-motions for summary judgment. *Second*, the memorandum addresses the following

three issues: (1) this Court's continuing jurisdiction over Ms. Clark's claim for injunctive relief

against Defendant Angel Quiros, who has been sued in his official capacity as Commission of the

Connecticut Department of Correction ("DOC"); (2) the lack of need for a hearing on Ms.

Clark's claim for injunctive relief in light of Judge Bryant's ruling; and (3) the nature and scope

of injunctive relief Ms. Clark seeks in light of the DOC's failure to treat her gender dysphoria.

## DISCUSSION

### I.      Judge Bryant's Opinion[1]

Ms. Clark is a transgender woman incarcerated by the Connecticut DOC on a 75-year

sentence. (*See* ECF No. 156-2, Local Rule 56(a)(2) Statement of Facts in Opposition to

Summary Judgment ¶¶ 1, 2.) After years of hiding her gender identity, in 2016, Ms. Clark told

DOC clinicians she believed she had gender dysphoria, *id.* ¶ 109, and was diagnosed by DOC

clinicians with gender dysphoria no later than May 2016, *id.* ¶ 110. Gender dysphoria is "a whole

continuum" of clinically significant distress generated by the mismatch between what a person

knows their gender to be and the gender label assigned to them at birth. *Id.* ¶ 111.

After waiting three years for DOC to treat her gender dysphoria—during which time Ms.

Clark attempted to cut off her own genitals with nail clippers, suffered frequent thoughts of

suicide, and submitted grievance after grievance begging for help—Ms. Clark turned to this

Court and filed the instant lawsuit in April 2019. ECF 1, Complaint. When Ms. Clark amended

her complaint in early 2021, the named defendants were Mr. Quiros, the DOC Commissioner,

who was named in his official capacity, and three DOC healthcare providers (the "Individual-

Capacity Defendants") who worked at Garner Correctional Institution between 2016 and 2020.

*See* ECF 84, First Amended Complaint (detailing claims against Barbara Kimble-Goodman, an

APRN; Richard Bush, an LCSW; and Dr. Gerald Valletta, an M.D.).

 In February 2022, the parties filed cross motions for summary judgment. ECF 133,

Plaintiff's Motion for Summary Judgment; ECF 128, Defendants' Motion for Summary

---

[1] Ms. Clark provides here a brief overview of Judge Bryant's ruling. For the Court's reference, a more extensive discussion of the factual and procedural history of this case can be found in Plaintiff's summary judgment briefs, *see* ECF 133 (Plaintiff's Motion for Summary Judgment) and ECF 154 (Plaintiff's Opposition to Defendants' Motion for Summary Judgment).

Judgment. Judge Bryant issued her opinion on September 15, 2023. ECF 194. In a carefully

reasoned and painstakingly detailed 73-page decision, Judge Bryant denied the Defendants'

motion for summary judgment in full and granted Ms. Clark's motion for summary judgment on

her Eighth Amendment claim.[2] Judge Bryant concluded that Ms. Clark had demonstrated both

elements of deliberate indifference to her serious medical need: that (1) her condition is

objectively serious, and (2) the prison employees who refused or failed to treat that condition did

so "with a sufficiently culpable state of mind." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.

1996).

As to the objective prong, Judge Bryant held that Ms. Clark's gender dysphoria

constituted a serious medical need, a fact that Defendants did not dispute. ECF No. 194 at 45-46.

As Judge Bryant found, "One of the "highly relevant" factors identified by courts in assessing

whether a medical need is sufficiently serious is '[t]he existence of an injury that a reasonable

doctor or patient would find important and worthy of comment.' The injury here is years of

documented mental anguish." *Id.* at 46 (citing *Chance*, 143 F.3d at 702–03). Ms. Clark's actual

injury aside, Judge Bryant found that even the *likelihood* of serious injury was obvious: "Any

reasonable medical professional knows that someone suffering with untreated or marginally

treated gender dysphoria, particularly someone like Ms. Clark that has a history of attempting to

self-castrate, will likely continue to suffer from the anguish that marks the condition." *Id.* at 48.

As to the subjective prong, Judge Bryant held that the Defendants had a sufficiently

culpable state of mind when they ignored Ms. Clark's suffering and repeated requests for medical

attention. As Judge Bryant concluded, "Here, the experts agree that Ms. Clark was denied

---

[2] Ms. Clark did not move for summary judgment on her state law claim for intentional infliction of emotional distress, which remains pending.

adequate care. It took years, *and this litigation*, for DOC officials to refer Ms. Clark to see someone with experience and expertise in treating gender dysphoria." ECF 194, at 45 (emphasis added). Rejecting the Defendants' arguments to the contrary, Judge Bryant held that "no reasonable official would have believed it was lawful to fail to provide informed care to Ms. Clark given her numerous and consistent complaints describing severe anguish." *Id.* at 64-65.

With respect to Barbara Kimble-Goodman and Richard Bush, both mental healthcare providers, "it was obvious to these Defendants that the failure to refer Ms. Clark to someone competent to provide her care would perpetuate Ms. Clark's acute anguish." *Id.* at 58. But "instead of treating her medical condition, these Defendants offered, at best, treatment of a mere symptom of her underlying medical condition. That is analogous to providing pain medication, rather than treatment for the medical condition known to cause the pain." *Id.* Or, put another way: "Ms. Clark begged them for help, but they did nothing more than listen and document her suffering. This is not adequate care." *Id.* So too for Dr. Gerald Valetta, a DOC physician who was in charge of overseeing Ms. Clark's medical care. Judge Bryant found that Dr. Valetta was "aware of both the extent of her injuries and what caused her injuries, yet he provided her with no informed care." *Id.* at 52.

After Ms. Clark was transferred from the DOC's facility in Garner in early 2020, the three Individual-Capacity Defendants ceased to be responsible for her care. But as Judge Bryant observed in her ruling, little had changed for Ms. Clark by September 2023. In "the summer or early fall of 2021, more than four years after Ms. Clark was diagnosed with gender dysphoria," the then-head of mental health at DOC, Dr. Craig Burns, began cold-calling a few providers in Connecticut about the possibility of surgery and electrolysis. *See id.* at 22-25. But Dr. Burns' efforts did not yield any additional treatment for Ms. Clark. Separately, in late 2021, DOC

entered into a contract with an LCSW, Dayne Bachmann, and "initiated recurring telehealth

visits with Mr. Bachmann" for Ms. Clark. *Id.* at 23. Mr. Bachmann quickly advised DOC that

gender-affirming surgery "is a fundamental need and vital to alleviating [Ms. Clark's] gender

dysphoria." *Id.* Yet, to this day, DOC has failed to arrange for any gender-affirming surgeries for

Ms. Clark.

Although the record shows that DOC is aware of the need to treat Ms. Clark's gender

dysphoria, it has still not adequately done so. DOC's application for Mr. Bachmann's one-year

contract (November 2021 to November 2022) demonstrated DOC's awareness of its obligation to

do *more* to address Ms. Clark' s gender dysphoria. ECF 133-16 (Ex. 14 to Plaintiff's Motion for

Summary Judgment) at 2. Acknowledging the existence of "constitutional law[] obligating

[DOC] to provide care for" transgender incarcerated people "commensurate with existing

standards in the community," DOC noted that it was "facing current litigation" on the subject,

*i.e.*, this lawsuit, and that its lack of personnel qualified to treat gender dysphoria "may be costly

not only in potential damages . . . , but also by having outside entities dictate to [DOC] how

future similar situations will be handled." *Id.*[3]

---

[3] In support of its application, the DOC noted that transgender people like Ms. Clark are at much
greater risk of self-harm without "tailor[ed]" treatment for their gender dysphoria:

> It is critical that the Department secure the services of a consultant . . . . Gender
> Non-Conforming (GNC) individuals, in the community, have an attempted
> suicide rate that approaches nearly 50% for that population. This extreme risk is
> only exacerbated by incarceration, where additional stressors build for those
> individuals. Combining incarceration and gender transition, neither of which can
> be placed on pause until the other is resolved, requires the Department to have
> expert guidance in the care of those in transition. To mitigate this constant, very
> present risk that exceeds other populations within the Department, we must tailor
> the treatment for this population, including the possibility of surgery and
> managing expectations surrounding possible surgical outcomes.

ECF 133-16 (Ex. 14 to Plaintiff's Motion for Summary Judgment) at 2.

Notwithstanding DOC's acknowledgment of its obligation to treat Ms. Clark (and others like her), and Judge Bryant's decision granting summary judgment to Ms. Clark on her Eighth Amendment claim, DOC has failed to provide Ms. Clark with adequate medical and mental health treatment for her gender dysphoria. Today, Dr. Burns is no longer in his role and DOC's contract with Dayne Bachmann has expired. Despite filing this lawsuit in 2019 and being awarded summary judgment in 2023, the picture for Ms. Clark in 2024 is not all that different from 2016, when she was first diagnosed by DOC with gender dysphoria. Although Ms. Clark remains on hormone therapy, DOC has not provided her with a gender-affirming therapist or any gender-affirming surgeries.

Eight years into her efforts to obtain treatment from DOC, Ms. Clark has little expectation that—left to its own devices—DOC will ever provide the medical and mental health care she needs for her gender dysphoria. As Judge Bryant put it last fall: "Her persistent pleas for help went entirely ignored until she brought suit, and even then, she is still not receiving the treatment recommended by the DOC's own consultant." ECF 194, at 48. Ms. Clark has now spent almost a decade listening to a paradoxical combination of arguments from DOC that she either does not need or is not entitled to treatment for her gender dysphoria, or that DOC is imminently arranging such treatment. As year after year of continued suffering by Ms. Clark and inaction by DOC has shown, neither is true. This Court's intervention is imminently required to ensure that Ms. Clark receives the medical and mental health treatment for her gender dysphoria that Judge Bryant found DOC has denied her, in violation of the Eighth Amendment.

## II. Ms. Clark's Positions on the Issues Before the Court

### A. This Case Should Not Be Stayed

Defendants are not entitled to a stay and this Court should not grant one. Because it is the Defendants' "difficult burden" to establish their entitlement to a stay, *United States v. Private*

*Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995), Ms. Clark

reserves the right to respond to Defendants' specific arguments. As a general matter, however,

"interlocutory appeals—allowed as a very limited exception to the final judgment rule—do not

terminate the district court's jurisdiction over a case as a whole." *City of New York v. Beretta*

*U.S.A. Corp.*, 234 F.R.D. 46, 49 (E.D.N.Y. 2006). Similarly, "[t]he filing of a notice of appeal

*only* divests the district court of its control over those aspects of the case involved in the appeal."

*Jin Zhao v. State Univ. of New York*, 613 Fed. App'x 61, 62 (2d Cir. 2015) (emphasis added)

(internal citation omitted); *see also New York State Nat'l Org. for Women v. Terry*, 886 F.2d

1339, 1350 (2d Cir. 1989) (explaining that "the filing of a notice of appeal only divests the

district court of jurisdiction respecting the questions raised and decided in the order that is on

appeal").

This Court retains jurisdiction to grant the injunctive relief that Ms. Clark seeks against

DOC to secure adequate treatment for her gender dysphoria. The Individual-Capacity

Defendants' pending interlocutory appeal does not divest this Court of jurisdiction.[4] The only

issue on appeal is the Individual-Capacity Defendants' entitlement to qualified immunity and

whether they must pay damages to Ms. Clark for violating her constitutional rights. As the

Second Circuit has explained, "finding an entitlement to qualified immunity is not the same as

finding no underlying constitutional violation, and an individual defendant's immunity from suit

does not transfer to the [agency]." *Bobolakis v. DiPietrantonio*, 2013 WL 1729731, at *2 n.2 (2d

Cir. Apr. 23, 2013) (summary order). Injunctive relief against the DOC is thus a "collateral

_____

[4] Defendant Quiros is not—and cannot be—part of the pending qualified immunity appeal. Qualified immunity "shields [defendants] only from claims for monetary damages"; it does not "bar actions for declaratory or injunctive relief." *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999). Ms. Clark *only* seeks injunctive relief from Defendant Quiros.

matter[] not affecting the questions presented on appeal." *United States v. Reed*, 404 F. App'x

464, 465 (11th Cir. 2010) (internal citation omitted) (appeal of § 3582 sentencing issue separate

from Rule 60 and Rule 33 motions attacking conviction and requesting return of property).

At the status conference on March 13, 2024, Defendants suggested that their interlocutory

appeal was so expansive that it might overlap with matters still before this Court. That is not the

case. The appeal brief that the Individual-Capacity Defendants filed in the Second Circuit does

not contain *any* argument that they did not violate Ms. Clark's Eighth Amendment rights. *See*

*generally* Brief of Defendants-Appellants, *Clark v. Valletta et al.*, No. 23-7377 (2d Cir. Jan. 17,

2024), ACMS No. 24.1. Indeed, the Individual-Capacity Defendants' brief never mentions the

standard for showing deliberate indifference to medical needs. Rather, it focuses *exclusively* on

whether Ms. Clark's constitutional right—which they improperly attempt to define exceedingly

narrowly—was "clearly established" for qualified immunity purposes. Thus, the Individual-

Capacity Defendants waived any argument before the Second Circuit on the merits of the first

prong of their qualified immunity burden: that each did not "violate[] a statutory or constitutional

right" of Ms. Clark.  *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023).[5] A ruling by the

Second Circuit on the second prong—how narrowly to define clearly established rights for

qualified immunity purposes—will not affect Ms. Clark's entitlement in this Court to injunctive

relief on her already-established Eighth Amendment claim.

---

[5] Waiver occurs whether the Individual-Capacity Defendants made a conscious choice to leave previously contested matters aside, *e.g.*, *JP Morgan Chase Bank v. Altos Hornos de Mexico*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if . . . pursued . . . in the district court"), or simply failed to sufficiently identify the contentions, *see McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005) ("[I]t is not [this Court's] obligation to ferret out a party's arguments. That, after all, is the purpose of briefing.").

Accordingly, while Ms. Clark reserves the right to respond to Defendants' arguments in support of a stay, it is Ms. Clark's position that the pending interlocutory appeal on the Individual-Capacity Defendants' entitlement to qualified immunity does not divest this Court of jurisdiction to grant her the injunctive relief she seeks against DOC.

### B.       A Hearing Is Not Necessary Before Granting A Permanent Injunction

This Court does not need to hold an evidentiary hearing or make any findings of fact before entering a permanent injunction. Where there are no material facts in dispute, a court may grant a party's request for a permanent injunction on summary judgment without holding a hearing. *See Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991) (noting that an evidentiary hearing is required before granting permanent injunction only where a material fact is in dispute).  In addition, "[t]here is no requirement that a District Court must wait for a formal motion and hold a hearing to issue a permanent injunction." *All. For Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 911 F.3d 104, 111–12 (2d Cir. 2018), *rev'd on other grounds sub nom. Agency for Int'l Dev. V. All. For Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082 (2020). Federal Rule of Civil Procedure 65 requires hearings for *preliminary* injunctions, not permanent ones. *Id.*

Here, in awarding summary judgment to Ms. Clark on Ms. Clark's Eighth Amendment claim, Judge Bryant has already found that there are no material facts in dispute. As such, there is no need for this Court to hold an evidentiary hearing before granting Ms. Clark the injunctive relief she seeks to ensure that DOC provides her with the long-denied medical and mental health treatment for her gender dysphoria. Moreover, as a practical matter, Ms. Clark submits that a hearing would not be helpful. A hearing has a high chance of retreading ground already covered, and decided, by Judge Bryant. Furthermore, a hearing would allow the Defendants further opportunity to delay Ms. Clark's treatment. Indeed, this litigation is replete with instances of

Defendants attempting to moot Ms. Clark's claims, without any actual change on the ground for Ms. Clark. Defendants have had ample time voluntarily to treat Ms. Clark's gender dysphoria (over eight years) and ample time to show this Court that they seriously intend to do so (over four years). They have failed on both fronts.[6]

Although Ms. Clark reserves the right to respond to the Defendants' specific arguments on this issue, it is her position that no hearing is necessary before the Court can grant the injunctive relief she seeks.

**C.      A Permanent Injunction Is Necessary and Warranted to Provide Ms. Clark Adequate Treatment for Gender Dysphoria**

This Court should enter a permanent injunction directing DOC to treat Ms. Clark's gender dysphoria by providing adequate and informed gender-affirming care. Gender-affirming care shall include a combination of surgical, hormonal, and mental health treatment provided by qualified medical and mental health professionals with experience treating transgender individuals. Given DOC's continued failure to treat Ms. Clark's gender dysphoria, its history of acting only when faced with legal intervention, and its continued professions of ignorance and incompetence as to how to treat her, Ms. Clark respectfully submits that this Court should be

---

[6] The Individual-Capacity Defendants' arguments before the Second Circuit that Ms. Clark does not have a clearly established constitutional right to hormone therapy, a vaginoplasty, or any other particular therapy or treatment for gender dysphoria would suggest little inclination on the part of DOC to provide these treatments voluntarily. These arguments echo the Defendants' general (and often contradictory) positions throughout this litigation: that Ms. Clark does not have gender dysphoria notwithstanding DOC clinicians' diagnosis of her; that the efficacy of gender-affirming treatment is unknown despite years of evidence to the contrary; and that gender-affirming treatment is in any case unnecessary for Ms. Clark despite DOC's own expert's and consultant's statements to the contrary. Taken at face value, these arguments are difficult to reconcile with any claims by DOC or its counsel before this Court that DOC will finally take Ms. Clark's treatment seriously.

specific in the injunctive relief it orders.  Based upon Judge Bryant's factual findings, this Court

should enter a permanent injunction directing that:

1.    For as long as Ms. Clark remains in the custody of DOC, DOC shall engage a medical clinician to serve as a leader of care (the "Leader of Care") to oversee her medical and mental health treatment for gender dysphoria. The Leader of Care should be trained and experienced in the provision of health care to individuals with gender dysphoria.

    a.   Under the guidance and supervision of the Leader of Care, DOC shall engage medical and mental health clinicians (the "Clinicians") who are experienced and specialized in the treatment of gender dysphoria to deliver gender-affirming medical and mental health care to Ms. Clark.

    b.   In accordance with the recommendations of the Leader of Care and the Clinicians, DOC shall ensure that Ms. Clark has ongoing and timely access to the Leader of Care and the Clinicians, both by telemedicine and in-person care, as needed.

    c.   In accordance with the recommendations of the Leader of Care and the Clinicians, DOC shall ensure that the Leader of Care and the Clinicians receive ongoing and timely access to Ms. Clark's complete medical and mental health records.

    d.   DOC shall ensure that any lab work and other medical orders by the Leader of Care and the Clinicians are timely performed and the results timely reported to the Leader of Care, the Clinicians, and any other relevant treatment providers.

    e.   Should the Leader of Care or the Clinicians recommend referral of Ms. Clark to another specialist, and reasonably explain why such referral is needed for her treatment, DOC shall timely arrange for Ms. Clark's treatment by that specialist.

2.    DOC shall abide by the professional recommendations of the Leader of Care and the Clinicians with respect to Ms. Clark's course of treatment, which shall be set forth in a treatment plan, to include, at a minimum, the following:

    a.   Ongoing consistent hormone therapy, along with lab monitoring;

    b.   Mental health treatment specific to gender dysphoria;

    c.   Breast augmentation surgery;

    d.   Vaginoplasty (including electrolysis, in preparation and as needed). Vaginoplasty shall be performed by a surgical team with experience in the procedure, in one or more stages as determined by that surgical team. DOC shall further take all necessary steps for Ms. Clark's recovery and aftercare, as directed by the surgical team.

3.    DOC shall provide Ms. Clark with any additional medical and mental health care, including surgery or other medical procedures, that the Leader of Care and Clinicians determine is medically indicated for the treatment of her gender dysphoria.

4.    DOC shall timely transfer Ms. Clark to a women's DOC facility upon Ms. Clark's reasonable request.

5.    Finally, the Court should appoint a monitor to ensure that DOC abides by the Court-ordered injunctive relief. Specifically, the Court should order DOC to

engage a third-party monitor, agreed to by the parties, with full access to Ms.

Clark, the Leader of Care, and Ms. Clark's providers and records. The monitor

shall report to the Court at least once per quarter on DOC's compliance with the

Court's injunction, and may be terminated if Ms. Clark reaches a stable place in

her treatment as determined by the monitor and the Leader of Care.

Plaintiff anticipates that the Defendants may try to portray Ms. Clark's requested

injunctive relief as unprecedented, and the necessary treatments for gender dysphoria as rare or

novel. It is worth noting, however, that multiple courts have ordered prison systems to provide

necessary gender-affirming treatment, and often in very specific terms. *See, e.g.*, *Edmo v.*

*Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (affirming order to Idaho to provide gender-

affirming surgery); *Soneeya v. Mici*, No. CV 07-12325-DPW, 2024 WL 550171, at *22 (D. Mass.

Feb. 12, 2024) (ordering gender-affirming therapy regimen as recommended by experts, as well

as surgery on prescribed timeline); *Iglesias v. Fed. Bureau of Prisons*, No. 19-cv-415, 2022 WL

1136629, at *10 (S.D. Ill. Apr. 18, 2022) (directing Federal Bureau of Prisons to provide

vaginoplasty to incarcerated person by the end of the year); *Monroe v. Meeks*, No. 3:18-cv-

00156, 2022 WL 355100, at *1 (S.D. Ill. Feb. 7, 2022) (appointing monitor for Illinois prisons to

oversee provision of hormone therapy and gender-affirming surgeries to class members); *Hicklin*

*v. Precynthe*, No. 4:16-cv-01357, 2018 WL 806764, at *15 (E.D. Mo. Feb. 9, 2018) (ordering

Missouri "to provide Ms. Hicklin with care that her doctors deem to be medically necessary

treatment for her gender dysphoria"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal.

2015) (ordering California to provide surgery).

Accordingly, it is Ms. Clark's position that the Court should enter a permanent injunction

ordering DOC to provide the medical and mental health treatment for her gender dysphoria set

forth above and requiring the appointment of a monitor to ensure compliance with the Court's injunction.

## CONCLUSION

For the foregoing reasons, the Court (1) should not stay this case pending the Individual-Capacity Defendants' interlocutory appeal; (2) does not need to hold an evidentiary hearing before granting a permanent injunction; and (3) should enter a permanent injunction ordering DOC to provide the gender-affirming treatment Ms. Clark requires.

By: /s/ Daniel S. Noble
Daniel S. Noble (ct31089)
Krieger Lewin LLP
350 Fifth Avenue
New York, New York 10118
Tel: (212) 390-9555
E-mail: Daniel.Noble@kriegerlewin.com

By: /s/ Matthew B. Danzer
Matthew B. Danzer (ct30740)
Evan I. Cohen (ct29799)
Kelsey A. Powderly (ct30855)
FINN DIXON & HERLING LLP
Six Landmark Square
Stamford, CT 06901-2704
Tel: (203) 325-5000
Fax: (203) 325-5001
E-mail: mdanzer@fdh.com

By: /s/ Elana Bildner
Elana Bildner (ct30379)
Dan Barrett (ct29816)
Sapana Anand (ct31422)
ACLU Foundation of Connecticut
765 Asylum Avenue, 2nd Floor
Hartford, CT 06105
Tel: (860) 471-8475
E-mail: ebildner@acluct.org

*Attorneys for Plaintiff Veronica-May Clark*