UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VERONICA-MAY CLARK,<br><br>*Plaintiff*,<br>v.<br>ANGEL QUIROS, DR. GERALD VALETTA,<br>RICHARD BUSH, and BARBARA KIMBLE-<br>GOODMAN,<br><br>*Defendants*. | Case No. 3:19-cv-575-VAB<br><br><br><br>June 21, 2024 |

**PLAINTIFF VERONICA-MAY CLARK'S**
**PROPOSED FINDINGS OF FACTS AND PROPOSED CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

**Plaintiff**

1.   Veronica-May Clark is 48 years old, grew up in Newtown, Connecticut, and has been serving a 75-year prison sentence in the custody of the Connecticut Department of Correction ("DOC") since 2007.

**Gender Identity and Gender Dysphoria Generally**

2.   A person's gender identity is their internal sense of whether they are male, female, or non-binary.

3.   Transgender persons are individuals who were designated male or female at birth based on their anatomy, but whose gender identity is different from that designation.

4.   Sexual orientation and gender identity are distinct from one another.

5.   Gender dysphoria is clinically significant distress generated by a mismatch between a person's gender identity and the gender label assigned to them at birth.

6.   The goal of treatment for gender dysphoria is to minimize or permanently resolve the patient's clinically significant distress symptoms so that they no longer experience discomfort or limitations on their daily functioning.

7.   The World Professional Association for Transgender Health ("WPATH") has developed the Standards of Care and Ethical Guidelines, which articulate a professional consensus about the psychiatric, psychological, medical, and surgical treatment and management of gender dysphoria.

8.   The WPATH Standards of Care are endorsed by major United States medical and mental health associations, as well as correctional organizations. There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups.

9.   The WPATH Standards of Care do not set out a one-size-fits-all program for treating gender dysphoria, but instead encompass a multipronged psychiatric, psychological, medical, and surgical approach to treatment. That can include (i) gender-informed psychotherapy, (ii) gender affirming hormone therapy, (iii) voice therapy, and (iv) gender affirming surgeries.

10. Untreated or insufficiently treated gender dysphoria is likely to result in serious negative medical and mental health outcomes, including depression, auto-castration, and suicide.

**The Connecticut Department of Correction's Healthcare System Generally**

11. Each Connecticut Department of Correction ("DOC") facility has onsite medical and mental health providers responsible for the health of the incarcerated individuals in their custody.

12. Incarcerated people do not choose the physician, mental health counselor, nurse, or psychologist who provides their care; instead, the patient sees whichever provider is assigned to

them. DOC providers, like the Provider Defendants, can refer patients to outside specialists when necessary.

13. DOC addresses medical and mental health problems by waiting for patients to ask to see a provider. It does not track people with chronic conditions like gender dysphoria, diabetes, or cancer. When a patient requires medical or mental health evaluation and treatment that a DOC provider is unable to perform, the provider may refer the patient to an outside specialist. To do so, the DOC provider submits a request for referral to DOC's Utilization Review Committee ("URC"), which typically consists of DOC's medical director and other physicians.

14. When a patient is approved to see a specialist and that specialist recommends the patient return for a follow-up appointment, a prison's principal physician is responsible for submitting further requests to the URC for each follow-up appointment.

**Angel Quiros**

15. Angel Quiros became interim Commissioner of DOC in June 2020, and was named Commissioner in September 2020. He has been working for DOC since 1989.

16. As Commissioner of DOC, Quiros is has authority over the department, and is responsible for the "overall supervision and direction of all . . . activities" of DOC. Conn. Gen. Stat. § 18-81. He establishes and signs off on all departmental regulations and policy, *id.*, including those involving healthcare and transgender and gender non-conforming people. He is further charged with "develop[ing] a plan for the provision of health care services . . . to inmates of correctional facilities under the jurisdiction of the department." Conn. Gen. Stat. § 18-81pp.

**Ms. Clark's Gender Dysphoria**

17. Ms. Clark suffers from gender dysphoria and identifies as transgender.

18. Born in 1976, Ms. Clark came of age at a time when virtually no transgender people were

visible in society.

19. Ms. Clark did not personally know anyone who was transgender and saw no positive media depictions of people whom the most charitable language of the time would have called "transsexual."

20. Ms. Clark understood from an early age that to openly present a gender that differed from that assigned at birth would be a very difficult—and potentially perilous—existence.

21. Ms. Clark chose at various times in her life to keep her true identity to herself, including initially while incarcerated.

22. Before Ms. Clark revealed her gender identity to DOC personnel, Ms. Clark was sexually assaulted by a DOC employee multiple times in 2011; that employee was fired, prosecuted, and served prison time.

**Ms. Clark Seeks Treatment from DOC for Gender Dysphoria**

23. On April 11, 2016, during a sick call visit at DOC's Cheshire Correctional Institution ("Cheshire"), where Ms. Clark was then incarcerated, Ms. Clark told a nurse that she believed she had gender dysphoria.

24. By May 27, 2016, DOC personnel had diagnosed Ms. Clark with gender dysphoria. But DOC provided no treatment at that time.

25. As months passed without any follow-up by DOC, Ms. Clark formulated a plan to self-treat her gender dysphoria and suppress the testosterone in her body. On July 15, 2016, Ms. Clark attempted to castrate herself by slicing open her scrotum with a nail clipper. She succeeded in cutting through her scrotum and extracting (but not detaching) a testicle before she succumbed to the intense pain and had to stop.

26. DOC staff found Ms. Clark in her cell bleeding from her genitals. She was taken to a

local hospital for treatment of the wound. Upon return to prison, Ms. Clark spent additional time recovering in an inpatient infirmary at MacDougall-Walker Correctional Institution.

27. Four years later, DOC staff at Cheshire still considered the incident "horrific" enough that they tried to prevent Ms. Clark from being transferred back to the facility out of concern for the trauma experienced by the staff that responded to Ms. Clark's self-castration attempt.

28. Cheshire's supervising psychologist at the time had no doubt what caused Ms. Clark to attempt self-castration, reporting that it was "clearly motivated" by Ms. Clark's "high level of psychological distress relative to his [*sic*] gender dysphoria."

29. On July 27, 2016, DOC transferred Ms. Clark to Garner Correctional Institution ("Garner"), where she would remain for the next four years. During that time, she had multiple interactions with each of Defendants Dr. Gerald Valletta, Barbara Kimble-Goodman, and Richard Bush (the "Provider Defendants") and various other DOC personnel whom DOC designated to provide medical and mental health care to Ms. Clark.

30. As discussed below, each of the Provider Defendants knew what gender dysphoria is, knew that Ms. Clark had gender dysphoria, and knew that they were not qualified to treat gender dysphoria, yet each of them—and thus DOC itself—deliberately failed to secure appropriate and necessary medical or mental health treatment for Ms. Clark's gender dysphoria.

**DOC Providers Failed to Treat Ms. Clark for Gender Dysphoria**

31. A few days after she arrived at Garner, Ms. Clark submitted a written request to see a doctor for treatment of her gender dysphoria.

32. On August 1, 2016, two weeks after her self-castration attempt, Ms. Clark was seen by Dr. Valletta for the first time.

33. Dr. Valletta was the principal physician at Garner and was responsible for providing a

variety of medical services to incarcerated individuals, including treatment of injuries, vaccinations, and assessing a patient's suitability for surgery.

34. For the entirety of Ms. Clark's time at Garner, Dr. Valletta was the medical provider designated by DOC to be responsible for her care. Dr. Valletta did not have training to treat gender dysphoria.

35. At the initial appointment with Ms. Clark, Dr. Valletta focused only on the wound from Ms. Clark's self-castration attempt. Regarding Ms. Clark's gender dysphoria, Dr. Valletta noted only: "[inmate] referred to M[ental] H[ealth] + case manager." Dr. Valletta, however, did not recall taking any affirmative action to refer Ms. Clark to a mental health provider.

36. The following month, in September 2016, Ms. Clark filed a request with Dr. Valletta and DOC asking for treatment of her gender dysphoria. Dr. Valletta responded, "As per CMHC/DOC policy, transitional treatment would be CONTINUED if inmate has already been on medication in the community, but transitional treatment will not be initiated while [the person] is incarcerated."[1]

37. Ms. Clark appealed that response, begging Dr. Valletta and DOC to reconsider: "I cannot overstate just how much emotional and psychological pain I'm in." Dr. Valletta again refused based on the "CMHC/DOC" policy. The "policy" that Dr. Valletta cited was not laid out in a written document, but purportedly was "widely known" to DOC medical staff.

38. With Dr. Valletta (and the other Provider Defendants and DOC personnel whom DOC

---

[1] CMHC or "Correctional Managed Healthcare" was a subdivision of UConn Health that provided healthcare to individuals in DOC custody until 2018, when DOC took direct control of that service. The distinction between CMHC and DOC is not relevant to this action.

designated to treat Ms. Clark) refusing to provide Ms. Clark with *any* medical or mental health treatment for gender dysphoria, she retained a legal clinic at Columbia Law School to assist her in trying to obtain treatment from DOC.

39. In May 2017, the clinic wrote to Dr. Robert Berger, then head of mental health at CMHC within DOC, to inform him of Ms. Clark's inability to access treatment and requesting a meeting in order to avoid litigation. The clinic wrote to Dr. Berger again on May 12, 2017.

40. On July 6, 2017—after a year of refusing to provide *any* treatment for Ms. Clark's gender dysphoria—Dr. Valletta filed paperwork to refer Ms. Clark to an endocrinologist for evaluation for the first time. In the request, Dr. Valletta noted that he was asked to submit the request by two CMHC managers.

41. An endocrinologist saw Ms. Clark on September 14, 2017. The endocrinologist did not have any baseline labs because Dr. Valletta, as the responsible physician at Garner, and DOC had not arranged for those labs in advance of the appointment. Nonetheless, the endocrinologist recommended starting Ms. Clark on hormone therapy, specifically spironolactone and estradiol. The endocrinologist also requested lab work in four weeks and again in twelve weeks and a follow-up appointment with Ms. Clark in three months.

42. Ms. Clark began hormone therapy with daily starter doses of 1mg of estradiol and 50mg of spironolactone. On the same day that Dr. Valletta prescribed those medications, he filed a request necessary for the three-month follow-up appointment that the endocrinologist ordered, which should have occurred in December 2017.

43. Dr. Valletta received approval for the follow-up appointment on October 6, 2017. But Dr. Valletta and DOC failed to undertake any further action to ensure that the follow-up appointment took place, even as Ms. Clark's bloodwork showed her hormone dosage was ineffective as her

testosterone levels had increased, rather than decreased, since beginning hormone therapy. Ultimately, it would take nearly *two years* before anyone at DOC arranged Ms. Clark's *first* follow-up appointment with an endocrinologist.

44. During the intervening period, Ms. Clark filed this suit *pro se* on April 17, 2019. She also routinely presented to Dr. Valletta with questions about her hormone therapy, told Dr. Valletta that her medications did not seem effective, and complained to DOC of delays in receiving refills.

45. At Ms. Clark's much-delayed August 2019 follow-up appointment with an endocrinologist, the endocrinologist recommended to DOC that it arrange fresh lab work for Ms. Clark and a follow-up appointment two months later, as Ms. Clark's most recent lab work was over 15 months old.

46. The new labs, performed in September 2019, showed that Ms. Clark's testosterone levels had nearly *doubled* since she began hormone therapy, confirming Ms. Clark's repeated complaints to Dr. Valletta and DOC that her hormone therapy was not effective.

47. At Ms. Clark's next endocrinology appointment, in October 2019, the endocrinologist substantially increased her spironolactone dosage and requested that DOC arrange repeat lab work and a follow-up appointment in the next four months.

48. At an appointment in early February 2020, Ms. Clark's testosterone levels were still high. The endocrinologist doubled Ms. Clark's estradiol dosage and asked DOC that she return in four months. Eight months would elapse, however, before Dr. Valletta and DOC arranged for Ms. Clark's next appointment on October 13, 2020.

49. As a direct result of Dr. Valletta's and DOC's failure to ensure that Ms. Clark received

timely lab work and follow-up appointments, Ms. Clark's hormone therapy remained at a "starter dose" for approximately *22 months*.

50. For the entirety of Ms. Clark's hormone therapy under Dr. Valletta's supervision, in addition to infrequent labs (often taken too late for her endocrinology appointments), Ms. Clark's medications repeatedly ran out and she never received essential monitoring—both to determine whether the treatment was working and to ensure there were no dangerous side effects. Nor did Dr. Valletta or anyone else at DOC take any steps to investigate, provide, or refer Ms. Clark to a specialist for any other treatments for gender dysphoria, including hair electrolysis, vocal therapy, or gender-affirming surgeries, despite Ms. Clark's demonstrated need and repeated requests for treatment.

51. At the same time that Dr. Valletta—and DOC more generally—was failing to provide necessary medical treatment for Ms. Clark's gender dysphoria, other DOC personnel denied Ms. Clark mental health treatment for gender dysphoria.

52. As early as August 2016, a mental health provider assigned by DOC saw Ms. Clark and noted her clinically significant distress and strong desire to be rid of primary and secondary male sex characteristics. Yet no mental health treatment for gender dysphoria followed.

53. In November 2016, Ms. Clark met for the first of eight times with Barbara Kimble-Goodman, a mental health advanced practice registered nurse designated by DOC to provide treatment to Ms. Clark. In that role, Ms. Kimble-Goodman was responsible on behalf of DOC for providing mental health evaluation and treatment, including prescribing psychiatric medication. Ms. Kimble-Goodman does not have any training in treating gender dysphoria.

54. At their first appointment, Ms. Kimble-Goodman spoke with Ms. Clark and noted that

Ms. Clark was seeking treatment for gender dysphoria and believed that her male genitalia was poisoning her. Yet Ms. Kimble-Goodman and DOC provided no treatment for gender dysphoria and made no referral to someone who would treat Ms. Clark; instead, Ms. Kimble-Goodman simply ordered that Ms. Clark follow up in three months.

55. In January 2017, Ms. Clark again asked DOC for treatment of her gender dysphoria. She filed an inmate request form, expressly stating that she needed access to transitional health care, including hormone therapy and gender affirming surgery, and noting the stress that she felt without treatment. Ms. Kimble-Goodman responded three days later by writing only: "[d]iscussed."

56. On February 2, 2017, Ms. Clark met with Ms. Kimble-Goodman, who reported Ms. Clark as saying she "need[ed] treatment," "feel[s] poisoned everyday," and "feel[s] like [she's] dying." During that meeting, Ms. Kimble-Goodman proposed medication for depression, but did not offer any treatment for Ms. Clark's gender dysphoria. Ms. Kimble-Goodman recommended another follow-up meeting in three months.

57. In June 2017, Ms. Kimble-Goodman saw Ms. Clark again. Ms. Clark reported moments of sobbing, but feeling better than she did a year prior (around the time of Ms. Clark's attempted self-castration) due to her efforts to bring a legal case against DOC to obtain treatment for gender dysphoria. Ms. Kimble-Goodman and DOC still provided no treatment for Ms. Clark's gender dysphoria, discussing only medication for depression and recommending a follow-up appointment in three months.

58. Ms. Kimble-Goodman next saw Ms. Clark in July 2017. She started Ms. Clark on Prozac for depression but did not provide treatment for gender dysphoria or refer Ms. Clark to someone who could.

59. Ms. Clark visited Ms. Kimble-Goodman again in November 2017, April 2018, and June 2018.  Each time Ms. Kimble-Goodman failed to offer appropriate mental health treatment for gender dysphoria or a referral to someone who could provide such treatment.

60. During their eight interactions over nearly two years, Ms. Kimble-Goodman knew that Ms. Clark suffered from gender dysphoria, but never provided Ms. Clark with any treatment for gender dysphoria. All Ms. Kimble-Goodman ever offered Ms. Clark was generic talk therapy and a prescription for depression.  Ms. Kimble-Goodman and DOC did not refer Ms. Clark to an outside specialist who could treat gender dysphoria, instead leaving it to Ms. Clark to pursue legal action against DOC to try to secure treatment.

61. Ms. Kimble-Goodman was not the only DOC mental health provider who was deliberately indifferent to Ms. Clark's need for treatment for her gender dysphoria. In 2019, Ms. Clark requested treatment from Richard Bush, then a licensed clinical social worker at Garner whom DOC also designated to treat Ms. Clark.

62. Mr. Bush was familiar with gender dysphoria but did not have training in how to treat it. Mr. Bush knew, however, that a social worker could treat gender dysphoria with cognitive behavioral therapy in order "to improve" a patient's emotional state and make it so that they "have less dysphoria." But Mr. Bush and DOC provided no such treatment to Ms. Clark.

63. Ms. Clark first met with Mr. Bush in March 2019 in response to a sick call she filed with DOC in which she stated that her requests for gender dysphoria treatment were being ignored. Mr. Bush offered Ms. Clark neither treatment for gender dysphoria nor a referral to a provider who could treat her.

64. Ms. Clark continued to submit requests to DOC saying she was stressed out and depressed over her transition. DOC routed those requests to Mr. Bush.

65. When Ms. Clark and Mr. Bush met again in September 2019, he "[a]llowed" Ms. Clark to "vent her feelings," but provided no treatment for gender dysphoria or referral to someone who could provide such treatment. Mr. Bush's report of that interaction demonstrated his deep lack of care for Ms. Clark's condition, writing that Ms. Clark expressed "frustrations of not getting what she wants when she wants it."

66. Just like Dr. Valletta and Ms. Kimble-Goodman, Mr. Bush provided no treatment for gender dysphoria to Ms. Clark over the six months that he was in contact with her. Nor did Mr. Bush or anyone else at DOC refer Ms. Clark to any other provider or to an outside specialist.

67. All Mr. Bush ever offered Ms. Clark was generic talk therapy, despite knowing Ms. Clark had gender dysphoria and knowing he was not qualified to treat her condition.

**DOC Continues to Deny Informed Care to Ms. Clark**

68. As Plaintiff's expert, Dr. George Brown, summarized Ms. Clark's experience as of November 2021: "DOC has provided inadequate, substandard medical, psychiatric, and surgical care for [Ms. Clark's] serious medical condition (GD) in spite of full knowledge of the severity of her diagnosis." In Dr. Brown's expert opinion, after reviewing Ms. Clark's records, "[t]his lack of access to basic, medically necessary services for the treatment of GD violates any reasonable standard of care for transgender inmates."

69. In the fall of 2021, while the parties were preparing to brief summary judgment motions, DOC's then-Chief Mental Health Officer, Dr. Craig Burns, suddenly began calling outside specialists who might serve as consultants to DOC on gender dysphoria and surgeons who could perform gender-affirming surgeries.

70. In October2021, DOC filed an application for exemption from Connecticut's open

bidding requirements for the purpose of obtaining "Gender Non-Conforming Consultant services."

71. In its application, DOC acknowledged the existence of "constitutional law[] obligating [DOC] to provide care for" transgender incarcerated people "commensurate with existing standards in the community." DOC noted that it was "facing current litigation" on the subject, *i.e.*, Ms. Clark's lawsuit, and that its lack of personnel qualified to treat gender dysphoria "may be costly not only in potential damages . . . , but also by having outside entities dictate to [DOC] how future similar situations will be handled." DOC, therefore, sought to retain a contractor without bidding so as to "provide immediate assistance with active Departmental litigation in a way that may limit or extinguish that specific litigation through provision of care."

72. In its application, DOC also emphasized the "extreme risk" that Ms. Clark faced:

> It is critical that the Department secure the services of a consultant . . . . Gender Non-Conforming (GNC) individuals, in the community, have an attempted suicide rate that approaches nearly 50% for that population. *This extreme risk is only exacerbated by incarceration, where additional stressors build for those individuals*. Combining incarceration and gender transition, neither of which can be placed on pause until the other is resolved, requires the Department to have expert guidance in the care of those in transition. *To mitigate this constant, very present risk that exceeds other populations within the Department*, we must tailor the treatment for this population, including the possibility of surgery and managing expectations surrounding possible surgical outcomes.

73. DOC's application was granted and on November 1, 2021, it awarded a one-year contract for gender-affirming care to a licensed social worker named Dayne Bachmann (now Dayne Romano).

74. Mr. Romano evaluated Ms. Clark on December 22, 2021. He concluded that genital

gender-affirming surgery for Ms. Clark is "a fundamental need and vital to alleviating her gender dysphoria." Mr. Romano also concluded that it would benefit Ms. Clark to have a gender therapist for counseling services.

75. Ms. Clark saw Mr. Romano several times. However, DOC did not renew Mr. Romano's contract. The last time Ms. Clark was taken to a telehealth visit with him was December 7, 2022. Ms. Clark has not received gender-informed mental health counseling since that time.

76. Dr. Burns also claimed to have begun the process of locating a surgeon to evaluate and potentially perform a vaginoplasty for Ms. Clark as of January 2022. According to Dr. Burns, as of April 14, 2022, he contacted a single potential surgeon in Connecticut that could perform vaginoplasties and two providers that could perform electrolysis. Ms. Clark has yet to receive either procedure.

77. In September 2022, upon a recommendation from Dayne Romano, Ms. Clark had a telemedicine visit with Kathryn Tierney, an APRN and the Medical Director of the Middlesex Health Center for Gender Medicine and Wellness. APRN Tierney wrote that under Ms. Clark's current hormone therapy regimen (oral estradiol and spironolactone, which she had been prescribed since 2017), Ms. Clark is "unlikely to reach target estradiol level or suppression of testosterone." Accordingly, APRN Tierney recommended beginning hormone injections—estradiol valerate 20mg/mL 0.3cc weekly—to treat Ms. Clark. After filing a grievance in October 2022 requesting injections, Ms. Clark received her first hormone injection in November 2022.

78. Since then, Ms. Clark has continued receiving injectable hormone therapy, albeit with delays in follow-up appointments with APRN Tierney.

79. By the end of 2022, Ms. Clark was still experiencing "very high levels of gender dysphoria."

80. Over a year later, in March 2023, while the parties' cross-motions for summary judgment were pending with the Court, DOC queried three states that had previously performed "bottom surgeries" for incarcerated individuals. Ms. Clark has yet to receive any such procedures.

**DOC Has Failed to Provide Adequate Treatment to Ms. Clark Since Summary Judgment**

81. The Court granted summary judgment in favor of Ms. Clark on Count One of her Complaint in an order issued on September 15, 2023. The parties then engaged in negotiations in an attempt to resolve this litigation.

82. Between September 15, 2023 and today, Ms. Clark has not received any gender-affirming surgery. Nor, since Dayne Romano's contract was not renewed, has she received gender-informed mental health counseling.

83. Nothing else changed in Ms. Clark's treatment between September 2023 and spring 2024.

84. On March 13, 2024, the Court held a status conference regarding how to proceed and set deadlines for the parties to provide their positions.

85. On April 15, 2024, a DOC provider unknown to Ms. Clark, Dr. Heather Gaw, noted in Ms. Clark's medical record that "Case discussed with Central Office Coordinator for GAC, A. Reich," and stated that she had been routed a request for an evaluation because "Pt. seeks pre-surgical letter for GAC [gender-affirming care]." She noted the plan was for "central office" to coordinate. In several other entries in Ms. Clark's records, Dr. Gaw made references to incomplete information, including: that Ms. Clark had told her Dr. George Brown had already conducted an evaluation, and thus needing to request a copy from "central office" or the AG's office; that given references to self-castration and suicide, she would request historical records; and that Ms. Clark had had "top surgery." Dr. Gaw's note states that Ms. Clark was hesitant to speak with her without checking with her lawyers—given the subject of this proceeding and her

uncertainty over Dr. Gaw's role—but was eager to move forward with accessing care. Nonetheless, Ms. Clark has not seen Dr. Gaw again.

86. On May 29, 2024, the Court set a hearing date in this matter. Shortly thereafter, in quick succession, the following happened:

>  a.  On May 31, 2024, DOC filled out a consultation form for a visit with Dr. Joshua Sterling, a urologist at Yale New Haven Hospital. It stated "Patient Desires Gender-Affirming Surgery."
>
>  b.  On June 3, 2024, Ms. Clark was informed she would be taken to a urologist the next day. She was not informed for what procedures she is being evaluated or on what timetable any such procedures may take place.
>
>  c.  On June 4, 2024, Ms. Clark was taken to a urology consult with Dr. Sterling.
>
>  d.  On June 11, 2024, Dr. Richard Williams, Cheshire's resident physician, placed an "OSS request to schedule the bilateral orchiectomy surgery with Dr. Sterling at Yale NHH." He also met with Ms. Clark and wrote a "Gender-Affirming Care Preoperative Medical Letter."

87. Ms. Clark does not know on what timetable any surgery is being scheduled.

88. Since spring 2024, notations in Ms. Clark's chart have contained multiple references to "central office" or the "AG's office."

89. Ms. Clark has not received any corresponding mental health treatment in connection with potential surgical interventions.

**The Toll on Ms. Clark**

90. DOC's persistent denial of care to Ms. Clark has taken a significant toll on her health and

exacerbated the risks that DOC itself has acknowledged. Being stuck in her body without treatment has reduced her to serving her sentence "in a prison within a prison."

91. At various times, Ms. Clark has considered resorting again to self-castration or suicide.

92. Since she first sought treatment for her gender dysphoria, Ms. Clark has been very vocal about the severe anguish that DOC's failure to provide adequate treatment has caused her, submitting grievance after grievance to DOC requesting treatment.

93. For Ms. Clark, not being treated for gender dysphoria is like "a slow-moving train crash, where every moment it just gets worse and worse and worse and worse and worse."

## PROPOSED CONCLUSIONS OF LAW

**Legal Standard for a Permanent Injunction**

1.   A movant seeking a permanent injunction must show (1) success on the merits; (2) an irreparable injury; (3) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (4) that considering the balance of hardships between plaintiffs and defendants, an equitable remedy is warranted; and (5) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

2.   Several of these factors converge. First, the Second Circuit treats "adequacy of other legal remedies" and "irreparable harm" as duplicative. *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989). Second, when the government is a party, "hardship-balancing" is the same as "public interest." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020) (explaining that the "two factors merge").

3.   Accordingly, Ms. Clark must show (1) success on the merits, (2) irreparable harm, and

(3) that an injunction is in the public interest.

4.   Constitutional wrongs are deemed irreparable harm as a matter of law. *See, e.g.*, *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

5.   Ms. Clark is irreparably harmed by the failure adequately to treat her serious medical condition—gender dysphoria—because "[a] substantial risk of serious illness or death has often been found to constitute irreparable harm." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 447 (D. Conn. 2020). "It is no leap to conclude that [Ms. Clark's] severe, ongoing psychological duress and the high risk of self-castration and suicide she faces absent surgery constitute irreparable harm." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 797-98 (9th Cir. 2019).[2]

6.   Injunctive relief for constitutional wrongs is always in the public interest.  *See Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) ("The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld.") (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)). The government can have no interest in violating federal law. *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also, e.g.*, *Allen v. Koenigsmann*, No. 19-CV-8173, 2023 WL 7151716, at *27 (S.D.N.Y. Oct. 31, 2023) (granting injunction in Eighth Amendment case).

7.   In short, "[t]he balance of the equities tips sharply" in favor of Ms. Clark, because she faces "irreparable harm to [her] constitutional rights and health." *Castillo v. Barr*, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020).

---

[2] *See also Monroe v. Meeks*, 584 F. Supp. 3d 643, 677 (S.D. Ill. 2022) (granting injunction to prisoners with gender dysphoria and holding that "trial testimony underscored the irreparable harm that [plaintiffs] have experienced and continue to suffer from—anxiety, depression, suicidal ideation and suicide attempts, and self-mutilation").

8. Thus, as discussed further below, because Ms. Clark has succeeded on the merits of her Eighth Amendment claim, she is entitled to a permanent injunction.

**Ms. Clark Has Demonstrated Actual Success on the Merits—Including Against Defendant Quiros**

9. This Court has held that Defendants' failure to provide Ms. Clark with adequate treatment for her gender dysphoria violated her Eighth Amendment rights. *See* ECF 194 at 72 ("The Court grants summary judgment on Count 1 to Ms. Clark.").  Thus, Ms. Clark has already demonstrated actual success on the merits.  *See, e.g.*, *Marriott v. Cty. of Montgomery*, 426 F. Supp. 2d 1, 11 (N.D.N.Y. 2006) ("[B]y succeeding on [he]r motion for partial summary judgment, plaintiff[] h[as] also demonstrated actual success on the merits of their claim.")

10. Ms. Clark has succeeded on the merits of her Eighth Amendment claim not just against the Provider Defendants, but also against Defendant Quiros. Ms. Clark moved for summary judgment on her Eighth Amendment claim as to all Defendants, including Defendant Quiros, whom Ms. Clark sued in his official capacity. ECF 133. This Court granted that motion, holding that the medical providers designated by DOC to treat Ms. Clark's gender dysphoria were deliberately indifferent. ECF 194.

11. Ms. Clark relies on DOC for her medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (writing that incarcerated individuals "must rely on prison authorities to treat [their] medical needs; if the authorities fail to do so, those needs will not be met"). As DOC Commissioner, Defendant Quiros has authority over all activities of the Department, including its provision of medical care. Further, because Ms. Clark's claim against Defendant Quiros is for injunctive relief only, "[Ms. Clark] need not prove 'personal involvement' of the Commissioner to succeed on such a claim." *Mercer v. Schriro*, 337 F. Supp. 3d 109, 137 (D. Conn. 2018) (collecting cases involving grants of injunctive relief).

12. In any event, "[t]he record in this case supports an inference that the inadequate care the plaintiff received was imposed on [her] systemically, by different health care contractors, different doctors, and the []DOC." *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1010 (C.D. Ill. 2009).

13. Because of the systematic violation of Ms. Clark's constitutional rights by DOC's designated providers, Ms. Clark requires injunctive relief against the DOC itself, who is represented by Defendant Quiros. *See, e.g.*, *Branch v. Guadarrama*, 2024 WL 1973494, at *2 (D. Conn. May 3, 2024) (injunctive relief for failure to fix ceiling permissible where commissioner is "responsible for the safety of the prison"); *see also Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996) (prisoner "may well be entitled to injunctive relief" where medical personnel failed to provide glasses, and superintendent had "overall responsibility to ensure that prisoners' basic needs were met"); *Torrence v. Pelkey*, 164 F. Supp. 2d 264, 273 (D. Conn. 2001) (similar).

**Treatment for Gender Dysphoria Is Multifaceted**

14. This Court incorporates its previous findings regarding what gender dysphoria is and how it is treated. ECF 194 at 5-7. As this Court held, treatment for gender dysphoria is necessarily multifaceted. It is not treated by a single, discrete procedure or intervention. ECF 194 at 5.

15. Critically, Ms. Clark "is not just seeking particular treatment from a particular doctor at a particular prison. [She] is seeking that particular treatment for the duration of [her] incarceration." *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1010 (C.D. Ill. 2009).

16. In considering whether the DOC adequately treated Ms. Clark's gender dysphoria, this Court must take into account evolving standards from the medical community. As the Ninth

Circuit explained in affirming the grant of a permanent injunction in *Edmo*:

> We apply the dictates of the Eighth Amendment today in an area of increased social awareness: transgender health care. We are not the first to speak on the subject, nor will we be the last. Our court and others have been considering Eighth Amendment claims brought by transgender prisoners for decades. During that time, the medical community's understanding of what treatments are safe and medically necessary to treat gender dysphoria has changed as more information becomes available, research is undertaken, and experience is gained. The Eighth-Amendment inquiry takes account of that developing understanding.

935 F.3d at 797-98.

**Defendants Violated Ms. Clark's Eighth Amendment Rights**

17. One of the "essential principle[s]" protected by the Eighth Amendment is that "the State must respect the human attributes even of those who have committed serious crimes." *Graham v. Florida*, 560 U.S. 48, 59 (2010).

18. Under the Eighth Amendment, a state has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

19. "[D]eliberate indifference to serious medical needs of prisoners constitutes the ' unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). It "requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

20. A plaintiff who alleges deliberate indifference to his medical needs must show that "(1) his medical condition was objectively serious (the objective test); and (2) the defendant acted with deliberate indifference to his medical needs (the subjective test)." *Bradshaw v. City of New York*, 855 F. App'x 6, 10 (2d Cir. 2021) (citing *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)).

21. As to the objective prong, factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quotation marks omitted).

22. The objective prong of the deliberate indifference test is plainly satisfied here.  This Court already held that Ms. Clark's gender dysphoria constitutes a serious medical need. ECF No. 194 at 45-46. Ms. Clark has suffered years of "documented mental aguish," and "[a]ny reasonable medical professional knows that someone suffering with untreated or marginally treated gender dysphoria, particularly someone like Ms. Clark that has a history of attempting to self-castrate, will likely continue to suffer from the anguish that marks the condition." *Id.* at 48.

23. The subjective prong of the deliberate indifference test is also satisfied here.  This prong requires that the official act with a "sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. This is "equivalent to subjective recklessness," such that the charged official acts "while actually aware of a substantial risk that serious inmate harm will result." *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37, 839-40 (1994)). "[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a [fact finder] to conclude that the defendant was actually aware of it." *Brock*, 315 F.3d at 164 (citing *Farmer*, 511 U.S. at 842).

24. Indifference to a serious medical need is said to occur at the institutional as opposed to the individual level when a prison's system of medical care is so inadequate as to cause unwarranted suffering. *See Cruz v. Ward*, 558 F.2d 658, 662 (2d Cir. 1977); *Bishop v. Stoneman*, 508 F.2d 1224, 1226 (2d Cir. 1974). In keeping with this principle, it has been held

that "deliberate indifference" is "a standard for measuring the adequacy of prison officials'
response to the known medical needs of inmates and their system for allowing inmates to make
their needs known." *Dean*, 623 F. Supp. at 402 (emphasis added).

25. Repeated examples of delay or denied medical care, or haphazard or ill-conceived
medical practices, are evidence of deliberate indifference by prison officials. *See Todaro v.
Ward*, 565 F.2d 48, 52 (2d Cir. 1977). While "mere malpractice of medicine in prison does not
amount to an Eighth Amendment violation," *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir.
2000), "refus[ing] treatment of a properly diagnosed condition that was progressively
degenerative, potentially dangerous and painful, and that could be treated easily and without
risk . . . is not mere medical malpractice." *Id.* (internal quotation marks omitted).

26. It has long been held in this Circuit that a defendant "may be deliberately indifferent if
he or she consciously chooses an easier and less efficacious treatment plan." *Chance v.
Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

27. That is exactly what Defendant Quiros (and the Provider Defendants) did in this case
over the past eight years:

    a.  Defendant Quiros's predecessor enacted an unwritten "freeze-frame" policy that
people like Ms. Clark could not access any transition-related care. ECF 194 at 9-
10, 52.

    b.  When DOC finally began providing Ms. Clark access to hormone therapy,
Defendant Dr. Gerald Valletta facilitated it so poorly that it was ineffectual, and
marked by months- and years-long delays. ECF 194 at 14-22, 45.

    c.  With the exception of several times that DOC arranged for Ms. Clark to meet
with Dayne Romano, DOC never provided Ms. Clark with mental health care for

her gender dysphoria—not even after she attempted to castrate herself. ECF 194 at 23.

    d.    Despite the fact that DOC diagnosed Ms. Clark with gender dysphoria in May 2016, and notwithstanding years of requests by Ms. Clark and its own consultant's conclusion that surgery was medically necessary for her, DOC never arranged a consultation for any kind of gender-affirming surgery before summary judgment was briefed (2022) or granted (2023).

28. Because DOC and the Provider Defendants were deliberately indifferent to Ms. Clark's gender dysphoria, this Court correctly concluded that Defendants, including Defendant Quiros, violated Ms. Clark's Eighth Amendment rights.

**Although Not Necessary To Grant an Injunction, the DOC's Violation of Ms. Clark's Eighth Amendment Rights Is Ongoing**

29. This Court may grant an injunction on the basis of its previous findings, even if there were no ongoing violation, as discussed below.

30. Nevertheless, the DOC's violation of Ms. Clark's Eighth Amendment rights is ongoing. *See, e.g.*, *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (explaining it is not true that "the challenged conduct has, in fact, ceased" when "the defendant's change in conduct is merely superficial or . . . suffers from similar infirmities as it did at the outset") (internal citation omitted).

31. Ms. Clark "has not received everything [s]he has requested." *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1010 (C.D. Ill. 2009) (granting injunction for plaintiff with chronic condition despite provision of some treatment and rejecting defendants' contention that "there is no ongoing constitutional violation to enjoin"); *see also De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("just because Appellees have provided De'lonta with some treatment consistent

with the GID Standards of Care, it does not follow that they have necessarily provided her

with constitutionally adequate treatment"). After years of litigation, the DOC has provided Ms.

Clark with hormone therapy, which for years was inadequately monitored and ineffectively

administered. But DOC has not provided Ms. Clark any consistent or effective mental health

treatment for gender dysphoria. Nor has DOC provided any gender-affirming surgeries—even

though Ms. Clark has requested them for years and DOC's own consultants have recommended

such surgeries. *See* ECF 194 at 48 (explaining that Ms. Clark is "still not receiving the

treatment recommended by the DOC's own consultant").

32. Indeed, the first time that DOC ever arranged a consultation for *any* gender-affirming

surgery for Ms. Clark was in late May 2024—two days after this Court scheduled the injunction

hearing.

33. The DOC's last-minute efforts to arrange for gender-affirming surgical consultations for

Ms. Clark on the eve of this hearing are further evidence of its deliberate indifference.  DOC's

recent efforts—which are a not-too-thinly veiled attempt to "moot" Ms. Clark's claim—have

been rushed, uncoordinated, and inconsistent.  DOC has also failed to communicate

appropriately with Ms. Clark or her current providers about these consultations. The DOC's

attempt to make up for eight years of "uninformed and inadequate care," ECF 194 at 46, in a

span of weeks is further evidence of deliberate indifference by prison officials. *See Todaro v.

Ward*, 565 F.2d 48, 52 (2d Cir. 1977).

34. Ms. Clark is still suffering as a result. She has continued to write grievances and to

express to DOC personnel that her levels of dysphoria are high.]

**Even If The Violation Were Not Ongoing, Ms. Clark Need Only Demonstrate A
"Cognizable Danger of Recurrent Violation" For Injunctive Relief**

35. Defendant Quiros may argue that he has ceased the Eighth Amendment violations found

by this Court, and/or that the Court's summary judgment findings do not reflect "the *current* practice of [DOC]." *Sughrim v. New York*, 690 F. Supp. 3d 355, 389 (S.D.N.Y. 2023) (emphasis in original). Not only is that factually inaccurate for the reasons set forth above, but even if true, it does not prevent this Court from granting injunctive relief.

36. It is a bedrock principle of equity that courts may issue prospective relief even absent an ongoing violation so long as "there exists some cognizable danger of recurrent violation." *W.T. Grant*, 345 U.S. at 633. *See also United States v. Hakim*, 462 F. Supp. 3d 418, 434 (S.D.N.Y. 2020) (granting permanent injunction where there was "cognizable danger of recurrent violation"); *Fresh Del Monte Produce Inc. v. Del Monte Foods Co*., 933 F. Supp. 2d 655, 661 (S.D.N.Y. 2013) (same where defendant engaged in unlawful conduct during pendency of litigation but claimed to no longer be doing so). This is no less true under the Eleventh Amendment. "The weight of authority [thus] supports the conclusion" that "the possibility of future violation suffices to render that violation ongoing for purposes of the Eleventh Amendment." *Saba v. Cuomo*, 535 F. Supp. 3d 282, 300 (S.D.N.Y. 2021) (cleaned up) (holding that Eleventh Amendment is satisfied even after named conduct has ceased, where "there is a possibility such conduct will recur, and that the effects are not completely eradicated").

37. Voluntary cessation of illegal conduct does not render the issue of injunctive relief moot. *Saba v. Cuomo*, 535 F. Supp. 3d 282, 293 (S.D.N.Y. 2021). Instead, in order to show a case is moot such that injunctive relief is not necessary, a defendant bears the "heavy" burden to establish that "there is no reasonable likelihood that the wrong will be repeated." *United States v. Hakim*, 462 F. Supp. 3d 418, 434 (S.D.N.Y. 2020) (internal citation omitted). *See also W.T. Grant*, 345 U.S. at 633 ("When defendants are shown to have settled into a continuing practice . . . , courts will not assume that it has been abandoned without clear proof.").

38. There is a cognizable danger of a recurrent violation of Ms. Clark's Eighth Amendment

rights by DOC. As this Court has already found, DOC has a continuing practice of ignoring Ms.

Clark's requests for help and undertreating her. Thus, even if the Court does not find a continuing

violation *today*, Defendants must satisfy a heavy burden and convince the Court there is no

likelihood that DOC will again violate Ms. Clark's Eighth Amendment rights. Defendants have

not done so.

39. The Defendants' "heavy burden" is not satisfied by Defendant's "self-serving

statements" that they are not currently engaged in violating Ms. Clark's rights and "that they

would not consider doing so in the future." *City of New York v. Golden Feather Smoke Shop,*

*Inc.*, 2013 WL 3187049, at *30 (E.D.N.Y. June 20, 2013) (granting permanent injunction after

finding cognizable danger of recurrent violation).

40. Rather, the Court looks more closely to consider "the bona fides of the defendant's

expressed intent to comply' with the law, 'the effectiveness of the discontinuance,' and 'the

character of the past violations.'" *Sughrim*, 690 F. Supp. 3d at 388 (internal citation omitted).

**Recent Efforts by DOC to Arrange Treatment for Ms. Clark's Gender Dysphoria Are Not**
**"Bona Fide," But Litigation-Driven**

41. Defendants cannot show there is no likelihood of further violation because recent efforts by

DOC to treat Ms. Clark's gender dysphoria were "litigation-driven," as opposed to "an authentic,

durable commitment" to "mend its ways." *Am. Council of Blind of N.Y., Inc. v. City of New York*,

495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020). In other words, the cognizable danger of recurrent

violation of Ms. Clark's rights is underscored by the "suspicious timing and circumstances" of any

claimed voluntary cessation. *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 604 (2d Cir.

2016); *see also United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 676 (2d Cir. 1996) ("[I]t is

significant that the change of policy was instituted on the eve of the lawsuit.").

42. This Court must "beware" of such "efforts to defeat injunctive relief by protestations of

repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption." *United States v. Oregon State Medical Soc.*, 343 U.S. 326, 333 (1952).

43. Here, the timing of any effort to provide Ms. Clark healthcare strongly suggests that Defendant Quiros had a "litigation-driven motivation." *Am. Council of Blind of New York*, 495 F. Supp. 3d at 248. Every single instance of providing care has coincided with a key moment in Ms. Clark's litigation efforts; namely,

  a.  After Ms. Clark brought on a Columbia Law School clinic in spring 2017 to intervene on her behalf, allowing her to begin hormone therapy in September 2017, *see* ECF 194 at 11-12;

  b.  After current counsel signed on to represent Ms. Clark and filed an amended complaint in July 2021, *see* ECF 184, hiring Dayne Romano in October 2021, ECF 194 at 23, while plainly laying out that:

> The Department is facing current litigation that may be costly not only in potential damages awarded to the plaintiff, but also by having outside entities dictate to the Department how future similar situations will be handled. Rapid acquisition of a GNC Consultant may have an immediate positive impact on not only this pending litigation but suits that may arise in the future on this topic. The process of putting the hiring of the GNC Consultant out for the RFP process would result in delays in bringing on a qualified person in this role. This specific delay could have very negative impact on litigation in which the Department is presently involved.

ECF 133-16 at 1.

  c.  In the run-up to summary judgment briefing in April 2022, having Craig Burns, the DOC's Chief Mental Health Officer, call a surgery practice and two electrolysis providers in Connecticut, ECF 194 at 25;

  d.  While awaiting a decision on summary judgment in early 2023, having DOC

administrative personnel send e-mails inquiring whether prison systems in other

states could take Ms. Clark for treatment, *see* ECF 192-2; *see also* ECF 194 at 30

(discussing the lack of explanation for these very belated efforts and holding: "If

anything, this evidence tends to support Ms. Clark's claim that injunctive relief is

necessary"); and

e.    From the time this Court stated it would not grant further stays in this case (March

2024), and escalating after the Court scheduled an injunction hearing in this matter

(May 2024), bringing Ms. Clark to see a variety of new medical providers without

explanation, as directed by "central office." Tellingly, just two days after the Court

set the date for this injunction hearing, a DOC provider filled out a form to have

Ms. Clark taken for a gender-affirming surgery consult. *See Farnam v. Walker*,

593 F. Supp. 2d 1000, 1011 (C.D. Ill. 2009) (ordering injunction where "the

plaintiff did not receive what he has been seeking until the virtual eve of the

preliminary injunction hearing, more than five years after his incarceration and

months after he filed this case and obtained pro bono counsel and the assistance of

[an expert]").

44. "While the treatment plan and progression of the surgical process are certainly promising,

they do not outweigh the concern generated by the rather ominous history in this case. For

example, as previously noted, it appears that it took the [court] taking notice of this case, and the

lackluster attention paid to Plaintiff's serious medical needs, to prompt earnest efforts to locate a

willing surgeon." *Delaughter v. Hatten*, 2022 WL 2526433, at *23 (S.D. Miss. July 6, 2022)

(granting injunction in deliberate indifference case).

45. Ms. Clark's efforts to secure her constitutional rights through litigation have been an

animating force behind every (belated and still inadequate) step that DOC has taken to arrange treatment for her gender dysphoria. It is far from "absolutely clear" that DOC will not violate Ms. Clark's rights again. *Am. Council of Blind of New York*, 495 F. Supp. 3d at 248. Given that any change "to the current conditions was influenced [by] . . . the current litigation," *Porter v. Clarke*, 923 F.3d 348, 365 (4th Cir. 2019), *as amended* (May 6, 2019), there is a lack of "bona fides of the defendant's expressed intent to comply" with the law. *Sughrim*, 690 F. Supp. at 388 (internal citation omitted).

**DOC Lacks Legal Barriers to Reversion and Continues to Insist on the Lawfulness of Its Inadequate Treatment of Ms. Clark**

46. In addition to evidence indicating that any changes in Ms. Clark's treatment have been driven by litigation, the absence of legal barriers to any reversion by DOC and Defendants' continued insistence that DOC's inadequate treatment of Ms. Clark is lawful further evidences the high risk of reoccurrence of the Eighth Amendment violation.

47. There are no legal barriers or safeguards to prevent Defendant Quiros from changing his mind once the threat of litigation or an injunction has ceased, thus reinforcing the need for an injunction. *See Mhany Mgmt., Inc.*, 819 F.3d at 603; *see also Am. Council of Blind of N.Y.,* 495 F. Supp. 3d at 248-49 (holding claim for injunctive relief was not moot where defendants did not "point[ ]to any safeguards that would prevent the new policy from being changed, rescinded, or honored in the breach" and defendants were "at liberty to reverse or revise this policy through a superseding memorandum or by other means").

48. Indeed, DOC has already demonstrated that in the absence of any safeguards, it will backtrack on treating Ms. Clark as soon as the threat of litigation has passed. For example, once Ms. Clark's counsel signed on to represent her and then filed an amended complaint in July 2021, DOC hastily arranged to contract with Dayne Romano in order to provide Ms. Clark with

transition-related therapy and resources (not to mention, to "extinguish th[is] specific

litigation," ECF 133-16). In their motion for summary judgment, Defendants then pointed to

DOC's retention of Dayne Romano as evidence that they were adequately treating Ms. Clark.

ECF 153-1 at 27. But after the parties concluded briefing summary judgment, DOC allowed

Dayne Romano's contract to expire in late 2022 and failed to renew it. Nor has DOC replaced

Mr. Romano with another qualified provider of gender-informed mental health counseling.

49. In addition, Defendant continues to fail to acknowledge that DOC's treatment of Ms.

Clark's gender dysphoria has been deficient, as this Court has already unambiguously held.

*See, e.g.*, *Porter v. Clarke*, 923 F.3d 348, 365 (4th Cir. 2019), *as amended* (May 6, 2019)

("Defendant[] ha[s] repeatedly reaffirmed—including in their briefing to this Court—that they

do not believe the challenged conditions violate the Eighth Amendment."). To the contrary,

Defendant has minimized the import of treatment for Ms. Clark. This includes:

a. Describing, in summary judgment briefing, the gender-affirming treatment Ms.
   Clark seeks as "radical surgery," a "radical intervention," and stating it is
   "impossible to argue that an alleged delay or inadequacy in treating gender
   dysphoria could 'worsen the prognosis' in the manner that failing to diagnose or
   treat cancer or a broken bone could," ECF 153-1 at 30, 35, 13.

b. Further arguing that Ms. Clark did not meet either the objective prong or
   subjective prong of the Eighth Amendment deliberate indifference claim, *see
   generally* ECF 153-1;

c. Describing Ms. Clark's litigation, in additional summary judgment briefing, as
   an effort to "pressgang this Court into service as her personal gender dysphoria
   treatment czar simply because she is dissatisfied or disagrees with the treatment

she is receiving," ECF 159 at 16;

d.  And most recently, arguing in the Second Circuit that that the Provider-

Defendants are entitled to qualified immunity—even if they violated the Eighth

Amendment—because a person's right to medical care for gender dysphoria is

not clearly established.

50.  "Defendant['s] continued contention, in recently filed briefing, that its practices are

lawful further indicates that it has not ceased or could be repeated." *Sughrim v. New York*, 690

F. Supp. 3d 355, 386 (S.D.N.Y. 2023); *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 368 (7th

Cir. 1990) ("Another factor supporting the injunction is that [defendant] still vigorously

maintains that its [] activity was lawful, and has never acknowledged its past conduct's

lawlessness"); *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 857 (9th Cir. 1995) (holding

that district court did not abuse its discretion in finding a cognizable danger of recurrence when

defendant introduced reforms "under protest" and because "past illegal conduct gives rise to an

inference that future violations may occur").

51.  By contrast, "[i]n cases where courts have held that a defendant's cessation of its

wrongful conduct obviates the need for injunctive relief, courts have relied on evidence of"—

among other things—"enduring reform," or "an amendment to a challenged standard along with

the defendant's abandonment of its prior litigation position." *Sughrim*, 690 F. Supp. 3d at 389

(*citing Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 108 (2d Cir. 2016)).

52.  "It is precisely [Defendant's] insistence on the validity of the challenged practice that

makes it 'reasonable' to expect that the conduct will be repeated." *Ahrens v. Bowen*, 852 F.2d

49, 53 (2d Cir. 1988).

**This Cout has Already Held that DOC's Violation of Ms. Clark's Rights Has Been Severe**

53. Lastly, courts look to the character of past violations. *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 213 (E.D.N.Y. 2018) (finding injunction warranted, in part because past violations were "severe," "pervasive" and "longstanding"). *See also United States v. Blue Ribbon Smoked Fish, Inc.*, 179 F. Supp. 2d 30, 50 (E.D.N.Y. 2001) ("The probability of future violations may be inferred from past unlawful conduct."), *aff'd*, 56 F. App'x 542 (2d Cir. 2003).

54. As this Court has found, the violation of Ms. Clark's Eighth Amendment rights by Defendants was severe, pervasive, and longstanding. As Judge Bryant explained, "[i]t took years, and this litigation, for DOC officials to refer Ms. Clark to see someone with experience and expertise in treating gender dysphoria." ECF 194, at 45. "Her persistent pleas for help went entirely ignored until she brought suit, and even then, she is still not receiving the treatment recommended by the DOC's own consultant." *Id.* at 48.

55. In sum: any recent change in course by DOC with respect to efforts to treat Ms. Clark's gender dysphoria has been litigation-driven; there are currently no legal barriers or safeguards to stop DOC from reversing course; notwithstanding this Court's holding that DOC violated Ms. Clark's Eighth Amendment rights, DOC has never abandoned its litigation position that its treatment of Ms. Clark's gender dysphoria is adequate; and DOC's violation resulted in "years of documented mental anguish." Accordingly, even if there were no current violation—although the facts demonstrate that there is—Ms. Clark faces a clear and cognizable danger of recurrent violation by DOC necessitating an injunction.

**The Scope of Injunctive Relief**

56. Courts "must not shrink from their obligation to enforce the constitutional rights of all

persons, including prisoners" and "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (citations and quotation marks omitted); *see also Disabled in Action v. Bd. of Elections of New York*, 752 F.3d 189, 198 (2d Cir. 2014) (noting that when officials fail to uphold the law, "breadth and flexibility are inherent in equitable remedies") (internal citation omitted).

57. Under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(2), prospective relief granted to a prisoner in any case concerning prison conditions must "be narrowly drawn, extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," and be "the least intrusive means necessary to correct the violation of the Federal right." In issuing injunctive relief, "the court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." *Id.*[3]

58. As the court explained in granting an injunction for gender dysphoria treatment to the plaintiff in *Norsworthy v. Beard*:

> An injunction granting her access to adequate medical care, including referral to a qualified surgeon for [gender-affirming surgery], is narrowly drawn, extends no further than necessary to correct the constitutional violation, and is the least intrusive means necessary to correct the violation.

---

[3] The PLRA does not pose a barrier to granting Ms. Clark injunctive relief. Courts "should not construe a statute to displace courts' traditional equitable authority absent the clearest command or an inescapable inference to the contrary." *Miller v. French*, 530 U.S. 327, 340 (2000). This Court, therefore, should "not construe Section 3626(a)(1) [of the PLRA] as displacing courts' equitable authority to *initially* impose prospective relief, even when a violation is not 'current and ongoing.'" *Porter v. Clarke*, 923 F.3d 348, 367–68 (4th Cir. 2019), *as amended* (May 6, 2019) (emphasis in original). The PLRA does not change "the well-established law that injunctive relief is available in the first instance 'to prevent a substantial risk of serious injury from ripening into actual harm.'" *Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)).

> See 18 U.S.C. § 3626. There is no evidence that granting this relief will have "any adverse impact on public safety or the operation of the criminal justice system." 18 U.S.C. § 3626(a)(2).

87 F. Supp. 3d 1164, 1194-95 (N.D. Cal. 2015).

59. The same is true here.

60. Ms. Clark has proposed the following injunction, *see* ECF 222 at 11-13:

*1. For as long as Ms. Clark remains in the custody of DOC, DOC shall engage a medical clinician to serve as a leader of care (the "Leader of Care") to oversee her medical and mental health treatment for gender dysphoria. The Leader of Care should be trained and experienced in the provision of health care to individuals with gender dysphoria.*

   a. *Under the guidance and supervision of the Leader of Care, DOC shall engage medical and mental health clinicians (the "Clinicians") who are experienced and specialized in the treatment of gender dysphoria to deliver gender-affirming medical and mental health care to Ms. Clark.*
   b. *In accordance with the recommendations of the Leader of Care and the Clinicians, DOC shall ensure that Ms. Clark has ongoing and timely access to the Leader of Care and the Clinicians, both by telemedicine and in-person care, as needed.*
   c. *In accordance with the recommendations of the Leader of Care and the Clinicians, DOC shall ensure that the Leader of Care and the Clinicians receive ongoing and timely access to Ms. Clark's complete medical and mental health records.*
   d. *DOC shall ensure that any lab work and other medical orders by the Leader of Care and the Clinicians are timely performed and the results timely reported to the Leader of Care, the Clinicians, and any other relevant treatment providers.*
   e. *Should the Leader of Care or the Clinicians recommend referral of Ms. Clark to another specialist, and reasonably explain why such referral is needed for her treatment, DOC shall timely arrange for Ms. Clark's treatment by that specialist.*

*2. DOC shall abide by the professional recommendations of the Leader of Care and the Clinicians with respect to Ms. Clark's course of treatment, which shall be set forth in a treatment plan, to include, at a minimum, the following:*

   a. *Ongoing consistent hormone therapy, along with lab monitoring;*

   b. *Mental health treatment specific to gender dysphoria;*

   c. *Breast augmentation surgery;*

   d. *Vaginoplasty (including electrolysis, in preparation and as needed). Vaginoplasty shall be performed by a surgical team with experience in the procedure, in one or more stages as determined by that surgical team. DOC shall further take all necessary steps for Ms. Clark's recovery and aftercare, as directed by the surgical team.*

*3. DOC shall provide Ms. Clark with any additional medical and mental health care, including surgery or other medical procedures, that the Leader of Care and Clinicians determine is medically indicated for the treatment of her gender dysphoria.*

*4. DOC shall timely transfer Ms. Clark to a women's DOC facility upon Ms. Clark's reasonable request.*

*5. Finally, the Court should appoint a monitor to ensure that DOC abides by the Court-ordered injunctive relief. Specifically, the Court should order DOC to engage a third-party monitor, agreed to by the parties, with full access to Ms. Clark, the Leader of Care, and Ms. Clark's providers and records. The monitor shall report to the Court at least once per quarter on DOC's compliance with the Court's injunction, and may be terminated if Ms. Clark reaches a stable place in her treatment as determined by the monitor and the Leader of Care.*

61. An order to ensure that, for as long as Ms. Clark remains in the custody of DOC, Defendant shall provide her with care that competent providers deem medically necessary treatment for her gender dysphoria meets the requirements of 18 U.S.C. § 3626.

PLAINTIFF
VERONICA-MAY CLARK

By: /s/ Daniel S. Noble
Daniel S. Noble (ct31089)
Krieger Lewin LLP
350 Fifth Avenue
New York, New York 10118
Tel: (212) 390-9555
E-mail: Daniel.Noble@kriegerlewin.com

By: /s/ Matthew B. Danzer
Matthew B. Danzer (ct30740)
Evan I. Cohen (ct29799)
Kelsey A. Powderly (ct30855)
FINN DIXON & HERLING LLP
Six Landmark Square
Stamford, CT 06901-2704
Tel: (203) 325-5000
Fax: (203) 325-5001
E-mail: mdanzer@fdh.com

By: /s/ Elana Bildner
Elana Bildner (ct30379)
Dan Barrett (ct29816)
Sapana Anand (ct31422)
ACLU Foundation of Connecticut
765 Asylum Avenue, 2nd Floor
Hartford, CT 06105
Tel: (860) 471-8475
E-mail: ebildner@acluct.org

*Attorneys for Plaintiff Veronica-May Clark*