UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VERONICA-MAY CLARK,
   *Plaintiff*,

  v.            No. 3:19-cv-575 (VAB)

ANGEL QUIROS, GERALD VALLETTA,
RICHARD BUSH, and BARBARA
KIMBLE-GOODMAN,
   *Defendants*.

**MEMORANDUM OF DECISION AND ORDER**

  No more than sixty people in the custody of the Connecticut Department of Correction ("DOC") identify as gender diverse, meaning that they have a gender identity or expression that does not conform to those typically associated with their biological sex. Tr. of Bench Trial Vol. II 131:22–132:8 (July 12, 2024) (testimony of Arielle Reich) ("Tr. Vol. II"). At this time, only five of them are seeking surgical interventions specifically related to their gender identity. Tr. of Bench Trial Vol. III 84:23–85:13 (July 15, 2024) (testimony of Dr. Heather Gaw) ("Tr. Vol. III").[1]

  Veronica-May Clark ("Ms. Clark" or "Plaintiff"), a forty-eight-year-old transgender woman serving an effective life sentence in DOC custody, is one of them. *See* Mem. of Decision on Cross-Mots. for Summ. J. and Mots. for Leave to Supp., ECF No. 194 at 1 (Sept. 15, 2023) ("Order on MSJs"); Def. Ex. A at 4; Tr. of Bench Trial Vol. I 15:11–13, 56:3–11 (July 8, 2024) (testimony of Veronica-May Clark) ("Tr. Vol. I").

---

[1] While not dispositive, nor necessary for purposes of this Memorandum and Decision, recent census data regarding the number of persons in DOC custody indicate a population of 10,555, *see Average Confined Inmate Population and Legal Status*, CONN. DEP'T OF CORR., RSCH. UNIT (July 1, 2024), *available at* https://portal.ct.gov/doc/report/monthly-statistics, meaning that less than 0.05% of the incarcerated population are seeking surgical interventions specifically related to their gender identity.

Diagnosed with gender dysphoria[2] in 2016, Ms. Clark has sued DOC Commissioner, Angel Quiros, (the "Commissioner" or "Defendant"), Dr. Gerald Valletta, Richard Bush, and Barbara Kimble-Goodman (collectively, "Defendants")[3] for their failure to adequately treat her gender dysphoria, in violation of the Eighth Amendment. Am. Compl. ¶ 1, ECF No. 84 (July 30, 2021) ("Am. Compl.").[4]

Under the United States Constitution's Eighth Amendment, because prisoners must rely on prison authorities for medical treatment, the failure to provide medical care means that the underlying medical condition will go untreated, often resulting in "the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). The DOC therefore has an obligation to provide adequate medical care to individuals in its custody. *Id.*

The Eighth Amendment's reach is not limited to certain underlying medical conditions. Medical conditions of all kinds—*e.g.* an untreated cavity, *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000); double vision and loss of depth perception resulting from a head injury, *Koehl v. Dalsheim*, 85 F.3d 86, 87 (2d Cir. 1996); or HIV infection, *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)—if inadequately treated, may trigger an Eighth Amendment violation, so long as they create "a condition of urgency" that may result in "degeneration" or "extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

---

[2] Gender dysphoria is clinically significant distress arising from incongruity between a person's gender identity and a person's sex assigned at birth. Tr. Vol. II 57:13–58:3 (testimony of Dr. George R. Brown, a qualified expert in this case, *see* fn. 11).

[3] Ms. Clark sued Dr. Gerald Valletta, Licensed Clinical Social Worker ("LCSW") Richard Bush, and advanced practice registered nurse ("APRN") Barbara Kimble-Goodman, each of whom participated directly in her care while in prison, in their individual capacities. Ms. Clark sued DOC Commissioner Angel Quiros in his official capacity. Her injunctive relief claim, the subject of the recent bench trial, is against DOC Commissioner Quiros in his official capacity only.

[4] In this lawsuit, Ms. Clark also seeks damages, but that portion of her claim cannot be resolved pending Defendants' appeal of Judge Bryant's ruling on qualified immunity. Additionally, Ms. Clark brought an intentional infliction of emotional distress claim against Defendants Valletta, Bush, and Kimble-Goodman, which is not relevant to this Order. Am. Compl. ¶¶ 54–61.

On September 15, 2023, United States District Judge Vanessa L. Bryant found that DOC medical providers had been deliberately indifferent to Ms. Clark's serious medical needs by failing to adequately treat her gender dysphoria in violation of the Eighth Amendment. Order on MSJs at 2–3. In recent years, a number of courts have similarly found that the failure to adequately treat gender dysphoria violates the Eighth Amendment. *See, e.g.*, *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103 (D. Idaho 2018), *aff'd Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015); *Monroe v. Meeks*, 584 F. Supp. 3d 643 (S.D. Ill. 2022).

Since that Ruling and Order, DOC has made progress toward providing Ms. Clark with appropriate gender-affirming care, including arranging for ongoing appropriate hormone therapy, a presurgical consultation, and electrolysis.

Now, this Court must decide whether, as a result of Judge Bryant's deliberate indifference ruling, Ms. Clark is entitled to injunctive relief, and, if so, what DOC should be ordered to do. The Court held a four-day bench trial to address these issues. *See* Min. Entry, ECF No. 256 (July 8, 2024); Min. Entry, ECF No. 261 (July 12, 2024); Min Entry, ECF No. 266 (July 15, 2024); and Min. Entry, ECF No. 267 (July 18, 2024). This Memorandum of Decision and Order provides the Court's answer.

In doing so, the Court has been guided by the applicable legal principles, as well as the unique facts and circumstances presented by Ms. Clark's case. As emphasized at trial and by other courts considering similar issues, appropriate care for gender dysphoria is highly individualized, and "[w]hat helps one person alleviate gender dysphoria might be very different from what helps another person." *Norsworthy*, 87 F. Supp. 3d at 1170.[5]

---

[5] A**s** a result, this Memorandum of Decision and Order cannot, and should not, be construed as determining the appropriate medical care required for all individuals with gender dysphoria in DOC custody.

For the reasons that follow, the Court **FINDS** an ongoing violation of Ms. Clark's Eighth Amendment rights and **ORDERS** the following relief:

1.  By **October 1, 2024,** the Commissioner shall file a status report, updating the Court on the efforts made since this Memorandum of Decision and Order to treat Ms. Clark's gender dysphoria. Such report shall include the following: (a) whether the presurgical assessment to be conducted by Dr. Heather Gaw has been completed; (b) whether Ms. Clark has had the opportunity to consult further with Dr. Joshua Sterling about appropriate gender-affirming genital surgery, and the extent to which further decisions have been made as to her surgical options, including any proposed schedule with respect to any such surgery; (c) whether, and to what extent, Ms. Clark continues to receive gender-affirming hormone therapy managed by Nurse Practitioner Kathryn Tierney at Middlesex Health; (4) whether, and to what extent, DOC has provided Ms. Clark with regular mental healthcare with an appropriate provider; (5) whether, and to what extent, DOC has continued to provide Ms. Clark with access to electrolysis; and (6) copies of the progress reports sent to counsel for Ms. Clark, as further described below.

2.  Before the submission of the **October 1, 2024** status report, counsel for Commissioner Quiros must keep counsel for Ms. Clark updated, in writing, on its ongoing progress in treating her gender dysphoria. Progress reports should be sent on **August 16, 2024**, **August 30, 2024**, and **September 13, 2024**. These progress reports shall not be filed with the Court until the filing of the Commissioner's **October 1, 2024** status report.

3.  Following the submission of the Commissioner's **October 1, 2024** status report, Ms. Clark will have until **October 15, 2024** to respond to it. Any such response shall include whether any or all of the relief reported on in the Commissioner's **October 1, 2024** status

report has sufficiently addressed the outstanding issues regarding Ms. Clark's gender dysphoria, and if not, what additional measures, if any, may be required.

4.      Following the filing of the Commissioner's **October 1, 2024** status report, and Ms. Clark's **October 15, 2024** response, the Court will determine what, if any, further injunctive relief is necessary.

## II.      PROCEDURAL HISTORY[6]

On September 15, 2023, Judge Bryant granted Ms. Clark's motion for summary judgment on her claim of deliberate indifference against Defendants Valletta, Bush, and Kimble-Goodman, Order on MSJs at 57, 59; denied those Defendants' claim of qualified immunity, *id.* at 65; and denied Defendants' motion for summary judgment on Ms. Clark's injunctive relief and intentional infliction of emotional distress claims, *id.* at 69, 72.

Defendants Valletta, Bush, and Kimble-Goodman have appealed Judge Bryant's ruling on qualified immunity. Not. of Appeal, ECF No. 196 (Oct. 10, 2023).

On November 15, 2023, the case was transferred to this Court. Order of Transfer, ECF No. 201 (Nov. 15, 2023).

On March 13, 2024, the Court held a hearing to discuss how the case should proceed, in light of the pending appeal on the issue of qualified immunity, as well as the outstanding issue of injunctive relief. Min. Entry, ECF No. 214 (Mar. 13, 2024).

On May 29, 2024, after receiving briefing from the parties, the Court scheduled a bench trial on the issue of injunctive relief, to begin on July 8, 2024. Order, ECF No. 230 (May 29, 2024).

---

[6] The Court assumes the parties' familiarity with the factual and procedural background of this case and summarizes only the history that is relevant to these motions.

On June 26, 2024, Ms. Clark filed two motions *in limine*, seeking to exclude or limit the scope of proposed witness testimony. Mot. in Limine to Preclude the Expert Testimony of Stephen Levine, M.D., ECF No. 244 (June 26, 2024) ("MIL re: Dr. Levine"); Mot. in Limine to Preclude Certain Witnesses from Testifying and Otherwise Limit Testimony to the Issue of Injunctive Relief, ECF No. 246 (June 26, 2024) ("MIL re: Witnesses).

Also on June 26, 2024, Commissioner Quiros filed a motion *in limine*, seeking to exclude certain of Ms. Clark's exhibits. Mot. in Limine to Exclude Plaintiff's Exhibits 1–5, 8–14, 20–21, 25, and 30–31, ECF No. 245 (June 26, 2024) ("MIL re: Exhibits").

On July 1, 2024, the parties filed responses to the pending motions *in limine*. Mem. in Opp'n to MIL re: Exhibits, ECF No. 249 (July 1, 2024); Opp'n to MIL re: Witnesses, ECF No. 250 (July 1, 2024); Opp'n to MIL re: Dr. Levine, ECF No. 251 (July 1, 2024).

On July 3, 2024, the Court ruled on the motions *in limine*. Ruling and Order on Mots. in Limine, ECF No. 255.

On July 8, 2024, the Court commenced a four-day day bench trial. *See* Min. Entry, ECF No. 256 (July 8, 2024); Min. Entry, ECF No. 261 (July 12, 2024); Min Entry, ECF No. 266 (July 15, 2024).

On July 11, 2024, Ms. Clark moved for sanctions based on alleged discovery violations. Mot. for Discovery Sanctions, ECF No. 259 (July 11, 2024) ("Mot. for Sanctions"). That motion sought to address allegedly late-produced discovery by requiring the Commissioner to reorganize the material; certify its completeness with respect to all of the Commissioner's discovery obligations; permit an opportunity to recall witnesses, to the extent necessary; and pay reasonable attorney's fees for the time spent reviewing this arguably late-produced discovery, and for having to bring the motion. *See id*.

On July 12, 2024, the Court issued an order requiring the Commissioner to respond to the motion for sanctions by July 13, 2024 and providing an opportunity for Ms. Clark to file a reply to that objection by July 14, 2024. Order, ECF No. 260 (July 12, 2024).

On July 13, 2024, Commissioner Quiros filed his objection to the motion for sanctions. ECF No. 263 (July 13, 2024) ("Opp'n to Mot. for Sanctions").

On July 14, 2024, Ms. Clark filed her reply to Commissioner Quiros' objection. ECF No. 264 (July 14, 2024) ("Reply to Opp'n to Mot. for Sanctions").[7]

During the course of this trial, the following witnesses testified: Veronica-May Clark, Licensed Clinical Social Worker ("LCSW") Dayne Romano, Nurse Practitioner ("NP") Kathryn Tierney, Dr. Joshua Sterling, Dr. George Brown, Arielle Reich, Dr. Heather Gaw, Dr. Richard Williams, and Dr. Robert Richeson. In addition, stipulations regarding the testimony of Jaclyn Osden and Deputy DOC Commissioner William Mulligan were read into the record.

The following exhibits were admitted into evidence: Pl. Ex. 14 (World Professional Association for Transgender Health ("WPATH") Standards of Care for the Health of Transgender and Gender Diverse People, Version 8); Pl. Ex. 15 (WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Version 7); Pl. Ex. 19 (Twin Peaks Counseling Contract, 11/1/2021); Pl. Ex. 21 (May 5, 2022 declaration of Ms. Clark); Pl. Ex. 24 (Ms. Clark's medical records since April 1, 2022); Pl. Ex. 25A (June 4, 2022 Inmate Request Form); Pl. Ex. 25B (June 5, 2024 Inmate Request Form); Pl. Ex. 25C (June 6,

_____

[7] The Court will address the motion for sanctions in a separate order. But, based on the evidence presented at trial, and the opportunity provided to Ms. Clark to recall any witnesses, or have sufficient time to address any of the allegedly late-produced discovery, the motion for sanctions, ECF No. 259, will be denied in part as moot as to any relief related to the providing of this discovery, or the recalling of witnesses. As to Ms. Clark's request for an order to pay reasonable attorney's fees, that part of the motion will be denied without prejudice to renewal, to the extent such time is not otherwise compensable in a motion for attorney's fees brought in conjunction with the representation provided throughout this case. *See* 42 U.S.C. § 1988(b) ("In any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs").

2024 Inmate Request Form); Pl. Ex. 27 (Twin Peaks Counseling Contract, 11/1/2022); Pl. Ex. 29

(letter from DOC terminating the Twin Peaks Counseling Contract); Pl. Ex. 30 (stipulation

regarding the testimony of Dr. Laura Saunders); Def. Ex. A (Ms. Clark's DOC medical records

from April 1, 2022 through the present); Def. Ex. A1 (Ms. Clark's more-recent DOC medical

records); Def. Ex. C (Ms. Clark's DOC medical records from Mr. Romano from April 1, 2022

through the present); Def. Ex. I (contract with Hartford HealthCare); and Def. Exhibit J (DOC

Policy G 2.09).[8]

At trial, the Court did not rule on the admissibility of Pl. Ex. 11 (letters from Morningside

Heights Legal Services, Inc. to Dr. Robert Berger regarding Ms. Clark's care) and it was not

agreed to by the parties. Because the Court does not rely on this exhibit in this Memorandum of

Decision and Order, the Court need not address its admissibility.

On July 18, 2024, the Court heard closing arguments. *See* Min. Entry, ECF No. 267 (July

18, 2024).[9]

## III.    FINDINGS OF FACT

---

[8] Commissioner Quiros has requested the Court to take judicial notice of the following: (1) Conn. Gen. Stat. 20-195d(d); (2) *Clark v. Hanley*, No. 3:18-cv-1765 (JAM), 2022 WL 124298 (D. Conn. Jan. 13, 2022); and (3) DOC Administrative Directive 8.17. As to the first two, a state statute and a previous case involving Ms. Clark but unrelated in subject matter to these proceedings, to the extent relevant, the Court will consider them. As to the third, a DOC administrative directive, the Court will also consider it, to the extent necessary. Fed. R. Civ. P. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *cf. United States v. Knauer*, 707 F. Supp. 2d 379, 397 (E.D.N.Y. 2010) ("courts may generally take judicial notice of administrative regulations").
[9] The parties elected to deliver oral closing arguments in lieu of post-trial briefing. *See* Tr. Vol. III 5:1–5.

Consistent with Federal Rule of Civil Procedure 52(a)(1),[10] the following findings of fact are based on the testimony and exhibits presented at trial. This section discusses only those issues considered "material to the resolution of the parties' claims." *Cliffstar Corp. v. Alpine Foods, LLC*, No. 09-CV-00690-JJM, 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016) (citing *I.N.S. v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("[C]ourts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach.")). Moreover, "the distinction between law and fact is anything but clear-cut," and therefore, "for purposes of appellate review, the labels of fact and law assigned" should not be considered controlling. *Id.* (internal quotation marks and citations omitted).

## A.  Gender Dysphoria

Gender identity is a person's internal sense of whether they are male, female, or non-binary. Order on MSJs at 5. Transgender persons are individuals whose sex designation at birth, based on their anatomy, differs from their gender identity. *Id.*

Gender dysphoria generally refers to symptoms, whether mild or severe, arising from some degree of mismatch or incongruity between a person's gender identity and a person's sex assigned at birth. Tr. Vol. II 57:15–58:3 (testimony of Dr. George Brown).[11] In a clinical sense, a diagnosis of gender dysphoria indicates that a person's symptoms have reached the level of

---

[10] Federal Rule of Civil Procedure 52(a)(1) provides:

> In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specifically and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

[11] Dr. Brown is a medical doctor retained by Ms. Clark. Order on MSJs at 5; Tr. Vol. II 74:13–75:7 (testimony of Dr. Brown). Dr. Brown has a bachelor's and medical degree from the University of Rochester. *Id.* 49:10–17. He attended a combined civilian-military residency program with the United States Air Force and Wright State University. *Id.* 49:18–25. A board-certified psychiatrist who specializes in treating adults with gender dysphoria, Dr. Brown has been researching transgender health for over thirty years and has served on the WPATH Committee to Revise the Standards of Care since 1990. *Id.* 50:5–56:7; Order on MSJs at 5. During trial, Dr. Brown was qualified as an expert in transgender health and gender-affirming care. Tr. Vol. II 56:22–57:11 (testimony of Dr. Brown).

clinical significance, such that a diagnosis under the Diagnostic and Statistical Manual V, the psychiatric and psychological manual of mental disorders, would be warranted. *Id.* Throughout this Memorandum of Decision and Order, the term "gender dysphoria" is used in its clinical sense.

Only a minority of transgender individuals qualify for a diagnosis of gender dysphoria. *Id.* 60:2–9.

### i.   Treatment for Gender Dysphoria

Generally, there are four broad categories of treatment for gender dysphoria: mental healthcare, social transition, medical or somatic treatments, and surgical interventions, *id.* 60:10–61:20, collectively referred to as "gender-affirming care."

Transgender and gender diverse people experience depression, anxiety, and suicidality at higher rates than the general population. Pl. Ex. 14 at S171.[12] These elevated rates have been linked to the complex trauma, societal stigma, violence, and discrimination that transgender and gender diverse individuals experience. *Id.* Many individuals with gender dysphoria will therefore benefit from mental healthcare as part of their transition. *Id.* Mental healthcare for individuals with gender dysphoria should be provided by a practitioner with specialized training and

---

[12] WPATH has developed the Standards of Care and Ethical Guidelines (the "WPATH Standards"), which articulate an international professional consensus about the psychiatric, psychological, medical, and surgical treatment and management of gender dysphoria. Pl. Ex. 14 at 55. Neither party disputes the relevance or the applicability of these standards, although there was some issue as to which version of these standards should be applied in some circumstances. *See* Tr. Vol. II 99:23–102:1 (testimony of Dr. Brown). The WPATH Standards are used throughout the United States and the rest of the world and are generally considered to be preeminent guidelines for the medical treatment of individuals with gender dysphoria. Tr. Vol. I 222:24–223:12 (testimony of Ms. Tierney); Tr. Vol. II 61:21–62:14 (testimony of Dr. Brown); *see also Edmo v. Idaho Dept. of Correction*, 358 F. Supp. 3d 1103, 1111 (D. Idaho 2018) ("WPATH Standards of Care for Health of Transexual, Transgender, and Gender Nonconforming People were first promulgated in 1979 and are the internationally recognized guidelines for the treatment of individuals with gender dysphoria."); *Norsworthy v. Beard*, 87 F.Supp.3d 1164, 1170 (N.D. Cal. 2015) ("[WPATH's standards of care] recognized as authoritative standards of care by the American Medical Association, the American Psychiatric Association, and the American Psychological Association." (citations omitted)). The current version of the WPATH standards, Version 8, was published in September 2022. Pl. Ex. 14 at 51; Tr. Vol. II 63:17–18 (testimony of Dr. Brown). Version 7 was in effect between September 2011 and September 2022. Pl. Ex. 15 at 110.

experience treating gender diverse individuals. *See* Pl. Ex. 14 at S35 (explaining that healthcare providers who are assessing patients for gender affirming medical or surgical treatment should have knowledge and experience in the healthcare of transgender and gender diverse people); Tr. Vol. II 71:7–73:8, 110:9–113:6 (testimony of Dr. Brown) (explaining that such credentials apply to treating healthcare providers, as well).

Mental health professionals who lack such training or experience, and who treat individuals with gender dysphoria, may incorrectly relate symptoms of gender dysphoria to other free-standing and independent diagnoses, thereby "miss[ing] the point." *Id.* 72:1–73:8. Providing mental healthcare that is not gender-informed to a patient with gender dysphoria can cause harm to the patient. *Id.*

Social transition involves presenting a person's gender publicly, or in a social context, in a way consistent with their gender identity. *Id.* 60:19–61:1. This can include, among other things, changing one's legal name, adopting pronouns of the felt gender, and wearing clothes consistent with the felt gender. *Id.*

Medical treatments include, but are not limited to, gender-affirming hormone therapy, which change "the hormonal milieu" of the patient's body to better match their gender identity. *Id.*

Finally, gender-affirming surgery refers to "a constellation of procedures designed to align a person's body with their gender identity[.]" Pl. Ex. 14 at S128. Surgical interventions are necessary for only a minority of patients with gender dysphoria. Tr. Vol. II 61:8–10 (testimony of Dr. Brown).

As for any medical condition, the range of treatment options for gender dysphoria may vary depending on the specific symptoms experienced by a patient. *Id.* 62:15–63:3.[13] Decisions about the necessary and appropriate treatment for an individual with gender dysphoria therefore require consultation between the patient and appropriately trained medical providers. *Id.* 66:23–67:15. For hormone therapy, the prescriber can be a licensed practitioner from a number of different fields, including psychiatry, primary care, family medicine, and endocrinology. *Id.* For surgeries, such consultations generally require a qualified mental health provider and a qualified surgeon. *Id.* 70:17–71:1.

Untreated or insufficiently treated gender dysphoria may result in serious negative medical and mental health outcomes, including depression, suicide, and surgical-self-treatment. *Id.* 73:25–74:12. For transgender females, like Ms. Clark, this can include auto-castration or auto-penectomy. *Id.*

ii.    Gender-Affirming Surgical Interventions

There are many gender-affirming surgical procedures. *See id.* 61:12–20 (describing "fifty or sixty" types of surgical interventions); Pl. Ex. 14 at S258 (listing various gender-affirming surgical procedures). For transgender women, some of the most common include breast augmentation, chondrolaryngoplasty (also known as a tracheal shave or Adam's apple reduction surgery), facial feminization, and various genital gender-affirming surgeries. Tr. Vol. II 61:14–18 (testimony of Dr. Brown); Pl. Ex. 14 at S258.

There are three primary genital surgeries (collectively referred to as "bottom surgeries") for transgender female patients. Tr. Vol. II 9:7–11 (testimony of Dr. Joshua Sterling). A bilateral

---

[13] *See also Norsworthy*, 87 F. Supp. 3d at 1170 ("The [WPATH's] Standards of Care explain that treatment for gender dysphoria is individualized: "What helps one person alleviate gender dysphoria might be very different from what helps another person." (citing to WPATH Standards of Care, Version 7)).

orchiectomy (or "orchiectomy") involves removing the testicles. *Id.* 9:11–15. A vulvoplasty, or zero-depth vaginoplasty, involves removing the external male genitalia (including penis, scrotum, and testicles) and creating external female genitalia (including labia, clitoris, and vaginal introitus). *Id.* 9:16–23. A full vaginoplasty involves removing external male genitalia and creating external female genitalia, as well as a vaginal canal, which allows for penetrative intercourse. *Id.* 9:16–23, 20:6–21:6.

These three bottom surgeries entail different levels of invasiveness and require different postoperative care. *Id.* 11:5–11. An orchiectomy is a same-day procedure with a typical recovery time of a week. *Id.* 11:11–14. A vulvoplasty typically requires a one-night stay in the hospital, and a two- to three-week recovery. *Id.* 11:15–21. A vaginoplasty typically requires a three- to seven-day stay in the hospital, followed by a few months of recovery, during which the patient has limited mobility. *Id.* 11:22–12:4.

The risk of complications is higher with a vaginoplasty (10–20%), as compared with a vulvoplasty (<5%) or an orchiectomy (<1%). *Id.* 12:19–13:6. The vaginoplasty also requires significant after-care, most notably regular dilation. *Id.* 12:5–18. Dilation entails inserting a dilator into the vaginal canal and leaving it in place for 20–30 minutes, in order to stretch out the space and keep it open. *Id.* 21:13–22:12. After a vaginoplasty, a patient must dilate their vaginal canal for the rest of their life, although the frequency and duration of dilation will decrease over time. *Id*. 21:13–15, 22:8–9. Dilation can be performed by the patient without medical assistance, and can be performed in a prison setting, assuming that the patient has adequate privacy. *Id.* 22:13–15, 37:4–23.

Before a vaginoplasty, a patient's pubic hair must be removed. *Id.* 9:24–10:7. Because hair removal can take up to a year to complete, it is often the biggest barrier to undergoing a full

vaginoplasty. *Id.* 13:21–14:1. There is no hair removal requirement for an orchiectomy or vulvoplasty. *Id.* 10:2–3.

A patient's decision to undergo surgery, including the specific type of surgery they elect, is highly personal and involves a range of considerations, including: what physical changes will help align their anatomy with their internal sense of self (in other words, where on their body their gender dysphoria is concentrated and what changes will "make them whole"); the risks, timelines, and recovery times of the various procedures; their own physical health and ability to engage in appropriate after-care; and the cost of the various procedures. *Id.* 20:6–22; Tr. Vol. I 239:9–19 (testimony of Kathryn Tierney).

Based on the applicable medical standards, before pursuing a surgical intervention, a patient should be assessed by a single healthcare provider who can evaluate and diagnose the individual and provide an independent opinion regarding the patient's desired gender-affirming surgical treatment. Pl. Ex. 14 at S40.

### B.  Ms. Clark's Medical Treatment Before September 2023[14]

Incarcerated since 2007, Ms. Clark currently resides at Cheshire Correctional Institution ("Cheshire"). Tr. Vol. I 27:13–14, 55:23–25 (testimony of Ms. Clark); Order on MSJs at 3. Upon entering DOC custody, although Ms. Clark had been living as a woman externally for several years, she chose to present as a man because she was afraid of experiencing violence in prison, due to her gender identity. Tr. Vol. I 15:14–16:16 (testimony of Ms. Clark). She continued to present as a man for approximately nine years, until she "couldn't deal with [the stress] anymore." *Id.* 16:17–24.

---

[14] The date on which Judge Bryant granted summary judgment to Ms. Clark on her Eighth Amendment claim. *See* Order on MSJs.

In April 2016, Ms. Clark wrote to medical stating that she believed she had gender dysphoria and requesting treatment, including hormone therapy and gender-affirming surgery. *Id.* 17:14–18:11; Order on MSJs at 5. Around May 2016, a DOC healthcare provider diagnosed Ms. Clark with gender dysphoria. Order on MSJs at 5. Ms. Clark was not provided with any gender-affirming treatment. Tr. Vol. I 18:1–16 (testimony of Ms. Clark).

On July 15, 2016, in an effort to self-treat her gender dysphoria, Ms. Clark tried to castrate herself by slicing open her scrotum with a nail clipper. *Id.* 19:2–14, 86:15–87:3; Order on MSJs at 7. DOC staff found Ms. Clark in her cell bleeding from her genitals, and they took her to a local hospital for treatment of her wounds. Order on MSJs at 7.

After the incident, the DOC supervising psychologist assessed Ms. Clark as "clearly motivated," and undergoing a "high level of psychological distress relative to [her] gender dysphoria." *Id.* at 7–8. After her discharge from the hospital, DOC mental health providers placed Ms. Clark in the highest risk level (5),[15] reflecting her severe vulnerabilities. *Id.* at 8.

In September 2016, Ms. Clark again filed a request for treatment of her gender dysphoria. *Id.* at 9. As she understood it, under DOC policy at that time, individuals who were receiving care for gender dysphoria before entering DOC custody would receive continued treatment while in custody, but "transitional treatment will not be initiated while [an individual] is incarcerated." *Id.* at 9–10.

In January 2017, Ms. Clark again requested hormone therapy and gender-affirming surgery, describing her situation as "simply intolerable" and DOC's treatment of her as "cruel and unusual." *Id.* at 11.

---

[15] DOC uses a classification system to categorize incarcerated persons based on the individuals' risk and vulnerabilities. Order on MSJs at 3. A person's risk category can be between 1 (the least severe) and 5 (the most severe). *Id.* The score impacts a person's housing, as well as the medical care they receive. *Id.*

Frustrated with her lack of care, Ms. Clark retained a legal clinic at Columbia Law School to assist her in obtaining treatment for her gender dysphoria. *Id.*; Tr. Vol. I 20:21–21:3 (testimony of Ms. Clark). In May 2017, the clinic wrote a letter to the head of Correctional Managed Health Care, which at the time had a contract to provide healthcare to patients in DOC custody, Tr. Vol. II 126:10–14 (testimony of Ms. Reich), to inform him of Ms. Clark's need for treatment and to request a meeting, Tr. Vol. I 21:7–22:18 (testimony of Ms. Clark).

On September 14, 2017, an endocrinologist at UConn Health Endocrinology Associates examined Ms. Clark, and shortly thereafter, she began hormone therapy, specifically spironolactone and estradiol. Order on MSJs at 14; Pl. Ex. 24 at 75–78. Dr. Valletta, Ms. Clark's DOC physician, managed her hormone therapy. Order on MSJs at 14. Ms. Clark was prescribed 1 mg of estradiol daily for one month, increased to 2 mg thereafter for 6 months, and 50 mg of spironolactone twice a day for one year. *Id.* According to Dr. Brown, Ms. Clark's retained expert, these levels were appropriate as "starter dosages" for the two medications, but they typically would be "titrat[ed] upwards" to a therapeutic dose. Tr. Vol. II 78:3–79:18 (testimony of Dr. Brown).

The UConn endocrinologist requested lab work and a follow-up appointment with Ms. Clark in three months, but she did not receive a follow-up appointment until August 2019,[16] approximately two years after her first appointment. Order on MSJs at 21; Pl. Ex. 24 at 80. In October 2019, Ms. Clark's spironolactone dosage was increased to 100 mg for six to eight weeks, and then 300 mg per day thereafter. Order on MSJs at 21. In the meantime, Ms. Clark's hormone levels were not within the target range and she experienced significant side-effects,

---

[16] Notably, this was after Ms. Clark filed this lawsuit *pro se* on April 17, 2019. Complaint, ECF No. 1; Tr. Vol. I 19:18–20:2 (testimony of Ms. Clark).

including dizziness and low blood pressure. Tr. Vol. I 229:18–230:9 (testimony of Ms. Tierney); Tr. Vol. II 78:25–79:11 (testimony of Dr. Brown).

Ms. Clark was not able to attend additional follow-up appointments regarding her hormone therapy until February and October 2020, despite the endocrinologist's request that she be seen every four months. Order on MSJs at 21. At the February appointment, her estradiol dosage was increased from 2mg to 4 mg daily. *Id.*

In Fall 2021, DOC's then-Chief Mental Health Officer, Dr. Craig Burns, began calling outside specialists who might serve as consultants to DOC on gender dysphoria. *Id.* at 22.

In October 2021, Dr. Brown, an expert retained by Ms. Clark's counsel, evaluated her. Tr. Vol. II 74:13–75:7 (testimony of Dr. Brown). In a subsequent report, Dr. Brown determined that Ms. Clark needed genital gender-affirming surgery. *See* Order on MSJs at 26 (citing Dep. Tr. of Dr. George Brown 245:17–21, Ex. 3 to Pl. Mot. for Summ. J., ECF No. 133-5 (Apr. 14, 2022) ("[Y]ou've concluded, and I think opined in your report, that genital confirmation surgery is medically necessary for Ms. Clark, is that right? A. Yes. Yes, I do believe that.")).

On December 22, 2021, Ms. Clark had her first session with Dayne Romano, a gender therapist, who had entered into a contract with DOC to provide gender-affirming and transition counseling. Tr. Vol. I 166:18–167:7, 173:23–174:3 (testimony of Dayne Romano). After that session, Mr. Romano concluded that genital gender-affirming surgery was "a fundamental and vital to [alleviating Ms. Clark's] gender dysphoria." *Id.* 174:4–25; Def. Ex. C at 2. More specifically, Mr. Romano suggested that a vaginoplasty might be appropriate because "[s]he relates much of her gender dysphoria to her male penis." Tr. Vol. I 174:20–25, 176:2–8 (testimony of Mr. Romano); Def. Ex. C at 2. He noted that hair removal in the genital area would be required before a vaginoplasty. Def. Ex. C. at 3. Mr. Romano also recommended that Ms.

Clark be referred to UConn or Middlesex Health because he believed that she needed to see an endocrinologist specializing in gender-affirming hormone therapy. Tr. Vol. I 177:21 –178:4 (testimony of Mr. Romano); Def. Ex. C at 3. Finally, he stated that Ms. Clark would benefit from a gender therapist for ongoing counseling services. Tr. Vol. I 179:21–180:5 (testimony of Mr. Romano); Def. Ex. C at 3.

Between December 2021 and December 2022, Ms. Clark attended six sessions with Mr. Romano. Tr. Vol. I 183:3–184:12 (testimony of Mr. Romano). Ms. Clark spoke with Mr. Romano about her experiences living as a transgender person and "the struggles that [she] endure[d], especially in the DOC[.]" Tr. Vol. I 25:22–26:1 (testimony of Ms. Clark). She enjoyed her sessions with Mr. Romano because "he got it[,]" at least in part based on his lived experience as a transgender man. Id. 25:13–16, 26:2–4.[17]

In January 2022, DOC began the process of trying to find a surgeon to evaluate Ms. Clark and potentially perform a vaginoplasty. Order on MSJs at 24–25. Dr. Burns contacted a Connecticut surgeon qualified to perform vaginoplasties but learned that the surgeon was not providing vaginoplasties at that time. Id. at 25. DOC could not locate a surgeon in the state of Connecticut capable of performing a vaginoplasty. Id.[18]

In March 2022, a DOC mental health provider contacted Kathryn Tierney, a nurse practitioner with a specialty in endocrinology (specifically, diabetes and gender-affirming

---

[17] In November 2021, DOC awarded a one-year contract for gender-affirming and transition counseling and therapy to a licensed social worker named Dayne Romano (previously, Dayne Bachman). Tr. Vol. I 166:6–169:2 (testimony of Mr. Romano); Pl. Ex. 19 at 4. In order to secure the contract with Mr. Romano, DOC applied for a waiver from the state competitive bidding requirement, noting that rapid acquisition of a gender specialist might have a positive impact on this litigation. Pl. Ex. 18. DOC entered into a second one-year contract with Mr. Romano in November 2022, Tr. Vol. I 169:3–170:17 (testimony of Mr. Romano); Pl. Ex. 27, but ended the contract early, Tr. Vol. II 148:20–25 (testimony of Ms. Reich).

[18] Incarcerated individuals with higher security levels cannot be transported across state lines without the permission of the receiving state. Deputy Comm'r Mulligan Stipulation ¶ 3. Ms. Clark has a level 4 overall security classification (on a scale of 1–5), and therefore could not be transported to another state, even for a single-day procedure, without the consent of the other state. Id. ¶¶ 2, 4.

hormone therapy) and the Medical Director of the Middlesex Health Center for Gender Medicine and Wellness, in order for her to begin overseeing hormone therapy for Ms. Clark. Tr. Vol. I 220:11–16, 221:17–21, 225:21–227:2 (testimony of Ms. Tierney); Pl. Ex. 24 at 175.

In April 2022, Jaclyn Osden, head of the Interstate Management Unit, began sending e-mails to the thirty states with which DOC has Interstate Corrections Compact ("ICC") contracts. Osden Stipulation ¶ 5. Only three of those states—Colorado, Massachusetts, and Oregon—had ever performed a vaginoplasty or had a process in place to perform such surgeries. *Id.* ¶ 6. None of those states was willing to consider a transfer of Ms. Clark, in order to allow her to obtain the surgery. *Id.* ¶ 7. DOC cannot require another state to accept an incarcerated person in a transfer; the decision rests with the receiving state. *Id.* ¶ 4.

Ms. Osden also contacted the remaining 19 states with which DOC does not have ICC contracts. *Id.* ¶ 8. Only three of those states—California, Idaho, and Washington—have ever performed a vaginoplasty. *Id.* ¶ 9. None of those states were willing or able to accept a transfer of Ms. Clark for the purpose of her obtaining a vaginoplasty. *Id.* ¶¶ 10–12.

The Federal Bureau of Prisons ("BOP") indicated that it had completed two vaginoplasties on incarcerated individuals but was not willing to accept a transfer of Ms. Clark to provide the surgery. *Id.* ¶¶ 14–15.

On September 22, 2022, upon Mr. Romano's recommendation, Ms. Tierney initially assessed Ms. Clark regarding her gender-affirming hormone therapy. Pl. Ex. 24 at 176–80. Ms. Tierney recommended a change in her medications from daily oral hormone tablets to weekly hormone injections. Tr. Vol. I 230:10–22 (testimony of Ms. Tierney). Ms. Clark has continued to see Ms. Tierney, and to receive hormone injections consistent with Ms. Tierney's recommendations, since September 2022. *Id.* 244:12–23. DOC did not enter into a contract with

Ms. Tierney and she provides hormone management services on a visit-by-visit, at-will basis. *Id.* 243:10–14.

Ms. Clark's testosterone levels have been "appropriately suppressed" since she began hormone injections. *Id.* 247:9–14.

### C.  Ms. Clark's Medical Treatment Since September 2023

In December 2023, Ms. Reich began looking for a hair removal provider for Ms. Clark in anticipation of genital gender-affirming surgery. Tr. Vol. II 165:20–25 (testimony of Ms. Reich); Tr. Vol. III 11:24–12:4 (testimony of Ms. Reich).[19] Ms. Reich contacted numerous providers but had trouble locating one who was willing to treat Ms. Clark. Tr. Vol. II 165:4–167:11 (testimony of Ms. Reich).

Also in December 2023, Ms. Tierney prescribed Ms. Clark finasteride, a drug that treats male pattern baldness. Tr. Vol. I 67:15–68:7 (testimony of Ms. Clark); Tr. Vol. II 248:23–249:17 (testimony of Ms. Tierney).

That same month, Dr. Robert Richeson, the Chief Operating Officer of DOC responsible for Health Services Unit operations, contacted Jeffrey Fisher, Assistant Commissioner for the Massachusetts Department of Corrections to learn more about whether Massachusetts had providers who performed genital gender-affirming surgeries. Tr. Vol. III 132:7–133:2 (testimony of Dr. Richeson). Mr. Fisher informed Dr. Richeson that Boston Medical Group performed bottom surgeries for their inmate population. *Id.* 134:3–7. On April 1, 2024, a physician at Boston Medical Group informed Dr. Richeson that a surgeon at Yale, Dr. Joshua Sterling, was newly or soon-to-be performing vaginoplasties in Connecticut. *Id.* 135:2–14; Tr. Vol. II 160:23–161:3 (testimony of Ms. Reich).

---

[19] Ms. Reich indicated that Dr. Burns had made prior efforts to locate an electrolysis provider for Ms. Clark, but no additional details were provided. Tr. Vol. III 50:16–22 (testimony of Ms. Reich).

Dr. Sterling is a reconstructive urologist in the Department of Urology within the Yale New Haven Health System, Tr. Vol. II 5:13–24 (testimony of Dr. Sterling), who was hired in October 2022 to help start a transgender health program at Yale. *Id.* 7:1–8. When Dr. Sterling joined Yale, there was no surgeon in Connecticut performing vaginoplasties. *Id.* 29:22–30:7. Dr. Sterling has not yet performed a full-depth vaginoplasty at Yale, although he has performed the procedure before. *Id.* at 10:8–11, 10:25–11:4. Currently, he performs orchiectomies and revision surgeries for patients who have had prior feminizing or masculinizing surgeries. *Id.* at 7:9–9:6. At this time, other than Dr. Sterling, and his surgical partner, Dr. Jamie Cavallo, both at Yale New Haven Hospital, there does not appear to be anyone else in Connecticut with the capacity to perform vaginoplasties. *Id.* 16:17–19, 25:13–24.[20]

On April 5, 2024, Dr. Robert Richeson, the Chief Operating Officer of DOC, along with other DOC personnel, met with Dr. Sterling to discuss potential surgeries for DOC inmates with gender dysphoria. Tr. Vol. III 135:15–4 (testimony of Dr. Richeson).

On May 9, 2024, Dr. Heather Gaw, a DOC psychologist, began meeting with Ms. Clark to conduct a presurgical evaluation. Tr. Vol. III 87:20–20 (testimony of Dr. Gaw); Def. Ex. A at 738–42. She also met with Ms. Clark on June 24, 2024 and July 10, 2024, and she has another meeting scheduled for the end of this month. Tr. Vol. III 89:17–90:6, 92:7–92:15, 92:23–93:2 (testimony of Dr. Gaw).

On June 4, 2024, Ms. Clark met with Dr. Sterling in-person for an initial surgical consultation. Def. Ex. A at 703–05. Ms. Clark was not notified of the meeting in advance, nor was she told who Dr. Sterling was, what the purpose of the appointment would be, or what

---

[20] Nevertheless, for more than twenty years, there have been surgeons in Connecticut capable of performing orchiectomies and providers capable of performing electrolysis. Tr. Vol. I 256:6–8 (testimony of Ms. Tierney).

surgeries would be discussed.[21] Tr. Vol. I 37:9–21 (testimony of Ms. Clark). In advance of the meeting, DOC provided Dr. Sterling with a copy of Ms. Tierney's notes from Ms. Clark's most recent visit, but he did not receive any other medical records. Tr. Vol. II 17:12–15 (testimony of Dr. Sterling).

During the meeting, Dr. Sterling discussed surgical options with Ms. Clark, explaining that the biggest barrier would be hair removal, since she had not yet begun the process, which could take up to a year. *Id.* 17:15–20. Ms. Clark expressed interest in an up-front bilateral orchiectomy, as an initial step toward a full vaginoplasty but she did not commit to a particular surgical plan during the meeting. *Id.* at 17:21–25. Currently, Ms. Clark does not have any scheduled follow-up appointment with Dr. Sterling. *Id.* 16:16–18; Tr. Vol. II 163:17–18 (testimony of Ms. Reich).

Dr. Sterling indicated to DOC that, before performing a gender-affirming surgery, he requires a letter from the medical provider managing the patient's hormones, as well as a letter from a mental health professional indicating that the patient has the adequate support to recover after the surgery. Tr. Vol. II 14:19–15:1 (testimony of Dr. Sterling). These letters generally must have been written within the past six months. *Id.* 15:2–13.

On June 11, 2024, Ms. Clark met with her primary care provider at DOC, Dr. Richard Williams, who performed the medical pre-operative evaluation and cleared her for surgery. Tr. Vol. III 118:20–119:14 (testimony of Dr. Williams); Ex. A at 681.

---

[21] Although it is typical that incarcerated people are not told in advance when outside appointments will occur, for security reasons, patients typically know the purpose of an appointment and are notified in advance that an appointment has been scheduled. Tr. Vol. I 54:22–55:22 (testimony of Ms. Clark).

"Very recently," DOC entered into a sole-source contract with Laura Hope Goodwin, establishing Electrolysis of West Hartford as a vendor for the State of Connecticut. Tr. Vol. II 167:21–168:5 (testimony of Ms. Reich); Tr. Vol. III 51:9–15 (testimony of Ms. Reich).

On July 13, 2024, in-between trial days in this case, Ms. Clark had her first electrolysis appointment. Tr. Vol. III 51:12–12 (testimony of Ms. Reich). DOC intends for Ms. Clark to continue receiving electrolysis treatments in preparation for a vaginoplasty. Tr. Vol. II 168:21–25 (testimony of Ms. Reich).

### D.  The Evolution of Gender-Affirming Care Within DOC

On February 13, 2018, DOC Administrative Directive 8.17 ("AD 8.17"), which set forth a policy to "identify, diagnose, treat and manage inmates who identify as gender diverse, and/or who have an intersex condition." AD 8.17 ¶ 1. AD 8.17 was updated in October 2023 and the current version went into effect in early 2024. AD 8.17; Tr. Vol. III 68:4–6 (testimony of Ms. Reich).

AD 8.17 outlines a process for creating a Gender Diverse Management Plan ("GDMP") for any individual who self-discloses that they are gender diverse, or who is otherwise assessed to be gender diverse. Tr. Vol. II 127:25–129:5 (testimony of Ms. Reich). The GDMP is a custodial document, meaning that it primarily relates to correctional functions, such as housing, commissary, and other facilities-based accommodations. *Id.* 128:2–11 (testimony of Ms. Reich); Tr. Vol. III 63:6–17 (testimony of Ms. Reich).

Under AD 8.17, upon intake to DOC, if an inmate self-identifies as or is known to identify as gender diverse, they will be referred, within three business days, to the supervising psychologist at their facility for a gender dysphoria assessment. Tr. Vol. II 128:2–13 (testimony of Ms. Reich); Tr. Vol. III 75:7–76:19 (testimony of Dr. Gaw). The supervising psychologist will

complete the diagnostic assessment within ten business days of receiving the referral. AD 8.17 ¶ 5(a). For individuals diagnosed with gender dysphoria, or who might otherwise require a management plan, a GDMP will be created. *Id.* ¶ 5(a)(i).

The GDMP contains recommendations, such as the gender and type of housing in which the inmate will live, whether the inmate needs to shower separately, and the individual's preferred gender commissary. Tr. Vol. II 129:15–21 (testimony of Ms. Reich). During this process, the supervising psychologist may assign a formal diagnosis and/or develop a mental healthcare treatment plan, if necessary. Tr. Vol. III 64:8–17 (testimony of Ms. Reich). Once complete, the GDMP will be reviewed by the facility Deputy Warden or their designee and the DOC Central Office. Tr. Vol. III 77:15–78:1 (testimony of Dr. Gaw). Once everyone has approved the GDMP, one copy is kept in the Central Office and another is sent to Population Management. Tr. Vol. II 129:22–130:5 (testimony of Ms. Reich); Tr. Vol. III 77:15–25 (testimony of Dr. Gaw). The GDMP is also documented in the patient's electronic health record ("EHR"). AD 8.17 ¶ 5(a)(i).

Individuals who meet the criteria for a diagnosis of gender dysphoria are referred to a licensed physician or advanced practice registered nurse ("APRN") and a facility psychologist to discuss possible medical and psychological interventions. AD 8.17 ¶ 5(b).

In late 2022, Ms. Arielle Reich, a planning specialist at DOC, voluntarily took on the role of assisting in coordinating healthcare for gender diverse inmates within DOC. Tr. Vol. II 126:17–127:5 (testimony of Ms. Reich); Tr. Vol. III 11:5–10 (testimony of Ms. Reich). Her role was to establish a policy and procedure for delivering healthcare to gender diverse incarcerated individuals, in addition to AD 8.17, which was already in place. Tr. Vol. II 128:2–5 (testimony of Ms. Reich).

Although the role was initially temporary, it eventually became permanent. *Id.* 127:6–15.

Ms. Reich now performs the gender diverse care coordination role in addition to the planning

specialist duties assigned to her previously. *Id.* 127:19–24. Either before or since assuming her

role, Ms. Reich has not undergone training specifically related to healthcare for transgender or

gender diverse patients. Tr. Vol. III 58:18–59:10 (testimony of Ms. Reich).

In 2023, Dr. Heather Gaw, a Supervising Psychologist I at Osborn Correctional

Institution ("Osborn"), volunteered to assume two system-wide responsibilities related to

healthcare for DOC's gender diverse patients, in addition to her facility-based case management

responsibilities. Tr. Vol. III 71:8–23, 73:16–74:25 (testimony of Dr. Gaw). First, Dr. Gaw

provides training on AD 8.17 for incoming DOC staff. *Id.* 74:18–22. Second, Dr. Gaw conducts

the presurgical mental health assessments for individuals in custody across the state. *Id.* 74:22–

23. Dr. Gaw has, on her own initiative, taken several courses through WPATH. *Id.* 74:25–4,

96:6–23.

Dr. Gaw's presurgical evaluations involve reviewing a patient's records, interviewing the

patient, educating the patient if necessary, and discussing all possible surgical options with the

patient. *Id.* 98:20–99:13. As part of this process, Dr. Gaw repeats the initial diagnostic evaluation

required by AD 8.17. *Id.* 105:12–16. She also provides patients an opportunity to review a rough

draft of her letter before entering it into their EHR. *Id.* 105:17–106:10. The process typically

spans multiple sessions. *Id.* 98:20–99:3.

On April 8, 2024, DOC adopted G 2.09, a policy governing the assessment and treatment

of gender diverse patients. G 2.09, Def. Ex. J at 1; Tr. Vol. III 140:23–141:2 (testimony of Dr.

Richeson). Before G 2.09, there was no official DOC Health Services Unit policy addressing

gender-affirming healthcare. *Id.* 141:7–9.

Under G 2.09, as under AD 8.17, any incarcerated person who meets the criteria for gender dysphoria will be referred to a licensed provider or facility psychologist for an evaluation and to discuss possible medical and psychological interventions. Def. Ex. J at 3. Patients interested in gender-affirming hormone therapy will be seen by a DOC provider, who will prescribe hormone therapy, if appropriate. *Id.* ¶ II(a). The DOC provider may also, at their own discretion, refer the patient to an appropriate outside specialist. *Id.* ¶ II(a)(ii). A medical treatment plan will be created to specify how often the patient should be seen for follow-up appointments and lab work. *Id.* ¶ II(a)(iii).

Individuals who are seeking gender-affirming surgery may only be considered for gender-affirming surgery once they have lived as the gender to which they are transitioning for at least one year, as determined by their clinician. *Id.* ¶ III(a). Before gender-affirming surgery, a patient must have: (1) a medical preoperative clearance letter, which confirms that the patient has the appropriate medical clearance to undergo a surgical procedure; and (2) a mental health referral letter, which assesses whether a referral for surgery is appropriate based on a review of the patient's medical record and an in-person consultation. *Id.* ¶ III(c). Once two positive letters of referral have been procured, the patient's DOC medical provider will refer the individual to the Gender Affirming Surgery Committee,[22] which will review the request and "decide on the requested gender affirming surgery." *Id.* ¶ III(d)(i). Decisions are made on a case-by-case basis. *Id.* The Committee does not guarantee that an outside surgeon will, in fact, perform the surgery. *Id.*

---

[22] The Gender Affirming Surgery Committee is comprised of a licensed psychologist, a representative from the Legal Affairs Unit, the Chief Medical Officer or designee, the Chief Nursing executive or designee, and the District Administrator responsible for programs and treatment or designee. Def. Ex. J ¶ III(d)(ii).

On June 28, 2024, DOC entered into a contract with Hartford HealthCare. Def. Ex. I; Tr. Vol. II 152:7–2 (testimony of Ms. Reich). Under the contract, Dr. Laura Saunders, the Director of the Center for Gender Health, will serve as a consultant, assisting DOC with developing a timeline for gender diverse patients seeking surgical interventions and making recommendations for surgeons, mental healthcare providers, and other providers, as needed. *Id.* 152:11–153:17; Def. Ex. I at 3. Dr. Saunders has not begun work on Ms. Clark's case, in part because of the ongoing litigation. Tr. Vol. II 155:8–156:1 (testimony of Ms. Reich).

Thus far, DOC has arranged gender-affirming surgeries for only one individual. Tr. Vol. III 18:4–12 (testimony of Ms. Reich). That patient, a transgender man, underwent a mastectomy and hysterectomy. *Id.* 18:4–12, 19:2–7; Tr. Vol. II 133:22–134:12 (testimony of Ms. Reich). DOC also arranged for a surgical consultation regarding an orchiectomy and breast augmentation for another individual; those surgeries did not occur because the patient left DOC custody before they could take place. Tr. Vol. II 134:4–12 (testimony of Ms. Reich); Tr. Vol. III 18:13–20 (testimony of Ms. Reich).

Currently, Dr. Gaw remains the only medical provider at DOC who has experience treating gender dysphoria. Tr. Vol. III 143:23–144:8 (testimony of Dr. Richeson). Dr. Gaw provides ongoing mental health services only to individuals incarcerated at Osborn. Tr. Vol. III 71:22–23, 103:18–104:2 (testimony of Dr. Gaw).

## IV.   CONCLUSIONS OF LAW

The issue of whether, and if so, what injunctive relief would be appropriate requires an analysis of several legal issues: the Eighth Amendment's deliberate indifference standard, sovereign immunity under the Eleventh Amendment, the legal standard for issuing an injunction,

as well as the need-narrowness-intrusiveness inquiry required by the Prison Litigation Reform Act ("PLRA").

The Court will address each of these in turn.

### A.  The Eight Amendment's Deliberate Indifference Standard

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "The Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation marks omitted). In light of these goals, the scope of the Eighth Amendment "is not static"—rather, the Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958). When assessing a potential violation of the Amendment, courts should consider "objective evidence of contemporary values before determining whether a particular punishment comports with the fundamental human dignity that the Amendment protects." *Ford v. Wainwright*, 477 U.S. 399, 406 (1986).

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion)).

In order to prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must satisfy both an objective and a subjective requirement. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154 (1995).

Under the objective requirement, the alleged deprivation must be "sufficiently serious," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), generally signifying a "condition of urgency . . . [which] may produce death, degeneration or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *abrogated on other grounds by Tripathy v. McKoy*, 103 F.4th (2d Cir. 2024). First, the court must determine whether the plaintiff was "actually deprived of adequate medical care." *Id.* Second, the court should determine "whether the inadequacy in medical care is sufficiently serious." *Id.*

Under the subjective requirement, "[a]n official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety[.]'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837 (1994)). In order to establish Eighth Amendment liability, a prisoner must demonstrate "more than an inadvertent failure to provide adequate medical care [.]" *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (internal quotation marks omitted). The required state of mind is roughly "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002) (per curiam).

Importantly, "[a] plaintiff cannot establish a claim of deliberate indifference on a theory that the defendant failed to take some available alternative or additional diagnostic techniques or forms of treatment when the defendant's decision is based on sound medical judgment." Order on MSJs at 43 (citing *Estelle*, 403 U.S. at 107). "[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

"Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith*, 316 F.3d at 184. In other words, "deliberate indifference entails something more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1970).

In September 2023, Judge Bryant found that Dr. Valletta, LCSW Bush, and APRN Kimble-Goodman, all DOC healthcare providers, had been deliberately indifferent to Ms. Clark's serious medical needs. *Id.* at 57, 59. As to the objective prong, Judge Bryant found that Ms. Clark "was denied adequate care" because: (1) it took years and this litigation for DOC to refer Ms. Clark to see any provider with experience and expertise in treating gender dysphoria; (2) it took over ten months from her self-castration attempt to provide any referral to a mental health provider, and even then, the provider had no experience in treating patients with gender dysphoria; (3) DOC failed to follow the medical protocol to properly manage Ms. Clark's hormone therapy; (4) when Ms. Clark was finally able to see a provider with experience treating gender dysphoria, DOC did not provide the recommended treatment. *Id.* at 45–46. As to the subjective prong, Judge Bryant found that the DOC providers were aware of Ms. Clark's suffering but failed to refer her to someone capable of providing adequate care, even though it was obvious to them that such a failure would cause additional harm. *Id.* at 58.

Altogether, Judge Bryant found that:

> Ms. Clark's gender dysphoria was the cause of her severe mental anguish which led to her partial self-castration . . . . Ms. Clark begged [the Defendants] for help, but [they] did nothing more than listen and document her suffering. This is not adequate care . . . . they knew of the extent of Ms. Clark's care, they knew the treatment she was receiving was ineffective, and they declined to do anything more to attempt to improve her situation.

*Id.*

## B. The Eleventh Amendment Sovereign Immunity Issue

Under the Eleventh Amendment, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., amend. XI. "The Eleventh Amendment bars suits in federal courts against states and state officials acting in their official capacities by their own citizens, citizens of another state, and foreign sovereigns[,]" absent their consent or an express statutory waiver of immunity. *Doe v. Annucci*, No. 14 Civ. 2953 (PAE), 2015 WL 4393012, at *15 (S.D.N.Y. July 15, 2015) (citations omitted); *Brown v. New York*, 975 F. Supp. 2d 209, 221 (N.D.N.Y. 2013) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 92–100 (1984)).

"Under the well-known exception to this rule first set forth in *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007); *see also CSX Transp. v. N.Y. State Office of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002) (describing the *Ex parte Young* doctrine as "a limited exception to the general principle of sovereign immunity [that] allows a suit for injunctive relief challenging the constitutionality of a state official's actions in enforcing state law under the theory that such a suit is not one against the State, and therefore not barred by the Eleventh Amendment" (internal citations and quotation marks omitted)). "Prospective relief . . . bars a state actor from engaging in certain unconstitutional acts or abates ongoing constitutional violations[.]" *Brown*, 975 F. Supp. 2d at 222–23.

In order to determine whether the doctrine of *Ex parte Young* is applicable to a given case, a court should conduct "a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 636 (2002) (internal quotation marks omitted).

Importantly, "personal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983." *Glass v. Coughlin*, No. 91 Civ. 0193 (PKL), 1991 WL 102619, at *2 (S.D.N.Y. May 29, 1991). "Actions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Marshall v. Switzer*, 900 F. Supp. 604, 615 (N.D.N.Y. 1995); *see also Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996) (finding that plaintiff's Eighth Amendment claim for prospective injunctive relief against the superintendent of the correctional facility, in his official capacity, was proper because he had "overall responsibility to ensure that prisoners' basic needs were met").

Ms. Clark argues that injunctive relief is warranted where there is a cognizable risk of recurrence of a constitutional violation. Pl.'s Proposed Conclusions of Law ¶¶ 35–40, ECF No. 241 (June 21, 2024). Because, in her view, DOC has a history of advancing her care only at points corresponding to key moments in this litigation, it cannot be counted upon to consistently provide her with adequate healthcare for her gender dysphoria in the absence of an injunction. *Id.* ¶¶ 41–45. Ms. Clark emphasizes that, without an injunction, there would be no legal barriers or other safeguards to prevent DOC from ceasing its treatment of Ms. Clark. *Id.* ¶¶ 47–48. Finally, Ms. Clark notes that DOC continues to argue, in briefing before the bench trial, as well as on

appeal, that its failure to treat her gender dysphoria was lawful, notwithstanding Judge Bryant's

ruling. *Id.* ¶¶ 49–50; Tr. of Bench Trial Vol. IV 24:6–12 (closing argument) ("Tr. Vol. IV").

      Commissioner Quiros argues that Ms. Clark has failed to demonstrate an ongoing of the

Eighth Amendment, and therefore cannot sustain this suit under the Eleventh Amendment. Def.'s

Proposed Conclusions of Law ¶¶ 4–7. In his view, this Court lacks the authority to issue an

injunction because Ms. Clark is presently receiving adequate care for gender dysphoria,

including hormone therapy, electrolysis, surgical consultation, and ongoing mental healthcare.

Tr. Vol. IV 61:2–17 (closing argument). To the extent that Ms. Clark is dissatisfied with any of

her recent care, the Commissioner argues that disagreements over treatment are not sufficient to

establish deliberate indifference. *Id.* at 58.

      The Court disagrees.

      DOC has made progress toward providing Ms. Clark with adequate healthcare, especially

over the past several months. Indeed, Ms. Clark herself does not dispute this. Tr. Vol. IV 23:14–

25:5 (closing argument) (acknowledging the treatment that DOC has provided to Ms. Clark,

including during the course of the bench trial, but urging the Court that such efforts "cannot be

viewed in a vacuum"). Since September 2022, Ms. Clark has been receiving appropriate

hormone therapy. Tr. Vol. I 116:14–25 (testimony of Ms. Clark) (Q: And you have been seeing

Ms. Tierney for about two years, right? A: Yes. Q: And you are happy with the care you are

getting from her, right? A. Yes.); Tr. Vol. II 247:12–14 (testimony of Ms. Tierney) ("I think as

soon as I switched her injections her testosterone level was appropriately suppressed but it was

not when I first met her."). And, she has begun electrolysis in anticipation of a vaginoplasty, Tr.

Vol. III 51:12–13 (testimony of Ms. Reich) ("Ms. Clark went to an electrolysis appointment on

this past Saturday."), and met with Dr. Sterling to discuss potential surgical options, Def. Ex. A

at 699–06. The necessary presurgical evaluations have been arranged and are either in progress

or completed. *Id.* at 675 (Dr. Williams's preoperative medical letter); *id.* at 738–44 (treatment

notes of Dr. Gaw, whose presurgical evaluation is ongoing).

Yet, despite this recent progress, the Court must also consider the long history of this

case and the many years during which Ms. Clark received minimal to no care for her gender

dysphoria in DOC custody. DOC's own provider diagnosed Ms. Clark with gender dysphoria in

May 2016, but despite her repeated requests for treatment, she did not receive any form of

gender-affirming care until September 2017, when she began hormone therapy. Order on MSJs

at 5, 14. Even then, Ms. Clark only had access to an inadequate starter dose of hormones, a

prescription negligently managed for two years, during which her testosterone levels were

inadequately suppressed and she experienced significant side effects. Order on MSJs at 21; Pl.

Ex. 24 at 80; Tr. Vol. II 78:25–79:18 (testimony of Dr. Brown); Tr. Vol. I 229:18–230:9

(testimony of Ms. Tierney).

Between December 2022 and December 2023, Ms. Clark saw a gender-affirming

therapist six times, but she has otherwise never had access to ongoing mental health services

with a provider who has any experience treating patients with gender dysphoria. Tr. Vol. I

183:3–184:12 (testimony of Mr. Romano).

And, despite her attempt at auto-castration in 2016 and her repeated requests for genital

gender-affirming surgery, DOC did not even explore any options for procuring gender-affirming

surgery for Ms. Clark until early 2022, more than five years later. Order on MSJs at 24–25. DOC

repeatedly emphasizes the fact that vaginoplasties were not available in Connecticut for much of

the relevant time period, and that other states' Departments of Correction were not willing to

receive Ms. Clark for the purpose of receiving surgery. But DOC has not explained why it failed

to explore surgical options for Ms. Clark until 2022. And, on this record, there was much that DOC could have done in the interim to advance Ms. Clark's care.

First, DOC could have referred Ms. Clark for a surgical consultation to review her treatment options. Even if vaginoplasties were not available in Connecticut at the time, a consultation would have allowed her to explore alternative surgical or medical interventions to alleviate her condition in the interim. *See* Tr. Vol. II 71:2–6 (testimony of Dr. Brown) (explaining that for individuals with gender dysphoria that is not resolved by mental health treatment, social transition, and hormone therapy, the opportunity to consult with someone about gender-affirming surgeries is "essential"). At her recent consultation with Dr. Sterling, Ms. Clark expressed interest in an up-front bilateral orchiectomy, as an initial step toward a full vaginoplasty. *See* Def. Ex. A at 703–05; Tr. Vol. II 17:21–25 (testimony of Dr. Sterling). As there have been surgeons in Connecticut performing orchiectomies for more than twenty years, such options could certainly have been explored earlier. Tr. Vol. I 255:25–256:8 (testimony of Ms. Tierney).[23]

Second, DOC could have arranged for Ms. Clark to begin hair removal, a necessary prerequisite to a vaginoplasty. *See* Def. Ex. C at 3 (a January 13, 2022 treatment note from Mr. Romano explaining that Ms. Clark would need to undergo laser hair removal or electrolysis before a vaginoplasty). The record reflects that Dr. Burns contacted six hair removal providers by July 2022, *see* Def. Ex. A at 38, but it is unclear what other efforts DOC had undertaken before December 2023 to arrange such services for Ms. Clark.

---

[23] Defendant argued repeatedly at trial that Ms. Clark never expressed interest in an orchiectomy until her most recent meeting with Dr. Sterling. But this argument misses the forest for the trees. While Ms. Clark may not have requested the surgery by name, she essentially tried to perform an orchiectomy on herself in 2016 through her self-castration attempt; expressed interest in "removal of the gonads" to a DOC medical provider in October 2020, *see* Pl. Ex. 24 at 108; and submitted Inmate Request Forms requesting surgical castration, *see, e.g.*, Pl. Ex. 25 at 18 ("I would like surgical castration performed."). Altogether, Ms. Clark's interest in an orchiectomy would have been plain to anybody with experience treating individuals with gender dysphoria.

Indeed, many of the recent efforts of DOC have yet to bear fruit in Ms. Clark's case. Although Ms. Clark has met with Dr. Sterling once, she does not yet have a follow-up scheduled, let alone a surgical procedure. Dr. Gaw's presurgical evaluation remains ongoing. Ms. Clark has attended only one electrolysis session. Dr. Saunders of Hartford HealthCare has not yet started to work on Ms. Clark's case. And, although Ms. Clark recently started seeing a mental health provider with whom she feels comfortable, Tr. Vol. I 98:8–100:6 (testimony of Ms. Clark), she has still yet to be provided with ongoing mental health treatment from a provider with experience treating gender dysphoria.[24]

Commissioner Quiros urges the Court to apply *Rasho v. Jeffreys*, a Seventh Circuit decision which reversed the district court's grant of a permanent injunction and found that the court had failed to adequately consider the efforts of the Illinois Department of Corrections ("IDOC") to cure the deficiencies identified by the plaintiffs. 22 F.4th 703, 706 (7th Cir. 2022). That case, however, bears little, if any, resemblance to this one.

There, a class of mentally ill inmates in IDOC custody sued IDOC officials for failing to provide constitutionally adequate mental health care. *Id.* The plaintiffs entered into a settlement agreement with IDOC, which required IDOC to meet certain benchmarks. *Id.* at 707. A year later, arguing that IDOC had failed to substantially comply with the settlement agreement, plaintiffs again sued IDOC. *Id.* The district court found that IDOC had been deliberately indifferent and entered a permanent injunction with specific staffing and other requirements for the delivery of mental health services. *Id.* at 707–08. The Seventh Circuit reversed, finding that "IDOC officials took reasonable steps to cure the deficiencies identified by plaintiffs" and that,

---

[24] To the extent that Defendant characterizes this omission as a mere failure to provide Ms. Clark with a treating mental health provider "with the qualifications she would prefer in her mind" or "a classic disagreement between two doctors[,]" *see* Tr. Vol. IV 56:13–58:9 (closing argument), the Court is not persuaded.

"[e]ven if those steps were not fully successful, their reasonable effort to address a known risk of harm" "cannot be squared with the judge's finding of deliberate indifference." *Id*. at 706.

Most importantly, though, the terms of the settlement in *Rasho* specified that, in order to bring a new case, the plaintiffs had to prove that the defendant's breach of the settlement agreement caused an Eighth Amendment violation. *Id.* ("Under the terms of the agreement, they needed to prove that the defendants' breach itself caused an Eighth Amendment violation."). None of those circumstances are present here, where the parties have not entered into any agreement to resolve this case. Nor is Ms. Clark required to prove a new violation of the Eighth Amendment in order to prevail here. Rather, this Court must determine whether there remains an ongoing Eighth Amendment violation that would render prospective injunctive relief appropriate. *See Verizon Md.*, 535 U.S. at 636 (in order to determine whether the *Ex parte Young* doctrine applies, courts should make "a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective").

Indeed, in *Vega v. Semple*, 963 F.3d 259 (2d Cir. 2020), current and former inmates and pretrial detainees of DOC brought a putative class action alleging that, while in custody, they were exposed involuntarily to unsafe levels of radon gas, a carcinogen, and that current and former DOC officials were deliberately indifferent to their safety in constructing the facility, failing to test for radon exposure, and failing to notify inmates when limited radon testing and remediation was finally conducted. *Id.* at 266.

In that lawsuit, like here, DOC argued that the court could not grant prospective relief because there was no ongoing violation of federal law, due to the recently enshrined DOC administrative directive requiring radon testing and mitigation in correctional facilities

throughout Connecticut. *Id.* at 283. The district court held, and the Second Circuit agreed, that "given 'the long history of alleged cover-up and failure to remediate radon,' Plaintiffs' allegations of an ongoing violation of federal law were not speculative.'" *Id.* And, despite the new Administrative Directive, "the result or impact of this directive remain[ed]" to be seen. *Id.* As a result, injunctive relief remained available to Plaintiffs, providing that, on a fully developed record, they could prove their entitlement to such relief. *Id.*

On the record presented at trial and discussed above, Commissioner Quiros has not cured the Eighth Amendment violation found by Judge Bryant. Although DOC has undertaken steps to address Ms. Clark's medical needs, as the parties agree, the medical issues surrounding Ms. Clark's gender dysphoria have not yet been resolved. Tr. Vol. IV 67:3–7 (Court: "I think there is also a consensus, based on the record, that the medical issues concerning Ms. Clark's gender dysphoria have not been resolved yet, correct?" Mr. Belforti: "[Y]es, I would say that."). And, as Defendant conceded during closing arguments, Ms. Clark's condition is "an ongoing, chronic condition" that must be distinguished from more concrete medical issues, like a knee injury, that can be resolved with a single medical intervention. *Id.* 68:11–16 ("I don't think the argument here is that Ms. Clark's [] gender dysphoria will ever be fully resolved It's not like – I think of a case [in which] someone has a knee surgery . . . and it is done with.").

Moreover, given the historic delays in providing treatment for Ms. Clark's gender dysphoria, as well as the fact that the most significant activity regarding this treatment has only occurred in the wake of a finding of a deliberate indifference, injunctive relief is necessary to ensure proper treatment of Ms. Clark's gender dysphoria, as further discussed below. *See Brown*, 975 F. Supp. 2d at 222–23 ("Prospective relief . . . abates ongoing constitutional violations[.]"). On this record, therefore, there is not a sufficient basis to conclude that Ms. Clark's gender

dysphoria will be treated effectively without court intervention. *Cf. City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) ("a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior"); *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 604 (2d Cir. 2016) (the "suspicious timing and circumstances" of the County's reforms, as well as the Court's doubts "that the County ha[d] committed to this course permanently" weighed in favor of court intervention); *Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 248 (S.D.N.Y. 2020) (holding that plaintiffs' claims for prospective, injunctive relief were not mooted out by a newly-announced city policy because "such timing suggests a litigation-driven motivation, as opposed to an authentic, durable commitment on the part of the defendant to mend its ways").

Accordingly, Ms. Clark has proved an ongoing violation of her Eighth Amendment rights and she properly seeks prospective injunctive relief under *Ex parte Young*, relief not barred by the Eleventh Amendment.

### C.  The Injunctive Relief Standard

The standard for a permanent injunction is similar to the standard for a preliminary injunction, except that the moving party must show actual success on the merits, rather than a likelihood of success. *Marriott v. County of Montgomery*, 426 F. Supp. 2d 1, 11 (N.D.N.Y. 2006) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987)). A prevailing party must additionally satisfy the following four-factor test before a court may grant a permanent injunction:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *Id.*

As described above, Ms. Clark has demonstrated actual success on the merits of her Eighth Amendment claim. The Court therefore proceeds to address the four *eBay* factors.

Ms. Clark has satisfied the first prong because she has established an ongoing violation of her constitutional rights, a *per se* irreparable injury. *See, e.g.*, *Ferreyra v. Decker*, 456 F. Supp. 3d 538, 549 (S.D.N.Y. 2020) ("In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm."); *Connecticut Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("the alleged violation of a constitutional right triggers a finding of irreparable injury"); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Constitutional violations generally satisfy the irreparable harm prong of the test. Where plaintiffs allege deprivation of a constitutional right, therefore, no separate showing of irreparable harm is necessary."). Ms. Clark has also satisfied this prong because she has proven that, in the absence of adequate medical care, she "face[s] imminent risk to [her] health, safety, and [life]." *Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) (quoting *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)).

The second prong—the inadequacy of other remedies available at law, such as monetary damages, to compensate for the injury—also weighs in favor of an injunction here. Damages are generally insufficient to address an ongoing constitutional violation, and Ms. Clark's irreparable injury will be remedied only by ongoing access to gender-affirming healthcare. *See, e.g.*, *Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) (drawing a distinction between past

constitutional violations, which can be remedied by money damages, and ongoing constitutional violations, which require injunctive relief).

The third prong, the balance of hardships between the plaintiff and defendant, also weighs in Ms. Clark's favor. Defendant has not identified any significant hardship that DOC would face if an injunction were entered. To the extent that cost is a concern, when balancing the potential for serious constitutional harm against financial or administrative concerns, the balance of equities "tips decidedly in plaintiffs' favor." *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984) ("Faced with such a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little difficulty concluding that the district judge did not err in finding that the balance of hardships tips decidedly in plaintiffs' favor.").

Finally, as to the fourth prong, the Court finds that the public interest will be served by an injunction because an injunction will ensure that Ms. Clark's constitutional rights are upheld. *See Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 448 (D. Conn. 2020) ("the public interest is best served by ensuring the constitutional rights of persons within the United States are upheld" (quoting *Coronel*, 449 F. Supp. 3d at 287)); *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) ("The public interest is best served by ensuring the constitutional rights of persons within the United States are upheld."). This factor additionally weighs in Ms. Clark's favor because, based on this record, Commissioner Quiros has not identified any way in which the provision of gender-affirming care would harm the public interest.

Accordingly, altogether, the four *eBay* factors weigh in favor of an injunction.

### D.  The Prison Litigation Reform Act

The Prison Litigation Reform Act further limits the scope of permissible prospective relief in a prison conditions case. The Act states that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). Courts may grant only that relief which is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* When weighing the appropriateness of injunctive relief in the prison context, courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

Courts refer to these requirements under the PLRA as the "need-narrowness-intrusiveness findings," a prerequisite to prospective injunctive relief in the prison context. *Benjamin v. Fraser*, 343 F.3d 35, 52 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009) ("under the PLRA prospective relief may continue only if the court makes need-narrowness-intrusiveness findings").

Moreover, courts must exercise great caution when intervening in the management of prisons. *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) ("In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." (citing *Farmer v. Brennan*, 511 U.S. 825, 846–47 (1994))). "If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief." *Farmer*, 511 U.S. at 846. "Of course, a district court should approach issuance of injunctive orders with the usual caution, . . . and may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction." *Id.* at 846–47. "[F]ederal judicial intervention

in the details of prison management is justifiable only where state officials have been afforded the opportunity to correct constitutional infirmities and have abdicated their responsibility to do so." *Fisher*, 981 F. Supp. at 177 (citing *Taylor*, 34 F.3d at 269).

At the same time, "[a]lthough the PLRA's requirement that relief be 'narrowly drawn' and 'necessary' to correct the violation might at first glance seem to equate permissible remedies with [legal] minimums, a remedy may require more than the bare minimum [federal law] would permit and yet still be necessary and narrowly drawn to correct the violation." *Handberry v. Thompson*, 446 F.3d 335, 346 (2d Cir. 2006) (quoting *Benjamin*, 343 F.3d at 54). "What is important, and what the PLRA requires, is a finding that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures." *Benjamin*, 343 F.3d at 54.

As described above, although DOC has made progress in providing gender-affirming medical treatment to Ms. Clark in recent months, such efforts have not yet cured the ongoing Eighth Amendment violation. And, the Court has determined that an injunction is necessary to ensure that Ms. Clark receives appropriate medical care for her gender dysphoria and does not suffer additional irreparable harm.

In fashioning an injunction, the Court is informed by the appropriate course of treatment identified, and largely agreed upon, by the parties. As described above, the parties do not dispute the proper course of action regarding Ms. Clark's healthcare moving forward, *see* Tr. Vol. IV 65:23–66:8 (noting the "consensus on both sides" regarding both the medical pathway for treating gender dysphoria and the fact that Ms. Clark's medical issues are as-of-yet unresolved), and much of the medical care Ms. Clark seeks is already underway.

Accordingly, an injunction to ensure that appropriate health care for Ms. Clark's gender dysphoria continues without unnecessary delays is narrowly drawn and is the least intrusive means necessary to correct the violation. *See* 18 U.S.C. § 3626. Such an approach appropriately defers to the expertise and discretion of prison officials, *see Fisher*, 981 F. Supp. at 167 ("In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons."), while also fulfilling the responsibility of the Court to ensure that Ms. Clark's constitutional rights are upheld.

Defendants have not suggested, nor is there any evidence in the record to indicate, that granting Ms. Clark this injunctive relief will have "any adverse impact on public safety or the operation of the criminal justice system." *Id.* § 3626(a)(2).

## V.    CONCLUSION

As a result of all of the foregoing, the Court the Court **FINDS** an ongoing violation of Ms. Clark's Eighth Amendment rights, and **ORDERS** the following relief:

1.    By **October 1, 2024,** the Commissioner shall file a status report, updating the Court on the efforts made since this Memorandum of Decision and Order to address Ms. Clark's continuing gender dysphoria. Such report shall include the following: (a) whether the presurgical assessment to be conducted by Dr. Heather Gaw has been completed; (b) whether Ms. Clark has had the opportunity to consult further with Dr. Joshua Sterling about appropriate gender-affirming genital surgery, and the extent to which further decisions have been made as to her surgical options, including any proposed schedule with respect to any such surgery; (c) whether, and to what extent, Ms. Clark continues to receive gender-affirming hormone therapy managed by Nurse Practitioner Kathryn Tierney at Middlesex Health; (4) whether, and to what extent, the DOC has provided Ms.

Clark with regular mental healthcare with an appropriate provider; (5) whether, and to what extent, the process for hair removal has continued; and (6) copies of the progress reports sent to counsel for Ms. Clark, as further described below.

2. Before the submission of the **October 1, 2024** status report, counsel for Commissioner Quiros must keep counsel for Ms. Clark updated on its ongoing progress on **August 16, 2024**, **August 30, 2024**, and **September 13, 2024**. These progress reports shall not be filed with the Court until the filing of the Commissioner's **October 1, 2024** status report.

3. Following the submission of the Commissioner's **October 1, 2024** status report, Ms. Clark will have until **October 15, 2024** to respond to it. Any such response shall include whether any or all of the relief reported on in the Commissioner's **October 1, 2024** status report has sufficiently addressed the outstanding issues regarding Ms. Clark's gender dysphoria, and if not, what additional measures, if any, are required.

4. Following the filing of the Commissioner's **October 1, 2024** status report, and Ms. Clark's **October 15, 2024** response, the Court will determine what, if any, further injunctive relief is necessary.

**SO ORDERED** at New Haven, Connecticut, this 26th day of July, 2024.

                           /s/ Victor A. Bolden
                          Victor A. Bolden
                          United States District Judge